**EXHIBIT D**

1                       ARBITRATION

2              AMERICAN ARBITRATION ASSOCIATION

---------------------------------------X

3    THE NEW YORK TIMES COMPANY,

4

5         A        Petitioner,

6

                         v.

7

NEWSPAPER and MAIL DELIVERERS'-PUBLISHERS'

8    PENSION FUND,

9                        Claimant.

---------------------------------------X

10

11

12                       ARBITRATION

13                New York, New York

14              Tuesday, February 10, 2015

15

16

17    REPORTED BY:  BARBARA R. ZELTMAN

18                 Professional Stenographic Reporter

19

20    Job Number:  90057

21

22

23

24

25

1    ARBITRATION
2
3
February 10, 2015
4    10:13 a.m.
5
6    Arbitration proceedings held at American
7    Arbitration Association, 120 Broadway, New York, New
8    York, before BARBARA R. ZELTMAN, a Professional
9    Stenographic Reporter and Notary Public within and
10    for the State of New York.

1    ARBITRATION
2    A P P E A R A N C E S :
3
4    ARBITRATOR:  MARK L. IRVINGS, ESQ.
5        24 Elba Street
6        Brookline, Massachusetts  02446
7
8
9    JONES DAY
10    Attorneys for Petitioner
11        51 Louisiana Avenue, N.W.
12        Washington, D.C.  20001
13        BY:  EVAN MILLER, ESQ.,
            MIGUEL EATON, ESQ., and
14        YAAKOV ROTH, ESQ.
15
16
17    SCHULTE ROTH & ZABEL
18    Attorneys for the Claimant
19        919 Third Avenue
20        New York, New York  10022
21        BY:  RONALD RICHMAN, ESQ.,
            MAX GARFIELD, ESQ., and
22        ADAM GARTNER, ESQ.
23
24
25

1        ARBITRATION
2        ARBITRATOR IRVINGS:  Good
3    morning.  Okay.  We have -- parties
4    have agreed on 145 Joint exhibits.
5        MR. ROTH:  Some of the tabs are
6    empty.  It's for putting in some of
7    the ones that are necessary.
8        MR. MILLER:  If objected to
9    exhibits that are admitted.
10        ARBITRATOR IRVINGS:  Okay.
11    Parties have so far agreed to --
12        MR. MILLER:  I believe 115.
13        ARBITRATOR IRVINGS:  -- 115
14    exhibits, and I presume you'll be
15    provided with an index.
16        THE REPORTER:  Thank you.
17        ARBITRATOR IRVINGS:  Those will
18    be simply referred to by exhibit
19    numbers.  And if other documents are
20    admitted, they will be added at the
21    end of the list.
22        Okay.  So I have received and read
23    the parties' prehearing briefs, so with
24    that in mind, we've agreed that you can
25    have up to 15 minutes for opening

1        ARBITRATION
2    statements.  Do not feel compelled to use
3    all the time.
4        MR. MILLER:  Thank you.
5    OPENING STATEMENT BY MR. MILLER:
6        Thank you, Mr. Arbitrator.  Evan
7    Miller of Jones Day for The New York
8    Times.
9        I will begin by addressing the
10    overarching issue in this case, whether
11    CBUs are wages or shifts.
12        Both parties have set forth in
13    their briefs their respective readings of
14    the operative contract language, but the
15    fact is that the language in the abstract
16    does not resolve the issue.  So I'll
17    address first how the parties have
18    actually implemented the contract in
19    practice over the three-plus decades that
20    it's been in force.
21        You will hear testimony this
22    morning from Morris Claffee, payroll
23    manager of The New York Times.
24        And he will testify that The Times
25    does not keep track of shift information

Page 6

ARBITRATION

1
2  in connection with Pension Fund
3  contributions and that it neither
4  calculates nor reports shifts in
5  connection with its Pension Fund
6  contributions.
7       And that practice has been
8  consistent as far back as anyone can
9  recall.
10       Mr. Claffee will testify that the
11  payroll process at The Times was and is
12  to aggregate various categories of wages
13  paid to NMDU union members multiplied by
14  8 percent and pay the resulting amount to
15  the Pension Fund.
16       In light of this practice,
17  The Times in fact routinely makes
18  contributions to the Pension Fund
19  relating not just to wages paid for
20  actual shifts worked but also to payments
21  to employees out on Workers' Comp. and
22  for bereavement pay, holiday pay,
23  vacation pay, none of which involves
24  shifts being worked.
25       In all these events, The Times

Page 7

ARBITRATION

1
2  aggregates wages paid and makes pension
3  contributions on a percentage of that.
4       Mr. Claffee will also provide
5  detailed testimony on how The Times makes
6  contributions to the Welfare Fund.
7       And this is important,
8  Mr. Arbitrator, because as you know the
9  Fund's brief indicates that The Times'
10  practices in connection with Welfare Fund
11  contributions supports its position that
12  CBUs equal shifts.
13       Mr. Claffee will testify that in
14  connection with the Welfare Fund,
15  The Times similarly makes contributions
16  primarily based on a percentage of wages
17  but also makes supplemental contributions
18  based on shifts.
19       And more specifically the 1981
20  collective bargaining agreement, the same
21  collective bargaining agreement that
22  created the language at issue here,
23  contains a provision for Welfare Fund
24  contributions very similar to the pension
25  provision.

Page 8

ARBITRATION

1
2       And Mr. Claffee will testify that
3  The Times treats this Welfare Fund
4  contribution provision just like the
5  Pension Fund provision.  It aggregates
6  eligible wages paid, multiplies by a
7  contribution rate and contributes the
8  resulting amount to the Welfare Fund.
9       But over time, The Times and the
10  Union have also agreed to supplemental
11  contributions to the Welfare Fund.  In
12  the late '80s, they agreed to a 47-cent
13  per shift contribution in lieu of a COLA
14  payment to members.
15       And in another memorandum of
16  agreement, The Times and Union agreed
17  that employees must make pretax
18  contributions to the Welfare Fund based
19  on a $3.67 amount per shift.
20       So when the bargaining parties
21  wanted to make clear that contributions
22  are to be made on a dollar per shift
23  basis, they knew how to say it.
24       They said it in connection with the
25  supplemental contributions to the Welfare

Page 9

ARBITRATION

1
2  Fund.  And Mr. Claffee will testify that
3  for these shift-based contributions,
4  The Times indeed reports shifts to the
5  Welfare Fund in contrast to its reporting
6  practice for pension.
7       And these practices we believe are
8  important for at least two reasons:
9  First, the Pension Fund has accepted
10  The Times' contribution and reporting
11  practice for years.  Pension Fund and
12  Welfare Fund apparently share the same
13  personnel, and it appears that such
14  personnel took it upon themselves to take
15  the shift information that The Times
16  provided under the Welfare Fund and
17  transfer that data to the Pension Fund
18  side of the ledger.
19       Second, this is important because
20  it debunks one of the Fund's key
21  arguments as to why CBUs equals shifts.
22       You will hear testimony that
23  The Times and the Union also entered into
24  a memorandum of agreement providing that
25  the Union could on occasion direct a

3 (Pages 6 to 9)

Page 10

ARBITRATION

1
2  portion of Pension Fund contributions to
3  the Welfare Fund, and the Pension Fund
4  argues that this diversion -- they called
5  it reapportionment in the brief -- shows
6  that CBUs equals shifts.
7       In fact, it demonstrates the
8  opposite.
9       Indeed, the Union has over time
10  directed that instead of the 8 percent
11  contribution to the Pension Fund, only
12  6 percent or 6.5 percent would be
13  contributed to pensions and the
14  additional 2 percent or 1.5 percent of
15  wages be paid to the Welfare Fund.
16       What The Times did on those
17  occasions was add that additional
18  nonshift-based percentage of wages amount
19  to its nonshift-based Welfare Fund
20  contribution.
21       And thus the diversion protocol
22  between The Times and the Union was
23  consistent with The Times making
24  contributions to both funds on the basis
25  of percentage of wages, not shifts.

Page 11

ARBITRATION

1
2       The Fund also contends that the
3  result of a 2010 payroll audit of the
4  Times affiliate C & S supports its
5  position.
6       But as you'll see during the course
7  of the hearing, the manner in which the
8  Fund's outside auditor characterized
9  pension contributions is at best for the
10  Fund inconsistent.  And more importantly
11  when the auditor explained in his final
12  audit report how he had recalculated the
13  contributions, he said that he multiplied
14  qualifying earnings by the applicable
15  percentage thus directly confirming
16  The Times' own approach.
17       And as for the Pension Fund's own
18  practices, the evidence will show that
19  they can be reasonably and objectively
20  described as inconsistent.
21       As I mentioned, the Pension Fund
22  has historically consented to The Times
23  practice of not reporting shifts or
24  contributing on behalf of shifts.
25       And in certain correspondence with

Page 12

ARBITRATION

1
2  The Times and other employers, the Fund
3  has characterized the contribution
4  obligation as a percent of wages.
5       Moreover, and quite importantly,
6  the Fund's own actuary has certified each
7  year for which we can find records that
8  the contribution rate is consistent with
9  our theory a percent of wages.
10       To be sure, Mr. Arbitrator, after
11  The Times was assessed liability and
12  after it initiated this arbitration, the
13  actuary changed her verbiage.
14       But obviously a reasonable person
15  would construe the phrase which was
16  previously used "8 percent of wages" as
17  stating a contribution formula based on
18  just that, a percent of wages and not
19  shifts.
20       The only practice of the Fund in
21  which it has counted shifts as CBUs is
22  prior withdrawal liability assessments.
23  But most of those are roughly 20 years
24  old.  We do not know what all the
25  relevant collective bargaining agreements

Page 13

ARBITRATION

1
2  said, nor how those affected companies
3  reported their contributions.
4       And The Times did not know of the
5  construction of CBUs contained in those
6  distant withdraw liability assessments,
7  and indeed where the Pension Fund has
8  been consistent, Mr. Arbitrator, is in
9  conveying to The Times that CBUs were
10  wages.
11       In that regard and thus in any
12  event, the Fund should be estopped from
13  applying CBUs as shifts retroactively.
14       You will hear testimony from Terry
15  Hayes, Times senior VP for Labor
16  Relations, that The Times has been
17  sensitive to its withdrawal liability
18  prospects in connection with this Fund
19  and could have taken steps to prevent a
20  partial withdraw had the Fund clearly
21  made known its view CBUs equals shifts.
22       But the Pension Fund has, even if
23  not intentionally, misled The Times about
24  what constitutes CBUs.
25       First in 2009 and 2010, The Times

4  (Pages 10 to 13)

Page 14

ARBITRATION

1
2  sought estimates of its withdrawal
3  liability and specifically requested CBU
4  information.
5      ERISA expressly requires that such
6  request be responded to within six months
7  of receipt but both the 2009 and the 2010
8  requests went unanswered in clear
9  violation of ERISA.
10     When the Fund finally responded to
11 a third request in mid 2012, the Fund
12 based CBUs not on shifts but on wages
13 earned.
14     And the Fund repeated this course
15 of action in connection with a fourth New
16 York Times request for an estimate.
17     On July 18, 2013, less than 60 days
18 before it made the assessment in this
19 case, the Fund sent The Times an estimate
20 of withdrawal liability in which CBUs
21 were again based on wages, not shifts.
22     So these estimates, when they were
23 provided, are part of what we believe is
24 a consistent pattern of conduct by the
25 Fund indicating to The Times that CBUs

Page 15

ARBITRATION

1
2  are wages.
3      The Times, as you will hear, was
4  paying close attention to the issue of
5  CBU levels, and had The Times known of
6  the Fund's position it could have and
7  would have undertaken bona fide business
8  practices and conduct to address that
9  contention.
10     Now let me turn to the next issue,
11 second issue, application of the Segal
12 blend.
13     By employing the Segal blend
14 method, the plan used a discount rate to
15 value Pension Fund liabilities that was
16 lower than the actuaries best estimate of
17 7.5 percent for the plan's anticipated
18 future investment returns.
19     And it's that 7.5 percent best
20 estimate that the actuary used for
21 funding purposes.
22     The Times' position on this issue
23 was simple.  Although ERISA might not
24 expressly contain a provision requiring a
25 plan to use the same investment return

Page 16

ARBITRATION

1
2  assumption for valuing liabilities for
3  withdrawal liability as it does for
4  funding, the relevant structure of the
5  statutory scheme does indeed legally
6  require it.
7      And the Supreme Court in
8  the Concrete Pipe case so held.
9      Moreover, later today you will hear
10 testimony from The Times' actuarial
11 expert Darren French who will testify
12 that under accepted actuarial principles
13 as well.
14     When an actuary certifies that the
15 anticipated future experience of a pool
16 of assets is 7.5 percent, actuarial
17 principles do not allow that actuary to
18 turn around and hypothesize a different,
19 more conservative set of assets in order
20 to derive a lower discount rate to value
21 liabilities for the withdrawing employer.
22     And that was precisely one of the
23 many issues that the Supreme Court
24 addressed in Concrete Pipe.
25     The Court in that case was asked to

Page 17

ARBITRATION

1
2  determine whether the withdrawal
3  liability scheme, which allows the fund
4  in the first instance to calculate
5  unfunded vested benefits and then
6  requires the employer to bear the burden
7  of proof in overturning that calculation,
8  satisfies procedural due process.
9      The Court said that the statute did
10 satisfy due process, but Mr. Arbitrator,
11 a linchpin in that finding was its
12 judgment that actuaries have to use the
13 same assumptions for funding as for
14 withdrawal liability, especially the
15 investment return assumption which, by
16 the way, the Court characterized as,
17 quote, the critical assumption, closed
18 quote, in calculating unfunded vested
19 benefits.
20     The Court recognized that in the
21 absence of such a constraint actuaries
22 might be pressured to act unfairly toward
23 withdrawing employers.  Requiring
24 uniformity in use of the investment

5 (Pages 14 to 17)

ARBITRATION

1
2  return assumption said the Court, quote,
3  limits the opportunity an actuary might
4  otherwise have to act unfairly downward
5  the withdrawing employer, closed quote.
6      In the current low interest rate
7  environment, use of the Segal blend
8  impacts The Times withdrawal calculation
9  by more than 33 percent.  And such a wide
10  impact demonstrates precisely the act of
11  unfairness to the withdrawing employer
12  that the Supreme Court was concerned
13  about.
14      Now, the Fund for its part intends
15  to use as its expert Dr. Ethan Kra.
16      Dr. Kra, by the way, believes that
17  the Segal blend method is an incorrect
18  approach to calculating withdrawal
19  liability in that it does not go far
20  enough.
21      Dr. Kra argues that a so-called
22  risk-free rate, akin to treasury bonds or
23  high-grade corporates, should be used to
24  value the withdrawing employer's share of
25  unfunded vested benefits.

ARBITRATION

1
2      His theory is that because
3  withdrawal liability is static, that is,
4  you know, once determined it never
5  changes --
6      ARBITRATOR IRVINGS:  Two-minute
7  warning.
8      MR. MILLER:  Based on future --
9  because it's static, based on future
10  investment performance or it never
11  changes based on future fund
12  performance, the withdrawing employer
13  is not affected by actual later
14  performance.
15      Kra contends as an economic
16  principle that the value to the
17  withdrawing employer of giving up any
18  future upside performance above a
19  risk-free rate equals the market value of
20  the withdrawing employer being immunized
21  from future downside performance risk,
22  below a risk-free rate.
23      As an economic matter, there's some
24  logic to Kra's approach, but that's
25  simply not how Congress structured this

ARBITRATION

1
2  scheme and it's not how the Concrete Pipe
3  court interpreted it.
4      In that regard and finally on
5  Page 25 of the brief, the Fund contends
6  that the reduction in overall
7  contributions caused by The Times and the
8  newspaper industry shrinkage generally
9  makes valuing withdrawal liability at
10  lower rates, at risk-free type rates
11  proper.
12      It may well be the case that these
13  are causes for concern for this Fund, but
14  if so, the Fund should lower its
15  investment return assumption from
16  7.5 percent and take less risk.
17      That will mean higher contributions
18  from remaining contributors and potential
19  tough slog with the Union to negotiate
20  give-ups to allow those higher
21  contributions.
22      Indeed, it's worth mentioning to
23  you, Mr. Arbitrator, that The Times does
24  remain a contributor to this Fund.  After
25  all, it's just a partial withdrawal.  So

ARBITRATION

1
2  this recommendation therefore also
3  affects The Times' interests.
4      But what the Fund cannot do is on
5  the one hand estimate to the best of its
6  actuary's ability that its assets will
7  return 7.5 percent over time and on the
8  other say that as to the withdrawing
9  employer whose contributions will be
10  invested just like any other contributor,
11  for you we'll pretend that your liability
12  contributions will be invested more
13  conservatively in the context of the
14  ERISA statute.  That's unlawful and
15  threatens due process.
16      Our third issue will, per our
17  agreement, be taken up in briefing.
18      Thank you.
19      ARBITRATOR IRVINGS:  Fine.
20      OPENING STATEMENT BY MR. RICHMAN:
21      I'm going to take to heart,
22  Mr. Arbitrator, what you told the parties
23  on the telephone, that you had read the
24  briefs, that you expected only very short
25  comments with respect to the issues so

Page 22

ARBITRATION

1
2  that's what I'm going to stick to.
3      So what's really interesting about
4  The New York Times' opening is that you
5  didn't hear anything about the language
6  in the collective bargaining agreement,
7  and in fact you didn't hear anything
8  about the language in the collective
9  bargaining agreements.  And the reason
10 for that is pretty simple.
11     The starting point with respect to
12 this analysis is the collective
13 bargaining agreement.  It's not the
14 ending point as I'll address, but it is
15 the starting point.
16     And when you read the language in
17 the collective bargaining agreement,
18 which I'm sure you've read already so I
19 won't repeat it, it makes clear that the
20 contributions are being made per shift
21 for each shift worked.
22     In a collective bargaining
23 agreement between the Union and City and
24 Suburban Delivery Systems, it's C & S
25 that's referred to in the papers, that

Page 23

ARBITRATION

1
2  contains other language which really
3  brings out the point.
4      And what it talks about is the
5  wholesaler, which is C & S, shall
6  contribute to the plan on behalf of such
7  apprentice for each plan year thereafter
8  a full shift contribution at the high
9  scale rate, a full shift contribution.
10 That is not the same language as The New
11 York Times contract, but it does focus on
12 shifts.
13     Now, The New York Times has been
14 making this argument about past practice
15 with respect to the Fund and talking
16 about contribution rate.
17     And we've addressed this in our
18 brief, so I'm not going to go into any
19 detail about this.  But the fact of the
20 matter is that a contribution rate is
21 different than a contribution base unit.
22     And one Court in the Second Circuit
23 has recognized; that's the only Court
24 that I know that has addressed that
25 specific issue.

Page 24

ARBITRATION

1
2      The contribution rate is 8 percent
3  of some number.  The contribution base
4  unit is shifts.
5      Now, the language in The Times
6  collective bargaining agreement also
7  talks about contributions being made when
8  an employee becomes eligible for Workers'
9  Compensation benefits.
10     And you are going to hear testimony
11 from the Fund's auditor, Mitchell Lewis,
12 that the way that worked in practice is
13 because it generally took some time for
14 somebody to qualify for Workers'
15 Compensation that no contributions would
16 be made for that individual, and then
17 when they got Workers' Comp., there would
18 be contributions made for all the shifts
19 missed.
20     And what is also the case, there is
21 even a document from 2001 written by
22 James Baker, the director of Labor
23 Relations of The New York Times,
24 confirming this practice of contributing
25 to the Pension Fund specifically for

Page 25

ARBITRATION

1
2  shifts on behalf of someone entitled to
3  Workers' Compensation.
4      The fact of the matter is that
5  The New York Times has in fact not been
6  providing the Fund with information with
7  respect to shifts.
8      It was easy for the Fund office,
9  for the same office who does the Welfare
10 and the Pension contributions, to be able
11 to take the Welfare reports and use that
12 shift information.
13     The fact of the matter is that, as
14 you will see from the testimony that
15 we're going to offer, that it didn't --
16 the amount contributed can be arrived at
17 two different ways.  And the same result
18 occurs whether you talk about 8 percent
19 of wages up to five shifts or whether you
20 talk about 8 percent of shifts
21 compensation, compensation of shifts --
22 in shifts up to five shifts.
23     Now, what the Fund has done in
24 every single assessment is choose based
25 on not only on the collective bargaining

7  (Pages 22 to 25)

ARBITRATION

1  agreement but its own determination,
2  which it has a right to make, to view
3  contributions being based on shifts. It
4  has had that longstanding practice.
5      And in all of the audit reports
6  that we will show you, which were shared
7  in fact with the trustees including
8  during the time that Mr. Hayes was a
9  trustee as well as his predecessor from
10  The Times, there is language in every
11  audit report that indicates the
12  contribution base unit is shifts.
13      Nobody from The Times ever raised a
14  question about this issue.
15      We will also be offering testimony
16  from John Urbank, who is a Segal
17  consultant, and you will see a practice
18  that every time that Segal was asked to
19  do a withdrawal liability assessment or
20  estimate, there was a request from Segal
21  for contribution base unit, i.e., shift
22  information.
23      In the earlier years, that
24  information was provided over and over

ARBITRATION

1  and over again. And the estimates -- the
2  two estimates for The New York Times,
3  that wasn't provided.
4      And the Segal actuary, without that
5  information, knowing that what she was
6  doing was an estimate, did an estimate
7  and put a note on the bottom of the page
8  on the schedule that I will agree is
9  cryptic. I don't really know what it
10  means, but she is an actuary and -- but
11  it was an estimate.
12      And the fact of the matter is that
13  The Times complains about not getting
14  information from the Fund, but they have
15  trustees, a trustee on the Fund.
16      That trustee went to trustee
17  meetings. That trustee had access to the
18  lawyers. One of the lawyers to the Fund,
19  one of whom was Neal Schelberg who comes
20  from the Proskauer firm. The Proskauer
21  firm also represented The New York Times,
22  sometimes at the same time that Neal
23  Schelberg represented the Fund with both
24  parties representing each other in

ARBITRATION

1  connection with the Fund.
2      It was very simple for Mr. Hayes or
3  anyone else from The Times to reach out
4  to the appropriate parties and get an
5  answer if they really wanted an answer,
6  but apparently they did not.
7      I'm just going to take the rest of
8  the time to talk about the presumption
9  issue because that was addressed in
10  The Times' brief and it was not addressed
11  in ours.
12      What The Times does is cite a
13  series of cases and says, uh-huh, the
14  presumption doesn't apply to collective
15  bargaining agreements.
16      And those cases involved a
17  collection of contributions,
18  contributions, delinquent contributions.
19      Those are not subject to the
20  provision in ERISA 4221 that provides the
21  standard for determining whether to
22  uphold a withdrawal liability
23  determination. And I won't go into depth
24  about the standard, but the standard

ARBITRATION

1  simply is that the presumption is with
2  the Fund, and The Times can only prevail
3  to the extent it shows that the Fund's
4  determination on the contribution base
5  unit issue was unreasonable or clearly
6  erroneous. That's what the statute says.
7      Lastly, I'm going to turn to this
8  issue which first came up in one of our
9  discovery calls, and actually The Times
10  has furthered this in an affidavit that
11  Mr. Hayes has submitted in connection
12  with The Times' brief as well as The New
13  York Times' own brief in this matter.
14      And that is The New York Times
15  admits when they closed C & S, they focus
16  on how much they needed to contribute to
17  the Pension Fund to avoid a partial
18  withdrawal.
19      What they're really complaining
20  about here with respect to the
21  information they say they couldn't get
22  from the Fund is that they're really
23  happy -- unhappy that they focus on total
24  wages as opposed to shifts when they did

Page 30

ARBITRATION

their calculations of whether a partial
withdrawal would occur.

And so if you boil their complaint
down to its essence is they are unhappy
with the Pension Fund because the Pension
Fund they say didn't provide them the
correct information so they could avoid
or evade withdrawal liability.

That, to me, is quite a novel
concept.

The New York Times actually says in
its prehearing brief that had The Times
been aware of the Fund's position, it
could have prevented shifts from falling
below the 70 percent threshold.

I've never seen anyone make an --
avoid or evade admission of that nature
ever. People don't usually say that's
what they're doing.

But that is what The Times has said
is, look, if you'd give me what I think
was the correct information as opposed to
so-called misleading me, I would have
just manipulated my contributions to

Page 31

ARBITRATION

avoid a partial withdrawal.

And we are ready to proceed.

ARBITRATOR IRVINGS: Okay.
Thank you.

MR. MILLER: Mr. Arbitrator,
can we bring in the first witness?

ARBITRATOR IRVINGS: Yes,
please.

MR. MILLER: Mr. Arbitrator, I
do want to raise the issue of
sequestration.

We've assumed sequestration, but we
do have a witness who is going to go on
later on today, Mr. Terry Hayes, who is
also a representative of The Times.

And, Ron, if you don't seriously
object, we would like him to attend just
as you apparently have a representative
here.

MR. RICHMAN: We have a
representative here but not a
representative who is going to testify.

MR. MILLER: I understand.

MR. RICHMAN: And we do object

Page 32

ARBITRATION

because I think there will be overlap
with respect to Mr. Hayes and
Mr. Claffee's testimony.

ARBITRATOR IRVINGS: Okay.

MR. MILLER: We certainly don't
anticipate any overlapping in
connection with two witnesses, but
obviously it's Mr. Richman's cross.

ARBITRATOR IRVINGS: And you do
have a representative of The Times
here.

MR. MILLER: Yes.

ARBITRATOR IRVINGS: To avoid
any potential problems, I would ask
the same sequestration apply.

MR. MILLER: I assume that
after Mr. Hayes is done testifying,
he can then stay, proceeding on that
assumption, yeah.

ARBITRATOR IRVINGS: Just to
avoid problems on the assumption
you're not going to call him back.

MR. MILLER: That's correct.
And I think Ron and I have reached an

Page 33

ARBITRATION

agreement that in connection with the
respective cross-examinations, the
cross-examiner can go beyond direct
to avoid the necessity of calling
back witnesses.

MR. RICHMAN: Just to make clear
that we're talking about if you, for some
reason you want to call him as a rebuttal
witness, that's going to be a problem if
he's here.

ARBITRATOR IRVINGS: Right.
Okay.

MORRIS CLAFFEE,
having been first duly sworn by
Arbitrator Irvings, was examined
and testified as follows:
DIRECT EXAMINATION BY MR. ROTH:
Q   Good morning, Mr. Claffee.
Can you state your name for the
record and also where you live.
A   My name is Morris Claffee. I live
in Norfolk, Virginia.

ARBITRATOR IRVINGS: Could you
spell his last name.

9 (Pages 30 to 33)

Page 34

ARBITRATION

1  THE WITNESS: C-L-A-F-F-E-E.
2  BY MR. ROTH:
3  Q    Where are you employed,
4  Mr. Claffee?
5  A    I currently work at the New York
6  Times Shared Service Center.
7  Q    And what is the Shared Service
8  Center?
9  A    The Shared Service Center is a
10  subsidiary of The New York Times Company and
11  we handle their back-office work.
12  Q    And what is your job title at
13  The Times?
14  A    I am currently the senior payroll
15  in Accounts Payable and travel and
16  entertainment expenses manager.
17  Q    How long have you held that
18  position at The Times?
19  A    I've been the senior payroll
20  manager for ten to 15 years.
21  Q    In that capacity are there other
22  employees who report to you?
23  A    Yes. I have 15 employees who work
24  for me.

Page 35

ARBITRATION

1  Q    And can you tell us in general
2  terms what your duties are as senior payroll
3  manager?
4  A    Generally, I oversee the payment to
5  all employees, their withholdings and make
6  sure they get the appropriate amount into
7  their net pays, and handle the payments to
8  the vendors for the accounts payable side.
9  Q    And more particularly with respect
10  to the Pension Fund, meaning the Newspaper
11  and Mail Deliverers'-Publishers' Pension
12  Fund, and the Welfare Fund which I mean
13  Publishers'-Newspaper Mail Deliverers'
14  Welfare Fund, what are your duties with
15  respect to those two funds?
16  A    I currently review the process on
17  at least on annual basis, and in addition I
18  review the remittance reports that go out
19  and the payments to the Fund.
20  Q    I'd like to start by asking you how
21  The Times goes about calculating the pension
22  contributions to the Pension Fund.
23  Can you tell us how that
24  calculation is performed?

Page 36

ARBITRATION

1  A    Yes, I can.
2  We currently aggregate a series of
3  earning codes, which we call a special
4  accumulator. And we use those earnings and
5  multiply them by currently 8 percent to come
6  up with the actual contribution to the
7  Pension Fund.
8  Q    And you referred to earning codes.
9  Can you tell us what you mean by
10  "earning codes"?
11  A    Sure. We have a series of earning
12  codes. We have regular pay, we have sick
13  pay, we have vacation, personal day,
14  vacation pay that employees can receive in
15  addition to. These are all what we call
16  earning codes.
17  Q    And there are actual codes for
18  those?
19  A    Yes, they each have their own
20  individual codes.
21  Q    So specifically for purposes of
22  pension contributions, can you tell us which
23  types of earnings are aggregated together
24  and multiplied by 8 percent to come up with

Page 37

ARBITRATION

1  the pension contribution.
2  A    Can you repeat the question?
3  Q    Specifically with respect to the
4  Pension Fund contributions, can you tell us
5  which types, which earning codes are added
6  together before you then multiply it by the
7  8 percent?
8  A    There's a pretty large listing but
9  we use regular pay, vacation pay, military
10  pay. There are a series of earnings based
11  on jury duty, bereavement, et cetera. There
12  are a whole series of earning codes. I
13  don't know them off the top of my head.
14  Q    That's fine.
15  What about the earnings that are
16  associated with overtime shifts, by which I
17  mean shifts that are worked beyond the
18  ordinary five in a week.
19  Are those earnings aggregated for
20  purposes of the Pension Fund?
21  A    No, they are not.
22  Q    And do those earnings have a
23  separate code?
24  A    Yes, they have their own code.

Page 38

ARBITRATION

1
2     Q    What is that code?
3     A    We use earning code CRS currently.
4     Q    And how does the payroll system
5  know that an employee is working let's say a
6  sixth shift in a week as opposed to a third
7  or fourth shift that week?
8     A    Well, we have a couple different
9  ways that determines that.  But the first
10  step is the time and attendance system,
11  which is controlled at the plant by the
12  foreman, which controls their work for the
13  week.
14        And after the five shifts it
15  converts the next shift to a sixth shift
16  which has a separate earning code.
17     Q    And how does the -- what is the
18  relationship between the payroll system and
19  that time and attendance system?
20     A    The information from the time and
21  attendance system is imported on the payroll
22  system on a weekly basis, and we use that
23  information to actually process the payroll.
24     Q    Now, with respect to the types of
25  earnings that are added together for pension

Page 39

ARBITRATION

1
2  contribution purposes, do they all
3  necessarily arise from shifts that are
4  actually worked by an employee?
5     A    Not necessarily.  We have vacation
6  pay, bereavement.  Certain payments are not
7  actually worked but are included in their
8  pay.
9     Q    And how does the system treat for
10  pension purposes the pay that goes to
11  workers who are out on Workers'
12  Compensation?
13     A    We include that in the pension
14  contribution, those wages are included.
15     Q    And how does The Times determine
16  how much to pay the workers who are out on
17  Workers' Compensation if they are not
18  actually working any shifts?  What are they
19  paid?
20     A    We actually have a process.  We go
21  back and determine the last full eight weeks
22  and take the eight-week average for their
23  occupational pay.
24     Q    Now, when an employee does work a
25  shift, regular shift, how are the earnings

Page 40

ARBITRATION

1
2  from that coded in the system?  What is the
3  earnings code for that?
4     A    It would be RGM is the earning code
5  we use for a work shift.
6     Q    And that's the only earnings code
7  for regular work?
8     A    No.  We have another code that we
9  use for foreman which is regular pay as well
10  but it's a different code.  We use REG.
11     Q    So REG is for the foreman?
12     A    Yes, sir.
13     Q    And how are the foremen generally
14  paid for their work?
15     A    Foreman are salaried.  They get
16  paid based on an annual salary.
17     Q    Is their pay based on the number of
18  shifts they work?
19     A    No.  It's not based on shifts at
20  all, no.
21     Q    How does The Times make pension
22  contributions with respect to those salaried
23  foremen?
24     A    We take the appropriate wages and
25  multiply it by 8 percent.  And that's how we

Page 41

ARBITRATION

1
2  calculate the contributions.
3     Q    Now, are there any types of work
4  that entitle an employee to any additional
5  pay beyond the regular pay?
6        MR. GARFIELD:  Objection.  I
7  think he's leading the witness.
8        ARBITRATOR IRVINGS:  I'm sorry.
9  What was the question?
10        (Requested portion of record read:
11  "Q.  Now, are there any types of
12  work that entitle an employee to any
13  additional pay beyond the regular pay?")
14        (End of read-back.)
15        ARBITRATOR IRVINGS:  You can
16  answer the question.  Go ahead.
17        MR. MILLER:  Would you mind
18  repeating it again.
19        (Requested portion of record read:
20  "Q.  Now, are there any types of
21  work that entitle an employee to any
22  additional pay beyond the regular pay?")
23        (End of read-back.)
24     A    Yes, there are, yes.
25     Q    Can you tell us about those?

11  (Pages 38 to 41)

Page 42

```
1              ARBITRATION
2      A    Yes.  Sure.  We have some special
3  equipment at the plant that if an employee
4  works on a special equipment, they would get
5  additional pay for driving a tractor-
6  trailer, for example, or working on a
7  forklift the back of the truck, that
8  generates additional pay for whatever
9  they're doing.
10     Q    And how is that type of pay treated
11 for pension contribution purposes?
12     A    Those earnings are included in our
13 special accumulator and it is included in
14 the calculation for the pension
15 contribution.
16     Q    Now, when calculating pension
17 contributions, do you or does the payroll
18 system ever actually count up the number of
19 shifts that an employee has worked?
20     A    No, we do not.  Never.  No.
21     Q    And, in general, has this approach
22 that you've been testifying about, has it
23 been consistent throughout your tenure at
24 The Times?
25          MR. GARFIELD:  Objection.  I
```

Page 43

```
1              ARBITRATION
2  think he's leading again.
3          ARBITRATOR IRVINGS:  Sustained.
4  BY MR. ROTH:
5      Q    Can you tell us about the
6  practices, the historical -- anything about
7  the historical practices of The Times with
8  respect to calculating pension
9  contributions?
10     A    Sure.  We transitioned in mid-2008
11 and at that point of transition we went back
12 and reviewed how it was handled previously,
13 and we made sure we mirrored what was done
14 in the payroll systems system that goes back
15 quite a few years.
16     Q    Thank you.
17          How often does The Times remit
18 pension contributions to the Pension Fund?
19     A    We remit the contributions on a
20 monthly basis.
21     Q    And what does The Times send to the
22 Pension Fund when it remits a contribution?
23     A    Well, we send them the money for
24 the contributions and we send them a report
25 that actually gives them the details of the
```

Page 44

```
1              ARBITRATION
2  contributions, the amount of the payment,
3  the remittance.
4      Q    So I would like you to turn to
5  Joint Exhibit 53 in the binders.
6          ARBITRATOR IRVINGS:  Just
7  "exhibit."  It's going to be hard
8  habit to break, but it's my effort to
9  reform.  It's Exhibit 53.
10         MR. MILLER:  Exhibit 53.
11 BY MR. ROTH:
12     Q    Do you recognize this document?
13     A    Yes, sir.  Sure do.
14     Q    What is it?
15     A    This is what we call a remittance
16 report that is sent to the Fund office.
17     Q    Can you tell us what the date of
18 this report was?
19     A    Sure.  It was June 2010.
20     Q    Can you just describe for us what
21 the first three columns in this report
22 represent?
23     A    Absolutely.  The first column is
24 the individual's name we're contributing to.
25          The blacked-out column, we blacked
```

Page 45

```
1              ARBITRATION
2  out the Social Security number for obvious
3  reasons for confidentiality.
4          The employee ID number is a unique
5  ID number applied to each employee at The
6  New York Times.
7      Q    What does the fourth column mean?
8      A    The fourth column is what we call a
9  deduction code for the Deliverers' Pension.
10         The fourth column is the
11 Deliverers' Pension, DELPEN, represents the
12 Deliverers' Pension, our code for that
13 contribution in the payroll system.
14     Q    And then the next two columns are
15 headed DEDMTD and DEDYTD.
16         Can you tell us what those columns
17 represent?
18     A    Absolutely.
19         The first one, the DEDMTD, stands
20 for deduction month-to-date.  And that's the
21 actual calculation of the pension for that
22 employee that we contributed to the Pension
23 Fund for that month.
24     Q    And the YTD column?
25     A    That would be similar but that's
```

ARBITRATION

the year-to-date amount at this point in
time that we would have contributed to the
Pension Fund for that employee.

Q    Those two columns, what units are
those in?

A    These are both in dollars and
cents.

Q    Then the next two columns on the
report are titled Base MTD and Base YTD.
Can you tell us what those columns
represent?

A    Absolutely.

The Base MTD is base month-to-date.
That's an earning column. Those are special
accumulated earnings for the pension
contribution that we multiply by the
percentage.

The Base YTD is the base
year-to-date column through June 2010 that
would have been multiplied by 8 percent to
come up with the monthly contributions.

Q    And then for those two columns,
what units are those numbers in?

A    These two columns are both in

ARBITRATION

dollars and cents.

Q    And then you have a bunch of
different rows in the column. What do the
rows represent?

A    Each row is individual employee.

Q    And if you can flip to the last
page of this exhibit, there is a line at the
end, a row at the end that says DELPEN
Total.

Can you tell us what that row is
indicating?

A    The DELPEN Total row at the end is
the sum of all the employee's contributions
for that month under the DEDMTD. That's the
total of all the employees.

Q    And what about under the base
columns?

A    It's similar. The total of all the
individual employee's amounts for the month.
Or the year-to-date.

Q    And what units are those totals in?

A    The totals are in dollars and
cents.

Q    Does anything on this remittance

ARBITRATION

report indicate the number of shifts any
employee worked?

MR. GARFIELD: Objection.
Leading.

ARBITRATOR IRVINGS: Go ahead,
you can have that question. You are
right; however, the answer is no.
Let's move on.

BY MR. ROTH:

Q    And we can put aside the exhibit.
Do you ever report to the Pension
Fund how many shifts were worked by a
particular employee?

A    Never, no.

MR. GARFIELD: Objection.
Leading.

ARBITRATOR IRVINGS: Again, why
don't you rephrase it so it's not
leading.

What's your practice regarding
reporting shifts.

BY MR. ROTH:

Q    Mr. Claffee, what is your practice
regarding reporting shifts worked for the

ARBITRATION

Pension Fund?

A    We don't have a practice. We don't
report shifts for the Pension Fund.

Q    Can you tell us historically
anything about the format of these reports?
Like going back, what do those reports look
like ten years ago? Do you have any
knowledge about that?

A    Yes, I do. At the time of
transition from the old system to the new
system, we actually mirrored the reports
that were previously filed under the old
system as far as we can go back. So this is
the same format that's been used for years.

Q    And to whom did you send these
remittance reports?

A    These remittance reports are
e-mailed to the Fund office.

Q    And how did you generally
communicate with the Fund office?

A    Via e-mail.

Q    To your recollection, did anyone
from the Pension Fund ever ask you to
include shift numbers in your remittance

Page 50

ARBITRATION

1  reports?
2  A   Never, no.  Absolutely not.
3  Q   And if anyone from the Pension Fund
4  had asked anyone at The Times to include
5  shift numbers in the remittance reports,
6  would that request have come to you?
7  MR. GARFIELD:  Objection. I'm
8  not sure the witness has any
9  foundation to answer that.
10  ARBITRATOR IRVINGS:  Sustained.
11  BY MR. ROTH:
12  Q   Do you know whether if someone from
13  the Pension Fund had asked someone from
14  The Times to report shift information, do
15  you know whether you would have heard about
16  that request?
17  MR. GARFIELD:  Same objection.
18  ARBITRATOR IRVINGS:  Do you
19  want to talk about general
20  communications between the Fund and
21  The Times.
22  BY MR. ROTH:
23  Q   To the extent there were general
24  communications between the Pension Fund and
25

Page 51

ARBITRATION

1  The Times, would you have been aware of
2  those communications?
3  MR. GARFIELD:  Same objection.
4  MR. ROTH:  Just move on.
5  ARBITRATOR IRVINGS:  Move on.
6  MR. ROTH:  Thanks.
7  BY MR. ROTH:
8  Q   Now I'd like to ask you some
9  questions about the Welfare Fund,
10  Deliverers' Welfare Fund.
11  Does The Times make contributions
12  to the Welfare Fund?
13  A   Yes, we do, yes.
14  Q   Can you tell us how those
15  contributions are calculated?
16  A   Well, there are more than one
17  Welfare Fund, so there's really not one way
18  we do the calculations to the Welfare Fund.
19  Q   Can you explain what you mean by
20  that?
21  A   Sure.
22  We have -- one of the employer
23  Welfare Funds is a special accumulator
24  similar to DELPEN.  It's a Deliverers'

Page 52

ARBITRATION

1  Welfare employer pay contribution.
2  Then we have a shift-based
3  contribution for DELCOL.  Those are codes we
4  use in the payroll system.  DELCOL, that's a
5  shift-base.
6  And we also have two employee
7  contributions that are made that are
8  deducted from an employee's pay and remitted
9  to the Fund.
10  So it's kind of not really one
11  type.
12  Q   Okay.
13  So I think you testified that there
14  is a contribution that is referred to as
15  DELWEL?
16  A   Yes, sir.
17  Q   How is that calculation -- how is
18  that contribution calculated by The Times?
19  A   We aggregate a series of earning
20  codes, total them up by employee and
21  multiply that amount by the current rate
22  which I believe is 7.68 percent.  And that's
23  basically how we do the calculation for that
24  based on the aggregate earnings.
25

Page 53

ARBITRATION

1  Q   How do the earnings that are
2  aggregated for this Welfare Fund
3  contribution compare to the earnings that
4  are aggregated for the Pension Fund
5  contribution that we had talked about
6  earlier?
7  A   The DELWEL and the DELPEN are the
8  same earning codes they use for the
9  calculation.
10  Q   Okay.
11  And then I think you mentioned
12  something called the DELCOL Welfare Fund
13  contribution as well?
14  A   Yes, sir.
15  Q   Can you tell us what that is?
16  A   Yes, sir.  The DELCOL is a
17  shift-based contribution which is capped at
18  five shifts per week except for personal
19  days which are unlimited for the week that
20  they would get credit for a shift.
21  Q   And how does the payroll system
22  compute that contribution, the DELCOL
23  contribution to the Welfare Fund?
24  A   The calculation is we take the
25

ARBITRATION

1
2  number of shifts up to five for the week and
3  we multiply that by 47 cents per shift. And
4  whatever that number comes up to, that's the
5  amount that we remit to the Fund office.
6    Q   And how frequently does The Times
7  remit those contributions to the Welfare
8  Fund?
9    A   Those contributions are remitted
10  weekly.
11    Q   And when The Times remits those --
12    ARBITRATOR IRVINGS: Just so
13  I'm clear, you are saying that the
14  DELCOL is remitted weekly or all
15  Welfare Fund is remitted weekly?
16    THE WITNESS: All the Welfare
17  Fund are remitted weekly. All.
18  BY MR. ROTH:
19    Q   Okay. And when you make those
20  weekly remittances, what does The Times send
21  to the Welfare Fund?
22    A   Again, we send the money and we
23  also send what we call remittance reports to
24  the Fund office.
25    Q   And how do those remittance reports

ARBITRATION

1
2  to the Welfare Fund compare to the
3  remittance reports that The Times sends to
4  the Pension Fund?
5    A   Could you repeat that question?
6    Q   Sure.
7    How do the remittance reports that
8  you send to the Welfare Fund compare to the
9  reports that you send to the Pension Fund?
10    A   Well, the DELWEL and the DELPEN
11  remittance reports are very similar. But
12  the other three are all shift-based, so, you
13  know, three are shift-based and one is
14  percentage-based.
15    Q   I'll ask you to turn to Exhibit 32
16  in the binder. I believe that should be in
17  the first binder.
18    Mr. Claffee, do you recognize this
19  document?
20    A   Yes, I do.
21    Q   What is it?
22    A   Give me one second to look through
23  it.
24    This is the remittance report we
25  send to the Fund for the Welfare Fund

ARBITRATION

1
2  contributions.
3    Q   Starting on the first page of the
4  actual report as opposed to the cover
5  e-mail, what type of contribution is being
6  reported on this page?
7    A   This is the DELCOL which is the
8  Deliverers' COLA Welfare Fund.
9    Q   Just remind us what type of
10  contribution that is.
11    A   This is shift-based contribution.
12    Q   Can you walk us through each of
13  these columns in this report, explain what
14  they are?
15    A   Absolutely.
16    Similar to the first report, you
17  have the individual's names listed
18  individually for their weekly contribution.
19  You have their unique employee ID number in
20  the second column. They're actually the
21  last four digits of their Social Security
22  number for confidentiality reasons.
23    And the DEDCD column, that is what
24  we call the Deliverers' COLA contribution.
25    The next column, the DEDCUR, is the

ARBITRATION

1
2  deduction current column which is actual
3  calculated amount of the shifts, actual
4  amount of the contribution based on the
5  shifts, $2.35 for the first person.
6    The next column, DEDYTD, stands for
7  the year-to-date amount that we've
8  contributed based on the shifts for DELCOL.
9    The next column, which is the
10  Base CUR, is base current. That Number 5 is
11  a shift count. So that's five shifts for
12  the current period.
13    The next column is Base YTD, is the
14  base year-to-date. That would be this
15  employee's total shifts at this point in
16  time whenever this report was created.
17    Q   Just to clarify, what are the units
18  of those last two columns, the base columns?
19    A   The last two columns are based on
20  shifts.
21    Q   And what happens, so if you were to
22  take the base current for a particular
23  employee, multiply that by 47 cents, what
24  would you get?
25    A   You would get $2.35.

Page 58

ARBITRATION

1
2    Q    You are talking about the first?
3    A    Yes. Five times 47 would be 2.35.
4    Correct. Whatever the number of shifts are
5    would be times 47 cents.
6    Q    Let me ask you this.
7         How do the categories of work and
8    categories of absences that count for
9    purposes of this DELCOL contribution to the
10   Welfare Fund, how do they compare to the
11   categories of work and categories of
12   absences that count for the DELPEN Pension
13   Fund contributions?
14   A    Just so I'm clear, comparing DELCOL
15   to the DELPEN?
16   Q    Correct.
17   A    Well, the DELPEN is an aggregate of
18   quite a few earning codes including items
19   that are not shift-based like special
20   equipment, like tractor-trailer
21   differentials, forklift payments.
22        Those are not included in the shift
23   calculation. I hope I'm answering your
24   question.
25   Q    That's fine.

Page 59

ARBITRATION

1
2    Q    Are there any other differences
3    that you --
4    A    Yeah, I mean we have a few other
5    ones. We have if an employee goes on active
6    duty, we have military pay to supplement
7    their pay.
8    Q    How is that military pay treated
9    for pension contribution purposes?
10   A    We would include that in the DELPEN
11   aggregate and they would get a contribution.
12   Q    And how was that military pay
13   treated for DELCOL purposes?
14   A    It's not part of the DELCOL
15   process. It's not included in that
16   calculation at all.
17   Q    And then if you just flip ahead in
18   the same exhibit to I think it's the seventh
19   page.
20        Can you tell us what this portion
21   of the report relates to?
22   A    Yes, sir.
23   Q    This particular section is going to
24   reflect the Deliverers' Welfare, the DELWEL
25   contribution.

Page 60

ARBITRATION

1
2         What's that contribution again?
3    A    It's the Deliverers' Welfare
4    contribution.
5    Q    How does this portion of the report
6    compare to the portion of the report that we
7    were just looking at for DELCOL?
8    A    This portion is actually an
9    aggregate and based on a percentage. An
10   aggregate of earnings based on a percentage.
11   Q    So what, if any, differences are
12   there between how it's actually presented on
13   the report?
14   A    Well, this is presented in dollars
15   and cents versus shifts as to DELCOL.
16   Q    Great.
17        So I'm going to ask you next to
18   turn to Exhibit 30.
19        Do you recognize this exhibit?
20        And we're really going to focus on
21   the first page.
22   A    Okay.
23   Q    Can you tell us what this is?
24   A    This is what we call a rate sheet.
25   Q    And what is a rate sheet?

Page 61

ARBITRATION

1
2    A    This is a sheet we update
3    periodically and at least on an annual basis
4    with any contractual changes.
5    Q    And what's the date on this
6    document?
7    A    This one is dated 3-23-2011.
8    Q    And can you just take a look at the
9    first line that says "Welfare DED Code 613."
10   And can you explain for us what that means
11   and what the various items on that line
12   mean?
13   A    Sure.
14        The Welfare DED Code 613 represents
15   the previous code used in the previous
16   payroll system, the old code. We
17   transitioned to My Shop and the
18   corresponding code in My Shop now is that
19   DELCOL code.
20        So 613 is a DELCOL now in the new
21   system.
22        And if you go across, the 10-1-89,
23   1989, represents the effective -- as far
24   back as we can go is 10-1-1989, we've been
25   using the .47 per shift straight time.

16  (Pages 58 to 61)

ARBITRATION

Q    And then can you take us through
the next line on this sheet?

A    Absolutely.

The Welfare DED Code 614 was again
the old legacy code which now translates to
the DELWPB, and it's an employee
contribution.  The date there was 3-31-1987.

And the per shift amount was $3.67
per shift with a five-shift cap.

Q    Okay.  And then the next one down?

A    Sure.

Again, this is a Welfare DED Code
615, the old legacy code converted to DELWEL
in our new system.

And then the years show the
different rates as they changed during
particular time periods, the percentages.

Q    And then the next line down?

A    Is casual Welfare deduction
Code 616 converted to DELWXT in our system,
and this one is per shift with the shift
amount changes per year.  On that line.

Q    And what does it mean "casual"?

A    A nonregular employee who gets

ARBITRATION

called.

Q    And then can you take us through
the next line below that, Delivery Welfare
EE pretax?

A    This was deduction Code 618 in our
old system which converted to DELWSP in the
new one, which is a Welfare contribution and
at this time it was six dollars per shift
with a five-shift max per week.

Q    And then finally can you explain
the bottom section?

A    Absolutely.  That's our Pension
Code 620 which now converts to the DELPEN
code, and then we have the rates from 6-1-94
through 3-31-09 as it changed on this sheet.

Q    And do you know why nothing in this
section, this Pension deduction of 620, why
nothing in this section talks about shifts?
Do you know why that is?

A    It has nothing to do with shifts.
It's strictly based on an aggregate of
earnings.

Q    Thank you.

So next I would like you to turn to

ARBITRATION

Exhibit 42.

If you can look at -- not the cover
e-mail but just the first page after the
cover e-mail, first page of the attachment.

Are you familiar with this
document?  Again, not the e-mail but the
attachment.

A    Yes, I'm familiar with this
document.

Q    And what is it?

A    This is a letter we get from the
Fund office each year that provides us with
the rates for the Welfare and the Pension
plan.

Q    And the numbers that are listed
under Pension Fund High Rate and Pension
Fund Low Rate, do you see those sections of
this sheet?

A    Yes, sir.

Q    What do you use those for?

A    I don't use them for anything
currently.

Q    Now, if you were going to use these
numbers to calculate Pension contributions,

ARBITRATION

how would you calculate the contribution for
an employee who was, let's say, out on
Workers' Compensation using these numbers?

A    It wouldn't get included.

If you just use these numbers --

ARBITRATOR IRVINGS:  I don't
understand the question.

THE WITNESS:  I was going to
ask for a little help on that.  I'm
sorry.

BY MR. ROTH:

Q    So I'm asking if -- you see there
are different numbers listed here under
Pension Fund High Rate, Pension Fund Low
Rate, et cetera.

Is there a number representing the
contribution to a worker who is out on
Workers' Compensation?

A    No there's not.

Q    And is there a number on here that
would represent the proper contribution to
an employee who had worked a shift using
specialized machinery?

A    No, there's not.

ARBITRATION

1
2  Q    And what about for the foreman,
3  salaried foreman?  Any number on here for
4  that?
5  A    No, there's not.
6  Q    Thanks.
7      Mr. Claffee, do you recall whether
8  a New York Times subsidiary known as C & S
9  had a 401k plan for its employees?
10  A    Yes.  I do recall them having a
11  401k plan, yes.
12  Q    Do you know on what basis
13  contributions to that 401k plan were made?
14  A    Yes.  They were made -- they were
15  shift-based contributions.
16  Q    And can you turn to Exhibit 84.
17      Can you turn to Page 3 of this
18  contract.  Take a look at the chart that's
19  at the top of this page under the heading
20  401k Plan Contribution.
21      And what does this chart indicate
22  to you about the basis on which C & S made
23  contributions to its 401k plan?
24  A    Looking at this, based on, for
25  example, on 3-31-06, they were getting $7.27

ARBITRATION

1
2  per shift they worked.
3  Q    Do you know who administered the
4  401k for C & S?
5  A    Yes.
6  Q    Who was it?
7  A    T. Rowe Price.
8  Q    And when C & S made contributions
9  to that 401k, do you know if it reported
10  anything to the plan administrator about how
11  the Fund contributions were calculated?
12  A    Yes.  We reported by individual the
13  shifts and the contribution.
14  Q    And how do you know that?
15  A    I was the one who was responsible
16  for doing the remittance.
17      MR. ROTH:  Thank you.
18      No more questions.
19      MR. MILLER:  Take a few
20  minutes.
21      ARBITRATOR IRVINGS:  Certainly.
22      (A brief recess was
23  taken.)
24   CROSS EXAMINATION BY MR. GARFIELD:
25  Q    Good morning, Mr. Claffee.

ARBITRATION

1
2  A    Good morning.
3  Q    So you are responsible for ensuring
4  that The Times remits the amounts it owes to
5  the Pension Fund, correct?
6  A    That's correct.
7  Q    So you need to know how The Times
8  contributes to the Pension Fund?
9  A    Can you -- I'm not sure what you
10  mean by that.
11  Q    Well, in order to remit the
12  appropriate amounts, you would need to know
13  how The Times is supposed to contribute to
14  the Pension Fund, correct?
15  A    I understand the calculation, yes.
16  Q    And you are similarly responsible
17  for ensuring that The Times remits the
18  correct amounts to the Welfare Fund?
19  A    That's correct.
20  Q    And for the Welfare Fund also you
21  need to know how The Times contributes to
22  the Welfare Fund?
23  A    Yes, sir.
24  Q    Can you please take a look at
25  Exhibit 8.

ARBITRATION

1
2      I will tell you, my question about
3  this is going to be very general.  But if
4  you want to take a moment to familiarize
5  yourself with the document, please go ahead.
6  A    Yes, sir.
7  Q    Mr. Claffee, prior to your
8  deposition in this matter, you had not
9  recalled ever seeing this document
10  previously; is that correct?
11  A    That's correct.
12  Q    And it's not your job to read and
13  interpret the contracts that govern
14  The Times' contribution to the Pension Fund?
15  A    That's correct.
16  Q    So you're directed as to how
17  The Times should contribute to the Pension
18  Fund by The Times Labor Department?
19  A    Yes, sir.
20  Q    So you speak with people in
21  The Times Labor Department to understand how
22  much should be remitted to the Pension Fund,
23  right?
24  A    I review the calculations with the
25  Labor Department.

ARBITRATION

1
2    Q    Do you speak with Andrew Gutterman?
3    A    Occasionally.
4    Q    And Chris Biegner?
5    A    Yes.
6    Q    And is there anyone else in
7  The Times Labor Department who you review
8  the calculations with?
9    A    No one else.
10    Q    So you are told how The Times
11  should contribute to the Pension Fund?
12    A    What I create is I update the rate
13  sheets on an automatic basis.
14         Before we implement any changes, we
15  review them with the Labor Department in New
16  York.
17    Q    Does the Labor Department have
18  sign-off on the method through which you
19  contribute to the Pension Fund?
20    A    They approve the calculation
21  process.
22    Q    Do you ever speak with people at
23  the Pension Fund office to understand how
24  much The Times is required to contribute to
25  the Pension Fund?

ARBITRATION

1
2    A    No, I do not.
3    Q    Never speak with -- you've never
4  spoken with Barbara Albergo about how
5  The Times should contribute to the Pension
6  Fund?
7    A    No, I have not.
8    Q    Do you ever speak with anyone at
9  the Newspaper and Mail Deliverers Union of
10  New York and vicinity to understand how
11  The Times is required to contribute to the
12  Pension Fund?
13    A    No, I do not.
14    Q    Do you ever speak with other
15  contributing employers to the Pension Fund
16  to understand how The Times was required to
17  contribute to the Pension Fund?
18    A    No. I'm not familiar with that at
19  all, no.
20    Q    Other than Mr. Gutterman and
21  Mr. Biegner, is there anyone else that you
22  speak with about how The Times should
23  contribute to the Pension Fund?
24    A    That's it.
25    Q    And it's correct, Mr. Claffee, that

ARBITRATION

1
2  you receive documents from the Pension Fund
3  about how The Times was obligated to
4  contribute to the Pension Fund?
5    A    Not from what -- what document are
6  you referring to?
7    Q    Take a look at Exhibit 42.
8         I believe that Mr. Roth asked you
9  about the second page when you were
10  testifying earlier.
11         If you could take a look at that,
12  please.
13    A    Okay.
14    Q    Do you receive a document that
15  looks like this approximately once a year
16  from the Pension Fund?
17    A    Yes, we do.
18         ARBITRATOR IRVINGS:  Just
19  so I'm clear, you answered "we."  And
20  I'm not sure you are using the royal
21  "we" or it's just you who gets it.
22         THE WITNESS:  It could come via
23  e-mail to my staff, so not
24  necessarily myself would receive it.
25  I would receive it but not

ARBITRATION

1
2  necessarily I would get it directly.
3  BY MR. GARFIELD:
4    Q    You would personally see it each
5  year; is that correct?
6    A    I would see it each year, yes.
7    Q    Mr. Claffee, please take a look at
8  the left-hand side of the top chart under
9  the words "effective 3-31-2013."
10         Do you see there are four terms
11  written there:  Day rate, short night, long
12  night and SAT, period, night.
13         Those are different types of
14  shifts, correct?
15    A    Correct.
16    Q    And then look at the numbers
17  immediately to the right of those four
18  terms.
19         You agree those are the different
20  rates that employees earn for working their
21  respective shifts; is that correct?
22    A    Yes.
23    Q    Now, when you received this
24  document approximately once a year, did you
25  see the information on the right-hand side

ARBITRATION

1
2 of the column under Pension Fund High Rate
3 that calculates the wages that an employee
4 earns per shift times 8 percent?
5    A    You asked do I see it?
6    Q    Did you see it when you received
7 it?
8    A    Yes, yes.
9    Q    Mr. Claffee, what's your
10 understanding of the term "shift" as we're
11 using it here today?
12    A    The term "shift," my understanding
13 is when someone works a shift.
14    Q    Does it refer to a number of hours?
15    A    It could, I guess.  I'm not too
16 familiar with that.  I'm not sure what you
17 are asking there.
18    Q    When you received this form
19 approximately once a year, did you ever
20 communicate with anyone in the Pension Fund
21 office that you thought the form was
22 incorrect?
23    A    I don't use that column for
24 anything so I never communicated anything
25 out.

ARBITRATION

1
2    Q    So the answer to my question is no?
3    A    No.  Yes, sir.
4    Q    The Times does not actually
5 contribute to the Pension Fund 8 percent of
6 all wages that an employee earns in a month;
7 is that correct?  For shifts worked?
8    A    That's correct.
9    Q    If an employee works six shifts in
10 a week, The Times does not contribute
11 8 percent of the money the employee earned
12 in respect of all six shifts; is that
13 correct?
14    A    That's correct, yes, sir.
15    Q    And why is that?
16    A    I couldn't tell you that.  I could
17 tell you the mechanism.  I don't know
18 why we don't contribute on the sixth shift.
19    Q    Mr. Claffee, during your deposition
20 in December, if you recall, you initially
21 testified that The Times' percentage-based
22 contributions to the Pension Fund and the
23 Welfare Fund were based strictly on a
24 percentage of total wages without any
25 limitation due to shifts, correct?

ARBITRATION

1
2    A    Correct.
3    Q    And later during the same
4 deposition following a break and discussion
5 with counsel, you changed your testimony,
6 correct?
7    A    Correct.
8    Q    You recently signed an affidavit
9 that was submitted with The Times'
10 prehearing brief in this matter; is that
11 correct?
12    A    Yes, sir.
13    Q    In your affidavit, you described
14 the sixth shift as overtime; is that
15 correct?
16    A    That's correct.
17    Q    Do you have any understanding of
18 whether the term "shift" is defined in the
19 collective bargaining agreement between
20 The Times and the Union?
21    A    I don't know that.
22    Q    Is it your understanding that any
23 shift beyond five in a week is an overtime
24 shift?
25    A    Correct.

ARBITRATION

1
2    Q    If an employee works five shifts in
3 a week -- I want to give you an example to
4 run through the calculation.
5    A    Okay.
6    Q    To keep the numbers simple, let's
7 say the wage rate is $200 per shift.
8         So it is your testimony that to
9 determine how much The Times is required to
10 contribute to the Pension Fund for that
11 employee in this example, you would take
12 8 percent of a thousand dollars?
13    A    You said five days -- shifts at
14 $200 for a thousand dollars times 8 percent
15 would be $80, yes, exactly.
16    Q    Would you describe that calculation
17 as taking 8 percent of the total wages?
18    A    If that was all there were, that
19 would be 8 percent of the total, yes.
20    Q    Now, if The Times contributed by
21 shift instead for the same employee at $200
22 per shift, to figure out how much The Times
23 was required to contribute for each shift
24 you would take 8 percent of $200, correct?
25    A    To determine the amount per shift?

ARBITRATION

1
2     Q     Correct.
3     A     Yeah, I guess you could do that.
4     Q     And 8 percent of $200, would you
5  agree that that's $16?
6     A     Eight percent of $200 is $16, yes.
7     Q     And if the same employee works five
8  shifts in a week, to determine the
9  contribution The Times would make for that
10  week, you would take five times $16; is that
11  correct?
12     A     Correct.  Five Times 16 would be
13  80, yes, sir.
14     Q     And that's the same amount
15  depending on if the calculation is 8 percent
16  of the total wages for an employee who works
17  five shifts in a week or if The Times
18  contributes 8 percent of the wages an
19  employee earns for each shift for the five
20  shifts worked, correct?
21     A     Correct.  The only thing that would
22  be missing would be the special equipment
23  work and things like that, though.
24          We wouldn't have that in that
25  number.

ARBITRATION

1
2          You know, the items that are not
3  shift-based they wouldn't get the Pension
4  benefit on.
5     Q     Are you talking about the
6  differential for, for example, a forklift?
7     A     Yes, sir.
8     Q     So that amount wouldn't be included
9  in the calculation of what would be
10  contributed to the Pension Fund; is that
11  correct?
12     A     That would be correct, yes, sir.
13     Q     Let's do one more example.  Keep
14  the earnings per shift at $200.
15          Say the employee works six shifts
16  in a week.
17          So given what -- your testimony, am
18  I correct that it's your view that The Times
19  would still make the contribution to the
20  Pension Fund as if the employee had worked
21  five shifts in a week, correct?
22     A     That's correct.  Yes, sir.
23     Q     So the calculation would still
24  yield an $80 contribution in respect of a
25  week in which an employee actually worked

ARBITRATION

1
2  six shifts, correct?
3     A     Correct.
4     Q     Again, if the Times contributed by
5  shift instead for up to five shifts, do you
6  agree that you would obtain the same
7  calculation of $80 that The Times would
8  ultimately contribute to the Pension Fund?
9     A     Could you do that one more time.
10     Q     Sure.
11          So if The Times contributes by
12  shift for up to five shifts, under this
13  example, you testified earlier that the
14  employee would earn $16 per shift, correct?
15     A     Correct, yes.
16     Q     And five times $16 is $80, correct?
17     A     Correct.
18     Q     And you agree you would disregard
19  the sixth shift for purposes of determining
20  the calculation; is that correct?
21     A     That is correct.
22     Q     So am I correct that for an
23  employee who worked six shifts in a week, if
24  The Times contributes 8 percent of the wages
25  that the employee earned in respect of the

ARBITRATION

1
2  first five shifts, that would yield the same
3  contribution as if The Times was
4  contributing 8 percent of the wages that an
5  employee earns per shift but only for the
6  first five shifts, correct?
7     A     Correct.  With the exception it's
8  not including some of the other items.  I do
9  have that aggregate number.
10     Q     In your affidavit, you wrote that
11  The Times,' quote, percentage contribution
12  rate, end quote, to the Pension Fund is
13  8 percent."
14          Is that correct?
15     A     That's correct, yes, sir.
16     Q     Do you have an understanding what
17  the term, quote, contribution rate, end
18  quote, means?
19     A     No, I don't.
20     Q     For The Times' contribution to the
21  Pension Fund in your affidavit and in your
22  testimony, you described multiplying certain
23  earnings by the percentage contribution
24  rate; is that correct?
25     A     That's correct, yes, sir.

ARBITRATION

1
2    Q    Now, you testified that The Times
3  each month actually contributes money to the
4  Pension Fund; is that correct?
5    A    That is correct.  Yes, sir.
6    Q    Do you agree that 8 percent,
7  standing on its own and not multiplied
8  against any other figure or data point, does
9  not yield a dollar amount that The Times can
10  use to determine how much to contribute to
11  the Pension Fund?
12    A    I'm a little confused by that
13  question.  If you would repeat it for me.
14        ARBITRATOR IRVINGS:  You can
15  argue that point.
16        MR. RICHMAN:  Yeah.
17        ARBITRATOR IRVINGS:  It's not a
18  factual point.  It's an argument.
19        Go ahead.
20  BY MR. GARFIELD:
21    Q    Mr. Claffee, you testified you also
22  are generally responsible for payroll for
23  The Times; is that correct?
24    A    That is correct, yes, sir.
25    Q    Can you look at Exhibit 30, please.

ARBITRATION

1
2    Q    And I would like you to flip to the
3  last page of the exhibit, please.
4    A    Yes, sir.
5    Q    Bates stamped NYT-49.
6    A    Okay.
7    Q    Now I'm asking about payment of
8  wages now, not contributions to the Pension
9  Fund.
10        Understood?
11    A    Yes, understood.
12    Q    Employees who participate in the
13  Pension Fund get paid a specified rate per
14  shift in wages; is that correct?
15    A    That is correct.
16    Q    So for working a day, employees
17  earn a specified daily wage?
18    A    Yes, sir.
19    Q    And that wage varies based on the
20  particular shift; is that correct?
21    A    On the day side?
22    Q    Well, the type of -- the
23  description of the shift for working a day
24  varies based on the category of shift; is
25  that correct?

ARBITRATION

1
2    A    Oh, you are looking at this sheet
3  here?
4    Q    Right.  I'm looking at specifically
5  the left-hand column where it lists shifts
6  and there's day, night, Sunday through
7  Thursday, Friday and Saturday.
8    A    Right.  I'm with you there.
9    Q    And there are different daily rates
10  that apply to the different types of shifts;
11  isn't that right?
12    A    I thought when you were saying
13  "day," I thought you were talking about the
14  Day column.
15    Q    I'm talking about the vertical Day
16  column, yes.
17        And my question for you --
18        ARBITRATOR IRVINGS:  The
19  vertical Day column?  You threw me
20  off on that.  Which one is the
21  vertical Day column?
22        MR. GARFIELD:  I'm looking at
23  the Shift column.
24        ARBITRATOR IRVINGS:  Right.
25  Okay.

ARBITRATION

1
2  BY MR. GARFIELD:
3    Q    Going down the list, those are
4  different types of shifts, different; is
5  that correct?
6    A    Well, you have day and then you
7  have night.
8    Q    Correct.
9    A    So you said the day, though.
10  There's only one "day" going across the
11  line.  I want to be clear what I'm talking
12  about here.
13    Q    For example, Saturday, compare day
14  and Saturday.  There's a different daily
15  rate that an employee is paid in wages if
16  they work a day shift versus a Saturday
17  shift according to this; is that correct?
18    A    Yes, that's correct.
19    Q    Okay.  So for The Times to pay an
20  employee's wages, The Times would need to
21  know how many shifts an employee worked and
22  what type of shift they worked; is that
23  correct?
24    A    They would have to know the job,
25  the work he was doing, yes.

Page 86

ARBITRATION

1
2    Q    And the work that was performed,
3  correct?
4    A    Correct.
5    Q    And The Times would have to know
6  the rate that the employee earned in respect
7  of each of the shifts that they had worked
8  during the pay period; is that correct?
9    A    That is correct, yes.
10    Q    Mr. Claffee, you testified that
11  The Times does not report shifts on the
12  remittance reports that it submits to the
13  Pension Fund; is that correct?
14    A    That is correct, yes, sir.
15    Q    As you also testified, The Times
16  does report shifts in the remittance reports
17  to the Welfare Fund; is that correct?
18    A    For certain Welfare Funds, yes.
19    Q    So for those certain Welfare Funds,
20  shifts are relevant; is that correct?
21    A    That is correct, yes, sir.
22    Q    And that shift information is
23  included on the weekly remittance reports
24  that are sent by The Times to the Welfare
25  Fund; is that correct?

Page 87

ARBITRATION

1
2    A    Yes, sir. Yes, they are.
3    Q    So it's correct then that The Times
4  has shift information for employees who
5  participate in the Welfare Fund, right?
6    A    Correct. Yes, sir.
7    Q    The Times contributes for the same
8  employees in both the Pension Fund and the
9  Welfare Fund?
10    A    Yes, we make contributions to the
11  Pension Fund and the Welfare Fund.
12    Q    So, Mr. Claffee, if you have the
13  weekly Welfare Fund remittance reports that
14  cover a particular month, if someone wanted
15  to obtain information about how many shifts
16  an employee had worked to use for some
17  purpose related to the Pension Fund, they
18  could use the Welfare Fund remittance
19  reports to derive that information, right?
20    A    I don't think so. I mean, we would
21  be missing some earnings. There's some
22  earnings that are not included. That
23  wouldn't be right. Not the way we do it
24  today.
25    Q    My question is not about earnings.

Page 88

ARBITRATION

1
2  My question is only about shift information.
3    A    But I thought you were saying
4  would the report still be correct just based
5  on shifts, correct? Wasn't that the
6  question?
7    Q    Let me rephrase it.
8      No, the question is: You could add
9  up -- and it might be a little bit
10  approximate with how the month ends -- the
11  number of shifts that an employee has worked
12  over the weeks that cover a month that would
13  be reported on the Welfare Fund remittance
14  reports.
15      And if someone wanted to understand
16  how many shifts somebody had worked for the
17  purposes of the Pension Fund, they could do
18  that calculation, right?
19    A    Yeah. Well, they couldn't do it
20  based on -- they don't have the same
21  earnings in their accumulator, so they don't
22  match up with the shift-based deduction
23  codes.
24      So you wouldn't have the same
25  number you would have under the aggregate

Page 89

ARBITRATION

1
2  codes under the DELPEN.
3      So I don't think you would have the
4  same number is what I'm saying. It's a
5  different calculation.
6    Q    How far off do you think it would
7  be?
8    A    I have no idea how far off it would
9  be. It would be a different number is all
10  I'm saying.
11    Q    You testified that no one from the
12  Pension Fund ever complained about The New
13  York Times' contributions?
14    A    To which fund?
15    Q    To the Pension Fund.
16    A    No one's called me and complained
17  about anything, no.
18    Q    No one's ever called and complained
19  about the remittance forms?
20    A    Absolutely not, no. We've been
21  doing it since we transitioned it in 2008.
22  I have no issues with it at all to date.
23    Q    No one from the Pension Fund ever
24  asked you for shift information?
25    A    Absolutely not, no. No one's ever

23 (Pages 86 to 89)

Page 90

ARBITRATION

1  asked me that, no.
2      Q   And that includes Barbara Albergo?
3      A   No.
4      Q   Do you have any understanding if
5  anyone from the Pension Fund office has
6  asked any of your colleagues to include
7  shift information?
8      A   Are you talking about the
9  colleagues, folks I work with in my office?
10     Q   I am, yes.
11     A   Well, I'm the direct contact to the
12  New York Labor Department.  Any changes that
13  go through, go through me.
14         Any requests that come to my team
15  that want to modify a change, it would be
16  escalated to me, which we escalate it to the
17  New York Labor folks before we make any
18  changes.
19         We're very concerned about making
20  sure we do everything right with the SSC, so
21  we are very, very careful with that kind of
22  stuff, and it definitely would have made it
23  to my desk.
24     Q   So it's your testimony that you're

Page 91

ARBITRATION

1  not aware of anyone from the Pension Fund
2  reaching out to anyone at The Times to raise
3  any concerns about the fact that The Times
4  was not including shift information on
5  remittance forms to the Pension Fund; is
6  that correct?
7      A   I can't say that.  I don't know
8  what goes on in New York.  I mean, in the
9  shop that I work at in Norfolk, Virginia,
10  no one's ever reached out to the team that I
11  work with at the SSC for any pension
12  information.  When you say The Times, I
13  can't speak for The Times Company.
14     Q   All I'm asking is for your
15  knowledge, if you have any knowledge that
16  anyone from the Pension Fund has reached out
17  to anyone at The Times, being at the Shared
18  Service Center, being at the Labor
19  Department in New York?
20     A   That question, I have no idea.
21     Q   Do you have any understanding of
22  the term "pensionable wages"?
23     A   Yes.
24     Q   And what is a pensionable wage?

Page 92

ARBITRATION

1      A   Using my context, the pensionable
2  wages would be the aggregate we use to
3  calculate the DELPEN contribution.
4      Q   So that would refer to, for
5  example, the earning code REG or RGM as a
6  couple of examples; is that correct?
7      A   Yes, that would be some of them.
8      Q   And it would not include the shifts
9  that The Times does not contribute for, such
10  as the CRS code which refers to overtime; is
11  that correct?
12     A   That is correct, yes.
13     Q   So for internal purposes, isn't
14  that correct that The Times tracks shifts
15  worked with respect to the various pension
16  codes that you're referring to?
17     A   We do not track the shifts at all.
18  We aggregate the earnings and multiply that
19  by 8 percent on a monthly basis.
20     Q   The Times contributes to the
21  Pension Fund for employees who haven't
22  actually worked certain shifts; isn't that
23  correct?
24     A   That's correct, yes, sir.

Page 93

ARBITRATION

1      Q   So take somebody on jury duty, how
2  does The Times know how much to contribute
3  to the Pension Fund for an employee who is
4  on jury duty?
5      A   My understanding -- I don't work at
6  the College Point plant, but at the plant
7  they have a time/attendance system that they
8  would enter that day as a jury duty day, at
9  that employee's rate, and we would receive
10  the rate for that day.
11     Q   So is it your testimony The Times
12  would contribute 8 percent of what that
13  employee's typical day rate is?
14     A   Correct.
15     Q   And how about for Workers'
16  Compensation, how exactly is the calculation
17  made about how much The Times should
18  contribute?
19     A   Well, we go back to the last full
20  8 weeks that they worked and we get the what
21  we call the 8-week average, and we use that
22  to process the Workers' Comp. benefit.
23     Q   Eight-week average of what?
24     A   Of their earnings.

ARBITRATION

Q    Of their earnings per day?

A    Of their weekly earnings.

Q    Is that obtained by taking their average earnings per day and multiplying it times five?

A    No.  It's taking the total for each of the weeks and dividing that by 8.

Q    We spoke about the differential payments for the tractor-trailer employees.

A    Uh-huh.

Q    How is that differential payment made to employees?

A    It has its own earning code.

Q    Is it made on a per-shift basis?

A    It's made on the work that they do. Whatever type of work that they do, if they're using the tractor-trailer for that work, they would get the differential.

Q    If they work on the tractor-trailer for a day, then they would get the differential?

A    I'm not really that clear on exactly whether it's ...

Q    Okay.

ARBITRATION

MR. GARFIELD:  Mr. Arbitrator, I would like to show the witness one of the exhibits -- it's 18, but it's in the objected.

MR. MILLER:  Objected Exhibit 18?

MR. GARFIELD:  Correct.

ARBITRATOR IRVINGS:  I don't know where my Objected folder went. Thanks.

MR. MILLER:  Mr. Arbitrator, we object to the use of this document and its introduction into the record.

ARBITRATOR IRVINGS:  And the basis is that you don't have either of the people.

MR. MILLER:  The basis is that, indeed, we do not have either of the people to testify as to the context for this document.

The document makes reference to, I believe, accrued benefits.  The second full sentence refers to checks representing accrued benefits.  That's a

ARBITRATION

phrase that is not reasonably understood in the context of pension contribution, so we really have no context here for the reason for this letter and the language used in this letter.

And we will not have the ability to examine the author of the letter nor the understanding of the recipient of the letter.

ARBITRATOR IRVINGS:  Do you want to ask some background questions to see whether you can -- I'll allow you to at least start that way to see whether this person has any knowledge about it.

MR. GARFIELD:  Whether Mr. Claffee has any knowledge about it?

ARBITRATOR IRVINGS:  Uh-huh.

MR. RICHMAN:  We can start that way, but the point here is that this is a document that came from the director of Labor Relations of The New York Times.

It's really the first sentence of

ARBITRATION

the document on the first page that is the critical issue.  It's self-explanatory.

I understand why --

ARBITRATOR IRVINGS:  He can argue whether that point is established.

But go ahead.

It's clearly your position that it's self-explanatory.

MR. RICHMAN:  I don't know how someone can read that and say -- it says what it says, right.

MR. MILLER:  Mr. Arbitrator, can I be heard on that issue?

ARBITRATOR IRVINGS:  Uh-huh.

MR. MILLER:  The second sentence provides some context or attempts to provide some context to the payments and the contributions and uses the phrase "accrued benefits."  And there's certainly been no testimony thus far, nor would I assume any testimony that could be

25  (Pages 94 to 97)

ARBITRATION

1 brought to bear, to demonstrate the
2 relationship between accrued benefits
3 and pension contributions.
4       This may be a one-off arrangement.
5 We simply have no idea, and we do not
6 have the ability to test those who may --
7 those who authored this letter and those
8 who helped them.
9       There's mention of ccs. We don't
10 know who these individuals are.
11       Mr. Schwartz is not available.
12 Mr. Garfield, I guess, could attempt to
13 lay a foundation, but I think at the end
14 the day, the foundation is going to go
15 nowhere because none of the individuals
16 who really understand the context for
17 this letter will be able to provide that
18 context to you.
19       MR. GARFIELD: Mr. Claffee's
20 testified that the process for these
21 contributions has remained the same
22 during an extended period of time
23 that encompasses the date that this
24 letter was sent. And I'd like to ask

ARBITRATION

1 Mr. Claffee if he has any
2 understanding why The New York Times
3 would have sent this letter to the
4 Pension Fund office.
5       ARBITRATOR IRVINGS: As I said,
6 you can start with your questions.
7       Go ahead.
8 BY MR. GARFIELD:
9       Q    Mr. Claffee, would you take a look
10 at the first page of Exhibit 18 in the
11 "objected to" binder.
12       A    Just the first page?
13       Q    That's all I'm going to ask you
14 about.
15       A    Okay.
16       Q    Do you have any understanding as to
17 why Mr. Baker would have referred to shifts
18 in respect of contributions for somebody who
19 was out on Workers' Compensation in a letter
20 to the Pension Fund office?
21       A    I have no idea at all.
22       Q    Does this contradict your
23 understanding of how The Times contributes
24 for employees who are out on Workers' Comp.?

ARBITRATION

1       A    It does. We base it on wages, the
2 eight-week average of wages. The last full
3 eight weeks they work is how we currently do
4 it. As far back as I can go, I think we
5 went back to 2001, but we have been doing
6 it that way for quite some time.
7       Q    So your understanding is the
8 contributions with respect to employees on
9 Workers' Comp. have nothing to do with
10 shifts?
11       A    Not as far as I know, they are not.
12 We use wages and we multiply it by
13 8 percent.
14       Q    So you think this letter is
15 incorrect?
16       A    For the way I do it today, yes. I
17 would not have worded it that way. I would
18 have taken wages times 8 percent.
19       ARBITRATOR IRVINGS: Okay. I'm
20 willing to accept the document.
21       You can make your arguments as to
22 what it does or doesn't prove. And it
23 will become 116.
24       (Exhibit Exhibit 116, was

ARBITRATION

1 received in Evidence.)
2       ARBITRATOR IRVINGS: I'm taking
3 the letter and the pages behind.
4 Thank you.
5 BY MR. GARFIELD:
6       Q    Mr. Claffee, if the contribution to
7 the Pension Fund was based on wages, as you
8 are testifying is the case, would it yield a
9 different dollar amount than if the
10 contribution was based on shifts?
11       A    We're talking about Workers' Comp.
12 cases?
13       Q    Yes, still on Exhibit 116.
14       MR. MILLER: Your question
15 continues to relate to the exhibit?
16       MR. GARFIELD: That is correct.
17       MR. MILLER: I'm sorry. I
18 thought we had moved on.
19       ARBITRATOR IRVINGS: No
20 problem.
21       THE WITNESS: I'm sorry.
22       (Requested portion of record read:
23 "Q. Mr. Claffee, if the
24 contribution to the Pension Fund was

ARBITRATION

1
2  based on wages, as you are testifying is
3  the case, would it yield a different
4  dollar amount than if the contribution
5  was based on shifts?")
6      (End of read-back.)
7      MR. MILLER: Mr. Arbitrator,
8  can I lodge an objection here?
9      I must say that I did not think the
10  question related to this document
11  precisely because there's been simply no
12  foundation laid that this witness knows
13  anything about this document and the
14  context behind this document.
15      So I'm not sure -- I don't
16  understand the question as it may or may
17  not pertain to this document, and, to the
18  extent that it does, there's certainly no
19  foundation that's been set forth to
20  justify this question with this witness
21  who knows nothing about it.
22      ARBITRATOR IRVINGS: Go ahead.
23      You can ask foundation questions to
24  see whether he has any of the requisite
25  knowledge to answer that question.

ARBITRATION

1
2  BY MR. GARFIELD:
3      Q    Are you aware of a situation in
4  which The Times has ever made contributions
5  to the Pension Fund for an employee who was
6  on Workers' Comp., using shifts as the basis
7  to calculate the amount that should be
8  contributed?
9      A    Not as long as I've been doing it,
10  no.  We've used wages consistently
11  throughout.
12      Q    Last question about this exhibit.
13      Who is James S. Baker?
14      A    James worked in the Labor
15  Department up until a couple years back and
16  retired.
17      Q    Did he hold the position that Terry
18  Hayes now holds?
19      A    No.
20      Q    Did he report to Terry Hayes?
21      A    I would guess he does.  I don't
22  know off the top.  Terry, as far as I know,
23  is the head of the department.
24      Q    Okay.
25      MR. GARFIELD:  I have another

ARBITRATION

1
2  objected to.  Objected Exhibit
3  Number 20.
4      MR. MILLER:  If I might,
5  Mr. Arbitrator, we lodged an
6  objection to this exhibit based on
7  untimeliness where I alluded to that
8  yesterday in our call.
9      The exhibit lists were due to be
10  and were exchanged by the parties over a
11  week ago.  I believe it was a week ago
12  today.  And this document was not on it.
13  And, in fact, we did not know about the
14  Fund's intent to add it to the witness
15  list and ask witnesses questions about it
16  until yesterday.  By that juncture we had
17  already spoken with several witnesses and
18  helped prep them.
19      And so we lodge an objection on the
20  timeliness and the prejudice emanating
21  therefrom.
22      MR. GARFIELD:  Mr. Claffee was
23  not on our witness list.  Based on
24  his deposition testimony, we didn't
25  expect that he would be on The Times'

ARBITRATION

1
2  witness list either.
3      After The Times advised us that
4  they planned to call him, we reviewed the
5  transcript -- this is an e-mail that he
6  was copied on.  He was asked about it
7  during his deposition.  We don't believe
8  there any prejudice to The Times in
9  asking about this.
10      And, moreover, I can use the
11  document to impeach Mr. Claffee based on
12  earlier testimony that he gave, if the
13  primary basis to just use it as an
14  exhibit is not accepted.
15      MR. MILLER:  May I respond?
16      ARBITRATOR IRVINGS:  Uh-huh.
17      MR. MILLER:  We provided our
18  witness list to the Fund indeed the
19  same day we provided our exhibit
20  list, so the Fund was aware of
21  Mr. Claffee being a witness for a
22  good week and, nonetheless, this came
23  in a week later.
24      And my understanding is that as it
25  relates to documents that might be used

ARBITRATION

1
2  to impeach, we have an exhibit list and
3  those are the exhibits in this case.  And
4  the parties are not allowed, unless an
5  exhibit is otherwise admitted, to freely
6  use exhibits that we were not aware of
7  for impeachment purposes.
8        ARBITRATOR IRVINGS:  Well, my
9  understanding of providing exhibit
10 lists is that you are providing that
11 which you are going to introduce in
12 your case-in-chief, not for
13 cross-examination.
14       And it does appear to be a document
15 that was addressed during his deposition.
16       MR. MILLER:  It was.
17       ARBITRATOR IRVINGS:  Okay.  So
18 I'm allowing it.
19       Go ahead.
20       MR. GARFIELD:  Thank you.
21       ARBITRATOR IRVINGS:  This will
22 be 117.
23       (Exhibit Exhibit 117, was
24 marked in Evidence.)
25       ARBITRATOR IRVINGS:  Go ahead.

ARBITRATION

1
2  BY MR. MILLER:
3    Q    Mr. Claffee, you have before you
4  what's you now been marked as Exhibit 117.
5    Do you see that?
6    A    Yes, sir.
7    Q    And can you tell me what this
8  document is?
9    A    This is an internal document the
10 SSC prepares for the New York Labor
11 Department.
12   Q    The first page is an e-mail that
13 you were copied on; is that correct?
14   A    Yes.
15   Q    And the second two pages attach a
16 spreadsheet; is that correct?
17   A    Correct, yes.
18   Q    Can you look at the bottom of
19 the -- I know it's difficult to read -- each
20 of the three charts that appear on the
21 second and third pages.
22       And you see there is a reference to
23 pensionable and nonpensionable?
24   A    Yes, sir.
25   Q    Earlier I asked you whether

ARBITRATION

1
2  The Times tracks the number of shifts that
3  employees work or do not work for the
4  Pension Fund, and you said that they do not.
5    Do you recall that testimony?
6    A    Yes, sir.
7    Q    Is your answer still the same to
8  that question?
9    A    Yes, it is.  I mean, basically,
10 this is the report that we develop for the
11 Labor Department in New York, and what they
12 use it for, I don't really know.
13   Q    That's not my question.  My
14 question is:  Does The Times track shifts
15 worked by earning code for the Pension Fund?
16 I'm not asking about the --
17       ARBITRATOR IRVINGS:  I'm sorry.
18 Your question is what?
19       MR. GARFIELD:  Does The Times
20 track shifts worked or not worked by
21 earnings code for the Pension Fund.
22   A    I'll repeat.  This is an internal
23 document.  We don't use this at the SSC for
24 any purposes whatsoever other than to
25 provide information to The New York Times

ARBITRATION

1
2  Labor Department.
3    Q    Do you agree that at the bottom of
4  each column it has a pensionable and
5  nonpensionable figure with respect to the
6  types of shifts that are listed in the
7  column above?
8    A    I would agree with that, yes,
9  absolutely.
10   Q    I think you testified earlier it's
11 your understanding that the pensionable
12 would refer to shifts on which contributions
13 are made to the Pension Fund; is that
14 correct?
15       MR. MILLER:  Objection.  I
16 think that mischaracterizes his
17 testimony.
18       ARBITRATOR IRVINGS:  I agree.
19 I believe it related to earnings that
20 were --
21       MR. GARFIELD:  To earnings --
22 let me rephrase the question.
23 BY MR. GARFIELD:
24   Q    You testified -- withdraw the
25 question.

ARBITRATION

1
2      MR. GARFIELD: Can I see the
3  question before that, please.
4      Q    I think you testified earlier,
5  Mr. Claffee, that it's your understanding
6  that the "pensionable" refers to earnings or
7  earning codes on which contributions are
8  made to the Pension Fund; is that correct?
9      A    That is correct, yes, sir.
10     Q    What's your understanding of what
11 "nonpensionable" refers to?
12     A    The sixth shift would be
13 nonpensionable.
14     Q    So The Times, according to this
15 document, knows how many shifts are
16 pensionable and how many shifts are
17 nonpensionable; is that correct?
18     A    Correct.
19     Q    Mr. Claffee, if an employee works a
20 sixth shift during the eight-week lookback
21 period for purposes of Workers'
22 Compensation, would the contribution that
23 The Times makes to the Pension Fund include
24 the sixth shift at a higher rate?
25     A    No, it would not.

ARBITRATION

1
2      MR. GARFIELD: I have no
3  further questions for Mr. Claffee.
4  Thank you.
5      THE WITNESS: You're welcome.
6      MR. MILLER: Let us just talk
7  for two minutes. There may be a
8  very, very brief redirect.
9      ARBITRATOR IRVINGS: Let me
10 make sure I understand.
11     For the eight-week average earnings
12 figures, would a sixth shift -- earnings
13 during a sixth shift at any point in that
14 eight weeks be included or not included?
15     THE WITNESS: Not.
16     ARBITRATOR IRVINGS: And might
17 as well ... for the DELCON, for the
18 Welfare contributions that are --
19     MR. MILLER: DELCOL.
20     ARBITRATOR IRVINGS: DELCOL,
21 I'm sorry.
22     What happens for shifts where
23 there's bereavement leave, jury duty,
24 vacation, sick pay?
25     THE WITNESS: They count.

ARBITRATION

1
2      ARBITRATOR IRVINGS: Okay.
3  Thank you.
4      THE WITNESS: You're welcome.
5      MR. RICHMAN: Can I just ask for a
6  clarification?
7      ARBITRATOR IRVINGS: Yes, you
8  may.
9      MR. RICHMAN: "They count." Does
10 that mean a sixth shift count?
11     THE WITNESS: Can you please
12 repeat? You caught me in the middle
13 there.
14     ARBITRATOR IRVINGS: Go ahead.
15     MR. RICHMAN: The question is, when
16 you just answered the question "They
17 count," it talked about various types of
18 paid leave. I wasn't sure exactly the
19 question you were answering.
20     Is it your testimony that a sixth
21 shift would count for the calculation of
22 the contribution to DELCOL?
23     THE WITNESS: The shifts are
24 capped at five per week.
25     (Pause.)

ARBITRATION

1
2      REDIRECT EXAMINATION BY MR. ROTH:
3      Q    Mr. Claffee, Mr. Gutterman asked
4  you a couple of hypotheticals involving what
5  the contribution will be for a certain
6  employee who had worked a certain number of
7  shifts and so on.
8      I just want to ask you a couple of
9  similar hypotheticals.
10     So first, if you had an employee
11 who worked four shifts and then took one
12 personal day and let's say, just keeping
13 with the numbers we used before, was paid
14 $200 for each of those shifts and was also
15 paid $200 for the personal day for a total
16 earnings for the week of a thousand dollars.
17     How would you calculate the pension
18 contribution in that situation?
19     A    We would take the five days at $200
20 per day times -- five times 200 is a
21 thousand and multiply that by 8 percent to
22 come up with the contribution of $80 for
23 that week.
24     Q    And had you instead made the
25 16-dollar per shift contribution that was

ARBITRATION

1
2 discussed earlier for the four shifts that
3 were worked, what would be the result of that
4 calculation have been had you done it that
5 way?
6     A    Just done the four shifts they
7 worked, it would be four times $200 which
8 would total to $800.  Then I would take the
9 $800 times 8 percent and that would be a
10 64-dollar contribution for that week.
11    Q    Thank you.
12         And then one other hypothetical.
13 Assume you have a salaried foreman.  You
14 testified earlier general foreman are paid
15 on a salary basis.
16         Assuming you have a foreman who was
17 paid a thousand dollars a week, what would
18 the Pension contribution be for that foreman
19 for that week?
20    A    It would be $1,000 times 8 percent,
21 so it would be $80.
22    Q    How, if at all, would that
23 calculation change if the foreman had worked
24 let's say only three shifts that week?
25    A    We don't calculate the shifts for

ARBITRATION

1
2 the foreman.  We just pay the foreman a
3 salary, so he gets that contribution
4 regardless.
5     Q    Does the contribution for the
6 foreman change from week to week?
7     A    No.  They're salaried.
8     Q    And then you had discussed earnings
9 codes and some shift codes, so let me ask
10 you:  Which, if any, earnings codes that
11 count for pension purposes do not have a
12 shift number attached to them?
13    A    I mean, off the top of my head, I
14 would say military pay, the special
15 equipment pay don't have any shifts
16 associated with it.
17    Q    And do The Times make Pension
18 contributions based on those earnings codes?
19    A    Yes, we do.
20    Q    If an employee is out on military
21 and earns military pay, does The Times make
22 any DELCOL contributions to the Welfare Fund
23 for that employee?
24    A    No.  There's no shifts involved
25 with the military pay.  It's just earnings.

ARBITRATION

1
2     Q    Then there were a couple questions
3 about whether the Pension Fund office had
4 ever asked The Times to report shifts in its
5 remittance reports.
6         If someone from the Fund office had
7 called not you but let's say someone in The
8 New York Times Labor Department and they
9 wanted to make that change, let's say, who
10 would ask to implement that change?
11         MR. GARFIELD:  Objection.  I
12 don't know that he has any foundation
13 to answer that question.
14 BY MR. ROTH:
15    Q    Would someone in the Labor
16 Department have independently been able to
17 change the reporting system for the
18 remittance reports to the Pension Fund?
19         MR. GARFIELD:  Same objection.
20 I think it's linked to the prior
21 question which I objected to.
22         ARBITRATOR IRVINGS:  Are you
23 asking sort of who does the
24 administerial functions of changing
25 things?

ARBITRATION

1
2         MR. ROTH:  Yes.
3         THE WITNESS:  I can answer
4 that.
5         MR. ROTH:  Yes.
6     A    I do.  I mean, I would have to do
7 it.
8     Q    Okay.  And then the last question.
9         If you can turn back to
10 Exhibit 117 -- or I believe it was 116, the
11 letter that we had discussed.
12    A    I didn't put it in the binder yet.
13    Q    Oh.  It's this one here.
14         Prior to this case, this
15 arbitration, have you ever seen this letter
16 before?
17    A    No, I've never seen this letter
18 before.
19         MR. ROTH:  Thank you.
20         That's it.  No further questions.
21         MR. GARFIELD:  I have just one
22 question.
23 RECROSS EXAMINATION BY MR. GARFIELD:
24    Q    Mr. Claffee, does The Times make
25 contributions to the Pension Fund in respect

ARBITRATION

1  of personal days taken by employees?
2     A   Yes, we do.  It's included in the
3  aggregate number.
4     Q   And on what basis or how does --
5  withdraw.
6        How does The Times know how much to
7  contribute in respect of a personal day
8  taken by the employee to the Pension Fund?
9     A   We contribute 8 percent of whatever
10  those day's earnings were.
11     Q   If it's a personal day, what do you
12  mean by the "day's earnings"?
13     A   They have a schedule at the plant
14  that's in the time and attendance system.
15  Whatever their normal shift is, if they're
16  taking a personal day, their work day is
17  where they would get that personal day.
18     Q   What they normally get paid for
19  working a day; is that correct?
20     A   Correct.
21        MR. GARFIELD:  Okay.  No
22  further questions for us.
23        MR. MILLER:  No further
24  questions.
25

ARBITRATION

1        ARBITRATOR IRVINGS:  Thank you
2  very much.
3        (A luncheon recess was taken at
4  12:51 p.m. through 2:02 p.m.)
5        TERRY L. HAYES,
6     having been first duly sworn
7  by Arbitrator Irvings, was examined
8        and testified as follows:
9  DIRECT EXAMINATION BY MR. MILLER:
10     Q   Good afternoon, Mr. Hayes.
11        Can you state your full name and
12  place of residence for the record.
13     A   Yes.  My name is Terry, middle
14  name, Lee, last name Hayes.  I reside in New
15  York City.
16     Q   And where are you employed?
17     A   New York Times Company.
18     Q   And what is your current position
19  at The Times?
20     A   I'm senior vice president of
21  Operations and Labor.
22     Q   How long have you held that
23  position?
24     A   I've held that position since July
25

ARBITRATION

1  of 2009.
2     Q   And what did you do before becoming
3  senior VP for Operations and Labor at
4  The Times?
5     A   I originally came to The Times in
6  2006, July of 2006, and I came in as vice
7  president of Labor Relations.
8     Q   Can you provide the arbitrator a
9  short summary of your work history prior to
10  being employed at The New York Times.
11     A   Out of college I went to work for
12  the airlines.  Started with Ozark Airlines
13  in 1974.  Ozark was merged into TWA, later
14  TWA was merged into American, so I kind of
15  followed that track.
16        Then shortly after 9-11 in 2001, I
17  left the airlines for a period and went to
18  work for the Transportation Security
19  Administration, TSA.  I stayed there for a
20  couple years.
21        Then in 2003, I went back to the
22  airlines.  I went to work for Delta and I
23  was with Delta until 2006 when I came to
24  The Times.
25

ARBITRATION

1     Q   And in connection with your airline
2  work, in what area of airline operations
3  were you employed?
4     A   In the airlines, I was in charge of
5  operations, labor relations and human
6  resources.
7     Q   So for roughly how many years have
8  you been involved with labor relations?
9     A   Oh, over 30.
10     Q   Can you briefly describe to us what
11  the responsibilities are of the senior vice
12  president for Operations and Labor at
13  The New York Times?
14     A   At The Times my responsibilities
15  include newspaper production, magazine
16  production, both T Magazine, the weekly
17  magazine that appears in the Sunday paper;
18  Safety, security, building operations, all
19  the real estate that The Times has around
20  the world; and labor relations.
21     Q   I'm now going to ask you a series
22  of questions about your service on boards of
23  trustees of benefit funds.
24        Do you sit on any boards of
25

Page 122

```
1              ARBITRATION
2   trustees for multiemployer pension or
3   welfare plans?
4       A   Yes, I do.
5       Q   And which ones?
6       A   I sit on the Fund for the New York
7   Guild, Newspaper Guild, both Pension and
8   Welfare.
9           And I also sit on the MDU, both
10  Pension and Welfare.
11      Q   And NMDU would be the Newspaper and
12  Mail Deliverers-Publishers Union?
13      A   The Newspaper Mail and Deliverers
14  Union, yes.
15      Q   Thank you.
16          And the Pension Fund is called the
17  Newspaper and Mail Deliverers'-Publishers'
18  Pension Fund?
19      A   Yes.
20      Q   And that's the Pension Fund in
21  connection with this arbitration, correct?
22      A   That is correct.
23      Q   And when did you join the board of
24  trustees for the NMDU Pension Fund?
25      A   I joined in 2007.
```

Page 123

```
1              ARBITRATION
2       Q   And who are currently the other
3   trustees on that Fund?
4       A   There is a another management
5   trustee on the Fund from one of the other
6   publishers as well as two trustees from the
7   Union.
8       Q   Who is the other management
9   trustee?
10      A   Just slipped my mind.  Sorry.  I
11  went blank.
12      Q   That's all right.
13          Is he a recent appointee?
14      A   Yes.
15      Q   Very recent appointee?
16      A   Very recent.
17      Q   And who are the Union trustees of
18  the Fund?
19      A   Mr. Setteducato and Mr. Tommy
20  Bentvena.
21      Q   In your role as trustee of the
22  Pension Fund, have you had any involvement
23  in the trustees' decisions in connection
24  with the assessment of partial withdrawal
25  liability against The Times?
```

Page 124

```
1              ARBITRATION
2       A   No, I have not.
3       Q   So you have not attended any
4   trustee board meetings where that issue was
5   discussed?
6           MR. RICHMAN:  Objection.
7           ARBITRATOR IRVINGS:  What's the
8       objection?
9           MR. RICHMAN:  It's leading.
10  BY MR. MILLER:
11      Q   Have you ever attended trustee
12  board meetings in which the issue of
13  assessment of withdrawal liability against
14  The Times was discussed?
15      A   No, not in my presence.
16      Q   Has there been a process that has
17  been employed by the trustees at these
18  meetings so as to assure that you will not
19  be involved in any such discussion?
20      A   During meetings when we were having
21  pension meetings, they wanted to discuss
22  that particular issue, sometimes it was
23  during the middle of the meeting, sometimes
24  at the end, I was asked to leave.  I was
25  recused from those meetings.
```

Page 125

```
1              ARBITRATION
2       Q   Roughly, how many meetings have you
3   attended of the trustees in which during the
4   course of the meeting you've been asked to
5   step out and recuse yourself?
6       A   Most all the meetings leading up to
7   the assessment letter.
8       Q   Since approximately what year?
9       A   Since about the beginning of 2009.
10      Q   Until when, sir?
11      A   Until the assessment letter came
12  which was around 2013.
13      Q   In light of these recusals, do you
14  possess any confidential or privileged
15  information about the Pension Fund's actions
16  in connection with the assessment of
17  withdrawal liability against The Times that
18  you acquired through your service as
19  trustee?
20      A   No, I do not.
21      Q   I'd now like to ask you a series of
22  questions about an entity known as C & S.
23          Do you know what C & S is?
24      A   Yes.  C & S was City and Suburban
25  Wholesaler.  It was a wholly owned
```

ARBITRATION

1
2  subsidiary of The New York Times.
3          Its business was distributing
4  mostly retail location papers for not only
5  The Times but for some of the other
6  publishers in the City.
7      Q    When you started at The Times in
8  July 2006, how was C & S doing financially?
9      A    When I joined The Times in 2006,
10  there was already a senior team that was
11  discussing C & S.  They had been discussing
12  C & S for several months before I arrived.
13          The assessment was clear that C & S
14  was not doing well, and so we were trying to
15  come up with a solution for the C & S
16  problem.
17      Q    And you mentioned the assessment.
18  Would that be the -- that was the assessment
19  of whom?
20      A    It was the assessment of the
21  management team that was working through the
22  process.
23          We looked at every option we could
24  think of in dealing with the C & S financial
25  issue.

ARBITRATION

1
2      Q    What did that team conclude about
3  C & S's viability?
4      A    That team concluded that C & S was
5  not a viable company during our assessment.
6          We shared that information with our
7  senior management and also with the
8  leadership of the Union.
9          We talked to the Union and advised
10  them that they might want to hire an analyst
11  to come in.  And under an NDA we shared
12  sensitive information about the company,
13  financial as well as operational.
14          And he came back to the team, both
15  the management team and the Union team that
16  were in the room together, and his
17  assessment was, basically, he looked at the
18  Union and told them even if they drove for
19  free, it was not a viable company.
20      Q    And this was the assessment of the
21  Union's financial consultant?
22      A    Yes, it was.
23      Q    What did The Times decide to do
24  about C & S following the team's assessment?
25      A    Following those meetings, we met

ARBITRATION

1
2  with, again, our senior management to brief
3  them on what those discussions had brought.
4  And this was about the beginning of June of
5  2008 we had those discussions.  Discussions
6  with the Union took place during the summer.
7          So it was determined that C & S
8  should be closed, and we made a decision
9  that we would publicly announce that in
10  September of 2008.
11      Q    How was The New York Times doing
12  financially during this time period?
13      A    The New York Times, like most
14  publications, most newspapers, we were
15  really going through a really tough time
16  with the advent of the e-readers and the
17  Internet and that entire thing that
18  continues today to give us problems.
19          So we were having a really tough
20  time.  We were losing subscribers.  They
21  were losing advertisers, so it was pretty
22  tough.
23          Then you throw on top of that the
24  economic situation in general because we
25  were in the midst of the meltdown during

ARBITRATION

1
2  that period of time.  So getting your hands
3  on operating capital was pretty tough.
4      Q    What steps did The New York Times
5  have to take to implement its decision to
6  close C & S?
7      A    Once we decided to close C & S and
8  made that public, we knew that we would have
9  to sit down with the NMDU and discuss a
10  wind-down proposal and plan that would do
11  several things.
12          Number one, we wanted to maintain
13  the business we already had.  It was already
14  in terrible shape but we wanted to protect
15  what we did have left.  And we also wanted
16  to come up with a plan that would treat the
17  employees fairly during the wind down.
18      Q    What was your understanding, if
19  any, about The Times' contractual
20  obligations to C & S employees in the event
21  of the C & S closing?
22      A    Under the C & S contract, we had an
23  obligation to the C & S regular situation
24  holders, which were the regular C & S
25  employees who had been employed by C & S for

ARBITRATION

1  more than one year, to give them eight weeks
2  of pay as their severance.
3     Q    And notwithstanding the contractual
4  obligations, was The Times prepared to
5  negotiate a package beyond those contractual
6  obligations?
7     A    As I said, we wanted to maintain
8  the business, we wanted to protect the
9  business that we had, and we were prepared
10 to give the employees a greater severance
11 package covering more employees than we were
12 contractually obligated to do.
13    Q    And let's discuss and why don't you
14 summarize in general terms what issues were
15 discussed with NMDU as part of these
16 negotiations.
17    A    We discussed various issues.  As I
18 said, it was important to us to maintain the
19 business.  It was important to the Union
20 that we treated the employees fairly, giving
21 them something that would help them get a
22 softer landing than what's called for the
23 contract.
24         And also they were most interested

ARBITRATION

1  in our trying to hire in to The Times
2  operations as many employees as they could
3  get us to take.
4         It was our original thought that we
5  really didn't want to take hardly any
6  employees.  We were kind of exiting that
7  business.  So as part of the cost savings
8  that we were going through at the time, it
9  was our impression not to take any of those
10 employees.
11        However, during the negotiations,
12 it became very clear to us that this was a
13 cornerstone issue for the Union that we hire
14 some of these employees.
15    Q    And so as a consequence of this
16 being a cornerstone issue for the Union,
17 what was eventually agreed to?
18    A    After several months of discussion,
19 we had identified a business plan that made
20 sense for us to hold on to that we could
21 justify where we would keep certain
22 Manhattan retail distribution outlets under
23 our control.
24         So what we ended up coming up with

ARBITRATION

1  was a plan that gave the company the option
2  to, if there were less than eight copies of
3  papers sold during a week as an average, we
4  could give that work to anybody else.  If it
5  was less than eight copies during the week,
6  we could give that work away.
7         So based on the construct such as
8  that, we identified locations that had eight
9  or more, and those we kept inside The Times.
10 And we hired employees from C & S to do that
11 work.
12    Q    And were pension costs a
13 consideration that The Times were mindful of
14 in these negotiations?
15    A    When we initially put together our
16 plan, it was our plan not to hire any
17 employees.
18        So part of our cost structure when
19 we were figuring out what the cost of
20 winding down C & S was, we had built in a
21 withdrawal possibility, a partial withdrawal
22 possibility.
23        That number was totaled about
24 15 million which was 12 million for the NMDU

ARBITRATION

1  plan -- and C & S was part of a wholesaler
2  plan, so we had identified $3 million that
3  would be associated with that.
4         Now, when we were going through the
5  process of determining if we were going to
6  hire employees or not, we realized that
7  their desire for us to hire employees would
8  address the issue of withdrawal liability.
9         So that was when we decided we'd go
10 forward with that, then that affected what
11 those withdrawal liability numbers were.
12    Q    Okay.
13        And how would the hiring of C & S
14 employees at The Times, how would that
15 address the issue of withdrawal liability?
16    A    Hiring enough employees from C & S
17 at the rate that was The New York Times
18 rate, because the C & S rate was less than
19 The Times wage rate.  So hiring them at
20 The Times in the right numbers with the
21 correct Times pay rate and wage rate would
22 keep us above that level where we would pick
23 a partial withdrawal.
24    Q    And did The Times model how many

Page 134

ARBITRATION

1
2  C & S employees would be needed to
3  potentially avoid or, rather, prevent --
4  strike that.
5      Did The Times model how many C & S
6  employees The Times would need to prevent a
7  partial withdrawal?
8      A    The driver was how many employees
9  did it take to get the job done.  And so we
10 figured that it would be somewhere between
11 58 and 60 employees that would kind of get
12 us to that level.
13     So, yes, we did model that.  And
14 those numbers coincidentally worked out.
15     Q    And what was your understanding at
16 that point in time of the relevant unit for
17 measuring whether a 70 percent decline might
18 occur?
19     A    It was the percentage of wage.
20     Q    It was wages?
21     A    Wages.
22     Q    And what did your estimates or
23 projections show in that regard respecting
24 hiring needs to keep wages above the
25 30 percent mark?

Page 135

ARBITRATION

1
2      A    When we began the negotiations and
3  once we started really talking about taking
4  on employees, our proposals initially were
5  to pay them at C & S rates.  And the Union,
6  of course, wanted a higher number.  I think
7  they were near 80 people at one point that
8  they wanted us to take.
9      Eighty, of course, didn't fit into
10 the business plan of the modeling of work
11 that we needed to have done, so we ended up
12 agreeing to 65 folks at The New York Times
13 rates.
14     Q    I'd now like to turn your attention
15 to Exhibit Number 55, which I think is in
16 the second binder.
17     A    Yes.
18     Q    Do you recognize this document?
19     Do you recognize this document,
20 sir?
21     A    Yes.  This is the C & S closing
22 agreement.
23     Q    And can you read into the record
24 the first sentence of Paragraph 2A of this
25 document.

Page 136

ARBITRATION

1
2      ARBITRATOR IRVINGS:  It is in
3  the record.
4      MR. MILLER:  Yes.  All right.
5  BY MR. MILLER:
6      Q    Can you focus on the first sentence
7  of Paragraph 2A of this document?
8      A    Yes.
9      Q    Did The Times ultimately hire 65
10 C & S employees pursuant to this agreement?
11     A    Ultimately, we hired a total of 68.
12 So what we hired was the 65 in accordance
13 with the agreement, and the hiring was done
14 in seniority order.  So we needed some
15 supervision also for this group, so we ended
16 up hiring an additional three people from
17 C & S.
18     So the total number was 68, at the
19 end of the day.
20     Q    And what was your expectation based
21 on these hirings as to whether The Times'
22 contribution base units with respect to the
23 Pension Fund would not decrease by
24 70 percent?
25     MR. RICHMAN:  Objection.

Page 137

ARBITRATION

1
2  Leading.
3      MR. MILLER:  I can rephrase.
4      ARBITRATOR IRVINGS:  Please.
5  BY MR. MILLER:
6      Q    Based on these hires, did The New
7  York Times have any expectations about the
8  impact of these hires on the prospect of a
9  partial withdrawal?
10     A    Yes.  We felt with these hires at
11 The New York Times rates of pay, that we
12 would not have a partial withdrawal.
13     Q    Do Times drivers get paid the same
14 wage as C & S drivers, or did they at the
15 time?
16     A    No, they did not.
17     Q    What was the significance of the
18 wage differential between The Times and
19 C & S in connection with expectations about
20 these hires?
21     ARBITRATOR IRVINGS:  I'm not
22 sure I understand the question.
23     MR. RICHMAN:  It's leading,
24 anyway.
25     MR. MILLER:  I'll rephrase.

35 (Pages 134 to 137)

Page 138

ARBITRATION

1
2    ARBITRATOR IRVINGS:  Go ahead.
3  BY MR. MILLER:
4      Q    Was there a significance about the
5  wage differential between The Times and
6  C & S in connection with The Times'
7  consideration about hiring and the
8  possibility of partial withdrawal?
9      A    Yes.  As I stated before, the wage
10  rates were higher at The Times.  And when we
11  brought these employees over, we raised
12  their rates from the C & S rates to
13  The Times rates, so the overall average
14  rate, wage rate was higher for The Times'
15  contributions.
16      Q    And now I would like you to turn
17  your attention to Exhibit 38.
18      A    Okay.  I have it.
19      Q    Do you recognize this document,
20  sir?
21      A    Yes.  This is a Form 8-K/A filing
22  for The New York Times Company.
23      Q    What is an 8-K/A?
24      A    An 8-K/A is, if you will, an
25  amendment to a prior filed 8-K.

Page 139

ARBITRATION

1
2      Q    And was there a prior filed 8-K in
3  connection -- strike that.
4          Let me lay a better foundation.
5          This 8-K/A filing was in connection
6  with what event, sir?
7      A    Yeah.  Several lines down -- this
8  is -- there is a date here of
9  September 8th.  That's a rounded date that
10  we announced the closing of C & S.
11          So this 8-K/A represents an update
12  at some point of the original filing of the
13  8-K that was tied to the closing of C & S or
14  the announcement of the close.
15      Q    And did The Times file an 8-K
16  regarding the closure of C & S?
17      A    Yes, they did.
18      Q    What was purpose of the 8-K/A, the
19  amendment to the original 8-K filing, in
20  connection with the closing of C & S?
21      A    It was to update any information
22  that may have changed from the original
23  filing, because we have to give the most
24  up-to-date and most correct information that
25  we can in our filings.

Page 140

ARBITRATION

1
2      Q    And when was this amendment, this
3  8-K/A filed?
4      A    This 8-K/A was filed on December 2,
5  2008.
6      Q    And what was the relationship
7  between the filing of this 8-K/A and any
8  closing agreement that you had reached with
9  the Union in connection with the C & S --
10          MR. RICHMAN:  Objection.
11  Leading.  Was there a relationship --
12          MR. MILLER:  I'm asking for --
13  I can easily lay the foundation.
14  BY MR. MILLER:
15      Q    Was there a relationship between
16  the filing of this amended 8-K and the
17  closing agreement that had been reached
18  respecting the closing of C & S?
19      A    Yes.  By December 2, 2008, we had
20  negotiated the closing agreement.  The
21  document had been signed, the document had
22  been ratified by the Union.
23      Q    Mr. Hayes, can you turn your
24  attention to Section 2.05 of this document.
25          It's on the second page.  It's the

Page 141

ARBITRATION

1
2  page entitled at the bottom NYT-000486.
3      A    Yes.
4      Q    Do you see Section 2.05?
5      A    Yes, I do.
6      Q    And what is the purpose of that
7  paragraph?
8      A    That paragraph, as stated in its
9  heading, "Costs associated with the exit or
10  disposal activities."
11          This is totally regarding the C & S
12  closure, and this is going through the
13  numbers of what those estimates and costs
14  may be.
15      Q    And what did Section 2.05 indicate
16  the costs would be to The Times of closing
17  C & S?
18      A    The cost to closing C & S was
19  between 48 and 53 million of which
20  30 million was associated with the staff
21  reduction which included any type of
22  withdrawal liability that there may be.
23      Q    And do you have an understanding as
24  to whether the estimated cost in this 8-K/A
25  in Item 2.05 reflected The Times' judgment

36  (Pages 138 to 141)

ARBITRATION

1
2  of any withdrawal liability to the NMDU
3  Fund?
4      A    Yes.
5      Q    And what is that understanding?
6      A    That understanding was that there
7  would be no withdrawal liability from the
8  NMDU Fund.
9          However, there was a small
10  withdrawal for the Wholesaler Fund of about
11  3 million.
12      Q    And is the Wholesaler Fund related
13  to the NMDU Fund?
14      A    No, it's not.  Totally separate.
15      Q    I'd now like to draw your attention
16  to Exhibit 54.
17      A    Okay.  I have it.
18      Q    Do you recognize this document?
19      A    Yes.  This is an internal document
20  that we used when we were forecasting the
21  cost of the C & S closure.
22      Q    And does this internal document --
23  strike that.
24          What is the relationship between
25  this internal document and the disclosures

ARBITRATION

1
2  that were made in the 8-K and 8-K/A, if any?
3      A    This was the backup document that
4  we utilized to feed what was ultimately
5  placed into the 8-K.
6          This is our financial backup.
7      Q    I'd like you to turn your attention
8  to the last page of this document, the page
9  that's entitled at the bottom right
10  NYT-000717.
11          Are you at that page, sir?
12      A    Yes, I am.
13      Q    Looking to the last page of the
14  document, what does this say across the line
15  that's entitled Potential Withdrawal
16  Liability?
17      A    Yes.  This document states that at
18  this point in our preparation that there was
19  a 15 -- and the 15 is in millions -- there
20  was a 15-million-dollar partial withdrawal
21  liability that we booked at this point.
22      Q    And what do the next columns say
23  under the heading 8-K Filing Low, 8-K Filing
24  High?
25      A    Those both say at this point TBD,

ARBITRATION

1
2  to be determined.
3      Q    And which, if any, of the 8-K or
4  8-K/A filings would the Number 15 million on
5  the last page have been reflected in?
6      A    The change to this would have been
7  reflected in the final backup to the final
8  document because then we would be able to
9  fill in the TBDs.
10      Q    And thus now I'd like you to turn
11  your attention to the first page of this
12  document, the one that is entitled on the
13  right NYT-000713.
14          And how was this first page
15  different from the last page of the
16  document?
17      A    This page has now removed the TBDs,
18  and they've replaced them with numbers, if
19  you will.
20          So what this says now under the
21  Potential Withdrawal Liability is the
22  original number was 15 million.  Now there's
23  a range that we've added, a low range and a
24  high range.
25          The low range is zero, the high

ARBITRATION

1
2  range is 3 million.
3          What that represents is we now know
4  that we have a signed agreement with the
5  Union and it's been ratified, so the numbers
6  that we can place in here now are our best
7  estimate of what our withdrawal liability
8  would be.
9      Q    And does this document contain a
10  description relating to The New York Times'
11  assumption about withdrawal liability for
12  the NMDU plan?
13      A    Yes, it does.
14          It states that it assumes no
15  withdrawal liability for the NMDU plan and a
16  minimum withdrawal for the C & S plan.
17          The C & S plan was a wholesaler
18  plan.
19      Q    That you referred to earlier?
20      A    That's what I referred to earlier.
21      Q    And what is the date on this
22  document, "this document" being the Page 1
23  of this exhibit?
24      A    This document is dated 12-1-2008.
25      Q    And, again, what is the timing or

ARBITRATION

1  ARBITRATION
2  temporal relationship between 12-1-2008 and
3  the date that the closing agreement
4  regarding C & S had been signed and
5  ratified?
6      A    Again, this is post ratification,
7  so we know what the numbers are.  And this
8  document indicates that.
9      Q    And why, if any, reason were you
10  able to make the determination that you
11  memorialized on the front page of this first
12  page of the document in connection with
13  withdrawal liability expectations for the
14  NMDU plan?
15      A    Yes.  Based on our calculations and
16  the wages that we were paying the employees
17  that came over from C & S, we were sure that
18  we would not take a partial withdrawal.
19      Q    And, indeed, what does it say, if
20  anything, about The Times' belief in the
21  accuracy of the dollar figures for the cost
22  of the C & S closing that it put those
23  dollar figures in its 8-K/A filing?
24      ARBITRATOR IRVINGS:  You can
25  argue that.

ARBITRATION

1  ARBITRATION
2      MR. MILLER:  Okay.
3  BY MR. MILLER:
4      Q    Would the judgment of The Times
5  about the potential for withdrawal liability
6  to the Pension Fund have been different had
7  you believed that a different relevant unit
8  applied to determine CBUs and the potential
9  of a 70 percent decline?
10      A    Yes.  We would have made other
11  choices other than the ones we did.
12      Q    And if you had believed that the
13  relevant unit for measuring the 70 percent
14  decline was shifts, what would you
15  potentially have done?
16      A    I could have gone with the higher
17  number that the Union wanted me to hire,
18  just accept their number.  That would have
19  gone a long way to solve that problem, or,
20  conversely, since we knew -- since we had
21  figured out what our withdrawal would be, we
22  may have decided not to hire any.
23      Q    And why would you have potentially
24  done something different if you had
25  understood that CBUs was shifts rather than

ARBITRATION

1  ARBITRATION
2  wages?
3      A    Because of the wage differential
4  between The Times and C & S, I mean, the
5  numbers were just different.
6      As far as shifts were concerned,
7  there was no way that there could be that
8  balance because there are just a lot of
9  people at C & S, so you didn't have that
10  wage arbitrage that you could deal with.
11      Q    And what was the basis for your
12  understanding and belief that CBUs were
13  wages rather than shifts back during this
14  time in late 2008/early 2009?
15      A    All the documentation that I had
16  seen:  Letters from the Union, a letter
17  between the bargaining parties, letters
18  between the Fund and the Employers,
19  everything talked about the percentage of
20  the wage.  So it was very clear to me that
21  that was it.
22      Q    Did the Union ever communicate with
23  The Times in a manner that referred to
24  pension contribution rates as a percentage?
25      A    Yes.

ARBITRATION

1  ARBITRATION
2      Q    And can you describe those
3  communications?
4      A    Yes.  Inside of one of the
5  agreements, the Union had negotiated the
6  ability to move up to 2 percent of the wages
7  from Pension to Welfare.  And that was
8  negotiated back in the late '90s, I believe.
9      Q    Can I draw your attention so we can
10  elaborate on this a little bit, so Exhibit
11  Number 60.
12      A    Yes, I have it here.
13      Q    Mr. Hayes, do you recognize this
14  document?
15      A    Yes.  This is a Memorandum of
16  Agreement from 1992.
17      Q    And this Memorandum of Agreement is
18  between The New York Times and whom?
19      A    And the Newspaper and Mail
20  Deliverers Union, the NMDU.
21      Q    And can you turn to the page marked
22  FUND-0001111, which is also Page 14 of the
23  MOA.
24      A    Yes.
25      Q    And can you review and briefly

Page 150

```
1              ARBITRATION
2    summarize your understanding of the
3    paragraph marked D.
4         ARBITRATOR IRVINGS:  One
5    moment.  Let me read it, please.
6    BY MR. MILLER:
7         Q    Mr. Hayes, go ahead and summarize.
8         A    Paragraph D sets up, if you will,
9    an agreement that allows the Union to
10   reapportion those percentages of wages
11   between the two funds as long as the total
12   contribution between the two funds was not
13   greater than 15.68 percent.
14        Q    And what did this language imply to
15   you about the basis for The Times'
16   contributions to the Pension Fund?
17        MR. RICHMAN:  Objection.
18        ARBITRATOR IRVINGS:  You are
19   asking him for opinion, an argument.
20        He could testify as to if he knows
21   how it's implemented, but to the extent
22   this all happened before he was there,
23   you are simply asking for him to
24   interpret a document which you can do
25   just as well, I'm sure.
```

Page 151

```
1              ARBITRATION
2         MR. MILLER:  We will attempt to
3    do so at the appropriate time,
4    Mr. Arbitrator.
5    BY MR. MILLER:
6         Q    Do you have an understanding of
7    whether the Union ever exercised this right
8    to move contributions?
9         A    They absolutely did.
10        Q    Now let me direct your attention to
11   Exhibit 6.
12        And, Mr. Hayes, what is this
13   document?
14        A    This document is a letter from
15   Stephen Goldstein, who at the time of this
16   writing was the secretary/chair of the NMDU
17   as well as a trustee.
18        And it's a letter to Thomasina
19   McMillan who was our manager of payroll.
20        Q    What is the date of this letter?
21        A    January 22, 2008.
22        Q    And you were indeed employed at
23   The New York Times at this time?
24        A    Yes, I was.
25        Q    And did you see this document on or
```

Page 152

```
1              ARBITRATION
2    around the time it was sent?
3         A    Yes, I did.
4         Q    And given that you saw this
5    document or recall seeing this document at
6    or around the time it was distributed, what
7    did this document imply to you about the
8    basis on which The Times is obligated to
9    contribute to the Pension Fund?
10        A    This document, the specifics of it
11   moved a half percent from the Welfare Fund
12   back to the Pension Fund, so our pension
13   contributions would now be changed,
14   effective February 1st, to 6 and a half
15   percent of wage effective that date.
16        Q    And what did this document imply to
17   you about the Union's understanding of the
18   basis on which The Times is obligated to
19   contribute to the Pension Fund?
20        MR. RICHMAN:  Objection.
21        ARBITRATOR IRVINGS:  You are
22   asking him to speculate on their
23   state of mind?
24        MR. MILLER:  Withdrawn.
25        ARBITRATOR IRVINGS:  Okay.
```

Page 153

```
1              ARBITRATION
2    Thanks.
3    BY MR. MILLER:
4         Q    I'd like to draw your attention to
5    the use in this letter of codes.
6         Do you see that this letter refers
7    to two codes:  Code 620 and Code 615.
8         Do you see that?
9         A    Yes, I do.
10        Q    Do you have an understanding of
11   what the reference to these codes are?
12        A    These are codes that are used
13   within our payroll system.
14        Q    So these are New York Times payroll
15   codes?
16        A    Yes.
17        Q    And the author of the letter, the
18   Union secretary/treasurer, is making
19   reference to New York Times payroll codes?
20        A    Yes.
21        Q    Thank you.
22        I now want to draw your attention
23   to Exhibit 7.
24        A    Okay.
25        Q    Do you recognize this document,
```

39 (Pages 150 to 153)

ARBITRATION

1
2  sir?
3     A   Yes, I do.
4     Q   And what is this document?
5     A   This is yet another letter from the
6  Union to Thomasina McMillan, our manager of
7  payroll.
8        This time it is signed by two of my
9  fellow trustees, the president of the Union,
10 Doug Panattieri, and the secretary/chair,
11 Stephen Goldstein.
12       And this letter, too, represents a
13 movement of a half percent from the Welfare
14 to the Pension.
15    Q   And did you see this letter on or
16 around the time it was sent?
17    A   Yes.
18    Q   And what did this letter imply to
19 you about the basis on which The Times was
20 obligated to contribute to the Pension Fund?
21    A   Once again, it indicated to me that
22 the Union viewed our contributions based on
23 the percentage of wage.
24    Q   Thank you.
25       Mr. Hayes, have you ever heard of

ARBITRATION

1
2  the term a "Form 5500"?
3     A   Yes, I have.
4     Q   And what is your understanding of a
5  Form 5500?
6     A   A Form 5500 is required to be filed
7  by plans, and it lays out all the financials
8  of a plan and all the pertinent information
9  regarding a plan.
10    Q   And did the NMDU Pension Fund file
11 annual Form 5500s?
12    A   They did file 5500s.
13    Q   And have you reviewed Form 5500s
14 filed by the Pension Fund?
15    A   Yes, I have.
16    Q   And did the information contained
17 in those Form 5500s have an impact on your
18 understanding regarding the proper base unit
19 measure for the 70 percent decline test for
20 partial withdrawal liability?
21       MR. RICHMAN:  Can we have some
22 understanding with respect to these
23 documents as to when he had reviewed
24 them?
25       MR. MILLER:  I will get there

ARBITRATION

1
2  in due course.
3     MR. RICHMAN:  Well, he's asking
4  him questions about a document that I
5  don't know if he reviewed at the time
6  or reviewed subsequent to assessment
7  of partial withdrawal or preparation
8  for this proceeding.
9     MR. MILLER:  And I'm about to
10 indeed ask those questions.  So let
11 me do so now.
12    ARBITRATOR IRVINGS:  Great.
13 BY MR. MILLER:
14    Q   So I'd like you to turn your
15 attention, Mr. Hayes, to Exhibit 69.
16       Do you recognize this document?
17    A   This is the 5500 filing for the
18 NMDU for Plan Year 2006.
19    Q   And when does that 2006 plan year
20 end?
21    A   May 31, 2007.
22    Q   I would like you to turn your
23 attention to the page in this document that
24 was marked FUND-0001759.
25       MR. RICHMAN:  Can we get to the

ARBITRATION

1
2  point of when he looked at these?
3  Seems to me pretty important if he is
4  simply going to be reading something
5  that he reviewed at a point in time
6  subsequent to the withdrawal,
7  preparation, subsequent to the
8  assessment or in preparation that
9  he --
10    MR. MILLER:  I have my
11 questions in a certain order, but I
12 can reverse them to address
13 Mr. Richman's point.
14    ARBITRATOR IRVINGS:  So go
15 ahead, I'd rather have you do it.
16 BY MR. MILLER:
17    Q   So on or around the time of this
18 C & S closing agreement -- strike that.
19 I'll just lay a foundation.
20       At around the time of the C & S
21 closing agreement, did you actually review
22 any Form 5500s?
23    MR. RICHMAN:  Objection.
24 Leading.  When?
25       ARBITRATOR IRVINGS:  We'll get

ARBITRATION

1
2    there.  We'll start with that one.
3       Go ahead.
4    A    Yes, I did review some Form 5500s.
5    Q    And what was the process by which
6    you obtained Form 5500s to review?
7    A    I had asked someone to supply me
8    with the latest Form 5500s that we had and
9    that's what I reviewed.
10   Q    And for what purpose did you review
11   these Form 5500s at that time?
12   A    I wanted to see what the Fund had
13   stated in the 5500, what the contribution
14   rate was.
15   Q    And do you recall looking at the
16   Form 5500 for 2006, which is Exhibit 69, on
17   or around the time of the C & S closing?
18   A    I looked at several forms around
19   that closing.  This may have been one of
20   them.  I can't say if it was or not.  But I
21   did review 5500s.
22   Q    Let's turn to the page I previously
23   referred to which is --
24   A    I'm sorry?
25   Q    -- FUND-0001759.

ARBITRATION

1
2    A    Yes.
3    Q    And can you turn to the bottom of
4    that page and the discussion of contribution
5    rate.
6    A    Yes.  This particular page shows
7    that the contribution rate is 6 percent of
8    wages.
9    Q    I'd now like to have you take a
10   look at what's been marked -- I'm sorry --
11   what is Exhibit 70.
12   A    Yes.
13   Q    And this is also a Form 5500?
14   A    Yes, this is Form 5500 or Plan Year
15   2007.
16   Q    And can you turn your attention to
17   the page marked FUND-0001999.
18   A    I have it.
19   Q    And what does that document and
20   that page say in connection with the heading
21   Contribution Rate?
22   A    Contribution Rate here says, "6 and
23   a half percent of wages effective June 1,
24   1999," followed by another line that says,
25   "6.5 percent of wages effective January 1,

ARBITRATION

1
2    2008."
3    Q    In connection with your review of
4    Form 5500s at or around the time of the
5    C & S closing, do you recall whether the
6    discussion of contribution rate in those
7    Form 5500s was put in the similar language
8    in each one of the forms in which you
9    reviewed?
10   A    Yes.
11   Q    And what was that language?
12   A    That language was percentage of
13   wage.
14   Q    Thank you.
15       Following the closing of C & S,
16   what, if anything, did you do to make sure
17   that a 70 percent decline in contribution
18   base units did not occur?
19   A    I had requested that our Finance
20   Department keep track of what our
21   contribution rates were.
22   Q    And who at the Finance Department
23   in particular was assigned that role?
24   A    I had asked Tom Cavallaro to keep
25   me up to speed on what those numbers were.

ARBITRATION

1
2    Q    And who is Mr. Cavallaro?
3    A    Tom Cavallaro is vice president of
4    Finance.
5    Q    And would Mr. Cavallaro or others
6    in the Finance Department report to you on
7    this issue?
8    A    I only had conversations about this
9    with Tom, and I would just -- periodically
10   he and I would discuss the Funds and we
11   would discuss where am I on my contribution
12   rate to the NMDU Fund, how am I doing.
13   Q    And did you have an understanding
14   that the Finance Department was monitoring a
15   decline in pensionable contribution?
16   A    Yes.
17   Q    And what was your understanding of
18   the basis upon which they were monitoring
19   that decline?
20   A    They were monitoring the percentage
21   of wage to make sure that we didn't touch
22   that point.
23   Q    And indeed in connection with your
24   communications with the Finance Department,
25   what did his review show?

Page 162

ARBITRATION

1
2    A    His review showed year by year that
3    we were okay.
4         At one point, he did tell me you're
5    within a million dollars of that point, so
6    we had our eyes on it.
7    Q    And what, indeed, was the time
8    frame of these communications?
9    A    These communications took place
10   probably around the fund period where the
11   Fund would report or during the September
12   time period.
13        Those were kind of the benchmarks
14   for me.
15   Q    As a consequence of the
16   communications with the Finance Department,
17   were there any actions that you took or
18   chose not to take because you did not want
19   wages to fall any further?
20   A    Yes.  Under the closing agreement,
21   there was a paragraph that stated that if a
22   certain number of papers would drop below
23   the 7, we could send more work out.  And if
24   there was enough of that occurring, we had
25   the ability to reduce headcount associated

Page 163

ARBITRATION

1
2    with the loss of that circulation.
3         While there was pressure to cut
4    costs, we made a conscious decision not to
5    do that.
6    Q    Not to do what?
7    A    Not to reduce the headcount.
8    Q    Is there anything you would have
9    done differently had you believed that
10   The Times was close to or about to trigger a
11   partial withdrawal?
12   A    Yes.  The Times always has the
13   ability to bring more work back in, so at
14   any time I could have brought work back into
15   The Times and hired people associated with
16   that work.
17   Q    During the years following the
18   C & S closing, did The Times ever
19   communicate with the Pension Fund with
20   regard to the 70 percent decline and
21   relevant base units?
22   A    Yes.
23   Q    I'd like to draw your attention to
24   Exhibit 14.
25        Do you recognize this document?

Page 164

ARBITRATION

1
2    A    Yes.  This is a letter from Tony
3    Benton, who is our senior vice president of
4    Finance, to the NMDU Fund requesting a
5    withdrawal liability estimate.
6    Q    And what was the date of this
7    request?
8    A    The letter's dated January 22,
9    2009.
10   Q    And, temporally, what was that date
11   relative to the C & S closing?
12   A    It was very close to the C & S
13   closing.  We closed C & S on January 4th of
14   that year.
15   Q    Were you involved in the
16   preparation of this letter?
17   A    Yes, I was.
18   Q    And who is Mr. Anthony Benton?
19   A    As I stated, he's our senior vice
20   president of Finance.  And at the time he
21   was corporate controller.
22   Q    And why did he sign the letter?
23   A    He signed the letter after he and I
24   discussed it, pretty much.  I decided that
25   it was better to come from him than from me

Page 165

ARBITRATION

1
2    because I am a trustee on that Fund, so it
3    was suggested that he make the request.
4    Q    Did The Times, to your knowledge,
5    ever receive a response to this letter?
6    A    No, we did not.
7    Q    And let me draw your attention to
8    Paragraph 4 on Page 2 of this letter.
9         And did The Times, to your
10   knowledge, in particular ever receive a
11   response to the requested information in
12   Paragraph 4 of this letter?
13   A    No, we did not.
14   Q    I'd now like to draw your attention
15   to Exhibit 56.  And when doing so, Mr. Hayes
16   and Mr. Arbitrator, please focus your
17   attention on the second page of the letter
18   which has a heading entitled "Mercer."
19        It's the second page of the
20   document, it's a separate letter.
21        Mr. Hayes, do you recognize this
22   document?
23   A    Yes.  It is a letter from Mercer to
24   the NMDU Pension Fund.
25   Q    And who is Mercer?

42 (Pages 162 to 165)

ARBITRATION

1
2     A    Mercer was our outside consultant
3 that we hired to work with us on all of our
4 pension funds, all our multiemployer funds.
5     Q    And can you turn to the second page
6 of the letter. It's got the Bates stamp
7 NYT-001964.
8     A    Yes.
9     Q    And you'll see there are some names
10 at the bottom aligned with the word "copy."
11         Who are those individuals?
12     A    Vince DiMaggio was vice president
13 with us, James Dexter and Mitchell Hoffman.
14 We were part of the Mercer firm at this
15 time.
16     Q    And were these the individuals that
17 The Times had hired to consult with you on
18 multiemployer fund issues?
19     A    Yes.
20     Q    And can you summarize the
21 information requested in Paragraphs 1 and 2
22 of this letter?
23     A    Once again, this is a request for
24 withdrawal liability information.
25         This letter is dated 2010. We

ARBITRATION

1
2 asked for full calculations, contribution
3 base units, just as we did before. The same
4 requests.
5     Q    Did The Times' consultant Mercer,
6 to your knowledge, ever receive an estimate
7 of withdrawal liability for the period
8 requested in this letter?
9     A    No, they did not.
10     Q    Did The New York Times, to your
11 knowledge, ever receive an estimate of
12 withdrawal liability for the plan years
13 requested in this letter?
14     A    No, we did not.
15     Q    To your knowledge, did the Pension
16 Fund ever send any of the requested
17 information in this letter?
18     A    To my knowledge, they did not.
19     Q    Did you have any conversations with
20 others at The Times about the Fund's failure
21 to answer both this request and the prior
22 request that we examined a moment ago?
23     A    Yes. We had internal discussions
24 about the inability for us to get
25 information that we asked for from the Fund.

ARBITRATION

1
2     Q    Now, I think you testified earlier
3 that you were recused from certain trustee
4 meetings where issues involving The New York
5 Times were discussed.
6         Do you remember that testimony?
7     A    Yes, I do.
8     Q    When did the meetings at which you
9 were recused begin to occur?
10     A    Beginning of 2009.
11     Q    And as a consequence of these
12 recusals, did you form a belief as to what
13 the Fund's intentions were in connection
14 with The Times?
15     A    Yes. I felt that the Fund was
16 trying to determine if it could establish a
17 basis for a partial withdrawal.
18     Q    Did there ever come a time in which
19 the Pension Fund contacted The New York
20 Times with a request for information about
21 The Times' relationship to third-party
22 wholesalers?
23     A    Yes, we did get a communication
24 from them.
25     Q    And did you at that time form a

ARBITRATION

1
2 belief as to why the Pension Fund was
3 seeking that information?
4     A    I felt this was one of the thoughts
5 they had, that they may be able to create a
6 partial withdrawal with that claim.
7     Q    And what was your understanding of
8 that claim?
9     A    My understanding of that claim is
10 that they claimed that the companies that we
11 had farmed the work out to were under our
12 control and we had simply just done away
13 with the Union members, hired in the back
14 room somewhere these other companies and
15 these employees were now doing the work.
16     Q    And did you form a belief about
17 whether that action as alleged by the Fund
18 might give rise to or have the Fund think it
19 gave rise to a partial withdrawal?
20     A    I absolutely felt that that was
21 what they were after.
22     Q    I would like to now draw your
23 attention to Exhibit 77.
24         What is this document, sir?
25     A    This document is my letter to the

Page 170

ARBITRATION

Fund, Murray Schwartz in particular,
answering his request for information
regarding the independent wholesalers that
were now delivering the papers.

Q    And take a moment and then I'd like
you to briefly summarize what The Times and
you indicated in this letter.

A    What this letter stated to the
Union and to the Fund was that these were
independent wholesalers not under our
control, not part of any companies that we
owned, and, therefore, their thought that
there was a withdrawal, partial withdrawal
based on that was not true, had no basis for
it.

They had requested confidential
information like contracts and all of those
things.  And we basically said to them,
there's no basis for any of that, either.

Q    Now I'd like to draw your attention
to Page 2 of the letter and the second
paragraph of the letter.

A    Yes.

Q    And can you please take a moment

Page 171

ARBITRATION

and review that second paragraph.

A    Yes.

Q    At the time of this letter, had the
Fund raised any allegation of a 70 percent
contribution decline?

A    No, they had not.

Q    Following this letter, did the Fund
tell you that it was considering whether a
70 percent CBU decline had occurred?

A    No, they did not.

Q    Now I would like to draw your
attention to Exhibit 1.

Do you recognize this document,
sir?

A    Yes, I do.

Q    And what is this document?

A    This is the Pension Fund's demand
letter based on a partial withdrawal from
the Fund based on the C & S closure.

Q    And what is your understanding of
the basis for CBUs in connection with the
assertion of a partial withdrawal that is
set forth in this letter?

A    This letter states that it's based

Page 172

ARBITRATION

on shifts.

Q    And what was your reaction when you
received this letter in September 2013 and
learned that the Fund was asserting partial
withdrawal liability on the basis of a
70 percent decline related to CBUs as
shifts?

A    I was very surprised by that.

Q    And why was that?

A    The only theory that we had seen
from them was the theory of the control
issue in my letter that I stated just
previous.  And I had requested in that
letter if you have any other theory, please
let us know, but if we don't hear from you,
then we believe that you agree with us that
it is percentage of wages.

I hadn't heard a word until this
letter arrived.

MR. MILLER:  No further
questions at this time.

MR. RICHMAN:  Take a couple
minutes.

MR. MILLER:  Sure.

Page 173

ARBITRATION

(A brief recess was
taken.)

CROSS EXAMINATION BY MR. RICHMAN:

Q    Mr. Hayes, how are you today?

A    I'm good.  Thank you.

Q    Good.

So in July 2000, you became the
vice president of Labor Relations at
The Times?

A    When?

Q    July of 2000?

A    2006.

Q    2006.  My "6" looks like a zero.
Okay.

And so when you became the vice
president of Labor Relations in 2006 in
July, did you read the collective bargaining
agreement between The Times and the NMDU?

A    The MOA that was in place, yes, and
the contract, yes.

Q    And the contract.  When we talk
about the contract -- let me show you
Exhibit 8, so we are all talking about the
same thing.

44  (Pages 170 to 173)

ARBITRATION

1
2     When you just answered "contract,"
3   Exhibit 8 is the contract to which you were
4   referring?
5     A   Yes, this is the contract.
6     Q   Okay.
7         When you became a trustee of the
8   Pension Fund, who was counsel to the Pension
9   Fund?
10    A   At that time, I'm not sure.  I
11  think it was Warren.
12    Q   Warren Mangan.
13    A   And Neal Schelberg.
14        ARBITRATOR IRVINGS:  Warren --
15        MR. RICHMAN:  M-A-N-G-A-N.  Or
16  some form of that.
17  BY MR. RICHMAN:
18    Q   What firm is Mr. Schelberg from?
19    A   Proskauer.
20    Q   And Proskauer provides what to
21  The New York Times?
22    A   Labor counsel.
23    Q   Labor counsel?
24    A   Yes.
25    Q   And Mr. Schelberg provides counsel

ARBITRATION

1
2   to The New York Times?
3     A   No.
4     Q   And did there come a time when
5   Mr. Mangan ceased being the counsel to the
6   Pension Fund?
7     A   Yes.
8     Q   And who took his place?
9     A   It was taken by, I can't remember
10  the young lady's name now, but they brought
11  in a whole new firm at one point.
12    Q   Does the name Elizabeth O'Leary
13  ring a bell?
14    A   It was before Elizabeth.  Elizabeth
15  came as part of the deal, so it was before
16  Elizabeth.
17    Q   So there was a deal --
18    A   There was Jani --
19    Q   Jani Rachelson?
20    A   Yes.
21    Q   So Jani Rachelson was there for a
22  period of time?
23    A   Yes.
24    Q   And she's been counsel to the
25  Pension Fund?

ARBITRATION

1
2     A   That's correct.
3     Q   And then is that when the deal was
4   made for Elizabeth O'Leary to come in?
5     A   Elizabeth O'Leary came in to be
6   counsel to the Fund, and the Union trustees
7   brought in someone else.
8     Q   Irwin Bluestein?
9     A   Irwin Bluestein.
10    Q   Was Mr. Schelberg counsel to the
11  Employer trustees?
12    A   Yes.
13    Q   And the other three counsel you
14  mentioned were counsel to the Union
15  trustees?
16    A   Elizabeth at one point was the
17  Union trustee, but then at one point she
18  became sort of like tied to the director.
19    Q   Okay.
20        And that director is Murray
21  Schwartz?
22    A   Murray Schwartz.
23    Q   And now who was the auditor to the
24  Fund during the time that you've been a
25  trustee?

ARBITRATION

1
2     A   I don't recall off the top of my
3   head.  I'm sorry.
4     Q   Mitchell Lewis, does that ring a
5   bell?
6     A   As an auditor?
7     Q   Yes.
8     A   Maybe Mitch, yeah.
9     Q   Maybe Mitch?
10    A   I'm on a couple funds.  There's
11  names running through my head.
12    Q   How many funds are you on?
13    A   I'm on a couple of funds.
14    Q   "Couple" as in two?
15    A   Yes.
16    Q   So you don't know whether Mr. Lewis
17  was the auditor to the Fund?
18    A   I believe he was.
19    Q   But you're not sure?
20    A   No.
21    Q   And is he still the auditor to the
22  Fund?
23    A   If he was, he is.
24    Q   If he was, he is.  Okay.
25        During the time you've been a

45  (Pages 174 to 177)

Page 178

```
 1            ARBITRATION
 2   trustee, who was the actuary to the Fund?
 3       A    That would be Segal.
 4       Q    And was there a specific individual
 5   at Segal who performed the actuary services
 6   for the Fund?
 7       A    There were two representatives at
 8   Segal on the Fund.
 9       Q    And who were they?
10       A    God.  Horrible with names.  One was
11   John Urbank and then there was a young lady
12   with him.
13       Q    Rosana Egan?
14       A    Rosana.
15       Q    And which one of those was the
16   actuary?
17       A    I think Rosana was.  I think John
18   was just the lead guy.
19       Q    And did both of them come to
20   trustee meetings while you were a trustee?
21       A    Yes.
22       Q    And did the auditor, if it was
23   Mr. Lewis or any other auditor, come to the
24   meetings while you were a trustee?
25       A    Yes.
```

Page 179

```
 1            ARBITRATION
 2       Q    And counsel came to the meetings?
 3       A    Yes.
 4       Q    And when I'm talking about
 5   meetings, for the record it's clear we're
 6   talking about meetings of the Pension Fund?
 7       A    Yes.
 8       Q    What was the nature of your
 9   relationship, let's take counsel to the
10   Funds?
11       A    Just they were there at the
12   meetings.  We would ask them for legal
13   guidance on different issues.  They would
14   give us their position.
15       Q    Okay.
16            Did you have a relationship at all
17   with Mr. Lewis?
18       A    No.
19       Q    Did you ever talk to him outside of
20   the meetings?
21       A    No.
22       Q    How about legal counsel, have you
23   ever talked to them outside of the meetings
24   about Pension Fund matters?
25       A    Yes.
```

Page 180

```
 1            ARBITRATION
 2       Q    And with whom did you speak?
 3       A    Neal Schelberg when we had internal
 4   meetings of the management trustees on an
 5   issue.
 6       Q    Anybody else?
 7       A    Sometimes there would be counsel to
 8   the Union.  It wasn't actually a meeting,
 9   but it would be a call, so, yes.
10       Q    Okay.  And what was the nature of
11   your relationship with Mr. Urban?
12       A    Purely professional at the
13   meetings.  I never saw him any other place.
14       Q    What about Ms. Egan?
15       A    Same thing.
16       Q    Who was the director of the Fund
17   during the time that you were a trustee?
18       A    Murray Schwartz for most of the
19   time.
20       Q    And who is the director now?
21       A    Now it's Bob Costello.
22       Q    And what was the nature of your
23   relationship with Mr. Schwartz?
24       A    He was director of the Fund.  That
25   was my relationship.
```

Page 181

```
 1            ARBITRATION
 2       Q    Had you ever talked to him outside
 3   of Fund meetings?
 4       A    If there was an issue regarding the
 5   Fund, yes.
 6       Q    And what issue regarding the Fund
 7   did you talk to him about?
 8       A    It could be almost anything having
 9   to do with if we were looking at some type
10   of changing someone, some money market
11   person.  If we were going to try to put the
12   funds in some other vehicle, he might talk
13   about that with us.  But that was pretty
14   much it.
15       Q    You ever talked with Mr. Schwartz
16   about how the Fund calculated withdrawal
17   liability?
18       A    No.
19       Q    You ever talk with Mr. Schwartz
20   about anything relating to withdrawal
21   liability?
22       A    No.
23       Q    You ever talk to Mr. Schwartz about
24   anything relating to partial withdrawal
25   liability?
```

46 (Pages 178 to 181)

Page 182

ARBITRATION

1
2    A    No.
3    Q    You ever talk to Mr. Schwartz about
4  anything related to contribution base units?
5    A    No.
6    Q    Do you know what a contribution
7  base unit is?
8    A    Yes.
9    Q    What is it?
10   A    It's the basis on which the company
11 makes its contribution to the Fund.
12   Q    Okay.  And is that the same or
13 different than a contribution rate?
14   A    It's the same.
15   Q    It's the same.  Okay.
16        Now, you testified something
17 about -- on your direct about what's
18 happening in the industry.
19   A    Yes.
20   Q    I want to spend a minute or two
21 talking about that.
22   A    Okay.
23   Q    You are quite familiar with the
24 industry, correct?
25   A    I'm familiar with the industry,

Page 183

ARBITRATION

1
2  yes.
3    Q    Fortunately or unfortunately?
4    A    Fortunately.
5    Q    Who are the contributing employers
6  of the Fund?
7    A    All the -- we've got the Daily
8  News, we've got the Post, we've got
9  The Times, we've got the Jersey paper I
10 can't think of right now.  But, yes.
11   Q    Okay.
12        And the papers are in the
13 publishing industry, correct, all the papers
14 you mentioned?
15   A    Yes.
16   Q    And what is the outlook for that
17 industry?
18   A    Not promising.
19   Q    And what's because of what?
20   A    Advertising dollars are down,
21 subscriptions are down because of the Web.
22 Free news.  Everybody wants it for free all
23 the time.
24   Q    That is always a problem.
25        Do you have any reason to believe

Page 184

ARBITRATION

1
2  that the industry will not continue to
3  decline?
4    A    There's no reason to believe that
5  they would turn around.
6    Q    Now, you indicated in your direct
7  that at some point in time you recused
8  yourself from certain activities as a
9  trustee of the Pension Fund, correct?
10   A    Yes.
11   Q    And what did you do to recuse
12 yourself from -- what activities did you
13 stop doing?
14   A    Any time there was going to be a
15 discussion regarding The New York Times, I
16 would recuse myself when it had to do -- and
17 they would tell me, they would tell me,
18 we're not going to talk about this issue and
19 so and Neal and I knew it was time to go.
20   Q    And why did Neal have to leave, to
21 your understanding?
22   A    Because it was also requested that
23 he recuse himself.
24   Q    Now, because of the nature of the
25 relationship between Proskauer and The New

Page 185

ARBITRATION

1
2  York Times?
3    A    I'm not sure why the trustees felt
4  that way, so I can't say.
5    Q    And while you were a trustee, did
6  you ever take a position vis–à–vis the
7  Pension Fund that was opposite the interest
8  of the Pension Fund?
9        MR. MILLER:  Objection.  Among
10 other things, it's vague and
11 ambiguous.  What do you mean?
12        And there's no -- there's certainly
13 no foundation to create a basis for
14 understanding the question.
15        MR. RICHMAN:  There is no
16 foundation necessary.  But I'll
17 rephrase the question.
18        ARBITRATOR IRVINGS:  Please.
19        MR. RICHMAN:  Okay.
20 BY MR. RICHMAN:
21   Q    So as I understood it, from
22 sometime in 2009, you started to recuse
23 yourself from certain discussions, correct?
24   A    Yes.
25   Q    And other than recuse yourself from

TSG Reporting - Worldwide    877-702-9580

ARBITRATION

1
2 certain discussions, did you do anything
3 else to recuse yourself?
4      A    I'm not sure I understand the
5 question.
6      Q    Okay.
7           Well, was the only thing that you
8 thought you had to do in order to recuse
9 yourself from -- let me withdraw that
10 question.
11          Why did you think you had to recuse
12 yourself?
13     A    The trustees had asked that we do
14 that.  This came from the trustees.
15     Q    Okay.
16          Did you understand why?
17     A    Well, I certainly understood why.
18     Q    And why was that?
19     A    Because they were going to be
20 discussing The New York Times.
21     Q    Okay.
22          Did you ever discuss The New York
23 Times' partial withdrawal liability with
24 Neal Schelberg or anyone else from
25 Proskauer?

ARBITRATION

1
2      A    No.
3           There was at one point someone else
4 at Proskauer who was representing us when
5 the theory was withdrawal based on control.
6      Q    Okay.
7           And you in fact wrote a letter, did
8 you not?
9      A    Yes.
10     Q    To Mr. Schwartz with respect to
11 that issue of control?
12     A    That's correct.
13     Q    And you wrote that letter at the
14 time that you were a trustee?
15     A    Correct.
16     Q    And you were trying to convince
17 Mr. Schwartz that The New York Times did not
18 have control, correct?
19     A    No, I was not trying to convince
20 him of anything.  He had written me a letter
21 to ask me for information directly I think
22 as my role as the senior executive at the
23 time.
24          So I answered that in that role as
25 senior executive at the time.

ARBITRATION

1
2      Q    Now, let's take a look at the
3 collective bargaining agreement.
4           First of all, let's look at the
5 cover page.  You see it says The News, The
6 New York Times.
7      A    Uh-huh.
8      Q    Who is The News?
9      A    It's just like the Daily News.  I'm
10 not sure who The News was at that time.
11     Q    Another contributing employer to
12 the Pension Fund?
13     A    Yes.
14     Q    And what was the Publishers
15 Association of New York City?
16     A    You know, that was before my time.
17 I can tell you what my
18 understanding was, but it would not be based
19 on any firsthand knowledge of what it was.
20     Q    Okay.  What is your understanding?
21     A    It was a group --
22          MR. MILLER:  Let me object.  In
23 light of Mr. Hayes' prior answer,
24 it's going to be speculation.
25          ARBITRATOR IRVINGS:  What's the

ARBITRATION

1
2 purpose of this?
3           MR. RICHMAN:  Well, I want to
4 know a little bit about the
5 Publishers Association.  That's all I
6 want to know.  So I can drag somebody
7 else in.
8           THE WITNESS:  I wouldn't know.
9 BY MR. RICHMAN:
10     Q    Is there anywhere in the collective
11 bargaining agreement that requires The New
12 York Times to contribute to the Pension
13 Fund?
14     A    Yes.
15     Q    And let's see if we can take a look
16 at Page 55 of the contract, and on the
17 bottom it's 952, Bates number.
18          And I'm focused on 13-I.1.
19          Do you see that?
20     A    I do.
21     Q    When was the first time you read
22 that language?
23     A    First time I saw the book.
24     Q    And when was that?
25     A    Before I arrived here in 2006.

48  (Pages 186 to 189)

ARBITRATION

1  Before I arrived in July 2006.
2  Q    And when you read that and
3  particularly the part that mentions, "The
4  publisher agrees it shall contribute
5  8 percent of each employee's pay rate per
6  shift for each shift worked by each employee
7  in the bargaining unit" -- I'm shortening
8  it -- "to the Pension Fund."
9       What did -- let's take the first
10 phrase, "per shift."
11      What did that mean to you?
12      MR. MILLER:  Objection.  Lack
13 of foundation.  Obviously, the
14 agreement was entered 25 years before
15 he got to The New York Times, but
16 there's been no foundation that he in
17 fact read this particular language in
18 2006 and formed an opinion as to what
19 it meant at that juncture.
20      MR. RICHMAN:  Well, there's no
21 other agreement that has this
22 language, at least not according to
23 The New York Times, because the only
24 language that was produced by The New

ARBITRATION

1  York Times was this agreement.
2       MR. MILLER:  But you haven't
3  established that he in fact looked at
4  this language and formed an opinion
5  about this language at the time he
6  saw it.
7       ARBITRATOR IRVINGS:  Let me
8  short-circuit this.
9       I don't know how people testify as
10 to their interpretation of an agreement.
11 They can testify as to how it's been
12 implemented.  But just as I'm not going
13 to have your witnesses come in and say we
14 believe this agreement means this and he
15 believes it means something else.  So ...
16      MR. RICHMAN:  Here's the
17 difference here.
18      He has testified on direct all
19 sorts of times about how it was clear to
20 him that the basis of contributions was
21 wages.  And I think that if anyone had
22 done, even the first thing that one would
23 expect someone to do trying to figure out
24 the basis on which a contribution was

ARBITRATION

1  made might actually read the contract.
2       And so I can go back and ask him
3  whether he read this language, and
4  certainly I want to ask him what he
5  thought this meant because I'm
6  cross-examining him on his belief.
7       ARBITRATOR IRVINGS:  Fair
8  enough.
9       MR. MILLER:  But,
10 Mr. Arbitrator, may I be heard?
11      ARBITRATOR IRVINGS:  You could
12 be heard, yes.
13      MR. MILLER:  That's another way
14 of saying I want to know what his
15 interpretation of the contract was.
16      And during my direct I asked him
17 what the bases were for his belief that
18 contribution base units equal shifts.
19      He did not in response to that
20 direct testimony indicate that one of the
21 bases was his reading an interpretation
22 of the contract.
23      If I had and if he had given that
24 answer, that would have opened the door

ARBITRATION

1  to Mr. Richman's question.
2       But because he did not testify that
3  any of the bases that formed his
4  impression was his reading and
5  interpretation of the contract, at this
6  juncture to ask him what he thinks the
7  contract means falls squarely in your
8  admonition that you don't allow such
9  testimony.
10      ARBITRATOR IRVINGS:  Well, let
11 me say this.  I go back and I look at
12 his testimony and he was asked about
13 if he believed it was wages not
14 shifts based on everything he had
15 seen between the Union and The Times.
16      So, yes, you can go into it.
17 However, let me say this:  I don't find
18 it probative, okay, on either side.
19      MR. MILLER:  Thank you.
20      MR. RICHMAN:  But let me just
21 make one other comment because this
22 is a different situation.  This is a
23 witness who is saying, look, I had to
24 figure out whether we're going to

ARBITRATION

have a partial withdrawal or not. And so I went about all these different ways to try to figure out what the partial withdrawal was. And I asked the Fund for on two occasions, they never responded.

And if he really wanted to find out whether there was a partial withdrawal, he might start with reading the contract.

ARBITRATOR IRVINGS: You can certainly ask him if he read the contract, which actually he said he did.

But the next step is to start interpreting the contract, I just -- ultimately, issues of how it was implemented, statements made, those type of things, fine. But, you know, interpretations now don't do it.

If there were statements, if there were declarations from either side, this is what we're maintaining it means, that's helpful information.

But getting a debate now from your



ARBITRATION

respective witnesses about how they interpret the contract now doesn't do anything for me.

MR. RICHMAN: Okay. I'll just end with this. All I wanted to understand is when he came to his conclusion, how he came to the conclusion with respect to -- I mean, he said he read the contract. He said he read it at or about or before the time he arrived at The New York Times.

So before he reached his conclusion, he had read the contract.

ARBITRATOR IRVINGS: Uh-huh.

MR. RICHMAN: And in reading the contract, I just wanted to know what his understanding was.

MR. MILLER: A contract that we submit was in the abstract ambiguous and you need to understand practices in order to interpret it.

I think you've indicated what weight you'll give it.



ARBITRATION

ARBITRATOR IRVINGS: You are free to examine.

MR. RICHMAN: Okay.

BY MR. RICHMAN:

Q So did you read this language?

A Yes. As I said, back in 2006 before I showed it up.

Q And did this language ever affect your conclusion as to what the basis was for The Times contributing to the Pension Fund?

A No. As I said during my testimony, it was based on how the parties actually utilized whatever the language was, so the practice that was in place is what I based my understanding on.

Q Now, do you know or did you ever know how other employers contributing to the Pension Fund contributed?

A No.

Q Okay. So as a trustee, you never inquired into that?

A As a trustee, it never came up at any trustee meeting as to how they were doing it. I only know how we were doing it.



ARBITRATION

Q So you never were interested in knowing how other contributing employers contributed to the Fund?

A I figured they contributed like we did. We contributed on a percentage of wages. That's how we reported, that's how we did it. I figured they did it the same way.

Q And that percentage of wages was for all wages?

A No, no, not all wages.

Q What wages?

A The contract states and the parties have identified what wages are counted, what wages are not.

Q Now let me show you the C & S contract, which is Exhibit 84.

Did you ever read this contract?

A I did read it at some point, yes.

Q And when did you read that?

A I think I read it when we started to have discussions about C & S. C & S wasn't in my purview, so I think I might have read it when I came into The Times.

ARBITRATION

1  ARBITRATION
2  And then I looked at it again, of course,
3  when we started talking about shutting it
4  down.
5     Q    When we are talking about "shutting
6  it down," you are talking about shutting
7  down C & S?
8     A    Yes.
9     Q    And when was that?
10    A    That would have been in 2008.
11    Q    Okay.
12         You see this contract on the first
13  page it says -- it extends the collective
14  bargaining agreement which expires on
15  March 30, 2008 until March 30, 2020.
16         Do you see that?
17    A    Yes.
18    Q    And was that, in your mind --
19  that's accurate, correct?
20    A    Yes, that's what it says.
21    Q    All right.
22         And if you take a look at Page 7 of
23  the contract, and particularly language
24  under K.  This is the Roman Numeral VI, it
25  starts on Page 4.  Just so you have the

1  ARBITRATION
2  context.
3         And then what I'm focused on is K.
4         Had you seen this language during
5  the time that there were internal
6  discussions at The New York Times about
7  shutting C & S down?
8     A    We never focused on this language.
9     Q    Never focused on this language?
10    A    No.
11    Q    Why not?
12    A    We were closing C & S down, so
13  provisions of the agreement, once it was
14  closed, would be gone.
15    Q    Okay.  Doesn't this language
16  indicate to you how C & S was contributing
17  to the Pension Fund?
18    A    How they were contributing was not
19  important to me if I was shutting it down.
20    Q    It wasn't important to you?
21    A    Not when I was shutting it down.
22    Q    Okay.  Thank you.
23         Do you have any idea what the term
24  in the fifth line of K "full shift
25  contribution" means?

1  ARBITRATION
2         MR. MILLER:  Objection.
3  Mr. Arbitrator, he's asking for an
4  interpretation again.
5         MR. RICHMAN:  I'll move on.
6         ARBITRATOR IRVINGS:  And he
7  never looked at it, so ...
8         MR. RICHMAN:  Okay.
9  BY MR. RICHMAN:
10    Q    Do you know whether the term
11  "shift" is defined in the collective
12  bargaining agreement?
13         ARBITRATOR IRVINGS:  Are we
14  talking about the --
15         MR. RICHMAN:  I'm sorry.  I'm
16  going back and forth.  Exhibit 8.
17         MR. MILLER:  You mean the C & S
18  agreement?
19         MR. RICHMAN:  No.  Exhibit 8 is
20  The Times agreement.
21    A    I don't remember off the top of my
22  head if it is or it is not.
23    Q    Has the language in Exhibit 8 with
24  respect to The Times' obligation to
25  contribute to the Pension Fund changed other

1  ARBITRATION
2  than the rates?
3     A    I'd have to look at the MOAs to see
4  if there have been shifts, or different
5  work, for no work that you get paid that you
6  get contributions for.  I don't know -- I'd
7  have to review that.
8         But I would have to venture to
9  think that along the way there's been
10  movement of what goes into that percentage
11  of contribution, that wage.
12    Q    Okay.
13         THE WITNESS:  You asked me
14  about one.  Did you ask me about the
15  contract itself?
16         MR. RICHMAN:  Eight.
17         THE WITNESS:  Eight.  It's over
18  here.  Okay.
19  BY MR. RICHMAN:
20    Q    I would like to focus you on, if
21  you turn to Page 55 of the contract.  That's
22  in Exhibit 8.
23    A    Yes.
24    Q    And you see the language -- I'm
25  really focused on the language at the

ARBITRATION

1
2  beginning of that paragraph and ending in
3  the line that says "First day of
4  absence ..."
5        Do you see that going down?
6    A    Yes.
7    Q    Has that language ever changed?
8    A    I don't know. And the reason I
9  don't know, the literal reading says "for
10 each shift worked," but I'm pretty sure we
11 made contributions for shifts that are not
12 worked.
13   Q    Okay.
14   A    So when you ask me if it's changed,
15 I can tell you that the practice doesn't
16 follow what you see, so that's why you look
17 to the practice of the parties to understand
18 how it's administered.
19   Q    Okay.
20        And for what types of
21 contributions -- contributions are due on
22 behalf of employees who haven't worked,
23 correct, under certain circumstances; is
24 that right?
25        MR. MILLER: Objection. Are

ARBITRATION

1
2  you asking him the practice as he
3  understands it or, again, an
4  interpretation of the contract?
5        MR. RICHMAN: I'm asking for
6  him as his practice.
7        ARBITRATOR IRVINGS: Go ahead.
8    A    Yes.
9    Q    Okay. And what kind of -- give me
10 an example of one.
11   A    When an employee is on vacation.
12   Q    Okay. And what was the practice of
13 The Times when an employee was on vacation?
14   A    I believe we gave him a percentage
15 of wage.
16   Q    Okay. And how did you figure out
17 what that wage was?
18   A    We knew what his wage was, and we
19 paid him that percentage of that wage for
20 that day.
21   Q    For that day?
22   A    For that day.
23   Q    And is it correct that a day is a
24 shift?
25   A    He didn't work.

ARBITRATION

1
2    Q    I understand he didn't work the
3  shift, but is it correct that a day is a
4  shift?
5        MR. MILLER: Can you answer
6    that?
7    A    A day, if you want to make that
8  leap, yes, a day is a shift. Could be a
9  night shift.
10   Q    Could be a night shift. That's
11 right?
12   A    Could be night, could be day.
13   Q    It could be a night shift and could
14 be a day shift?
15   A    Right.
16   Q    How does The Times contribute for
17 employees who go on Workers' Compensation?
18   A    I'm not that familiar with the ins
19 and outs of that.
20   Q    Okay. But you don't know?
21   A    No.
22   Q    I think we're looking at 116, so we
23 need a new volume.
24        Have you had a chance to read it?
25   A    Yes.

ARBITRATION

1
2    Q    Did you work with Mr. Baker?
3    A    Yes, I did.
4    Q    So when you came to The Times in
5  2006, he was still there?
6    A    Yes.
7    Q    And did he report to you?
8    A    Yes.
9    Q    Did he generally know what he was
10 doing in his job?
11        MR. MILLER: Objection.
12        What do you mean by that question?
13   A    He was my employee. I would not
14 like to talk about what I felt about his
15 work.
16   Q    Okay.
17   A    I'm not sure if it's relevant to
18 what we're talking about.
19   Q    Okay.
20        So when you read this, this is a
21 letter that he sent to Mr. Schwartz.
22        And in the letter he says, "This is
23 to confirm that the two New York Times
24 checks" -- and the checks, by the way, are
25 attached.

ARBITRATION

1
2      Do you see them on the second and
3  third page?
4      A    Okay.
5      Q    -- "in your possession are
6  contributions for 23 shifts to the Welfare
7  Fund and for 23 shifts to the Pension
8  Fund" -- you see that -- "on behalf of
9  Mr. Santiago Aguilar."
10      MR. MILLER:  Mr. Arbitrator,
11  I'm going to object to this line of
12  questioning on complete lack of
13  foundation.
14      Mr. Hayes was not at The Times in
15  2001.  Mr. Richman has not established
16  he's seen this letter.
17      Mr. Richman has not established a
18  foundation that Mr. Hayes, unlike
19  Mr. Claffee, is familiar with the payroll
20  processes at The New York Times.
21      MR. RICHMAN:  All I'm going to
22  ask him is if what is described here
23  comports with what his understanding
24  is of The New York Times' practices,
25  if he has one.

ARBITRATION

1
2      MR. MILLER:  And my objection
3  is that Mr. Richman has not even laid
4  a foundation that Mr. Hayes
5  understands and is knowledgeable
6  about the payroll practices.
7      We had testimony about the payroll
8  practices from somebody who is
9  knowledgeable.
10      MR. RICHMAN:  He knows what --
11      ARBITRATOR IRVINGS:  You got
12  the answers you wanted from the
13  witness who knew about payroll
14  practice.
15      You want to keep asking?
16      MR. RICHMAN:  I'm going.  I'm
17  going.  Sorry.
18  BY MR. RICHMAN:
19      Q    Now, Mr. Hayes, let me show you
20  Exhibit 42.
21      A    Okay.
22      Q    Have you ever seen these before?
23      A    I've seen this at some point.
24      Q    Can you tell us at what point?
25      A    Oh, within the last couple weeks.

ARBITRATION

1
2      Q    Oh, okay.  I'm not interested at
3  that point.
4      Okay.  Prior to the Fund assessing
5  partial withdrawal liability against
6  The Times, had you seen these?
7      A    No.
8      Q    Okay.  Now, you indicated on direct
9  that you reviewed Form 5500s, correct?
10      A    Yes.
11      Q    And you indicated on direct that
12  you received them from -- I wrote down
13  "someone."
14      A    Yes.
15      Q    Can you tell me who the someone is?
16      A    I don't recall.  It might have been
17  from our actuary consultant.  I'm just not
18  sure.
19      Q    That actuary consultant would have
20  been Mercer?
21      A    Yes.
22      Q    And let's take a look at
23  Exhibit 69, please.
24      A    All right.
25      Q    Now, my understanding of what you

ARBITRATION

1
2  testified on direct was that you read the
3  Form 5500.
4      A    I read some 5500s.  I've read a lot
5  of 5500s since I've gotten the letter.
6      Q    Okay.
7      And, but it is my understanding
8  that you looked at Form 5500s during the
9  time period that you were working on closing
10  down C & S.
11      A    Yes.
12      Q    I'm sorry.  You have to wait until
13  I've finished, even though you were right on
14  the question.
15      So, but you didn't recall exactly
16  which 5500s you read, correct?
17      A    That's correct.
18      Q    So we're going to take them one by
19  one.
20      And so this one is for the plan
21  year ending 5-31-2007.
22      And I want to direct your attention
23  to Page 1793, particularly if you just read
24  the paragraph to yourself entitled
25  Contributions.

53 (Pages 206 to 209)

ARBITRATION

1
2    A    Okay.
3    Q    Now, did you read that when you
4    read the Form 5500?
5    A    No, I did not.
6    Q    So did you read the audit report --
7    this is part of an audit report.
8        If we go back to Page 1785, you can
9    see the front page of that.
10   A    Yes.
11   Q    Did you read the audit report at
12   the time that you read the 5500s?
13   A    As I said, I wasn't sure if this
14   was one of the 5500s I reviewed.
15   Q    Okay.
16       But there were audit reports that
17   you did review.
18   A    No.  I was focused -- when I looked
19   at the 5500s, I was focused in one place and
20   I was looking at the contribution rate.
21       When I went to the Form 5500, I
22   wanted to see how the Fund stated that.
23       So that's where my focus was.
24   Q    Why was that your focus?
25   A    Because that's the form that the

ARBITRATION

1
2    plan states for the world to see and
3    understand how it operates, and it gives you
4    all of its elements there.
5        So that's why I went straight
6    there.
7    Q    And as I recall your testimony
8    before, to you, contribution rate is the
9    same thing as contribution base unit?
10   A    Yes.
11       MR. RICHMAN:  I don't need to
12   go through these one by one.
13   BY MR. RICHMAN:
14   Q    Is it your testimony, Mr. Hayes,
15   you never read an audit report from the
16   Pension Fund?
17   A    I never said that.
18       MR. MILLER:  Wait.  Objection.
19       MR. RICHMAN:  I'm asking.  It's
20   his testimony.
21   Q    Is it your testimony that you have
22   never read an audit report from the Pension
23   Fund?
24       MR. MILLER:  No.  Objection.  I
25   think the implication -- I don't know

ARBITRATION

1
2    whether you're asking him whether he
3    read audit reports during that
4    2008/2009 time frame or more broadly.
5        MR. RICHMAN:  I'm starting more
6    broadly and then I'll focus.
7        MR. MILLER:  Okay.
8    A    I have read audit reports, yes.
9    Q    For the Pension Fund?
10   A    Yes.
11   Q    And when was the first time that
12   you read an audit report from the Pension
13   Fund?
14   A    I can't recall.
15   Q    Did you read them during the time
16   period that you were working on shutting
17   down C & S?
18       MR. MILLER:  I think he already
19   testified --
20       MR. RICHMAN:  Excuse me.
21   Q    Did you read them --
22   A    I can't recall when I read them.
23   Q    Okay.  And so is it your testimony
24   that you can't place any time period when
25   you read an audit report for the Pension

ARBITRATION

1
2    Fund?
3    A    No.
4    Q    It's not your testimony?
5    A    No, I can't tell you when I did or
6    did not read it.
7    Q    So you don't know whether you read
8    it before the Pension Fund assessed partial
9    withdrawal liability against The Times?
10   A    I don't know if I did or not, no.
11   Q    Okay.
12       When you were working on this
13   project with respect to shutting down C & S,
14   who else at The New York Times was working
15   with you?
16   A    There was a very large group of us
17   working on that project.  It included people
18   from Finance, it included people from
19   Circulation.  It included a lot of folks.
20   There was a room larger than this full of
21   people.
22   Q    The room had more people or it was
23   a large room?
24   A    Both.
25   Q    Sorry.  Couldn't help it.

Page 214

ARBITRATION

1
2    Did you ask any ERISA counsel to
3    review the Form 5500s of the Pension Fund at
4    or around the time that you were working on
5    the closing of C & S?
6        MR. MILLER:  Mr. Arbitrator, I
7    think this runs quite close to a
8    question that's covered by the
9    attorney/client privilege.
10       I think that the answer as to
11   whether legal advice was sought is
12   probably okay, but I want to put the
13   marker down now that Mr. Richman can go
14   no further.
15       ARBITRATOR IRVINGS:  The marker
16   is glowing.
17       MR. RICHMAN:  I would never
18   cross the marker.
19       ARBITRATOR IRVINGS:  Go ahead.
20       MR. RICHMAN:  I'll assure you.
21   BY MR. RICHMAN:
22    Q    Can you answer that question,
23   please.
24    A    Yes.
25    Q    You did?

Page 215

ARBITRATION

1
2    A    Yes.
3    Q    And who was that counsel?
4    A    It was Mr. Projansky.
5    Q    At Proskauer Rose?
6    A    Yes.
7    Q    Did you ask The Times CFO to review
8    the Pension Fund's audit reports during the
9    time that you were working on shutting down
10   C & S?
11   A    No.
12   Q    Now, were you present at a board of
13   trustees meeting of the Pension Fund when
14   there was a discussion of a payroll audit of
15   C & S?
16   A    I was there when they said that an
17   audit of C & S had been ordered, yes.
18       We usually were told when they were
19   going to audit and who they were going to
20   audit.  So, yes, I was there.
21   Q    Okay.  Let me show you Exhibit 51
22   first.
23   A    Okay.
24   Q    Now, these are minutes of a
25   trustees meeting, correct?

Page 216

ARBITRATION

1
2    A    Yes.
3    Q    And you were present at that
4    trustees meeting?
5    A    Yes, I was.
6    Q    Were you present at the meeting
7    during the time that Mitchell Lewis gave his
8    report?
9    A    Yes.
10   Q    And did you listen to Mr. Lewis'
11   report?
12   A    Yes.
13   Q    Did you ask him any questions?
14   A    No.
15   Q    Did you talk to him outside of a
16   trustees meeting about his report?
17   A    No.
18   Q    Did you ever talk to Murray
19   Schwartz about Mr. Lewis' report?
20   A    No.
21   Q    Talk to any of the other trustees
22   about Mr. Lewis' report?
23   A    No.
24   Q    Did you ever talk to anybody
25   else -- and "else" meaning other than the

Page 217

ARBITRATION

1
2    people I just's went through with you --
3    about Mr. Lewis' report?
4    A    No.
5    Q    I'm going to show you -- well,
6    let's turn to Page 12 -- let's start with
7    Page 1246.  The Bates numbers on the bottom.
8    A    1246, yes.
9    Q    This was handed out at the meeting,
10   correct?
11   A    Yes.  I think it was an attachment.
12   Q    Okay.  And when you go to a
13   trustees meeting, are there documents
14   provided to you?
15   A    Yes.
16   Q    And when are those documents
17   provided to you?
18   A    At the beginning of the meeting.
19   Q    And do you read those documents?
20   A    No.  We don't go through them at
21   the meeting.
22   Q    Okay.  I'm sorry.  Fair enough
23   answer.
24       Do you personally take the time to
25   read those documents?

55 (Pages 214 to 217)

ARBITRATION

1     ARBITRATION
2     A    Not all of them.
3     Q    And do you provide those documents
4     to anybody else at The Times to read?
5     A    No.  In fact, they never leave my
6     office.
7     Q    Okay.  If you look at Page 1247.
8     A    Yes.
9     Q    First, did you read this report?
10    And "this report" meaning the April 20, 2010
11    letter from Mitchell Lewis and Ivy -- I
12    can't see the last name -- to Murray
13    Schwartz.
14    A    Yes, I think I may have looked at
15    this one.
16    Q    And when you say you think you may
17    have looked at it, would that have been at
18    the time that it was handed out at the
19    trustees meeting?
20    A    Or sometime after, probably.  Not
21    at the meeting itself.
22    Q    All right.  And were you concerned
23    that anything in this report was inaccurate?
24    MR. MILLER:  Objection.  Lacks
25    foundation.

1     ARBITRATION
2     MR. RICHMAN:  He said he read
3     it.  I want to know if --
4     Q    Is there anything in this report
5     that you looked at, that you read, whether
6     it was inaccurate?
7     MR. MILLER:  But, again,
8     objection.  He hasn't laid a
9     foundation that Mr. Hayes is aware of
10    the issues and has direct knowledge
11    of the issues in payroll practices
12    that are addressed in the document.
13    MR. RICHMAN:  All I did was ask
14    him, were you concerned.
15    ARBITRATOR IRVINGS:  Yeah.  I
16    mean, he can answer -- he's not going
17    to be able to answer whether in fact
18    they were accurate, but whether he
19    had a concern about whether they were
20    accurate.
21    A    I did review the document.  I don't
22    know if it's accurate, I can't say, but I
23    did review it.
24    Q    No.  What I'm asking you is, when
25    you reviewed the document, were you

1     ARBITRATION
2     concerned that the document was not
3     accurate?  The things in the document were
4     not the accurate?
5     MR. MILLER:  Same objection.
6     ARBITRATOR IRVINGS:  This is
7     about his state of mind then.
8     Go ahead.
9     A    No, I didn't look at it for
10    accuracy.
11    Q    What did you look at it for?
12    A    I was looking at it for how the
13    Fund treated pension and it was percentage
14    of wages.  And it moved around the
15    diversion, just like they had in the letters
16    that we've written.  So it was consistent.
17    Q    Okay.
18    Let me show you Exhibit 45.
19    A    Okay.
20    Q    Just flip through there.  Take your
21    time.
22    A    Okay.
23    Q    You attended this meeting?
24    A    Yes.
25    Q    And you see on Page 1250, which is

1     ARBITRATION
2     the second page, it says Mr. Lewis reviewed
3     the final results of C & S payroll audit.
4     You see that?
5     A    Yes.
6     Q    And were you in the room when that
7     review occurred?
8     A    I was in the room, but the reviews
9     of Mr. Lewis' reports are not very in depth.
10    Q    Okay.  And so what was the review
11    in this case that you remember?
12    A    They just told us what the amount
13    was and that it was paid, and that was it.
14    Q    Okay.  Now, the letter that's
15    attached, that's at 1251.
16    A    Yes.
17    Q    June 14, 2010 letter from Mitchell
18    Lewis and Ivy Narissi to Murray Schwartz.
19    Do you see that?
20    A    Yes.
21    Q    Okay.  And did you review this at
22    the meeting?
23    A    No, I didn't review it at the
24    meeting.
25    Q    Did you review it after the

Page 222

ARBITRATION

1  meeting?
2      A    I don't know if I looked at this
3  because it was only the followup to what we
4  had obtained in April.
5      Q    But this was in fact the result of
6  the audit, was it not?
7      A    Yes.
8      Q    And it showed The New York Times
9  owed the Pension Fund money, correct?
10     A    Right.
11     Q    And The New York Times paid that
12 money, correct?
13     A    Right.
14     Q    Did The New York Times protest
15 before paying that money?
16     A    You know, I don't get involved in
17 the audits, so I'm not really sure what the
18 back and forth may have been.
19     Q    Who would have been involved in the
20 audits?
21     A    Our Payroll folks are involved in
22 the audits.  Sometimes my folks get involved
23 in the audits.
24     Q    Okay.  At this time -- and we're

Page 223

ARBITRATION

1  talking about June of 2010 -- do you know
2  who got involved in this audit?
3      A    No, I don't.  Not offhand.  I'm
4  sure our Payroll folks were involved,
5  but ...
6      Q    When you say "our Payroll folks,"
7  to whom are you referring?
8      A    People who work in Payroll.
9      Q    I was actually looking for some
10 names.
11     A    I can't tell you who.  I don't
12 know.  I would imagine -- I don't know.  I
13 don't know.
14     Q    Would these people be down in
15 Virginia or --
16     A    Yes, they would be down in
17 Virginia.  Morris would probably be
18 involved, Morris Claffee.  I think you met
19 him earlier.
20     Q    Yes, I did meet him.  Twice, in
21 fact.
22     A    Yes, he would probably be one of
23 those folks.
24     Q    During the discussions that you had

Page 224

ARBITRATION

1  internally at The New York Times concerning
2  the closing of C & S, it's my understanding
3  from your direct testimony that you -- by
4  that I mean you or somebody else in The New
5  York Times -- ran some models with respect
6  to partial withdrawal liability.
7      A    Yes.
8      Q    And do you know if those models
9  still exist?
10     A    I don't know.  Probably not.
11     Q    Who ran those models?
12     A    Can you be more precise on which
13 model you are talking about?
14     Q    Well, actually, you just talked
15 about models, so I'm going to flip the
16 question on you.
17          What kind of models were run?
18     A    I mean --
19     Q    With respect to partial withdrawal
20 liability.
21     A    Well, I mean, it was based on the
22 fact that we couldn't get real good
23 information.  We kind of looked at the last
24 information we had to figure out what our

Page 225

ARBITRATION

1  percentage of the liability was, the
2  shortfall and the funding of the Fund.
3          And so we kind of did, if you will,
4  a back-of-the-envelope to figure out what
5  that withdrawal might be, what that partial
6  might be based on those numbers, because we
7  couldn't get any real good numbers to work
8  with.
9      Q    Okay.  And you couldn't get any
10 good numbers because why?
11     A    Didn't have them.
12     Q    Okay.  And who worked on this
13 model --
14     A    I wouldn't call it a model.  I
15 wouldn't call it a model.  It wasn't a whole
16 lot of, you know, click one button, a whole
17 lot things move.  It wasn't that situation.
18     Q    Well, you were the one in your
19 direct testimony called it a model, right?
20     A    Yeah.
21     Q    So let's just stick with that.  It
22 may not have been a sophisticated model.
23     A    Yes.
24     Q    But it did model what would trigger

57  (Pages 222 to 225)

ARBITRATION

1  a partial withdrawal, did it not?
2      A    Yes.  Well -- and I have to say,
3  remember, when we closed C & S, it was our
4  interpretation that we were taking no one.
5  So we expected there to be a partial because
6  we weren't taking any of the employees.
7      Q    Okay.
8          Well, first, we haven't gotten to
9  the point to answer my question about who
10 worked on this model?
11     A    It was me and my attorney.  My
12 labor attorney.
13     Q    And who is your labor attorney?
14     A    Bernie Plum.
15     Q    And Bernie Plum is from Proskauer,
16 correct?
17     A    Yes.
18     Q    And so were you running the model
19 or was he running the model?
20     A    I was running the model.
21     Q    And what were the inputs into the
22 model?
23     A    Like I said, we looked at what our
24 shortfall, what the total shortfall in the

ARBITRATION

1  plan was.  We looked at our size within that
2  plan, and that's how we kind of came up with
3  some numbers.
4      Q    Did a benefit consultant work on
5  that model?
6      A    No.
7      Q    No?
8      A    No.  Not at that point.
9      Q    And did the model indicate how many
10 employees The New York Times needed to
11 transfer over to -- I'm sorry.
12         Let me withdraw that.
13         Did the model indicate how many
14 employees The New York Times needed to hire
15 from C & S in order not to have a partial
16 withdrawal?
17     A    No, not when we initially did it.
18 We kind of did the back-of-the-envelope
19 knowing what the total pay of a New York
20 Times driver is, and we just multiplied
21 numbers.
22     Q    Well, multiplied what numbers?
23     A    Multiplied the number of people
24 that you hire to what The New York Times

ARBITRATION

1  wage rates were.
2      Q    Okay.
3      A    Okay.  And then we looked at how
4  much of that, a percent of that is what you
5  would give to the Fund.
6          So it was just plugging in the
7  numbers and watching the numbers fly.
8      Q    Now, you indicated it was a
9  coincidence --
10     A    Yes.
11     Q    -- that the number of people you
12 were willing to hire happened to not cause a
13 partial withdrawal; is that correct?
14     A    That's correct.
15     Q    And what was -- withdrawn.
16         How far above the contribution were
17 you with the 58 or 60 employees that you
18 were going to hire -- I'm sorry.  Withdraw
19 that.
20         So you were talking about hiring 58
21 or 60 employee from C & S.
22     A    Right.  Associated with the work
23 that we were going to leave inside
24 The Times.

ARBITRATION

1      Q    And so that was -- the decision,
2  was that driven by the work that The New
3  York Times decided to take inside The Times?
4      A    Yes.  As I said, the Union's real
5  point was to try to get The Times to take
6  some of the former C & S employees.
7          So we identified watching a business
8  decision that made sense for us to leave
9  inside.  So once we figured out what we were
10 going to keep inside The Times -- and that
11 number moved around a little bit as we came
12 up to the less than seven or eight or
13 more -- we determined how many people we
14 needed to do that work.
15     Q    Okay.
16         Did the C & S contract require you
17 to keep certain people on payroll from C & S
18 for a period of time?
19     A    On C & S?
20     Q    Or C & S or New York Times?
21     A    No.
22     Q    No?
23     A    No.  There was no requirement to
24 keep people in a closed company, no.

ARBITRATION

1
2     Q    Was there a requirement to transfer
3  them to The New York Times?
4     A    There was -- I think the Union
5  asserted at some point there was some
6  obligation, but we disagreed with that.
7     Q    Now, during this period of time had
8  you asked the Fund for a withdrawal
9  liability calculation?
10    A    During which period?
11    Q    During the period that you were
12 running these models, running the model or
13 models trying to figure out what the
14 potential partial withdrawal might be.
15    A    I don't recall when we were in the
16 midst of that doing that.
17         I do recall shortly thereafter
18 doing that.
19    Q    Okay.
20         Because -- when was the first time
21 that The New York Times asked for a
22 withdrawal liability estimate from the
23 Pension Fund?
24    A    I can't tell you when they first
25 asked.  I can tell you when I became aware

ARBITRATION

1
2  of the first request.
3     Q    Okay.  When were you first aware of
4  the first request?
5     A    That was the January 22nd letter.
6     Q    Of what year?
7     A    2009.
8     Q    And that's after an agreement was
9  already reached concerning the closing down
10 of C & S?
11    A    Yes.
12    Q    And you learned, as I understand
13 from your direct testimony, that the Pension
14 Fund did not provide the information to the
15 first request -- that you at least were
16 aware of -- The New York Times made for
17 withdrawal liability.
18    A    That's correct.
19    Q    How long after the first request
20 was second request made?
21    A    To my knowledge, it was about a
22 year.
23    Q    About a year.  And why did you wait
24 a year to ask again?
25    A    We were probably going through the

ARBITRATION

1
2  same process that we usually go through.  We
3  were reviewing our funds.  And we realized
4  we didn't get an answer from The Times --
5  from the NMDU.  I'm sorry.
6     Q    When you didn't get an answer from
7  the Pension Fund, you were unhappy about it,
8  correct?
9     A    I was disturbed why we didn't get
10 an answer.
11    Q    I'll use "disturbed."
12         And so what did you do to attempt
13 to get an answer from the Pension Fund?
14    A    I didn't do anything from my
15 position to get an answer.
16    Q    Did you ask anybody to contact the
17 Pension Fund and attempt to get an answer to
18 your request?
19    A    I did not personally do that, no.
20    Q    Did anybody else?
21    A    I'm unaware if they did.
22    Q    And did you ever ask Murray
23 Schwartz, How come I can't get a response to
24 my request for a withdrawal liability
25 estimate?

ARBITRATION

1
2     A    No, I didn't.
3     Q    Did you ever ask Neal Schelberg the
4  same question?
5     A    No, I didn't.
6     Q    Did you ever ask Rosana Egan or
7  John Urbank the same question?
8     A    No.  Like I said, I don't talk with
9  them except when they're giving reports.
10    Q    Did you ever raise the issue at a
11 trustees meetings as to why can't I get a
12 response to my request for withdrawal
13 liability estimate?
14    A    No, I did not.
15    Q    Did you ever ask the Union as to
16 why you didn't get a response to your
17 request for withdrawal liability estimate?
18    A    No.
19    Q    How come?
20         How come you didn't ask anybody?
21    A    I had done what the Fund requires
22 and that's to make the request.  So we gave
23 them written requests for the information.
24         Under the plan, I'm supposed to get
25 it.

ARBITRATION

1
2   Q    And when you didn't get it, you
3  didn't follow up?
4   A    No.  I asked again the following
5  year.
6   Q    And then you didn't get that?
7       I'm sorry, there's got to be a
8  audible response.
9   A    You're correct.  I didn't get it.
10   Q    And when that happened the second
11  time, you didn't follow up?
12   A    No, I didn't.
13       Mr. Schwartz followed up with me
14  with a question regarding information on a
15  theories on withdrawal liability.  That was
16  the answer I got from the Fund.
17   Q    Well, that answer wasn't an
18  estimate of withdrawal liability, was it?
19   A    Exactly, it was not.
20   Q    You said Mr. Cavallaro, he's a VP
21  of Finance at The Times?
22   A    Yes.
23   Q    Now, he was following the situation
24  for you to see if you were coming close to
25  triggering a partial withdrawal, correct?

ARBITRATION

1
2   A    Yes.
3   Q    And if he came to you and said we
4  have a problem -- I'm sorry.  I withdraw.
5       Did he ever come to you and say,
6  look, we have a problem here and we're going
7  to trigger a partial withdrawal?
8   A    No.
9   Q    But if he came to you and said we
10  have a problem, we're going to trigger a
11  partial withdrawal, what would you have
12  done?
13   A    I could have brought more work back
14  in-house.
15   Q    And that would be for the purpose
16  of avoiding a partial withdrawal?
17   A    Yes.
18       MR. RICHMAN:  I just want to
19  take a few minutes.
20       (A brief recess was
21  taken.)
22       MR. RICHMAN:  Okay.  We're
23  done.
24       MR. MILLER:  Oh, okay.
25       We can go back on the record.

ARBITRATION

1
2       REDIRECT EXAMINATION BY MR. MILLER:
3   Q    Mr. Hayes, I just have a couple of
4  follow-up questions.
5       You were asked several questions
6  about The New York Times' payroll system.
7       How knowledgeable are you about
8  The New York Times' payroll system?
9   A    Not at all.
10   Q    How knowledgeable are you about the
11  process that the Times uses to calculate and
12  pay pension contributions to the NMDU
13  Pension Fund?
14   A    I don't get involved in those
15  calculations.
16   Q    Now I'm going to ask you a couple
17  questions about your role as a trustee.
18       As a trustee, do you see remittance
19  reports that are filed by other contributing
20  employers?
21   A    No, I do not.
22   Q    How involved are the trustees in
23  the day-to-day collection of contributions
24  at the Fund?
25   A    We don't ever see any documents on

ARBITRATION

1
2  who is making what contribution and how
3  they're making it.  We never see those.
4   Q    You were asked several questions
5  about following up with the Pension Fund in
6  connection with The New York Times' request
7  for withdrawal liability estimates and other
8  information.
9       Let me ask you this question:
10       Do you have a belief whether it
11  would have been appropriate for you in your
12  trustee role to use that trustee role to get
13  the Fund to respond to pending requests for
14  information made by The Times?
15   A    No.  As I said, I was recused from
16  that.  And for me, that was an extension of
17  that recusal is that I didn't think that was
18  appropriate for me to do that.
19   Q    And is that why you did not
20  followup with individuals at the Fund in
21  connection with The Times' request for
22  information?
23   A    Yes.
24   Q    And finally, Mr. Hayes, I want to
25  draw your attention to Exhibit 45 which we

ARBITRATION

1
2  previously looked at.  Those were redacted
3  minutes in connection with that Weiser
4  report.
5      A    The September 24th --
6      Q    It's the September 24th minutes.
7  And attached to that is a letter from Weiser
8  dated June 14, 2010.
9      A    Yes.
10     Q    You are there?
11     A    Yes.
12     Q    I want to draw your attention to
13  Page 2 of that letter, and at the top of
14  Page 2 of the letter, there's a paragraph
15  entitled "Result."
16          And I'd like you to just read that
17  paragraph to yourself for a moment.
18     A    Yes.
19     Q    The last sentence in that paragraph
20  discusses recalculation of pension
21  contributions.
22     A    Yes.
23     Q    And do you have a belief as to
24  whether the statement in that last sentence
25  about how to calculate pension contributions

ARBITRATION

1
2  is consistent with your understanding of the
3  contribution form?
4      A    The way it's written, it is
5  consistent with my understanding.
6      Q    Okay.
7          MR. MILLER:  No further
8  questions.
9          RECROSS EXAMINATION BY MR. RICHMAN:
10     Q    So, Mr. Hayes, you thought as part
11  of your recusal that you couldn't follow up
12  with anyone at the Fund with respect to
13  The New York Times' requests for a
14  withdrawal liability estimate; is that
15  correct?
16     A    I thought it would be inappropriate
17  for me to do that.
18     Q    Okay.  So you thought it would be
19  inappropriate to do that.
20          But let's turn to Exhibit 77.
21     A    Yes.
22     Q    And you did send this letter,
23  correct?
24     A    Yes, I did.
25     Q    Okay.

ARBITRATION

1
2          Did you write the letter?
3      A    Yes, I did, with some help from my
4  counsel.
5      Q    And you actually didn't come up
6  with the sections of ERISA, did you, that's
7  referenced in the letter?
8      A    No.
9      Q    And so you thought it was
10  appropriate for you to send this letter to
11  the Fund in response to Mr. Schwartz's
12  request to you but it was inappropriate for
13  you to ask for an estimate of The New York
14  Times' withdrawal liability?
15     A    Mr. Schwartz asked me a question in
16  a letter in my role as a senior manager at
17  the time, and so I felt appropriate as a
18  senior manager of The Times to answer that
19  letter.
20          And so that was different than in
21  my role as a trustee to try and use that
22  role to try to get the Fund to do something
23  that it clearly didn't want to do and that's
24  answer what we've asked them for.
25          So I felt uncomfortable doing that

ARBITRATION

1
2  for the reasons we were asking.
3          MR. RICHMAN:  I have no further
4  questions.
5          MR. MILLER:  No further
6  questions.
7          ARBITRATOR IRVINGS:  Very good.
8  Thank you very much.
9          Off the record.
10
11          (Whereupon, the proceeds were
12  adjourned at 5:18 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 242

1              ARBITRATION
2            I N D E X
3                        PAGE
4    Opening Statement by Mr. Miller        5
5    Opening Statement by Mr. Richman      21
6
7    WITNESS: MORRIS CLAFFEE
8    Direct Examination by Mr. Roth        33
9    Cross Examination by Mr. Garfield     67
10   Redirect Examination by Mr. Roth     113
11   Recross Examination by Mr. Garfield  117
12
13
14   WITNESS: TERRY L. HAYES
15   Direct Examination by Mr. Miller     119
16   Cross Examination by Mr. Richman     173
17   Redirect Examination by Mr. Miller   236
18   Recross Examination by Mr. Richman   239
19
20
21
22            E X H I B I T S
23
     Exhibit 116    Marked in Evidence    100
24
     Exhibit 117    Marked in Evidence    106
25

Page 243

1              ARBITRATION
2            C E R T I F I C A T E
STATE OF NEW YORK    )
3                    : ss.
COUNTY OF NEW YORK   )
4            I, BARBARA R. ZELTMAN, Shorthand
5    Reporter and Notary Public, within and
6    for the State of New York, do hereby
7    certify:
8            That this transcript is a true
9    record of the proceedings had.
10           I further certify that I am not
11   related to any of the parties to this
12   action by blood or marriage, and that I
13   am in no way interested in the outcome of
14   this matter.
15           IN WITNESS WHEREOF, I have hereunto
16   set my hand this 17th day of February,
17   2015.
18
19
20   _____
     BARBARA R. ZELTMAN
21   Court Reporter and Notary Public
22
23
24
25

1                ARBITRATION - VOLUME II

2             AMERICAN ARBITRATION ASSOCIATION

---------------------------------------X

3    THE NEW YORK TIMES COMPANY,

4                    Petitioner,

5

                      v.

6

     NEWSPAPER and MAIL DELIVERERS'-PUBLISHERS'

7    PENSION FUND,

8                    Claimant.

---------------------------------------X

9

10

11

12                   ARBITRATION

13              VOLUME II - DAY 2

14              New York, New York

15          Wednesday, February 11, 2015

16

17

18   REPORTED BY:  BARBARA R. ZELTMAN

19             Professional Stenographic Reporter

20

21   Job Number:  90058

22

23

24

25

Page 245

ARBITRATION - VOLUME II


February 11, 2015
9:11 a.m.


Arbitration proceedings held at American
Arbitration Association, 120 Broadway, New York, New
York, before BARBARA R. ZELTMAN, a Professional
Stenographic Reporter and Notary Public within and
for the State of New York.

Page 246

ARBITRATION - VOLUME II
A P P E A R A N C E S:

ARBITRATOR:  MARK L. IRVINGS, ESQ.
     24 Elba Street
     Brookline, Massachusetts  02446


JONES DAY
Attorneys for Petitioner
     51 Louisiana Avenue NW
     Washington, D.C.  20001
     BY:  Evan Miller
         Miguel Eaton
         Yaakov Roth

SCHULTE ROTH & ZABEL
Attorneys for the Claimant
     919 Third Avenue
     New York, New York  10022
     BY:  Ronald Richman
         Max Garfield
         Adam Gartner

Page 247

ARBITRATION - VOLUME II
     ARBITRATOR IRVINGS:  Let's get
started.
     DARREN FRENCH,
     having been first duly sworn by
     Arbitrator Irvings, was examined
     and testified as follows:
     DIRECT EXAMINATION BY MR. MILLER:
     Q    Mr. French, can you state for the
record your full name and the town and state
in which you reside.
     A    My name is Darren French.  I reside
in Edgewater, New Jersey.
     Q    Good morning, Mr. French.
     A    Good morning.
     Q    What is your profession, sir?
     A    I'm an actuarial consultant to
multiemployer pension funds and to certain
contributing employers to the same.
     Q    Are you familiar with the term
"enrolled actuary"?
     A    Yes, I am.
     Q    And what is your understanding of
the term "enrolled actuary"?
     A    It's a person who is authorized to

Page 248

ARBITRATION - VOLUME II
sign certain government filings, certain
schedules, the Form 5500, for example.
     Q    And are you an enrolled actuary?
     A    Yes, I am.
     Q    And how does one become an enrolled
actuary?
     A    There are several exams one needs
to take.  There are some experience
requirements, working in funds or other
experience as actuaries, and application.
     Q    And I take it you took and passed
the exams to become an enrolled actuary?
     A    Yes, I did.
     Q    Can you please summarize for us
your general qualifications as an actuary?
     A    I spent about 30 years as an
actuarial consultant with Buck Consultants
working on all kinds of pension plans but in
particular multiemployer plans for the last
20 years or so.
     Q    And when did you leave the
employment of Buck?
     A    Around the end of 2013.
     Q    And under what circumstances did

2

Page 249

1   ARBITRATION - VOLUME II
2   you leave Buck?
3   A   I retired.
4   Q   And do you continue to engage in
5   actuarial consulting for either pension
6   funds or employers?
7   A   I continue to do some actuarial
8   consulting, some special assignments for
9   both funds and employers.
10  Q   And by "funds," do you mean
11  multiemployer funds?
12  A   Yes, I do.  Excuse me.
13  Q   Are you a member of any
14  professional societies?
15  A   Yes.  I am an associate of the
16  Society of Actuaries and I'm a member of the
17  American Academy of Actuaries.
18  Q   And how does one go about joining
19  these actuarial societies?
20  A   Well, the Society of Actuaries is a
21  series of exams as well as application and
22  application fee, and the Academy of
23  Actuaries is really a related type of
24  qualifications and, again, application and
25  fee.

Page 250

1   ARBITRATION - VOLUME II
2   Q   Thank you.
3       Did you serve during the course of
4   your career in any leadership role in any of
5   these professional societies?
6   A   Yes.  I was -- from around 2008
7   through 2014, I think, I was a member of the
8   Multiemployer Task Force of the American
9   Academy of Actuaries.
10  Q   And can you briefly summarize for
11  the record what kinds of activities the
12  Multiemployer Task Force of the triple AAA
13  engage in?
14  A   Periodic calls and meetings to
15  discuss potential legislation, to discuss
16  our input on any guidelines that are going
17  to be put out by the triple AAA, as well as
18  meetings sometimes with PBGC or IRS to help
19  them understand the law and the implications
20  of any changes thereof.
21  Q   And during the course of your
22  association with this task force, did you in
23  fact represent the triple AAA in connection
24  with meetings with regulatory agencies?
25  A   Yes, I did.

Page 251

1   ARBITRATION - VOLUME II
2   Q   Do you have experience with
3   multiemployer pension funds?
4   A   Yes, I do.
5   Q   And can you briefly summarize for
6   the record that experience.
7   A   Yeah.  Over the last 20-something
8   years, I have probably worked on maybe 15 or
9   so plans that I was the enrolled actuary.
10  Maybe 10 to 15 plans I was working on.
11      I had done and reviewed withdrawal
12  liability calculations probably in the
13  hundreds as well as done audits or reviews
14  for employers on at least a hundred other
15  calculations done by other actuaries at, I'm
16  going to say, maybe 50 funds.
17  Q   During the course of your work at
18  Buck, did you have any leadership role at
19  Buck Consultants?
20  A   Yes.  From around 2008 till when I
21  retired, I basically led Buck's
22  multiemployer practice.
23  Q   Can you please summarize for the
24  record what that leadership role entailed?
25  A   It entailed marketing, it entailed

Page 252

1   ARBITRATION - VOLUME II
2   helping set standards for the firm, helped
3   review reports and memos that other
4   actuaries who maybe had less experience in
5   multiemployer plans did, and, of course,
6   handling my own caseload of multiemployer
7   clients.
8   Q   Thank you.
9       And what are the responsibilities
10  of the enrolled actuary for a multiemployer
11  fund?
12  A   Well, the enrolled actuary
13  essentially signs reports and the government
14  filings and really, ultimately, has -- is
15  where the buck stops and has the ultimate
16  decision-making authority over the actuarial
17  assumptions.
18  Q   Must those assumptions that an
19  actuary makes in connection with his or her
20  work for a multiemployer plan be certified
21  by that actuary as representing their best
22  estimate of those assumptions?
23      MR. RICHMAN:  Objection.  We're
24  past the introductory stage.  Let's
25  stop leading.

Page 253

ARBITRATION - VOLUME II

1   ARBITRATION - VOLUME II
2   ARBITRATOR IRVINGS:  Okay.
3   MR. MILLER:  Okay.
4   BY MR. MILLER:
5       Q    What, if any, attestations does an
6   enrolled actuary have to make in connection
7   with the actuarial assumptions that such
8   actuary determines for a multiemployer fund?
9       A    Well, I could think of at least two
10  things:  One is there's a certification
11  requirement on the Schedule MB.  Schedule
12  MB, for example, to the Form 5500 where such
13  an attestation is needed.
14          And under the Academy rules, any
15  valuation reports and any communications
16  that involve valuations need to have such
17  certification.
18      Q    In connection with your work at
19  Buck, did you ever engage in peer review
20  work of your multiemployer fund enrolled
21  actuary colleagues?
22      A    Yes, I did.
23      Q    And can you briefly summarize that
24  work.
25      A    Yes.  You know, memos and reports

Page 254

ARBITRATION - VOLUME II

1   ARBITRATION - VOLUME II
2   other actuaries did, either peers or other
3   actuaries with less experience, just to
4   review and make sure, you know, the basic
5   rules are met and that there's nothing else
6   that I could suggest that would be helpful.
7       Q    And although you may have
8   previously touched upon this, do you have
9   experience with respect to withdrawal
10  liability under ERISA?
11      A    Yes, I do.
12      Q    And can you please summarize that
13  experience.
14      A    Yes.  I've done, again, probably
15  hundreds or at least supervised hundreds of
16  calculations of withdrawal liability, and
17  probably at least a hundred that I have
18  reviewed that other actuaries have done on,
19  again, I would say 50 funds.
20      Q    What are some of the multiemployer
21  funds for which you have served as the
22  enrolled actuary?
23      A    The Teamsters Central States Fund.
24  The UNITE HERE National Retirement Fund
25  would be another.  The IUE-CWA Pension Fund,

Page 255

ARBITRATION - VOLUME II

1   ARBITRATION - VOLUME II
2   third.
3       Q    And can you please summarize for
4   the Arbitrator the size of the Central
5   States Teamsters Pension Fund vis–à–vis
6   other multiemployers?
7       A    The Central States Teamsters
8   Pension Fund I believe -- certainly is one
9   of the biggest funds in the country.  And my
10  understanding is it's the largest in terms
11  of numbers of participants.
12      Q    And what are some of the other
13  large multiemployer funds that you have
14  worked with?
15      A    I've worked on the Western
16  Conference of Teamsters Pension Fund,
17  Blacksmiths-Boilermakers Pension Fund.
18      Q    Can you please summarize for the
19  Arbitrator the size of the Western
20  Conference of Teamsters pensions?
21      A    The Western Conference of Teamsters
22  Pension Fund, again, one of the largest
23  multiemployer pension funds in the country
24  and I believe the largest in terms of
25  assets.

Page 256

ARBITRATION - VOLUME II

1   ARBITRATION - VOLUME II
2       Q    Have you previously testified in
3   any litigation as an expert witness on
4   actuarial issues?
5       A    Yes, I have.
6       Q    And what is the most recent case in
7   which you've served as an expert witness?
8       A    It was -- I believe it was the
9   FELRA Pension Plan versus the Great
10  Atlantic & Pacific Tea Company.  It was done
11  in the Southern District Court in White
12  Plains, New York.
13      Q    And what year was that, sir?
14      A    2013.
15      Q    And did you testify as an expert
16  during the trial in that case?
17      A    Yes, I did.
18      Q    And were you qualified as an expert
19  by the judge in that case?
20      A    Yes.
21      Q    Have you previously testified in
22  any arbitrations as an expert witness on
23  actuarial issues?
24      A    Yes.
25      Q    And can you please summarize the

4

ARBITRATION - VOLUME II

1  number of arbitrations in which you've
2  testified as an expert?
3      A    Three or four.  Something like
4  that.
5      Q    And in those arbitrations, were you
6  qualified by the arbitrator as an expert on
7  actuarial issues?
8      A    Yes.
9      Q    Has any adjudicator ever rejected
10  you as an expert either in litigation or
11  arbitration in connection with actuarial
12  issues?
13      A    No, not to my knowledge.
14          MR. MILLER:  Mr. Arbitrator, at
15      this juncture, I'd like to move to
16      qualify Mr. French as an expert on
17      actuarial issues.
18          MR. RICHMAN:  I didn't know
19      this was an issue.
20          MR. MILLER:  Okay.  Good?
21      Thank you.
22          ARBITRATOR IRVINGS:  Go right
23      ahead.
24  BY MR. MILLER:

ARBITRATION - VOLUME II

1      Q    Have you been retained by The New
2  York Times as an expert actuary in this
3  case?
4      A    Yes, I have.
5      Q    In general terms, can you describe
6  what you were asked to do by The Times?
7      A    Yes.  I was asked to review the
8  withdrawal liability assessment that was
9  assessed against The New York Times and
10  provide my professional opinion, actuarial
11  opinion on the assumptions used and, in
12  particular, the assumption regarding the
13  interest rate that the Fund employed.
14      Q    And what do you mean by the
15  "interest rate" assumption?
16      A    By the "interest rate," I mean the
17  rate at which the benefit obligations were
18  discounted in order to determine the present
19  value of the liabilities.
20      Q    And can you please summarize what
21  you reviewed in order to carry out that
22  assignment?
23      A    Well, I reviewed the calculation,
24  of course, as well as the back-and-forth

ARBITRATION - VOLUME II

1  letters between the Fund and Fund counsel.
2          There was four or five valuation
3  reports, 2007 or '8 through 2013 or so.  And
4  similar dates for the Fund audited financial
5  statements.
6          And I also reviewed the appropriate
7  sections of the law and the actuarial
8  standards.
9      Q    Thank you.
10          In general, what do you understand
11  to be the purpose of withdrawal liability?
12      A    Conceptually, withdrawal liability
13  as I understand it is that when an employer
14  withdraws from a multiemployer plan that
15  they basically pay their fair share of the
16  unfunded vested benefit obligations.
17      Q    And can you explain what you mean
18  by "unfunded vested benefit obligations"?
19      A    Yes.
20          The fund has certain legal
21  obligations that have been accrued and
22  invested under the plan and there's a pool
23  of assets.  And to the extent that those
24  obligations or liabilities exceed the

ARBITRATION - VOLUME II

1  assets, that's an unfunded benefit vest --
2  vested benefit obligation.
3      Q    Without getting into too much
4  technical detail, how does an actuary go
5  about measuring those unfunded vested
6  benefits?
7      A    The fund basically has a series of
8  payments that it needs to make.  And those
9  payments, in simplistic terms, are brought
10  back to today's value via the discount rate.
11  You look at the payment, five years, ten
12  years, each of the payments.  Each of those
13  are brought back in terms of present value
14  to today.  That is compared to the current
15  value of the assets, and the difference is
16  the unfunded benefits.
17      Q    Can you elaborate a little on what
18  it means to discount a future pension
19  payment obligation to its present value?
20      A    Well, yeah, because of the time
21  value of money, say $100 payable ten years
22  from now is not worth $100 today.  And the
23  same way that $100 today is going to be
24  worth more than that in ten years because

ARBITRATION - VOLUME II

there's interest and investment earnings on
that money.

Q    So what then is the relationship
between a discount rate and the interest
earned or interest rate on assets?

A    My view, they're basically the same
thing, almost to say two sides of the same
coin.

The interest rate is kind of the
way you take a dollar today and bring it
forward into the future, what it's going to
be worth in five or ten years.

The discount rate, on the other
hand, you look at a dollar out in ten years
and bring that back or discount that back to
today.

Q    For withdrawal liability purposes,
what is your understanding of how ERISA law
directs actuaries to select a discount rate
to value unfunded vested benefits?

A    Well, the law says, my
understanding, is that it is the rate that
reflects the best estimate of the actuary's
anticipated experience under the plan.

ARBITRATION - VOLUME II

Q    And what is your understanding of
what the actuary's best estimate of
anticipated experience under the plan means?

A    Right.  The experience under the
plan that's being referred to there is the
interest, the interest or investment return
that you expect the fund earnings to achieve
over time.

Q    And in your judgment, is there a
relationship between the investment return
assumption that you --

MR. RICHMAN:  Objection.  It's
about to be a leading question.

MR. MILLER:  Look, I can lay a
foundation and ask is there a
relationship, but I'm sort of trying
to move this along.

I can certainly lay the foundation.

ARBITRATOR IRVINGS:  Lay the
foundation.

MR. MILLER:  Okay.

BY MR. MILLER:

Q    Is there a relationship between the
investment of return that an actuary expects

ARBITRATION - VOLUME II

fund earnings to achieve and the discount
rate?

A    Yes.  They are essentially the same
thing in most cases.

Q    If an actuary selects a discount
rate for valuing liabilities that is lower
than the anticipated investment return, what
is the effect of that?

A    If the actuary chooses a discount
rate that is lower than the investment
return, that would necessarily mean that the
liability be increased above what it would
otherwise have been, higher than it arguably
should be.

Q    In your opinion, what should the
relationship be between the investment
return assumption used to estimate expected
experience on assets and the discount rate
to present value of the plan's future
benefit obligations?

A    Again, I think they are essentially
the same number.

Q    That opinion that you just
expressed, that they are essentially the

ARBITRATION - VOLUME II

same number, is that consistent with basic
actuarial principle?

A    Yes, it is.

Q    Are there, in fact, any actuarial
principles that guide actuaries in how to
select a discount rate for purposes of
discounting future liabilities to present
value in the multiemployer context?

A    Yes.  There's at least one
guideline produced that's called ASOP
Number 27 that guides members of the
Academy, anyway, on how to choose an
investment return assumption or discount
rate.

Q    And what is an ASOP?

A    Sorry.  An ASOP is Actuarial
Standards of Practice that are promulgated
by the Actuarial Standards Board.

Q    And how do ASOPs govern how
actuaries should select their assumptions?

A    The ASOPs basically -- my
recollection of ASOP Number 27 says that the
discount rate is basically the investment
return assumption.

Page 265

ARBITRATION - VOLUME II

1
2   Q    Mr. French, can you turn your
3   attention to Exhibit 10. It's in the white
4   binder.
5        MR. MILLER:  We have colors
6   today.
7   BY MR. MILLER:
8   Q    Mr. French, is this the ASOP that
9   you just referred to?
10  A    Yes, it is.
11  Q    And what is it titled?
12  A    It's Selection of Economic
13  Assumptions for Measuring Pension
14  Obligations.
15  Q    And what is the date for this
16  ASOP 27, the one that you are looking at,
17  Exhibit 10?
18  A    Adopted September 2007, updated
19  effective May 1, 2011.
20  Q    And do you know if this version of
21  ASOP 27 has itself been updated since then?
22  A    Yes, it has.
23  Q    And when was that update?
24  A    I believe in 2013.
25  Q    And do you have an understanding of

Page 266

ARBITRATION - VOLUME II

1
2   when that updated ASOP 27 is effective?
3   A    I believe it is in 2014.
4   Q    So would the version of ASOP 27
5   that is Exhibit 10, would that have been the
6   version of ASOP 27 in force at the time the
7   NMDU Pension Fund here calculated the
8   withdrawal liability imposed on The Times?
9   A    Yes, it would.
10  Q    Can you please turn your attention
11  to Page 5 of this Exhibit 10. And in
12  particular to Section 3.6.
13       And can you take a moment and just
14  read to yourself the first three paragraphs
15  of Section 3.6.
16  A    Okay.
17  Q    In your opinion, do these
18  paragraphs set forth a general
19  proposition -- strike that.
20       Let me lay a better foundation.
21       What is the title of Section 3.6?
22  A    Selecting an Investment Return
23  Assumption and a Discount Rate.
24  Q    Thank you.
25       And in your opinion, do the initial

Page 267

ARBITRATION - VOLUME II

1
2   paragraphs of Section 3.6 set forth a
3   general proposition by which actuaries
4   should go about selecting investment return
5   assumptions and discount rates?
6   A    Yes, it does.
7   Q    And what is that opinion?
8   A    Very generally, a general rule is
9   the appropriate discount rate is the same as
10  the investment return assumption.
11  Q    Do those paragraphs that you
12  reviewed in Section 3.6 also state any
13  exceptions to that general proposition?
14       MR. RICHMAN:  Objection.  It
15  says what it says.
16       MR. MILLER:  It says what it
17  says.
18       ARBITRATOR IRVINGS:  Yeah, it
19  does.
20  BY MR. MILLER:
21  Q    What is your understanding -- well,
22  do you have an understanding whether these
23  three paragraphs also state some exceptions?
24  A    Yes, they do.
25  Q    And can you please summarize your

Page 268

ARBITRATION - VOLUME II

1
2   understanding of those exceptions?
3   A    The exceptions stated here -- and
4   when reading the whole ASOP together which
5   you kind of need to do to understand it
6   really completely, but the two exceptions
7   shown here are where there's a regulation or
8   accounting requirement that something other
9   than the investment return assumption be
10  used to discount the future payments in
11  order to determine the liability.
12       And there is a second exception
13  shown here which is when the plan is
14  unfunded or, in simpler terms, simply has no
15  assets backing ASOP, there's no assets
16  backing the liabilities, you clearly can't
17  look at and expect an investment assumption.
18  Q    And in what sort of situation or
19  what sort of benefit plan would there be no
20  assets set aside to support the liability
21  process?
22  A    For example, a retiree medical plan
23  might not have -- isn't required by law
24  typically have to an asset pool.  Sometimes
25  an executive benefit compensation plan

ARBITRATION - VOLUME II

1
2  doesn't have to have a dedicated pool of
3  assets.
4      Q    In the absence of either of those
5  two situations that you described, do you
6  have an opinion on whether it would be
7  appropriate to use a discount rate other
8  than the investment return assumption to
9  present value liabilities?
10     A    Would there ever be?
11     Q    Let me say it again.
12         In the absence of either of the two
13 exceptions described in 3.6, do you have an
14 opinion on whether it would be appropriate
15 to use a discount rate other than the
16 investment return assumption to present
17 value liability?
18     A    Well, let me answer it this way.
19 If one's looking for a best estimate of
20 anticipated experience under a pension plan,
21 then the answer would be no, I can't think
22 of one.
23     Q    And in your opinion when an actuary
24 for a multiemployer plan selects an
25 investment return assumption, are they

ARBITRATION - VOLUME II

1
2  required to do so by virtue of providing
3  their best estimate of that anticipated
4  experience?
5      A    Yes.
6      Q    In your opinion, what is the
7  relationship, if any, between the exceptions
8  to the general rule set forth in Section 3.6
9  and the context of withdrawal liability?
10     A    The exceptions that are set forth
11 in 3.6, the second exception, which is the
12 plan that has unfunded or no assets, clearly
13 doesn't apply to withdrawal liability.
14         And there is to my knowledge no
15 rule or governing rule or accounting rule
16 requiring an actuary to use a rate other
17 than the investment return assumption for
18 calculating withdrawal liability.
19         And, in fact, the natural reading
20 of the law is this is the best estimate of
21 anticipated experience under the plan.  I'm
22 not sure what else that could be besides the
23 investment return assumption.
24     Q    Can I turn your attention to 3.6.2
25 of the ASOP.  It begins at the bottom of

ARBITRATION - VOLUME II

1
2  Page 5 and then goes on to Page 6 and
3  Page 7.
4          Can you take a quick moment to
5  review 3.6.2, and why don't you explain your
6  understanding of that section.
7      A    3.6.2 shows two examples of
8  acceptable methods of determining an
9  investment return assumption.
10     Q    What are those two methods?
11     A    One of them is called a building
12 block approach, and the second one is called
13 the cash flow matching method.
14     Q    And can you briefly summarize what
15 the building block approach is?
16     A    The building block approach
17 basically looks at a core inflation number
18 first and then builds upon that based on the
19 type of assets that might be in the plan or
20 that you are trying to determine an
21 investment return on.
22         So if there's equities, you might
23 figure out what kind of investment premium
24 there would be over inflation and then build
25 that onto the inflation rate.  And the same

ARBITRATION - VOLUME II

1
2  sort of thing could apply for real estate or
3  actually for debt, for that matter, for bond
4  holdings.
5      Q    In connection with multiemployer
6  plans, in what circumstances would it be
7  appropriate to use the building block method
8  to develop an investment return assumption?
9      A    In most situations.  I mean, most
10 plans have equities, they have real estate,
11 they have bonds.  This is a very flexible
12 method to be used for almost any fund.
13     Q    But in particular, would it be
14 appropriate to use the building block method
15 to develop the investment return assumption
16 in connection with multiemployer plans that
17 have a diversified pool of assets?
18     A    Yes, absolutely.
19     Q    What is the cash flow matching
20 method?
21     A    The cash flow matching method
22 basically looks at all the series of
23 payments that the Fund is going to be able
24 to make and tries to match that against the
25 duration of certain bond investments.

ARBITRATION - VOLUME II

1
2       And it's a method that makes sense
3   when you need to cash flow match for
4   whatever reason, either because of a
5   government standard or because you are
6   trying to immunize a portfolio that has such
7   investments in it.
8       Q    And indeed, what type of portfolio
9   of assets would make the cash flow matching
10  method appropriate to be used by a
11  multiemployer pension plan in developing its
12  investment return assumption?
13      A    Well, a plan, that has, for
14  example, all government bonds or maybe
15  corporate bonds in particular, particularly
16  less callable-type duration bonds.
17      Q    And what about for a plan that has
18  a diversified pool of assets including
19  assets in equity?
20      A    I don't think this method would
21  make sense because there's no way under this
22  method to, for example, try to figure out
23  the return on the equity portion.
24      Q    Based on your review of the
25  financial statements for the NMDU Pension

ARBITRATION - VOLUME II

1
2   Fund and the Form 5500s for the Pension
3   Fund, do you have an opinion on whether the
4   Pension Fund here used either the building
5   block or cash flow matching method to come
6   up with its investment return assumption?
7       A    Well, I don't think it could have
8   used the cash flow matching method, but it
9   could certainly have used the building block
10  method.
11      Q    And why is that?
12      A    Because of the return assumption
13  that they've had, basically a consistent
14  7.5 percent return, would be the type of
15  return I would expect under a building block
16  approach.  I don't believe you would get to
17  that type of return under a government
18  bond portfolio in this day and age.
19      Q    Just to elaborate on that some
20  more.
21      What is the nature of the portfolio
22  of assets that would be needed to have an
23  investment return assumption in these times
24  of approximately 7.5 percent?
25      A    A fairly well-diversified portfolio

ARBITRATION - VOLUME II

1
2   that's fairly heavy in equities, real
3   estate, commodities or other
4   alternative-type investments and not
5   terribly heavy on the fixed income side.
6       MR. MILLER:  Mr. Arbitrator, I
7   now would like to introduce into
8   evidence one of the objected
9   exhibits.
10      It's Objected Exhibit 4.
11      And Mr. Arbitrator, this exhibit
12  has been objected to by the Fund on
13  relevance grounds, so I thought if I
14  might to try and lay a foundation for
15  relevance.
16      ARBITRATOR IRVINGS:  Go ahead.
17      MR. MILLER:  Thank you.
18  BY MR. MILLER:
19      Q    Mr. French, do you recognize this
20  document?
21      A    Yes, I do.
22      Q    And what is this?
23      A    This is the ASOP Number 27 adopted
24  by the Actuarial Standards Board September
25  of 2013.

ARBITRATION - VOLUME II

1
2       Q    And is this document the revised
3   version of ASOP 27 that you referred to in
4   your testimony moments ago?
5       A    Yes, it is.
6       Q    Do you know whether this version of
7   ASOP 27 makes any changes to Section 3.6?
8       A    Yes, my recollection is --
9       MR. RICHMAN:  I'm going to
10  object now and we have a enough of a
11  foundation.
12      What we know is that this does not
13  govern the calculation that was done.
14  The "this" being the Objected Exhibit 4.
15      And so I'm not really sure why
16  we're spending time going through this.
17  In fact --
18      ARBITRATOR IRVINGS:  Let's find
19  out.
20      MR. MILLER:  Let's find out.
21      May I continue to lay the
22  foundation?
23      MR. RICHMAN:  No, you can't.
24      ARBITRATOR IRVINGS:  Just
25  explain why we are doing this.

ARBITRATION - VOLUME II

1     ARBITRATION - VOLUME II
2     MR. MILLER:  The updated ASOP
3  clarifies the statements made in the
4  ASOP version that was used for
5  purposes of coming up with an
6  investment return assumption in this
7  matter as it relates to the question
8  of best estimate.  And it clarifies
9  and provides additional meaning to
10  the term "best estimate."
11     And the concept of best estimate is
12  important and we believe crucial as it
13  relates to the legitimacy of the
14  investment return assumption and discount
15  rate that was employed to calculate the
16  present value of liabilities for this
17  withdrawal liability assessment.
18     MR. RICHMAN:  It revises.  It
19  doesn't clarify.
20     MR. MILLER:  And I'd like --
21     MR. RICHMAN:  Excuse me.
22     MR. MILLER:  I would like the
23  expert to give his opinion on that
24  subject.
25     MR. RICHMAN:  We are going to

ARBITRATION - VOLUME II

1     ARBITRATION - VOLUME II
2  have both experts to talk about it
3  and we'll have a little issue with
4  respect to the document.
5     It revises.  It doesn't clarify.
6     And even if it's really just to
7  clarify, it doesn't matter.  It wasn't in
8  force at the time this calculation was
9  done.  It doesn't govern.  Their expert
10  has already testified that it doesn't
11  govern.
12     A later clarifying rule doesn't
13  come into play, period.
14     ARBITRATOR IRVINGS:  Go ahead.
15     MR. MILLER:  The lay opinion of
16  whether this revised ASOP clarifies
17  or doesn't clarify is in my judgment
18  not material.  We should hear from
19  the actuaries on that subject.
20     And to repeat, the issue of what
21  constitutes a best estimate is an
22  important one here.
23     And we think that the testimony
24  that Mr. French is going to give on how
25  this update impacts what the version that

ARBITRATION - VOLUME II

1     ARBITRATION - VOLUME II
2  was in effect says on the subject of best
3  estimate is important.  And you as the
4  arbitrator will give it the weight that
5  you deem it deserves.
6     ARBITRATOR IRVINGS:  Well, how
7  would a clarification -- let's assume
8  sort of a summary judgment standard
9  here --
10     MR. MILLER:  Okay.
11     ARBITRATOR IRVINGS:  How would
12  a clarification that was not
13  available at the time the
14  calculations were made in any way
15  govern, since they didn't have the
16  benefit that clarification at the
17  time they made --
18     MR. MILLER:  Sure.  It doesn't
19  govern, but the clarification will
20  guide the legitimacy of the
21  interpretation of the old version of
22  ASOP 27 at the time it was made.
23     So to the extent that a
24  determination and interpretation of the
25  operative version of ASOP 27 was made on

ARBITRATION - VOLUME II

1     ARBITRATION - VOLUME II
2  the subject of best estimate, the new
3  version, to the extent it clarifies,
4  demonstrates whether the interpretation
5  that was given to the old version at the
6  time was correct.
7     MR. RICHMAN:  First of all,
8  that doesn't shed any light on how
9  those people who were doing
10  calculations at that time would use
11  something that hadn't actually been
12  put out.
13     MR. MILLER:  It's also --
14     MR. RICHMAN:  Excuse me, I'm
15  not finished.
16     Secondly, there was an
17  interpretation with respect to this that
18  was put out by the American Academy that
19  talked about how the range should be
20  looked at.  It was there at the time that
21  people did these calculations.
22     That is what governs, not a
23  revision, even clarification of ASOP 27.
24     MR. MILLER:  Finally,
25  Mr. Arbitrator, I'll mention that as

Page 281

ARBITRATION - VOLUME II

1  indicated here, this updated version
2  was passed in September 2013, and it
3  was indeed in September of 2013 that
4  the calculation and the assessment
5  here was made.
6      MR. RICHMAN:  Well, the
7  assessment, I don't know exactly when
8  the actual calculation was made, but
9  the assessment goes back to a period
10  of time.  The actual date of the
11  calculation, the date for which the
12  calculation is done was years before
13  that.
14      And it doesn't make any sense to
15  have this out here.
16      The calculation was apparently
17  prepared, I'm being told by wire here, in
18  August of 2013.
19      This is not even effective
20  according to their own actuary until
21  2014.
22      MR. MILLER:  The document
23  discusses the various draft versions,
24  and what became the updated ASOP 27
25

Page 282

ARBITRATION - VOLUME II

1  was first discussed and aired by the
2  actuarial community in as early as
3  January of 2011.
4      MR. RICHMAN:  And the
5  calculation was as of 2009.
6      ARBITRATOR IRVINGS:  I think
7  what's applicable is what was in
8  effect at the time.
9      MR. MILLER:  Okay.
10  BY MR. MILLER:
11      Q   I'm now going to ask you a couple
12  of questions about the investment return
13  assumption that the Fund here developed and
14  applied.
15      Did you indeed have an opportunity
16  to review the audited financial statements
17  of the Pension Fund here?
18      A   Yes, I did.
19      Q   And based on your review of those
20  statements, is the Pension Fund here a
21  funded plan in the sense that it has a pool
22  of invested assets?
23      A   Yes, it does.
24      Q   Do you know what the investment
25

Page 283

ARBITRATION - VOLUME II

1  return assumption is for this pension?
2      A   The actuary was using for regular
3  funding purposes 7.5 percent.
4      Q   And how do you know that it was and
5  is 7.5 percent?
6      A   From the Schedule B to the
7  Form 5500 as well as the annual valuation
8  reports produced by the Fund actuary.
9      Q   Let's take a look at one of those
10  actuarial reports.
11      Let's look at Exhibit 24.
12      Is Exhibit 24 one of the annual
13  actuarial reports that you reviewed?
14      A   Yes, it is.
15      Q   Can you turn your attention to the
16  page that's marked on the bottom left
17  SEGAL-000551.
18      A   I found it.
19      Q   Good.
20      And can you read the third line,
21  the third heading.  Third under "Age of
22  Spouse."
23      A   "Net investment return,
24  7.5 percent."
25

Page 284

ARBITRATION - VOLUME II

1      Q   Yes.  And what do you understand
2  that to mean?
3      A   The net investment return is
4  essentially the actuary's best estimate of
5  the return assumption of the asset pool
6  under this plan.  You know, basically an
7  average of what it will be from now till the
8  end of the last benefit payment is made from
9  this Fund.
10      Q   And do you have an opinion about
11  whether actuarial principles require the
12  actuary to use his or her best estimate in
13  developing this investment return
14  assumption?
15      A   Yes, I do.
16      Q   And what is that opinion?
17      A   That the best estimate is required
18  under the law, is required under the
19  actuarial standards in part as a result of
20  that.
21      Q   Am I correct that you reviewed
22  other annual actuarial valuations for this
23  Pension Fund?
24      A   Yes, I have.
25

ARBITRATION - VOLUME II

1
2  Q   And was this 7.5 percent investment
3  return assumption consistent throughout the
4  actuarial valuations that you reviewed for
5  this Fund?
6  A   Yes, it was.
7  Q   In your experience -- strike that.
8      Do you have an opinion about
9  whether the 7.5 percent investment return
10 assumption is typical or unusual for a
11 multiemployer plan of this size?
12 A   I do.
13 Q   And what is that opinion?
14 A   It is quite typical, quite frankly,
15 for a plan of this size invested the way I
16 believe this plan is invested.
17 Q   And in connection with this
18 engagement, did you have occasion to review
19 the asset mix for this Pension Fund?
20 A   Yes, I did.
21 Q   And where did you find that
22 information?
23 A   In the annual accounting reports or
24 audit statements, financial statements.
25 Q   Can you turn your attention to

ARBITRATION - VOLUME II

1
2  Exhibit 75, which should be in the
3  light-blue binder.
4      And, Mr. French, can you turn your
5  attention toward the back end of the
6  document, and it's the page entitled
7  FUND-0001640.
8      Again, it's toward the back end.
9  A   Yes, I've found it.
10 Q   And can you please review its
11 contents for a moment.
12 A   Okay.
13 Q   And what is your opinion about what
14 this page reflects in connection with the
15 Pension Fund's assets mix?
16 A   Well, it shows a breakdown as of,
17 in this example, May 31, 2012, and May 31,
18 2011, of the various types of investments
19 that the Fund has both by name and the name
20 happens to have in it a descriptor that
21 would give me a pretty good idea of what
22 type of investment those funds are.
23 Q   And based on those descriptors,
24 what conclusions do you draw about the asset
25 allocation mix in the Pension Fund here?

ARBITRATION - VOLUME II

1
2  A   Well, that it's a fairly typical
3  mix for a plan of this size and type, that
4  it's fairly heavily invested in equities.
5  Also has some real estate and has some -- a
6  bond portfolio as well, along the lines of
7  what we pretty typically see for a
8  multiemployer plan.
9  Q   And you'll notice that this page is
10 Page 10 of a document.  And if you go back
11 to FUND-0001631 in this exhibit, that is a
12 letter.
13     And what is your understanding of
14 that letter, and what is your understanding
15 of what document you've been looking at that
16 is part of the Form 5500?
17 A   This is the independent auditors'
18 report.  It's been signed by the auditor or
19 the firm of auditors basically saying that
20 they've audited statements and what they did
21 and that they looked at it in terms of
22 general auditing standards of the United
23 States.
24 Q   And did you also in connection with
25 your engagement review other audited

ARBITRATION - VOLUME II

1
2  financial statements for this Fund for other
3  years?
4  A   Yes, I did.
5  Q   And for approximately what years?
6  A   I think it was from 2008 through
7  2013.
8  Q   Okay.  And did you also review the
9  discussions of asset allocations that are
10 contained elsewhere in the Form 5500?
11 A   Yes.
12 Q   And based on those reviews of both
13 the audited financial statement information
14 and other information about asset
15 allocations contained in the Form 5500, do
16 you have an opinion about whether the asset
17 allocations in this Fund have been
18 consistent in the last number of years?
19 A   Yes, I do.
20 Q   And what is that opinion, sir?
21 A   That while they have bounced around
22 a little bit, not unusual given the kind of
23 cash flows that the Fund has and the
24 different investment performances over time,
25 but that they have been fairly steady over

ARBITRATION - VOLUME II

1  ARBITRATION - VOLUME II
2  that period of time.  They ended up pretty
3  much where they were at the beginning.
4      Q    And based on your review of this
5  Fund's assets statements and your
6  understanding of the general asset
7  allocations for this Fund in particular, do
8  you have an opinion about whether a
9  7.5 percent investment return assumption is
10  reasonable?
11     A    Yes, I do.
12     Q    And what is that opinion?
13     A    7.5 percent strikes me as very
14  reasonable and consistent and not unusual.
15     Q    And indeed why is that?  Why is
16  your opinion that this is reasonable and
17  consistent?
18     A    Because based on the asset
19  allocations that I inferred from the
20  statements, that type of return is what I
21  would expect over time.  And the Fund
22  actuary has also certified that that is what
23  she believes to be a best estimate return.
24     Q    Now I'm going to ask a series of
25  questions about actuarial assumptions and

1  ARBITRATION - VOLUME II
2  actuarial assumptions in connection with
3  funding.
4          Aside from -- putting aside a
5  withdrawal liability situation, under what
6  circumstances, if any, would a multiemployer
7  pension plan have a need to discount to
8  present value its future benefit
9  obligations?
10     A    Well, for one thing, under their
11  regular Internal Revenue Code required
12  funding rules, there's minimal funding
13  requirements and maximum tax deductible
14  rules that are spelled out under the
15  Internal Revenue Code.
16          And for those purposes, very
17  similar calculations to what needs to be
18  done for withdrawal liability needs to be
19  done for those purposes as well.
20     Q    In your experience, do
21  multiemployer pension plans -- strike that.
22          I'll lay a better foundation.
23          Do you have an opinion, Mr. French,
24  about whether multiemployer pension plans
25  generally discount their future benefit

1  ARBITRATION - VOLUME II
2  obligations when calculating their ordinary
3  funding needs?
4      A    Yes.
5      Q    And in doing so, what do they use
6  as the discount rate when calculating their
7  ordinary funding needs?
8      A    They ordinarily use the investment
9  return assumption.
10     Q    And in your opinion, does it make
11  sense to use the investment return
12  assumption as the discount rate to present
13  value benefit obligations in connection with
14  funding?
15     A    Yes, absolutely.
16     Q    And why is that, sir?
17     A    Because if the fund uses -- if the
18  fund is vested fairly heavily in equities
19  and there is an anticipation that the fund
20  will earn a high investment return, then a
21  lower amount of assets, a lower amount of
22  contributions is needed in the fund.
23          If, on the other hand, there is an
24  expectation of a lower investment return,
25  then that would necessarily require a larger

1  ARBITRATION - VOLUME II
2  amount of money, large amount of
3  contributions in order to make the benefit
4  payments.  That's the whole point of the
5  minimum funding requirements.
6      Q    Mr. French, in your experience --
7  strike that.
8          Do you have an opinion about
9  whether multiemployer fund trustees
10  generally prefer a higher or a lower
11  discount rate when they're valuing
12  liabilities for ordinary funding purposes?
13     A    For ordinary funding purposes, I
14  would expect they would typically prefer a
15  higher discount rate.
16     Q    And why is that?
17     A    Because, as we discussed earlier,
18  higher discount rate means lower liabilities
19  and, therefore, is easier to meet the
20  minimum funding rules.  And they could have
21  less contributions to provide the same or
22  higher benefits than if they're using a
23  lower discount rate.
24     Q    And do you have an opinion on
25  whether, especially since the capital market

ARBITRATION - VOLUME II

1
2 decline in 2008, multiemployer fund trustees
3 generally prefer a higher or lower discount
4 rate when they're calculating withdrawal
5 liability?
6     A    Yeah.
7     Q    And what is this opinion?
8     A    For withdrawal liability purposes,
9 there's more of a tendency to prefer a lower
10 discount rate.
11     Q    And why is that?
12     A    Because the, again, lower discount
13 rate, as we mentioned earlier, provides a
14 higher liability, and a higher unfunded
15 liability means higher withdrawal liability
16 payments.
17         Now, that does two things that are
18 generally to be considered favorable to most
19 trustees.
20         One is it makes it a much bigger
21 incentive for the employer to stay in the
22 plan, or, rather, a bigger disincentive to
23 leave the plan.
24         And at least if the employer leaves
25 the plan, it provides for a larger amount of

ARBITRATION - VOLUME II

1
2 money coming in than if there were a higher
3 discount rate.
4         Now, that obviously makes it easier
5 for the ongoing employers to fund the
6 benefits.  And certainly for the Union side,
7 it makes it easier.  The Union doesn't have
8 to negotiate large contribution increases or
9 perhaps benefit declines they otherwise
10 would have to do if there was less money in
11 the plan.
12     Q    In your opinion, are you seeing a
13 trend in connection with using lower
14 discount rates to calculate withdrawal
15 liability?
16     A    Yes, I am.
17     Q    And why is that?
18     A    Well, the reasons are as we just
19 spoke about earlier.
20         The trustees are going to want
21 that -- is favorable in the view of most
22 trustees.  There may be some exceptions
23 where an employer plans on being in the fund
24 for a very long time, but for most trustees
25 it would be preferable to have a lower

ARBITRATION - VOLUME II

1
2 interest rate environment.
3         And, you know, there's ways to
4 apply pressure on professionals to try to
5 get to a lower rate than a higher rate.
6     Q    Do you know what rate the Pension
7 Fund here used to discount its liabilities
8 for ordinary funding purposes?
9     A    For ordinary funding purposes, yes.
10 That was 7.5 percent.
11     Q    And did the Pension Fund here also
12 use that same rate to discount its
13 liabilities when calculating The Times'
14 withdrawal liability?
15     A    Yes, they did.  A different rate.
16 Yes, they used a different rate.
17     Q    So they did not use 7.5 percent as
18 the discount rate to value liabilities when
19 calculating withdrawal liability?
20     A    That's correct.
21     Q    While we'll get into specifics
22 shortly, how did that change in the discount
23 rate affect the withdrawal liability
24 assessment against The Times?
25     A    The lower discount rate increased

ARBITRATION - VOLUME II

1
2 The Times' withdrawal liability.
3     Q    Putting aside the discount rate,
4 are there other assumptions that an actuary
5 has to make in computing a plan's ordinary
6 funding needs?
7     A    Yes, there are other assumptions.
8         Some examples would be the
9 mortality rate assumption, the percentage of
10 the retirees who are married, the age at
11 which nonretired participants would commence
12 benefits.  Those are kind of the key ones.
13     Q    Okay.
14         And these assumptions that are used
15 in connection with the plan's ordinary
16 funding needs, are assumptions on these
17 issues also required to be made in order to
18 compute withdrawal liability?
19     A    Yes, they are.
20     Q    And why is that?
21     A    The calculations are really very
22 similar.  I mean, there's not -- while there
23 are some minor technical differences, they
24 are essentially the same calculations for
25 the same purposes.

ARBITRATION - VOLUME II

1
2     Q    And in the course of your review,
3  did you review the other actuarial
4  assumptions that the actuary applied here in
5  calculating The New York Times' withdrawal
6  liability?
7     A    Yes, I did.
8     Q    And do you have an opinion on
9  whether, aside from the discount rate, the
10  Pension Fund here used similar or different
11  assumptions on these issues for withdrawal
12  liability than for ordinary funding
13  purposes?
14     A    Yes.  Aside from the discount rate
15  or investment return assumption, they used
16  the same assumptions for withdrawal
17  liability purposes as they did for regular
18  funding purposes.
19     Q    Now I'd like you to turn to the
20  white book and to Exhibit 1.
21     A    Okay.
22     Q    And what is this document, sir?
23     A    This appears to be the withdrawal
24  liability assessments from the Fund to
25  The New York Times.

ARBITRATION - VOLUME II

1
2     Q    And can you turn your attention,
3  it's about a little less than halfway
4  through the document to the page that's
5  marked FUND-000730.
6     A    Yes.
7     Q    And can you read to yourself the
8  first sentence.
9     A    Yes.
10     Q    What do you understand that to
11  mean?
12     A    Basically what it says, that the
13  actuarial assumptions used for the
14  withdrawal liability calculations and the
15  withdrawal assessment were the same as used
16  for plan funding, with the exception of the
17  investment return and the expense charge.
18     Q    And what's an expense charge?
19     A    Expense charge is a load, sometimes
20  on the liabilities, to account for the
21  plan's administrative expenses.
22     Q    And do you have an understanding of
23  why the Pension Fund here may have, as
24  indicated, used different assumptions
25  respecting the expense charge for withdrawal

ARBITRATION - VOLUME II

1
2  liability as it did for plan funding
3  purposes?
4     A    Well, I have an idea that they are
5  using a regulation from the PBGC to
6  determine their discount rate or their
7  investment return assumption.  And that
8  regulation or rule from the PBGC has
9  attached to it an accompanying expense load
10  calculation.
11       So very often when you use these
12  rates you use the expense load that's in
13  that same or associated with that
14  regulation.
15     Q    So is the change to the expense
16  load or expense charge necessarily the
17  byproduct of the change that was made in the
18  investment return rate?
19     A    It is related to it.  It could
20  certainly be a byproduct of it.
21     Q    Okay.  Thank you.
22       Now I want to ask a couple
23  questions about a concept called the Segal
24  blend.
25       Are you familiar with the term

ARBITRATION - VOLUME II

1
2  "Segal blend"?
3     A    Yes, I am.
4     Q    And what do you understand that to
5  mean?
6     A    It's basically a shorthand for a
7  methodology predominantly used by the Segal
8  Company where they effectively blend the
9  regular ongoing valuation interest rate with
10  these PBGC interest rate assumptions.
11     Q    And how does that blending
12  generally work?
13     A    Basically, it's for up to the value
14  of the plan assets, the PBGC rates are used.
15       For liabilities in the excess of
16  the value of the assets, the regular plan
17  funding rates are used.
18     Q    And these different rates are used
19  to value the liabilities, correct?
20     A    Correct.
21     Q    And what is your understanding of
22  what is meant by "the PBGC rates"?  What are
23  the PBGC rates?
24     A    In this instance, the PBGC rates
25  are rates published by the PBGC, which from

ARBITRATION - VOLUME II

1 my understanding are derived from annuity
2 purchase rates.  The PBGC solicits or has
3 some way of getting input on annuity
4 purchase rates from insurers, and then by
5 some methodology that's not clear, that I
6 don't believe the PBGC publishes, they
7 convert those rates, those rates into
8 basically these discount rates that they
9 show in the regulations.
10    Q    Let me ask a base, fundamental
11 question.
12        Are the PBGC rates interest rates?
13    A    They are really discount rates, I
14 would say, more than anything else, but
15 sometimes people may use the term "interest
16 rate."
17    Q    And you indicated that the PBGC
18 rates or PBGC interest rates are derived by
19 that agency from commercial insurance
20 company annuity purchase rates; is that
21 correct?
22    A    Correct.
23    Q    What is your understanding of how
24 insurance company annuity rates are derived?

ARBITRATION - VOLUME II

1    A    My understanding of how insurance
2 company annuity rates are derived is
3 insurance companies look at the duration of
4 the obligations they're picking up, and they
5 look at the kind of corporate bond portfolio
6 that would kind of match up with it, and
7 that's what they use to typically price
8 their annuities.
9    Q    Do you have an opinion on the
10 relationship, if any, between PBGC rates and
11 rates at the time the PBGC rates are
12 published for high-grade corporate bonds?
13    A    They should be kind of similar.
14        Given my understanding of how the
15 PBGC rates are determined and how insurance
16 company rates are determined, then one ought
17 to be kind of a proxy for the other,
18 although, in my experience, PBGC rates tend
19 to be a bit lower.
20    Q    Are you familiar with the term
21 "risk-free rate"?
22    A    Yes, I am.
23    Q    And what does the term "risk-free
24 rate" mean to you?

ARBITRATION - VOLUME II

1    A    It's a rate that's associated with
2 bonds or other debt obligations that
3 essentially have no risk of repayment or no
4 default risk.
5    Q    Is the concept of risk-free rate a
6 concept that multiemployer plan actuaries
7 routinely use in their practice or routinely
8 consider?
9    A    Routinely consider?  Only in terms
10 of maybe setting up a building block
11 approach to setting their investment return.
12    Q    Do you have an opinion on whether
13 high-grade corporate bond rates are a type
14 of risk-free rate?
15    A    I think they're often considered a
16 type of risk-free rate or very close to a
17 risk-free rate.
18        ARBITRATOR IRVINGS:  High-grade
19 corporate bond, is that what you
20 said?
21        MR. MILLER:  Yes, I did.
22 BY MR. MILLER:
23    Q    And what other types of securities
24 might fall into the bucket or a concept of

ARBITRATION - VOLUME II

1 risk-free securities?
2    A    US Government bond.
3    Q    What is your understanding of the
4 origins of the Segal blend method?
5    A    My understanding is that the Segal
6 blend methodology dates back to the 1980s
7 sometime after MEPPA was enacted.  And it
8 was, I believe, put in effect at a time when
9 many multiemployer plans had very heavy
10 fixed income portfolios.
11        And at the time fixed income
12 investments were earning higher than most
13 actuaries were typically using for their
14 regular funding assumption.
15        So in actuality at the time it was
16 put into place, the methodology actually
17 ended up with lower withdrawal liabilities
18 than was the case under the regular funding
19 rules.
20        So, yeah, I think the basis for it
21 was that would make the withdrawal liability
22 calculations a little less susceptible to
23 challenge because who is going to challenge
24 a number that's higher than what they think

ARBITRATION - VOLUME II

1  it should be, or lower -- who is going to
2  challenge a number that is lower.
3  
4  ARBITRATOR IRVINGS:  I was
5  going to ask you about that twist.
6  MR. MILLER:  I was going to ask
7  a clarifying question.
8  ARBITRATOR IRVINGS:  Just
9  making sure we are paying attention.
10 THE WITNESS:  Makes me feel
11 better.
12 MR. MILLER:  Thanks.
13 BY MR. MILLER:
14 Q    In your experience, is the Segal
15 blend commonly used today by multiemployer
16 plan actuaries?
17 A    In my experience, it's almost
18 exclusively used by actuaries at the Segal
19 Company, but it's not commonly used by
20 actuaries outside of the Segal Company.
21 Q    Do you as an actuary use the Segal
22 blend when calculating or estimating
23 withdrawal liability for multiemployer funds
24 for which you are or were the enrolled
25 actuary?

ARBITRATION - VOLUME II

1  
2  A    I'm not an enrolled actuary now but
3  in the plans where I was the enrolled
4  actuary, I did not use the Segal blend
5  method.
6  Q    Why did you not use the Segal blend
7  method?
8  A    In my view, the Segal blend method
9  has nothing to do with my idea of the best
10 estimate of the return of the fund and,
11 really, in most cases could not be the best
12 estimate of the investment return --
13 anticipated return under the fund.
14 Q    So can you explain why in your
15 judgment the Segal blend method is in
16 conflict with actuarial best estimates of
17 anticipated experience?
18 A    Because the Segal method doesn't
19 take into account how the fund is actually
20 invested or intended to be invested, and it
21 assumes that a certain part of the assets
22 are going to be basically invested in fixed
23 income securities.
24 And unless that's the trustees'
25 intent, I don't see how that can be a best

ARBITRATION - CONFIDENTIAL

1  estimate of the plan's anticipated
2  investment returns.
3  
4  Q    Has your position on use or, more
5  particularly, the inapplicability of the
6  Segal blend method ever caused you
7  difficulties with a client for which you
8  were serving as the enrolled actuary?
9  A    Yes, it has.
10 
11 (Whereupon, the following testimony
12 is deemed Confidential:)
13 
14 
15 
16 
17 
18 
19 
20 
21 
22 
23 
24 
25 

ARBITRATION - CONFIDENTIAL

1  
2  BY MR. MILLER:
3  Q    And what client is that?
4  THE WITNESS:  Are we
5  stipulating this is confidential?
6  MR. MILLER:  Mr. Richman?
7  MR. RICHMAN:  Yeah, I think all
8  of the actuarial stuff should be
9  confidential.
10 MR. MILLER:  And we agree.
11 ARBITRATOR IRVINGS:  Okay.
12 Yes.
13 THE WITNESS:  So everything I'm
14 talking about here on will be
15 confidential.
16 MR. RICHMAN:  During this
17 proceeding.
18 ARBITRATOR IRVINGS:  This is
19 not a free pass for the rest of your
20 life.
21 MR. MILLER:  No free passes for
22 Mr. Richman.
23 BY MR. MILLER:
24 Q    Go ahead.
25 A    The client was the Central States

Page 309

1    ARBITRATION - CONFIDENTIAL
2  Teamsters Fund.
3    Q    And can you describe what the
4  difficulties were and the upshot in
5  connection with that client and your
6  position on the inapplicability of the Segal
7  method?
8    A    This client, the Central States
9  Teamsters Fund, when I was the actuary in
10  2005, 2006 into early 2007, I think, was
11  experiencing great difficulties.  It was a
12  very unfunded plan.
13    And United Parcel Service, UPS, was
14  the largest employer in the fund, and it was
15  pretty well known that they wanted to get
16  out and they were very likely going to be
17  pulling out of the fund.  And everyone from
18  Hoffa, Junior to -- you know, wanted to make
19  sure either keep them in the fund or, if
20  they're leaving, that they're going to pay a
21  very hefty price for it.
22    And so eventually the understanding
23  became, well, withdrawal liability
24  assumptions would be a good way to do that.
25    However, you know, I had never used

Page 310

1    ARBITRATION - CONFIDENTIAL
2  the Segal blend and was not really
3  comfortable with the idea of the Segal
4  blend.  So they decided to hire Segal to be
5  the fund's actuary because Segal was well
6  known as having used that and having -- at
7  least it would not be as suspicious a
8  change.
9    Q    So you were terminated by the
10  Central State's Teamsters Fund as its
11  enrolled actuary?
12    A    Correct.
13    Q    And as a consequence of this
14  matter?
15    A    Correct.
16    Q    And did they in fact retain Segal?
17    A    They did.
18    Q    And did UPS indeed withdraw?
19    A    They did.
20    Q    And was the Segal blend method
21  indeed applied to determine the withdrawal
22  liability?
23    A    To the best of my knowledge.  I did
24  not see the calculation.
25    (End of Confidential portion.)

Page 311

1    ARBITRATION
2  BY MR. MILLER:
3    Q    Let's return to the subject of
4  application of PBGC rates and calculation of
5  withdrawal liability.
6    Can you think of any reason to use
7  PBGC rates, particularly in the current
8  environment, in calculating withdrawal
9  liability if the actual multiemployer
10  pension plan's assets are not invested in
11  high-grade corporate bonds or equivalent
12  low-risk investments?
13    A    Well, it wouldn't make sense to me
14  under a standard where you need to have the
15  best estimate of anticipated experience
16  under the plan.
17    Q    And why is that?
18    A    Because the expected return on such
19  a fund would be higher than the PBGC rates,
20  probably considerably higher in this day and
21  age.
22    Q    Do you have an opinion on whether
23  the Segal blend represents an actuarially
24  reasonable approach to valuation of a plan's
25  unfunded vested benefits for withdrawal

Page 312

1    ARBITRATION
2  liability purposes?
3    A    I do.
4    Q    And what is that opinion?
5    A    My opinion of that is actuarial
6  unreasonable in the aggregate.
7    Q    And why is that?
8    A    Because the funding assumptions --
9  they're using the regular funding
10  assumptions which are reasonable and have
11  attested they're best estimates for every
12  other purpose except for the investment
13  return assumption.
14    Now, for regular funding they are
15  attesting to the 7.5 percent as being the
16  best estimate of the anticipated experience
17  or investment return under the fund which
18  makes sense.  And I certainly believe and
19  concur with that.
20    But then they inexplicably use a
21  lower rate for that one purpose and that one
22  purpose only.  And that one rate has a very
23  material impact on the obligations.
24    Q    Who serves as the actuary for the
25  NMDU Pension Fund here?

ARBITRATION

1
2      A    My understanding it's the Segal
3  Company.
4      Q    And do you have an understanding
5  whether the Segal Company in fact uses the
6  Segal blend method to calculate withdrawal
7  liability against The New York Times?
8      A    Yes, they did.
9      Q    And did you calculate the monetary
10 impact of the use of the Segal blend
11 assumptions here as opposed to the use of
12 the ordinary 7.5 percent funding rate?
13     A    Yes, I did.
14     Q    And can you summarize what your
15 calculation was of that differential?
16     A    My calculation was somewhere above
17 $19 million versus the Fund's calculation I
18 think close to $26 million.
19          So divide what they calculate by
20 what I calculated is about a 33 percent
21 difference; 33 percent higher than the value
22 I would have gotten using the Fund's regular
23 assumptions.
24     Q    And briefly summarize how you went
25 about making that calculation.

ARBITRATION

1
2      A    The numbers that I needed to do the
3  calculation were already in the Segal
4  reports.
5          So I simply redid the calculations,
6  only changing the assumption in the last
7  year, the number I had readily available,
8  and was able to redetermine what the
9  withdrawal liability would have been based
10 on that assumption.
11     Q    Well, let's drill down on that some
12 more.
13     A    Okay.
14     Q    What method does this multiemployer
15 Pension Fund use to calculate withdrawal
16 liability?
17     A    They use the so-called presumptive
18 method.
19     Q    And how many years in looking back
20 on underfunding does a multiemployer plan
21 examine in connection with application of
22 the presumptive method?
23     A    The presumptive method goes back
24 20 years in valuations.  So there's 20 years
25 of calculations to review.

ARBITRATION

1
2      Q    I see.
3          In calculating the monetary impact
4  of the use of the Segal blend assumptions
5  here, were you able to go back the full
6  20 years?
7      A    No, I was not.
8      Q    So do you have an opinion on
9  whether the impact that you did calculate,
10 the roughly 6, $7 million impact is the
11 precise calculation of the impact?
12     A    It is only precise if the
13 assumption were to change in that year, and
14 that's probably not the best way to do it.
15          So it is probably not the precise
16 answer.
17     Q    Okay.  And what would you need to
18 do to make the precise calculation of the
19 impact of application of the Segal blend on
20 the withdrawal liability assessment against
21 The Times?
22     A    I would need really the last
23 20 years of reports and all of the backup
24 calculations.  There is a lot of
25 complications that would get involved in

ARBITRATION

1
2  that.
3      Q    Have you made any estimate on what
4  the amount would be if you in fact received
5  all of the data going back the 20 years to
6  perform that calculation?
7      A    I have made some further estimates,
8  yes.
9      Q    And what is that estimate?
10     A    Since this came up in my deposition
11 as to whether, you know, what impact it
12 might have and I think some guesses at the
13 time, I looked back at what I did have which
14 was four years going back from, I think from
15 May 31, 2009.
16          And based on that, the number that
17 I calculated would have been even lower than
18 what I calculated using just the last year
19 by roughly another half a million dollars.
20     Q    And by "the lower number," you mean
21 the withdrawal liability number?
22     A    Yes, lower withdrawal liability
23 number is what I mean.
24     Q    And I think you previously
25 testified that you did review the other

Page 317

ARBITRATION

1
2  actuarial assumptions that Segal employed in
3  estimating and valuing the Pension Fund's
4  unfunded pension benefits for withdrawal
5  liability purposes.
6        Is that a correct summary of your
7  prior testimony on that subject?
8     A    Yes, it is.
9     Q    And those assumptions were in what
10  regard?  What types of additional
11  assumptions were they?
12    A    Those were the Mortality Table
13  assumptions, the percentage of retirees,
14  married retirement rate assumptions and any
15  other assumptions that were shown in the
16  report.
17        I reviewed those against my general
18  knowledge of multiemployer plans and the
19  specific type of plans and plan provisions
20  they had.  And they all struck me as
21  perfectly reasonable in line what I would
22  typically expect assumptions to be.
23    Q    Thank you.
24        With that in mind, assuming that
25  these other assumptions that were employed

Page 318

ARBITRATION

1
2  were actuarially reasonable, do you have an
3  opinion on whether the actuarial assumptions
4  used to compute the unfunded vested benefits
5  here for this withdrawal liability
6  calculation were reasonable or unreasonable
7  in the aggregate?
8     A    I do have an opinion.
9     Q    And what is that opinion?
10    A    That they were not reasonable in
11  the aggregate.
12    Q    And why is that?
13    A    Because all of the assumptions but
14  one were reasonable and presumably best
15  estimate assumptions.
16        The one assumption that was not was
17  an assumption that was an investment return
18  assumption which was much lower than what
19  appeared to be the best estimate return.
20  And that one assumption has a very large
21  impact on the numbers.  It's the most
22  important assumption.
23        And like I said, there's no
24  counterbalancing other assumption that would
25  go in the other direction that would even

Page 319

ARBITRATION

1
2  allow in the aggregate to be reasonable.
3  And, you know, as we've stated earlier, the
4  impact is significant, at least 33 percent.
5     Q    By virtue of calculating the
6  withdrawal liability for The Times using the
7  Segal blend as opposed to the ordinary
8  7.5 percent fund rate, do you have an
9  opinion on whether there will be an impact
10  on the other contributing employers to the
11  Pension Fund if the 7.5 percent best
12  estimate is ultimately realized?
13    A    Yes.
14    Q    And what is that opinion?
15    A    Well, as I mentioned earlier, by
16  one employer paying more than its fair
17  share, by one employer paying based on a low
18  discount rate but the Fund actually
19  achieving a high investment return, it means
20  that portion of the plan would become more
21  than fully funded.
22        Since it's one pool of assets to
23  provide for one set of benefits, the other
24  employers would necessarily get the benefit
25  of that 7.5 percent return over the Segal

Page 320

ARBITRATION

1
2  blend return.
3     Q    And just to drill down on this a
4  little further.
5        So do you have an opinion on
6  whether employers would be better off or
7  worse off following the withdrawal of
8  The New York Times in the event the best
9  estimate of 7.5 percent is obtained relative
10  to where they would be if there had not been
11  an assessment of withdrawal liability?
12    A    Yes.  For reasons that we just
13  stated, the other employers are better off
14  because The Times is essentially overfunding
15  its portion of the unfunded benefits.
16    Q    And in such event, would The Times
17  in effect be paying more or less than its
18  allocable share of the unfunded vested
19  benefits in the Pension Fund?
20    A    More.
21    Q    Mr. French, I recall you testified
22  moments ago that you do not use the Segal
23  blend approach when you -- or did not use
24  the Segal blend approach when you served as
25  an enrolled actuary to a multiemployer fund.

ARBITRATION

1
2       What was your practice in
3  connection with calculating or estimating
4  withdrawal liability?
5       A    My typical practice on withdrawal
6  liability was to use the same investment
7  return assumption as for regular funding.
8       Q    Was there ever an occasion in which
9  you departed from that general practice?
10      A    Yes.
11      Q    And what was that?
12      A    I think on one occasion where under
13  the Consolidated Retirement Fund, was a
14  client of mine --
15      Q    And can you explain the
16  circumstances in connection with that
17  departure from your practice?
18      A    Yes.
19          The Consolidated Retirement Fund is
20  a fund who had basically four large key
21  employers.  One of those employers, UNITE
22  HERE, was threatening to leave the fund.  It
23  was probably one of the strongest
24  financially of the employers.  And the
25  second employer, I think was Amalgamated

ARBITRATION

1
2  Bank, was in grave danger of going out of
3  business.  And there were other issues with
4  some of other employers especially related,
5  as they're kind of interrelated entities in
6  some respects.
7          So there was a concern that there
8  would be a very large withdrawal or several
9  large withdrawals from the plan and whether
10 in the event of that occurring, what would
11 happen to the fund.
12          And, you know, trustees in this
13 fund were also plan participants.  This was
14 a union staff fund where the trustees of the
15 fund had very large, very substantial
16 benefits being paid from this fund.
17          So their indication to me was,
18 look, if this kind of thing happens, we're
19 going to have to change -- we are not going
20 to invest -- this was a fund that was
21 invested very heavily in equities and real
22 estate and alternative investments.  They're
23 going to very seriously consider changing
24 the investment portfolio mix if these strong
25 employers withdraw from the plan.

ARBITRATION

1
2          And in that circumstance, the
3  liabilities of the fund would go up.
4          So in anticipation of that
5  occurring, the withdrawal liability was
6  changed -- well, I changed the withdrawal
7  liability assumptions to reflect that
8  possibility or that if a big employer or two
9  or more withdrew from the fund and the
10 trustees were going to change the investment
11 mix so that it would be a more
12 conservative -- and "more conservative,"
13 meaning lower investment return portfolio --
14 then, of course, that would make sense to
15 use a lower withdrawal liability assumption.
16      Q    And in that situation, did you have
17 an expectation of what the funding rate
18 would be in connection with that plan
19 following the withdrawal of one or more of
20 these significant contributors?
21      A    Yes.  If the withdrawals indeed
22 occurred and the trustees followed through
23 and changed the investment portfolio,
24 investment mix to be more conservative,
25 then, of course, the ongoing regular funding

ARBITRATION

1
2  assumptions would change to a lower discount
3  rate as well.
4       Q    And did you have any expectation of
5  whether and the extent to which that revised
6  funding rate would migrate to the withdrawal
7  liability discount rate?
8       A    Well, at that point --
9           ARBITRATOR IRVINGS:  I'm sorry.
10 I missed that.
11          MR. MILLER:  Sure.
12 BY MR. MILLER:
13      Q    Did you have any expectation of
14 whether the revised funding rate that would
15 occur as a consequence of the change in the
16 investment of assets would migrate to the
17 withdrawal liability discount rate that you
18 had determined?
19          ARBITRATOR IRVINGS:  I guess
20 I'm confused because I thought he
21 just said that he started with the
22 lower rate for withdrawal liability
23 and then said it would migrate to the
24 funding.
25          MR. MILLER:  Why don't you

Page 325

ARBITRATION

1
2  clarify.
3      THE WITNESS:  What I said, I
4  would expect that the funding rate,
5  once the trustees actually changed
6  the portfolio and the withdrawal
7  actually occurred, the funding rate
8  would come down.
9      And, of course, at that point the
10  funding rate and the withdrawal liability
11  rate would be more or less in concert
12  unless, of course, we expected further
13  withdrawals and further making more
14  conservative investments in the fund that
15  would then require or necessitate a
16  further lowering of the regular funding
17  rate.
18      ARBITRATOR IRVINGS:  Okay.  Got
19  it.
20      MR. MILLER:  Thank you.
21  BY MR. MILLER:
22      Q    How were you advised in connection
23  with this matter of the anticipated changes
24  to the investment asset mix?
25      A    Well, as you can imagine, this was

Page 326

ARBITRATION

1
2  a very big concern.
3      There were quite a number of
4  meetings surrounding this and, you know,
5  what are we going to do.
6      And my meetings with some of the
7  trustees, I asked that very question:  In
8  the event of this withdrawal, would you
9  change the investment portfolio and make it
10  more conservative?  And of course given that
11  this was their pensions, they said, Yes,
12  yes, we would.
13      Q    And who was fund counsel at the
14  time of this matter?
15      A    Ron Richman.
16      Q    And did you document your reasoning
17  for departing from the funding rate in that
18  matter and using a lower discount rate for
19  the forthcoming withdrawal?
20      A    Yes, I did.
21      Q    And why don't you describe what
22  that document was and how it's used.
23      A    Well, I don't have the document.  I
24  don't remember exactly what was in it, but
25  my recollection is that there were concerns

Page 327

ARBITRATION

1
2  about this, you know, there would be
3  challenges to this, that we wanted to
4  document it carefully.
5      So I do remember we wrote it
6  carefully.  Ron looked at it, reviewed it,
7  we sent it out to the trustees.
8      And it basically set forth the
9  rationale as to why we're doing it and I
10  believe it set forth kind of how we came
11  down to the number.
12      Q    Just to confirm, do you have a copy
13  of that memo?
14      A    No, I don't.
15      Q    Do you happen to know whether the
16  investment mix changes ultimately were made?
17      A    To the best of my knowledge, they
18  were not.
19      Q    And why was that?
20      A    To the best of my knowledge, no
21  employer or no substantive employer ever
22  withdrew from the fund.
23      Q    Do you continue to serve as the
24  enrolled actuary for the Consolidated
25  Retirement Fund?

Page 328

ARBITRATION

1
2      A    No.
3      Q    And when did you stop serving in
4  that capacity?
5      A    I believe when I left employment
6  with Buck in July or so of 2013.
7      Q    Switching subjects.
8      Have you had a chance to review the
9  expert report filed in this matter by the
10  Fund's expert actuary, Dr. Ethan Kra?
11      A    Yes, I have.
12      Q    Do you have an understanding of
13  whether Dr. Kra agrees with use of the Segal
14  blend method?
15      A    My understanding from his report is
16  that he does not.
17      Q    He does not?
18      A    Does not.
19      Q    And what is your understanding of
20  why the Fund's own expert disagrees with use
21  of the Segal blend method?
22      A    My understanding is Dr. Kra
23  believes that withdrawal liability ought to
24  be calculated purely on a risk-free based
25  approach.

ARBITRATION

1
2    Q    And that would be as opposed to the
3    blending approach that you described for
4    the, indeed, Segal blend method?
5    A    That's correct.
6    Q    And do you have an understanding of
7    whether Dr. Kra believes that the risk-free
8    rate should be employed even if the fund
9    that is employing that risk-free rate has
10   assets that have an expected return above a
11   risk-free rate?
12   A    That is my best understanding based
13   on his report and his deposition.
14   Q    Do you agree with that?
15   A    I do not.
16   Q    And why not?
17   A    I don't because it seems the
18   wording of the law is that this has to be
19   the actuary's best estimate of anticipated
20   experience under the plan.
21        Well, the only experience that the
22   plan can have is the actual investment
23   return.  And if the plan is not invested in
24   purely risk-free investments, it is going to
25   be expected to have a higher return.  Your

ARBITRATION

1
2    best estimate is going to be a higher number
3    than the risk-free return; otherwise, why
4    would you be investing in those things.
5    Q    In your experience, is it common
6    for actuaries to use the risk-free rate as
7    the discount rate for funding purposes?
8    A    For regular funding purposes, no.
9    I don't know that I've ever heard of that.
10   At least -- except for a fund that was
11   invested purely in risk-free investments.
12   Q    What about using the risk-free rate
13   as the discount rate for withdrawal
14   liability purposes, is that commonly done by
15   actuaries?
16   A    It's not commonly done by
17   actuaries, but that, I have seen.
18   Q    Would you describe that practice as
19   unusual?
20   A    I would describe that as unusual,
21   yes.
22        MR. MILLER:  Mr. Arbitrator, I
23   have about ten minutes, tops, so
24   should I just continue and finish up
25   the direct?

ARBITRATION

1
2        ARBITRATOR IRVINGS:  Might as
3    well.
4        THE WITNESS:  I'm fine.  Thank
5    you.
6        ARBITRATOR IRVINGS:  Do you
7    need a break?
8        MR. RICHMAN:  No.
9        ARBITRATOR IRVINGS:  Finish the
10   wrap then.
11       MR. MILLER:  Sure.  Thank you.
12   BY MR. MILLER:
13   Q    What do you understand to be Dr.
14   Kra's basis for using a risk-free rate
15   approach to value liabilities for withdrawal
16   liability purposes only?
17   A    Well, my understanding, again based
18   on his report and deposition, is that since
19   the withdrawing employer will pay a single
20   sum of money and, therefore, doesn't take on
21   the risk of those investments, that if the
22   investments earn less than expected that he
23   has effectively underfunded his portion of
24   the plan.
25   Q    And what is your reaction to that

ARBITRATION

1
2    argument?
3    A    My reaction to that argument is,
4    yes, if in fact the plan doesn't achieve
5    what we expect, then, sure, they're going to
6    underfund the portion of plan.
7    Q    Do you have a judgment as to
8    whether Dr. Kra's theory is consistent with
9    the requirement of a best estimate of
10   anticipated future investment experience?
11   A    Yes.  I can't square it with that
12   requirement.
13   Q    And why is that?
14   A    Because this Fund is investing
15   fairly heavily in equities and real estate
16   and is expected -- my expectation and
17   certainly the plan actuaries' expectation,
18   which is the most important one, is that the
19   Fund will earn better than a risk-free rate.
20   Q    Isn't it true, though, that if the
21   Fund does not ultimately earn 7.5 percent,
22   the withdrawing employer would end up paying
23   less than what is necessary to fund its
24   share?
25   A    Yes.

Page 333

ARBITRATION

1
2    Q    But, nonetheless, you view that
3    theory as being in conflict with actuary
4    principle?
5        MR. RICHMAN:  Objection.
6        ARBITRATOR IRVINGS:  You want
7    to rephrase it.
8    BY MR. MILLER:
9    Q    Do you have an opinion on whether
10   in the event of such an impact Dr. Kra's
11   theory would be consistent with actuarial
12   principles?
13   A    Yes, I have an opinion.  Yeah, the
14   actuarial principle is, look, we expect 7
15   and a half percent.  Maybe it will be higher
16   than 7 and a half percent.  Maybe it will be
17   lower than 7 and a half.  But on average we
18   expect 7 and a half.
19       So if you are going to use 4 or 5,
20   or 6, well, that can't be your best
21   expectation because, yes, if it only earns
22   5, they will underfund their portion of the
23   plan.
24       But if the plan earns 9, well,
25   they're going to overfund their portion of

Page 334

ARBITRATION

1
2    the plan.
3        And, you know, we don't know.  It
4    could be 5, it could be 9, but the best
5    estimate is 7 and a half.
6    Q    Are you familiar with the term
7    "actuarial bias"?
8    A    Yes.
9    Q    And what is your understanding of
10   actuarial bias?
11   A    My understanding of actuarial bias
12   is an assumption that would systemically
13   either overprovide or overfund a liability
14   or systemically underfund a liability as
15   opposed to trying to get at your true,
16   accurate best estimate.
17   Q    Do you have an opinion as to
18   whether if an actuary's best estimate of how
19   a pool of assets is to perform is
20   7.5 percent, but assumes a different
21   estimate for a withdrawing employer whose
22   payments will go into that asset pool, the
23   actuary's engaging in bias?
24   A    Yes.
25   Q    And what is your judgment?

Page 335

ARBITRATION

1
2    A    That would be a bias.
3    Q    What if, as a consequence of a
4    withdrawal, there would be a significant
5    drop in the contributions of the Pension
6    Fund with not a material prospect of future
7    growth in participants, wouldn't that case
8    justify perhaps a lower discount rate for
9    the withdrawing employer?
10   A    Not unless the trustees are going
11   to, as in the case of, say, the Consolidated
12   plan, going to change the investment mix of
13   the fund.
14       If you are going to keep the
15   investment mix where it was, then the change
16   in the contribution -- the number of
17   employers in the fund doesn't impact what
18   your expectation is for the investment
19   return of the fund in any material way.
20   Q    In the context of a termination of
21   a single-employer pension plan, what
22   interest rates are used as the discount rate
23   to value vested benefits?
24   A    My understanding in a distressed
25   termination of a single-employer plan, the

Page 336

ARBITRATION

1
2    statute requires the use of PBGC rates for
3    discount rates.
4    Q    And do you have an opinion on what
5    the policy view or rationale is for
6    employing PBGC rates to discount liabilities
7    in the case of a single-employer pension
8    termination?
9    A    Well, I don't know for certain, but
10   certainly the idea in the case of a single
11   plan termination is you are going to
12   purchase annuities from an insurance
13   company.
14       And so if you are going to purchase
15   annuities from an insurance company, then
16   PBGC, of course, is the exactly the type of
17   rate that's required.  And, of course, the
18   statute specifically notes that in this
19   case.
20   Q    Do multiemployer pension funds
21   ordinarily purchase annuities with a portion
22   of their assets in the event of an
23   employer's withdrawal?
24   A    Certainly not ordinarily.  And, in
25   fact, I don't think I've ever seen that

ARBITRATION

1
2  occur.
3      Q    In the materials that you reviewed
4  in connection with your engagement by
5  The New York Times, was there any evidence
6  that the Pension Fund here was going to
7  annuitize a portion of the benefits as a
8  consequence of The New York Times
9  withdrawal?
10     A    I did not see any evidence of that
11 sort and I didn't see any evidence of any
12 prior annuity purchases, at least in the few
13 years that I looked at.
14     Q    And one final question for
15 completeness.
16         Mr. French, what is your expert
17 opinion regarding the actuarial assumptions
18 used by the Pension Fund here to compute its
19 unfunded vested benefits relating to
20 The Times withdrawal?
21     A    From withdrawal liability purposes
22 that they are actuarial unreasonable in the
23 aggregate.
24         MR. MILLER:  Thank you.
25         No further questions.

ARBITRATION

1
2          MR. RICHMAN:  Take a few
3  minutes.
4          (A brief recess was
5  taken.)
6          MR. RICHMAN:  Let's go.  Get
7  back on the record.
8          ARBITRATOR IRVINGS:  All set.
9      CROSS EXAMINATION BY MR. RICHMAN:
10     Q    About how many multiemployer
11 pension plans does Segal provide actuarial
12 services to?
13     A    I don't know the answer to that.
14     Q    Let me show you an opinion.  And I
15 don't intend to introduce it in evidence.  I
16 just want to show you something.
17         MR. MILLER:  Mr. Arbitrator,
18 let me object right there.
19         We agreed to a set of exhibits.
20 And the understanding was that those
21 exhibits would be used for both
22 cross-examination purposes and
23 evidentiary purposes.  And to use
24 exhibits now for which we have not seen
25 and have not had an opportunity to vet

ARBITRATION

1
2  and potentially prepare witness is
3  prejudicial.
4          MR. RICHMAN:  It's not
5  prejudicial, first of all.
6          This is a cross.  And as the
7  Arbitrator ruled yesterday with respect
8  to crosses, the exhibits themselves don't
9  need to be placed on a witness list.  I
10 don't need to put this in as an exhibit.
11 It is a decision of Arbitrator Jaffe
12 where there is a discussion of the number
13 of multiemployer pension plans which
14 Segal represents.  And I think what I
15 would like to do is to ask the witness if
16 he has any reason to believe that that is
17 incorrect.
18         Now, I could bring in as a witness,
19 if we can't get that information,
20 somebody from Segal who has that
21 information, but this is a whole lot
22 easier.
23         MR. MILLER:  There's going to
24 be a witness from Segal immediately
25 succeeding Mr. French.  That question

ARBITRATION

1
2  can be asked.  And even if she is not
3  a definitive authority, she can
4  express her judgment as somebody who
5  has worked at Segal --
6          ARBITRATOR IRVINGS:  Well, I
7  think all of this is sort of much to
8  do about a tangential fact.
9          But if my recollection is correct,
10 in your memorandum you referenced was
11 Ira's opinion.
12         MR. RICHMAN:  I wrote about
13 Ira's opinion.  But this is certainly
14 not a surprise.  And even if it were
15 a surprise, it doesn't matter.
16         ARBITRATOR IRVINGS:  But asking
17 him whether it strikes him as
18 unreasonable, why don't you wait and
19 just ask the Segal person because
20 whether he has a guess as to whether
21 Ira's figures -- I'm sure that Ira's
22 figure is correct.  And we all know
23 Ira.
24         MR. RICHMAN:  We all know Ira.
25         ARBITRATOR IRVINGS:  But

Page 341

ARBITRATION

1
2  without referencing Ira's, why don't
3  you simply say, "Does the number ..."
4      MR. RICHMAN:  All right.  Okay.
5  I'm not going to reference anything.
6  BY MR. RICHMAN:
7      Q    But does it sound approximately
8  correct to you that Segal Company
9  represented in 2008 approximately 415
10 multiemployer pension plans?
11     A    It doesn't strike me as impossible.
12 It certainly seems reasonable -- reasonable
13 possibility.
14     Q    A reasonable possibility.  Okay.
15         How many multiemployer pension
16 plans were there in about 2008?
17     A    I don't know exactly.  I'm going to
18 say, based on knowledge I have, roughly
19 1,500.
20     Q    1,500 or 1,200?
21     A    I think it was closer to 1,500 but
22 I didn't look it up for this because I
23 didn't know it was going to come up.
24     Q    And who are the other large firms
25 that do -- who provide a significant amount

Page 342

ARBITRATION

1
2  of actuarial services to -- I'm sorry.
3  Withdraw that.
4         Which other firms, other than
5  Segal, provide actuarial services to a
6  substantial number of multiemployer pension
7  plans?
8      A    There's Kiron (ph.).  There's
9  Milliman.  There's Buck.  One time there was
10 Mercer.  There's a whole host of reasonable
11 firms that provide services.
12     Q    What about Horizon?
13     A    And Horizon, yes.  Thank you.
14     Q    Is it your understanding that the
15 Segal method is used by all of Segal's
16 actuaries?
17     A    I don't know about all of Segal's
18 actuaries.
19         My understanding it is if not all,
20 virtual -- the vast majority, let's say.  At
21 least the vast majority, how about that.
22     Q    Okay.
23         Do you know whether actuaries at
24 Milliman use a discount rate for withdrawal
25 liability purposes that's different than the

Page 343

ARBITRATION

1
2  interest assumption used for ongoing funding
3  purposes?
4      A    I don't know for certain.  I'm sure
5  that I have looked at some Milliman reports.
6  I haven't looked at them recently, but my
7  recollection was that they typically use the
8  regular investment return assumption, but --
9  you know, Milliman is one of those firms
10 where each office is sort of independently
11 run, and it's certainly a possibility each
12 office does something different.
13     Q    Do you know whether Horizon uses a
14 discount rate that's different from the
15 investment assumption from time to time for
16 some of its multiemployer plans?
17     A    I know one that you told me it is.
18 So you know the answer to that question.
19         I don't recall any others, but
20 there could be.
21     Q    For how long did the Segal Company
22 use the Segal blend?
23     A    My understanding dating some time
24 back to the 1980s.
25     Q    So I just want to see if we can pin

Page 344

ARBITRATION

1
2  that down a little bit.
3         So the Multiemployer Act gets
4  passed in 1981, right?
5      A    That's my recollection.  I wasn't
6  working then, but ...
7      Q    Wise guy.
8         And did the Segal Company use a
9  different withdrawal liability method other
10 than the Segal blend after the adoption of
11 the MEPPA?
12     A    I wouldn't know.
13         I don't know the history.  I know
14 they used it in the '80s.
15     Q    It's been used for at least
16 25 years?
17     A    I think that's a fair estimate.
18     Q    As you indicated, when it was first
19 used, it was used to lower withdrawal
20 liability?
21     A    I can't say it was used to lower
22 withdrawal liability, but that was the
23 impact.
24     Q    Okay.
25         Do you have any reason to believe

26

ARBITRATION

1
2  it was implemented at that time for the
3  purpose of lowering withdrawal liability?
4      A    I can't say for certain one way or
5  the other what purposes.
6      Q    Do you know what the rationale that
7  Segal provides for using the Segal method
8  is?
9      A    I've seen the rationale in
10 different places and explained it different
11 times.
12          It seemed to be related to the
13 possibility of actually purchasing annuities
14 or going out and immunizing a portfolio.
15          But that explanation never made
16 sense to me because it doesn't seem to be
17 coupled with any actuality of doing that.
18     Q    Okay.  I just want to make sure I
19 understand your answer.
20          Is it your understanding of the
21 Segal method that it's premised on the fund
22 actually going out and buying annuities?
23     A    No.  I'm saying it's premised on
24 the concept that -- you know, why else would
25 you use that methodology as your best

ARBITRATION

1
2  estimate unless you thought you were either
3  going to purchase annuities or that you were
4  going to change your investment mix to be
5  that return, you know, a portfolio that
6  would give you that return.
7      Q    You mentioned that you were on the
8  Multiemployer Task Force, and that's of the
9  American Academy of Actuaries?
10     A    I think it was "Task Force" and
11 then it changed to "Committee."  If that's
12 important.  Of the American Academy of
13 Actuaries, yes.
14     Q    And that was beginning in 2008 and
15 ending sometime --
16     A    I believe early 2014.
17     Q    And during that time period, did
18 you as a committee or task force examine how
19 withdrawal liability was calculated by
20 various actuarial firms?
21     A    I don't think we examined it, no.
22 I believe it was discussed, not so much how
23 each firm did it, but just the general
24 concept of calculating withdrawal liability.
25          I have one distinct recollection of

ARBITRATION

1
2  a phone meeting where it was discussed.
3      Q    Okay.
4          Did this Task Force come out with
5  any papers or directives or any suggestions
6  to practicing actuaries on how withdrawal
7  liability should be calculated?
8      A    I don't remember anything on
9  interest rates.  I have a vague recollection
10 that there was something about maybe the
11 actual benefits that are determined, but --
12     Q    But nothing on interest rates?
13     A    Not that I can recall, no.
14     Q    The members of this committee were
15 aware, weren't they, that the Segal method
16 was used almost exclusively by Segal as well
17 as by some other actuaries to calculate the
18 interest rate for withdrawal liability,
19 correct?
20     A    Correct.  I think most people in
21 the industry are aware of that, and there
22 was at least one person from Segal on the
23 committee.
24     Q    Why didn't the committee express
25 its opinion as to the impropriety of using

ARBITRATION

1
2  the Segal method for calculating interest?
3          MR. MILLER:  Objection.
4  There's been no foundation that the
5  committee was structured and designed
6  to give opinions --
7          MR. RICHMAN:  He said they
8  examined withdrawal liability and how
9  it was calculated and there was some
10 focus on interest.
11         ARBITRATOR IRVINGS:  That
12 wasn't his testimony.
13         MR. RICHMAN:  He did say --
14         ARBITRATOR IRVINGS:  He said
15 there was a discussion.  He recalled
16 a phone discussion on withdrawal
17 liability.
18         THE WITNESS:  Assumptions.
19         MR. RICHMAN:  Okay.
20 BY MR. RICHMAN:
21     Q    And what was the conclusion of that
22 discussion?
23     A    There was no conclusion to the
24 discussions.  These discussions were
25 typically discussions and all conclusions

Page 349

ARBITRATION

1
2  would be done in a formal statement, and
3  there was no formal statement put out that I
4  certainly would have been involved in and I
5  certainly would have remembered it.
6      Q    You've also done work for the PBGC,
7  as I understand it, correct?
8      A    Yes, I have.
9      Q    On single or multiemployer side?
10     A    Multiemployer side.
11     Q    Do you know whether the PBGC has
12  issued the regulations that are referenced
13  in ERISA for calculating -- I'm sorry, for
14  actuaries choosing assumptions?
15     A    I'm going to assume that you mean
16  the section of ERISA that instructs
17  actuaries how to choose assumptions for
18  withdrawal liability purposes?
19     Q    I'm talking about 4213, right?
20     A    I don't remember which section, the
21  section numbers.
22     Q    Okay.  So 4213 says that "The
23  corporation" -- which is referring to PBGC,
24  right?
25     A    Sounds right, yes.

Page 350

ARBITRATION

1
2      Q    -- "can prescribe by regulation
3  actuarial assumptions which may be used by a
4  plan actuary in determining the unfunded
5  vested benefits of a plan for purposes of
6  determining an employer's withdrawal
7  liability."
8      A    Yes.
9      Q    You are familiar with that?
10     A    Yes, I am.
11     Q    And have they done so?
12     A    Not to my knowledge.
13     Q    Did you do any work with the PBGC
14  with respect to the possibility of the PBGC
15  issuing a regulation?
16     A    No.  PBGC had no interest in
17  issuing a regulation of that type.
18     Q    Why was that?
19     A    Regulations issued by PBGC, the
20  hurdles they have to go through are almost
21  insurmountable.
22     Q    The people at -- withdraw that.
23          When you were consulting with the
24  PBGC, did you consult with anyone at the
25  PBGC who you knew was aware that the Segal

Page 351

ARBITRATION

1
2  method was being used by the Segal Company
3  and other actuaries to calculate withdrawal
4  liability?
5      A    I can't say we specifically
6  discussed it.  Were they aware of it?
7  Probably, but I would have to speculate.  I
8  don't recall any specific discussion or
9  information I had that they know that, but I
10  would tend to think they would.
11     Q    Do you know Bruce Perlman at the
12  PBGC?
13     A    I know who he is.
14     Q    So you don't know him?
15     A    I don't know him personally.
16     Q    You never worked with him?
17     A    I did not.  I think he's an
18  attorney, not an actuary.
19     Q    You get to answer the questions.
20          Do I understand your testimony
21  correctly today that it is your opinion that
22  the use of the Segal blend for consulting
23  withdrawal liability is a violation of the
24  law?
25          MR. MILLER:  Objection.

Page 352

ARBITRATION

1
2          MR. RICHMAN:  I said "Do I
3  understand" --
4  BY MR. RICHMAN:
5      Q    Is that correct?
6      A    I don't think I said that, those
7  words.
8      Q    Well, isn't it in your opinion a
9  violation of the law?
10     A    I can't give an opinion on the law.
11  I can say I know what the law says.  The law
12  says it should be a best estimate of
13  anticipated experience under the plan.
14          Those words are fairly simple, and
15  in my mind the Segal method does not do
16  that.
17     Q    Okay.
18          But you're not taking a position on
19  that?
20     A    I'm not going to take a legal
21  position, no.
22     Q    And in your view, the Segal blend
23  violates ASOP 27?
24     A    In my view, the Segal blend does
25  not conform with ASOP 27, correct.

ARBITRATION

1
2      Q     So that would mean it violates it?
3      A     Okay.  If you want to say
4  "violate," sure.
5      Q     For how long is the Pension Fund
6  here -- for how long has the Pension Fund
7  here used Segal blend?
8      A     I don't know.  At least as far back
9  as I looked, I think back to 2005.
10     Q     Okay.
11           Do you have any reason to believe
12  that the Segal blend was adopted by this
13  Pension Fund for the purposes of increasing
14  withdrawal liability?
15     A     I have no reason to think one way
16  or the other.
17     Q     That's different from your
18  experience with the Central States
19  Teamsters?
20     A     That is correct.
21     Q     In the Segal blend that was used to
22  calculate the Fund's withdrawal liability
23  includes an investment assumption, the
24  plan's ongoing funding investment
25  assumption, correct?

ARBITRATION

1
2      A     The regular ongoing investment
3  assumption, the Segal valuation does show
4  that number, correct.
5      Q     And it's also used in the
6  calculation of The Times' withdrawal
7  liability?
8      A     It is partially used in the
9  calculation of The Times' withdrawal
10  liability, yes.
11          ARBITRATOR IRVINGS:  I'm sorry.
12  Can we just go back to your first
13  question on that.
14          MR. RICHMAN:  Yes.
15          ARBITRATOR IRVINGS:  I just
16  missed the beginning of the question.
17  Was there a specific rate that you
18  mentioned?
19          MR. RICHMAN:  No, no, I didn't.
20  What I'm asking, which Darren just
21  answered, is to whether the investment
22  assumption that is the plan's ongoing
23  investment assumption, whether that was
24  used as part of the Segal blend to
25  calculate the withdrawal liability for

ARBITRATION

1
2  The New York Times.
3  BY MR. RICHMAN:
4      Q     And I think your answer is yes?
5      A     The answer is partially, yes.
6      Q     Partially.  It's one of --
7      A     One of the parts of the
8  calculation.
9      Q     Two components of the calculation?
10     A     Okay.  Yes.
11     Q     And the other component is?
12     A     The PBGC rates.
13     Q     Okay.
14           Focusing on the investment
15  assumption component, for what year was the
16  investment assumption used to do The Times'
17  withdrawal liability calculation?
18     A     I'm not sure I'm following your
19  question.  Sorry.
20     Q     So the Fund uses the Segal blend,
21  and the Segal blend used in part, the
22  interest assumption that was reported by the
23  actuary, correct?
24     A     Yes.
25     Q     Okay.  And I'm asking you for what

ARBITRATION

1
2  year.
3      A     For every year that I looked at it.
4      Q     Okay.  I'm just focusing on the
5  year that the assumption would have been
6  actually used to calculate the Segal blend.
7      A     Well, remember, this Fund uses the
8  presumptive method, so it goes back
9  20 years.  So really, while it may first
10  come into effect in the calculation May 31,
11  2009, that necessarily needs to go back
12  20 years.  And so --
13     Q     But if the interest assumption at
14  that time of the Pension Fund was
15  6 percent --
16     A     At what time?
17     Q     At the March 31, 2009.
18     A     Okay.  If it was.
19     Q     That's why I said if it was.
20     A     Trying to follow you.
21     Q     If it were and that was, in your
22  words, the actuary's best estimate, would
23  that be the component that would be used for
24  the ongoing funding investment assumption as
25  part of the Segal blend?

ARBITRATION

1
2     A    Yes, I believe it would.
3     Q    Okay.  So it would be the March 31,
4  2009 interest assumption?
5     A    For that one part of the
6  calculation.
7          Now, remember, it goes back
8  20 years, so each -- it matters each and
9  every year going back 20 years what that
10 assumption is.  It affects the calculation.
11    Q    And I keep saying March.
12    A    I'm sorry.
13    Q    It's May 31st.
14    A    Thank you.
15    Q    But when you did your
16 recalculation, what you focused on was the
17 last year, did you not?
18    A    The one I used in my expert report,
19 yes.
20    Q    So, and you testified here today
21 that you think the 7 and a half percent that
22 was used as the investment assumption for
23 May 31, 2009 was a reasonable assumption,
24 correct?
25    A    Yes.  And I do think that.

ARBITRATION

1
2     Q    And would 7 percent have been a
3  reasonable assumption, if the actuary chose
4  that?
5     A    Possibly.
6     Q    How about 6 and a half percent?
7     A    I don't know.  It depends on the
8  asset mix.  Depends on a lot of things.
9     Q    We know what the asset mix was.
10    A    I wouldn't have picked a rate like
11 that, and this actuary didn't pick a rate
12 like that.
13    Q    That's not the question.
14         The question is pretty simple.
15    A    Okay.
16    Q    And that is:  Would 6 and a half
17 percent have been, in your mind, a
18 reasonable rate if the actuary had picked
19 that as the investment assumption for
20 May 31, 2009?
21    A    I think it's a very -- I think it
22 would be a low rate.  Could it be
23 reasonable?  Maybe.  It's a very
24 hypothetical question.
25    Q    Why is it a hypothetical question?

ARBITRATION

1
2     A    Because they didn't.
3     Q    Well, but you know all of the
4  information that you'd need to determine
5  whether it was an appropriate rate, you
6  knew -- right?  Yes?
7     A    Yes.
8         MR. MILLER:  But, objection.
9     You asked him that question in
10    connection with if the actuary had
11    picked that assumption.  Are you now
12    asking him a different question?
13         MR. RICHMAN:  We're beyond
14    that.  Stay with us.
15 BY MR. RICHMAN:
16    Q    So you had the information --
17    A    Yes.
18    Q    -- to determine whether 6 and a
19 half percent, that's May 31, 2009, was a
20 reasonable interest rate for the Pension
21 Fund, correct?
22    A    Yes.  I could figure that out.
23    Q    Okay.
24         And as I understand it, in fact,
25 you examined the portfolio of the Fund for

ARBITRATION

1
2  various years?
3     A    Yes.
4     Q    So let's take a look at the
5  portfolio as -- for the Pension Fund as of
6  May 31, 2009.
7         And we're going to Exhibit 7.  We
8  can do some math together or I can hand out
9  something with the math already done,
10 whatever you'd like to do.
11         What I'm focused on is Page 14,
12 which is FUND-1580.
13    A    1580.  Landscape page?
14    Q    I don't know what a landscape is.
15         ARBITRATOR IRVINGS:  Meaning
16    it's printed this way.
17         MR. RICHMAN:  Oh, really.
18 BY MR. RICHMAN:
19    Q    Now, you testified about this page
20 before previously?
21    A    Not this page I don't think.  It
22 was a similar page --
23    Q    In a different report?
24    A    In the Fund's audited financial
25 statements is what I testified about earlier

ARBITRATION

today, if that's what you mean.

Q    Is this not in the Fund's audited financial statement.

Let's look at 1564.

A    Maybe it is.  Yes, but it's a different page.

Q    If you look at Page 1564, it is the financial statement, correct?

A    Yes, it would appear to be.  Yes.

Q    Do you have any reason to believe it's not?

A    I have no reason to believe it's not.  So, yes, I agree with you it appears to be.

It's in the supplemental information.  I mean, I don't have the bound report, but I think typically this is.

MR. RICHMAN:  I mean, is there some question that this is not really the report, Evan?

MR. MILLER:  I don't know what -- do you know what a supplemental information is on?  Do you know whether supplemental

ARBITRATION

information is part of the report?

THE WITNESS:  It often is.  I just don't remember if it is in this specific case.

BY MR. RICHMAN:

Q    You just testified previously that you didn't use this page, but you used a similar landscape page --

A    No.  Similar portrait page.

Q    Portrait page, with this information?

MR. MILLER:  But it was not part of the supplemental information.  The only issue is, is supplemental information part of the report.

MR. RICHMAN:  We can brief that.  Okay?

ARBITRATOR IRVINGS:  Go ahead.

MR. RICHMAN:  Or we can wait and call in an auditor.

BY MR. RICHMAN:

Q    So let's look at the Fund's investments as of May 31, 2009.

And I'm going to hand this to your

ARBITRATION

counsel to see if he's okay with this because what we did was add this up.  Or we could try out our math skills.

MR. MILLER:  What is the purpose of this?

MR. RICHMAN:  I want to show the asset allocation.

MR. MILLER:  Okay.  This is essentially a demonstrative exhibit, correct?

MR. RICHMAN:  It's not an exhibit.

MR. MILLER:  And we had agreed on a deadline for use of demonstratives.

MR. RICHMAN:  It's not a demonstrative.  I'm not planning to use it as an exhibit.  But if you don't want to use it, we can all add it up together.

MR. MILLER:  It is a demonstrative exhibit.

MR. RICHMAN:  That's fine.  We can all add it up together and we can

ARBITRATION

be here for four days or five days.

THE WITNESS:  I don't have a calculator with me.

BY MR. RICHMAN:

Q    You can do math --

A    What math do you want me to do?

Q    I want you to add up certain numbers.

A    Let me turn on my phone.

MR. GARFIELD:  We have an HP12C you can borrow.

THE WITNESS:  Thank you.

If we can use rounded numbers, make it easier.

MR. RICHMAN:  Sure.

BY MR. RICHMAN:

Q    So Collective Short-term Investment Fund.

Do you know what type of fund that is?

A    That is a fixed income fund of a sort.

Q    So what I'm going to be doing is adding up fixed income or bond funds.

ARBITRATION

1
2       And one category equity, in another
3   category real estate, and a third category.
4       A   Okay.
5       Q   If you want to put that on the side
6   of investment fund -- bond fund?
7       A   Okay.
8       Q   Let's go down to the LongView Core
9   Bond Index Fund.
10      A   Okay.
11      Q   That's also a bond fund?
12      A   Yes.  That certainly sounds like
13  it.
14      Q   And let's also take the Western
15  Asset Core Bond Fund.
16      A   Okay.
17      Q   Can you add those three up for us?
18      A   Well, we got 47,200,000.
19      Q   Okay.  Fair enough.
20          Now, let's add up the Russell 1000
21  Fund.
22      A   The Russell 1000 Fund.  So we'll
23  call it 9.6.
24      Q   Okay.  And this would be an equity
25  fund?

ARBITRATION

1
2       A   That would be an equity fund, I
3   believe.
4       Q   And let's add up the Intech Risk
5   Managed Large Cap Growth Fund.
6       A   So we are going to add up the
7   Russell 1000, which is 9.6 plus.
8       Q   The Intech Risk Managed Large Cap
9   Growth Fund.  And the LongView 1500 Total
10  Market Index Fund.
11          THE WITNESS:  I'm going to use
12  my calculator because that one
13  confounds me.
14      A   Okay.  Let's try this again.
15      Q   So we got those three together.
16      A   Russell 1000, that's 9.6.
17          And the next one was?
18      Q   LongView 1500.
19      A   Okay.  26.0.  Okay.
20      Q   And then the Intech fund.
21      A   11.9.  Okay.
22          So we have 47.5 million.
23      Q   And the last fund is a real estate
24  fund?
25      A   Yes.  6.2 million.

ARBITRATION

1
2       Q   And so would it be accurate to say
3   that the Fund was roughly 47 percent
4   invested in equity, 47 percent invested in
5   bonds and 6 percent invested in real estate?
6       A   As of this point in time, yes.
7       Q   Now, on a scale from -- in terms of
8   aggressiveness, how would you consider this
9   Fund to be invested as of this time?
10      A   As of this time, based on these
11  numbers -- and, by the way, these numbers
12  don't look familiar to me because I did do
13  this exact thing in my report.  And I
14  remember some are higher equity numbers.
15          But assuming these numbers aren't
16  missing something that I'm not seeing right
17  here, this would be a fairly typical fund,
18  maybe slightly less aggressive than a
19  typical fund.
20      Q   Okay.  And for this asset mix, what
21  would you consider to be a reasonable
22  investment assumption?
23          MR. MILLER:  Lack of
24  foundation.  There's been no evidence
25  that he engaged in any of the

ARBITRATION

1
2   actuarial methods to calculate an
3   investment return assumption in
4   connection with this portfolio.
5          Mr. Richman is now asking him for
6   an invest return assumption decision to
7   be made.
8          His testimony earlier was that what
9   he did was he made a judgment about the
10  investment return assumption that was
11  made by the plan's actuary here, and he
12  further testified that he thought that
13  that actuary had engaged in a technical
14  method called the building block method.
15          I mean, Mr. Richman can ask him if
16  he engaged in any building block method
17  exercise.
18          There's no foundation for him to be
19  able to render a judgment on what the
20  investment return assumption should be,
21  based on rough figures of asset classes,
22  without at least knowing more detail of
23  those asset classes and applying the
24  scriptures of the ASOP 27.
25          ARBITRATOR IRVINGS:  What's

ARBITRATION

1
2    your question?
3    BY MR. RICHMAN:
4        Q    My question is:  Given this asset
5    mix -- and this is the May 31, 2009 asset
6    mix.
7        A    Based on this page?
8        Q    Yes.
9        Do you have any reason to believe
10   these numbers are wrong?
11       A    Different pages of reports don't
12   show the full asset values necessarily.
13   There's certain things that may be missing
14   from this page that are on some other page.
15       Q    What would be missing from this
16   page that's on some other page?
17       A    Some kind of accrual number, some
18   kind of other fund besides -- these may be
19   just the interest in common collected
20   funds -- I don't know offhand because I
21   haven't studied this page before.
22       I studied the other page where I
23   did look at the numbers which I show in my
24   report, which would be much easier to look
25   at my report and just see based on that what

ARBITRATION

1
2    kind of return I would expect, rather than
3    looking at one point in time from a part of
4    an exhibit that I'm not familiar with.
5        Q    But why wouldn't you have picked
6    this page to review given the fact that this
7    would be the interest -- this would be for
8    the interest assumption that would have been
9    the ongoing funding assumption at that point
10   in time?
11       A    I picked a different page.
12       MR. MILLER:  Objection.
13   There's no evidence --
14       A    I think there's a better --
15       ARBITRATOR IRVINGS:  Wait.
16   When counsel objects, you've got to
17   let him speak.
18       THE WITNESS:  I'm sorry.
19       MR. MILLER:  Lack of
20   foundation.
21       There's no evidence that the
22   enrolled actuary in this case focused on
23   these investments and the description of
24   these investments exclusively in
25   developing our 7.5 percent best estimate.

ARBITRATION

1
2        MR. RICHMAN:  Look, there is an
3    allocation mix at the time of May 31,
4    2009.  This witness has already
5    testified to in cross that this would
6    be the investment assumption that
7    would be used as a component in the
8    Segal method.
9        And what I'm simply trying to find
10   out is whether this component used in the
11   Segal method is an appropriate number.
12       ARBITRATOR IRVINGS:  And did he
13   not already testify that the
14   7.5 percent he found to be in the
15   aggregate a reasonable interest rate
16   assumption?
17       MR. RICHMAN:  Right.  And I'm
18   going to debunk that, because what
19   I'm going to show is that it is at
20   most on the very high end of a
21   reasonable assumption and that when
22   you take into account the asset mix
23   at this time, which is the -- which
24   is what the number -- which was the
25   asset allocation that existed at the

ARBITRATION

1
2    time for the number that was selected
3    for the investment assumption, that
4    the range at least is significant --
5    that 7.5 percent is at the high end
6    of the range.  And the range goes
7    significantly lower than 7.5 percent.
8        That's important, very important to
9    understand all of Mr. French's testimony,
10   because it is our view that use of the
11   Segal method or not, it didn't matter
12   because the number when you put together
13   the calculation that it was, as
14   Mr. French testified in his deposition,
15   that the same -- that the vested
16   liability number could be reached by
17   using an interest assumption of somewhere
18   between 6 and a quarter and 6.5 percent.
19       And my point here is very simple:
20   That when you look at the investment
21   portfolio and the allocation at May 31,
22   2009, that 6.5 is certainly within the
23   realm of reason under actuarial
24   principles.
25       MR. MILLER:  May I be heard?

Page 373

ARBITRATION

To the extent that Mr. Richman is
attacking the 7.5 percent, he is,
ironically, attacking the best estimate
of his client's own actuary.

That's point number one.

Point number two is that Mr. French
testified this morning that there is a
technical and elaborate process that
actuaries go through as identified in
that ASOP. He mentioned specifically
this building block method to determine a
best estimate assumption.

Mr. Richman can ask, I have no
issue with his asking Mr. French if he
engaged in a building block method
analysis to essentially audit the
7.5 percent assumption.

But Mr. French is not equipped, by
his own testimony in the course of this
examination, to calculate his own best
estimate assumption, particularly in
light of what he just testified about the
potential inadequacies and limitations of
the information on that page.

Page 374

ARBITRATION

ARBITRATOR IRVINGS: Okay. Let
me try and understand.

Did you as part of your report
calculate an interest rate investment
assumption based on the asset mix, the
actual asset mix?

THE WITNESS: No. In part of
my report, I showed this kind of
calculation based upon a much bigger
range of numbers and a much bigger
number of years.

I looked at the asset mix, and
based on that, and my knowledge of other
calculations I've done for funds of a
similar-type nature, determined that I
believe 7 and a half percent was a
reasonable best estimate.

And I know from my own experience
on funds of this sort I've used that type
of a rate.

ARBITRATOR IRVINGS: So what
are you asking him to do now?

MR. RICHMAN: Well, what I'm
asking him to do is based on the

Page 375

ARBITRATION

asset mix that existed at May 31,
2009 -- where I'm going with this is
I want to know the range.

Now, he's already said, when I said
7 and a half: Could have been 7, could
it have been 6 and a half, that would be
on the low end.

But he seems to be focused on a
different asset mix than the asset mix
that existed on the critical date which
is May 31, 2009.

And we can brief that issue about
whether that's the critical data or not.
That's not an actuarial opinion. But in
our view, that's the critical date
because that's the date in which the
actuaries gotta look at the asset
allocation and see what they're going to
come up with, with an investment
assumption.

MR. MILLER: We have an actuary
who apparently undertook a detailed
analysis in 2009 and made a
conclusion about what is the best

Page 376

ARBITRATION

estimate of investment performance
then, and that was repeated
subsequently each year.

Mr. Richman will have an
opportunity to examine that actuary, the
actuary for his client, and is certainly
free to ask that actuary what the range
was within the complex calculations she
may have made and perhaps ask her why she
did not pick 7.5 percent or did pick
7.5 percent as opposed to a different
number.

But Mr. French is not equipped at
this juncture to make projections about
where the range is of estimates for
either best estimate or the particular
best estimate for this portfolio.

MR. RICHMAN: Let me go back to
the deposition.

ARBITRATOR IRVINGS: Sure.

MR. RICHMAN: And I'm going to
look at Mr. French's deposition on
December 8, 2014.

And there was a series of questions

ARBITRATION

1  ARBITRATION
2  that I was asking.
3      I can read the whole thing or let
4  me just pick a ...
5      So I'm going to pick up on Page 82
6  and Line 22.
7      "Question:  That best estimate is
8  Segal's best estimate, correct?  And
9  that's the 7 and a half percent."
10     And the answer was:  "That is
11  Segal's best estimate, correct."
12     "Question:  Is that also your best
13  estimate?"
14     Mr. Miller objects to the form.
15     And the answer is:  "My best
16  estimate is not what's relevant here but
17  it would certainly -- certainly that is a
18  reasonable assumption that would not be
19  unusual for me to use as a best estimate
20  assumption.
21     "Okay.  Would 6 and a half also be
22  a reasonable assumption?
23     "Objection to the form."
24     And I say, "Answer the question."
25     "It could be in certain situations,

1  ARBITRATION
2  not in this one.
3      "Why not in this one?
4      "Because the actuaries already
5  certified that 7 and a half is their return.
6  And this is a very aggressively invested
7  fund.  It's a big fund.  It's professionally
8  managed.  That would be a low rate."
9      ARBITRATOR IRVINGS:  Okay.
10     MR. RICHMAN:  And so my point
11  here is he made an assumption based
12  on a portfolio, and he testified
13  today, "7.5 percent is very
14  reasonable.  That return is what you
15  would expect."
16     That's what he testified to today.
17     ARBITRATOR IRVINGS:  Right.
18     MR. RICHMAN:  And so what I'm
19  asking him is 7 and a half percent
20  really, when I'm crossing him, is 7
21  and a half really a reasonable
22  number?  And how far down can you go
23  down in that number.
24     MR. MILLER:  But that's not
25  responsive to our argument.

1  ARBITRATION
2      Our argument is that the withdrawal
3  liability investment return assumption
4  was not the same as the funding policy
5  assumption.
6      If they believed that their own
7  actuary's funding policy assumption was
8  wrong, they can ask their own actuary
9  when she takes the stand.
10     But this is not relevant
11  essentially and at bottom to our
12  contention that it's precisely because
13  the two investment return assumptions
14  were not the same that the assumption
15  used for calculating the withdrawal
16  liability is wrong.
17     ARBITRATOR IRVINGS:  And I
18  fully understand your argument.
19     He apparently has a somewhat
20  different argument.
21     And opinions have been offered that
22  this was a reasonable assumption.
23     You can test that examination.
24     However, I'm not sure that a
25  calculation based only on this page is --

1  ARBITRATION
2      MR. RICHMAN:  I'm happy to
3  brief that.
4      ARBITRATOR IRVINGS:  Okay.
5      MR. RICHMAN:  I mean, I'm sure
6  Evan will take a contrary view.  We
7  think that's the accurate way to look
8  at it.
9      The May 31, 2009 asset allocation.
10     We don't have any reason to believe
11  this is not the asset allocation as of
12  May 31, 2009.
13     ARBITRATOR IRVINGS:  And you
14  are free to ask him what asset
15  allocation he was judging.
16     MR. RICHMAN:  Which he was
17  judging.
18     ARBITRATOR IRVINGS:  When he
19  made his opinion that the 7.5 was a
20  reasonable figure for the investment
21  rate of return.
22     MR. RICHMAN:  I'm happy to ask
23  him that but I'd also like to ask
24  him, based on what he's already said,
25  May 31, 2009 would be the right time

Page 381

ARBITRATION

1
2  period to ask him about what it would
3  be based on this allocation.
4       ARBITRATOR IRVINGS:  And you
5  can certainly ask him whether that's
6  a determination he can make simply
7  from this data.  That's fine.
8       You know, I clearly have evidence,
9  his statement that he can't, but you are
10  free to ask the witness.
11       MR. RICHMAN:  Okay.
12  BY MR. RICHMAN:
13     Q    So you testified on direct that
14  7 and a half percent is very reasonable and
15  that the return is what you would expect.
16       Do you remember that?
17     A    Yes.
18     Q    And you base that on looking at
19  what?
20     A    If you look in my expert report, I
21  went through a fairly detailed analysis of
22  how the Fund has been invested over the past
23  few years.  And I would not look at just one
24  date at one particular moment in time.
25       I mean, funds often reallocate

Page 382

ARBITRATION

1
2  assets at different points particularly at a
3  year end, so I wouldn't look at this just
4  one point in time.
5       And my recollection from my report,
6  this is about the lowest percentage.  In
7  fact, this looks lower than anything I
8  recall from my report, but it was
9  substantially higher than this in terms of
10  equities at different points in time over
11  the period that I looked at.
12       And even this return, even this
13  portfolio has a fair amount of risk in it,
14  so 7 and a half percent is not an
15  unreasonable return even for these numbers
16  that we look at here.
17       But I would look at something
18  considerably larger than that and based on
19  higher percentage.  Seven and a half percent
20  is absolutely a reasonable assumption.
21     Q    And so you just testified, "And
22  even this return, even this portfolio has a
23  fair amount of risk on it, so 7 and a half
24  is not an unreasonable return here even for
25  these numbers that we look at here."

Page 383

ARBITRATION

1
2       So you are apparently able to do
3  this calculation as we sit here.
4     A    No.  That's not what I said.
5       I said if this was the portfolio
6  the whole time, even that's not
7  unreasonable.  It may or may not be the
8  return I would come up for this, but it is
9  not an unreasonable one.
10     Q    Given this portfolio, what do you
11  view as the range of reasonable numbers?
12     A    I don't have one.  I don't have
13  one.  And I can't do that on the fly right
14  here.
15     Q    But on the fly right here, you can
16  conclude that 7 and a half percent was --
17       MR. MILLER:  Not unreasonable.
18     A    Not unreasonable.
19     Q    -- not unreasonable.
20       MR. RICHMAN:  Excuse me.  You
21  can't answer his questions.
22       MR. MILLER:  I was lodging an
23  objection.
24       ARBITRATOR IRVINGS:  What's the
25  objection?

Page 384

ARBITRATION

1
2       MR. MILLER:  The objection is
3  it mischaracterizes his testimony.
4  His testimony said that in connection
5  with the work he did for his expert
6  report, he made conclusions about
7  whether 7.5 percent --
8       MR. RICHMAN:  I just read his
9  testimony.  How did I mischaracterize
10  it?  He just -- I just simply read
11  his testimony.
12       ARBITRATOR IRVINGS:  Okay.
13  Let's move on.
14       What's the next question, please.
15  BY MR. RICHMAN:
16     Q    Okay.  So based on this allocation
17  of assets, are you able to opine as to
18  whether 6 and a half percent was in the
19  range of reason?
20     A    Which allocation risk?
21     Q    The allocation we've been fighting
22  over for the last --
23     A    Which may or may not be accurate.
24     Q    Thank you for that.  That's
25  helpful.

ARBITRATION

1
2    A    Well, because I'm not sure it
3  does -- you know, I didn't look at this
4  page.
5    Q    I'm not asking you -- I'm asking
6  you based on the numbers on that page.
7    A    Is it possible?  I don't know.
8  Maybe it is possible.  But I'm not going to
9  sit here today and try to go through these
10  numbers and give you an exact range of where
11  I think would be a reasonable assumption.
12  It's just not something you do on the fly
13  here.
14    Q    Okay.
15        You indicated that you were the
16  actuary for the CRF, correct?
17    A    I was the actuary for the CRF, yes.
18    Q    What interest assumption did you
19  use there?
20    A    I used a 7.5 percent interest
21  assumption net of all plan expenses, if I
22  recall correctly.
23    Q    With respect to ASOP 27, what is
24  the best estimate range?
25    A    ASOP 27, I believe in section -- I

ARBITRATION

1
2  don't remember the exact section number --
3  talks about a range of numbers more likely
4  than not for the results to come in at.
5    Q    Let's take a look.  I don't want
6  you to do this blindly.
7        Let's look at Exhibit 10.
8        MR. MILLER:  White binder.
9    A    Exhibit 10 in the white binder.
10  Okay.
11    Q    If you take a look on the second
12  page of ASOP 27, it says Best Estimate
13  Range.  2.1?
14    A    Yes.
15    Q    And what is your understanding of
16  what the -- you see the phrase "narrowest
17  range"?
18    A    Yes.
19    Q    What is your understanding of what
20  that means?
21    A    My understanding is, my view on
22  that is that it's a very narrow range
23  depending on certain parameters that you
24  might pick.
25        I don't think it is very specific

ARBITRATION

1
2  about exactly what it means, but I think the
3  words "narrowest range" suggest exactly what
4  they say, a narrow range.
5        But there's no backup on this that
6  I'm aware of that gives guidance from the
7  Triple A as to how exactly that would be
8  determined.
9    Q    Are you familiar with something
10  called the Pension Practice Council Practice
11  Note, May 2001, Selecting and Documenting
12  Investment Return Assumptions?
13    A    May 2001?
14    Q    Correct.
15    A    I don't remember that, no.
16        MR. RICHMAN:  I would like to
17  show it to the witness.
18        ARBITRATOR IRVINGS:  First show
19  it to counsel.
20        MR. MILLER:  We've not seen
21  this document, so, Mr. Arbitrator, we
22  object to use of this document in the
23  cross-examination.  Obviously, this
24  is the first time we've seen it.  We
25  have not been advised that it would

ARBITRATION

1
2  be used.  And there's been no laying
3  of a proper foundation for its use.
4        We don't know what the Pension
5  Practice Council is, whether actuaries
6  are required to follow the practices, and
7  what the importance of this note --
8  whether the Council practice notes are
9  held in regard.
10        And, indeed, the date of this is
11  May 2001 which is significant number of
12  years before the relevant time period or
13  periods as it relates to selection of a
14  best estimate return assumption and,
15  indeed, before the adoption of the ASOP
16  that was in effect when the calculation
17  of withdrawal liability was made.
18        And for all those reasons, we don't
19  think it's probative and potentially
20  prejudicial.
21        MR. RICHMAN:  I just want to
22  know if you are aware of it.  I would
23  just like to show it to him to see if
24  he's aware of it.
25        ARBITRATOR IRVINGS:  You can

ARBITRATION

1
2  ask the foundation questions, which
3  were all appropriately raised.
4          MR. RICHMAN:  Okay.
5  BY MR. RICHMAN:
6      Q    So do you know what the American
7  Academy of Actuaries is?
8      A    Yes, I do.
9      Q    And you are a member or you were a
10 member?
11     A    I am a member.
12     Q    You are still a member?
13     A    Yes, I am.
14     Q    And do you know what the Pension
15 Practice Council of the American Academy of
16 Actuaries is?
17     A    I don't think I was even an academy
18 member back at that time.  And I don't
19 remember this particular note.  And that's
20 something that I think --
21     Q    You are jumping to a conclusion.
22 If you can just answer the question.
23     A    I'm sorry.  Sure.
24     Q    Do you know what the Pension
25 Practice Council of the American Academy of

ARBITRATION

1
2  Actuaries is?
3      A    I'm not familiar with that phrase.
4      Q    And I think you've already answered
5  you're not familiar with this note either.
6      A    Correct.
7      Q    Thank you.
8          In your view, could the narrowest
9  range be a range as broad as from the 25th
10 to the 75th percentile in terms of
11 investment returns?
12     A    I've heard people using that as a
13 possibility of interpreting this, yes.
14     Q    Do you agree with that?
15     A    I think that's way too broad a
16 range, especially when you consider -- you
17 know, actuaries are fairly conservative
18 bunch.  And these standards in particular
19 tend to be very evolutionary rather than
20 revolutionary.
21         And when you look at the next
22 version of this in terms of where they went,
23 the range was eliminated entirely.  The idea
24 you go from a very ride range to no range at
25 all strikes me as very odd and not typical

ARBITRATION

1
2  of the way actuaries operate.
3      Q    Now, during your deposition, I
4  asked you as to what the interest rate --
5  what interest rate would produce the same
6  result for calculating the Segal blend that
7  was used for The New York Times' withdrawal
8  liability.
9          Do you recall that?
10     A    Yes.
11     Q    And you recall what your answer
12 was?
13     A    Yes.  I said that I hadn't done an
14 actual calculation.  I had done a,
15 metaphorically, back-of-the-envelope
16 calculation more or less in my head and came
17 up with something probably 6 and a quarter,
18 6 and a half.
19     Q    Do you have any reason to believe
20 that that estimate is incorrect?
21     A    Other than the fact that I hadn't
22 done a detailed calculation, no, but it
23 could be.  It results from the fact it's not
24 a true calculation.  Of course, it could be
25 wrong.

ARBITRATION

1
2      Q    I'm going to want to show you --
3  let's go to Exhibit 12.
4          Do you have it?
5      A    I do.
6      Q    Can you tell me what this is?
7      A    It appears to be the 2012 Form 5500
8  for the Consolidated Retirement Fund.
9      Q    And I want to direct your attention
10 to Page 23.  Actually, it's Page 23 of the
11 financial statements.
12     A    Okay.
13     Q    Do you see that?
14     A    It's the one entitled Schedule H?
15     Q    Yes.
16     A    Yes, I see that.
17     Q    Do you know what that is?
18         ARBITRATOR IRVINGS:  One
19 moment, please.
20     A    Schedule H in 5500?
21     Q    Yes.
22     A    I believe it's details regarding
23 the investments of the fund at December 31,
24 2012.
25     Q    You were the enrolled actuary for

ARBITRATION

1
2  this fund as of December 31, 2012?
3      A    I believe I was, but maybe I can
4  just check.
5      Q    Sure.  Go ahead.
6      A    Yes, I signed the Schedule MB.
7      Q    What was the interest assumption
8  you used for the ongoing funding of this
9  plan?
10     A    That would be shown on 6(b) of
11 Page 3 of the Schedule MB and that shows
12 7.5 percent.
13     Q    And that's the same interest
14 assumption that Segal actuary used for the
15 portfolio for the NMDU plan, correct?
16     A    Correct.  Although there is a
17 difference because Segal uses an expense
18 load on top of that.  This rate is net of
19 all plan expenses.
20         So this 7.5 percent rate is truly a
21 higher rate and closer to 8 percent.
22         If you are comparing apples and
23 apples.
24     Q    And so you think it's about
25 8 percent if you put --

ARBITRATION

1
2      A    I don't remember.  I know it's
3  higher than 7.5.
4      Q    But you don't remember?
5      A    I don't, no.
6      Q    You would agree, would you not,
7  that the CRF plan was invested much more
8  aggressively than the Pension Fund in this
9  case?
10     A    I don't know that offhand.  It
11 might have been.  We'd have to look
12 through --
13     Q    Weren't you the actuary for the
14 plan for a period of years?
15     A    Yeah, couple years ago.
16         Do you remember everything you did
17 the last five years?
18     Q    Pretty much.
19     A    Yes, I was.  No, I don't remember
20 the details.
21         It might well have been, but I'm
22 not going to testify to that without
23 reviewing it.
24     Q    And what was the interest
25 assumption that you were using for the

ARBITRATION

1
2  discount rate for calculating withdrawal
3  liability?
4      A    On this particular fund?
5      Q    In this particular fund.
6      A    I do believe -- let's see, this was
7  2012, so this was after the point where we
8  talked about earlier today.
9         So I do believe I was using a lower
10 withdrawal liability interest rate
11 assumption.
12     Q    Let's turn to an unnumbered page.
13 But it's a Schedule MB, Line 11, Addendum,
14 it appears.
15         ARBITRATOR IRVINGS:  I'm sorry?
16 What document are you looking at?
17         MR. RICHMAN:  Same document.
18         MR. MILLER:  It's the page that
19 follows Page 24 on the Supplemental
20 Schedule.
21     A    The first page of Schedule MB.
22     Q    No.  It's the page after what we
23 were just looking at, the asset allocation.
24     A    There may be more than one version.
25     Q    There is more than one version.

ARBITRATION

1
2  There is a financial report.
3         MR. MILLER:  Here it is.  Talks
4  about interest rates.
5      A    Okay.
6      Q    And you see the first paragraph?
7      A    Yes, I do.
8      Q    And so the interest rate used to
9  value vested liability for purpose of
10 withdrawal liability was changed to
11 6 percent from 7 and a half percent.
12     A    Yes, I see that.
13     Q    And you decided to make that
14 change, correct?
15     A    Yes.
16     Q    And while you were still at Buck,
17 was the rate lowered to 5.5 percent?
18     A    It might have been.  I don't
19 remember.
20     Q    But you were not the enrolled
21 actuary at the time it was lowered to
22 5.5 percent?
23     A    This was, I think, the last year
24 that I was the signing actuary on the plan.
25     Q    And who took over your position as

ARBITRATION

1
2  the enrolled actuary for the CRF?
3      A    At Buck, I think it was Robin
4  Zlotowitz.
5      Q    Did you discuss with Ms. Zlotowitz
6  the changing of the interest rate used to
7  value liability for withdrawal liability
8  purposes from 6 to 5.5 percent?
9      A    I don't remember.
10     Q    And now, as I understood your
11  testimony on direct, you changed this
12  because the trustees had indicated to you
13  that there might be a change in the
14  investment allocation, correct?
15     A    What I indicated was that if UNITE
16  HERE and another large employer were to
17  withdraw from the fund, the trustees
18  indicated that they would be changing the
19  investment mix of the fund because they no
20  longer had the deep pockets and were
21  concerned about their own benefit security.
22     Q    So I think your testimony before on
23  direct was that the trustees were seriously
24  considering changing the asset allocation;
25  is that correct?

ARBITRATION

1
2      A    Yes.  And we had a discussion about
3  it that if there were major employers
4  leaving the fund, they were concerned, it
5  was their own benefits here --
6      Q    But you changed it before there was
7  actually a major employer leaving the fund.
8      A    Yes, an anticipation that if, if,
9  an employer -- they are only talking about
10  changing the investment mix if there was a
11  major withdrawal.
12          If there was not a major withdraw,
13  they were not going to change their
14  investment portfolio.
15          So for regular funding where that
16  is not anticipated, we did not change the
17  investment return assumption for that
18  purpose.
19          For withdrawal liability which
20  would have necessarily been contingent on a
21  withdrawal incurring, in anticipation if
22  that situation occurred, then the funding
23  rate, the ongoing funding rate would be
24  reduced later.
25     Q    But I actually asked you a simple

ARBITRATION

1
2  question.
3      A    I'm sorry.  I must have missed it.
4      Q    And the simple question is that you
5  changed the rate before there was an actual
6  change in the asset allocation?
7      A    Correct.
8      Q    Thank you.
9          And with whom did you have this
10  discussion?
11     A    I believe -- it was quite a while
12  ago, but I believe it was with three of the
13  trustees at a meeting with Amalgamated Bank
14  and could have been others, but I have one
15  particular discussion that comes to mind.
16     Q    Did you ever have a discussion
17  about this or hear a discussion about this
18  with the investment consultant being
19  present?
20     A    No.  He wouldn't have been involved
21  in these conversations.
22     Q    He wouldn't have been involved in a
23  conversation about a change of the asset
24  allocation?
25     A    He wasn't at the meeting.  And, in

ARBITRATION

1
2  fact, the actual change never occurred.
3  There was never a withdrawal that would have
4  brought him into this to actually talk about
5  making changes to the investment allocation.
6      Q    Okay.  And was there an act, a
7  decision by the board of trustees of the CRF
8  to change the asset allocation of the fund?
9      A    No.  Like I said, it was a:  If
10  this occurs, this is what we are very likely
11  going to do.  This is our anticipation.  But
12  if it doesn't occur, we are not going to
13  change it.
14     Q    How many trustees were there on the
15  CRF?
16     A    Oh, I'm going to say ten, maybe
17  more than ten.
18     Q    And you had this discussion with
19  three of them?
20     A    Three very key ones.  The key
21  decision-makers.
22     Q    Okay.  How many discussions were
23  there?
24     A    At least one.  There may have been
25  others but at least one.

Page 401

ARBITRATION

Q   How long did this discussion take place?

A   I don't remember.  Ten minutes.  I don't know.

Q   So on the basis of that discussion, you determined that 6 percent would be the appropriate rate for withdrawal liability purposes?

A   I determined a rate.  I set it down in a memo to the trustees saying, look, this is what you've told me.  Based on this information, this is how I'm changing the investment return assumption for withdrawal liability purposes, assuming this many employers withdraw and they change the mix to a fixed-income portfolio on a bigger portion of the fund.  And this is how I came up with the number.

So it wasn't just a conversation. I put it back in writing to the trustees, this is what you told me, this is why I did it.

Q   Okay.  I understand you did a memo.

A   Yes.

Page 402

ARBITRATION

Q   And you put it back to the trustees.

Did the trustees ever tell you what the investment mix would be if there were a withdrawal?

A   We didn't get exact percentages or anything of that sort.  It was sort of we were going to go to a very conservative fixed-income type on a bigger portion of the fund assets.

Q   And so they told you that that would actually happen?

A   That was their anticipation.

Q   What does that mean, that was their anticipation?

A   That's what they believed they would do if this event occurred.

Q   So they told you that that's what they believed that they would do.  And on the basis of that, before anything happened, you decided to change the interest rate for calculating withdrawal liability?

ARBITRATOR IRVINGS:  I think, Ron ...  Let's move on.

Page 403

ARBITRATION

MR. RICHMAN:  Okay.

BY MR. RICHMAN:

Q   Did the employer that was considering withdrawing, that was whom?

A   UNITE HERE.  All capital letters. UNITE HERE.

Q   And did they actually withdraw?

A   Not while I was working on the account.

Q   Okay.  And while -- when was it that you last stopped working on the account?

A   I think it was around July of 2013, somewhere in that area.

Q   And in July of 2013, was there still a threat that UNITE HERE was going to withdraw from the Fund?

A   Very likely.  I don't know, but they had never withdrawn their threat. Let's put it that way.

Q   Okay.

So in your mind that was -- their threat to withdraw from the fund still existed in July of 2013?

Page 404

ARBITRATION

A   Very possibly, but, remember, I wasn't setting the assumptions at that point.  When I was setting the assumptions in 2012, it was certainly out there.

Q   And did you ever have a conversation with anybody from Buck that if this withdrawal didn't occur that you needed to reset the assumption?

A   I don't remember.

But, remember, if no one withdraws, the withdrawal liability assumption is essentially academic.

Q   But it still would have been in violation of ASOP 27, would it not?

A   Not if you have a logical reason to do it in that it's going to follow through and to be a change in the investment, it's perfectly consistent with ASOP 27.

Q   And what if one of the smaller employers withdrew?

A   Well, they didn't happen to, to the best of my knowledge.

Q   But if they did, they would have been assessed with withdrawal liability

1          ARBITRATION
2   using that assumption correct?
3       A    Correct.  But just like any other
4   assumption, just because it didn't happen,
5   doesn't mean it was wrong.  Doesn't mean it
6   was a wrong assumption.
7       Q    Let's go back to ASOP 27 which is
8   Exhibit 10.
9       A    Okay.
10      Q    Let's look at 3.6 on Page 5.
11      A    Yes, I have it.
12      Q    Now, as I understood -- and correct
13  me if I'm wrong -- that you thought pursuant
14  to 3.6 that there were two exceptions for
15  the discount rate being selected that is
16  different than the investment return
17  assumption?
18      A    There are two exceptions shown
19  there, yes.
20      Q    And in your reading of 3.6, is it
21  your view that 3.6 is intended to have only
22  two exceptions?
23      A    3.6 can't necessarily be read
24  entirely on its own.  This whole statement
25  works together and there are other sections

1          ARBITRATION
2   where they specify where it wouldn't apply.
3           But when you read these sections
4   together, it's clear that the exceptions are
5   two categories:  One is where, by government
6   or accounting regulation, you are required
7   to use something else.  Or in the case where
8   the plan has no assets, obviously you can't
9   use the actual portfolio because there is
10  not one.
11          There's nothing in here to suggest
12  there would be some other -- there's no
13  other example shown of some other reason why
14  you would do something other than the
15  investment return.
16          And the examples shown here show
17  very clearly why you wouldn't in those
18  examples.
19      Q    Can you tell me where else in this
20  ASOP 27 that supports your view that there
21  are only two exceptions to the statement
22  that generally the appropriate discount rate
23  is the same as the investment assumption?
24      A    Well, there's that line.  There's
25  the section in the front --

1          ARBITRATION
2       Q    Let's go to that.
3       A    That is Page 1 under Section 1.2.
4       Q    All right.
5       A    The third paragraph on that page,
6   last paragraph on Page 1, "This standard
7   does not apply to the selection of an
8   assumption where the actuary is precluded
9   from exercising independent judgment by
10  applicable law, regulation or other binding
11  authority, i.e., when a specific assumption
12  is mandated or when only a specified range
13  of assumptions is deemed to be acceptable."
14          Then it goes on to show an example.
15      Q    Isn't that simply saying that
16  ASOP 27 doesn't apply?
17      A    Meaning in the same sense.
18          The same example they're showing
19  for ASOP 27 is essentially that same type of
20  thing.  Yes, it is paraphrasing to some
21  extent.
22          It is paraphrasing this entire
23  ASOP 27, but you have to read this thing as
24  an actuary and in terms of how it was
25  intended.  And the logic of it is, of

1          ARBITRATION
2   course, if you are required by an outside
3   standard, whether it be accounting standard
4   or a government entity, to do something
5   else, well, of course you should do
6   something else.
7           And if you don't have a pool of
8   assets to use as your basis, well, of course
9   you have to do so something else.
10          But there's no suggestion here of
11  any other reason why you would do something
12  else when you need a best estimate of
13  anticipated experience under the plan.
14      Q    And what do you think the phrase
15  "anticipated experience under the plan"
16  means?
17      A    What could it mean besides --
18      Q    I'm just asking you what you think
19  it means.
20      A    It means the investment return of
21  the underlying assets.
22      Q    Okay.  That's what you think it
23  means?
24      A    Right.  What else --
25      Q    I can't answer questions.

Page 409

ARBITRATION

1
2     A    I'm just saying, there is nothing
3  else that it could mean.
4     Q    So you can't imagine anything else
5  that it could mean?
6     A    Not if you are trying to determine
7  the experience under the plan.
8        I just don't want you to parse one
9  piece out that doesn't belong with the
10  other.  That's all.
11     Q    Take a look at 3.3 of the ASOP 27.
12  That's on Page 4.
13     A    Yup.
14     Q    And it talks about the
15  consideration the actuary should consider
16  when "identifying which types of economic
17  assumptions to use for a specific
18  measurement and when selecting those
19  economic assumptions that will be used."
20        And the first one is the purpose
21  and nature of the measurement.
22        Can you tell me how that works with
23  3.6?
24     A    Yeah.  They're saying depending on
25  the purpose and nature, you might use

Page 410

ARBITRATION

1
2  something different.
3        But, remember, the purpose and
4  nature of a withdrawal liability calculation
5  is essentially no different than the purpose
6  and nature of the regular minimum funding
7  requirements.  They are essentially looking
8  at the present value of basically the same
9  benefits.  Basically, all of them are going
10  to be paid out of the same trust fund.  They
11  are going to be vested under one asset
12  policy.
13        So, and this doesn't give you a
14  rationale for using a different rate for
15  withdrawal liability versus minimum funding
16  because they aren't different.
17     Q    So they are not different.  So
18  isn't withdrawal liability only assessed
19  against an employer that withdraws?
20     A    Yes.
21     Q    And that's not different than the
22  employer continuing to participate in the
23  pension fund?
24     A    It's different only in a sense of
25  who is paying the money and how you are

Page 411

ARBITRATION

1
2  characterizing them.
3        Either way, they are going into the
4  minimum funding standard account.  Either
5  way, they're going into one pool of assets.
6  Either way, those assets are going to pay
7  one set of benefits under the plan.
8        There's not one pool over here for
9  withdrawal liability payments and another
10  pool over here for regular funding payments.
11  They all determine minimum funding.
12     Q    But the withdrawal liability's
13  actually fixed at the time that the employer
14  withdraws from a fund, correct?
15     A    Yes.  But, again, it doesn't change
16  the dollars coming in and where they go.
17     Q    I just would wish you would answer
18  the question.
19        ARBITRATOR IRVINGS:  Yeah, it's
20  going to be faster if you just --
21        MR. RICHMAN:  Or we'll be here
22  three days.
23        MR. MILLER:  Speaking of that,
24  it is 1:00 --
25        MR. RICHMAN:  Not a good time

Page 412

ARBITRATION

1
2  for a break, but I'll look for a
3  break hopefully soon.  And if I could
4  be provided some assistance, we'll
5  get there.
6  BY MR. RICHMAN:
7     Q    So what I just asked you is the
8  withdrawal liability is actually fixed for
9  an employer who withdraws as of a certain
10  date, correct?
11     A    Correct.
12     Q    And the withdrawal liability is
13  paid over a certain period of time?
14     A    Correct.
15     Q    And that calculation is done under
16  the statute for how long a period of time?
17     A    For up to 20.
18     Q    Up to 20 years.
19        So they are not in the pension plan
20  to the extent that they have any risk
21  associated with the performance of the
22  investment portfolio, correct?
23     A    That's correct.
24        MR. RICHMAN:  Tell you what.
25  Maybe this is a good time to take a

Page 413

ARBITRATION

break. I'm not finished. But let's
eat lunch.

(A luncheon recess was taken at
1:05 p.m. through 1:54 p.m.)

MR. MILLER: Back on the
record.

CONTINUED CROSS EXAMINATION BY MR. RICHMAN:

Q    We have had testimony previously in
this arbitration, in particular from a New
York Times witness, particularly about the
decline in the industry in which the Fund's
participants are employed.

And he had also indicated that he
did not expect that that decline was going
to be reversed.

And so assuming he is correct in
his judgment, how would that affect the
pension plan, this pension plan in this
suit?

A    How would that affect this pension
plan?

Q    Yes.

A    Well, there would be lower
contributions coming in presumably, unless

Page 414

ARBITRATION

rates were correspondingly increased.
It would slightly reduce the
ongoing obligations to the Fund versus what
would otherwise would happen.

And there would be less
contributions and assets. There would also
be probably less liabilities in the future.

Q    And the plan would become more
mature?

A    I think you would often use the
word "more mature." I think the retiree or
inactive population relative to the active
population would probably increase, and that
is often called a more mature plan.

Q    What are the facts of having a more
mature plan?

A    There's less contributions coming
in relative to the size of the assets
typically. And at some point the plan would
have a somewhat shorter time horizon.

Q    And what does that mean, have a
shorter time horizon?

A    Less further-out liabilities. For
example, if you didn't bring any new

Page 415

ARBITRATION

participants in the plan, eventually the old
ones would stop incurring benefits, retire,
die off and the last benefits would be paid.

So if you are having fewer and
fewer participants, then over time, your
horizon of the plan will slowly start to
decline.

Q    And would this affect the risks
associated with the plan doing well or not
doing well?

A    Yeah. I think we've discussed this
earlier and it's been discussed quite a bit
that with less participants and less
contributions coming in, that the risk of an
aggressive portfolio is somewhat higher
because in the event that the plan does not
do as well as anticipated, there are fewer
bodies over which to amortize that
difference.

And, likewise, if the plan does
better than expected, there would be a lot
less bodies to amortize that decline over.

Q    When you talk about "less bodies to
amortize," can you explain what you mean?

Page 416

ARBITRATION

A    Per participant.
So, in other words, if you need
$10 million -- you need to fund a
10-million-dollar liability and you've got
10 million lives, well, that's not a whole
lot of money. Well, if you have only ten
lives, that's only a million dollars each.

Q    I thought I was sure before but I'm
not sure now about what you are giving an
opinion on.

And so let me ask you: Do you have
an opinion on whether the assumptions used
to calculate The Times' withdrawal liability
were unreasonable in the aggregate?

MR. MILLER: Objection.

MR. RICHMAN: This is
cross-examination. Thank you.

BY MR. RICHMAN:

Q    Do you have an opinion?

A    Yes.

Q    Now, how could you opine that the
assumptions -- I'm sorry. And what is that
opinion?

A    The opinion was that the

ARBITRATION

assumptions are not reasonable in the
aggregate.

Q    And so they're unreasonable in the
aggregate?

A    Unreasonable in the aggregate.

Q    So how could you opine that the
assumptions used to calculate The Times'
withdrawal liability are unreasonable in the
aggregate without knowing what interest rate
would produce the same withdrawal liability
for The Times?

A    For reasons that I just stated
earlier in the day.

All of the other assumptions are
reasonable.  We know that the 7 and a half
return is reasonable, so if you are using a
much lower than 7 and a half percent return
which is going to have a substantial impact
on the liabilities, a 33 percent increase in
the withdrawal liability, you've got no
offsetting assumption factor.  That's
unreasonable.

Q    But what I understood your
testimony before is that you have not

ARBITRATION

developed a firm view as to what interest
rate, when used to calculate the liabilities
of the Fund, would yield the same result as
the Segal blended rate that was used?

A    That's correct.  I didn't determine
the rate but I did determine the impact on
the numbers and it's substantial.

Q    So how do you know that that rate
that would produce the same result would not
be a reasonable interest rate?

A    I'm not following you.

Q    Okay.

I understand that you don't know
the rate, firmly anyway.  You did some
estimate of it at your deposition, correct?

A    That's correct.

Q    Okay.

And you do not know what rate for
sure, and you didn't work on determining
that rate as to a rate that would produce
the same withdrawal liability rate as the
Segal blend.

A    That's correct.

Q    So you don't know that.

ARBITRATION

And so let's just take -- maybe
it's easier with a hypothetical.

Let's assume that rate were 6 and a
half percent.  Okay.  Just for hypothetical
purposes.

A    Okay.

Q    I know you're not saying it is.

A    Okay.

Q    And so if that rate were 6 and a
half percent, how do you know that 6 and a
half percent is not a reasonable rate to use
for the Fund in calculating The Times'
withdrawal liability?

A    Because the actuary has certified
that 7.5 percent is her best estimate rate.
So 6 and a half percent can't be reasonable
if that's the assumption.

Q    So you are saying that 6 and a half
percent is not within the range of the 7 and
a half percent that the Fund actuary did?

A    I didn't say that.  I said the
actuary picked a number, as she must.  And
once she picks it, you can't have another
rate that represents the same number.  The

ARBITRATION

number is 7 and a half.  There can't be
another number that's 7 and a half.

Q    All right.

And so if she had picked 6 and a
half --

A    Okay.  If she had picked 6 and a
half.

Q    If she had picked 6 and a half,
would you have an opinion as to whether
The Times' withdrawal liability calculated
using 6 and a half was unreasonable?

A    If I believed that 6 and a half was
the right number, then that would very
likely be reasonable, but that's a different
situation.

Q    But you haven't developed an
opinion as to whether 6 and a half is a
reasonable number?

A    Correct.  I mean, I'm not looking
at that.

Q    I'm just asking you if --

A    That is correct.

MR. RICHMAN:  I have no further
questions.

Page 421

ARBITRATION

1
2     MR. MILLER:  Just take a minute
3  or two.  Everyone should stay here.
4     (Pause.)
5     MR. MILLER:  I just have a
6  couple brief follow-up questions.
7     REDIRECT EXAMINATION BY MR. MILLER:
8     Q   I think you had testified that the
9  actuary who succeeded you on the
10  Consolidated Retirement Fund was Robin
11  Zlotowitz; is that correct?
12     A   That is correct.
13     Q   Does she continue to be the
14  actuary?
15     A   No, I don't believe so.
16     Q   And do you know who the
17  Consolidated Retirement Fund has retained as
18  the successor actuary?
19     A   I'm not a hundred percent certain,
20  but I do believe that Horizon Actuarial
21  Services was hired, but I wouldn't swear to
22  that.
23     MR. MILLER:  No further
24  questions.
25     RECROSS-EXAMINATION BY MR. RICHMAN:

---

Page 422

ARBITRATION

1
2     Q   Do you know who at Horizon
3  Actuarial Services is providing services to
4  the CRF?
5     A   I do not offhand.
6     Q   Do you know whether they've changed
7  the interest assumption used to calculate
8  withdrawal liability?
9     A   On their Consolidated Retirement
10  Fund?
11     Q   Yes.
12     A   I do not know.
13     MR. RICHMAN:  That's it.
14  So now we have a little dilemma.
15     MR. MILLER:  Yes.
16  Off the record.
17     (Pause.)
18     ROSANA EGAN,
19  having been first duly sworn by
20  Arbitrator Irvings, was examined and
21  testified as follows:
22     DIRECT EXAMINATION BY MR. MILLER:
23     Q   Good afternoon, Ms. Egan.
24  Can you please state your full name
25  and place of residence, but not street

---

Page 423

ARBITRATION

1
2  address, for the record.
3     A   My name is Rosana Egan.  And I live
4  in Lido Beach, New York.
5     Q   Where are you currently employed?
6     A   The Segal Company.
7     Q   And how long have you been employed
8  at the Segal Company?
9     A   Since 1982.
10     Q   And, generally, what are your
11  responsibilities at the Segal Company?
12     A   I'm an actuary at the Segal
13  Company.
14     Q   Are you an enrolled actuary?
15     A   Yes, I am.
16     Q   And what does it mean to be an
17  enrolled actuary?
18     A   It means that you can prepare
19  certifications and governmental filings for
20  a pension plan.
21     Q   As an enrolled actuary, do you
22  develop actuarial assumptions that a pension
23  plan uses?
24     A   Yes.
25     Q   Do you develop those actuarial

---

Page 424

ARBITRATION

1
2  assumptions in connection with the pension
3  plan's funding obligations?
4     A   Yes.
5     Q   And as an enrolled actuary, what
6  type of pension plan does your practice
7  primarily focus on?
8     A   Multiemployer defined benefit
9  plans.
10     Q   And for how long has that been the
11  case?
12     A   For myself?
13     Q   Yes.
14     A   Since I've been employed at the
15  Segal Company.  Or since I've been an
16  enrolled actuary.
17     Q   And how long have you been an
18  enrolled actuary?
19     A   Since approximately 1990.
20     Q   And what does an enrolled actuary
21  to a multiemployer pension plan do?
22     A   That's a kind of broad question.
23  We prepare our annual valuations of the
24  status, the funding status of a plan,
25  defined benefit plan, and prepare

ARBITRATION

governmental filings that go with that.

Q    And you develop the actuarial assumptions in conjunction with those valuations and filings?

A    Yes.

Q    Are you familiar with the term "endangered status"?

A    Yes.

Q    What does the term "endangered status" mean in the context of multiemployer pension plans?

A    Since the passing of the Pension Protection Act of 2006, the law required that annually that the status as to a plan -- as to what zone -- they created three zones that a defined benefit plan could be in.

And a certification needs to be done annually to determine what status a plan is, and endangered status is one of those statuses.

Q    And let me just quickly get to the heart of the question that I was going to ask.

ARBITRATION

In connection with multiemployer pension plans that are in endangered status, what kind of services do you perform as an enrolled actuary?

A    We first have to certify that they are in endangered status, and then we assist the trustees in their development of their funding improvement plan that needs to be developed.

Q    And can you elaborate on the types of assistance that you provide to a multiemployer plan in helping and develop this funding improvement policy?

A    We might provide projections as to their future status to help them come up with what remedies or schedules they need to develop to meet the requirements of a funding improvement plan.

Q    Do you help them with the projections about future contribution amounts?

A    Yes, future liabilities and contribution amounts.

Q    For how many multiemployer plans do

ARBITRATION

you currently serve as the enrolled actuary?

A    Approximately 20.

Q    Over the course of your career, approximately how many multiemployer plans have you served as an enrolled actuary to?

A    About maybe 50.

Q    Fifty.

A    Approximately, give or take.

Q    Are you the enrolled actuary for the NMDU Pension Fund?

A    Yes.

Q    And how long have you been the Fund's enrolled actuary?

A    Since about the mid '90s.

Q    Is it fair to say approximately 1995?

A    Approximately, give or take. I don't remember exactly.

Q    Does anybody else from the Segal firm work with you in conjunction with your engagement by the Pension Fund here?

A    Yes.

Q    Can you identify those for me?

A    John Urbank.  And I have a team of

ARBITRATION

actuaries that has changed over the years but is currently James Yon (ph.) and Frank Santaciera (ph.).

Q    And what is Mr. Urbank's role in connection with Segal's engagement by the NMDU Fund here?

A    Mr. Urbank's role is the client relationship manager.

Q    And what does the client relationship manager do?

A    He is the person that deals mostly with the client and go to meetings and maybe will take whatever we do in-house and bring it to the client.

Q    Do you know whether Mr. Urbank routinely attends the trustee meetings of this fund, the NMDU Fund?

A    My understanding is that he does routinely attend.  I don't know that he's made every single meeting, but ...

Q    Okay.  And do you attend meetings of this Pension Fund?

A    Yes, but not all of them.

Q    Can you provide an example of the

Page 429

ARBITRATION

1
2 type of subject matter that would be
3 addressed at a meeting that would cause you
4 to attend? And by "meeting," I mean a
5 meeting of the NMDU Fund.
6     A    One example would be when we've
7 completed an actuarial valuation report, I
8 may go and present it or go over the report.
9 Or if we've prepared some projections, I may
10 be there to go over the projections.
11     Q    Who is the current Fund
12 administrator?
13     A    Bob Costello.
14     Q    How long has Mr. Costello been in
15 that post?
16     A    Approximately a year, give or take.
17     Q    Who was the prior administrator?
18     A    Mr. Murray Schwartz.
19     Q    And approximately how long was
20 Mr. Schwartz in the post?
21     A    A long time. Trying to think. I
22 think since I've been on the Fund. I don't
23 remember if there was someone before him
24 maybe, but it's a long time.
25     Q    And just to recap, you've been the

Page 430

ARBITRATION

1
2 enrolled actuary for this Fund since
3 approximately 1995?
4     A    The mid '90s, yes.
5     Q    And was Mr. Schwartz serving as the
6 Fund administrator when you became the
7 enrolled actuary?
8     A    That's what I'm not exactly sure
9 of. It could have been someone else and
10 then him, but I'm not sure exactly of when
11 he started.
12     Q    Do you know the reasons for
13 Mr. Schwartz no longer serving as the Fund
14 administrator?
15     A    My understanding is they were going
16 to a third-party administrator and closing
17 down the Fund office.
18     Q    Was Mr. Schwartz terminated?
19     A    I would assume so, yes.
20         MR. RICHMAN: I hope we are not
21 going to dwell on this topic.
22 BY MR. MILLER:
23     Q    Let me talk for a moment about the
24 NMDU employees who participated in this
25 Fund. Okay. I'm going to ask you a couple

Page 431

ARBITRATION

1
2 questions about the compensation for the
3 participants in the NMDU Fund. Okay.
4         The Fund covers newspaper
5 deliverers; is that correct?
6     A    That's my understanding.
7     Q    And is it correct that these
8 newspaper deliverers are generally
9 compensated for shifts worked?
10     A    That they're compensated -- that's
11 my understanding.
12     Q    Do you know if the participants in
13 this Fund also received compensation and pay
14 while out on Workers' Compensation?
15     A    I have no idea.
16     Q    Do you know if the workers in this
17 Fund also receive holiday pay?
18     A    I don't know what they receive as
19 far as that holiday pay.
20     Q    In preparing actuarial valuation
21 reports for this Fund, do you receive
22 information from the Fund respecting
23 compensation of the employee participants?
24     A    Could you ask that question again?
25     Q    Sure.

Page 432

ARBITRATION

1
2         In preparing actuarial valuation
3 reports for this Fund, do you receive
4 information from the Fund, the Fund office
5 respecting the compensation of the employee
6 participants?
7     A    Not -- no, not that I am aware of.
8     Q    Okay.
9     A    Not to prepare a valuation report.
10     Q    Do you receive compensation
11 information about the participants in this
12 Fund in connection with preparation of or
13 estimates of withdrawal liability?
14     A    What do you mean by "compensation
15 information"?
16     Q    The compensation information --
17 strike that.
18         In connection, for example, with
19 preparing an estimate of withdrawal
20 liability of an employer, would you receive
21 from the Fund office information about the
22 compensation of that employer's employees
23 who participate in the Fund?
24     A    Compensation? Not typically.
25         MR. RICHMAN: Can I stop you

Page 433

ARBITRATION

1  ARBITRATION
2  for one second.
3      Can we go off the record for one
4  second.
5      (Discussion off the record.)
6          JOHN URBANK,
7      having been first duly sworn by
8  Arbitrator Irvings, was examined and
9          testified as follows:
10    DIRECT EXAMINATION BY MR. RICHMAN:
11    Q    How are you today, Mr. Urbank?
12    A    Fine, thank you.
13    Q    You are currently employed?
14    A    Yes.
15    Q    By whom?
16    A    The Segal Consulting Company.
17    Q    And for how long have you been
18  employed by the Segal Company?
19    A    Thirty-four years.
20    Q    Thirty-four years?
21    A    Thirty-four years.  I know it's
22  hard to believe.
23    Q    That's good.
24        And what is currently your role at
25  the Segal Company?

Page 434

ARBITRATION

1  ARBITRATION
2      A    I'm a benefits consultant and a
3  client relationship manager for the Segal
4  Consulting Multiemployer Group.
5      Q    And are those two different roles
6  or are they part of the same role?
7      A    Part of the same role.
8      Q    And what do you do as a benefits
9  consult and clients relations manager?
10    A    I'm assigned a book of business,
11  multiemployer trust funds, pension and
12  welfare annuity.
13        My role is I'm basically the face
14  of the Segal Company, present our services
15  to them, actuarial, health benefits, pension
16  benefits to the client, which would
17  constitute usually the fund director, fund
18  managers and the boards of trustees, and
19  deal with the other professionals that are
20  employed by the clients.
21    Q    When you refer to the fund
22  director, what is the position of the fund
23  director?
24    A    Each trust fund usually has
25  employees, a fund director, fund manager.

Page 435

ARBITRATION

1  ARBITRATION
2  They have different titles.
3      Their role is to oversee the
4  operations of the specific funds, whether
5  they be pension, welfare or annuity.
6  Responsible for the day-to-day operations.
7      We deal with them in terms of
8  providing our services and consulting.
9      Q    For how long have you been a
10  benefits consultant at Segal?
11    A    About 20 years.
12    Q    And before you were a benefits
13  consultant, what was your position at Segal?
14    A    I worked in the Health Group
15  underwriting area at first as an analyst,
16  then moved up to assistant manager in the
17  department.
18    Q    What types of services did the
19  Health Group underwrite --
20    A    Health Benefits Underwriting
21  Services.
22    Q    Sorry.  What services did they
23  provide?
24    A    We provided our clients with
25  various services related to the health fund.

Page 436

ARBITRATION

1  ARBITRATION
2  We do projections of their benefit plans.
3  We acquire or evaluate their insurance
4  products, whether it be on an insured basis
5  or a self-funded basis.  We do self-funded
6  feasibility studies.
7      We solicit proposals from different
8  vendors and we analyze them, present them to
9  the clients, make recommendations regarding
10  their benefit program.  We do compliance
11  work.  Summary Plan Descriptions,
12  participant notifications.
13    Q    And how long did you serve in that
14  group?
15    A    Approximately ten years.
16    Q    So I think at least four years.
17        Did you have a position before
18  being in that group at Segal?
19    A    No.  So it was more likely ten
20  years in that capacity and 24 years in the
21  consulting.
22    Q    As a benefits consultant?
23    A    Yes, sir.
24    Q    And how many plans do you provide
25  currently benefit consulting services?

ARBITRATION

1
2     A    Approximately ten to 12 clients and
3  they'll have either a pension, a welfare
4  fund and some will have annuity funds as
5  well.
6     Q    So it's ten to 12 clients and eight
7  clients could have a pension fund and a
8  welfare fund and possibly an annuity fund.
9     A    Yes.
10    Q    So how many pension plans do you
11 provide services to?
12    A    It would be 12.
13    Q    Twelve?
14    A    Twelve.
15    Q    And what types of pension plans are
16 those?
17    A    Mostly they're defined benefit
18 plans or predominantly defined benefit
19 plans.
20    Q    Are any of the 12 plans you are
21 consulting to other than employers benefit
22 plans?
23    A    The annuity fund would be defined
24 contribution plans.
25    Q    So the annuity funds in the 12 you

ARBITRATION

1
2  mentioned?
3     A    No, those would be separate.
4     Q    I'm just focusing on pension funds.
5     A    Right.  There would be 12 pension
6  funds.
7     Q    And the NMDU pension plan would be
8  one of those funds?
9     A    Yes, sir.
10    Q    And for how long have you provided
11 services to the NMDU pension plan, which I'm
12 going to refer to as either the Pension Plan
13 or the Pension Fund, okay?
14    A    Okay.  I believe Segal was retained
15 by them in 1990 or 1991.
16    Q    And have you been the benefits
17 consultant from Segal to the plan since 1990
18 or '91?
19    A    Initially, I was not then the
20 consultant that was assigned.  The business
21 left the Segal Company and then I stepped
22 into that role probably three to four years
23 later.  Around 1995.
24    Q    So approximately 1995?
25    A    Approximately.

ARBITRATION

1
2     Q    When you became the benefit
3  consultant to the Pension Fund, who was the
4  enrolled actuary to the Pension Fund?
5     A    I believe the enrolled actuary was
6  Cecilia Villar.
7     Q    Was she an employee of Segal?
8     A    Yes, sir.
9     Q    And for how long was Ms. Villar the
10 enrolled actuary for the Pension Fund?
11    A    I believe only a couple years.
12    Q    And did she start being the
13 enrolled actuary before she became the
14 benefit consultant?
15    A    No.  Actually, the person who was
16 initially on the Fund was an enrolled
17 actuary.
18    Q    Okay.  And who was that?
19    A    Michael Kaplan.
20    Q    So Mr. Kaplan was the enrolled
21 actuary immediately after Segal became the
22 actuary to the Pension Fund?
23    A    Yes.
24    Q    Okay.  And Ms. Villar became the
25 enrolled actuary?

ARBITRATION

1
2     A    She probably worked with Mr. Kaplan
3  on it.  In our Actuarial Department, we
4  usually have a team that works on each of
5  our clients which could -- there is a
6  signing enrolled actuary.  There could be
7  two other team members in our Actuary
8  Department that work for the client.  I
9  don't recall who was the actual signing
10 enrolled actuary.  Currently, it's Rosana
11 Egan.
12    Q    When did Ms. Egan become the
13 enrolled actuary?
14    A    Probably in the late '90s.
15    Q    Who was the administrator of the --
16 or Fund manager of the Pension Fund when you
17 became the benefit consultant?
18    A    Barney Barlam.
19    Q    Can you spell that last name,
20 please.
21    A    B-A-R-L-A-M.
22    Q    And he is not still the
23 administrator, correct?
24    A    No.  I believe he's deceased.
25    Q    And when did Mr. Barlam cease being

ARBITRATION

the administrator of the Pension Fund?

    A    Mid '90s.

    Q    And who succeeded Mr. Barlam as the administrator?

    A    Murray Schwartz.

    Q    Did Murray Schwartz become the administrator before Rosana Egan became the enrolled actuary?

    A    I believe so.

    Q    Who was the counsel to the Pension Fund when you became the benefit consultant?

    A    I don't recall.

    Q    Do you know who the counsel is today?

    A    Today I think they employ three counsels: Proskauer Rose, employer counsel; Meyer, Suozzi, English & Klein, Union counsel; and Elizabeth O'Leary who is with -- I don't recall her firm.

    Q    Okay.

    And is there someone specific at the Proskauer firm who handles the Pension Fund?

    A    Neal Schelberg.

ARBITRATION

    Q    And for how long has Mr. Schelberg been the employer counsel?

    A    My estimate, 15 years.

    Q    And is there someone at Meyer Suozzi who handles the Pension Fund?

    A    Irwin Bluestein.

    Q    And how long has Mr. Bluestein been counsel to the Pension Fund?

    A    Two to three years. They've only been recently retained.

    Q    And Ms. O'Leary, how long has she been counsel to the Fund?

    A    She's probably worked with the Fund for the last five to six years.

    Q    And does Mr. Bluestein have a specified role as --

    A    He's Union counsel.

    Q    And that leaves Ms. O'Leary. What counsel is she?

    A    Counsel to the counsel. She worked a lot with the Fund director.

    Q    Okay. How long did Mr. Schwartz serve as the Fund director?

    A    Well, as I said, I think he started

ARBITRATION

in 1995, the mid '90s, and I believe he was dismissed about this time last year.

    Q    So in roughly the winter of 2014?

    A    That would be correct.

    Q    And do you know why he was dismissed?

    A    The Fund transitioned to a third-party administrator and closed down the operations of an independent Fund office.

    Q    And who is that third-party administrator?

    A    C & R Consulting.

    Q    C & R, the ampersand sign?

    A    Yes, sir.

    Q    And is there anyone specifically at C & R Consulting who provides services to the Fund?

    A    I believe the principal would be Robert Costello.

    Q    When you became benefit consultant to the Fund, who was the auditor to the Fund?

    A    As far as I can recall, it's been

ARBITRATION

the one that they have now.

    Well, I think he was dismissed recently. So Mitchell Lewis was the -- M.R. Weiser I believe was his firm. I don't recall when he was initially engaged.

    Q    M.R.?

    A    M.R. Weiser. W-E-I-S-E-R.

    Q    And do you think that he's been terminated as the auditor to the Fund?

    A    Yes.

    Q    And when did that occur?

    A    I'm going to say fall of last year.

    Q    And do you know why that happened?

    A    No.

    Q    Who is the auditor currently?

    A    I believe it's Steinberg, Steckler & Picciurro is the name of the firm.

    Q    And is there a person at the firm who in particular provides services to the Fund?

    A    I don't recall his name.

    Q    Before you worked at Segal, were you previously employed?

Page 445

ARBITRATION

1
2    A    Yes.
3    Q    At a full-time job?
4    A    Yes.
5    Q    And --
6    A    Now you are really asking me to go
7    back.
8    Q    And what did you do?
9    A    Prior to Segal, I was a staff
10   accountant.
11   Q    Where was that?
12   A    I was a staff accountant for the
13   Kemper Insurance Group for a while.  In
14   between that, I had a sales position,
15   actually.
16   Q    At Kemper?
17   A    No, no.  There's a time between
18   Kemper and Segal when I was not doing
19   accounting.
20   Q    Now, what types of services do you
21   generally provide to multiemployer pension
22   plans to which you are the benefit
23   consultant?
24   A    We serve as the enrolled actuary.
25   We do the annual actuarial valuations.

Page 446

ARBITRATION

1
2         We do the Schedule MB, which is the
3    actuarial information for the Form 5500 and
4    entails us doing a data request on the
5    pension data.  We review that to prepare the
6    valuations.
7         We provide services related to
8    compliance, Summary Plan Descriptions, plan
9    amendments.  We attend boards of trustees
10   meetings.
11   Q    Okay.
12        And of those services that Segal
13   provides to Pension Fund clients, which ones
14   do you get involved in?
15   A    Well, I'm the benefits consultant
16   so I'm the day-to-day person that deals with
17   the client, so I'm involved with pretty much
18   all our services that if our client needs a
19   particular service -- you know, we have a
20   normal retainer agreement which specifies
21   what our services are.
22        So I'm basically the person who
23   makes sure those things -- we get the
24   information from the clients, we get our
25   things done and, in conjunction with our

Page 447

ARBITRATION

1
2    actuarial team, get the services completed,
3    presented and provided to the necessary
4    either professionals or to the board.
5    Q    Do you do actuarial work for the
6    funds?
7    A    No, I do not.
8    Q    Are you an actuary?
9    A    No.
10   Q    Do you know what the Segal blend
11   method is?
12   A    It's a method for Segal to do
13   withdrawal liability.
14   Q    And do you know how it works?
15   A    Generally, basically it's our
16   preferred method.  It's our best estimate of
17   what the withdraw liability should be for a
18   company that withdraws from a Pension Fund.
19   Q    And when did Segal start using that
20   method?
21   A    I'm going to say back when the
22   Multiemployer Pension Act started -- back on
23   the onset of the Multiemployer Pension Act.
24   Q    And that was before you actually
25   started work, correct?  Or approximately the

Page 448

ARBITRATION

1
2    same time?
3    A    Approximately around the same,
4    '80s.
5    Q    But before you became a benefit
6    consultant?
7    A    Yes.
8    Q    And so when you became a benefit
9    consultant, was Segal already using the
10   blended method?
11   A    Yes.
12   Q    Okay.  And do you have an estimate
13   of the number of clients for which you have
14   served as the benefit consultant over the
15   24 years you've been a benefit consultant?
16   A    Probably somewhere between 12 and
17   18.
18   Q    And how many of those pension funds
19   use the Segal blend?
20   A    Best of my knowledge, all of them.
21   Q    Are Segal actuaries required to use
22   the Segal blend?
23   A    I'm not sure if they're required to
24   use it.  As I said earlier, that's our
25   company's understanding.  It's at their best

ARBITRATION

1
2  estimate.  Obviously, they can discuss with
3  clients if there's an alternative that might
4  be -- that ultimately what we use could be
5  up to the client.
6      Q    Do you have an estimate of what
7  percentage of Segal pension fund clients use
8  the Segal blend?
9      A    Actual percentage, no.  I would say
10  a majority of them do.
11      Q    Do you have an estimate of how many
12  multiemployer pension plans Segal provides
13  actuarial services to?
14      A    Hundreds.  I don't know the exact
15  number.
16      Q    You testified you go to trustee
17  meetings, correct?
18      A    Yes.
19      Q    What do you do at trustee meetings?
20      A    Present any particular services or
21  work that we've done since the last meeting
22  or that are required annually.  In some
23  instances, we take notes, record the minutes
24  at the meetings, provide any comments or
25  consulting services based upon what's

ARBITRATION

1
2  reported by other professionals, accountant
3  or investment managers, if we have any input
4  on how it affects the operations of the
5  pension fund, the value of the funded status
6  of a pension plan.
7      Q    Okay.
8          Did you ever take minutes at the
9  NMDU Pension Fund?
10      A    Yes.
11      Q    And for what period of time did you
12  do that?
13      A    Probably since when Murray Schwartz
14  became the Fund director, the mid-1990s.
15      Q    Oh, okay.  So did you take the
16  minutes all during the time period that
17  Mr. Schwartz was the Fund director?
18      A    Yes.
19      Q    And does he still take them now?
20      A    I'm not involved with the Fund as
21  we used to be.
22      Q    What do you mean by that?
23      A    We were terminated as consultants
24  to the Welfare Fund back in October 2014,
25  and I understand we're being considered to

ARBITRATION

1
2  be replaced on the Pension Fund any day.
3      Q    Have you ever heard the term
4  "contribution base unit"?
5      A    Yes.
6      Q    Do you know what it is?
7      A    It's usually the factor by which
8  contributions are submitted to a fund.
9      Q    And had you ever heard the term
10  "contribution rate"?
11      A    Contribution rate is usually the
12  monetary amount that's contributed based
13  upon the factor of a base unit.
14      Q    Are the contribution rate and the
15  contribution base unit the same thing?
16      A    No.
17      Q    During the time you've been the
18  benefit consultant to the Pension Fund, did
19  you develop an understanding as to what the
20  contribution base unit was for the Pension
21  Fund?
22      A    My understanding is that
23  contributions were submitted based on days
24  or shifts worked.
25      Q    And how did you develop that

ARBITRATION

1
2  understanding?
3      A    Based on what was provided to us in
4  terms of information on how the plan was
5  receiving contributions from its
6  contributing employers.
7      Q    And you said "based on information
8  that was provided to us."
9          And who provided that information
10  to you?
11      A    The Fund office.
12      Q    And who in the Fund office?
13      A    Typically -- well, the staff, but
14  usually I'm the oversight of the Fund
15  director.
16      Q    Let's get into the staff a little
17  bit of the Fund office.
18          During the time that Mr. Schwartz
19  was the Fund director, and let's start to --
20  if we can start from the last time that he
21  was the Fund director, the winter of 2014,
22  and work ourselves backwards, can you tell
23  us who the staff members were of the Fund
24  office?
25      A    He had a bookkeeper.  Her name I

ARBITRATION

1
2  believe was Albergo.
3      A woman who dealt mostly with the
4  Welfare Fund, Laura Achuto (ph.).
5      There was another woman that worked
6  there, first name was Rose.  I don't know
7  her last name.
8      There was a woman who dealt
9  primarily with the pensions.  Her name was
10  Kathy Revy.  R-E-V-Y.
11      I think that was the most recent
12  staff prior to the closing of the Fund.
13      ARBITRATOR IRVINGS:  I'm sorry.
14  Did you say Rose?
15      THE WITNESS:  Rose.
16      A  She did multiple tasks mostly with
17  the Welfare, I believe.
18      Q  And how long was Ms. Albergo
19  employed by the Fund office?
20      A  I don't know precisely.  She was
21  there for at least ten years.  Ten, fifteen
22  years that I can recall.
23      Q  So when you became the benefit
24  consultant, she was not there?
25      A  I don't recall precisely.  Many of

ARBITRATION

1
2  them were long-term employees.
3      Q  And as the bookkeeper, what did
4  Ms. Albergo do?
5      A  I was never in the office, but long
6  enough to know, handled the receipt of
7  contributions, probably posting
8  contributions day to day, journal entries,
9  et cetera, working with the Fund's outside
10  auditors to have the books ready for the
11  annual audits.
12      Q  And did you communicate with
13  Ms. Albergo during the time both she was
14  employed by the Fund and you were the
15  benefit consultant?
16      A  Yes.
17      Q  And was that on a regular basis?
18      A  Occasionally.  Occasionally.  Most
19  of our communications were directly with the
20  director.
21      Q  With Mr. Schwartz?
22      A  With Mr. Schwartz.
23      Q  And how often would you speak to
24  Mr. Schwartz?
25      A  More frequently when there was a

ARBITRATION

1
2  trustees meeting.  Occasionally.  Few times
3  a month.  Tried to keep in contact with our
4  clients more so when certain reporting
5  requirements or valuation was going to be
6  completed.  There was going to be a trustees
7  meeting, we would help set the agenda with
8  him.  So more frequently near meetings and
9  during filing times for the requirements.
10      Q  Did there come a time when Segal
11  was asked to perform withdrawal liability
12  calculations for the Fund?
13      A  It was part of our service.
14      Q  And did it actually happen?
15      A  Yes.  We probably calculated
16  several withdrawal liability calculations
17  for employers.
18      Q  Okay.  Let me show you Exhibit 42.
19      A  Okay.
20      Q  And you can see there are a bunch
21  of pages here.  They are all similar in
22  their setup, but please take a quick look at
23  them.
24      Have you ever seen these before?
25      A  Yes.

ARBITRATION

1
2      Q  What are they?
3      A  Those are paid by the Fund office.
4  They're notification to the employer what
5  the contribution rates to the Fund are.
6      Q  And on the left-hand side of the
7  page, you see under -- and I'm looking at
8  2371 so we're all looking at the same thing.
9      2371 at the bottom of the page,
10  which is the second page.
11      A  Yup.  Got it.
12      Q  You see that?
13      A  Yes.
14      Q  So that's from March 31, 2013?
15      A  Uh-huh.
16      Q  I'm sorry.  You have to answer
17  audibly.
18      A  Yes, sir.  I'm sorry.
19      Q  And so you see it says "effective
20  3-31-2013"?
21      A  Yes.
22      Q  And under that it says, "day rate,
23  short night, long night, SAT night."
24      What are those four items?
25      A  Those are different shifts, periods

ARBITRATION

1
2  that employees can work for the employer.
3      Q    Let me show you Exhibit 104.
4          MR. RICHMAN:  I'm mindful of
5  the time here.
6          MR. MILLER:  Thank you.
7      A    Okay.
8      Q    Can you identify what this is,
9  please.
10      A    It's a letter prepared by me to
11  Mr. Schwartz requesting information in order
12  to calculate the withdrawal liability for
13  the Jolt Corporation.
14      Q    And did you prepare this letter?
15      A    Yes.
16      Q    That is your signature at the
17  bottom of the letter?
18      A    Yes, it is.
19      Q    And the ccs on the letter, you see
20  Mr. Bluestein, Mr. Mangan?
21      A    Yes.
22      Q    Mr. Schelberg you've identified.
23          Who is Mr. Mangan?
24      A    Mr. Mangan was co-counsel to the
25  Funds at some point in time during the years

ARBITRATION

1
2  that I was consultant to the Fund, as there
3  were others.
4      Q    Okay.
5          And did you send copies of this to
6  them?
7      A    Yes.
8      Q    Now, in the paragraph numbered 2,
9  you see that?
10      A    Yes.
11      Q    And that's information that you
12  were asking for?
13      A    Correct.
14      Q    Why were you seeking that
15  information?
16      A    We require that to come up with the
17  payment schedule for the withdrawal
18  liability.
19      Q    Let me show you Exhibit 15 which is
20  in a different book.  White one, I think.
21          You don't have to turn back to
22  Exhibit 104, but did Mr. Bluestein and
23  Mr. Mangan or Mr. Schelberg ask you why you
24  were asking for shifts/hours in your
25  request?

ARBITRATION

1
2      A    Did counsel ask us why?
3      Q    Yes.
4      A    No.
5      Q    Did Mr. Schwartz ask you why?
6      A    I don't recall specifically but I'm
7  sure he did probably because he questioned
8  everything we did.
9      Q    Let's go to Exhibit 15, please.
10  Can you identify this, please.
11      A    Similar to the other one.  It's a
12  request for information in order to
13  calculate the withdrawal liability in this
14  case for The New York Times.
15      Q    And you see the ccs are Jani
16  Rachelson and Neal Schelberg.
17      A    She was the counsel of flavor at
18  that time, I guess.  She was counsel at that
19  time.  And Neal Schelberg was.
20      Q    And she was Union trustee counsel,
21  Ms. Rachelson?
22      A    Yes.
23      Q    Did Mr. Schelberg or Ms. Rachelson
24  ask you a question as to why you were
25  seeking shifts or hours?

ARBITRATION

1
2      A    No.
3      Q    Let me show you Exhibit 16.
4          See if you can identify that for
5  us.
6      A    Similar letter request for
7  information to do a withdraw liability
8  calculation for the Employer City and
9  Suburban.  Ccs at that time were Elizabeth
10  O'Leary, counsel at that time, and Neal
11  Schelberg, except I believe he shouldn't
12  have gotten this letter and that's why you
13  see the line through it.  So I'm not sure if
14  he actually received it.
15      Q    Did Ms. O'Leary ask you why you
16  were asking for shifts or hours?
17      A    No.
18      Q    Let me show you Exhibit 97.
19          Can you identify what this is?
20      A    It's a memorandum from myself to
21  Mr. Schwartz providing him with the
22  withdrawal liability determined for Brooklyn
23  News for a withdrawal that occurred in the
24  1989 plan year.
25      Q    And you see on the upper right-hand

Page 461

ARBITRATION

1
2  side, it says Exhibit K?
3      A    Yes, sir.
4      Q    What is that?
5      A    That would identify that this was
6  an exhibit to the board of trustees meeting
7  minutes.
8      Q    And you see that there is a cc on
9  the second page --
10     A    Right.
11     Q    -- to co-counsel.
12     A    Yes.
13     Q    And do you know who co-counsel was
14  at that time?
15     A    I believe Union counsel may have
16  been Warren Mangan's firm.  I'm not a
17  hundred percent sure who it was, Employer
18  counsel.
19     Q    Okay.  Let's go to -- flip you back
20  to the first page.  And that's -- look at
21  the second paragraph.
22         And if you would just read to
23  yourself the second sentence in the second
24  paragraph.
25     A    Okay.

Page 462

ARBITRATION

1
2      Q    Why is the phrase "average annual
3  shifts of 5835" used?  Why did you use that
4  in this memo?
5      A    That's used to calculate the annual
6  payment schedule.  The shifts and the
7  highest contribution rate.
8      Q    Do you recall anybody, the
9  trustees, Mr. Schwartz or co-counsel,
10  raising a question as to why shifts were
11  being used to calculate the payment
12  schedule?
13     A    No.
14     Q    Let's look at Exhibit 98.
15         Can you tell me what this is?
16     A    Memorandum from our firm, myself
17  and Cecilia Villar, who was the actuary at
18  that time, providing the estimated
19  withdrawal liability for Passaic Evening
20  Journal.
21     Q    So what the letter says is, "We
22  estimated the withdrawal liability for
23  Passaic Evening Journal, an employer of the
24  above fund, which withdrew on August 15,
25  1994."

Page 463

ARBITRATION

1
2      And why was this an estimate?
3      A    I don't believe it was known that
4  it was definitely a withdrawal from the
5  Fund.  So the date was not certain.  So if
6  the date's not certain, we'd assume it's an
7  estimate because if it's a later date, the
8  actual withdrawal liability would have to be
9  calculated based on a subsequent valuation.
10     Q    Well, if you look in the first
11  paragraph, in the third sentence, the
12  sentence that begins with, "Since the
13  withdrawal occurred after May 31, 1994,
14  these results are preliminary and must be
15  determined upon the completion of the
16  May 31, 1994 valuation."
17     A    And that's why it would be
18  considered an estimate because we did it
19  based upon results of the May 31, 1993
20  valuation.
21     Q    But at the time it was done, you
22  actually knew the withdrawal date.
23         MR. EATON:  Objection.
24         ARBITRATOR IRVINGS:  Sustained.
25  BY MR. RICHMAN:

Page 464

ARBITRATION

1
2      Q    Did you know the withdrawal date at
3  the time this estimate was done?
4      A    Well, since this was -- when they
5  requested it, it was subsequent to the end
6  of the May plan year, so we assumed that it
7  was going to be an estimate, would be later.
8         I don't know what the precise date
9  of the withdrawal was.
10     Q    The first line of the letter says,
11  "As requested, we estimate withdraw
12  liability for Passaic Evening Journal, an
13  employer of the above fund, which withdrew
14  on August 15, 1994."
15         Do you have any reason to believe
16  that that date's not correct?
17     A    No.  That date would have had to be
18  provided by the Fund office, so, no.
19     Q    Take a look at the second paragraph
20  and take a look at the third sentence which
21  starts with, "The payment schedule flex,
22  average annual shifts" ...
23     A    Yes.
24     Q    And why did you mention the average
25  annual shifts?

Page 465

ARBITRATION

1
2    A    As I said earlier, when we
3    developed the payment schedule, we used the
4    shifts as the base unit and the highest
5    contribution rate in effect.
6        MR. EATON:  If you got another
7    one of these in the mid '90's that
8    have shifts in it, I'm going to
9    stipulate --
10        MR. RICHMAN:  I've got
11    Exhibit 101, 102 --
12        ARBITRATOR IRVINGS:  Well, they
13    say what they're going to say.  If
14    you are only pointing out what the
15    letter says, they say what they say.
16        MR. RICHMAN:  All right.
17        MR. MILLER:  Because we don't
18    have a lot of time.
19  BY MR. RICHMAN:
20    Q    Was the Segal blend ever discussed
21  at trustee meetings that you attended?
22    A    It may have been.  I don't recall
23  specifically.
24    Q    Was the interest assumption used to
25  calculate withdrawal liability ever

Page 466

ARBITRATION

1
2  discussed at a trustees meeting?
3    A    No, not to the best of my
4  knowledge.
5        MR. RICHMAN:  I'm finished.
6        CROSS EXAMINATION BY MR. EATON:
7    Q    Mr. Urbank, how are you?
8    A    Good.  How are you?
9    Q    Good.
10        I think you described your role
11  with the Fund as that of a benefits
12  consultant; is that right?
13    A    Yes.
14    Q    And in that role you listed some
15  responsibilities and they include serving as
16  the point of contact to the Fund of Segal;
17  is that right?
18    A    Yes.
19    Q    And presenting the results of
20  Segal's work to the Fund?
21    A    Yes.
22    Q    Does your role include attending
23  collective bargaining negotiations between
24  the Employers and the Funds?
25    A    No.

Page 467

ARBITRATION

1
2    Q    Does your role include reviewing
3  collective bargaining agreements that give
4  rise to contributions?
5    A    No.
6    Q    Does your role include receiving or
7  reviewing the reports that contributing
8  employers send to the Fund each month that
9  detail their contributions?
10    A    Remittance reports, no.
11    Q    Does your role include auditing the
12  contributing employers to ensure that they
13  contribute the correct amount of money?
14    A    No.
15    Q    Does your role include any direct
16  interaction with the contributing employers?
17    A    No.
18    Q    And that would include The New York
19  Times, correct?
20    A    Correct.
21    Q    Let's talk a little bit about past
22  practices.
23        You discussed some exhibits with
24  your counsel where you showed withdrawal
25  liability corrections; is that right --

Page 468

ARBITRATION

1
2  withdrawal liability calculations?
3    A    Yes, sir.
4    Q    Let's start with Exhibit 97.
5        And you were shown this document
6  during your direct examination, right?
7    A    Yes.
8    Q    And this is a withdrawal
9  liability -- excuse me.  The letter is dated
10  January 6, 1995?
11    A    Yes.
12    Q    And it's for withdrawal liability
13  for the Brooklyn News Company that withdrew
14  in the year ending May 31, 1989; is that
15  right?
16    A    Yes.
17    Q    Why did it take six years to assess
18  withdrawal liability?  If you know.
19    A    I have no idea.
20        MR. RICHMAN:  Objection as to
21  relevance.
22    Q    Did you review the collective
23  bargaining agreement that gave raise to
24  Brooklyn News contributions?
25    A    No.

1              ARBITRATION
2        Q    And this was a demand for complete
3   withdrawal; is that right?
4        A    This was in response to a request
5   from the Fund to do a calculation of the
6   withdrawal liability.
7        Q    So did Brooklyn News actually
8   withdraw?
9        A    I don't know.
10       Q    Let's look at the first sentence.
11  It says, "As requested, we have calculated
12  the withdrawal liability for Brooklyn News
13  Company which withdrew in the year ending
14  May 31, 1989."
15            Do you still think this is an
16  estimate or is this an actual --
17       A    I didn't say it was an estimate.
18       Q    Let me finish the question.
19            Is that an estimate or is this a
20  demand for a withdrawal liability?
21       A    It's not a demand.  It's a request
22  for the calculation.  It's the calculation
23  of withdrawal liability if this employer
24  actually withdrew in the time period
25  specified by the client to us.

1              ARBITRATION
2        Q    So is it your testimony you don't
3   know whether Brooklyn News Company withdrew?
4        A    I don't know if they actually
5   withdrew and were assessed a withdrawal
6   liability.
7        Q    Is there any mention in this
8   calculation of an estimate that the trigger
9   of the withdrawal was a 70 percent decline
10  in contribution base units?
11       A    No.
12       Q    Let's go to Exhibit 98.
13            And this is a letter from you dated
14  January 23, 1995; is that right?
15       A    Yes.
16       Q    And I think we looked at this
17  during your direct examination.
18       A    Yes.
19            MR. RICHMAN:  Hang on a second.
20       Q    Let's start again.  Exhibit 98.
21  And if I could direct your attention to
22  Paragraph 2.
23            It says, "We have calculated the
24  preliminary withdrawal liability for Passaic
25  Evening Journal to be $150,274."

1              ARBITRATION
2        Do you see that?
3        A    Yes.
4        Q    Do you know if Passaic actually
5   withdrew?
6        A    No.
7        Q    Is there anything in this letter
8   that describes the withdrawal as triggered
9   by a 70 percent decline in contribution base
10  units?
11       A    No.
12            MR. EATON:  And,
13  Mr. Arbitrator, there were several
14  letters sort of analogous to what Ron
15  did.  There were several letters that
16  were like this from the mid '90's.
17            I can read the exhibit numbers I
18  was going to point to so it's clear in
19  the record, but ...
20            MR. RICHMAN:  If you needed to
21  make the time, that's fine.
22            MR. EATON:  That's fine.  So I
23  would just like to give him the
24  opportunity to review them because I
25  have the same sort of series of

1              ARBITRATION
2   questions.
3            ARBITRATOR IRVINGS:  Perfect.
4            MR. EATON:  Let me give you the
5   exhibit numbers.  You can take a look
6   at them and I'll ask the same sort of
7   questions.
8            MR. RICHMAN:  Fine.
9            MR. EATON:  So it's 99, 100,
10  102 and 103.
11           MR. RICHMAN:  And just tell me
12  the series of questions that you want
13  to ask.
14           MR. EATON:  I basically want to
15  ask him if any of these have a
16  70 percent decline as the trigger for
17  withdrawal liability, and whether he
18  read the contribution -- the
19  collective bargaining agreements that
20  gave rise to contributions for any of
21  these employers.
22           MR. RICHMAN:  Those two
23  questions.  Okay.
24           THE WITNESS:  Did you say 103,
25  also?

ARBITRATION

1   ARBITRATION
2   ARBITRATOR IRVINGS:  103, also.
3   THE WITNESS:  And the question?
4   BY MR. EATON:
5   Q    So my question is:  In any of those
6   letters pertaining to withdrawal liability,
7   did any of them have as a trigger for the
8   withdrawal a 70 percent decline in
9   contribution base units?
10   A    I don't believe so.
11   Q    Did you read the collective
12   bargaining agreements that gave rise to
13   contributions for any of the employers
14   listed in those letters?
15   A    No.
16   Q    Let's talk about Exhibit 16.
17   Do you have it?
18   A    Yes.
19   Q    I believe you testified on your
20   direct examination that in the bottom
21   left-hand corner where it says "cc,"
22   Mr. Schelberg's name has a line through it;
23   is that right?
24   A    Yes.
25   Q    And you testified that the reason

ARBITRATION

2   there was a line through it is because he
3   was not supposed to get this; is that right?
4   A    I believe so.
5   Q    Why wasn't he supposed to get this?
6   A    I believe his firm is counsel to
7   City and Suburban.
8   Q    Any other reason?
9   A    No.
10   Q    And why shouldn't he have gotten it
11   if his firm was counsel to the City and
12   Suburban?
13   A    He would have a conflict of
14   interest.
15   Q    And who decided that he would have
16   a conflict of interest?
17   A    I think it would be the Fund.
18   Q    So is it your testimony that it was
19   the Fund who decided to not provide this --
20   A    That I should not have provided --
21   Q    Let me finish.
22   Is it your testimony that it was
23   the Fund who decided not to provide this
24   document to Mr. Schelberg?
25   A    Yes.

ARBITRATION

2   Q    And by "the Fund," who do you mean
3   in particular?
4   A    Fund director.
5   Q    And who would that be in April of
6   2010?
7   A    Murray Schwartz.
8   Q    Did you have a conversation with
9   Mr. Schwartz about why Mr. Schelberg should
10   not get this document?
11   A    I probably sent it to -- he
12   probably saw that and told me not to extend
13   it to him.  Or he may have gotten this
14   letter.
15   Q    Meaning Mr. Schelberg?
16   A    Yes, possibly.
17   Q    Who put the line through it, if you
18   know?
19   A    I don't know.
20   Q    When did you have this conversation
21   with Mr. Schwartz about Mr. Schelberg not
22   receiving this letter?
23   A    Probably around the time period
24   this letter going out, 2010.
25   Q    Was it a phone call or in person?

ARBITRATION

2   A    Probably a phone call.
3   Q    Did he explain to you why he
4   shouldn't receive the document?
5   A    I was aware that -- he explained to
6   me and I was aware that City and Suburban,
7   The New York Times was a client of the
8   Proskauer firm.
9   Q    Thank you.
10   Let's talk about trustee meetings.
11   You said you attended the trustee
12   meetings for both the Welfare and the
13   Pension Fund; is that right?
14   A    Yes.
15   Q    And is one of your roles to keep
16   the minutes of the meeting?
17   A    Yes.
18   Q    Is it fair to say you've been going
19   to those meetings for 15 years now?
20   A    Yes.
21   Q    Or more.
22   A    Somebody has to do the dirty work.
23   Q    Okay.
24   Could you sort of describe the
25   process of how the notes that you take at

Page 477

ARBITRATION

1
2  meetings become minutes?
3      A    The minutes are drafted from my
4  notes.  I would draft them.  They become
5  typed, sent usually -- with this Fund were
6  sent to the Fund director and typically Neal
7  Schelberg.
8          They would edit and correct the
9  minutes, return to me, which would then be
10 considered the final minutes, and they would
11 then be distributed to the board and
12 professionals who attended the meeting
13 either via most likely mail or, in some
14 instances, e-mail to those who got e-mail.
15     Q    Is there someone who didn't get
16 e-mail?
17     A    The Fund was not big on e-mail.
18     Q    Let's talk about communications
19 from the Fund.
20         Do you know what an actuarial
21 valuation is?
22     A    Yes.
23     Q    Does Segal draft the actuarial
24 valuations for the Fund each year?
25     A    Yes.

Page 478

ARBITRATION

1
2      Q    And what is involved or can you
3  describe an actuarial valuation?
4      A    Actuarial valuation is an annual
5  report that provides the Fund with its
6  status of the Pension Fund based on their
7  plan year that runs from June to the end of
8  May.
9          It lists information related to the
10 participants, the number of retirements, the
11 asset return, the investment returns, any
12 changes in actuarial assumptions.  It would
13 provide information on the unfunded vested
14 benefits or the withdrawal liability each
15 year for the overall fund.
16         Other regulatory requirements that
17 are reported annually would be included in
18 the valuation.
19     Q    Do you have a role in the drafting
20 of the valuation?
21     A    I peer-review it, edit it and would
22 distribute it to the board of the client.
23     Q    And I think, given all the things
24 you listed that go into the valuation, is it
25 fair to say that the actuarial valuation

Page 479

ARBITRATION

1
2  contains a lot of information about the
3  Fund?
4      A    Yes.
5      Q    And would the information in those
6  valuations be important to contributing
7  employers?
8      A    Yes.
9      Q    Let's take a look at Exhibit 20,
10 please.
11         Are you there?
12     A    Yes.
13     Q    Is this an example of an actuarial
14 valuation?
15     A    This would be a Segal actuarial
16 valuation.
17     Q    And this is for review as of
18 June 1, 2006; is that right?
19     A    Yes.
20     Q    Let me direct your attention to
21 Page SEGAL-280.  That's I think the very
22 last page.
23     A    Yes.
24     Q    And at the very bottom, it says
25 "contribution rate."

Page 480

ARBITRATION

1
2          What does it say next to
3  contribution rate?
4      A    Six percent of wages.
5      Q    What does that mean to you?
6      A    The rate was a percentage of the
7  wage.
8      Q    I think you were asked some
9  questions about contribution rate and CBUs
10 in your direct examination; is that right?
11     A    Yes.
12     Q    What is your understanding of what
13 a contribution rate is?
14     A    Contribution rate is usually the
15 monetary amount that is submitted by
16 contributing employers to a particular fund.
17     Q    And what is your definition of a
18 contribution base unit?
19     A    The base unit would be the factor
20 upon which the monetary amount is submitted
21 to the fund.
22     Q    And so going back to our exhibit,
23 how would you define what is listed there as
24 6 percent of wages?
25     A    It doesn't give you the exact

ARBITRATION

1
2  amount.  It's just giving you explanation
3  that the rate is a percentage of the wage,
4  just the rate.
5       Q    I don't understand what you mean by
6  "It doesn't give you an exact amount."
7            What do you mean by that?
8       A    In other words, if the wage rate
9  was $100, the contribution rate would be
10  6 percent of the wage which could be six
11  dollars.
12       Q    Okay.  Does a rate always have to
13  be a monetary amount?
14       A    Typically, it would be.
15       Q    I think my question a little bit
16  different.  I asked does a rate always have
17  to be a monetary amount.
18            MR. RICHMAN:  I think he
19  answered it.
20       A    Contribution rate is typically a
21  monetary amount.
22       Q    Okay.  So typically doesn't mean
23  always, right?
24       A    Well, if I could interject my
25  experience with other funds, the

ARBITRATION

1
2  contribution rate is a dollar amount and it
3  gets contributed based upon a factor in
4  order to submit -- the employer submit to
5  the Fund.  Could be based on hours, weeks,
6  days, shifts.
7       Q    Could a rate be a percentage?
8       A    Could the rate be -- well, it's a
9  percentage of something which ultimately
10  becomes mathematically a number.
11       Q    Let's look at Exhibit 21.
12            And this is the actuarial valuation
13  as of June 1, 2007.
14       A    Uh-huh.
15       Q    Could you flip to Page SEGAL-342.
16            Could you read what's listed for
17  contribution rate, please.
18       A    Six percent of wages effective
19  June 1, 1999, although 6.5 percent of wages
20  effective January 1, 2008.
21       Q    And is it fair to say that the
22  actuarial valuations for the years 2007
23  through approximately 2012 describe the
24  contribution rate in the same way we're
25  looking at on this page right here?

ARBITRATION

1
2       A    Yes.
3       Q    Let's look at Exhibit 27.
4            And this is the actuarial valuation
5  as of 6-1-2013; is that right?
6       A    Yes.
7       Q    Could you flip to the last page
8  that's SEGAL-760.
9       A    Yes.
10       Q    Are you there?
11       A    Yes.
12       Q    What does it state next to
13  "contribution rate" here?
14       A    Eight percent of the shift rate per
15  shift effective January 1, 2009.
16       Q    And is it fair to say that the
17  description of the contribution rate here
18  differs from the description listed for
19  contribution rates in the prior actuarial
20  valuations?
21       A    It differs in the percentage and it
22  differs in the wording, yes.
23       Q    And why is the wording different?
24       A    We at Segal decided to make it
25  clearer as to what the explanation of the

ARBITRATION

1
2  shift rate was.
3       Q    And how was this language clearer
4  than the language used previously?
5       A    This refers to the percentage of
6  the shift rate or the wage rate.
7       Q    Maybe I didn't understand the
8  answer.
9            How was this language more clear
10  than the language used previously?
11       A    Because it indicates that it's a
12  percentage of the shift rate per shift.
13       Q    So is it your view that the
14  language in prior actuarial valuations were
15  unclear?
16       A    No.  It was just probably not as
17  clear as it should have been.
18            At the time, we used wages because
19  there was an allocation of contributions
20  going from the Pension Fund to the Welfare
21  Fund.
22            As you recall earlier, the rates
23  were lower percentages and the reason for
24  that is that a portion of that rate was
25  being allocated to the Welfare Fund.  And

Page 485

ARBITRATION

1  that's part of the reason why we were
2  referring it to that previously.
3  Q   Did you consult with the Fund for
4  changing the language?
5  A   No.
6  Q   When did you change this language?
7  A   When we prepared this earlier last
8  year.
9  Q   And was that after The New York
10  Times challenged the withdrawal liability
11  assessment in September of 2013?
12  A   I believe it was.
13  Q   Let me direct your attention to
14  Exhibit 42.
15      You were asked about this on your
16  direct testimony.
17      What is your understanding of what
18  this sheet means?
19  A   It's informing the contributing
20  employer, in this case The New York Times,
21  of the contribution rate they should submit
22  to the Fund, the Pension and Welfare Funds.
23  Q   Do you get this document -- well,
24  strike that.

Page 486

ARBITRATION

1      Under what circumstances would you
2  see this rate sheet?
3  A   Typically, we were getting this
4  when we requested information for the
5  withdrawal liability.
6  Q   Is it fair to say that these sheets
7  were developed and sent out yearly?
8  A   I would think the Fund would do
9  that if there were changes in the rates or
10  changes in the contribution requirements,
11  yes.
12  Q   But you only got these when you
13  were preparing withdrawal liability
14  calculations; is that right?
15  A   Yes. We didn't get them regularly.
16  Q   What did you do after you received
17  these sheets? Did you keep them?
18  A   Typically, we would keep them.
19  Q   So is it fair to say that looking
20  at this sheet for the Pension Fund, that
21  there are eight different contribution rates
22  for Pension Fund contributions?
23  A   Yes.
24  Q   Do you have any understanding about

Page 487

ARBITRATION

1  whether certain employees get paid a rate
2  different than what's listed here on these
3  sheets?
4  A   Repeat that, please.
5  Q   Do you have any understanding about
6  whether employees receive pay rates that are
7  different than the ones listed on this
8  sheet?
9  A   Specific employees?
10  Q   Yeah, correct. If they do
11  something to earn some sort of pay different
12  than what's on these.
13  A   No.
14  Q   Let's talk a little bit about
15  withdrawal liability estimates.
16      Is it common for a contributing
17  employer to request an estimate of its
18  potential withdrawal liability?
19      MR. RICHMAN: Objection as to
20  what "common" means. What does that
21  mean?
22      MR. EATON: If he understands
23  the question, he can answer.
24      ARBITRATOR IRVINGS: Well,

Page 488

ARBITRATION

1  "common" is unclear. Why don't you
2  rephrase the question.
3  BY MR. EATON:
4  Q   In your experience, do employers
5  request estimates of their withdrawal
6  liability?
7  A   Yes.
8  Q   In your experience, do employers
9  request information about withdrawal
10  liability estimates and other actuarial
11  factors that impact plan funding?
12  A   Yes.
13  Q   And, in fact, The New York Times
14  requested withdrawal liability estimates; is
15  that right?
16  A   Yes.
17  Q   And, in fact, they requested
18  information above and beyond more than just
19  a withdrawal liability estimate; isn't that
20  right?
21  A   I believe so.
22  Q   In your experience, why do
23  employers request such information?
24      MR. RICHMAN: Objection.

Page 489

ARBITRATION

1
2     ARBITRATOR IRVINGS:  He can
3 answer in his experience, if he
4 knows.
5     A   They want to know what the amount
6 is related to their fund, and some public
7 corporations require that for their
8 financial statements.
9     Q   Is it fair to say that when it
10 comes to information about a pension fund,
11 the pension fund has an information
12 advantage over the contributing employers?
13     MR. RICHMAN:  Objection.
14     ARBITRATOR IRVINGS:  I'm sorry.
15 Rephrase that.
16     MR. EATON:  I'll rephrase the
17 question.
18 BY MR. EATON:
19     Q   When it comes to information about
20 the pension fund, is it fair to say that the
21 pension fund has more information about the
22 fund than contributing employers?
23     A   Yes.
24     Q   So do you think that responses to
25 requests from employers, that those

Page 490

ARBITRATION

1
2 responses from the fund be accurate?
3     MR. RICHMAN:  Objection.
4     MR. EATON:  What's the
5 objection?
6     MR. RICHMAN:  So do you think
7 responses to request from employers,
8 that those responses from the fund be
9 accurate?
10     MR. EATON:  I'll rephrase the
11 question.
12 BY MR. EATON:
13     Q   When an employer seeks information
14 from a pension fund, either withdrawal
15 liability estimate or other actuarial
16 information, is it important that the
17 responses from the fund be accurate?
18     A   I would think so.
19     Q   In your practice, have you seen
20 employers hire outside consultants to
21 communicate with pension funds on the
22 employers' behalf?
23     A   Yes.
24     Q   They hire actuaries, right?
25     A   They hire actuaries.

Page 491

ARBITRATION

1
2     Q   They hire attorneys, right?
3     A   They may.
4     Q   And for some information, pension
5 funds charge a fee to provide that
6 information; is that right?
7     A   They can.
8     Q   And those fees can be upwards of a
9 thousand dollars; is that right?
10     A   Yes.
11     Q   Do you think an employer should be
12 able to rely on the information it receives
13 from a pension fund?
14     MR. RICHMAN:  Objection.
15     ARBITRATOR IRVINGS:  That's an
16 argument.  You can make that
17 argument.
18     MR. RICHMAN:  It's argument and
19 it's opinion.  He's a fact witness.
20     MR. EATON:  I'll rephrase the
21 question.
22     In fact, I'll withdraw the
23 question.
24     MR. RICHMAN:  Better.
25 BY MR. EATON:

Page 492

ARBITRATION

1
2     Q   Can you describe the process of
3 what happens at Segal with respect to this
4 Fund of when an employer requests withdrawal
5 liability estimates?
6     A   The request is usually made to the
7 Fund office.  The Fund office would make
8 that request to us.  We, in turn, would send
9 out one of the exhibits you referred to
10 earlier in terms of data request for the
11 information needed to do the withdrawal
12 liability.
13     We would prepare a memorandum
14 and/or a report advising what the withdrawal
15 liability is for that particular employer
16 and return it to the Fund.
17     Q   And if an employer in its request
18 for withdrawal liability estimate also asks
19 for a payment schedule, do you include a
20 payment schedule?
21     A   If they request that of the Fund
22 and the Fund requests that of us, we would
23 give them the payment schedule, yes.
24     Q   Let's look at Exhibit 3.
25     This is an estimate for a complete

ARBITRATION

1
2   withdrawal; is that correct?
3       A    Yes.
4       Q    And it includes information about a
5   total withdrawal liability of approximately
6   $38 million.
7           Do you see that?
8       A    Yes.
9       Q    And it includes information about a
10  payment schedule; is that right?
11      A    Yes.
12      Q    And attached to this letter is
13  something called a Report on Employer
14  Withdrawal Liability for the withdrawal in
15  the year ended May 31, 2013.
16          Do you see that?
17      A    Yes.
18      Q    And this is a 16-page report that,
19  is it fair to say, lays out in some detail
20  how the Fund calculated the estimate?
21      A    How the Segal Company --
22      Q    How the Segal Company calculated
23  the estimate?
24      A    Yes.
25      Q    It describes the assumptions used;

ARBITRATION

1
2   is that right?
3       A    Correct.
4       Q    It calculates the liability under
5   two different methods?
6       A    Yes.
7       Q    And it breaks down the calculations
8   year by year; is that right?
9       A    Yes.
10      Q    If you could turn to Page 15 of the
11  report which is FUND-609.
12      A    Yes.
13      Q    And it provides information about a
14  payment schedule, right?
15      A    Yes.
16      Q    And if you turn the page to 16,
17  does it lay out the information used to
18  calculate the payment schedule?
19      A    Yes.  Contribution.
20      Q    And the payment schedule was
21  calculated using wages; is that right?
22      A    I believe so.
23      Q    And you sent this document to the
24  Fund?
25      A    Yes.

ARBITRATION

1
2       Q    And was it your understanding that
3   the Fund sent this to The New York Times?
4       A    I can't answer that.
5       Q    If you could look at Exhibit 15,
6   please.
7           And this is a letter from you to
8   the Fund regarding withdrawal liability
9   calculations; is that right?
10      A    Yes.
11      Q    And the date on this letter is
12  March 11, 2009?
13      A    Correct.
14      Q    And you write, "In order to
15  complete the request for a calculation of
16  withdrawal liability in the plan year ending
17  May 31, 2009 for The New York Times, we will
18  need the following information from the Fund
19  office."
20          Do you see that?
21      A    Yes.
22      Q    And one of the things you request
23  is Number 2, "Total base units
24  shifts/hours."
25          Do you see that?

ARBITRATION

1
2       A    Yes.
3       Q    And why did you request
4   shifts/hours?
5       A    We usually request that in order to
6   determine the payment schedule.
7       Q    And what's your understanding of
8   what shifts/hours represent?
9       A    The base units.
10      Q    Is it your understanding that
11  shifts are the base units for this Fund?
12      A    Yes.
13      Q    Is it your understanding that hours
14  are the base units for this Fund?
15      A    With this Fund, it's shifts.  It
16  should be based on shifts.
17      Q    Why are hours listed on this
18  letter?
19      A    I don't know.
20      Q    You drafted the letter, right?
21      A    Yes.
22      Q    Did you ever get a response from
23  the Fund about this letter?
24      A    Specifically, I don't recall.
25      Q    Do you use this form letter that's

Page 497

ARBITRATION

1
2  Exhibit 15 to request information from other
3  funds which are your clients?
4      A    Typically, yes.
5      Q    So you don't recall one way or the
6  other whether you actually calculated a
7  withdrawal liability estimate as a result of
8  this letter you sent to the Fund?
9      A    If we did a calculation for the
10  period ended 2009, then we would have gotten
11  information from them.
12          Do I recall if we did a
13  calculation?  Yeah, I don't recall if we did
14  one.  If you have one, then we would have
15  done it and gotten information to do so.
16          ARBITRATOR IRVINGS:  Let me ask
17  you this, and I hate to do this,
18  but --
19          MR. RICHMAN:  I have recross,
20  too.
21          ARBITRATOR IRVINGS:  So what
22  we're going to have to do is we are
23  not going to finish in the next day,
24  and I understand you can't come the
25  next day we have, but we'll just have

Page 498

ARBITRATION

1
2  to have him back because I don't want
3  to cut off your cross examination.
4  You are entitled to whatever time you
5  need.  And you are entitled to
6  direct.  But I certainly gave
7  prewarning --
8          MR. RICHMAN:  That, you did.
9          ARBITRATOR IRVINGS:  -- from
10  yesterday that that's the limit that
11  I have today.
12          MR. RICHMAN:  Can we try --
13  let's go off the record for a second.
14          MR. MILLER:  We are concluding
15  for the day.
16
17      (Whereupon, the proceedings were
18  adjourned at 3:58 p.m.)
19
20
21
22
23
24
25

Page 499

ARBITRATION
I N D E X

1
2
3                               PAGE
4  WITNESS:  DARREN FRENCH
5  Direct Examination by Mr. Miller       247
6  Cross Examination by Mr. Richman       338
7  Redirect Examination by Mr. Miller     421
8
9
10  WITNESS:  ROSANA EGAN
11  Direct Examination by Mr. Miller       422
12
13
14  WITNESS:  JOHN URBANK
15  Direct Examination by Mr. Richman      433
16  Cross Examination by Mr. Eaton         466
17
18
19
20
21
22
23
24
25

Page 500

ARBITRATION
C E R T I F I C A T E

1
2
3  STATE OF NEW YORK    )
                         : ss.
4  COUNTY OF NEW YORK   )
5      I, BARBARA R. ZELTMAN, Shorthand
6  Reporter and Notary Public, within and
7  for the State of New York, do hereby
8  certify:
9      That this transcript is a true
10  record of the proceedings had.
11      I further certify that I am not
12  related to any of the parties to this
13  action by blood or marriage, and that I
14  am in no way interested in the outcome of
15  this matter.
16      IN WITNESS WHEREOF, I have hereunto
17  set my hand this 18th day of February,
18  2015.
19
20
                    _____
21                  BARBARA R. ZELTMAN
                    Court Reporter and Notary Public
22
23
24
25

Page 501

1            ARBITRATION - VOLUME III

2          AMERICAN ARBITRATION ASSOCIATION

----------------------------------------X

3   THE NEW YORK TIMES COMPANY,

4                    Petitioner,

5

                        v.

6

    NEWSPAPER and MAIL DELIVERERS'-PUBLISHERS'

7   PENSION FUND,

8                    Claimant.

----------------------------------------X

9

10

11                    ARBITRATION

12                    VOLUME III

13                      DAY 3

14              New York, New York

15          Tuesday, February 24, 2015

16

17

18   REPORTED BY:  BARBARA R. ZELTMAN

19              Professional Stenographic Reporter

20

21   Job Number:  90059

22

23

24

25

ARBITRATION - VOLUME III

February 24, 2015
9:07 a.m.

Arbitration proceedings held at American Arbitration Association, 120 Broadway, New York, New York, before BARBARA R. ZELTMAN, a Professional Stenographic Reporter and Notary Public within and for the State of New York.

ARBITRATION - VOLUME III
A P P E A R A N C E S :

ARBITRATOR:  MARK L. IRVINGS, ESQ.
        24 Elba Street
        Brookline, Massachusetts  02446

JONES DAY
Attorneys for Petitioner
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
BY:   EVAN MILLER, ESQ.
      MIGUEL EATON, ESQ.
      YAAKOV ROTH, ESQ.

SCHULTE ROTH & ZABEL
Attorneys for the Claimant
919 Third Avenue
New York, New York  10022
BY:  RONALD RICHMAN, ESQ.
      MAX GARFIELD, ESQ.
      ADAM GARTNER, ESQ.

(Cont'd)

ARBITRATION - VOLUME III
A P P E A R A N C E S :  (Cont'd)

ALSO PRESENT:
      Ethan Kra,
      Ann Koski, Segal
      Jeff Zomper
      Darren French
      Thomas Bentvena
      Charles Setteducato

ARBITRATION - VOLUME III
        ARBITRATOR IRVINGS:  Okay.  You are still under oath.
        MR. MILLER:  On the record.
        ARBITRATOR IRVINGS:  On the record.
            ROSANA EGAN,
        having been previously duly sworn by
        Arbitrator Irvings, was examined and
            testified as follows:
CONTINUED DIRECT EXAMINATION BY MR. MILLER:
    Q    Good morning, Ms. Egan.
    A    Good morning.
    Q    I'm just going to jump right in where we left off nearly two weeks ago.
        One of your roles as the Fund's enrolled actuary is to prepare an annual Actuarial Valuation Report, correct?
    A    Yes.
    Q    And for how many years have you been doing that for the Fund?
    A    Since the mid '90s, approximately.
    Q    And one of the purposes of an annual Actuarial Valuation Report is to establish the funding requirements for the

ARBITRATION - VOLUME III

1
2    current year, correct?
3    A    Yes.
4    Q    And does it also -- the Actuarial
5    Valuation Report include information that is
6    required to be filed with the annual
7    Form 5500?
8    A    Yes.  Some of the information there
9    is used for the 5500.
10   Q    It's incorporated into --
11   A    Schedule B/MB for the 5500.
12   Q    Okay.
13       Ms. Egan, can you turn your
14   attention to the white binder in front of
15   you, Exhibit 25.
16   A    Okay.
17   Q    And what is that document?
18   A    It's the actuarial valuation as of
19   June 2011.
20   Q    And this is the Actuarial Valuation
21   Report for the Newspaper and Mail
22   Deliverers'-Publishers' Pension Fund,
23   correct?
24   A    Yes.
25   Q    And did you prepare this report?

ARBITRATION - VOLUME III

1
2    A    Yes.
3    Q    Let me direct your attention to the
4    page that is labeled SEGAL-000606.
5    A    Okay.  I'm there.
6    Q    And this page is entitled
7    Certificate of Actuarial Valuation.
8    A    Yes.
9    Q    And what is a Certificate of
10   Actuarial Valuation?
11   A    It basically lays out the different
12   liabilities and assets for the valuation of
13   the year.
14   Q    And your name appears at the bottom
15   of this certification; is that correct?
16   A    Yes.
17   Q    Turn to the very next page, which
18   is essentially a table of Certificate
19   Contents.
20       Am I correct that the eight
21   exhibits and the information contained in
22   those exhibits that is listed on this next
23   page are part of the Certificate of
24   Actuarial Valuation?
25   A    Yes.

ARBITRATION - VOLUME III

1
2    Q    And the information contained in
3    those eight exhibits in fact comprises the
4    Certificate of Actuarial Valuation?
5    A    Yes.
6    Q    And you are in fact certifying to
7    the accuracy of the information contained on
8    those exhibits, correct?
9    A    Yes.
10   Q    Let's go back to the certificate
11   page.  And let me draw your attention to the
12   last paragraph and the sentence, the second
13   sentence which states, "To the best of my
14   knowledge, the information supplied in this
15   actuarial valuation is complete and accurate
16   except as noted in Exhibit 1."
17       Do you see that sentence?
18   A    Yes.
19   Q    Is it fair to say that you
20   personally are certifying to the accuracy of
21   the information that's contained in this
22   Certificate of Actuarial Valuation?
23   A    To the reasonableness of the
24   accuracy.
25   Q    You, personally, are certifying to

ARBITRATION - VOLUME III

1
2    the reasonableness of the information?
3    A    We are given some information to do
4    the numbers, and we don't audit that
5    information but we look at it for
6    reasonableness.  So the information that
7    goes in, we see that it's reasonable and
8    then come up with our numbers.
9    Q    At the time you prepared this
10   certificate in Exhibit 25, did you believe
11   that the information contained in this
12   certificate was accurate to the best of your
13   knowledge?
14   A    Yes.
15   Q    Do you still believe that?
16   A    Yes.
17   Q    Now, let me direct your attention
18   to the page that's been labeled
19   SEGAL-000628.
20       Are you there?
21   A    Yes.
22   Q    Okay.  And you'll see that there's
23   a definition of "contribution rate" in the
24   middle of that page.
25   A    Yes.

Page 510

ARBITRATION - VOLUME III

1
2  Q    Does that definition of
3  contribution rate make any mention of
4  shifts?
5  A    There, no.
6  Q    Does it make any mention of
7  employees' per-shift wage rates?
8  A    No. Wait. Can you say that again?
9  Q    Yes. Does it make any mention of
10 employees per shift wage rates?
11 A    It says "8 percent of the wages."
12 Q    It does not say "8 percent of
13 employees' per-shift wage rates," correct?
14 A    It doesn't use those words.
15 Q    Thank you.
16     Is this description of contribution
17 rate, in your judgment, accurate?
18 A    Yes.
19 Q    Rather than walk through each of
20 the annual actuarial valuation
21 certifications and annual valuation reports,
22 let me just ask you this question: Did the
23 actuarial valuation reports' certificates
24 that you prepared prior to this valuation
25 report as of June 1, 2011 describe the

Page 511

ARBITRATION - VOLUME III

1
2  contribution rate using these same general
3  words?
4  A    I don't remember. "Before." When
5  you say "before," within the last 15 years,
6  20 years?
7  Q    Well, why don't we quickly do this.
8  MR. RICHMAN: Can I be helpful
9  here? They say what they say.
10 MR. MILLER: Well, but it's my
11 examination.
12 MR. RICHMAN: It is your
13 examination. I'm trying to be
14 helpful.
15 MR. MILLER: That's all right.
16 Thank you.
17 BY MR. MILLER:
18 Q    Why don't we quickly turn to
19 Exhibit 20. And why don't you turn to the
20 last page of that exhibit which also
21 contains a description of contribution rate.
22 Do you see that?
23 A    Yes.
24 Q    And this Actuarial Valuation Report
25 is for the year as of June 1, 2006; is that

Page 512

ARBITRATION - VOLUME III

1
2  correct?
3  A    Yes.
4  Q    And the description that's used for
5  contribution rate uses the same description
6  as the one that we just reviewed for the
7  actuarial report for 2011; isn't that
8  correct? Last page.
9  A    Similar, yes.
10 Q    And similar in the sense that it
11 describes the contribution rate as a
12 percentage of wages, correct?
13 A    Yes.
14 Q    Thank you.
15     So at least as far back as 2006's
16 actuarial valuation report, you were
17 describing the contribution rate in the form
18 of a percent of wages, correct?
19 A    Assuming the ones in between the
20 two are the same, yes.
21 Q    The description of the contribution
22 rate that's contained in these actuarial
23 valuation reports, they were included in the
24 corresponding Form 5500 for the relevant
25 plan year, correct?

Page 513

ARBITRATION - VOLUME III

1
2  A    Usually the pieces of the
3  certificate are attached to the Form 5500.
4  Q    Including that piece of the
5  certificate that contained the description
6  of contribution rate, correct?
7  A    I would think so.
8  Q    Do you believe that persons who
9  reviewed those Form 5500s could reasonably
10 rely upon the information that you certified
11 to and was contained in those Form 5500s?
12 MR. RICHMAN: Objection.
13 ARBITRATOR IRVINGS: Sustained.
14 MR. MILLER: Withdraw the
15 question.
16 BY MR. MILLER:
17 Q    Ms. Egan, why don't you turn your
18 attention to Exhibit 27, also in the white
19 binder.
20     And, Ms. Egan, this is the Pension
21 Fund's Actuarial Valuation Report as of
22 June 1, 2013; is that correct?
23 A    Yes.
24 Q    And did you prepare this report?
25 A    Yes.

Page 514

ARBITRATION - VOLUME III

1
2     Q    And is this actuarial valuation
3  analogous to the two that we just examined
4  in terms of its overall purpose?
5     A    Yes.
6     Q    Let me direct your attention again
7  to the final page which labeled 000760.
8         And please review the description
9  there respecting contribution rate.
10    A    Okay.
11    Q    Did you draft this language?
12    A    I possibly could have.  I don't
13  remember exactly who did.  A couple people
14  work on the valuation, so it could have been
15  someone else, but I reviewed it.
16    Q    You did review it?
17    A    Yes.
18    Q    And you did certify to it in the
19  Certificate of Actuarial Valuation, correct?
20    A    Yes.
21    Q    And this is not the same language
22  that was used to describe the contribution
23  rate in the prior valuations that we looked
24  at, right?
25    A    Correct.

Page 515

ARBITRATION - VOLUME III

1
2     Q    In fact, this description omits use
3  of the word "wages," doesn't it?
4     A    Yes.
5     Q    And this language does use the word
6  "shift," right?
7     A    "Shift rate."
8     Q    That's right.  "Shift rate."
9         Do you believe that the language
10  that you previously used, "8 percent of
11  wages," means the same thing as "8 percent
12  of the shift rate per shift"?
13    A    Yes.
14    Q    And why is that?
15    A    Because the shift rate is the wage
16  in this situation.
17    Q    Are you aware whether employees
18  that are covered by this Pension Fund are
19  compensated for holidays?
20    A    I'm not sure exactly what they're
21  compensated for.
22    Q    To the extent that they were paid
23  for holidays, that would be wages for
24  something other than a shift worked,
25  correct?

Page 516

ARBITRATION - VOLUME III

1
2         MR. RICHMAN:  Objection.  She
3  is not sure what they're compensated
4  for.  I don't think she should be
5  going down this road.  She's a fact
6  witness, not providing opinions.
7         ARBITRATOR IRVINGS:  You can
8  have the question.  It's going toward
9  terminology that she used.
10        MR. MILLER:  Exactly right.
11        (Requested portion of record read:
12        "Q.  To the extent that they were
13  paid for holidays, that would be wages
14  for something other than a shift worked,
15  correct?")
16        (End of read-back.)
17    A    I'm not sure how they measure the
18  holidays, if they measure it by shifts or
19  they could say a holiday is one shift.  I'm
20  not sure how they measure holidays.
21    Q    I'll make my question simpler.
22        When somebody is out on a holiday,
23  they do not work a shift, correct?
24    A    It's my understanding -- I would
25  think not.

Page 517

ARBITRATION - VOLUME III

1
2     Q    If somebody is out on military
3  leave and is compensated for military leave,
4  they are not working a shift, correct?
5     A    I would think not.
6     Q    And if somebody is out on Workers'
7  Compensation and still receives payments
8  from their employer, they are not working a
9  shift, correct?
10    A    I would think not.
11    Q    So assuming that in all of those
12  instances, the covered employee of the Fund
13  is not working a shift, is it still your
14  view that wages equal shift rate per shift?
15    A    We were describing the contribution
16  rate, and it was my understanding that it's
17  a percentage of the wage rate.
18    Q    Why did you substitute the words
19  "shift rate per shift" for the word "wages"
20  in this 2013 Actuarial Valuation Report?
21    A    To make it clearer.
22    Q    And is that because the previous
23  use of the word "wages" made it unclear?
24    A    It could have made it unclear for
25  those who maybe are not familiar with the

ARBITRATION - VOLUME III

1  Fund.
2
3       Those involved in the Fund knew how
4  the contributions were made.
5       Q    But for those not working at the
6  Fund, the prior language, in your judgment,
7  was unclear?
8       A    Could have been unclear.  It was
9  clear to me, but could have been unclear to
10 someone else.
11      Q    Did you consult with anyone at the
12 Fund before changing this language from
13 "8 percent of wages" to "8 percent of shift
14 rate per shift"?
15      A    No.  We're always tweaking language
16 in the reports.
17           MR. RICHMAN:  Just answer the
18 question.
19           THE WITNESS:  Oh, sorry.
20 BY MR. MILLER:
21      Q    Did you consult with Segal's
22 in-house counsel before changing the
23 language?
24      A    No.
25      Q    Let's turn to the second page of

ARBITRATION - VOLUME III

1
2  this report.
3       That contains the cover letter,
4  correct?
5       A    Yes.
6       Q    And the cover letter is dated
7  February 7, 2014, correct?
8       A    Yes.
9       Q    So you drafted this revised
10 language after The New York Times was
11 assessed withdrawal liability in this case,
12 correct?
13      A    Yes.
14      Q    And you drafted this revised
15 language after The New York Times had
16 challenged the withdrawal liability
17 assessment in this case, correct?
18      A    Yes.
19      Q    And I take it that your testimony
20 is, nonetheless, you just suddenly decided
21 to revise this language, correct?
22           MR. RICHMAN:  Objection.
23 "Suddenly decided to."
24           ARBITRATOR IRVINGS:  It's cross
25 examination.

ARBITRATION - VOLUME III

1
2       Go ahead.
3           MR. MILLER:  Can you repeat the
4  question.
5       (Requested portion of record read:
6  "Q.  And I take it that your
7  testimony is, nonetheless, you just
8  suddenly decided to revise this language,
9  correct?")
10      (End of read-back.)
11      A    Thinking it over as we were doing
12 the valuation, it appeared it was unclear,
13 so we thought we should make it clearer.
14      Q    Let's go back to the last page of
15 the document and the description of
16 contribution rate.
17      I'd like you to focus on this
18 revised articulation of the description.
19      In this description, what is the
20 contribution rate?
21      A    Eight percent of the shift rate.
22      Q    And so the words in this
23 formulation "per shift," they represent your
24 understanding of contribution base units,
25 correct?

ARBITRATION - VOLUME III

1
2       A    Yes.
3       Q    So this formulation, 8 percent of
4  the shift rate per shift, is actually the
5  entire contribution formula.  It represents
6  both the contribution rate and the
7  expression of the CBUs, correct?
8       A    Yes.
9       Q    So, similarly, when the prior
10 valuation reports use the formulation
11 8 percent of wages, the word "8 percent"
12 represented the contribution rate and
13 "wages" represented the base units, correct?
14      A    No.
15      Q    Why?
16      A    It was 8 percent of wages.  That's
17 how we would describe the contribution rate
18 any time we talked about it.  And everyone
19 knew that you meant the wage rate.
20      But that's how it was described all
21 the time.  It was the way people spoke about
22 it.
23      The language change was to make it
24 clearer because it didn't appear to be
25 clear, just like you are making it not

ARBITRATION - VOLUME III

clear.

Anyone in the room knew that the contribution rate was 8 percent of the wage rate.

Q    What room would that be?

A    Where you talked about -- the people who saw the valuation, where you talked about the valuation.

Q    So among the people who talked about the valuation, they understood?

A    Yes.

Q    So in the 2013 Actuarial Valuation Report, what you have expressed under Contribution Rate is, in your judgment, the entire contribution formula, but in the earlier versions, you were not expressing the entire contribution formula?

A    Technically, yes.

Q    Let's turn our attention -- sticking with this document, SEGAL-000721.

And you see the last sentence on that page?

A    Yes.

Q    That last sentence says, "The

ARBITRATION - VOLUME III

contribution rate is unchanged from that reflected in our prior valuation of 8 percent of the shift rate per shift."

Do you see that?

A    Yes.

Q    But to confirm, the prior valuation report's description of the contribution rate did not use the language about shift rate, did it?

A    Correct.

Q    Nor did it use the word "shift" at all?

A    Correct.

Q    And, in fact, you just testified that this expression "8 percent of the shift rate per shift" is the entire contribution formula.  And in the earlier versions, you did not express the entire contribution formula.

A    This sentence is to compare what the projected contributions are based on, and we were basically just saying that it's still on allocation of 8 percent of the wages.  That's all that sentence is about.

ARBITRATION - VOLUME III

Q    That's not quite what I asked you.

What I asked you was to confirm that in use of the phrase "8 percent of the shift rate per shift," you were expressing what you thought was the entire contribution formula.  And in the earlier versions, you were not expressing the entire contribution formula.

Yes or no?

A    Yes.

Q    So why did you say here that the contribution rate is unchanged?

A    Again, the contribution rate didn't change.  It's the same way that we described it in the last page.  We were trying to be clearer about it.  To be clearer.

Q    Except that in the earlier versions, you weren't expressing the contribution formula, correct?

ARBITRATOR IRVINGS:  That point's been made.

Let's move on.

MR. MILLER:  Fine.

MR. RICHMAN:  Thank you.

ARBITRATION - VOLUME III

BY MR. MILLER:

Q    Can you turn your attention -- sticking with the white binder -- to Exhibit 5.

Take a moment to review that document, please.  Thank you.

A    Okay.

Q    What is this document?

A    It looks like it's a notice to the bargaining parties about the funding improvement plan schedules.

Q    Ms. Egan, have you seen this document before?

A    I think I've only seen it at the deposition.  I don't think I've seen it before then.

Q    But didn't you review this notice before it was finalized?

A    I don't know that I reviewed the notice.  I might have reviewed the attachments.  The Exhibits 1 and 2 were part of what was completed for the funding improvement plan, which might have been attached to this.

ARBITRATION - VOLUME III

1
2     I don't remember this first page.
3  I don't know.
4     Q    Take a look at Exhibit 1 and 2 of
5  this document there entitled Alternative
6  Schedule and Default Schedule.
7          Were you asked by the NMDU Fund to
8  review these schedules that are attached to
9  this document?
10    A    I think it's part of the funding
11  improvement plan.  I think I was.
12    Q    Have you ever heard of the term
13  "yellow zone status"?
14    A    Yes.
15    Q    And have you ever heard of the term
16  "endangered status"?
17    A    Yes.
18    Q    And what does the term "endangered
19  status" mean?
20    A    The Pension Protection Act lays
21  out -- under the Pension Protection Act, one
22  is to measure the status of the plan every
23  year.  And if you hit certain triggers, you
24  are considered in endangered status.
25    Q    And am I correct that in connection

ARBITRATION - VOLUME III

1
2  with the plan year that commenced on June 1,
3  2012, you as the enrolled actuary certified
4  that this Fund was in endangered status?
5    A    I think in 2012, yes.
6    Q    And as a consequence of your
7  certification, the Fund had to develop a
8  funding improvement plan, correct?
9    A    Yes.
10    Q    And that funding improvement plan
11  needed to have certain funding commitments
12  that would allow the Pension Fund to exit
13  from endangered status, correct?
14    A    Or to hit certain triggers, to hit
15  a certain target, I should say, at the end
16  of a period.
17    Q    Okay.
18          And you, in fact, advised the Fund
19  and helped the Fund to develop its funding
20  improvement plan, correct?
21    A    We prepared projections for them to
22  assist them in developing a funding
23  improvement plan.
24    Q    And those projections included
25  projections about necessary contributions to

ARBITRATION - VOLUME III

1
2  meet the benchmark?
3    A    Yes.
4    Q    And in fact, the Pension Fund here
5  did adopt a funding improvement plan,
6  correct?
7    A    Yes.
8    Q    And this document here is the
9  notice to the collective bargaining parties
10  that, among other things, sets forth the
11  contribution schedules in connection with
12  that adopted funding improvement plan,
13  correct?
14          MR. RICHMAN:  Can you specify
15      which document you're talking about?
16      Are you talking about the exhibits or
17      the first page?
18          MR. MILLER:  I'm talking about
19      the entirety of the document, the
20      notice and the attachments to the
21      notice, which are the schedules.
22    A    It reads that way, yes.
23    Q    And the collective bargaining
24  parties would include the employer
25  contributors and the Union, correct?

ARBITRATION - VOLUME III

1
2    A    I would think so.
3    Q    Do you have any reason to believe
4  otherwise?
5    A    No.
6    Q    Let's turn your attention to the
7  second page of this document which is
8  Exhibit 1 entitled Alternative Schedule.
9          And how does Paragraph 2 of this
10  Alternative Schedule describe the employer
11  contributions that would take effect under
12  this Alternative Schedule?
13    A    It basically says that the
14  8 percent allocation would become
15  11.8 percent.
16    Q    And it says "11.8 percent of
17  wages"?
18    A    Yes.
19    Q    It does not mention anything about
20  shifts, correct?
21    A    No.
22    Q    Or about pay rates per shift?
23    A    It implies, again like the other
24  one, the 11.8 percent of wages means the
25  11 percent of the wage rate.

ARBITRATION - VOLUME III

1
2   Q    At least to the group of
3   individuals who would review the actuarial
4   report, correct?
5   A    To anyone -- my understanding is
6   everyone talks about it that way, and that's
7   how it was characterized.
8   Q    Do you know whether any employers
9   talked about it that way?
10  A    I have no idea.  Well, some of
11  them.  Some of them are trustees, so I'm
12  sure they did.
13  Q    But you don't know, one way or the
14  other?
15  A    I don't know each individual
16  person, no.
17  Q    And I think, speaking of trustees,
18  that you just testified that you in fact
19  advised the trustees regarding the
20  contribution levels that would be required
21  under these two schedules, correct?
22  A    We prepared projections where they
23  included these final numbers.
24  Q    So these final numbers were based
25  on projections that were undertaken by your

ARBITRATION - VOLUME III

1
2   team at Segal?
3   A    Yes.
4   Q    And in undertaking those
5   projections of future employer
6   contributions, did you do that on the basis
7   of percentage of wages or on the basis of
8   shifts?
9   A    The way we projected contributions
10  was neither.  We did not have the
11  information on shifts or wages to do
12  projections on contributions.
13       We would use information on the
14  prior historical contributions and make
15  adjustments to those to project
16  contributions.
17  Q    I'm going to switch gears now and
18  talk a little bit about withdrawal liability
19  estimates.
20       In your practice, do you prepare
21  estimates of employers' potential withdrawal
22  liability?
23  A    For any fund or --
24  Q    Let's take it generally for any
25  fund first.

ARBITRATION - VOLUME III

1
2        For any of the funds that you
3   served, is it customary for you to prepare
4   estimates of employers' potential withdrawal
5   liability?
6   A    We have prepared, yes.
7   Q    And in connection with this Fund
8   here, the NMDU Fund, as I'll call it, did
9   you prepare estimates of employers'
10  potential withdrawal liability?
11  A    Yes.
12  Q    And isn't it true that ERISA, the
13  federal pension law, provides an employer
14  with a right to obtain an estimate of
15  withdrawal liability upon request?
16  A    Yes.
17  Q    And isn't it also true that ERISA
18  requires that, if an employer has requested
19  an estimate of withdrawal liability, that
20  request needs to be responded to within six
21  months?
22       MR. RICHMAN:  Objection.  Can
23  you give us a time frame?
24  Q    For the last several years, hasn't
25  it been the case that ERISA has required

ARBITRATION - VOLUME III

1
2   that if an employer has requested an
3   estimate of withdrawal liability, the
4   request needs to be responded to within six
5   months?
6        ARBITRATOR IRVINGS:  How about
7   give me a year.
8        MR. MILLER:  Okay.
9   Q    Since, say, 2009.
10  A    I'm not sure exactly of the
11  six-month period.
12  Q    Well, the law will speak for
13  itself.
14       MR. RICHMAN:  There we go.
15  Q    Now, I want to talk a little bit
16  about not estimates of withdrawal liability
17  but actual calculations of withdrawal
18  liability.
19       ERISA sets forth rules for how a
20  withdrawal liability amount must be
21  amortized, correct?
22  A    Yes.
23  Q    And ERISA provides that in the
24  normal course, withdrawal liability amounts
25  are to be amortized through quarterly

1          ARBITRATION - VOLUME III
2   payments, correct?
3       A    Yes.
4       Q    And can you summarize for me how
5   the quarterly payment amount is calculated?
6       A    Based on the date of withdrawal,
7   you look back ten years at the contribution
8   base units and calculate the average
9   three-year highest base units.  And in the
10  ten years prior to the date of withdrawal,
11  the actual withdrawal date, you use the
12  highest contribution rate.
13          And the annual payment is the
14  highest base units times the highest
15  contribution rate, highest average base
16  units times contribution rate.
17      Q    And you would divide that number by
18  four to get your quarterly payment amount,
19  correct?
20      A    Correct.
21      Q    So am I correct that CBU
22  information is crucial in preparing a
23  payment schedule?
24      A    Yes.
25      Q    Now back to preparing estimates of

1          ARBITRATION - VOLUME III
2   withdrawal liability.
3          When preparing an estimate of
4   withdrawal liability, that estimate should
5   also include a payment schedule if the
6   employer requests one, correct?
7       A    Yes.
8       Q    So in order for you to calculate a
9   withdrawal liability estimate with a payment
10  schedule, you would need CBU information and
11  contribution rate information, correct?
12      A    Yes.
13      Q    By the way, are employers allowed,
14  at their discretion, to pay their withdrawal
15  liability in a lump sum?
16      A    I think the law allows you to pay
17  it upfront.  I know you can settle a
18  lump-sum payment.
19      Q    The payment schedule to amortize
20  withdrawal liability may be as long as
21  20 years, correct?
22      A    At most, 20 years, under a regular
23  withdrawal.
24      Q    So is it often the case that
25  withdrawal liability assessments, if not

1          ARBITRATION - VOLUME III
2   paid off in a lump sum, create long-term
3   debt obligations of the withdrawing employer
4   to the fund?
5          MR. RICHMAN:  Objection.  I'm
6   not -- can you maybe just repeat the
7   question.
8          MR. MILLER:  What's the
9   objection?
10         MR. RICHMAN:  I didn't
11  understand the question.
12         MR. MILLER:  But the witness
13  may have understood the question.
14         THE WITNESS:  Can you repeat
15  the question.
16         MR. RICHMAN:  Maybe she didn't.
17  BY MR. MILLER:
18      Q    Is it often the case that
19  withdrawal liability assessments, if not
20  paid off in a lump sum, create a long-term
21  debt obligation of the withdrawing employer
22  to the fund?
23         MR. RICHMAN:  Objection.  The
24  witness is a fact witness, not
25  offering opinions.

1          ARBITRATION - VOLUME III
2          MR. MILLER:  I'm asking for her
3   experience as an actuary to nearly
4   50 multiemployer plans whether, based
5   on the withdrawal liability
6   assessments she has calculated, it is
7   often the case that it results in a
8   long-term amortization period.
9          MR. RICHMAN:  That is a request
10  for an expert opinion.  It is not a
11  fact.
12         She is a fact witness.
13         ARBITRATOR IRVINGS:  Let me
14  ask:  Are you disputing that if there
15  is a liability payment schedule, that
16  there's then an obligation?
17         MR. RICHMAN:  I don't know --
18  we're going into opinion testimony.
19  Is it often the case?  I don't know,
20  how often is "often"?
21         ARBITRATOR IRVINGS:  Okay.
22         MR. MILLER:  I'll just make the
23  point that lay witnesses are often
24  asked to give their opinion based on
25  experience.

ARBITRATION - VOLUME III

ARBITRATOR IRVINGS: But where are we going with this?

MR. MILLER: I simply would like her, Ms. Egan, to confirm that based on her experience the withdrawal liability payment schedules may result in long-term obligations of the withdrawing employer.

ARBITRATOR IRVINGS: As long as 20 years. Yes?

BY MR. MILLER:

Q    Yes?

A    The most, 20 years.

Q    Okay.

MR. MILLER: Then I'll move on.

A    Not necessarily it could be one year. Maybe it could be one year. It doesn't have to be 20 years. That's the maximum.

Q    Let me focus on estimates of withdrawal liability that you have made in connection with the Pension Fund here.

I think you did testify a moment

ARBITRATION - VOLUME III

ago that in fact you have prepared estimates of withdrawal liability when requested by employers in connection with this Fund?

A    Yes.

Q    And can you summarize for us the process that you employed when asked to prepare an estimate?

ARBITRATOR IRVINGS: For this Fund?

MR. MILLER: For this Fund, yes.

A    We asked for the data needed and then we prepared the calculation.

Q    And in the ordinary course, what data would you request from the Fund?

A    The obligated contribution history of the employer and any information needed to set up the pools, if they have them set up, the current pool.

Each year you're setting up a pool.

Q    Ms. Egan, let me draw your attention to Exhibit 14 again in that white binder.

This is a letter dated January 22,

ARBITRATION - VOLUME III

2009 from R. Anthony Benton of The New York Times to the Pension Fund.

And you'll see that it is regarding Pension Fund and withdrawal liability estimates.

Have you ever seen this document?

A    I don't know that I -- I don't think I've seen this.

Q    Let me quickly draw your attention to Paragraph 4.

And Paragraph 4 requests an estimate of New York Times' withdrawal liability and then certain additional backup worksheets.

Do you ever recall performing the calculations that were requested by The New York Times in this letter and, in particular, Paragraph 4's request?

A    I know we've prepared a couple of estimates for The New York Times. I don't know if it was this particular request.

Q    Okay.

Are you aware that the Segal Company received a Subpoena requesting

ARBITRATION - VOLUME III

documents in this case?

A    Yes.

Q    And are you aware that Segal in fact produced documents in this case?

A    Yes.

Q    Do you have any reason to believe that if you had prepared a withdrawal liability estimate with backup in 2009, it would not have been produced by Segal?

A    Say that again.

Q    Do you have any reason to believe that if you had prepared the withdrawal liability estimate that is requested in this letter and the backup, it would not have been in the production that Segal made in this case?

A    If we found it, we would have produced it.

Q    Thank you.

Now I'd like to have you turn your attention to Exhibit 56. Again, I think it's in the same binder.

No, I'm sorry. The second binder. It should be in the red binder.

ARBITRATION - VOLUME III

1
2    And, again, that's Exhibit 56.
3    And Ms. Egan, this document staples
4 together several letters, so let me just ask
5 you to draw your attention to the second
6 page of this document which has the stamp at
7 the bottom NYT-001963.
8    A    1963, okay.
9    Q    Do you see that at the bottom.
10    Why don't you take a moment and
11 take a look at that letter.
12    A    Okay.
13    Q    So this appears to be another
14 request by The New York Times for an
15 estimate of withdrawal liability including
16 CBU information which is requested in
17 Paragraph 2.
18    A    Okay.
19    Q    And are you familiar with this
20 letter?
21    A    No.
22    Q    Do you recall having prepared an
23 estimate of The New York Times' withdrawal
24 liability in response to this letter?
25    A    I don't recall preparing.  I know

ARBITRATION - VOLUME III

1
2 we did a couple of them but I thought it was
3 later.
4    Q    And I take it that if a request --
5 strike that.
6    I take it that if you had prepared
7 an estimate in response to this request and
8 it was in Segal's files, you would have --
9 Segal would have produced it in this case?
10    A    Yes.  If we had it.  If we could
11 find it.
12    Q    I'm sorry.  Now I need you to turn
13 your attention back to the white binder and
14 Exhibit 4.
15    This should be a letter dated
16 August 15, 2011, again to the Fund, from a
17 man named James Dexter.
18    Do you recall seeing this letter?
19    A    They all look alike after a while.
20 I don't remember.  I don't remember
21 if I've seen this letter.
22    Q    Now sticking with this white
23 binder, why don't you just go ahead and move
24 to Exhibit 18.
25    A    Okay.

ARBITRATION - VOLUME III

1
2    Q    Exhibit 18 is a memorandum from you
3 and Mr. Urbank to the Fund director of the
4 NMDU Fund, Mr. Schwartz, dated June 25,
5 2012, correct?
6    A    Yes.
7    Q    And attached to this letter is an
8 estimate of withdrawal liability for The New
9 York Times for withdrawal in the year ended
10 May 31, 2012, correct?
11    A    Yes.
12    Q    Did you prepare the report that is
13 attached to the memorandum?
14    A    Yes.
15    Q    And if you turn your attention to
16 Page 15 of the report, which has a label
17 entitled SEGAL-000032, you'll see there is a
18 payment schedule that you calculated in
19 connection with this estimate of withdrawal
20 liability.
21    Do you see that?
22    A    Yes.
23    Q    And you calculated a payment of
24 roughly 952,000 per quarter in connection
25 with this withdrawal liability estimate,

ARBITRATION - VOLUME III

1
2 correct?
3    A    Yes.
4    Q    And now I'd like to draw your
5 attention to the next page, Page 16.
6    And what I'd like to do is explore
7 with you how you came up with that quarterly
8 payment amount of roughly $952,000.
9    A    Sorry?
10    Q    So I'd like to explore with you how
11 you calculated that number.
12    A    Oh, okay.  Okay.
13    Q    So under the heading Contribution
14 Rates, you'll see that there are a variety
15 of percentages that are listed.
16    And then under the heading
17 Effective Date, it indicates roughly a
18 ten-year period from July 1, '99 through
19 January 1, 2009, correct?
20    A    Yes.
21    Q    And the highest contribution rate
22 listed there is 8 percent, correct?
23    A    Eight percent of wage.
24    Q    And then under the column Total
25 Wages for The New York Times, there are

ARBITRATION - VOLUME III

1
2  ten years' worth of wages listed in that
3  column, correct?
4      A.   Yes.
5      Q.   And the three consecutive years
6  that are the highest would be for the years
7  2003, '4 and '5, correct?
8      A.   Yes.
9      Q.   So am I correct that the way you
10 did the math was to take the average for the
11 high three-year period of total wages,
12 multiply that by 8 percent and divide by 4?
13     A.   That's how we estimated it.
14     Q.   Right. And that's how you came up
15 with roughly $952,000 per quarter, correct?
16     A.   That's how it was estimated.
17     Q.   But the answer to my question is
18 yes, correct?
19     A.   Yes.
20     Q.   That's how you did the math,
21 correct?
22     A.   Yes.
23     Q.   Thank you.
24          So if the mathematical allocation
25 was 8 percent times the high of the three

ARBITRATION - VOLUME III

1
2  consecutive years of wages, then the
3  contribution rate that you used in making
4  this calculation was 8 percent, correct?
5      A.   It was an estimation.
6      Q.   That's not my question.
7           In doing the math, the contribution
8  rate that you used was 8 percent, correct?
9      A.   That was a piece of what was used
10 to come up with the payment.
11     Q.   And that 8 percent piece was the
12 contribution rate piece, correct? Yes or
13 no?
14     A.   It was a way to get to an annual
15 payment.
16     Q.   But you previously testified that
17 in determining a payment schedule you need a
18 contribution rate, correct?
19     A.   But this was an estimated annual
20 payment.
21     Q.   And you estimated an annual payment
22 of $952,000, correct?
23     A.   Yes.
24     Q.   And in undertaking the math for
25 that estimate, you used 8 percent --

ARBITRATION - VOLUME III

1
2      A.   We multiplied one number times
3  another number to get to an estimated annual
4  payment.
5      Q.   And the contribution rate number
6  that you used was 8 percent, correct?
7      A.   We used -- didn't necessarily
8  represent the contribution rate, but it
9  represented -- it was a way to get to an
10 annual payment.
11     Q.   And the number 8 percent, that's
12 under what heading?
13     A.   Eight percent of wages is under
14 Contribution Rate.
15     Q.   The term "8 percent" is under the
16 heading Contribution Rate, correct?
17     A.   The term "8 percent of wages" is
18 under the heading Contribution Rate.
19     Q.   In preparing this mathematical
20 allocation of quarterly payments, did you
21 use for any purpose the total number of
22 shifts worked by New York Times employees?
23     A.   No. But it's embedded in the
24 numbers.
25     Q.   On this page, there is no shift

ARBITRATION - VOLUME III

1
2  data, correct?
3      A.   No.
4      Q.   Thank you.
5      A.   Not directly.
6      Q.   Just answer yes-or-no questions
7  "Yes" or "No." Other lawyers will have an
8  opportunity to ask you questions.
9      A.   Sorry.
10          MR. RICHMAN: That's not fair.
11          ARBITRATOR IRVINGS: But it's
12     the rules, so we'll live with it.
13          MR. MILLER: Correct. It is
14     the rules.
15          ARBITRATOR IRVINGS: All right.
16     Let's move on.
17 BY MR. MILLER:
18     Q.   For purposes of this mathematical
19 allocation, total wages functioned as CBUs;
20 isn't that right?
21     A.   Like I said before, we were trying
22 to get to an annual payment, and we
23 multiplied one number by the other to try to
24 simulate an annual payment, whether it
25 functioned as one thing or another.

ARBITRATION - VOLUME III

1
2    Q    Let me ask the question another
3    way.
4        Am I correct that in order to
5    estimate a payment schedule, you need CBU
6    information?  You previously testified to
7    that, correct?
8    A    You need CBU and contribution rate
9    information.
10    Q    And in connection with this
11    calculation, total wages played the role of
12    CBUs, correct?
13    A    As an estimate.
14    Q    I know it's an estimate.
15        But in this calculation -- answer
16    my question:  In this calculation, total
17    wages played the role of CBUs, correct?  Yes
18    or no?
19    A    I'm not sure how to explain this.
20        THE WITNESS:  Can I explain or
21    do I have to say yes or no?
22        ARBITRATOR IRVINGS:  You have
23    to say yes or no.
24        Ron will ask you to explain.
25    A    It's hard when it's not a yes or no

ARBITRATION - VOLUME III

1
2    answer.
3        It looks like it played that role,
4    but, indirectly, it wasn't.
5    Q    So essentially, your answer is yes,
6    total wages played the role of CBUs,
7    correct?
8        I'm just looking for a yes or no
9    answer.
10    A    It looks that way.
11    Q    Thank you.
12        Did you anywhere in this document
13    indicate your view that shifts are CBUs?
14    A    No.
15    Q    Did you indicate anywhere in this
16    document that CBUs are not total wages?
17    A    No.
18    Q    So it would have been reasonable
19    for a reader of this payment schedule to
20    conclude that CBUs are total wages, correct?
21        MR. RICHMAN:  Objection.
22        ARBITRATOR IRVINGS:  Sustained.
23        You can argue it.
24    BY MR. MILLER:
25    Q    Let's turn to the note at the

ARBITRATION - VOLUME III

1
2    bottom of this page.
3        The note says that "Contributions
4    and contribution rate information for The
5    New York Times was received from the Fund
6    office."
7        And right above that note is that
8    column, that vertical column entitled
9    Contribution Rates.
10        Do you see that?
11    A    Yes.
12    Q    And the contribution rate
13    information that's under that column, that
14    was received from the Fund office, correct?
15    A    The allocation of the rate, yes.
16    The 6 percent, the 8 percent.
17    Q    That was received from the Fund
18    office, correct?  Yes or no?
19    A    Yes.
20    Q    Now I'd like to turn your attention
21    to Exhibit 3.
22        And why don't you take a moment to
23    review that document.
24    A    Okay.
25    Q    And are you familiar with the cover

ARBITRATION - VOLUME III

1
2    memorandum and the estimate that's attached
3    to that document?
4    A    Yes.
5    Q    And this is a similar estimate of
6    withdrawal liability that you prepared for
7    The New York Times in July of 2013, correct?
8    A    Yes.
9    Q    And if you turn your attention to
10    Page 15 of this exhibit, which is labeled
11    FUND-0000609, you see again there is a
12    payment schedule that's set forth, correct?
13    A    Yes.
14    Q    And this payment schedule indicates
15    a quarterly payment of approximately
16    952,000?
17    A    Yes.
18        ARBITRATOR IRVINGS:  Can we
19    agree that the colloquy will be the
20    same?
21        MR. MILLER:  Yes.  Let me ask
22    that question to get it done.
23    BY MR. MILLER:
24    Q    Is it fair to say that the last
25    page of the document is structured just the

ARBITRATION - VOLUME III

1  ARBITRATION - VOLUME III
2  same as the payment schedule analysis you
3  prepared for the June 2012 estimate?
4       A    Yes.
5       Q    So am I correct that in the span of
6  13 months from June 2012 to July 2013, you
7  used 8 percent as the contribution rate in
8  preparing estimates of a payment schedule
9  for withdrawal liability for The Times?
10      A    At those two points in time, I did.
11      Q    Thank you.
12           And in both instances, there's
13 nothing to alert the reader that the
14 contribution formula was not a percentage of
15 wages, correct?
16      A    It appears not.
17      Q    And, similarly, there's nothing in
18 the document alerting the reader that CBUs
19 are not total wages, correct?
20      A    Yes.
21      Q    Now, can you turn your attention to
22 Exhibit 1.
23           Take a moment to review that
24 document, please.
25      A    Okay.

1  ARBITRATION - VOLUME III
2       Q    Can you identify this document?
3       A    I don't know that I've seen this,
4  this actual document.
5       Q    Okay.  But let me draw your
6  attention to the portion of this document
7  that's identified on the bottom right with
8  the Bates stamp FUND-0000727.
9            Do you see that?
10           It's about midway through the
11 document.
12      A    Okay.
13      Q    Are you familiar with this portion
14 of the document, the calculation of
15 withdrawal liability?
16      A    Yes.
17      Q    And you prepared this portion of
18 the document, correct?
19      A    Yes.
20      Q    And as far as you are aware, this
21 is the actual assessment of partial
22 withdrawal liability that was made against
23 The New York Times in this case?
24      A    Yes.  I think so.
25      Q    And are you aware that the basis

1  ARBITRATION - VOLUME III
2  for this assessment of partial withdrawal
3  liability was that CBUs had declined by more
4  than 70 percent, correct?
5       A    That's my understanding, yes.
6       Q    And did you calculate a payment
7  schedule in connection with this assessment?
8       A    Yes.
9       Q    And why don't you in that regard
10 turn to FUND-0000743.
11           Page 16.  Are you there?
12      A    Yes.
13      Q    And let's turn your attention to
14 Roman Numeral VIII, the heading Payment
15 Schedule for New York Times' Partial
16 Withdrawal during Year Ended May 31, 2012.
17           Do you see that?
18      A    Yes.
19      Q    And this Section VIII sets forth
20 the calculations that lead to your
21 determination of the amount of the quarterly
22 payment of being approximately $923,000,
23 correct?
24      A    Yes.
25      Q    And as we discussed earlier, the

1  ARBITRATION - VOLUME III
2  formula that's mandated by ERISA to
3  calculate a payment schedule depends on
4  historical CBU levels and contribution rate,
5  correct?
6       A    Yes.
7       Q    But here, you did not use wages for
8  CBUs, did you?
9       A    No.
10      Q    Instead, you used shifts?
11      A    Correct.
12      Q    So quickly just to walk through the
13 calculation, you took the average number of
14 shifts over the high ten-year period prior
15 to the plan year of withdrawal and
16 multiplied that by $23.75.  Then you
17 multiplied that, I take it, by a partial
18 withdrawal fraction and divided by 4?
19      A    Yes.
20      Q    And if you look at the final page
21 of this document, which is FUND-0000757, I
22 take it those are the historical shift
23 numbers you used in the calculation?
24      A    Yes.
25      Q    Where did you obtain the shift

ARBITRATION - VOLUME III

1 numbers reflected on that page?
2     A   From the Fund office.
3     Q   And did you also receive from the
4 Fund office that $23.75 figure you used in
5 the calculations?
6     A   Yes.
7     Q   And you agree that you calculated
8 this payment schedule differently from how
9 you had done the estimates, the last one
10 being less than 60 days earlier, correct?
11     A   Yes.
12     Q   Why did you change your approach?
13     A   The first one was an estimate and
14 we didn't have all the information to do it.
15 And the second one was an actual calculation
16 and we were able to get the information to
17 do it.
18     Q   So in connection with the earlier
19 calculations, you were missing certain
20 information that you needed and used in
21 performing the payment schedule or
22 calculating the payment schedule for the
23 actual assessment, correct?
24     A   That's my recollection.

ARBITRATION - VOLUME III

1     Q   And do you recall what information
2 you were missing?
3     A   I believe we didn't have the
4 contribution rate information.
5     Q   You had the shift information, just
6 not the shift rate information, correct?
7     A   That's my recollection.
8     Q   Can you turn your attention to
9 Exhibit 42.
10     Ms. Egan, have you ever seen this
11 cover e-mail and the attachments to it?
12     A   Yes.
13     Q   And, in fact, you're a recipient of
14 this e-mail, correct?
15     A   Yes.
16     Q   Do you recall receiving this e-mail
17 from Ms. Albergo, Barbara A., at the Fund
18 office?
19     A   Yes.
20     Q   This e-mail also copies an
21 oleary@kmm.com.
22     Who does that e-mail address belong
23 to, if you are aware?
24     A   That's one of the counsels of the

ARBITRATION - VOLUME III

1 NMDU.
2     Q   And do you know why Ms. O'Leary was
3 copied on the e-mail?
4     A   I don't know why Barbara copied
5 her.
6     Q   And this e-mail indicates it was
7 sent on July 31st, and this was two weeks
8 after or roughly two weeks after you had
9 completed the estimate of payment schedule
10 using wages as CBUs, correct?
11     A   Yes.
12     Q   And, Ms. Egan, can you briefly
13 describe the information that's attached to
14 this e-mail?
15     A   It's my understanding that the
16 information shows the contribution rates to
17 the Welfare Fund and the Pension Fund at
18 different effective dates for the different
19 types of shifts.
20     Q   So this Pension Fund information,
21 was this the information that you needed to
22 calculate the payment schedule for the
23 actual assessment?
24     A   Yes.

ARBITRATION - VOLUME III

1     Q   And had you previously asked for
2 this information from the Fund in connection
3 with the two prior estimates you calculated
4 of withdrawal liability?
5     A   My recollection is that we did.
6     Q   So just to confirm, this is the
7 information that you did not have in
8 connection with those prior estimates that
9 you prepared, correct?
10     A   As far as I recall, yes.
11     Q   In preparing calculations of
12 withdrawal liability for employers of this
13 Fund, do you typically receive this -- did
14 you typically receive this kind of rate
15 information?
16     A   Not always.  Not typically.
17     Q   Can you think of any reason why it
18 would have been difficult for the Fund
19 office to have provided you these sheets at
20 an earlier date?
21     A   I have no idea what's difficult
22 about it.
23     Q   Let's focus on the first page of
24 this rate information.

ARBITRATION - VOLUME III

1
2      This appears to be rate information
3  for, it says in the first sentence, "day
4  shifts of March 31, 2013."
5      Do you see that at the top?
6      A   Yeah.
7      Q   And am I correct that for the
8  Pension Fund, eight different wage rates are
9  depicted on this sheet?
10      A   For The New York Times?
11      Q   For The New York Times, correct.
12      A   Yes, that's what I see is eight
13  rates for the Pension Fund.
14      Q   So is it your understanding that
15  The New York Times has eight different
16  contribution rates that applied to its
17  pension obligations in any given year?
18      A   That's my understanding by looking
19  at this.
20      Q   Thank you.
21      Are you aware whether employees who
22  work shifts that might use specialized
23  machinery, such as a forklift, are paid
24  higher shift rates, shift wages than the
25  rates listed on these sheets?

ARBITRATION - VOLUME III

1
2      A   I have no idea.
3      Q   To the extent that they are, there
4  would be two additional contribution rates
5  on top of the eight contribution rates
6  applicable to The New York Times, correct?
7      A   Why two?  Why two?
8      Q   Strike that.  Let me rephrase the
9  question.
10      To the extent that an employee who
11  might use specialized machinery such as a
12  forklift is paid a higher shift wage than
13  the rates listed on this sheet, that would
14  be an additional contribution rate
15  applicable to The New York Times, correct?
16      A   If that's how they make the
17  contributions to the Fund, you would think
18  so.  I don't know otherwise.
19      Q   You don't know one way or the
20  other?
21      A   Right.
22      Q   Do you know whether there are any
23  employees who participate in this Fund who
24  are paid on a salary rather than a per-shift
25  basis?

ARBITRATION - VOLUME III

1
2      A   I have no idea.
3      Q   To the extent that a person that is
4  covered by this Fund were to be paid a
5  salary rather than on a per-shift basis,
6  does this rate sheet reflect the
7  contributions for such a salaried
8  individual?
9      A   I have no idea.
10      Q   Is there any information on this
11  rate sheet that would advise the
12  contributing employer how much to contribute
13  for an employee who would be paid on a
14  salary rather than on a per-shift basis?
15      A   I don't see any information.  I
16  don't.
17      Q   Thank you.
18      Is there a contribution rate on
19  this sheet that reflects the appropriate
20  contribution for an employee who might be
21  out on Workers' Compensation?
22      A   It doesn't appear that way.  I'm
23  not sure -- I didn't create this sheet, so I
24  don't ...
25      Q   But it's your testimony that it

ARBITRATION - VOLUME III

1
2  does not appear to be that way, correct?
3      A   It doesn't specify.
4      Whether they need to use one of
5  these rates, I wouldn't know.
6      Q   Okay.  Let's turn to a different
7  subject.  Let's talk about investment return
8  assumptions.
9      Can you describe what an investment
10  return assumption is as it relates to
11  multiemployer pension plan funding?
12      A   The investment return assumptions
13  used for funding?
14      ARBITRATOR IRVINGS:  Before we
15  go into this new area, maybe we can
16  take a five-minute break.
17      MR. RICHMAN:  That was my
18  suggestion.
19      (A brief recess was
20  taken.)
21      MR. MILLER:  Back on the
22  record.
23  BY MR. MILLER:
24      Q   Ms. Egan, let me just restate the
25  question.

ARBITRATION - VOLUME III

1
2      Can you describe what an investment
3  return assumption is?
4      A    That is used for funding
5  valuations?
6      Q    That's correct.
7      A    It is an assumption that is used to
8  reflect how money will -- how much you're
9  expecting to receive on your return on your
10 assets.
11     Q    And these would be the assets at
12 which the Pension Fund -- strike that.
13         These would be the investments that
14 the Pension Fund has made with its assets,
15 correct?
16     A    Yes.
17     Q    Do you know what investment return
18 assumption you used for the NMDU Fund for
19 funding purposes?
20     A    Currently?
21     Q    Yes.
22     A    Seven and a half percent.
23     Q    And how did you select that
24 investment return assumption?
25     A    Well, it's a long-term assumption

ARBITRATION - VOLUME III

1
2  that's derived from looking at historical
3  data and expected market -- current and
4  recent market returns.
5         We use a building block approach
6  where we reflect or take into account
7  inflation expectations or any anticipated
8  risk premiums on each of the asset classes
9  in the portfolio.
10        We take into account the target
11 asset allocation of the fund.
12     Q    So I take it you are familiar with
13 the term "building block approach" or
14 "building block method," correct?
15     A    Yes.
16     Q    And is it fair to say that you
17 applied the building block method in
18 connection with the decision to use
19 7.5 percent as the investment return
20 assumption for this Fund?
21     A    Yes.
22     Q    And is it fair to say that the
23 building block method takes into account the
24 Fund's actual assets and actual targeted
25 asset allocation, correct?

ARBITRATION - VOLUME III

1
2      A    Yes.
3      Q    And is it fair to say that the
4  7.5 percent assumption represents your best
5  estimate of how the Pension Fund's assets
6  here will on average perform over the long
7  term?
8      A    Over a long-term period, yes.
9      Q    For ongoing regular funding
10 purposes, you need to annually value a
11 pension plan's liabilities as an enrolled
12 actuary for a multiemployer plan, correct?
13     A    Yes.
14     Q    And a critical assumption in
15 present valuing a pension plan's liabilities
16 is the discount rate used to arrive at that
17 present value, correct?
18     A    Yes.
19     Q    And, indeed, isn't that the most
20 critical of the assumptions that an enrolled
21 actuary applies in determining the present
22 value of a pension fund's liabilities?
23     A    If you mean critical, has the most
24 effect on the liabilities, yes.
25     Q    Thank you.

ARBITRATION - VOLUME III

1
2      A    In most cases.
3      Q    And am I correct that for
4  multiemployer pension plans for ongoing
5  funding purposes, the plan's investment
6  return assumption is used as the discount
7  rate to present value liabilities?
8      A    In most cases.
9      Q    And did you in fact use the
10 7.5 percent investment return assumption for
11 this Pension Fund to present value this
12 Pension Fund's liabilities for ongoing
13 funding purposes?
14     A    Currently, yes.
15     Q    And, indeed, you've done so for the
16 last number of years, correct?
17         MR. RICHMAN:  Objection.
18     What's the number of years?
19 BY MR. MILLER:
20     Q    For how many years have you applied
21 the Fund's investment return assumption as
22 the discount rate to value the Fund's
23 liabilities?
24     A    Many years.
25     Q    At least ten?

ARBITRATION - VOLUME III

1
2      A    At least ten.  For valuation
3  purposes.
4      Q    Can you recall any period during
5  which you've been the enrolled actuary for
6  this Fund in which you did not use the
7  Fund's investment return assumption as the
8  discount rate to value its liabilities?
9      A    No.  Off the top of my head, no.
10     Q    And am I correct that that discount
11  rate assumption, which is also the
12  investment return assumption, has been
13  reflected in the various annual Actuarial
14  Valuation Reports that you've prepared for
15  the Pension Fund over the years?
16     A    Yes.
17     Q    In that regard, let's turn our
18  attention back to Exhibit 25 which is the
19  Actuarial Valuation Report as of June 1,
20  2011.
21        So turning back to Exhibit 25, why
22  don't you draw your attention to the page
23  that's been marked SEGAL-0000621.
24        Are you on Page 000621?
25     A    Yes.

ARBITRATION - VOLUME III

1
2      Q    And you'll see toward the middle of
3  the page there is a line that reads "Net
4  investment return, 7.5 percent."
5        Do you see that?
6      A    Yes.
7      Q    And that 7.5 percent indeed
8  memorializes that as the enrolled actuary
9  for this Fund for this valuation report
10  you're using 7.5 percent as the investment
11  return assumption and discount rate,
12  correct?
13     A    Yes.
14     Q    Actuarially, why does it make sense
15  to use the plan's investment return
16  assumption as the discount rate to present
17  value liabilities for funding purposes?
18     A    The liabilities are on a long-term
19  basis, and the investment return, what you
20  are expecting on your assets on a long-term
21  basis, are similar, so it would make sense
22  if they are, they would be the same.
23     Q    Is it fair to say they're
24  essentially the flip side of the same coin?
25     A    Not always.

ARBITRATION - VOLUME III

1
2      Q    In most cases, yes?
3      A    In this case, yes.
4      Q    Thank you.
5        Am I correct that the actuarial
6  profession has set forth standards of
7  practice on the issue of selecting
8  investment return assumptions and discount
9  rates, correct?
10     A    Yes.
11     Q    And in preparing your Actuarial
12  Valuation Reports and developing an
13  investment return assumption and discount
14  rate, you applied those standards of
15  actuarial practice, correct?
16     A    Yes.
17     Q    Can you turn your attention to
18  Exhibit 10, please.  Again in the white
19  binder.
20        And are you familiar with this
21  document, Ms. Egan?
22     A    Yes.
23     Q    And is this the ASOP, Actuarial
24  Standard of Practice?
25        Is this the ASOP that guided your

ARBITRATION - VOLUME III

1
2  actuarial assumptions when you developed the
3  Fund's investment return assumption and
4  discount rate?
5      A    Yes.  For that valuation that we
6  were looking at.
7      Q    For the 2011?
8      A    For the 2011 valuation, yes.
9      Q    And is this the ASOP that guided
10  your actuarial assumptions when you
11  calculated The Times' withdrawal liability
12  in 2013?
13     A    Yes.
14     Q    Can you turn your attention to
15  Section 3.6, please, which is entitled
16  Selecting an Investment Return Assumption
17  and Discount Rate.
18        And can you please review the first
19  three paragraphs under that heading.
20     A    Okay.
21     Q    Do you agree with the actuarial
22  principles that are set forth in those two,
23  three paragraphs under the heading Selecting
24  an Investment Return Assumption and Discount
25  Rate?

ARBITRATION - VOLUME III

1
2  A    In most cases, yes.
3  Q    What would be the instances in
4  which you would not apply the principles
5  that are set forth in those paragraphs?
6  A    Which specific principle are you
7  talking about?
8  Q    Fair question.  Let's turn to the
9  first big paragraph, the one that reads,
10 "The discount rate is used to determine the
11 present value of expected future plan
12 payments.  Generally, the appropriate
13 discount rate is the same as the investment
14 return assumption."
15     Let me stop there and ask you.
16     Do you agree with that actuarial
17 principle?
18 A    Yes.
19 Q    And the next sentence goes on to
20 say, "But for some purposes such as SFAS
21 Number 87 or unfunded plan valuations, the
22 discount rate would be selected
23 independently of the plan's investment
24 return assumption, if any."
25     So do you understand that sentence

ARBITRATION - VOLUME III

1
2  to provide exceptions to the general
3  principle?
4  A    Yes.
5  Q    Do you believe that the exceptions
6  that are articulated in that sentence apply
7  in the case of calculating withdrawal
8  liability in connection with a pension plan
9  that has a pool of invested assets?
10 A    Repeat the question.
11     (Requested portion of record read:
12     "Q.  Do you believe that the
13     exceptions that are articulated in that
14     sentence apply in the case of calculating
15     withdrawal liability in connection with a
16     pension plan that has a pool of invested
17     assets?")
18     (End of read-back.)
19     MR. RICHMAN:  I'm going to
20 object.
21     What exceptions are we talking
22 about because I'm not sure we're talking
23 about the same thing.
24     MR. MILLER:  Well, let me ask
25 the witness.

ARBITRATION - VOLUME III

1
2  BY MR. MILLER:
3  Q    Let's focus on the sentence that
4  says, "For some purposes such as SFAS
5  Number 87 or unfunded plan valuations, the
6  discount rate may be selected independently
7  the plan's investment return assumption."
8      So let me ask you:  In your
9  judgment, does this sentence articulate any
10 exceptions to the general principle that you
11 use the investment return assumption as the
12 discount rate, this sentence here?
13 A    That sentence gives examples of
14 exceptions.
15 Q    Okay.  And what are those examples?
16 A    If you are doing FAS 87 --
17 Q    And let me stop right there.
18     In other words, if the financial
19 accounting standards would mandate a
20 different discount rate, then this sentence
21 authorizes the actuary to use the
22 FAS-mandated discount rate; is that fair?
23 A    The sentence before it authorizes
24 that generally the appropriate discount rate
25 is the same as investment return.  That

ARBITRATION - VOLUME III

1
2  tells me that there are exceptions.
3  Q    And one of them is in connection
4  with FAS requirements, correct?
5  A    One of them, based on this, yes.
6  Q    And the other based on this
7  sentence is in connection with unfunded plan
8  valuations, correct?
9  A    Right.  That looks like the two
10 examples, yes.
11 Q    Right.  And my question was:  Do
12 either of those exceptions have any
13 application in calculating withdrawal
14 liability for a pension plan that has
15 invested and thus funded assets?
16 A    I'm not sure what one has to do
17 with the other.
18 Q    In other words, they have no
19 application to the calculation of withdrawal
20 liability, these two exceptions.
21     Strike that.  Let me articulate
22 better.
23     Am I correct that these two
24 exceptions have no application to the
25 calculation of withdrawal liability?

ARBITRATION - VOLUME III

1
2    A    Those particular exceptions.
3    Q    Do not apply -- have any
4  application to the calculation of withdrawal
5  liability, correct?
6    A    Correct.
7    Q    I take it you you've heard of the
8  term "Segal blend."
9        What is your understanding of the
10  concept Segal blend?
11    A    Segal blend is -- I use as my best
12  estimate to calculate the unfunded vested
13  benefits for withdrawal liability purposes.
14        The way it works?
15    Q    Yes. Why don't you go ahead and
16  explain how the Segal blend method works to
17  derive a withdrawal liability amount.
18    A    A withdrawing employer, in my view,
19  is looked upon as at a point where he's
20  settling his pension obligation. And there
21  are a couple ways you can settle your
22  pension obligation, one being paying lump
23  sums to the participants or purchasing
24  annuities for them.
25        And if you were to go out and

ARBITRATION - VOLUME III

1
2  purchase annuities, you would pay a certain
3  interest rate for them. And we use the
4  Pension Benefit Guaranty Corporation
5  publishers' rates that we use that are in
6  line with use information for insurance
7  companies for purchasing annuities.
8        So we calculate the liability based
9  on these rates.
10        As far as the funding rate, we
11  don't use the funding rate to come up with
12  the liability. It's my view that the
13  funding rate is a long-term rate. It
14  reflects that the assets are in riskier --
15  you may be expecting to get higher interest
16  rates because a long-term rate, your assets
17  are held in investments that could be
18  riskier.
19        And, therefore, there's a risk
20  taken by the ongoing employers. The
21  withdrawing employer is not taking that
22  risk, so they shouldn't benefit from -- they
23  shouldn't benefit from a risk that they
24  didn't take, that they are not taking.
25        So we don't use the funding

ARBITRATION - VOLUME III

1
2  assumption. We use the PBGC rates, but we
3  don't solely just use the PBGC rates because
4  withdrawal liability is not typically paid
5  in a lump sum. It's paid over a period of
6  time.
7        So what we do is we do a blend. We
8  do a blend of using the more current rate
9  which is by proxy the PBGC, the more current
10  rate for the liabilities up to the market
11  value of assets because in essence the
12  thought is that with the assets, you go out
13  and you purchase annuities.
14        For the liability above that, we
15  say -- the thought is that a more long-term
16  expectation of what the annuity rates would
17  be, we use a proxy of the funding assumption
18  for that.
19        So we do a blend of the two to come
20  up with the liabilities.
21        On the asset side, we use the
22  market value of assets because, again, it's
23  on more of a termination basis. It's the
24  employer settling their obligation.
25        So that's how we come up with the

ARBITRATION - VOLUME III

1
2  liability pieces and asset pieces to come up
3  with the unfunded vested benefits for
4  withdrawal liability purposes.
5    Q    Let me see if I can unpack that a
6  little bit.
7        So am I correct that the Segal
8  blend is a method in which the plan's
9  liabilities are valued using different
10  discount rates, correct?
11    A    Yes.
12    Q    And a portion of the plan's
13  liabilities are valued using PBGC rates,
14  correct?
15    A    Uh-huh.
16    Q    And another, the remaining portion
17  of the plan's liabilities are valued using
18  the plan's investment return assumption,
19  correct?
20    A    Well, that's used as a proxy, the
21  investment return assumption, a more
22  long-term assumption.
23    Q    In making the calculation, you are
24  in fact using in part the plan's investment
25  return assumption, in this case 7.5 percent,

21

ARBITRATION - VOLUME III

1
2 correct?
3     A    Yes.
4     Q    And more particularly, you use the
5 PBGC rates to value the liabilities up to
6 the market value of assets.  And in
7 connection with the liabilities in excess of
8 the market value of assets, for those
9 liabilities, you switch and use the
10 investment return assumption, correct?
11     A    The more long-term assumption, yes.
12     Q    Which is the investment return
13 assumption, correct?
14     A    Yes.
15     Q    And in the case of The New York
16 Times' assessment, you use 7.5 percent,
17 correct?
18     A    Yes.
19     Q    And did I hear you correctly that
20 in your judgment, these PBGC rates are
21 designed to approximate the rate for
22 purchase of annuities to settle pension
23 obligations, correct?
24     A    Yes.  They're used as a proxy for
25 that, yes.

ARBITRATION - VOLUME III

1
2     Q    So they are in a sense a proxy for
3 commercial insurance annuity rates, correct?
4     A    Yes.
5     Q    And your view is that the
6 investment return assumption is a proxy for
7 the long-term expected annuity rates?
8     A    Yes.
9     Q    In the 1980s, were PBGC rates
10 higher or lower than the discount rates that
11 multiemployer plans were using at the time
12 to value liabilities for funding purposes?
13     A    In the '80s?  I think it was more
14 typically higher in most cases.  I can't say
15 for every situation.
16     Q    And so for a pension fund at that
17 time in which the investment return
18 assumption and discount rate for funding
19 purposes was lower than the PBGC rate, use
20 of the Segal blend at that time would have
21 resulted in a higher effective investment
22 return assumption and discount rate for
23 withdrawal liability calculation purposes,
24 right?
25     A    Typically.

ARBITRATION - VOLUME III

1
2     Q    And in using a higher effective
3 discount rate, it would have resulted in a
4 lower present value of liabilities, correct?
5     A    In most cases, yes.
6     Q    And thus a lower withdrawal
7 liability, correct?
8     A    In most cases, yes.
9     Q    So if the Segal blend was used in
10 the 1980s when PBGC rates were high, in most
11 cases, it indeed would have resulted in
12 lower withdrawal liability calculations than
13 if the investment return assumption had been
14 used to value liabilities?
15     A    In most cases, yes.  Generally.
16     Q    By contrast today in the current
17 interest rate environment, PBGC rates are
18 customarily higher or lower than the rates
19 that pension plans use to value liabilities
20 for funding purposes?
21     A    I'm sorry.  Say that again.  I was
22 a little distracted.
23     Q    In the current interest rate
24 environment, are PBGC rates typically higher
25 or lower than the rates that pension plans

ARBITRATION - VOLUME III

1
2 use to value liabilities for funding
3 purposes?
4     A    Typically lower.
5     Q    So then using the Segal blend in
6 today's interest rate environment will
7 result in a lower discount rate and,
8 therefore, higher liabilities, right?
9     A    Yes.
10     Q    You used the Segal blend to
11 calculate withdrawal liability for all of
12 the multiemployer funds for which you serve
13 as an enrolled actuary, correct?
14     A    Yes.  As my best estimate.
15     Q    And the particular asset mix that
16 the Fund to which you serve as enrolled
17 actuary has does not matter to you, correct?
18     A    With respect to?
19     Q    Use of the Segal blend.
20        You can answer.
21     A    I guess not, no.
22     Q    So to put it another way, in
23 connection with the funds to which you
24 served as an enrolled actuary, you used the
25 Segal blend assumptions for calculating

Page 586

ARBITRATION - VOLUME III

1 withdrawal liability regardless of the
2 particular pension plan's actual portfolio
3 of assets, correct?
4    A    Yes.
5    Q    For funding purposes, not
6 withdrawal liability purposes, if there are
7 obligations over the next 20 years of that
8 fund, do you use PBGC rates as the discount
9 rate for funding purposes?
10    A    Repeat the question again.
11    Q    Sure.
12        For funding purposes, if a pension
13 plan has obligations over the next 20 years,
14 do you use the PBGC rates as the discount
15 rate for funding purposes?
16    A    For any client, you are saying?
17    Q    For any of the funds to which you
18 serve as the enrolled actuary.
19    A    Not currently that I'm aware of.
20    Q    Now, I think you mentioned a moment
21 ago that one of the rationales for your
22 decision to use the Segal blend is that you
23 view the withdrawing employer as settling
24 its pension obligations.

Page 587

ARBITRATION - VOLUME III

1    Do you remember that testimony?
2    A    Yes.
3    Q    In the event of a single-employer
4 plan, not a multi, but a single-employer
5 plan, a standard termination, in that
6 instance the pension plan in fact goes out
7 and buys annuities to fund its benefit
8 obligations, correct?
9    A    I'm not -- I haven't done a
10 single-employer termination, so I don't know
11 exact details of the calculation.
12    Q    Do you have any reason to believe
13 that in a standard single-employer
14 termination, the plan sponsor does not go
15 out and buy commercial annuities?
16    A    There might be details -- I don't
17 know if they have enough money --
18    Q    In a standard termination.
19    A    Oh, a standard.  I don't -- I'm not
20 familiar with the exact details of the
21 calculations.
22    Q    You just don't know one way or the
23 other --
24    A    Right.

Page 588

ARBITRATION - VOLUME III

1    Q    -- in a standard termination
2 what --
3    A    What the process is?
4    Q    -- what a sponsor does in settling
5 an obligation.
6        MR. RICHMAN:  You guys have to
7 go one at a time.
8        MR. MILLER:  You need to let me
9 finish.
10        MR. RICHMAN:  You need to let
11 her finish her answer, too.
12        ARBITRATOR IRVINGS:  So I'm
13 clear, "standard termination," you
14 are talking about termination of a
15 plan with funds.
16        MR. MILLER:  Correct.
17        ARBITRATOR IRVINGS:  As opposed
18 to an --
19        MR. MILLER:  Underfunded plan.
20 That's right.
21        Do you need me to lay that
22 foundation in the record?
23        ARBITRATOR IRVINGS:  No, thank
24 you.

Page 589

ARBITRATION - VOLUME III

1        MR. RICHMAN:  It's in the law
2 books.
3 BY MR. MILLER:
4    Q    Let's turn to a multiemployer plan.
5        In your experience and in
6 connection with the funds to which you
7 served as enrolled actuary, does a
8 multiemployer plan typically go out and buy
9 annuities when an employer withdraws?
10    A    No.
11    Q    Are you aware whether the Pension
12 Fund here in connection with the assessment
13 against The New York Times has gone out and
14 purchased annuities with The New York Times'
15 withdrawal liability payments?
16    A    I'm not aware of that.
17    Q    Are you familiar with the concept
18 of a plan partition?
19    A    Yes.
20    Q    What is a plan partition?
21    A    Basically, the plan is
22 segregated -- is split -- or a piece -- I
23 don't want to use the same word
24 "partition" -- split where a portion of it

ARBITRATION - VOLUME III

1
2  moves out of the plan and either goes into
3  another fund, another -- stands alone or is
4  picked up by the PBGC and the pieces are
5  separated.
6      Q    Okay.
7          In your experience as an enrolled
8  actuary, did any of the funds to which you
9  served as actuary partition a withdrawing
10 employer's liabilities following a
11 withdrawal and the assets allocated to them
12 and had the withdrawal liability payments
13 made into the partitioned plan?
14     MR. RICHMAN:  Objection as to
15 relevance.  Where are we going?
16     ARBITRATOR IRVINGS:  We need
17 some sense.
18     MR. MILLER:  Right.
19 Partitioning a plan is also a
20 potential way of settling
21 liabilities.
22         And so what I'm getting at here is
23 that when an employer withdraws from an
24 ongoing plan, the typical means of
25 settling obligations are not in fact

ARBITRATION - VOLUME III

1
2  undertaken.  Thus, the analogy that is at
3  the center of the Segal blend is not
4  reasonable.
5      ARBITRATOR IRVINGS:  Go ahead.
6      MR. MILLER:  Please repeat the
7  question.
8      (Requested portion of record read:
9  "Q.   Okay.
10         In your experience as an enrolled
11 actuary, did any of the funds to which
12 you served as actuary partition a
13 withdrawing employer's liabilities
14 following a withdrawal and the assets
15 allocated to them and had the withdrawal
16 liability payments made into the
17 partitioned plan?")
18     (End of read-back.)
19     A    I don't have any plans that did
20 that.
21     Q    And I take it you're not aware of
22 whether the Pension Fund here has
23 partitioned The New York Times' liabilities
24 and had its withdrawal liability payments
25 made into a partitioned plan?

ARBITRATION - VOLUME III

1
2      A    I'm not aware.
3      Q    Generally speaking, withdrawal
4  liability payments to a fund are pooled with
5  all other contributions and assets in that
6  fund and invested in the same manner,
7  correct?
8      A    I would assume so.
9      Q    Do you have any reason to believe
10 that it would not be?
11     A    I'm not the investment manager, but
12 I don't have any reason to believe.
13     Q    In your experience, has it ever
14 been the case -- strike that.
15         In your experience, isn't it true
16 that in all cases withdrawal liability
17 payments to the multiemployer fund are
18 pooled with all other contributions and
19 assets and invested in the same manner?
20     A    Can you repeat the beginning?
21     (Requested portion of record read:
22 "Q.   In your experience, isn't it
23 true that in all cases withdrawal
24 liability payments to the multiemployer
25 fund are pooled with all other

ARBITRATION - VOLUME III

1
2  contributions and assets and invested in
3  the same manner?")
4      (End of read-back.)
5      A    I don't know if it's all cases, but
6  typically they're together.
7      Q    They're pooled and invested
8  together?
9      A    Typically.  I don't know if it's
10 all cases.
11     Q    Are you aware of any case in which
12 that was not done?
13     A    Off the top of my head, I can't
14 think of one.
15     Q    And am I correct that the
16 withdrawal liability payments, once pooled
17 with all of the other assets, are invested
18 for the long term?
19     A    If that's their investment policy.
20     Q    Are you aware of any multiemployer
21 funds to which you are the actuary that does
22 not invest for the long term?
23     A    Those that expect to be there for
24 the long term.  Unless someone is going
25 insolvent, they may have a different

Page 594

ARBITRATION - VOLUME III

1    investment strategy.
2        Q    So in the absence of an expected
3    insolvency, multiemployer plans invest for
4    the long term, correct?
5        A    Typically.
6        Q    Based on the rationale that you
7    gave for the Segal blend, do you believe
8    that the Segal blend is justified on the
9    ground that if the plan's investments turn
10   out to generate returns below the best
11   estimate investment return assumption, the
12   withdrawing employer cannot be assessed any
13   additional liability?
14       A    Say that again.
15           (Requested portion of record read:
16       "Q.  Based on the rationale that
17   you gave for the Segal blend, do you
18   believe that the Segal blend is justified
19   on the ground that if the plan's
20   investments turn out to generate returns
21   below the best estimate investment return
22   assumption, the withdrawing employer
23   cannot be assessed any additional
24   liability?")

Page 595

ARBITRATION - VOLUME III

1        (End of read-back.)
2        A    Yes.
3        Q    So by charging the withdrawing
4    employer more in liability than would be
5    charged if the investment return assumption
6    best estimate were used, the Segal blend
7    effectively provides a cushion in the event
8    that the pension fund falls short of its
9    best estimate investment return assumption,
10   correct?
11       A    That doesn't always happen.
12   Sometimes it's the reverse.  So it's not
13   necessarily ...
14       Q    In the current interest rate
15   environment, however, by charging the
16   withdrawing employer more in liability than
17   would be charged if the best estimate
18   investment return assumption is used, the
19   Segal blend provides a cushion in the event
20   the plan falls short of its best estimate
21   investment return assumption, correct?
22       A    Can you repeat it again.
23           (Requested portion of record read:
24       "Q.  In the current interest rate

Page 596

ARBITRATION - VOLUME III

1    environment, however, by charging the
2    withdrawing employer more in liability
3    than would be charged if the best
4    estimate investment return assumption is
5    used, the Segal blend provides a cushion
6    in the event the plan falls short of its
7    best estimate investment return
8    assumption, correct?")
9        (End of read-back.)
10       A    The intention is not to provide a
11   cushion.  It's to not have the employer
12   share in the risk that's being taken by the
13   ongoing employers.
14       Q    But I didn't ask you what the
15   intent of the Segal blend is.  I asked you a
16   question about the consequence of the Segal
17   blend.
18           And isn't it the case that in the
19   current interest rate environment by
20   charging withdrawing employers more in
21   withdrawal liability than would be charged
22   if the best estimate investment return
23   assumption is used, the Segal blend provides
24   a cushion in the event the plan falls short

Page 597

ARBITRATION - VOLUME III

1    of its best estimate?
2        A    Because the way the mechanics work
3    and there is a higher number, there is more
4    being charged.
5        Q    Let me ask you this question:
6    Isn't it true that the fund's -- a fund's
7    assets could turn out to generate higher
8    returns than the plan's best estimate
9    funding investment return assumption?
10       A    The experience -- repeat the
11   question.
12       Q    Isn't it true that the fund's
13   assets and actual experience could result in
14   returns that are higher than the plan's
15   current best estimate funding investment
16   return assumption?
17       A    Yes.  It could be higher, it could
18   be lower.
19       Q    Exactly.
20           And in the event that the returns
21   are higher than the best estimate investment
22   return assumption, an employer who has been
23   assessed with withdrawal liability will not
24   receive a refund of its earlier assessed

ARBITRATION - VOLUME III

1    liability payments, correct?
2        A    Right.
3        Q    When you certify that your best
4    estimate investment return assumption is
5    7.5 percent, that means the returns might be
6    higher or might be lower but on average over
7    the long term are expected to return
8    7.5 percent annually; isn't that correct?
9        A    Yes.
10       Q    Let's turn back to Exhibit 1 which
11   is the actual withdrawal liability
12   calculation in this case.
13           And why don't you draw your
14   attention to FUND-000730.
15           Are you there?
16       A    Yes.
17       Q    So you indeed in this case utilized
18   the Segal blend in calculating The Times'
19   partial withdrawal liability, correct?
20       A    Yes.
21       Q    And this page, 0000730, sets forth
22   the particular interest rates that you in
23   fact blended in applying the Segal blend,
24   correct?

ARBITRATION - VOLUME III

1        A    Yes.
2        Q    And can you briefly summarize what
3    those interest rates were that you blended
4    together?
5        A    For the valuation as of May 31,
6    2009 of the unfunded vested benefits, we
7    used for the PBGC rates 5.5 percent for the
8    first 20 years and 5.02 percent thereafter.
9            And for the long-term rate, we used
10   7 and a half percent.
11       Q    And by "long-term rate," you mean
12   for the portion -- for the long-term rate,
13   you mean the portion for the vested benefits
14   that were not matched by the market value of
15   plan assets using the PBGC rates, correct?
16       A    Yes.
17       Q    And for those you used the
18   investment return assumption of 7.5 percent,
19   correct?
20       A    Yes.
21       Q    And the result of using those
22   blending rates was an effective investment
23   return assumption that was less than
24   7.5 percent, correct?

ARBITRATION - VOLUME III

1        A    Yes.
2        Q    And that effective investment
3    return assumption was below your best
4    estimate of the future returns that the NMDU
5    Fund's assets are expected to generate over
6    the long term, correct?
7        A    Yes.
8        Q    And that effective investment
9    return assumption was also below your best
10   estimate of the future anticipated
11   experience of this Pension Fund, correct?
12       A    Expected for the long term?
13       Q    Yes.
14       A    Yes.
15       Q    Yes.
16           So just to confirm:  The resulting
17   effective investment return assumption by
18   applying the Segal blend was lower than your
19   best estimate of the future anticipated
20   experience of this plan over the long term?
21       A    Yes.
22       Q    Now, you previously testified that
23   the PBGC rates are, in effect, a proxy for
24   commercial insurance annuity rates, right?

ARBITRATION - VOLUME III

1        A    Yes.
2        Q    And is it fair to say that
3    commercial insurance companies when they
4    issue annuities, they tend to support those
5    annuities largely or principally through
6    ownership of high grade corporate bonds,
7    correct?
8        A    I'm not sure of the details.
9        Q    Let me ask you this question:  Do
10   you have any reason to believe that the NMDU
11   Fund here is planning to change its
12   investment mix in the near future?
13       A    I have no idea what they're
14   planning to do.
15       Q    And in connection with the
16   withdrawal liability payments that are being
17   made by The New York Times in connection
18   with this assessment, they are in fact going
19   into the same pool of assets that the other
20   contributing employers' contributions are
21   going into, correct?
22       A    It's my understanding.
23       Q    Right.
24           And the payments made by The Times

ARBITRATION - VOLUME III

1
2  are in fact invested like all the other
3  assets over the long term, correct?
4      A   I would think so.
5      Q   And the Pension Fund is not using
6  The Times' payments to purchase annuities,
7  correct?
8      A   Not that I know of.  I'm not aware.
9      Q   You've been employed at Segal
10 since -- strike that.
11         Let me ask you this question:  Do
12 you believe that it is appropriate to use
13 current market rates to value all of the
14 liabilities of a Pension Fund in calculating
15 withdrawal liability?
16     A   Repeat the question again.
17     (Requested portion of record read:
18     "Q.  Do you believe that it is
19     appropriate to use current market rates
20     to value all of the liabilities of a
21     Pension Fund in calculating withdrawal
22     liability?")
23     (End of read-back.)
24         MR. MILLER:  Strike that.  Let
25 me rephrase the question.  I think I

ARBITRATION - VOLUME III

1
2  can do so in a more articulate way.
3  BY MR. MILLER:
4      Q   In your opinion, would it be
5  appropriate for an actuary in valuing
6  liabilities for withdrawal calculation
7  purposes to use purely a commercial annuity
8  rate as opposed to a blend?
9          MR. RICHMAN:  Objection.  He's
10     asking for an opinion.
11         Rephrase the question and ask what
12     she does.
13         He is asking for an opinion.  She
14     is not here as an expert witness.
15         ARBITRATOR IRVINGS:  You can
16     respond.
17         MR. MILLER:  Yes.  But I'm
18     allowed to ask her for her
19     justification of use of the Segal
20     blend as compared to other
21     approaches.
22         And I'd like to ask her whether she
23     would embrace a different approach and,
24     if she wouldn't, why not.
25         ARBITRATOR IRVINGS:  You can

ARBITRATION - VOLUME III

1
2  have it.  Go ahead.
3      (Requested portion of record read:
4      "Q.  In your opinion, would it be
5      appropriate for an actuary in valuing
6      liabilities for withdrawal calculation
7      purposes to use purely a commercial
8      annuity rate as opposed to a blend?")
9      (End of read-back.)
10     A   I would not use a pure annuity rate
11 for the reasons I explained about the Segal
12 blend.
13         Whether another actuary believes
14 that that is their best estimate, that's
15 their belief.
16     Q   And in connection with the Pension
17 Fund here and the calculation of The New
18 York Times' partial withdrawal liability, in
19 your judgment, it would not be appropriate
20 to use exclusively or purely a commercial
21 annuity rate, correct?
22     A   I would not use it.
23         Whether someone else would find it
24 appropriate, that's for them to say.
25     Q   But you, personally, do not find it

ARBITRATION - VOLUME III

1
2  appropriate?
3      A   I would use the Segal blend and
4  that's my best estimate.
5      Q   That's not the question I asked.
6          The question I asked is:  You,
7  personally, as the actuary for this Fund do
8  not think it is appropriate to use purely a
9  commercial market annuity rate to calculate
10 withdrawal liability?
11     A   I, personally, would not use it.
12     Q   And in your judgment it's not
13 appropriate, correct?  Yes or no?
14     A   Whether another actuary finds it
15 reasonable ...
16         ARBITRATOR IRVINGS:  The
17     question is what do you find it?
18     A   There are many ways that it could
19 be done.  I don't think it's unreasonable to
20 use funding.  I don't think it's
21 unreasonable to use one rate, but I wouldn't
22 do it.  I would do it the way I do it which
23 is the Segal blend.
24     Q   You've been at Segal since
25 approximately 1990; is that right?

Page 606

ARBITRATION - VOLUME III

1
2   A    1982.
3   Q    Since?
4   A    1982.
5   Q    And in your role as enrolled
6   actuary for multiemployer plans, you've
7   always used the Segal blend method, correct?
8   A    Yes.
9   Q    And I think as we discussed
10  earlier, I think your testimony was that
11  there was a period of time in the 1980s in
12  which the Segal blend would cause withdrawal
13  liability to be lower than it would be had
14  plan investment return assumptions be used.
15       Do you remember that testimony?
16  A    Yes.
17  Q    And but I take it there came a time
18  when interest rates associated with
19  commercial annuities fell below investment
20  return assumptions such that, as is
21  currently the case, use of the Segal blend
22  began to cause increases in withdrawal
23  liability relative to application of
24  investment return assumptions, correct?
25  A    Yes.

Page 607

ARBITRATION - VOLUME III

1
2   Q    Do you know who Thomas Levy is?
3   A    He is the chief actuary for the
4   Segal blend.
5   Q    Do you know who Judith Mazo is?
6   A    She was a legal counsel for the
7   Segal Company.
8   Q    She's retired now, right?
9   A    Yes.
10  Q    She was long-time legal counsel to
11  the Segal Company?
12  A    Yes.  I don't know how long.  "Long
13  time," I don't know what that means.
14  Q    Do you know if they ever provided
15  any guidance about the use of the Segal
16  blend to the consulting actuary staff?
17  A    I'm sure they would send out any --
18  I'm sure they sent out guidance throughout
19  the years.
20  Q    Have you ever heard of a Supreme
21  Court case called Concrete Pipe?
22  A    Yes.
23  Q    Ms. Egan, I would like to draw your
24  attention to the green binder, which is the
25  Objected Exhibits binder.

Page 608

ARBITRATION - VOLUME III

1
2        And to Objected Exhibit 5.
3   A    Which one?
4   Q    Five.
5        MR. RICHMAN:  Let's have the
6   Objected Exhibit 5 objected to.
7        We object to this with respect to
8   relevance.
9        This memo does not have any
10  relevance to how the Segal blend was used
11  in this case.  It doesn't have any
12  relevance to actuarial principles that
13  Ms. Egan used to develop The Times'
14  calculation, and we are going to go off
15  on a witch hunt here.
16       MR. MILLER:  Can I lay a brief
17  foundation and then respond,
18  Mr. Arbitrator?
19       ARBITRATOR IRVINGS:  Go ahead.
20  BY MR. MILLER:
21  Q    Ms. Egan, do you recognize this
22  document?
23  A    It looks familiar.
24  Q    Do you recall seeing this document
25  during the course of your actuarial

Page 609

ARBITRATION - VOLUME III

1
2   practice?
3   A    Yes.
4   Q    And this document appears to be a
5   memo from Mr. Levy and Ms. Mazo dated
6   March 29, 1994 relating to use of the Segal
7   blend following the Supreme Court's decision
8   in Concrete Pipe; is that correct?
9   A    Yes.
10  Q    And could you take a moment and
11  review carefully the first paragraph.
12       MR. MILLER:  And,
13  Mr. Arbitrator, I would ask you to
14  review it as well in connection with
15  laying the foundation for its
16  relevance.
17       May I respond?
18       ARBITRATOR IRVINGS:  Go ahead.
19  If you are done laying a foundation,
20  go ahead.
21       MR. MILLER:  Yes.
22       As you know from our opening brief,
23  Mr. Arbitrator, we take the position that
24  indeed under the Supreme Court's decision
25  in Concrete Pipe, the statutory

ARBITRATION - VOLUME III

1  requirements on actuaries in calculating
2  withdrawal liability, which statutory
3  requirements says that the actuary has to
4  use assumptions that in the aggregate are
5  reasonable and the best estimate of
6  anticipated experience requires that the
7  investment return assumption for funding
8  purposes be used in calculating
9  liabilities for withdrawal liability
10 purposes.
11     This memo is a memo from senior
12 people at the Segal Company in which the
13 Segal Company recognizes, having
14 developed the so-called Segal blend, that
15 the Supreme Court decision in Concrete
16 Pipe, as they concede, raises a serious
17 question whether continued use of the
18 Segal blend is permissible.
19     That's what they say in the very
20 first paragraph.
21     In the second paragraph and
22 throughout the remainder of the memo,
23 they state these issues about continued
24 use of the Segal blend must be brought to

ARBITRATION - VOLUME III

1  the attention of clients who might be
2  affected.
3     And the clear implication of the
4  memo and its attachments is that the very
5  actuarial consulting firm that developed
6  this approach recognized that the Supreme
7  Court decision could -- and we submit
8  does -- render that approach illegal.
9  And they wanted to take steps, as set
10 forth in the memo when you read it in its
11 entirety, to protect themselves from
12 potential professional liability in the
13 event it continued to be and was
14 eventually found to be illegal.
15     So the fact that the very
16 consulting firm that developed this
17 approach found the Supreme Court
18 decision, which we're relying upon, as
19 raising a serious issue of the continued
20 legal permissibility is, I would submit,
21 not merely relevant but highly relevant
22 and should be given appropriate weight by
23 you in your decision here.
24     MR. RICHMAN:  Okay.  Whether

ARBITRATION - VOLUME III

1  the Segal method is illegal under
2  Concrete Pipe is a legal question.
3     The fact that the Segal Company
4  issued a memo saying it raised -- and it
5  actually says, "The US Supreme Court
6  decision raises the question whether that
7  is permissible" -- is -- has no weight
8  whatsoever in anyone, whether it's
9  yourself or a court, deciding whether
10 Concrete Pipe determined that the Segal
11 blend is impermissible."
12     This is a legal question.
13     ARBITRATOR IRVINGS:  I'll get
14 to you, too.  Don't worry.
15     (Laughter.)
16     MR. RICHMAN:  I could see him
17 out of my left eye.  I didn't know if
18 he was going to jump on the table.
19     And are we seriously going forward
20 with the argument here that because the
21 Segal Company raised the issue and asked
22 its actuaries to do certain things with
23 respect to their clients, that somehow
24 that lends a support for a legal

ARBITRATION - VOLUME III

1  determination as to whether what Concrete
2  Pipe decided?
3     The fact of the matter is, as we
4  know, Courts subsequent to Concrete Pipe
5  don't interpret Concrete Pipe the way
6  that The Times interprets it.  In fact,
7  the Seventh Circuit, Judge Posner,
8  specifically endorses the use of the
9  Segal method.
10     The other thing is that we're now
11 going to go down the road and the reality
12 is the Segal method (sic.) hasn't
13 retreated from the use of the Segal
14 method.
15     And we already had testimony from
16 this witness about how she uses it for
17 all of her plans from beginning to end.
18     And so I really don't understand
19 why we're going to go on this detour.  It
20 has no relevance.
21     MR. MILLER:  Mr. Richman
22 suggested that there was no link
23 between this memo and the factual
24 record.

1    ARBITRATION - VOLUME III
2        And, indeed, what I would like to
3    know by further questioning of Ms. Egan
4    is did she indeed discuss this memo with
5    her clients?  Did she discuss it with the
6    NMDU Fund per the memo's guidance?  And
7    to the extent she did not, why not?  And
8    what her judgment was, her factual
9    judgment was in connection with
10   understanding and applying the guidance
11   provided by this memo.
12       Those are factual links and credits
13   (phonetic).
14       ARBITRATOR IRVINGS:  I think
15   that on the issue of binding legal
16   determination, I think you're
17   correct.  As the basis for factual
18   inquiry, it's a relevant document.
19       So you can have the document.
20   We'll mark it as 118.
21       (Arbitration Exhibit 118,
22   Memorandum dated March 29, 1994,
23   was marked in Evidence.)
24       ARBITRATOR IRVINGS:  118 is a
25   memo dated March 29, 1994 from Thomas

1    ARBITRATION - VOLUME III
2    Levy and Judith Mazo, M-A-Z-O, to
3    consulting staff and others.
4    BY MR. MILLER:
5        Q    So, Ms. Egan, I think you testified
6    that you had seen this document before.
7        Did you ever discuss the issue of
8    whether the Concrete Pipe decision
9    foreclosed application for the Segal blend
10   with the NMDU Fund?
11       A    This is 20 years ago.  I don't
12   recall the details.
13       Q    Do you not recall the details of
14   the memo, or do you not recall the details
15   of raising the issue of the implications of
16   the Concrete Pipe decision with your client
17   NMDU Fund?
18       A    I don't recall whether it was
19   raised or not.  It was 20 years ago.  I have
20   numerous clients --
21       MR. RICHMAN:  Just answer the
22   question.
23       A    Okay.  I don't recall.
24       Q    Do you recall discussing the
25   guidance in this memo with any of the

1    ARBITRATION - VOLUME III
2    multiemployer plans to which you served as
3    enrolled actuary?
4        A    I don't recall specifically a
5    client.
6        Q    After receiving and reviewing this
7    memo, did you have any conversations with
8    any of your fellow actuaries at the Segal
9    Company about the memo and its implications
10   to continued use of the Segal blend?
11       A    I'm sure there was discussion, but
12   I don't remember specifics.
13       Q    But you do remember discussing this
14   with your fellow actuaries at Segal?
15       A    At some point, there would have
16   been a discussion at some point.  I don't
17   remember details at all.
18       Q    I think you previously testified
19   that your best estimate of how the assets in
20   the NMDU Fund are going to perform over the
21   long term is 7.5 percent, correct?
22       A    For the long term, yes, for
23   valuations purposes.
24       Q    And 7.5 percent is indeed your best
25   estimate of long-term performance for this

1    ARBITRATION - VOLUME III
2    Fund, correct?
3        A    Yes.
4        Q    But for withdrawal liability
5    purposes, you apply a different best
6    estimate of liabilities, correct?
7        A    Yes.
8        Q    Is that withdrawal liability best
9    estimate based on your assessment of the
10   future performance of the same pool of
11   assets that are currently in this Fund's
12   portfolio?
13       A    Repeat the question.
14       (Requested portion of record read:
15   "Q.  Is that withdrawal liability
16   best estimate based on your assessment of
17   the future performance of the same pool
18   of assets that are currently in this
19   Fund's portfolio?")
20       (End of read-back.)
21       A    The best estimate is based on, as I
22   described before, of the Segal blend is a
23   blend of the two because of the way we view
24   an employer.
25       I'm confused.

Page 618

ARBITRATION - VOLUME III

1
2    Q    Let me see if I can ask the
3  question a little differently for you.
4    A    I'm not sure where you are going.
5    Q    Is your withdrawal liability best
6  estimate based on an assessment or an
7  assumption respecting a hypothetical pool of
8  assets that are not currently in this
9  Pension Fund?
10    A    I'm not sure how to answer that
11  question.
12        We use the market value of assets,
13  the current value of assets, and we discount
14  the liabilities using the blend to come up
15  with their unfunded vested benefits.
16    Q    And am I correct that the rate for
17  the current value of assets is a rate that
18  is tied to investment -- strike that -- is
19  tied to interest rates on high quality
20  corporate bonds?
21    A    It's a snapshot of the value of the
22  assets at that point in time.  The assets
23  are a snapshot at that point in time.
24        MR. MILLER:  Strike that.  Let
25    me start again.

Page 619

ARBITRATION - VOLUME III

1
2  BY MR. MILLER:
3    Q    In determining the withdrawal
4  liability best estimate, you said that you
5  do so based on current market rates,
6  correct?
7    A    Yes.  To discount the liabilities.
8    Q    To discount the liabilities,
9  exactly.
10        So the discount rate that you use
11  in your withdrawal liability best estimate
12  is a discount rate that is tied to current
13  market rates, correct?
14    A    Yes.  It's actually the blend, the
15  blend of the two.
16    Q    The blend of the two.
17    A    Right.
18    Q    And one part of the blend is
19  current market rates, correct?
20    A    Yes.
21    Q    And by "current market rates," you
22  mean rates on commercial annuity products or
23  a proxy thereof like the PBGC rates?
24    A    Yes.
25    Q    And commercial annuity rates are

Page 620

ARBITRATION - VOLUME III

1
2  typically derived from rates on investment
3  grade bonds, correct?
4    A    I'm not sure how the annuity rates
5  are derived, but ...
6    Q    Okay.  So in using your -- strike
7  that.
8        In developing your withdrawal
9  liability best estimate, you do so at least
10  in part based on current market rates, and
11  you don't know what the underlying basis is
12  for those current market rates, correct?
13    A    We use the PBGC rates which are a
14  proxy of annuity purchase rates.
15    Q    And you don't know what the basis
16  is to derive those annuity rates, correct?
17    A    Yes.
18    Q    That was a yes?
19    A    Yes.
20    Q    It is fair to say, however, that
21  you use two different approaches to derive
22  the two different best estimates in, on the
23  one hand, determining liability for funding
24  and, on the other hand, determining
25  liabilities for withdrawal liability?

Page 621

ARBITRATION - VOLUME III

1
2    A    Yes.
3    Q    Ms. Egan, can you summarize your
4  understanding of the term "vested benefits."
5    A    "Vested benefits"?
6    Q    Yes.
7    A    The benefits that a participant
8  is -- have a nonforfeitable right to -- I
9  don't want to use the word "vested" -- that
10  they're vested in.
11    Q    So essentially the term "vested
12  benefits" is the pension amount that an
13  employee has a nonforfeitable right to,
14  correct?
15    A    Yes, essentially.
16    Q    And those vested benefits are
17  necessarily and exclusively the pension
18  liability amount, correct?
19    A    That they are or they aren't?
20    Q    They are.
21        So those pension benefits are --
22        MR. MILLER:  Strike that.  Let
23  me start again.
24    Q    Vested benefits are pension
25  liabilities, correct?

ARBITRATION - VOLUME III

1
2    A    The vested monthly benefit is the
3  amount of money that the participant will
4  receive.
5    Q    In a pension, correct?  As opposed
6  to an expense of the plan.
7    A    Oh, oh, okay.
8    Q    Here's where I'm getting, the term
9  "vested benefits" does not include pension
10  plan expenses, correct?
11    A    Correct.
12    Q    So in connection with the NMDU
13  Fund, for funding purposes, you do not
14  include administrative expenses in valuing
15  the Pension Fund's pension liabilities,
16  correct?
17    A    We include it with the normal costs
18  of the plan, which is a liability.
19    Q    But you don't include it in
20  calculating the present value of the Fund's
21  liabilities, correct?
22    A    Correct.
23    Q    And why is that?
24    A    Because it's included as a term
25  cost with the normal cost which is a

ARBITRATION - VOLUME III

1
2  liability.
3    And I have to take back what I
4  said.  It is part of the liabilities but not
5  the present value of vested benefits.  It's
6  part of the normal cost liability.
7    Q    Just to clarify the record, but not
8  part of the present value of vested
9  benefits, correct?
10    A    Calculation, yes.  Present value of
11  vested benefits calculation.
12    Q    Correct?
13    A    Yes.
14    MR. MILLER:  Mr. Arbitrator, at
15  this point, I am done.
16    Let me ask you this:  In connection
17  with the third issue in this arbitration,
18  the so-called ordering of the calculation
19  of the revised assessment, it's The New
20  York Times' view that the documents make
21  clear that the ordering of that
22  calculation was changed.
23    Because of that, unless,
24  Mr. Arbitrator, you would like me to ask
25  some questions to confirm for the factual

ARBITRATION - VOLUME III

1
2  record that when Ms. Egan calculated the
3  revised assessment, she changed the order
4  of calculations.  In the absence of your
5  thinking that's necessary, at this
6  juncture, we have no further questions.
7    MR. RICHMAN:  We had an
8  agreement.
9    MR. MILLER:  And that's why I'm
10  raising it and that's why I'm not
11  asking the question yet.
12    ARBITRATOR IRVINGS:  It's a
13  legal issue.
14    MR. MILLER:  That's fine.
15  That's why I raised it, just to
16  confirm without asking any questions.
17    MR. RICHMAN:  Take a little
18  break and we'll come back, and I
19  would like to start going because we
20  have Mr. Kra.
21    ARBITRATOR IRVINGS:  We are
22  going to take a meal break at some
23  point?
24    MR. RICHMAN:  Yeah, I never
25  want to forgo lunch.

ARBITRATION - VOLUME III

1
2    ARBITRATOR IRVINGS:  Off the
3  record.
4    (A brief recess was taken.)
5    CROSS EXAMINATION BY MR. RICHMAN:
6    Q    Do you communicate with the Pension
7  Fund office?
8    A    With the Pension Office?
9    Q    With the Pension Fund office?
10    A    Sometimes.
11    Q    Who have you communicated with at
12  the Pension Fund office during the time
13  you've been the enrolled actuary for the
14  Pension Fund?
15    A    Mostly with Murray Schwartz.
16    Q    And Mr. Schwartz, he's the
17  director?
18    A    Was the director.
19    Q    That's right.  All right.
20    And how frequently did you
21  communicate with the Pension Fund office
22  during the time you were the enrolled
23  actuary for the Fund?
24    A    Not that often, depending on what
25  it is we're working on.  It would be in

ARBITRATION - VOLUME III

1
2    spurts, so depending on what we were working
3    on.  Sometimes he called me, I didn't call
4    him.
5        Q    When he would call you, what would
6    he call you about?
7        A    Maybe he didn't understand a number
8    in a report or ...
9        Q    Would he call you to ask you to do
10   things?
11       A    Typically, it would be through
12   John, typically, if he asked.
13       Q    And let's just for the record -- so
14   the record is clear, "John" is John Urbank?
15       A    John Urbank.
16       Q    Who is one of your colleagues at
17   Segal?
18       A    One of my colleagues at Segal.
19       Q    Do you communicate directly with
20   the trustees of the Pension Fund?
21       A    No.  Other than at meetings, a
22   trustee meeting, no, no.
23       Q    But you do communicate with him at
24   trustee meetings?
25       A    Yes.

ARBITRATION - VOLUME III

1
2        Q    And so you attend trustee meetings?
3        A    Yes.
4        Q    And do you attend all the trustee
5    meetings?
6        A    No, not all of them.
7        Q    And how often do you attend trustee
8    meetings?
9        A    Approximately once a year, twice a
10   year.  Depends on how often they are in a
11   given year because they are not -- it's
12   not -- what's the word I want? -- it varies
13   by year.
14       Q    Does Segal have a point person who
15   is charged with communicating with the
16   Pension Fund?
17       A    Yes.
18       Q    And who is that?
19       A    That's John Urbank.
20       Q    During the -- withdraw that.
21            When you became an enrolled actuary
22   at Segal and were providing -- and serving
23   as an enrolled actuary for clients, did you
24   initially use the Segal method for
25   calculating withdrawal liability?

ARBITRATION - VOLUME III

1
2        A    I always used the Segal method.
3        Q    Always?
4        A    Yes.
5        Q    So there's not a single instance in
6    which you haven't used the Segal method?
7        A    Not as my best estimate, correct.
8        Q    When you became the enrolled
9    actuary at the Pension Fund, what was the
10   withdrawal liability method that the Pension
11   Fund was using?
12       A    The method was the presumptive
13   method.
14       Q    And what was the method used to
15   calculate the interest assumption for
16   determining withdrawal liability?
17       A    The Segal blend.
18       Q    Okay.  And so that was in place
19   when you became the actuary?
20       A    Yes.
21       Q    Do you know how long it was in
22   place before you became the actuary?
23       A    No, I don't know.
24       Q    Now, you testified previously in
25   response to Mr. Miller's questions that the

ARBITRATION - VOLUME III

1
2    contribution base units for the pension
3    funds was shifts.
4        A    Yes.
5        Q    How did you know that?
6        A    Any correspondence that I had as I
7    took over the case, any correspondence I saw
8    referred to shifts.  Any conversation at any
9    meeting, people talked about shifts.  There
10   was no reason to believe it wasn't shifts.
11       Q    When you talk about any discussion
12   at any meeting, you are talking about
13   meeting of whom?
14       A    A trustees meeting.
15       Q    Okay.
16            Did this Pension Fund ever use a
17   contribution base unit other than a shift?
18       A    Not that I am aware of.
19       Q    So did you ever use a contribution
20   base unit other than a shift?
21       A    In doing --
22            I'm sorry, for this Fund.
23       A    For this Fund in doing an actual
24   calculation?
25       Q    Yes.

ARBITRATION - VOLUME III

1
2    A    No.
3    Q    Did you ever review The New York
4    Times Collective Bargaining Agreement with
5    the Union?
6    A    No.
7    Q    Why not?
8    A    There was no need to for my
9    purposes.
10   Q    And why was there no need to do so?
11   A    Because I didn't need it in any of
12   the calculations.  I didn't need to look at
13   the Collective Bargaining Agreement for any
14   reason.
15   Q    Did you ever review the C & S
16   Collective Bargaining Agreement with the
17   Union?
18   A    C & S?
19   Q    C & S.
20   A    No.
21   Q    Okay.
22        Did you ever review The Times'
23   remittance reports to the Pension Fund?
24   A    Remittance reports, no.
25   Q    Why not?

ARBITRATION - VOLUME III

1
2    A    There was no need for me to see the
3    remittance reports.
4    Q    Now, we discussed in response to
5    Mr. Miller's questions CBUs or contribution
6    base units.
7        Can you tell us what a contribution
8    base unit is and what your understanding is?
9    A    My understanding of contribution
10   base unit is the basis for how you make
11   contributions, whether it be -- you provide
12   a dollar amount per an hour, a day, a
13   specified unit of measurement for how to --
14   for how much contributions are put into the
15   fund.
16   Q    Okay.  And what is a contribution
17   rate?
18   A    It's the amount of the -- the
19   dollar amount that is being put into the
20   fund by this unit.
21   Q    Okay.  So is the contribution rate
22   the same as the contribution base unit?
23   A    No.
24   Q    If you would turn to Exhibit 42.
25   A    What color?

ARBITRATION - VOLUME III

1
2    Q    White.
3        Okay.  You previously testified
4    about this.
5        Let's look at 3-31-2013.  Do you
6    see on the left side it says "effective
7    3-31-2013."  It's on Page FUND-2371.
8        You there?
9    A    Yes.
10   Q    And if you look under Pension Fund
11   High Rate.
12   A    Yes.
13   Q    And it says "$300.18 times
14   8 percent."
15   A    Yes.
16   Q    What is that?
17   A    3.18 times 8 percent, what is that?
18       My understanding is one is the wage
19   rate and the other is the allocation of the
20   wage rate to total the contribution rate.
21   Q    What would be the contribution rate
22   there?
23   A    $24.01.
24   Q    And look over in the left-hand side
25   of that same group of calculations.  And see

ARBITRATION - VOLUME III

1
2    it says "day rate, short night, long night,
3    SAT night."
4        What are those?
5    A    The different types of shifts that
6    those contribution rates correspond to.
7    Q    Okay.
8        Now, you testified previously that
9    you did some withdrawal liability estimates
10   for the Fund, correct?
11   A    Uh-huh.
12   Q    And you also did some withdrawal
13   liability assessments, correct?
14   A    Uh-huh.
15   Q    What I want to do is take you
16   through a few of those.
17       Let's take a look at Exhibit 107.
18       Have you seen this document before?
19   A    Yes.
20   Q    What is it?
21   A    It's a withdrawal liability
22   estimate for El Diario.
23   Q    Who or what was El Diario?
24   A    One of the employers to the Pension
25   Fund, NMDU Pension Fund.

ARBITRATION - VOLUME III

1
2  Q    Contributing employer?
3  A    A contributing employer, yes.
4  Q    You see it says in the "from" line,
5  it has your name and Mr. Urbank's name.
6      Do you see that?
7  A    Yes.
8  Q    Did you prepare this with
9  Mr. Urbank?
10  A    Yes.
11  Q    And the first line says, "As
12  requested, we have estimated the potential
13  withdrawal liability for El Diario, an
14  employer of the above fund, assuming
15  withdrawal during the year ended May 31,
16  2011.
17      Do you know who made that request?
18  A    Most probably Murray Schwartz.
19  Q    And why do you answer, "Most
20  probably Murray Schwartz"?
21  A    Because usually he made the
22  requests to us.
23  Q    And when you say "to us," is it to
24  you, to Mr. Urbank, to both of you?
25  A    It could be any combination

ARBITRATION - VOLUME III

1
2  thereof.  Could have been to him, to me.
3  Usually through him most requests were done.
4  Q    Let's go to the -- well, let me ask
5  you:  In this document, is there a reference
6  to shifts anywhere?
7  A    No.
8  Q    Why not?
9  A    Because a payment schedule was not
10  provided.
11  Q    Okay.
12  A    So it was not needed.
13  Q    Okay.  And there are, as I
14  understand from your direct testimony, that
15  there are some situations where you have
16  provided a payment schedule for an estimate,
17  correct?
18  A    Yes.
19  Q    And so how do you determine whether
20  to provide a payment schedule for an
21  estimate?
22  A    We typically don't provide a
23  payment schedule for an estimate unless
24  we're requested to.
25  Q    And who would request you to do

ARBITRATION - VOLUME III

1
2  that with respect to the Pension Fund?
3  A    That would most probably be Murray
4  Schwartz.
5  Q    Now, was the El Diario estimate
6  ever discussed at a Pension Fund meeting?
7  A    I believe this one was discussed at
8  a Pension Fund meeting.
9  Q    Do you know what the nature of the
10  discussion was?
11  A    We reported that the calculation
12  was done.
13  Q    Okay.
14      And was there any discussion at the
15  meeting other than your report?
16  A    My recollection is that after our
17  report, there was further discussion of the
18  possibility of El Diario incurring a partial
19  withdrawal, possibility of it.
20  Q    And what was the nature of that
21  discussion?
22  A    I think there was a discussion
23  about what partials are and how partials
24  could be and mention -- part of the
25  discussion was that you need to track the

ARBITRATION - VOLUME III

1
2  shifts to see if there is a 70 percent
3  decline in the base units to see if a
4  partial possibly occurred.
5  Q    Were you given the assignment to
6  track -- to determine whether partial
7  withdrawal occurred?
8  A    No.
9  Q    Who was given that assignment?
10  A    I don't know if anyone was given
11  the assignment to determine whether it
12  occurred.  I think it was just noted that
13  the shifts need to be kept track of to see
14  if there is a possibility.
15  Q    Okay.  And did the Segal Company
16  track shifts?
17  A    No.  We don't have that
18  information.
19  Q    And who would have that
20  information?
21  A    The Fund office would have that
22  information.
23  Q    Turn to Exhibit 99.
24      Do you have that?
25  A    Yes.

ARBITRATION - VOLUME III

1
2    Q    And you see that -- well, why don't
3    you tell us what that is.
4    A    An estimate for withdrawal
5    liability for Raritan Periodical Sales.
6    Q    And did you participate in doing
7    this estimate?
8    A    Yes.
9    Q    And if you see in the second
10   paragraph, it says, "The payment schedule
11   reflects the average annual shifts of 39,022
12   in the highest rate consecutive years."
13         Do you see that sentence?
14   A    Yes.
15   Q    Why did you include that sentence
16   in the memo?
17   A    Because a payment schedule was
18   done, and we were just showing how it was
19   done.
20   Q    Okay.
21         Now, on the second page, do you see
22   that it says "cc co-counsel"?
23   A    Uh-huh.
24   Q    Who was co-counsel at the time of
25   this was prepared?

ARBITRATION - VOLUME III

1
2    A    This Fund has had so many changes
3    in co-counsel over the years, I'm not even
4    sure who co-counsel was in '96.
5    Q    Did either of the co-counsel of the
6    Fund raise a question to you about why you
7    use shifts to do the schedule?
8    A    No.
9    Q    Did Mr. Schwartz raise a question
10   to you as to why you use shifts to do the
11   schedule?
12   A    No.
13   Q    Let's go to Exhibit 100.
14         And can you tell me what this is?
15   A    A calculation for the actual
16   withdrawal for the Daily Racing Form.
17   Q    And who was -- or is the Daily
18   Racing Form?
19   A    They were a contributing employer.
20   Q    You see in the second paragraph
21   there is a discussion about payment schedule
22   of average annual shifts?
23   A    Yes.
24   Q    Why did you do a payment schedule
25   for this calculation?

ARBITRATION - VOLUME III

1
2    A    Because this was an actual
3    withdrawal.
4    Q    Okay.
5         And did Mr. Schwartz ask you why
6    you used shifts to do the payment schedule?
7    A    No.
8    Q    And you see on the second page,
9    there is a "cc to co-counsel."
10   A    Yes.
11   Q    Did either of the co-counsel ask
12   you why you used shifts to do the
13   calculation?
14   A    No.
15   Q    Let's go to Exhibit 101.
16         Can you tell us what this is?
17   A    This is an actual withdrawal
18   liability calculation for Passaic County
19   News and that was an employer to the Fund.
20   Q    And you see that there's a
21   discussion, second paragraph, about a
22   payment schedule?
23   A    Yes.
24   Q    And also a discussion of shifts in
25   that second paragraph?

ARBITRATION - VOLUME III

1
2    A    Yes.
3    Q    And why did you do a payment
4    schedule for this calculation?
5    A    It was an actual withdrawal.
6    Q    Did you get any questions from
7    Mr. Schwartz or co-counsel, who you will see
8    on the second page are copied on this, as to
9    why you used shifts as the contribution base
10   unit?
11   A    No.
12   Q    Let's go to 102, please.
13         Can you tell me what this is?
14   A    This is a report of withdrawal
15   liability for Jalt Corporation.
16   Q    And who is Jalt Corporation?
17   A    That was a contributing employer.
18   Q    Was this an estimate or an actual
19   calculation of liability?
20   A    I think it was an actual.
21   Q    Did you prepare this calculation?
22   A    Yes.
23   Q    If you look through here, if you
24   turn to Page 15 of the document.
25   A    Okay.

1    ARBITRATION - VOLUME III
2    Q    Which happens to be the last page.
3         You see it says at the top, Roman
4    Numeral VI, Payment Schedule.
5    A    Uh-huh.
6    Q    And did you do that calculation?
7    A    Yes.
8    Q    And why did you use shifts to do
9    that calculation?
10   A    Because those are the base units.
11   Q    Did anyone associated with the
12   Pension Fund raise a question to you as to
13   why you used shifts for contribution base
14   units in calculating this payment schedule
15   for Jalt?
16   A    No.
17   Q    Turn to 103.
18        If you look at 103, can you tell me
19   what this is?
20   A    This is a withdrawal liability
21   report for Dow Jones.
22   Q    And what was Dow Jones or is?
23   A    A contributing employer of the
24   Fund.
25   Q    Did Doe Jones actually withdraw

1    ARBITRATION - VOLUME III
2    from the plan?
3    A    I don't think so.
4    Q    How do you know that?
5    A    Because I think they're still a
6    contributing employer, if I remember
7    correctly.
8    Q    Now take a look at Page 11.
9         And you see Roman Numeral V is
10   the --
11        MR. RICHMAN:  The witness can't
12   help the Arbitrator.
13        ARBITRATOR IRVINGS:  No, it's
14   okay.  Page 11.
15        MR. RICHMAN:  You have more
16   than one Page 11?
17        Actually, we do.  That's pretty
18   interesting.  Well, what I'm focused on
19   is 1298.  FUND-1298.
20        So it goes 10, 11, 12, 13, 11.
21   Just to keep everybody on their toes.
22   BY MR. RICHMAN:
23   Q    So did you calculate this payment
24   period?
25   A    Yes.

1    ARBITRATION - VOLUME III
2    Q    And why did you use shifts to
3    calculate the payment period?
4    A    Why?
5    Q    Yes.
6    A    Because it's the base units.
7        ARBITRATOR IRVINGS:  Can I just
8    ask:  How many of these examples, and
9    maybe we can agree that the dialogue
10   would be the same?
11        MR. RICHMAN:  That's the real
12   last one until we go into --
13        ARBITRATOR IRVINGS:  Go ahead.
14        MR. RICHMAN:  Just want to make
15   sure no one misses it.
16   BY MR. RICHMAN:
17   Q    So did anybody associated with the
18   Fund, counsel or Murray Schwartz or anyone
19   from the Fund office, any of the trustees
20   raise a question about the calculation of
21   Dow Jones' withdrawal liability?
22   A    No.
23   Q    Anybody raise a question about
24   calculation of the payment period?
25   A    No.

1    ARBITRATION - VOLUME III
2    Q    All right.  So we are now to
3    The New York Times estimate.  Exhibit 18.
4        MR. RICHMAN:  So we could be
5    going for about 15 minutes or do you
6    want to break now?
7        MR. MILLER:  Maybe we should
8    break now.
9        MR. RICHMAN:  That's fine.
10       ARBITRATOR IRVINGS:  That's
11   fine.  Could we do 45 minutes?
12       MR. MILLER:  Yes.
13       MR. RICHMAN:  Yes.
14   (A luncheon recess was taken at
15   12:44 p.m. through 1:36 p.m.)
16   A F T E R N O O N  S E S S I O N
17       ROSANA EGAN,
18   resumed, having been previously
19   duly sworn, was examined
20   and testified further as follows:
21   CONTINUED CROSS EXAMINATION BY MR. RICHMAN:
22       MR. RICHMAN:  The last document
23   I wanted you to turn to was
24   Exhibit 18.
25       We're back on the record.

1      ARBITRATION - VOLUME III
2  BY MR. RICHMAN:
3      Q    Ms. Egan, before we get to
4  Exhibit 18, have you ever testified before?
5      A    No.
6      Q    Not in an arbitration?
7      A    No.
8      Q    At a court proceeding?
9      A    No.
10     Q    So let's look at Exhibit 18.
11     I think it's been well documented
12  so far that you prepared this estimate,
13  correct?
14     A    Yes.
15     Q    And did you prepare the payment
16  schedule for the estimate?
17     A    Originally, no.
18     Q    Originally, no.  Okay.
19     How did it come that you prepared
20  the payment schedule later?
21     A    We provided a preliminary copy and
22  Murray Schwartz had asked us to include a
23  payment schedule.
24     Q    So I just want to make sure I
25  understood your testimony.  You provided a

1      ARBITRATION - VOLUME III
2  preliminary copy to Mr. Schwartz?
3      A    Mr. Schwartz, yes.
4      Q    And then he asked that you provide
5  a payment schedule?
6      A    Yes.
7      Q    Did you ask the Fund for
8  information to prepare Exhibit 18?
9      A    Yes.
10     Q    And what did you ask for?
11     A    We asked for everything we needed
12  which was contribution information, shifts,
13  base units, contribution rates.  I think
14  that was it.
15     Q    And did you get everything you
16  needed?
17     A    No.
18     Q    What did you need that you did not
19  get?
20     A    We didn't get the contribution rate
21  information.
22     Q    And why was that important for you
23  to get?
24     A    Because to be able to do the
25  payment schedule, you needed contribution

1      ARBITRATION - VOLUME III
2  rate history.
3      Q    Okay.  And, but you asked for that
4  from the Fund?
5      A    Yes.
6      Q    Did anyone in the Fund tell you why
7  they didn't give you that information?
8      A    No.  I didn't get a reason.
9      Q    You just didn't get it?
10     A    I just didn't get it.  I'm trying
11  to remember.
12     Q    I'm sorry?
13     A    I'm trying to remember, recollect
14  the sequence of events.
15     Q    Okay.
16     So let's turn to Page 16 of
17  Exhibit 18, the last page.
18     And you see the note on the bottom?
19     A    Uh-huh.
20     Q    Did you write that?
21     A    Yes.
22     Q    What were you saying in the note?
23     A    The note was attempting to say that
24  these figures were estimated.
25     Q    Okay.

1      ARBITRATION - VOLUME III
2      And what did you actually do, and
3  take it through step by step, to estimate
4  the numbers on this page?
5      A    We knew that the allocation of the
6  wage rate was 6 percent, 6 and a half
7  percent, 7 percent, and 8 percent.
8      So what we did was we took the
9  contribution -- to estimate a payment, we
10  took the contribution information and
11  divided it by that allocation to get -- to
12  simulate kind of a wage, and trying to piece
13  those pieces together come up with what
14  could be an estimate of a payment, an annual
15  payment.
16     Q    And what did you do to piece those
17  pieces together?
18     A    We multiplied the highest in one
19  category by the highest average in the other
20  category to get a similar number that you
21  would get to an annual payment.
22     Q    Okay.
23     Did anybody ask you a question
24  about the note on Page 16?
25     A    No.

ARBITRATION - VOLUME III

1
2   Q    And let's take a look at Exhibit 3.
3       This is the second estimate that
4   you did for The New York Times, correct?
5   A    Yes.
6   Q    And did you have all the
7   information you needed in order to prepare
8   what's been marked Exhibit 3?
9   A    I don't think we had that there,
10  either.
11  Q    And let's just focus in.  What is
12  it that you didn't have?
13  A    The actual contribution rates.
14  Q    Okay.  And you did have shift
15  information?
16  A    Yes.
17  Q    And that's both for doing the
18  calculation for Exhibit 3 and Exhibit 18?
19  A    Yes.
20  Q    And why was it that you couldn't do
21  the calculation without the contribution
22  rate information?
23  A    The same reason for the other one
24  is it's part of the actual calculation.  So
25  we tried to estimate it.

ARBITRATION - VOLUME III

1
2   Q    And did you estimate it in the same
3   fashion as the other one?
4   A    Yes.
5       MR. MILLER:  Thank you.
6       MR. RICHMAN:  Okay.
7   BY MR. RICHMAN:
8   Q    And did you -- for Exhibit 3, did
9   you do a payment schedule initially?
10  A    That, I don't remember exactly.
11  That one, I don't remember.
12  Q    And the note on Exhibit 3 on
13  Page 16, that is the same note from
14  Exhibit 16?
15  A    Basically, yes.
16  Q    And you wrote both?
17  A    Yes.
18  Q    And the purpose of you writing both
19  was the same?
20  A    Yes.
21  Q    Now, let's take a look at
22  Exhibit 1.
23      If you take a look, there is a
24  payment schedule in this exhibit, is there
25  not?  Apparently FUND-743, I'm told.

ARBITRATION - VOLUME III

1
2   A    Yes.
3   Q    And did you have all the
4   information you needed to prepare this?
5   A    Yes.
6   Q    Were you told by anyone at the Fund
7   in preparing Exhibit 1 to use shifts as the
8   contribution base units?
9   A    No.
10  Q    Let me show you what's been marked
11  Exhibit 104.
12      Can you tell us what this is?
13  A    This is a request for information
14  to do a withdrawal liability calculation for
15  Jalt Corporation.
16  Q    And you see in the second
17  paragraph, it says "for the withdrawing
18  employer to determine base units"?
19  A    Uh-huh.
20  Q    And there is a parenthetical inside
21  the parenthetical that says "shifts/hours."
22  A    Uh-huh.
23  Q    What's shifts/hours supposed to
24  mean?
25  A    The shifts is supposed to be the

ARBITRATION - VOLUME III

1
2   base units.
3   Q    Why is the word "hours" in there?
4   A    I think it's because the shifts are
5   a set of hours.  I'm not sure exactly.
6   Q    You see in the cc at the bottom of
7   the letter, there are three lawyers who are
8   cc'ed on that?
9   A    Uh-huh.
10  Q    And one of them is Neil Schelberg?
11  A    Yes.
12  Q    Did any of those lawyers ask you
13  why you needed shifts or hours for
14  contribution base units?
15  A    No.
16  Q    I just want to talk about the
17  investment assumption that you used for the
18  pension plan.
19  A    Oh, okay.
20  Q    I understand from your testimony
21  you used 7 and a half percent and you used
22  7 and a half percent for the investment
23  assumption as far back as you can remember,
24  sitting here today?
25  A    Yes.

Page 654

ARBITRATION - VOLUME III

1
2    Q    So you don't ever remember changing
3    to 7 and a half percent for this Pension
4    Fund?
5    A    We could have, but I don't remember
6    and I'd have to look it up.
7    Q    Okay.  You described briefly in
8    response to questions from Mr. Miller how
9    you chose 7 and a half percent.
10        Was the interest assumption, your
11   best estimate, a single number?
12   A    It's a range of numbers and you are
13   picking a number within a range.
14   Q    Okay.  And where did 7 and a half
15   percent fall within the range that you were
16   picking?
17   A    I'm not sure exactly where.
18   Somewhere in it.  I'm not sure exactly.
19   Q    Do you know whether it was the
20   50th percentile?
21   A    Could have been anywhere between
22   the 25th and the 75th.  I'm not sure
23   exactly.
24   Q    Why do you say the 25th and
25   75th percentile?

Page 655

ARBITRATION - VOLUME III

1
2    A    It's an educated guess here.
3    Q    Okay.
4        But why did you -- you said it
5    could have been between the 25th and the
6    75th percentile --
7    A    Because I didn't think it was the
8    top or the bottom.
9    Q    Do you know whether 6 and a half
10   percent would have been a reasonable
11   investment assumption for this Fund?
12   A    It could be, without looking at it.
13   It could be.
14   Q    Do you know the percentage of
15   multiemployer pension plans that use Segal
16   as the actuary?
17   A    My understanding, it's
18   approximately 30 percent in the US.
19   Q    And is that in a certain time
20   period?
21   A    I think that was a survey maybe
22   back in 2011 done.
23   Q    And do you have an estimate as to
24   what percentage of the actuaries at Segal
25   used the Segal blend for withdrawal

Page 656

ARBITRATION - VOLUME III

1
2    liability purposes back in 2011?
3    A    I would say a very large
4    percentage.  Could be at least 80 percent,
5    if not more.  I'm guessing.
6    Q    We don't want you to guess.
7        Now, there was a period of time the
8    Fund was in the yellow zone, correct?
9    A    Yes.
10   Q    Do you know what the yellow zone
11   is?
12   A    Yes, I do.
13   Q    Could you, just for the record, say
14   what that is?
15   A    It is one of the statuses under the
16   Pension Protection Act that an actuary has
17   to determine that a fund is in if it meets
18   certain triggers.
19   Q    And if you are in the yellow zone,
20   what happens?
21   A    You're what's called endangered,
22   which says you are on the path of becoming
23   an underfunded plan and certain -- then you
24   have to do certain things to try to put
25   yourself back on track.

Page 657

ARBITRATION - VOLUME III

1
2    Q    If you use a 6 and a half percent
3    interest assumption, investment assumption,
4    how would that affect a determination as
5    opposed to 7 and a half percent as to
6    whether this plan was in the green or the
7    yellow zone?
8    A    It would make them more
9    underfunded.  If you had used a lower
10   investment return and everything else was
11   the same, the Fund would be more underfunded
12   and could possibly be in the yellow zone or
13   worse.
14   Q    "Or worse" is?
15   A    Red zone.
16   Q    And what happens if you are in the
17   red zone?
18   A    You have to also try to rectify the
19   problem by building what's called a
20   rehabilitation plan.
21       MR. RICHMAN:  I just want to
22   take one minute.
23       (Pause.)
24   BY MR. RICHMAN:
25   Q    Ms. Egan, can you give us a range

1          ARBITRATION - VOLUME III
2  of what a reasonable estimate would be for
3  an investment assumption for the Pension
4  Fund?
5          MR. MILLER:  Objection.  When?
6          MR. RICHMAN:  Let's take
7  May 31, 2009.
8          ARBITRATOR IRVINGS:  Give me
9  the question again, please.
10  BY MR. RICHMAN:
11      Q    Can you give us a range for what a
12  reasonable estimate would be for an
13  investment assumption for the Pension Plan
14  as of May 31, 2009?
15      A    That's difficult to say without
16  looking at anything.
17          MR. MILLER:  Objection.  Based
18  on what she said, it's necessarily
19  going to be speculation from here on
20  out.
21          ARBITRATOR IRVINGS:  Yeah,
22  doesn't help me.
23          MR. RICHMAN:  Okay.
24      I think that's it.
25          MR. MILLER:  Take five minutes

1          ARBITRATION - VOLUME III
2  and I'll come back for redirect
3  questions.
4          (Pause.)
5          MR. MILLER:  Back on the
6  record.
7      REDIRECT EXAMINATION BY MR. MILLER:
8      Q    Ms. Egan, in the testimony that you
9  just went through with Mr. Richman, I think
10  you testified that there was some
11  correspondence from the Fund that led you to
12  believe that shifts were CBUs.
13          Do you remember that testimony?
14      A    Yes.
15      Q    Can you identify the correspondence
16  from the Fund that led you to believe that
17  shifts were CBUs?
18      A    Whatever information we received
19  from the Fund administrator regarding the
20  base units he would give in shifts.
21      Q    Are you referring to the wage rate
22  information that we previously looked at?
23      A    He would give us shifts when we
24  asked for base units.
25      Q    In connection with your preparation

1          ARBITRATION - VOLUME III
2  of withdrawal liability assessments, did you
3  ask for shifts or did you ask for base
4  units?
5      A    We asked for base units that were
6  shifts.
7      Q    Shifts.  Correct?
8          Correct?
9      A    Yes.  We would say base
10  units/shifts.
11      Q    You would say base units slash
12  shifts?
13      A    Yes.
14      Q    I think you also testified in
15  connection with Mr. Richman's questions that
16  the word or term "shifts" was mentioned at
17  trustee meetings.
18          Do you remember that testimony?
19      A    Yes.
20      Q    Was the discussion or mention of
21  shifts at these meetings discussed in
22  connection with discussion of CBUs?
23      A    There would be for different
24  reasons we'd hear "shifts."  Whatever the
25  discussion was on withdrawal liability or

1          ARBITRATION - VOLUME III
2  the discussion was on audits that were maybe
3  made on an employer on how their
4  contributions were made.
5      Q    So shifts would come up in the
6  discussions about audits of contributions?
7      A    Yes.
8      Q    And in connection with discussions
9  of withdrawal liability, how did the subject
10  of shifts come up?
11      A    Like the one example was El Diario
12  when discussion was had about possible
13  partial withdrawal, there was discussions
14  about tracking the shifts.
15      Q    And that was in connection with
16  El Diario?
17      A    Yes.
18      Q    Do you remember it being in
19  connection with any other employer?
20      A    Not exactly off the top of my head.
21      Q    Now, you were also asked the
22  question about what is your understanding of
23  a contribution rate.
24          Do you remember that?
25      A    Yes.

Page 662

ARBITRATION - VOLUME III

1
2   Q    In your judgment, does a
3   contribution rate have to be expressed as a
4   dollar figure?
5   A    My understanding is that dollars
6   are being put into the Pension Fund.
7   Q    That's not the question I asked.
8       My question was: Is it your
9   understanding that a contribution rate has
10  to be expressed as a dollar figure?
11  A    I would think it would be in most
12  cases.
13  Q    Do you think it has to be in all
14  cases?
15  A    I don't know how else it would be
16  expressed.
17  Q    Okay.
18      So your testimony is you think a
19  contribution rate in all instances has to be
20  expressed as a dollar figure, correct?
21  A    I'm not sure how else it would be
22  expressed.
23  Q    You went through a number of older
24  withdrawal liability assessments and
25  estimates of withdrawal liability with

Page 663

ARBITRATION - VOLUME III

1
2   Mr. Richman.
3       And in those withdrawal liability
4   assessments or estimates in which the
5   payment schedule was based on shifts, the
6   Fund office had provided you with the wage
7   rate information, correct?
8   A    Yes.
9   Q    But in providing the estimates for
10  The New York Times, the Fund office did not
11  provide you with the wage rate information,
12  correct?
13  A    Yes.
14  Q    Why don't you turn your attention
15  to Exhibit 99, which we previously -- which
16  you previously went over with Mr. Richman.
17  It was a withdrawal liability estimate for
18  Raritan.
19      Was this withdrawal liability
20  estimate prepared in connection with a
21  possible partial or a complete withdrawal?
22  A    My understanding, it was a complete
23  withdrawal.
24  Q    And then the very next exhibit is
25  the withdrawal liability calculation for the

Page 664

ARBITRATION - VOLUME III

1
2   Daily Racing Form.
3       Was that a partial or complete
4   withdrawal?
5   A    Which exhibit?
6   Q    Daily Racing Form is 100.
7   A    Oh, okay.
8       My understanding, this is a
9   complete withdrawal.
10  Q    And the very next exhibit is
11  Passaic County News. Obviously, that would
12  be Exhibit 101.
13      And was that withdrawal liability
14  calculation based on a partial or a
15  complete?
16  A    My understanding, it's a complete.
17  Q    In fact, in connection with all of
18  the withdrawal liability estimates or
19  assessments that you went through other than
20  El Diario, all of them related to complete
21  withdrawals, correct?
22  A    Yes.
23  Q    And in the context of a complete
24  withdrawal, the only consequence to the
25  withdrawing employer of using shifts as CBUs

Page 665

ARBITRATION - VOLUME III

1
2   as opposed to wages would be in connection
3   with the payment schedule calculation,
4   correct?
5   A    Yes.
6   Q    But in connection with a potential
7   partial withdrawal based on a 70 percent
8   decline, the use of shifts as opposed to
9   total wages could indeed determine whether
10  there was a partial withdrawal, correct?
11  A    Under the 70 percent decline?
12  Q    Yes.
13  A    Yes.
14  Q    So in the context of a partial
15  withdrawal, use of shifts as opposed to
16  wages as CBUs had a much greater
17  consequence, correct?
18  A    Yes.
19  Q    Getting back to complete
20  withdrawals and the determination of a
21  payment schedule in connection with a
22  complete withdrawal, do you know whether the
23  consequence of using shifts rather than
24  wages as CBUs would be more or less helpful
25  to the employer in connection with the

ARBITRATION - VOLUME III

1    payment schedule?
2        A    I have no idea, more or less.
3        Q    And by "more or less," I meant,
4    would it result in a higher quarterly
5    payment or a lesser quarterly payment?
6            ARBITRATOR IRVINGS:  I'm not
7        understanding the question.  Take me
8        through it again.
9            MR. MILLER:  Sure.
10   BY MR. MILLER:
11       Q    In connection with the development
12   of a quarterly payment schedule, that
13   payment schedule has to necessarily be based
14   on CBUs, correct?
15       A    Uh-huh.
16       Q    And do you know whether use of
17   shifts as opposed to wages would ordinarily
18   in connection with this Fund result in a
19   higher or a lower quarterly payment amount?
20       A    I don't know that I could tell it
21   would be one direction or the other.
22       Q    Okay.
23            Now let's turn to Exhibit 107,
24   which is the withdrawal liability for

ARBITRATION - VOLUME III

1    El Diario which you briefly discussed.
2            And am I correct that withdrawal
3    liability calculation for El Diario was in
4    the context of a possible partial
5    withdrawal?
6        A    Well, no, it was a calculation.  We
7    were asked just to do a complete withdrawal.
8        Q    But you referred to a trustees
9    meeting in which the subject of a partial
10   withdrawal by El Diario did come up,
11   correct?
12       A    Yes.
13       Q    And that discussion at that
14   trustees meeting about a possible partial
15   withdraw was in connection with a partial
16   withdrawal relating to a 70 percent decline
17   in CBUs, correct?
18       A    Whether they thought the 70 percent
19   decline was a possible reason, I don't know,
20   but it was brought up that the shifts should
21   be looked at.  And that's what you would do
22   when you do a 70 percent decline.
23       Q    And, indeed, you testified that
24   there was a discussion at that trustees

ARBITRATION - VOLUME III

1    meeting about the need to track shifts,
2    correct?
3        A    Yes.
4        Q    Did Mr. Urbank attend that trustees
5    meeting?
6        A    Most probably.
7        Q    Were minutes taken at that trustees
8    meeting?
9        A    I would expect them to be.
10       Q    Do you have any reason to believe
11   that minutes were not taken at that trustees
12   meeting?
13       A    I have no reason to believe they
14   weren't.
15       Q    Finally, I want to discuss your
16   testimony with Mr. Richman regarding the
17   investment return assumption of 7.5 percent.
18            Am I correct that you discussed
19   that -- strike that.
20            Am I correct that the 7.5 percent
21   investment return assumption fell within a
22   best estimate range?  Was that your
23   testimony?
24       A    That when we're doing our analysis,

ARBITRATION - VOLUME III

1    it's a range that you are looking at and you
2    are picking a number in the range.
3        Q    In connection with the selection of
4    the 7.5 percent, did you select that percent
5    within a range?
6        A    At that point in time, yes.
7        Q    So did you actually calculate a
8    best estimate range?
9        A    I don't remember off the top of my
10   head exactly what happened in 2011 as far as
11   exact calculation.
12       Q    So you can't remember whether, in
13   fact, you calculated a best estimate range
14   and then selected 7.5 percent from within
15   that range, correct?
16       A    There's an analysis done and
17   whether we determined a specific range,
18   whether a specific exact range was
19   determined, I can't say exactly what the
20   range was.
21       Q    So I want to see if I can get the
22   record clear on this.
23            Am I correct that you cannot
24   remember whether you either calculated a

Page 670

ARBITRATION - VOLUME III

1  range and then selected 7.5 percent within
2  that range or merely selected 7.5 percent as
3  the best estimate, correct?
4      A    Say that again.
5      Q    Am I correct that you cannot
6  remember whether you either calculated a
7  range and then selected 7.5 percent within
8  that range or merely selected 7.5 percent as
9  your best estimate?
10     A    In 2011?
11     Q    Yes.
12     A    Yes.
13     Q    Yes, meaning you can't remember?
14     A    Yes.
15         MR. MILLER:  Mr. Arbitrator, I
16 do not have any additional questions.
17         But I do want to advise you and
18 Mr. Richman that in all probability,
19 we're going to file a motion to strike
20 Ms. Egan's testimony respecting what
21 occurred at that trustees meeting
22 involving the discussion of El Diario on
23 the ground that we requested minutes that
24 would have encompassed the minutes of

Page 671

ARBITRATION - VOLUME III

1  that meeting.  And we were not provided
2  those minutes, nor were we provided with
3  a list of attorney/client protected
4  information.
5         So we may well file a motion to
6  strike and I'll lay it all out for you,
7  and then the Fund can obviously reply in
8  due course.
9         MR. RICHMAN:  If he wants to
10 file a motion to strike, I can't stop
11 him.
12         But the minutes were not provided.
13 The fact is that both parties were asked
14 to provide minutes, and I'm happy to
15 address this in a response to his motion.
16 It's probably better than doing it right
17 now while we have an hour and a half
18 left.
19         ARBITRATOR IRVINGS:  That's
20 fine.
21         Thank you.
22         MR. MILLER:  Thank you.
23         ARBITRATOR IRVINGS:  Do you
24 have anything further?

Page 672

ARBITRATION - VOLUME III

1         MR. RICHMAN:  No, I don't.
2         So we had a discussion with you
3  about Ms. Albergo, and what you said
4  during that conference call was that at
5  that point in time that you were not
6  going to issue a Subpoena for
7  Ms. Albergo, that it could be -- and your
8  words were "revisited" and that you
9  suggested that the parties attempt to
10 work out a stipulation to avoid the
11 necessity to bring in Ms. Albergo.
12        And what we did is Mr. Miller or
13 his group gave us a stipulation.  We
14 provided a counter-stipulation.  No one
15 is going to be shocked to hear that the
16 stipulations didn't match up and didn't
17 deal with an issue that we would like her
18 to testify about.
19        What I offered to Mr. Miller about
20 right after the last hearing date, I said
21 to him -- and I actually wrote a letter,
22 so we'll get the letter and have it
23 exactly.
24        So the essence of the letter is we

Page 673

ARBITRATION - VOLUME III

1  have six weeks before March 26th, and
2  you can go, if you want to depose
3  Ms. Albergo, we have found her now and
4  we'll attempt to make her available to
5  you for a deposition.  And what it says
6  specifically -- and this is an e-mail on
7  2-12-2015.  And part of it is an e-mail
8  from --
9         ARBITRATOR IRVINGS:  Let me ask
10 you because I'm getting anxious.  We
11 have her here.  Is there any chance
12 we can do this by phone tomorrow?
13        MR. RICHMAN:  Yes.
14        MR. MILLER:  Yes.
15        MR. RICHMAN:  Not tomorrow.
16        MR. MILLER:  I'm available
17 Thursday.
18        MR. RICHMAN:  The rest of the
19 week I'm toasted.  And I mean
20 toasted.
21        ARBITRATOR IRVINGS:  When can
22 you do it?
23        MR. RICHMAN:  I can do it next
24 week.  Monday.

Page 674

ARBITRATION - VOLUME III

1    ARBITRATION - VOLUME III
2        MR. MILLER:  Monday.
3        ARBITRATOR IRVINGS:  I think
4    Monday works for me.
5        MR. MILLER:  Let's make it 4:30
6    on Monday.
7        ARBITRATOR IRVINGS:  Just send
8    me the documentation.  You don't need
9    cover e-mails.  We'll do it on the
10   phone.
11       ETHAN EMANUEL KRA,
12          having been first duly
13      affirmed by Arbitrator Irvings, was
14      examined and testified as follows:
15   DIRECT EXAMINATION BY MR. RICHMAN:
16   Q    Can you state your full name for
17   the record, please.
18   A    Ethan Emanuel Kra.
19   Q    Can you give us a brief review of
20   your work history?
21   A    Working backwards, I'm currently
22   the principal of Ethan E. Kra Actuarial
23   Services LLC since September 2011.
24       Previous to that, I was with Mercer
25   which underwent various names over a

Page 675

ARBITRATION - VOLUME III

1    ARBITRATION - VOLUME III
2    34-plus-year period.  I was with them from
3    May of 1977 through August of 2011.  During
4    the last 17 and a half years, I was the
5    chief actuary of the US retirement business.
6    And my last title was senior partner.
7        Prior to that, I was with
8    Prudential Insurance Company of America for
9    just under four years.
10       Prior to that, I was in graduate
11   school at Yale University where I also
12   taught calculus.
13   Q    Okay.
14   A    I don't think you want anything
15   further back.
16   Q    No, I don't want to know any lawn
17   mowing jobs.
18       Can you give the Arbitrator a brief
19   discussion of your education.
20   A    Bachelor, BA, MA, MPhil and Ph.D.,
21   all in mathematics from Yale University,
22   summa cum laude and phi beta kappa honors
23   with exceptional distinction in mathematics.
24       Then I became a fellow of the
25   Society of Actuaries.  A member of the

Page 676

ARBITRATION - VOLUME III

1    ARBITRATION - VOLUME III
2    American Academy of Actuaries and enrolled
3    actuary under ERISA.  Fellow of the
4    Conference of Consulting Actuaries.  A
5    Chartered Enterprise Risk Analyst.  And
6    recently became a fellow of the College of
7    Pension Actuaries of ASPPA.
8    Q    Is that it?
9    A    Well, there were a few others, but
10   we can leave them out.
11   Q    Have you worked with multiemployer
12   pension plans?
13   A    Yes.
14   Q    And can you give us a brief
15   discussion of plans that you worked with?
16   A    I worked on the United Mine Workers
17   1950 plan and 1974 plan, both pension plan
18   and the health and welfare fund back
19   starting in around 1978 or so,
20   78/'79 through somewhere around 1984.
21       I've worked on the UFCW Local 1262
22   Nonfood Pension Fund for close to a quarter
23   of a century.
24       I worked on the UFCW Local 1262
25   Food Pension Fund for almost a decade.

Page 677

ARBITRATION - VOLUME III

1    ARBITRATION - VOLUME III
2        I worked on the District Counsel 37
3    Culture Institutions Health and Security
4    Trust Fund for about 20 years.
5        I worked on the New York City
6    Carpenters Pension Fund for a number of
7    years.
8        In addition, I advised Mercer's
9    corporate clients on issues dealing with
10   multiemployer pension plans.
11       I also, as chief actuary, was
12   responsible for the internal quality control
13   audits or reviews of the practice around the
14   country, which include auditing of
15   multiemployer pension plan relationships and
16   actuarial work.
17       As chief actuary, I was also
18   responsible for creating some of the
19   intellectual capital relating to Mercer's
20   internal policies on dealing with
21   multiemployer pension plans, among other
22   types of plans.
23   Q    Okay.
24       Now, how many actuaries did Mercer
25   have on the pension side when you were the

1            ARBITRATION - VOLUME III
2  chief actuary or during the time you were
3  the chief actuary?
4      A    Sorry.  I don't have numbers.  I
5  would have to estimate somewhere, in the
6  US-enrolled actuaries, around 400.
7      Q    Okay.
8      A    But that's an estimate.  There were
9  about 4,000 active actuaries in America, and
10 Mercer had about 10 percent of them.
11     Q    Have you testified in withdrawal
12 liability arbitrations previously?
13     A    Yes.
14     Q    Can you just tell us how many
15 without going through them?
16     A    Oh, well, it would help if I could
17 have the list of cases from my report.
18     Q    Okay.  Let me show you Exhibit 11.
19     A    Going down the list --
20     Q    And where are you looking?
21     A    I'm looking at Exhibit C, which is
22 the last two pages of the exhibit, where
23 I've actually testified where there were
24 multiemployer issues involved.
25         If you go down to The Matter of

1            ARBITRATION - VOLUME III
2  Arbitration between Local 863, I testified
3  in an arbitration and that dealt with
4  withdrawal liability.
5         You only want testimony, not
6  depositions, I assume?
7      Q    Anything.
8      A    Waste Management was a deposition
9  dealing with withdrawal liability.
10        On the second page, the second
11 case, Croop, C-R-O-O-P, dealt with
12 withdrawal liability.  I don't recall the
13 details of the case.  It was over a decade
14 ago and it was just an expert report and we
15 never got beyond that.
16        And the last case, Vornado versus
17 Trustees, were affidavits and depositions.
18 I don't believe I was ever deposed.  And
19 that was a case involving withdrawal
20 liability and partition.
21     Q    Now, did you prepare Exhibit 11?
22     A    Yes.
23     Q    And did anyone provide you
24 assistance in preparing Exhibit 11?
25     A    I may have had assistance with

1            ARBITRATION - VOLUME III
2  fixing up some typos, but they didn't catch
3  them all.  And my apologies.  And I did have
4  my report peer-reviewed by a colleague,
5  another actuary.  My policy is that I will
6  not issue a report without having another
7  actuary review the report to make sure it
8  makes sense, holds together.  And he found
9  some -- he did catch some of the typos.
10        He will often point out that
11 something that he reads he doesn't
12 understand why I said and he needs me to
13 clarify it, but there were no substantial
14 changes to this report.
15     Q    Let's take a look at Exhibit 9.
16        Have you seen that before?
17     A    Yes, I have.
18     Q    And what is that?
19     A    That is the Revised Expert Report
20 of Darren French, which I received after I
21 prepared my report.
22     Q    And did you review the revised
23 report of Darren French?
24     A    Yes, I did.
25     Q    And you heard him testify at his

1            ARBITRATION - VOLUME III
2  deposition?
3      A    Yes, I did.
4      Q    And did you hear him testify at
5  this hearing?
6      A    Yes, I did.
7      Q    What is the standard for
8  determining whether actuarial assumptions
9  are appropriate for calculating withdrawal
10 liability?
11     A    If I could refer to my report, I
12 think I cite the relevant section.
13        ERISA 4213, which is cited on
14 Page 6 of my report in Tab 11.
15        Section A describes actuarial
16 assumptions.  And they must be assumptions
17 and methods which in the aggregate are
18 reasonable, taking into account the
19 experience of the plan, reasonable
20 expectations which in combination offer the
21 actuary's best estimate of anticipated
22 experience under the plan, or actuarial
23 assumptions and methods set forth in the
24 corporation as regulations for the purpose
25 of determining an employer's withdrawal

ARBITRATION - VOLUME III

1
2 liability.
3     Q    When the term "corporation" is used
4 there, do you know what that refers to?
5     A    The Pension Benefit Guarantee
6 Corporation, an agency of the United States
7 government.
8     Q    Sometimes called the PBGC?
9     A    Yes.
10    Q    And so has the PBGC set forth
11 regulations for determining an employer's
12 withdrawal liability -- for determining the
13 actuarial assumptions and methods used in
14 determining an employer's withdrawal
15 liability?
16    A    Absent a mass withdrawal, they have
17 not issued any regulations for the actuarial
18 assumptions on a withdrawal liability.
19    Q    Does this provision in 4213 -- let
20 me strike that.
21        How are you familiar with
22 Section 4213?
23    A    I had to use that when I was an
24 actuary handling multiemployer pension plans
25 and when I advised corporate clients on

ARBITRATION - VOLUME III

1
2 dealing with multiemployer pension plans
3 when they were looking at withdrawal
4 liability assessments or potential
5 withdrawal liability.
6     Q    Okay.
7        And in your opinion --
8     A    Can I finish?
9     Q    Sorry.
10    A    I also had to read it and learn it
11 when it was enacted because I was working on
12 United Mine Workers at the time and we had
13 to explain and figure out how that would
14 affect that large pension plan.
15    Q    In your opinion, does 4213A require
16 an actuary to use the same interest
17 assumption for calculating withdrawal
18 liability as the assumption for investment
19 returns?
20    A    No.
21    Q    And why not?
22    A    Doesn't say to.  There's nothing
23 there that says to.
24    Q    Now, you mentioned assumptions that
25 are used for calculating withdrawal

ARBITRATION - VOLUME III

1
2 liability.
3        What is the standard with respect
4 to each individual assumption for withdrawal
5 liability?
6     A    Under ERISA, ERISA requires that
7 the assumptions and methods in aggregate are
8 reasonable and in combination of the
9 actuary's best estimate of anticipated
10 experience under the plan.
11        There is no specificity here on
12 individual assumptions.
13    Q    In developing your expert opinion
14 in this case, did you review the assumptions
15 used by the Pension Fund's actuary to
16 calculate withdrawal liability?
17    A    Yes, I did.
18    Q    And what assumptions did you
19 review?
20    A    If you go further into the report,
21 I -- starting on Page 9, I did an analysis
22 of the interest rate used to discount the
23 liabilities.
24        Starting on Page 13, I did an
25 analysis of the Mortality Table.

ARBITRATION - VOLUME III

1
2        On Page 14, I analyze spouse age,
3 in other words, the relative ages between
4 husbands and wives.
5        On that same page I analyzed
6 percent married.
7        And then the other demographic
8 assumptions were analyzed in the aggregate
9 because I did not have enough data about the
10 demographics of this -- the group of
11 participants in this Fund to do a specific
12 analysis, but I was able to analyze them in
13 the aggregate by looking at other
14 information in the actuarial valuation
15 reports.
16        And that's described on Pages 14
17 and 15.
18    Q    Let's see if we can go through the
19 different assumptions that you looked at.
20        You said you looked at the interest
21 assumption.
22    A    Yes.
23    Q    And what was your conclusion about
24 the interest assumption?
25    A    The interest assumption that was

ARBITRATION - VOLUME III

1    used was a blended rate by the actuary,
2    7 and a half percent for some of the
3    liabilities, 5.50/5.02 percent depending on
4    duration for others of the liabilities.
5        I estimated that that assumption
6    even independently would have fallen within
7    the best estimate range required as
8    described in the actuarial literature,
9    actuarial standards of practice and the
10   guidance given by the American Academy of
11   Actuaries Pension Council on selection of
12   economic interest rates and that the
13   assumption was in the best estimate range.
14       I did more analysis and looked at
15   what current interest rates were at that
16   time, market interest rates.
17       And depending where in the risk
18   spectrum one were going to look at the
19   interest rates ranging from Treasuries to
20   corporates, there was somewhere between
21   3 and a half to 7 percent, but more in the
22   middle of that range would have been an
23   interest rate based on relatively risk-free
24   bonds or financial instruments.

ARBITRATION - VOLUME III

1    Q    So you mentioned the phrase "best
2    estimate range" required as described in the
3    actuarial literature, actuarial standards of
4    practice and the guidance given by the
5    American Academy of Actuaries Pension
6    Council.
7        So let's see if we could take these
8    one by one and tell us, if you could tell
9    us, what is the best estimate range required
10   as described in, first, generally, actuarial
11   literature?
12   A    Well, we would start with Actuarial
13   Standard of Practice 27.  I believe it's one
14   of the documents, if we could tell me which
15   number.
16   Q    Ten.
17   A    Ten.
18       On Page 2, Section 2.1, best
19   estimate range is defined for each economic
20   assumption.  "The narrowest range within
21   which the actuary recently anticipates that
22   the actual results compounded over the
23   measurement period are more likely than not
24   to fall."

ARBITRATION - VOLUME III

1        So it's the narrowest range over
2    the measurement period where you have
3    50 percent of the results falling when you
4    do some type of stochastic modeling.
5        And then the practice note issued
6    by the Pension Practice Council of the
7    American Academy of Actuaries actually went
8    through a derivation explaining to the
9    actuaries how this could actually be
10   calculated.
11       And generally --
12   Q    Go ahead.
13   A    And, generally, it's between the
14   25th and 75th percentiles of the
15   distribution stochastic model.
16   Q    And did you participate in that
17   practice note?
18   A    Yes.  My name is actually on the
19   practice note.  I was on the Pension
20   Practice Council at the time.  I don't
21   recall if I was vice-chair or just a member.
22   Q    When you say in general it's
23   between the 25th and 75th percentile,
24   can you explain what that means?

ARBITRATION - VOLUME III

1    A    The fund has different types of
2    investments.  They may have some
3    international equity, domestic large cap,
4    domestic small cap, value funds, growth
5    funds, real estate, money market funds,
6    short-term bond funds, long-term bond funds,
7    international, high risk, all different
8    types of investment classes.  Every
9    investment class.
10       Economists or market specialists
11   based on various models would be able to
12   determine the expected return, the geometric
13   mean of return over a period of time.  Most
14   actuaries would use something like 30 years
15   as the measurement period for the model,
16   some may use 20.
17       And then you have a standard
18   deviation, and that gives a range of
19   results.
20       And then there are correlations of
21   return between the different asset classes
22   so that when some asset classes go up,
23   others will generally go down.  Others will
24   go in sync.

ARBITRATION - VOLUME III

1
2      So a model will have the
3  correlations, the geometric means as well as
4  the standard deviations for the different
5  asset classes and, whether it does it using
6  mathematic formulas or stochastic model,
7  will then model out the range of scenarios
8  that can ensue and rank them from bottom to
9  top.
10     And then you get percentiles.  You
11 find where the 5th percentile is where
12 they're 5 percent below and 95 percent
13 above, and that's the 5th percentile.
14     The 25th percentile is where
15 25 percent are below and 75 percent are
16 above.
17     And the best estimate range is --
18 in the practice note is generally going to
19 be the 25th to 75th percentiles of that
20 range of possible outcomes for the
21 particular asset mix.
22     Q    Okay.  Can you just tell us what a
23 stochastic model is?
24     A    Stochastic model is something where
25 it's equivalent of running a thousand or ten

ARBITRATION - VOLUME III

1
2  thousand scenarios, where you're effectively
3  rolling the dice or taking a random number
4  generated as CBUR (ph.) from the spectrum
5  for each individual outcome such as for the
6  bonds or for the CPI or for the
7  international equities.
8      And then you get one scenario, one
9  model running out for the 30 years.  And
10 then you redo it again on another scenario,
11 and you run all the different scenarios and
12 get the results over a 30-year period, what
13 the compound effect of return is in each one
14 of those scenarios, and then you rank them.
15     And that's the output of a
16 stochastic model.  Sometimes they're called
17 Monte Carlo models.
18     It's a way of looking at the data
19 to see what is the range of possible
20 outcomes.
21     Other times people will do it using
22 the mathematic formulas that could be
23 derived from the different inputs to
24 actually just get it out exactly
25 mathematically.

ARBITRATION - VOLUME III

1
2      There are three different
3  approaches.
4      Q    And, well, I'll tell you what.
5  Let's go to the mortality assumption.
6      You took a look at that.
7      A    Yes.  Page 13.
8      Q    Okay.  And what was your -- without
9  going through your whole report, what was
10 the conclusion you reached?
11     A    The conclusion I had was that for
12 the May 31, 2009 liabilities, they were
13 pretty close.  There were two assumptions,
14 two aspects of the assumption that were off
15 but they were somewhat offsetting.
16     One is it did not reflect the
17 blue-collar nature of the workers which
18 would give us anticipated higher mortality
19 and did not reflect mortality improvements
20 from 2000 to 2009, nor any expected
21 mortality improvements from 2009 to actual
22 experience over the ensuing lifetimes of
23 these individuals.
24     And the two factors of not
25 projecting the mortalities improvements and

ARBITRATION - VOLUME III

1
2  not reflecting the blue collar, I thought it
3  would be pretty close to offsetting each
4  other.  So the Mortality Table was pretty
5  close to spot on.
6      Q    Okay.  And what about the spouse
7  age?
8      A    Spouse age was right in the middle
9  of the age where actuaries have the
10 assumption.  Absent data of the individuals
11 in this plan, I would say it's a very
12 reasonable assumption.
13     Q    And what about percent married?
14     A    Percent married, I believe the
15 actuary understated the percentage married
16 within the population.  Under normal
17 circumstances, that would slightly
18 understate the liabilities.
19     Because this plan has a death
20 benefit with respect to nonmarried
21 individuals, the amount of understatement
22 becomes much smaller, but there is a small
23 understatement of liability.
24     Q    Okay.  And the other demographic
25 assumptions?

ARBITRATION - VOLUME III

1
2  A    When I looked at the history of the
3  demographic experience in the valuation
4  reports over a nine-year period, I had to
5  exclude two of those reports because of
6  extraordinary events that occurred during
7  the year.
8         There were demographic items such
9  as a major shutdown which led to a turnover
10 of population, people terminating employment
11 that would not be in the norm over time.
12        And the other was a death audit
13 where they went through and actually checked
14 to make sure that all the retirees were
15 alive and nobody was cashing checks.  So
16 it's a death audit.
17        And they found a fair number of
18 people who were dead that they did not know
19 they were dead, and as a result the
20 liabilities went down.  So that's a
21 nonrecurring event that the actuary could
22 not anticipate.
23        So excluding those two years and
24 looking at the other seven years, the
25 actuarial demographic experience was very

ARBITRATION - VOLUME III

1
2  close to a wash, which would mean that the
3  assumptions in the aggregate for
4  demographics were pretty close to spot on,
5  with one exception.  There was no allowance
6  for mortality improvements from the date of
7  the valuation to the expected for the rest
8  of the life expectancy of the participants.
9         So to that extent, there was a few
10 percent understatement of plan liabilities.
11 Q    Okay.
12        Did you reach a conclusion as to
13 whether the actuarial assumptions in the
14 aggregate used by the Segal Company to
15 calculate The New York Times' withdrawal
16 liability were reasonable?
17 A    I believe they were reasonable in
18 the aggregate.
19 Q    Now, Mr. French testified that the
20 Segal blend method is unreasonable because
21 it does not use a fund's investment return
22 assumption to calculate withdrawal
23 liability.
24        Do you recall that?
25 A    Yes.

ARBITRATION - VOLUME III

1
2  Q    And it's also in his Exhibit 9 --
3  not his Exhibit 9, in Exhibit 9 which is his
4  report.
5         Do you agree with his opinion?
6  A    No.
7  Q    Why not?
8  A    There's no requirement that the two
9  assumptions be the same.
10 Q    And let's take a look at ASOP 27.
11 A    Which is Exhibit 10?
12 Q    Yes.
13        And can you tell us in looking at
14 the ASOP 27 why it is your opinion that the
15 investment assumption and the interest
16 assumption for calculating withdrawal
17 liability don't need to be the same?
18 A    Well, first of all, ASOP 27 has a
19 Section 3.3, General Considerations.
20        "The actuary should consider the
21 following folks when identifying which types
22 of economic assumptions to use for a
23 specific measurement and when selecting
24 those economic assumptions that will be
25 used, A, the purpose and nature of the

ARBITRATION - VOLUME III

1
2  measurement."
3         So if you have two measurements of
4  the same cash flow stream which have
5  different purposes and different natures,
6  perforce you may have different assumptions.
7  Q    Okay.
8         And how does that apply to the
9  issue of using an interest assumption that's
10 different than the investment return
11 assumption for calculating withdrawal
12 liability?
13 A    When you have withdrawal liability,
14 the withdrawing employer is given a final
15 number with no risk.
16        If the investments underperform,
17 you cannot go back to that withdrawing
18 employer with another bill.
19        If the investment is outperforming,
20 the withdrawing employer gets no credit.
21        But it is a final settlement of an
22 obligation to provide for certain benefits.
23        In an ongoing plan, all of the
24 ongoing employers share in the upside, share
25 in the downside.

ARBITRATION - VOLUME III

1        ARBITRATION - VOLUME III
2       If the fund underperforms, they pay
3  more.  If the fund overperforms, they pay
4  less.  They take risk, they take the
5  benefit.
6       With withdrawal liability, the
7  withdrawing employer has no risk and has a
8  fixed schedule to pay for fixed benefits.
9    Q   And are you familiar with the
10  concept of risk premium?
11    A   Yes.
12    Q   And what is that?
13    A   Risk premium is the higher expected
14  return one gets on risky investments.
15       Equities have higher expected
16  return than bonds.  Equities have higher
17  risk.
18       If you have US Treasuries, ten-year
19  Treasuries, they will pay coupons for
20  ten years and pay off in ten years.  You
21  assume the United States government will not
22  default.  Never has.
23       Equities, stocks go up, stocks go
24  down.  Some companies go out of business.
25  If you bought Enron in 2000, you could paper

1        ARBITRATION - VOLUME III
2  your walls with your stock certificates.
3       So because there's risks, the
4  market demands a higher expected return.
5  Where there's no risk, the marketplace will
6  accept a lower return on the investment.
7       A thousand dollars' worth of stock
8  and a thousand dollars' worth of bonds can
9  both be bought for a thousand dollars.  The
10  bonds have a lower expected return, the
11  stocks have a higher expected return.
12  They're both worth a thousand dollars.
13    Q   Okay.
14       How do you determine what the cost
15  of the price of risk is?
16    A   I don't.  The market does.
17    Q   Okay.  How does it do that?
18    A   Through the marketplace, through
19  the stock markets, the bond markets, Wall
20  Street.
21       So you have an investment, the
22  market equilibrium will set a price for that
23  investment.
24       If you have -- let's compare two
25  bonds, a junk bond and a Treasury.  One's a

1        ARBITRATION - VOLUME III
2  riskier investment than the other.  It has a
3  higher expected return, even after allowing
4  for the default risk.
5       And if you were to take the
6  expected cash flow, adjust it for default on
7  the junk bond and discount that back to
8  today, the Treasury rate, you would get a
9  higher value than the Treasury.  That
10  difference is the risk premium.
11    Q   Okay.
12       Why should employers who withdraw,
13  as I understand from your testimony, not get
14  any benefit from the risk premium?
15    A   A withdrawing employer has not
16  borne the risk, will not pay more if the
17  investments do poorly.
18       If an employer withdrew in 2000,
19  January 1, 2000, and paid its withdrawal
20  liability based on bonds, the fund could
21  have bought bonds and had no risk.
22       If the fund bought equities, the
23  fund had risk and the employers who were
24  continuing to contribute deciding
25  effectively to take that risk, good or bad,

1        ARBITRATION - VOLUME III
2  in fact over the past 15 years, they've lost
3  the bet.
4    Q   Who's lost the bet?
5    A   The ongoing employers have lost the
6  bet and they have to contribute more.
7       Had the market done well, they
8  would contribute less.  They're taking all
9  of the downside for which they get the
10  upside.
11       Otherwise, there's an arbitrage
12  that the exiting employer is benefitting
13  from.
14    Q   Okay.
15       Does the Segal blend penalize
16  withdrawing employer by using a lower
17  interest rate in today's interest rate
18  environment for calculating withdrawal
19  liability?
20    A   I believe the Segal blend method
21  benefits the withdrawing employer because it
22  doesn't use the market interest rate for the
23  entire liability.
24    Q   And why is that?
25    A   Because the Segal blended method in

ARBITRATION - VOLUME III

1
2  The New York Times -- I forgot whether it
3  was 52/48 or 48/52, but for about half the
4  liabilities, it used a market interest rate,
5  and for about half the liabilities, it used
6  the valuation 7 and a half percent interest
7  rate.
8         A fair, equitable settlement would
9  have been using the market interest rate for
10 the entire liability in assessing the
11 withdrawal liability.
12        So Segal actually came up with a
13 lower withdrawal liability than a true
14 market-based calculation.
15        So in the exiting from this Fund,
16 The New York Times was able to put risk on
17 the remaining employers.
18   Q    Okay.
19        Let's take a look at 3.6 of
20 ASOP 27.  That's Exhibit 10.
21   A    Okay.  Page 5?
22   Q    Page 5.  Yes.
23        Are you familiar with 3.6?
24   A    Yes.
25   Q    I'm not going to ask you to read it

ARBITRATION - VOLUME III

1
2  and I'm not going to read it, but can you
3  summarize very briefly what it says?
4    A    It says -- it's discussing the
5  investment return assumption and the
6  discount rate assumption.  Where the
7  investment return anticipates returns on the
8  plan's current and future assets, discount
9  rate is used to determine present values of
10 future payment streams.
11        It says generally but not all
12 cases, the appropriate discount rate is the
13 same as the investment return assumption.
14 There are cases where it will not be.  And
15 this paragraph gives two examples where it
16 may not be, but they are not the exclusive
17 examples.
18   Q    How do you know they are not the
19 exclusive examples?
20   A    First of all, it says for some
21 purposes.  It doesn't say for these purposes
22 or something else exclusively.
23        I mean, if they were the only two,
24 I think the language would have been
25 different.  The drafters of ASOPs are very

ARBITRATION - VOLUME III

1
2  meticulous in their choice of language,
3  having been on one of the committees of
4  ASOPs.  There are a number of ASOPs where my
5  name appears, and I know how careful the
6  committees are in the wordsmithing of these
7  ASOPs.
8         So if it says for some purposes, it
9  does not mean exclusively only for those
10 purposes.
11        Secondly, in Section 3.6.2,
12 construction being the investment return
13 range, it describes two very different
14 methods which can be used.
15        And the cash flow matching method
16 is very comparable to the method I described
17 which would be how I would select the
18 withdrawal liability discount rate.
19        There are a number of situations.
20 For example, FAS 35, Statement of Financial
21 Accounting Standards Number 35, which has
22 subsequently been renumbered and don't ask
23 me the new number, which allows as
24 interpreted by the audit profession either
25 the expected rate of return on assets or a

ARBITRATION - VOLUME III

1
2  settlement of bond-type rate but nothing in
3  between, according to many auditors.
4    Q    Okay.
5         So Mr. French has opined that the
6  use of the investment assumption to
7  calculate withdrawal liability neither
8  advantages or disadvantages a withdrawing
9  employer, or the Fund for that matter,
10 because there is the same chance that the
11 Pension Fund is going to earn an investment
12 return above or below the interest
13 assumption.
14        Do you agree with that statement?
15   A    I unequivocally disagree.
16   Q    And why is that?
17   A    Let's consider May 31, 2009.  And
18 for argument's sake, let's assume that the
19 PBGC rate was the market rate.  And for
20 simplicity, we'll take the 5.50 percent that
21 they used for the first 20 years as if it
22 were for all years.  Not saying that's the
23 number but just for simplicity.
24        That would indicate that you could
25 essentially buy bonds or other defeasance

Page 706

ARBITRATION - VOLUME III

1   ARBITRATION - VOLUME III
2   instruments which could settle the
3   obligation for the portion of the liability
4   attributable to The New York Times.
5       To the extent that you took any
6   other investment portfolio and looked to do
7   the following: I'm going to invest in
8   whatever the Fund is investing in, but I
9   want to buy insurance that covers all of the
10  downside below 5 and a half percent.  What
11  would it cost me?
12      If I were to sell to somebody else
13  all of the upside above 5 and a half percent
14  from this portfolio, the two numbers would
15  exactly balance each other out because
16  that's the marketplace for valuing risk,
17  valuing the variability of investments.
18      So the marketplace price for
19  insuring the 5 and a half percent, given how
20  I'm investing, the market would charge me a
21  price for giving up all of the upside 5 and
22  a half percent, one hundred percent of the
23  upside.
24  Q   I just want to make sure I
25  understand what you are saying.

Page 707

ARBITRATION - VOLUME III

1   ARBITRATION - VOLUME III
2       So is it your testimony that the
3   market would take all of the upside and
4   charge you a price in addition to that?
5   A   The market would charge me all of
6   the upside, and that would equal what I have
7   to pay for all of the downside protection.
8       The two absent frictional costs,
9   brokerage commissions, things like that, the
10  buy/sell spreads, the two would cancel each
11  other out assuming the 5 and a half were the
12  correct marketplace interest rate.
13  Q   And 5 and a half marketplace
14  interest rate for?
15  A   PBGC is indicating that that's the
16  marketplace interest rate for these
17  liabilities at that date.
18  Q   What about a 7 and a half percent
19  assumption?
20  A   If I wanted to buy insurance
21  against everything below 7 and a half and
22  give up everything above 7 and a half, I
23  would give up everything above 7 and a half.
24  And I would have to pay incrementally out of
25  my pocket the difference between the present

Page 708

ARBITRATION - VOLUME III

1   ARBITRATION - VOLUME III
2   value of the cash flow stream at 7 and a
3   half and the cash flow stream at 5 and a
4   half.
5       All of that difference in present
6   value would be the price I would have to pay
7   in addition to the upside above 7 and a half
8   to insure everything below 5 and a half.
9       I'm sorry.  Back up.
10      To insure everything below 7 and a
11  half, I would have to give up all the upside
12  plus pay for the difference between 5 and a
13  half and 7 and a half.  That's what would it
14  cost me to insure the 7 and a half.
15      So I would have to pay, give up all
16  the upside and pay money to guarantee the 7
17  and a half.  So I couldn't buy 7 and a half
18  in the marketplace with no cost.
19  Q   What is a Bader Swap?
20  A   Bader Swap was popularized in
21  literature by Larry Bader, a well-known
22  actuary who spent nine years at Salomon
23  Brothers under Marty Leibowitz, under Henry
24  Kaufman writing research papers.
25      Marty Leibowitz went over

Page 709

ARBITRATION - VOLUME III

1   ARBITRATION - VOLUME III
2   to Tiaa-CREF, and Henry Kaufman was the one
3   who called the market switch in 1982.
4       If I offered to give you a -- if I
5   offer you a 20-year deal, I will give you
6   one hundred percent of return on the S&P 500
7   on a million dollars.
8       In return, you are going to give me
9   one hundred percent of return on one month's
10  Treasuries for 20 years on a million
11  dollars.
12      But, remember, on the S&P that I'm
13  paying you, the market goes down, you gotta
14  pay me.
15      So you are getting the full return
16  on the S&P 500, good or bad, for 20 years.
17      The expectation is, let's for
18  argument sake the S&P's expected to earn
19  8 percent over the next 20 years.  And one
20  month Treasuries, for argument's sake, are
21  not going to be low like they are now but
22  will be 3 percent for the next 20 years.
23      And, further, to make sure this is
24  a good transaction, we each have humongous
25  banks behind us guaranteeing that we'll make

ARBITRATION - VOLUME III

1
2  good on our commitments so it's not a
3  promise that won't be kept.
4          So your expectation is you're going
5  to make $50,000 a year, the difference
6  between 8 percent and 3 percent, over a
7  20-year period on this million-dollar
8  investment.
9          If I offered to enter into this
10 transaction with you, what would you offer
11 to pay me?  Because this transaction is
12 called the Bader Swap.  I will give you the
13 return on one investment, you'll give me the
14 return on another investment.  And it's a
15 20-year deal, we can't get out of it.
16         Most people would say, oh, I'm
17 going to make $50,000 expected a year for
18 the next 20 years, I should pay something
19 for it.  Maybe not the million dollars.
20 Discount it, maybe some discount for risk
21 whatever, but they'll pay me something.
22         The answer is if you are willing to
23 pay me one dollar, you have overpaid because
24 anything you pay me is pure profit, and I
25 can guarantee that contract at zero cost.

ARBITRATION - VOLUME III

1
2  Why?  If I'm going to give you the S&P 500,
3  I'll buy a million dollars' worth of
4  S&P 500.  Whatever returns I give you, you
5  are going to give me one month's Treasuries.
6          I sell one month's Treasuries short
7  for a million dollars, and whatever you give
8  me I pay the short.  Where do I get the
9  money to buy the million dollars for the
10 S&P?  From what I get by selling the
11 Treasuries short.
12         So I'm at no cash Day One.  I'm
13 long S&P, short Treasuries because you are
14 going to pay me to cover the short in the
15 Treasuries.  I'll pay you to cover the long
16 on the S&P.
17         Every time that we have to settle
18 up, whatever you pay me for the Treasuries,
19 I give to the short market.  Whatever I have
20 to pay you on the S&P, I collect from the
21 contract I bought.
22         So I'm just the middleman shuffling
23 money between you and the marketplace.  I
24 can actually put this on autopilot and walk
25 away.  But whatever you paid me Day One, I

ARBITRATION - VOLUME III

1
2  put in my pocket, I walk away, pure profit.
3          The expected return on the S&P is
4  500 basis point greater than the expected
5  return on the one-month Treasuries.
6          Yet ab initio, from Day One, the
7  two have the same value because I can just
8  swap them.
9          After 20 years, ex-ante, you can
10 say, well, based on expected return, you
11 should have done better.  But you had risk
12 where there are years S&P doesn't do as
13 well, and they can be very long periods of
14 time.  From the years 1962 to 1982, the Dow
15 Jones Industrial Average, before dividends,
16 went up 16 percent, less than one percent a
17 year.  Bond prices did much better.
18 Q     Thank you.
19        Let's go to Exhibit 12.
20 A     This is a 2012 Form 5500.
21 Q     And you see this is for the
22 Consolidated Retirement Plan if you look on
23 the front page.
24    A     Yes, it is.  Consolidated
25 Retirement Plan, Line 1A.

ARBITRATION - VOLUME III

1
2  Q     I would like you to take a look --
3  A     Interest rate or the investments?
4  Q     I'm looking at -- if you look at
5  the end of the financials, and it's -- it's
6  right after Page 24.  It says Schedule MB,
7  Line 11, "Justification for change in
8  actuarial assumptions."
9          Do you see that?
10 A     Yes.
11 Q     And looking at that, can you tell
12 us what -- for that year what the interest
13 rate was used to calculate withdrawal
14 liability?
15 A     Yes.
16 Q     And what was that?
17 A     Six percent.  The interest rate
18 used to value vested liability for purposes
19 of withdrawal liability determination was
20 changed to 6 percent.
21 Q     And can you take a look at the
22 Form 5500, the Schedule MB, and tell us what
23 was the interest assumption used for
24 investment returns for that same year?
25    A     On Schedule MB, Line 6D, "Valuation

1        ARBITRATION - VOLUME III
2 liability" --
3       MR. RICHMAN:  Could you hang on
4 a second.  See if we can get
5 everybody there.
6    A   Next page, Line 6D, as in "David."
7 "Valuation liability interest rate, 7 and a
8 half percent preretirement, 7 and a half
9 percent post retirement."
10    Q   Okay.
11      Do you know what the effective
12 interest rate that results from the use of
13 the Segal blended method for calculating
14 The New York Times' withdrawal liability?
15    A   I cannot calculate it exactly
16 because I don't have the data and because I
17 haven't built the entire valuation software.
18      I was able to estimate it by
19 looking at various documents and using
20 various actuarial rules of thumb and
21 estimation procedures.
22      I looked at the liability based at
23 7 and a half percent, and then I looked at
24 the current liability based at another
25 interest rate and determined the effect on

1        ARBITRATION - VOLUME III
2 the liability percentage-wise for every
3 1 percent change in the discounting rate.
4      I also looked at the Segal numbers,
5 at the two different discount rates used in
6 the withdrawal liability, which were the
7 7 and a half percent and the PBGC rates
8 which effectively were between 5.4 and
9 5.5 percent, most of the liabilities at
10 5 and a half.
11      Only those payments that exceed
12 beyond 20 years are being discounted at 5.2
13 but only for the period of 20 years.  The
14 first 20 years of every payment is at 5 and
15 a half percent.
16      So the effective interest rate for
17 the PBGC interest rate calculation was
18 somewhere in the 5.4s.  Looking at the 7 and
19 a half and looking at the differences, I
20 would say that the net effective rate -- the
21 single interest rate that would give the
22 liability used for withdrawal liability was
23 close to 6 and a half percent.
24    Q   Okay.  And let's take a look at
25 Exhibit 71.

1        ARBITRATION - VOLUME III
2    A   Seventy-one.  Red?
3      ARBITRATOR IRVINGS:  You're
4 right.  Red.
5      THE WITNESS:  Which Bates
6 number?
7 BY MR. RICHMAN:
8    Q   FUND-1580.
9    A   This appears to be an exhibit
10 that's attached to the auditor's report.
11    Q   Okay.
12    A   Or, actually, it may be a
13 Schedule H, Line 4(i), or maybe just another
14 exhibit supplement -- well, Page 1579 says
15 Supplemental Information.  And that's
16 dealing with the auditor's report coming
17 right after the notes, so I would infer that
18 these are supplemental information from the
19 auditor's report.
20    Q   We did this math once before, and
21 I'm happy to do it again if you want to go
22 through it.
23      MR. MILLER:  Just summarize the
24 math.  I can always cross-examine him
25 on the math.

1        ARBITRATION - VOLUME III
2      MR. RICHMAN:  I'm good with
3 that.
4      MR. MILLER:  I figured you
5 would be.
6 BY MR. RICHMAN:
7    Q   So I have, if you look on Page 14,
8 and this is as of May 31, 2009.
9      I have 47.14 percent in equities.
10 46.7 percent in fixed income, and
11 6.07 percent in real estate.
12      With that asset mix, is the 7 and a
13 half percent interest assumption a
14 reasonable assumption?
15    A   A 7 and a half percent discount
16 rate or interest assumption, the interest
17 assumption for expected return on assets
18 would fall within the best estimate range
19 within the 25th to 75th percentiles as
20 of that date.
21    Q   And where would it fall in the
22 range?
23    A   It would be approximately the
24 65th percentile as measured by the Mercer
25 Portfolio Return Calculator.

ARBITRATION - VOLUME III

1
2  Q    Can you tell us what the Mercer --
3  A    The Mercer Portfolio Return
4  Calculator.
5  Q    Can you tell us what that is?
6  A    When ASOP 27 that we looked at, the
7  earlier version came out, the Pension
8  Practice Council put out a practice note
9  advising actuaries, helping them deal with
10  the ASOP.
11      At that time, I was the chief
12  actuary of Mercer and I had one of our
13  investment consultants with some analysts
14  put together a tool.  It may have been
15  Excel-based, but it got investment formulas
16  using expected returns, geometric or
17  arithmetic means, standard deviations and
18  correlations to take various asset mixes and
19  determine the percentiles that we discussed
20  earlier.
21      And what I did was I called one of
22  my colleagues who is at Mercer, my successor
23  who is the chief actuary of the US
24  retirement business.  And I asked him to
25  pull up the second calendar quarter 2009

ARBITRATION - VOLUME III

1
2  Mercer Portfolio Return Calculator, the
3  assumptions that would have been used by an
4  actuary at Mercer at that time.
5      The assumptions are updated roughly
6  quarterly.
7      And to put in 47 percent equities,
8  47 percent mixed bonds and 6 percent real
9  estate to assume 20 basis points of
10  investment-related expenses, commissions,
11  buy/sell, trust fees, things like that that
12  reduce an investment return on a portfolio,
13  and to run it.
14      And the results were a 50th
15  percentile of 6.75 percent, approximately,
16  and 7 and a half percent was at about the
17  65th to 70th percentile.
18      MR. MILLER:  Mr. Arbitrator,
19  I'm going to object at this point in
20  time.  And it is my opinion that
21  based on Dr. Kra's deposition
22  testimony, what he just testified to
23  as to the results from application of
24  this Mercer Portfolio Calculator were
25  results that he conducted after his

ARBITRATION - VOLUME III

1
2  deposition and after his expert
3  report.
4      And I specifically asked him at his
5  deposition whether his expert report
6  contained all of the opinions that he was
7  going to testify to at this hearing and
8  whether he was going to give any
9  additional opinions.
10      And we can find the deposition
11  testimony, but Dr. Kra testified at that
12  time that his expert report contained all
13  of his opinions.
14      If, in fact, the application of
15  this Mercer Portfolio Calculator, which
16  he's just testified to, was undertaken
17  after his deposition, I would move that
18  this testimony be struck because we did
19  not have the opportunity to ask him about
20  it at his deposition.  And we're
21  prejudiced by that.
22      This is, I believe, a post expert
23  report and post deposition calculation.
24      MR. RICHMAN:  This is a
25  response to the testimony of the

ARBITRATION - VOLUME III

1
2  expert for The New York Times in
3  terms of his talking about the return
4  as 7 and a half being the number that
5  the actuary chose and, therefore, it
6  was accurate.  And I think it is
7  eminently reasonable to have
8  Mr. Kra -- and it was done, by the
9  way, after his report and his
10  deposition -- to testify about what
11  the rate would be.
12      MR. MILLER:  I would point out
13  that I believe Mr. French said he did
14  not calculate a range in connection
15  with his expert report.
16      But as Mr. Richman just confirmed,
17  all of this was done not merely after
18  deposition and after filing of the expert
19  report and in conflict with his
20  deposition testimony, but apparently it
21  was done just within the last two weeks
22  subsequent to Mr. French's expert
23  testimony in this case.  And it is
24  thereby inherently prejudicial.
25      MR. RICHMAN:  Well, he did,

Page 722

ARBITRATION - VOLUME III

1  Mr. Kra did testify -- Dr. Kra did
2  testify at his deposition with
3  respect to what he thought the rate
4  would be.  And we are just bringing
5  it up right now.
6  ARBITRATOR IRVINGS:  Well, is
7  the issue here the testimony about
8  the overall -- his calculation about
9  a single effective rate would be 6.5
10  or that the 7.5, using the Mercer
11  calculation, would be approximately
12  65 percent?
13  MR. RICHMAN:  Well, his
14  deposition testimony -- here's the
15  deposition testimony, and if you want
16  to read along, it's on Page 167 of
17  Dr. Kra's testimony.
18  The question:  "Fair point.  In
19  that regard, did you do a calculation to
20  convert the liability result that Segal
21  obtained to a single discount rate?
22  "I don't have the data for which to
23  do so."
24  MR. MILLER:  That's not what

*Lines 1-25 renumbered; the above reflects line content.*

Page 723

ARBITRATION - VOLUME III

1  I'm challenging.
2  ARBITRATOR IRVINGS:  Ron, if I
3  might.
4  What I'm understanding, they are
5  not challenging his testimony about the
6  6.5 percent as a single effective rate.
7  They're simply challenging the use
8  of the Mercer scale to place the
9  7.5 percent.  And I'm not sure what that
10  information does for me anyhow.
11  MR. RICHMAN:  Okay.  If it
12  doesn't do anything for you, then I'm
13  not going to press it.
14  MR. MILLER:  Yeah, and we'll
15  move that it be stricken.
16  MR. RICHMAN:  That issue about
17  the Mercer.
18  ARBITRATOR IRVINGS:  The Mercer
19  be stricken.
20  MR. RICHMAN:  Okay.
21  BY MR. RICHMAN:
22  Q    Now, Mr. French testified that he
23  had not developed an opinion as to whether
24  6 and a half percent is a reasonable or was

Page 724

ARBITRATION - VOLUME III

1  a reasonable investment assumption for the
2  Fund at this hearing.
3  Pages 173 to Pages 175 of the rough
4  transcript.
5  And in your opinion, can Mr. French
6  opine on whether the Fund's assumptions for
7  calculating withdrawal liability are
8  reasonable in the aggregate if he doesn't
9  have an opinion as to whether the 6 and a
10  half percent is a reasonable investment
11  assumption for the Fund?
12  A    Let me flesh that out.
13  I believe he testified that he had
14  no difficulty with the demographic
15  assumptions as being reasonable.
16  Given that, it would be impossible
17  actuarially to opine that the assumptions
18  are unreasonable in the aggregate if you
19  have no opinion on the reasonableness of the
20  investment return assumption of the interest
21  rate.
22  MR. RICHMAN:  And we can
23  address it now or we can address it
24  in papers, but we're going to move to

Page 725

ARBITRATION - VOLUME III

1  strike Mr. French's testimony
2  completely because he did not opine
3  on the ultimate question here.
4  ARBITRATOR IRVINGS:  I'm sure
5  I'll be getting motions and
6  responses.
7  MR. MILLER:  You'll be getting
8  responses to said motions.
9  BY MR. RICHMAN:
10  Q    There has been testimony at this
11  hearing about the decline of the industry in
12  which the participants of the Pension Fund
13  participate.
14  And what effect, if any, should the
15  client of the industry have on an actuary's
16  choice of an interest assumption for
17  calculating withdrawal liability?
18  A    As the population declines, you
19  have fewer and fewer bodies over which to
20  spread or amortize the losses resulting from
21  adverse fluctuations.
22  So if you have a large asset pool
23  and only a handful of people and you lose
24  20 percent in the market one year and you

ARBITRATION - VOLUME III

1
2  don't recover for quite some time, and as a
3  result you have to contribute more money to
4  the pension plan to amortize those losses,
5  if you have very few people, that would
6  require a humongous contribution increase.
7  It increases the risk to the plan to the
8  point where the plan could no longer perhaps
9  either increase contributions adequately and
10 the plan could go bankrupt.
11          So as the number of contributing --
12 participants for whom contributions are
13 being made shrinks, the risk to the plan
14 increases.  And as a result, at some point
15 trustees would have to derisk in some
16 respects.
17          And, in fact, I think I even had a
18 comment about that in my report.
19     Q    You did.
20     A    On Page 12 of my report,
21 Paragraph 42, "As of May 31, 2008, there
22 were 1.28 nonactives," meaning retirees of
23 vested returns -- "per active.  As of
24 May 31, 2010, only two years later, that
25 ratio skyrocketed to 2.11, a 65 percent

ARBITRATION - VOLUME III

1
2  increase."
3          So now instead of every active
4  participant covering all of the liabilities
5  and gains and losses with respect to that
6  person plus one and a quarter retirees, that
7  active person had to cover themselves plus
8  over two retirees or vested returns.
9          And that means there were
10 substantially more risk, and the plan really
11 has to take note of that.
12     Q    Okay.
13          If you were the enrolled actuary
14 calculating the withdrawal liability for
15 The New York Times, what interest assumption
16 would you have used?
17     A    I would have used a bond-type
18 interest rate for all of the liabilities.
19 If I were using the PBGC interest rates for
20 all of the liabilities, the effective rate
21 would have been somewhere about 5.4,
22 something in that range.
23          It would have been a relatively
24 risk-free rate.  It might have -- depending
25 on the plan, I might have used PBGC.  I

ARBITRATION - VOLUME III

1
2  might have used Treasuries.  I would have to
3  look at the duration of liabilities, the
4  nature.  But it would have been something in
5  the 4s or 5s for the interest rate.
6          MR. RICHMAN:  I have no further
7  questions.
8          ARBITRATOR IRVINGS:  Okay.  Let
9  me ask you this.  Let's try and
10 introduce some level of reality here.
11          I hate to say, you know, this is as
12 we say in Boston, it's a shocka (ph.)
13 that it's here and 20 of 4.
14          Realistically, how long do you
15 think cross examination is going to take?
16          MR. MILLER:  Realistically, at
17 least an hour and a half if not two
18 hours.
19          ARBITRATOR IRVINGS:  There we
20 go.  So it doesn't make any sense for
21 me to start this now.
22          MR. MILLER:  I understand.
23          ARBITRATOR IRVINGS:  We can go
24 off the record.
25          We're done for the day.

ARBITRATION - VOLUME III

1
2          (Pause.)
3          ARBITRATOR IRVINGS:  Are you
4  available the next day of -- the
5  26th?
6          MR. MILLER:  I'm on the West
7  Coast Monday, Tuesday, Wednesday that
8  week at an arbitration.  At best, I
9  can come back on the red eye, so I
10 would not want to do it first thing
11 in the morning.
12          If you have another witness to do
13 --
14          MR. RICHMAN:  Yeah, we can go
15 to Urbank.  We have to finish Urbank.
16          And then we can get in -- finish
17 Urbank and Lewis and Barbara.
18          ARBITRATOR IRVINGS:  That would
19 be decided -- are you going to go one
20 day or two days?
21          Is your mediation in New York?
22          MR. RICHMAN:  Is it someplace
23 good?
24          MR. MILLER:  Boston.
25          ARBITRATOR IRVINGS:  So we can

ARBITRATION - VOLUME III

1  
2  start at 9:00 on the 26th.
3      MR. RICHMAN:  Right.
4      ARBITRATOR IRVINGS:  Where are
5  we in Urbank's testimony?
6      MR. MILLER:  I think we are
7  pretty close to done.
8      We have about an hour or so, say an
9  hour and a half to complete cross and
10 redirect.
11     What do you think?
12     ARBITRATOR IRVINGS:  Okay.  So
13 then who else do you have?
14     MR. RICHMAN:  We're going to
15 have to deal with that issue on
16 Monday.
17     We also have an issue with respect
18 to if it's decided we don't need to bring
19 in other contributing employers or
20 representatives of contributing
21 employers, but we have collective
22 bargaining agreements that have been
23 objected to on relevance grounds.
24     And my suggestion would be we each
25 argue relevance in the brief, and you'll

ARBITRATION - VOLUME III

1  
2  tell us it's not relevant and we'll tell
3  you why it is relevant.
4      MR. MILLER:  It's beyond that.
5      Mr. Arbitrator, if you recall, you
6  had indicated prehearing conflicts that
7  to the extent that you wanted us to bring
8  in representatives of other contributing
9  employers, we needed to identify who they
10 were and make offers the conclusion of
11 the second day of the hearing if there is
12 a predicate issue.
13     MR. RICHMAN:  Well, we can also
14 bring in Mr. Costello who is on our
15 list who is a fund administrator, but
16 I think it's a ridiculous waste of
17 time.
18     The collective bargaining
19 agreements of other contributing
20 employers --
21     MR. MILLER:  Which I don't
22 think are relevant.
23     MR. RICHMAN:  So we'll argue
24 about relevance.
25     The collective bargaining

ARBITRATION - VOLUME III

1  
2  agreements all have the same language.
3      MR. MILLER:  No, they don't.
4      MR. RICHMAN:  Well --
5      MR. MILLER:  They don't.
6      MR. RICHMAN:  The key language
7  is all the same.
8      MR. MILLER:  And we certainly
9  don't know the procedures by which
10 other employers made their
11 contributions and the relevant
12 statements that they made from those
13 other employers that they understood
14 the operative language to be.  And I
15 just quickly blurted out, "No, those
16 bargaining agreements are not all the
17 same."
18     So it just opens up an enormous can
19 of worms.
20     And the reality is that if Ron had
21 wanted to have testimony from other
22 contributing employers, there was an
23 opportunity earlier in this case to
24 identify who he wants his potential
25 witnesses to be and we could have deposed

ARBITRATION - VOLUME III

1  
2  them and addressed that here, but the
3  time for that has passed.
4      And as it relates to the relevance
5  question, we believe that certainly the
6  documents --
7      MR. RICHMAN:  Excuse me --
8      MR. MILLER:  -- has no
9  relevance.
10     MR. RICHMAN:  Look, the answer
11 is pretty simple.  The documents will
12 speak for themselves.  There's not an
13 issue about whether they're authentic
14 or not.  Part of what The Times has
15 been saying is, oh, okay, so you did
16 all these calculations for withdrawal
17 liability for all these other folks
18 but that wasn't for The New York
19 Times.  And to the extent -- and the
20 arbitrator will get to see the
21 language -- to the extent the
22 language is the same in the relevant
23 portions that deals with that issue.
24     It is -- there is no prejudice to
25 anybody to have these collective

Page 734

ARBITRATION - VOLUME III

1   bargaining agreements come in and
2   everybody argue about why the language --
3   that certain language is different and
4   that's relevant or the language is the
5   same as the relevant language; that's the
6   point here.
7       MR. MILLER:  And our view is
8   the documents do not speak for
9   themselves.
10      Indeed, the reason we're having
11  this hearing is to try to ascertain what
12  the meaning of The New York Times
13  relevant bargaining agreement language
14  was.  We need to know what the process
15  was for making contributions that these
16  other employers may have engaged in, we
17  need to have testimony from other
18  employers about their understanding.
19      It is a dramatic expansion at this
20  late date and I think at great prejudice
21  to The Times to either let the documents
22  in without that context going in
23  directly.  And to the extent that that
24  context would be developed, it would

Page 735

ARBITRATION - VOLUME III

1   expand this hearing in a dramatic
2   fashion.  And the time for making that
3   position --
4       ARBITRATOR IRVINGS:  The
5   evidence we looked at the letters,
6   for example, breakdown
7   for competitors' relationships, isn't
8   it arguably in your interest to see
9   what the language says?
10      MR. MILLER:  Well, most of the
11  bargaining agreements that are on the
12  objections that Mr. Richman wants to
13  have come in are not related to those
14  withdrawal liability assessments.
15  They're from other contributing
16  employers.  And we will make
17  arguments in our briefs about the
18  assessments and the relevance and
19  weight you should give to those
20  assessments as a consequence of not
21  having the appropriate testimony.
22      ARBITRATOR IRVINGS:  Are these
23  collective bargaining agreements and
24  employers about whom I have no other

Page 736

ARBITRATION - VOLUME III

1   evidence?
2       MR. RICHMAN:  There are some.
3   And there are those that are for the
4   contributing employers for whom there
5   is evidence.
6       ARBITRATOR IRVINGS:  Okay.  So
7   let me say this:  I would take the
8   collective bargaining agreement
9   exhibits and employers about which
10  the calculations were done, but I'm
11  not going to start expanding it for
12  ones I don't have any other evidence
13  on.
14      MR. RICHMAN:  Okay.
15      MR. MILLER:  That's fine.
16
17
18
19
20
21
22
23
24
25      $$$$$$$$$$$$$

Page 737

ARBITRATION - VOLUME III

1       I'm on the West Coast Monday,
2   Tuesday, Wednesday that week at an
3   arbitration.  At best, I can take the red
4   eye, so I would not want to do it first
5   thing in the morning.
6       If you have another witness --
7       MR. RICHMAN:  We can go to
8   Urbank.  We have to finish Urbank.
9       And we can get in -- finish
10  Urbank and Lewis and Barbara.
11      MR. MILLER:  That would be
12  decided -- are you going to go one
13  day or two days?
14      MR. RICHMAN:  Is your mediation
15  in New York?  Is it someplace good?
16      MR. MILLER:  Boston.
17      ARBITRATOR IRVINGS:  So we can
18  start at 9:00 on the 26th.
19      MR. RICHMAN:  Right.
20      ARBITRATOR IRVINGS:  Where are
21  we in Urbank's testimony?
22      MR. MILLER:  I think we are
23  pretty close to done.
24      We have about an hour or so, an

1    ARBITRATION - VOLUME III
2  hour and a half to complete cross and
3  redirect.
4      What do you think?
5      ARBITRATOR IRVINGS:  Okay.  Who
6  else do you have?
7      MR. RICHMAN:  We're going to
8  have to deal with that issue on
9  Monday.
10     We also have an issue with respect
11 to if it's decided we don't need to bring
12 in other contributing employers or
13 representatives of contributing
14 employers, but we have collective
15 bargaining agreements that have been
16 objected to on relevance grounds.
17     And my suggestion would be we each
18 argue relevance in the brief and you'll
19 tell us it's not relevant and we'll tell
20 you why it is relevant.
21     MR. MILLER:  It's beyond that.
22     Mr. Arbitrator, if you recall, you
23 had indicated prehearing conflicts that
24 to the extent that you wanted us to bring
25 in representatives of other contributing

1    ARBITRATION - VOLUME III
2  employers, we needed to identify who they
3  were and by the second day of the hearing
4  if there is a predicate issue.
5      MR. RICHMAN:  Well, we can also
6  bring in Mr. Costello who is on our
7  list who is a fund administrator, but
8  I think it's a ridiculous waste of
9  time.
10     The collective bargaining
11 agreements of other contributing
12 employers --
13     MR. MILLER:  Which I don't
14 think are relevant.
15     MR. RICHMAN:  So we'll argue
16 about relevance.
17     The collective bargaining
18 agreements all have the same language.
19     MR. MILLER:  No, they don't.
20     MR. RICHMAN:  Well, --
21     MR. MILLER:  They don't.
22     MR. RICHMAN:  The key language
23 is all the same.
24     MR. MILLER:  And we certainly
25 don't know the procedures by which

1    ARBITRATION - VOLUME III
2  other employers made their
3  contributions and the relevant
4  statements that they made from those
5  other employers that they understood
6  the operative language to be and I
7  just quickly blurted out "no, those
8  collective bargaining agreements are
9  not all the same."
10     So it just opens up an enormous can
11 of worms.
12     And the reality is that if Ron had
13 wanted to have testimony from other
14 contributing employers, there was an
15 opportunity earlier in this case to
16 identify who he wants his potential
17 witnesses to be and we could have deposed
18 them and addressed that here, but the
19 time for that has passed.
20     And as it relates to the relevance
21 question, we believe that certainly the
22 documents --
23     MR. RICHMAN:  Excuse me --
24     MR. MILLER:  -- has no
25 relevance.

1    ARBITRATION - VOLUME III
2      MR. RICHMAN:  Look, the answer
3  is pretty simple.  The documents will
4  speak for themselves.  There's not an
5  issue about whether they're authentic
6  or not.  Part of what The Times has
7  been saying is, oh, okay, so you did
8  all these calculations for withdrawal
9  liability for all these other folks
10 but that wasn't for The New York
11 Times.  And to the extent -- and the
12 arbitrator will get to see the
13 language -- to the extent the
14 language is the same in the relevant
15 portions that deals with that issue.
16 It is -- there is no prejudice to
17 anybody to have these collective
18 bargaining agreements come in and
19 everybody argue about why the
20 language -- that certain language is
21 different and that's relevant or the
22 language is the same as the relevant
23 language; that's the point here.
24     MR. MILLER:  And our view is
25 the documents do not speak for

ARBITRATION - VOLUME III
themselves.

Indeed, the reason we're having this hearing is to try to ascertain what the meaning of the New York Times relevant bargaining agreement language was. We need to know what the process was for making contributions that these other employers engaged in, we need to have testimony from other employers about their understanding.

It is a dramatic expansion at this late date and I think at great prejudice to the Times to either let the documents in without that context going to the director. And to the extent that that context would be developed, it would expand this hearing in a dramatic fashion. And the time for making that position --

ARBITRATOR IRVINGS: For example, breakdown for competitors' relationships, isn't it arguably in your interest to see what the language says?

ARBITRATION - VOLUME III
MR. MILLER: Well, most of the bargaining agreements that are on the objections that Mr. Richman wants to have come in are not related to those withdrawal liability assessments. They're from other contributing employers. And we will make arguments in our briefs about the assessments and the relevance and weight you should give to those assessments as a consequence of not having the appropriate testimony.

ARBITRATOR IRVINGS: Are these collective bargaining agreements and employers about whom I have no other evidence?

MR. RICHMAN: There are some. And there are those that are for the contributing employers for whom there is evidence.

ARBITRATOR IRVINGS: Let me say this: I would take the collective bargaining agreement exhibits and employers about which the

ARBITRATION - VOLUME III
calculations were done, but I'm not going to expand it for ones I don't have any other evidence on.
MR. RICHMAN: Okay.
MR. MILLER: That's fine.

(Whereupon, the proceedings were adjourned at 3:54 p.m.)

ARBITRATION - VOLUME III
I N D E X
PAGE

WITNESS: ROSANA EGAN
Continued Direct Examination by Mr. Miller    505
Cross Examination by Mr. Richman    625
Redirect Examination by Mr. Miller    659

WITNESS: ETHAN EMANUEL KRA
Direct Examination by Mr. Richman    674


E X H I B I T S

Exhibit 118   Memorandum dated March 29,    614
1994

Page 746

```
1              ARBITRATION - VOLUME III
2                 C E R T I F I C A T E
3       STATE OF NEW YORK    )
                             : ss.
4       COUNTY OF NEW YORK   )
5              I, BARBARA R. ZELTMAN, Shorthand
6       Reporter and Notary Public, within and
7       for the State of New York, do hereby
8       certify:
9              That this transcript is a true
10      record of the proceedings had.
11             I further certify that I am not
12      related to any of the parties to this
13      action by blood or marriage, and that I
14      am in no way interested in the outcome of
15      this matter.
16             IN WITNESS WHEREOF, I have hereunto
17      set my hand this 6th day of March, 2015.
18
19
20      _____
               BARBARA R. ZELTMAN
               Court Reporter and Notary Public
21
22
23
24
25
```

1              ARBITRATION - VOLUME IV

2           AMERICAN ARBITRATION ASSOCIATION

---------------------------------------X

3    THE NEW YORK TIMES COMPANY,

4                  Petitioner,

5

                      v.

6

NEWSPAPER and MAIL DELIVERERS'-PUBLISHERS'

7    PENSION FUND,

8                  Claimant.

---------------------------------------X

9

10

11                  ARBITRATION

12                  VOLUME IV

13             New York, New York

14             March 26, 2015

15

16

17

18

19   REPORTED BY:  BARBARA R. ZELTMAN

20            Professional Stenographic Reporter

21

22

23

24   Job Number:  90463

25

Page 748

1   ARBITRATION - VOLUME IV
2
3
    March 26, 2015
4   9:28 a.m.
5
6   Arbitration proceedings held at American
7   Arbitration Association, 120 Broadway, New York, New
8   York, before BARBARA R. ZELTMAN, a Professional
9   Stenographic Reporter and Notary Public within and
10  for the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 749

1   ARBITRATION - VOLUME IV
2   A P P E A R A N C E S:
3
4   ARBITRATOR:  MARK IRVINGS, ESQ.
5       24 Elba Street
6       Brookline, Massachusetts  02446
7
8
9   JONES DAY
10  Attorneys for Petitioner
11      51 Louisiana Avenue, N.W.
12      Washington, D.C.  20001
13      BY:  EVAN MILLER, ESQ.,
            MIGUEL EATON, ESQ., and
14          YAAKOV ROTH, ESQ.
15
16
17  SCHULTE ROTH & ZABEL LLP
18  Attorneys for the Claimant
19      919 Third Avenue
20      New York, New York  10022
21      BY:  RONALD RICHMAN, ESQ.,
            MAX GARFIELD, ESQ., and
22          ADAM GARTNER, ESQ.
23
24
25

Page 750

1       ARBITRATION - VOLUME IV
2       (Whereupon, the following
3   proceedings were had:)
4       MR. MILLER:  I want to begin
5   today's hearing by making a statement
6   and a motion as a result of The Times
7   finally receiving certain trustee
8   minutes over the weekend.
9       In our recent briefing respecting
10  Rosana Egan's testimony, The Times
11  expressed a concern that it was likely
12  that the minutes supportive of The Times'
13  position in this case had not previously
14  been produced.
15      And what we have now learned is
16  that this concern is quite warranted.
17      There are a number of separate set
18  of minutes that are very supportive of
19  The Times' position.  And supportive of
20  The Times' position, Mr. Arbitrator, on
21  both of the issues in this case, the
22  contract issue and the Segal blend issue.
23      And not only would we have put
24  these documents in evidence, quoted from
25  them in our opening brief, but more

Page 751

1       ARBITRATION - VOLUME IV
2   importantly, we would have deposed a
3   number of witnesses about these documents
4   including potentially witnesses who have
5   not testified.  And we would then have
6   used these documents in eliciting their
7   hearing testimony.
8       And all of these relevant documents
9   were responsive to our prior discovery
10  requests and should have been produced
11  back in the fall and prior to the
12  deposition schedule.
13      Here's what we've also learned.  We
14  also learned that there are a number of
15  additional documents that clearly exist.
16  And the Fund has custody of specifically
17  exhibits to the trustee minutes and
18  trustee meeting agenda memos that are
19  also potentially relevant and potentially
20  helpful to The New York Times, and they
21  have not yet been produced.
22      And, finally, we learned from the
23  meeting minutes that we do have that
24  there were other special meetings of the
25  trustees for which the Fund has not

ARBITRATION - VOLUME IV

produced minutes as well as other
possible meetings involving trustees that
didn't rise to the level of a formal or
special meeting.

And we need to have a thorough
search done for these special meeting
minutes and an opportunity to depose
people about special meetings and other
meetings and potentially have them
testify.

I thought it would be helpful in
demonstrating how probative these meeting
minutes that we did receive are and
helpful to The Times in this case if I
went quickly through two examples. And I
have a binder of the meeting minutes.

The first one I want to go through
is under Tab 21, which are the minutes of
a special meeting of April 18, 2011.

Mr. Arbitrator, if you look at the
first page of that set of meeting minutes
under the discussion of Funding
Improvement Plan, and as you know there
have been testimony about the Funding

ARBITRATION - VOLUME IV
Improvement Plan.

Under the first paragraph under
that heading, there's reference to a
Segal report that was discussed at this
trustee meeting, and a copy of the Segal
report is appended to these meeting
minutes as Exhibit A. And we have not
yet received that Exhibit A Segal report
nor have we received any of the exhibits
that were indeed attached to any of these
sets of meeting minutes.

The more probative element of this
set of meeting minutes is on the second
page. And it would be useful I think if
you turn to that page and focus on the
bottom paragraph. There is a paragraph
that begins "The Segal representatives
and review ..."

And so this purports to be a
discussion at this meeting by Segal of
potential contributions that would be
necessary in developing a Funding
Improvement Plan.

And toward the bottom of that

ARBITRATION - VOLUME IV
paragraph, there is a sentence that
begins "Under the scenario ..." And it
says, "Under the scenario that took into
account the adoption of this special
funding relief measures, the default
schedule would increase the employer
contribution rate at the time of
collective bargaining from 8 percent to
12.4 percent."

And later on it also makes mention
of employer contribution rate, not rates,
plural. And it refers to the rate as a
percentage.

That's our theory. I mean, our
theory is that the contribution rate
under the bargaining agreement is
expressed as a percentage. And if the
contribution rate is expressed as a
percentage and CBUs are necessarily
because they have to be expressed in
dollars and wages.

So this is a very probative
document and very helpful to The Times'
case, and as trustees meeting minutes it

ARBITRATION - VOLUME IV
ties the trustees to the concept of a
contribution rate as a percentage.

And because we didn't have this
document until this past weekend, we
couldn't use it to support Terry Hayes'
testimony on what constituted CBUs and
what he learned at trustee meetings.

And we couldn't use it in the
depositions of Rosana Egan and John
Urbank on the issue of CBUs, and we
couldn't use it in refuting Rosana Egan's
testimony when she testified.

And, indeed, I think this
documentary evidence does directly
contradict her testimony that those
people at the Fund always understood that
the contribution rate was a percentage of
the shift wage.

This document refutes that and we
couldn't use it.

We also couldn't use it to refresh
the trustees' recollection of what
happened at trustee meetings regarding
what the contribution was.

ARBITRATION - VOLUME IV

1
2    The second of the two examples I
3  would like to show you is at Tab 25.
4        Those are meeting minutes almost
5  two years later in February of 2013,
6  February 27, 2013, and you'll see under
7  the first paragraph it says "Call to
8  order."  And, again, there is a mention
9  of a Segal handout on funding plan
10  projections, again attached and made part
11  of the minutes of Exhibit A.
12        And as I said, we haven't receive
13  any of those exhibits.
14        And if you turn to the third page,
15  you'll see toward the bottom of the page,
16  again there is a discussion of the
17  Funding Improvement Plan and different
18  objectives in order to develop it.
19        And under the Paragraphs 1, 2 and 3
20  there's reference to changing the
21  contribution rate from 8 percent of what,
22  of wages, to 11.8 percent of wages.
23        And, in fact, without belaboring
24  it, this document on more than ten
25  different occasions within the document

ARBITRATION - VOLUME IV

1
2  refers to the contribution as a
3  percentage of wages.
4        And, again, it ties use of the
5  phrase "percent of wages" to the trustees
6  since these were their minutes.
7        And my point here is not that there
8  are arguments to be made about the
9  implication of this, but that we didn't
10  have a chance to use it in depositions
11  and then at the hearing both, as I say,
12  for our witnesses as well as in cross.
13        And you should be aware that the
14  meeting minutes also speak of the
15  7.5 percent return and projections of
16  7.5 percent return for this particular
17  portfolio for a number of years.  And
18  that the trustees at times also in the
19  last several years started out changing
20  the investment allocation mix and decided
21  not to do that.
22        That's also helpful for The Times.
23  It's also consistent with our views on
24  the Segal blend.  We couldn't use it to
25  refute Rosana Egan on the Segal blend.

ARBITRATION - VOLUME IV

1
2        So these are very helpful minutes
3  that we had a right to and we have not
4  been able to use thus far in the case.
5        There are additional documents that
6  we glean as a consequence of these
7  minutes that we know are in the
8  possession of the Fund that we have not
9  received.
10        I made mention of special meetings.
11  In these minutes they make mention of
12  some special meetings, and we don't have
13  minutes of all of the special meetings.
14        And there are at least four
15  separate special meetings referred to in
16  the minutes we do have that we have not
17  yet received minutes in connection with.
18        And if the Fund doesn't have them
19  in the Fund office, perhaps their agents
20  did, their counsel, former trustees.  We
21  need to see these documents.  We have a
22  right to these documents.
23        So we think we've been highly
24  prejudiced by this failure to get these
25  documents.  And we think that these

ARBITRATION - VOLUME IV

1
2  documents were clearly responsive to our
3  production requests that we made back in
4  the summer.
5        So at this juncture, we think we
6  cannot eliminate the prejudice, but for
7  the reasons that I discussed and the
8  importance of these documents, we should
9  not be required to just press ahead.
10        So, instead, as a consequence of
11  all this, The Times would like to and
12  hereby does make the following motion to
13  hopefully at least mitigate the
14  prejudice.
15        So, first, we would move for an
16  order requiring the Fund, Mr. Arbitrator,
17  to produce all of the exhibits to the
18  minutes that we have received, the agenda
19  memos.  I made mention that there were
20  apparently written agenda memos that were
21  provided at each of the trustee minutes.
22  We'd like all of the agenda memos that
23  were prepared for each trustee meeting
24  and all other documents referred to in
25  the minutes.

ARBITRATION - VOLUME IV

1
2      And we'd like the order to require
3  the Fund to inquire of all of its agents
4  for minutes relating to special meetings
5  that we have not yet received or other
6  meetings involving trustees where minutes
7  or notes were kept.
8      Second, following receipt of these
9  documents -- and we don't think it would
10 take that long to pull them together,
11 10 days, 14 days, tops -- we'd like an
12 order allowing us a three- to four-week
13 period to depose or redepose witnesses.
14 We don't want to have to confront these
15 witnesses with documents at a hearing
16 without have a sense of what would be
17 said about them.
18     To be sure, the depositions will be
19 limited to questions regarding trustee
20 minutes and trustee minutes only and the
21 exhibits and the other documents that we
22 would be provided.
23     And, third, following sort of the
24 close of this mini additional deposition
25 period, we would like the opportunity to

ARBITRATION - VOLUME IV

1
2  then identify the witnesses we'd like to
3  put back on the stand, like a Terry Hayes
4  or Rosana Egan or additional witnesses,
5  potentially trustees, other trustees.
6      And then we'd schedule additional
7  hearing days, and that would also include
8  Ms. Albergo, presumably in May or perhaps
9  June after this short period to take
10 depositions.
11     And, fourth and finally, we'd like
12 the order to require the Fund to pay
13 The Times' costs and fees for this
14 additional discovery and hearing
15 testimony.
16     And in that final regard and as to
17 this last request, we would like the
18 opportunity to brief the issues so that
19 we can provide to you, Mr. Arbitrator,
20 what we think would be useful precedent
21 to demonstrate that under that fact
22 scenario we have here there is clear
23 support and a good foundation for the
24 imposition on the Fund of causing them to
25 pay The Times' costs and fees for this

ARBITRATION - VOLUME IV

1
2  additional discovery.
3      Now, I recognize that there's some
4  irony in this because this request would
5  extend the proceedings further. And as
6  you know, we at the time said
7  historically, in trying to move in the
8  other direction, to wrap this up. That
9  irony hasn't been lost on me or my
10 client.
11     And to be sure with this delay
12 The Times is going to have to continue to
13 make the ongoing withdrawal liability
14 payments, and that's prejudicial.
15     But we think in light of the
16 wrongful practices here and in order to
17 have a full and complete record and to
18 mitigate our prejudice that has and would
19 continue to result from a failure to have
20 this opportunity to properly prepare for
21 and use these responsive documents, this
22 is the fairest way to proceed. And that
23 we should not have to pay for these extra
24 efforts caused by the very, very late
25 arrival of what our relevant and helpful

ARBITRATION - VOLUME IV

1
2  document and documents that should have
3  been produced are.
4      ARBITRATOR IRVINGS:  Just so I
5  understand before you respond.
6      What is your request regarding
7  today?
8      MR. MILLER:  So obviously we
9  thought about that.  So we have three
10 witnesses scheduled for today.  The
11 order was Mr. Urbank and then
12 Dr. Kra, my cross of Dr. Kra, and
13 then Mr. Lewis from Weiser.  Let's
14 take the easy case.
15     I don't think there's any reason we
16 should hold up the cross-examination of
17 Dr. Kra, to be sure.  And as I said,
18 there's some meeting minutes that is
19 supportive of our theory of the Segal
20 blend.  I would like to reserve the
21 opportunity, although I don't think we'll
22 use it, to have him come back, but I
23 think we should proceed.
24     It makes sense to proceed with
25 Dr. Kra.  He's really independent of this

ARBITRATION - VOLUME IV

1   additional request.
2   With Mr. Lewis, our view was that
3   assuming he's here and we're all here,
4   while we would reserve the right to
5   recall him, we're ready to proceed to
6   examine him.  We'll put aside an
7   examination of him respecting a trustee
8   minutes of meetings obviously he was at
9   until we've got the whole package of
10  relevant documents so we don't do it
11  piecemeal.  But we think it makes sense
12  to nonetheless proceed with him.
13  Mr. Urbank was the toughest of the
14  three as it relates to what we're
15  requesting.  And we think on bounds that,
16  notwithstanding his being here, that so
17  many of these documents are related to
18  his testimony.  Indeed, you may recall,
19  Mr. Arbitrator, he's the one who often
20  takes the minutes of the meetings and
21  does the initial draft of minutes.
22  So I think as to him, all things
23  being equal, it would be prejudicial to
24  The Times and kind of half-hearted to
25

ARBITRATION - VOLUME IV

1   have a cross-examination of him now,
2   knowing that for certainty we'd want to
3   both redepose him on certain documents,
4   so we can prepare in advance what he
5   would have to say as it relates to
6   testimony, and then hearing testimony.
7   So that's how we align the
8   witnesses.
9   ARBITRATOR IRVINGS:  Okay.
10  MR. RICHMAN:  I'm just going to
11  make some initial comments.
12  Obviously, this is an extraordinary
13  surprise to us.
14  My first reaction, I think the best
15  analogy here, this is a desperate cry for
16  help from a drowning person and nothing
17  more.
18  This idea that there is
19  extraordinary evidence in the meeting
20  minutes is ridiculous.
21  We have had a lot of evidence, both
22  people testifying as well as a plethora
23  of documents, that have talked about
24  contribution rate, the difference between
25

ARBITRATION - VOLUME IV

1   contribution rate and contribution base
2   unit.
3   Ms. Egan, Mr. Urbank both testified
4   about that.
5   There are lots of other documents
6   already admitted into evidence that talk
7   about consideration rate, and to say
8   that, whoa, all the sudden we have found
9   the Holy Grail is ridiculous.
10  That's not any new evidence.  It's
11  not even evidence at all.
12  Now, Mr. Miller has given us two
13  examples when he opened his -- I was
14  going to say plea, but -- presentation.
15  He was talking about what appeared to be
16  many more than two examples.
17  We, obviously, would like the
18  opportunity to know what these examples
19  are and to address them, because other
20  than the two that have been pointed out,
21  we don't know about them.
22  We think that we produced documents
23  appropriately.  It is absolutely the
24  case, given the tumult at the Fund with
25

ARBITRATION - VOLUME IV

1   respect to the termination of the
2   in-house folks and the changes of
3   trustees that one can easily see from
4   year to year.  And the changes in
5   lawyers, it's been difficult to collect
6   documents.
7   But we've done everything
8   appropriately with respect to producing
9   documents.  We actually offered in our
10  response to The Times' last motion that
11  all of the minutes be put into evidence.
12  And we're happy to go back and ask again
13  for anything that appears to be missing.
14  We do know that there are missing
15  minutes, as you know, that we have wrote
16  to you earlier this week.
17  With respect to the other requests
18  for relief, I think it's not a surprise
19  given my response or given the request
20  that they are completely and totally out
21  of bounds.  We're happy to respond to
22  them in writing if, Mr. Arbitrator, you
23  think that's even necessary.  We're
24  certainly hoping that it isn't necessary
25

Page 768

```
1        ARBITRATION - VOLUME IV
2   because they're, quite frankly, off the
3   wall.
4        And -- but we are certainly willing
5   to take all the minutes, put them into
6   evidence.  That was our proposal.  That's
7   fine.
8        If The Times has good reason to
9   take other depositions after looking at
10  this -- after pointing to this new
11  evidence, in quotes, you know, that is
12  fine.  But contrary to The Times'
13  approach, if we're going to open up a
14  whole discussion about evidence, it's
15  already in evidence.  It's not The Times
16  that should be compensated here, it is
17  the Fund.
18       And so we have ourselves a little
19  bit of a mess here.  And my suggestion
20  would be that The Times put it in writing
21  so we can respond to a motion.
22       I would like the opportunity to,
23  quite frankly, not have to respond and
24  not spend the Fund's resources to respond
25  to a motion that I think is credibly
```

Page 769

```
1        ARBITRATION - VOLUME IV
2   unfounded, but if, Mr. Arbitrator, you
3   think that we need to respond, we
4   obviously will respond.
5        In terms of today's events, you
6   know, without having a written motion and
7   really some real argument about why this
8   is startling new evidence, I do think we
9   should go forward with all three of the
10  witnesses.  And, you know, obviously
11  that's not going to be my call, right.
12  And I got that.
13       I will say that we are told
14  Dr. Kra -- oh, he's here.
15       MR. MILLER:  He's here.
16       MR. RICHMAN:  He is here.
17       ARBITRATOR IRVINGS:  But that
18  was going to be a powerful argument.
19       MR. RICHMAN:  I didn't know
20  what time he was coming.
21       ARBITRATOR IRVINGS:  I
22  understand.
23       MR. RICHMAN:  So he's here,
24  he's got a pretty difficult schedule,
25  let's go ahead and deal with him in
```

Page 770

```
1        ARBITRATION - VOLUME IV
2   terms of a cross and recross, if
3   necessary.
4        Mr. Lewis is waiting to receive a
5   call from us to let him know what the
6   schedule might be.  We are happy to have
7   him testify today.  And, quite frankly,
8   we think Mr. Urbank ought to testify too,
9   but again that's your call.
10       MR. MILLER:  May I respond?
11       ARBITRATOR IRVINGS:  No.
12       MR. MILLER:  Okay.
13       ARBITRATOR IRVINGS:  Without
14  attributing blame, culpability and
15  the rest, my approach obviously
16  throughout this whole proceeding
17  while handling a plethora of motions
18  is that my role is to get in evidence
19  as much as is relevant, necessary and
20  expeditiously as possible.  I
21  consider that my obligation.
22       I'm concerned about some of the
23  things in the minutes -- again, without
24  attributing culpability or the rest.
25  Clearly, while the issue of the
```

Page 771

```
1        ARBITRATION - VOLUME IV
2   difference between contribution rate and
3   CBUs has been well highlighted, what has
4   now been pointed out, at least the
5   examples, would represent things that was
6   discoverable.
7        And you are entitled to make an
8   assessment as to whether you want to do,
9   A, get certainly the exhibits, the
10  documents you want.  I would like a
11  listing of what it is.
12       MR. MILLER:  Yes.
13       ARBITRATOR IRVINGS:  And if
14  there are other points in the minutes
15  that you feel trigger requests for
16  documents, highlight those to me and
17  to Ron.
18       Clearly Dr. Kra, there's no reason
19  not to take him.  Largely, he wasn't part
20  of the meetings.
21       MR. MILLER:  We agree.
22       ARBITRATOR IRVINGS:  Mr. Urbank,
23  I think it's not appropriate to take
24  him until you get the additional
25  stuff, at least.  At the very least,
```

Page 772

ARBITRATION - VOLUME IV

1   one of the examples related
2   specifically to his reports and his
3   work and his discussions at the
4   meetings.
5       The other gentleman, Mr. Lewis, the
6   auditor, do you feel you can --
7       MR. MILLER:  Yes.  As I
8   indicated, we can certainly start and
9   we think it would be useful given
10  that everybody is here to have an
11  initial examination of him, but we
12  would reserve the right as a
13  consequence of the documents we have
14  and will be receiving to recall him.
15      ARBITRATOR IRVINGS:  You
16  certainly reserve the right to
17  request to recall him.
18      MR. MILLER:  Right.
19      MR. RICHMAN:  And if he is
20  going to be recalled, and certainly
21  Urbank, it sounds like will be
22  recalled, we think that the freeze
23  ought to melt.  The witness freeze
24  ought to melt --

Page 773

ARBITRATION - VOLUME IV

1       ARBITRATOR IRVINGS:  Meaning?
2       MR. RICHMAN:  Meaning,
3   Mr. Urbank testified, so we haven't
4   talked to him since he's testified
5   here because he's in the middle of
6   his testimony.
7       ARBITRATOR IRVINGS:  Right.
8       MR. RICHMAN:  And so if we are
9   now going to go back and do
10  discovery, and Mr. Urbank may get
11  deposed, that we want the opportunity
12  to talk to him about the new things
13  that he is going to be deposed by, if
14  he is deposed and he is going to
15  testify about, if he's going to
16  testify.  And the same for Mr. Lewis.
17      MR. MILLER:  I think Ron's
18  request is fair as it relates to a
19  deposition.  And we would like to
20  depose him before we put him back on
21  the stand, because we're trying to
22  sort of replicate where we would have
23  otherwise been if we had these
24  documents.

Page 774

ARBITRATION - VOLUME IV

1       And so I do think, first, we do
2   want to depose him as well as put him
3   back on the stand.
4       And as a consequence of our wanting
5   to depose him, I do think it would be
6   unfair if he were prohibited from being
7   prepped for that deposition.
8       ARBITRATOR IRVINGS:  Okay.
9   Thank you.  Great.  We'll do that
10  then.  You'll be able to speak with
11  Mr. Urbank.
12      MR. RICHMAN:  Okay.
13      And what about Mr. Lewis?
14      ARBITRATOR IRVINGS:  If he's
15  going to be deposed, yes, you'll be
16  able to speak to him, too.
17      MR. RICHMAN:  Okay.
18      ARBITRATOR IRVINGS:  Okay.
19      MR. MILLER:  So,
20  Mr. Arbitrator, based on what you
21  said, let me make this
22  recommendation.
23      Perhaps by Monday, if not earlier,
24  we would provide to you and Ron both a

Page 775

ARBITRATION - VOLUME IV

1   particularized request as to the
2   additional categories of documents that
3   we want.
4       We would identify as it relates to
5   the meeting minutes that we do have other
6   instances in which we think that a
7   particular document is relevant.
8       I think we would probably want to
9   hold off on who we want to depose until
10  Mr. Richman has provided the additional
11  documents.  We would then promptly
12  indicate to Ron who we want to depose.
13  And then following those depositions, we
14  would identify who we'd want to put on
15  the stand.
16      ARBITRATOR IRVINGS:  Let me
17  mention this.  You mentioned, for
18  example, agenda memos or whatever.
19      MR. MILLER:  Memos.
20      ARBITRATOR IRVINGS:  Is it
21  necessary for you to get the agenda
22  memos for every meeting even where
23  from the minutes there's nothing
24  that --

1        ARBITRATION - VOLUME IV
2        MR. MILLER:  I think so because
3    the minutes are -- they are not
4    necessarily thorough.
5        It may well be the case that, for
6    example, an agenda --
7        ARBITRATOR IRVINGS:  It's okay.
8    I'm willing to err on the side of
9    completeness.  I don't know what it
10   means in terms of --
11       MR. RICHMAN:  We don't even
12   know what they are.
13       THE COURT:  Okay.
14       And you can give them an annotated
15   request explaining what they are.  Give
16   them like a treasure map.
17       MR. MILLER:  Okay.
18       MR. RICHMAN:  The fact it may
19   appear in the reference to the
20   minutes --
21       ARBITRATOR IRVINGS:  I
22   understand.  Let me ask another
23   question, a practical question.
24       Terry Hayes was a trustee during
25   this entire period?

1        ARBITRATION - VOLUME IV
2        MR. MILLER:  No.  He became a
3    trustee I believe in '07.
4        MR. RICHMAN:  '07, that's
5    pretty close to the --
6        ARBITRATOR IRVINGS:  That's
7    pretty close.
8        MR. MILLER:  Most of the
9    people.
10       ARBITRATOR IRVINGS:  Most of
11   the people.
12       Does he have, so far as you know, a
13   complete set of minutes and agenda items?
14       MR. MILLER:  We have
15   not reviewed those minutes because
16   they are not --
17       ARBITRATOR IRVINGS:  I guess my
18   first question being, could we ask
19   him does he think he has all --
20       MR. MILLER:  We did ask, and he
21   says he does not believe he has a
22   full set of minutes.
23       MR. RICHMAN:  Well, he
24   testified that he had the minutes
25   that we took him from, he had the

1        ARBITRATION - VOLUME IV
2    meeting materials, that he took them
3    home -- not home, to his office, and
4    that he had them in his office and
5    they never left his office.
6        So, look, we're happy to have
7    him -- without discussing with Mr. Hayes
8    what went on in the trustees meeting,
9    because we think that that would be a
10   prohibited transaction -- to have him
11   turn over his -- any set of meeting
12   minutes that he has, meeting minutes and
13   exhibits to the meetings.
14       ARBITRATOR IRVINGS:  Right.
15   Okay.
16       MR. RICHMAN:  That does not
17   include his minutes that were, any
18   notes that were taken, although it
19   didn't sound like he took notes, but
20   we're happy to have him turn over all
21   the minutes and agenda items if those
22   things exist.
23       MR. MILLER:  That sounds fine.
24   To the extent he took those minutes,
25   unless those minutes reflect

1        ARBITRATION - VOLUME IV
2    privileged information, why wouldn't
3    we be able to get those minutes?
4    Those notes.  Notes.
5        ARBITRATOR IRVINGS:  Those
6    notes.
7        Let's take it one step at a time.
8    My only concern, to forestall a
9    subsequent problem, I went through a
10   whole process -- and you went through a
11   process of redacting, I went through the
12   process of the appropriate redactions.
13   So you probably don't want to turn over
14   the complete minutes.
15       MR. RICHMAN:  Thank you.  My
16   mistake.
17       ARBITRATOR IRVINGS:  All right.
18   Because I don't want to do it again.
19       So perhaps you can provide him with
20   a list, Mr. Hayes a list, the minutes.
21   He doesn't have to produce all the
22   minutes that we've already produced and
23   have been redacted.  But to the extent
24   that he has these agenda memos, exhibits
25   to the -- responding to your list, if

Page 780

ARBITRATION - VOLUME IV

1  there are other, for example, minutes of
2  special meetings that you guys can't find
3  and he has, maybe the answer is to copy
4  them, send them to Ron, make his
5  redactions and then you can filter them
6  to me.
7       MR. RICHMAN:  Copy without
8  reviewing.
9       ARBITRATOR IRVINGS:  Yeah.
10  Terry Hayes can copy them.
11       MR. RICHMAN:  Right.
12       MR. MILLER:  The point is it
13  goes to you first, make the call
14  about what might be privileged and
15  give us the nonprivileged, and then
16  we'll decide.
17       Now, the issue of notes is entirely
18  separate, right.  This is an issue the
19  same as any other trustee.  If they have
20  notes from the meetings --
21       MR. RICHMAN:  He can produce
22  them but not just give them to them.
23       ARBITRATOR IRVINGS:  Right.
24       MR. RICHMAN:  In other words,

Page 781

ARBITRATION - VOLUME IV

1  that there's a difference between
2  them just receiving his notes.
3       If he has some notes, we're happy
4  to -- he can produce them.
5       MR. MILLER:  Notes should be
6  produced.  Not just notes, though,
7  from Mr. Hayes.  To the extent other
8  trustees have notes that they took at
9  these meetings, it would be useful
10  and consistent with your overarching
11  objective that the both parties have
12  notes.
13       ARBITRATOR IRVINGS:  So to the
14  extent the notes exist that don't
15  relate to privileged information --
16       MR. RICHMAN:  Well, the answer
17  is, you need to follow the same
18  setup, right?  Copy those notes, send
19  them to us.
20       ARBITRATOR IRVINGS:  Right.
21  That's fine.
22       MR. RICHMAN:  And we will
23  redact --
24       ARBITRATOR IRVINGS:  That's

Page 782

ARBITRATION - VOLUME IV

1  fine.  And then send both sets to me,
2  a complete set and a redacted set.
3       MR. MILLER:  And not just
4  Hayes, but my point was other
5  trustees.
6       MR. RICHMAN:  Happy to do that.
7       MR. MILLER:  And former
8  trustees.
9       MR. RICHMAN:  Former trustees
10  would be interesting.
11       ARBITRATOR IRVINGS:  So you
12  will produce the list of documents
13  you are seeking.
14       MR. MILLER:  Yes.
15       ARBITRATOR IRVINGS:  And we'll
16  go on from there.
17       MR. MILLER:  Very good.
18       And we will be able to take
19  depositions once we've got those
20  documents and determine who needs to be
21  deposed.
22       ARBITRATOR IRVINGS:  That's
23  fine.
24       MR. MILLER:  That was my

Page 783

ARBITRATION - VOLUME IV

1  understanding.
2       ARBITRATOR IRVINGS:  Well, this
3  was a frolicking detour.
4       You want to call Dr. Kra back?
5       MR. RICHMAN:  Can we break for
6  five minutes?
7       MR. MILLER:  Certainly.
8       (A brief recess was
9  taken.)
10       ARBITRATOR IRVINGS:  Cross
11  resumed.
12       He was previously affirmed.
13       MR. MILLER:  So technically
14  this is the beginning of the cross
15  for Dr. Kra.
16       ETHAN EMANUEL KRA, Ph.D., FSA,
17       having been previously affirmed
18       by Arbitrator Irving, was
19  examined and testified as follows:
20       CROSS EXAMINATION BY MR. MILLER:
21  Q    Okay, Doctor.  Good morning.
22  A    Good morning.
23  Q    Let's talk about briefly your
24  experience as an actuary for multiemployer

10

1      ARBITRATION - VOLUME IV
2  pension funds.
3          During the time when you were
4  serving as an enrolled actuary for
5  multiemployer funds, do you recall whether
6  they had occasion to assess withdrawal
7  liability?
8      A    I had at least one fund that did
9  withdrawal liability.  There may have been
10 others.  I just would have to go through the
11 list.
12     Q    And the one fund that you do recall
13 that assessed withdrawal liability during
14 your ten years as an enrolled actuary, what
15 was what fund?
16     A    The UFCW Local 1262 Nonfood -- I'm
17 sorry, no, the Food Pension Fund.
18          And also we did withdrawal
19 liability on the Nonfood Pension Fund which
20 was through a mass withdrawal.
21     Q    In terms of non-mass withdrawal
22 liabilities, roughly how many calculations
23 would you say that you have performed on
24 behalf of multiemployer pension funds for
25 which you were the enrolled actuary?  And by

1      ARBITRATION - VOLUME IV
2  "calculations," I mean withdrawal liability
3  calculations.
4      A    I don't recall.
5      Q    Would it be more than five?
6      A    I don't recall.
7      Q    Do you recall what the time frame
8  was during the period in which you did
9  perform calculations of withdrawal
10 liability?
11     A    Thinking through, the UFCW
12 Local 1262 Food Fund had withdrawals, but I
13 believe that the calculations were prepared
14 by one of my colleagues and not by myself.
15          The Nonfood Fund had a mass
16 withdrawal.  We had withdrawal liability
17 assumptions and methods clearly outlined.  I
18 don't recall if we had any prior to the mass
19 withdrawal actually withdrawing.
20     Q    So as you sit here today, can you
21 recall any instance in which you calculated
22 a withdrawal liability for a withdrawing
23 employer of a multiemployer pension plan
24 outside of a mass withdrawal?
25     A    I can't recall.

1      ARBITRATION - VOLUME IV
2          ARBITRATOR IRVINGS:  Sorry.
3  Keep your voice up because of the
4  noise-maker here.
5      Q    Dr. Kra, let's turn to the Segal
6  blend.
7          Am I correct that you do not agree
8  with the Segal blend approach to valuing
9  unfunded vested benefits for withdrawal
10 liability purposes?
11     A    It is not the method that I would
12 select.
13     Q    So it is not the approach that you
14 would take in calculating unfunded vested
15 benefits for withdrawal liability purposes?
16     A    Correct.
17     Q    Do you believe that the Segal blend
18 approach to valuing unfunded vested benefits
19 for withdrawal liability purposes is a sound
20 approach?
21          MR. RICHMAN:  Objection.  I'm
22 not sure what "sound" means.
23          Is that, does it abide by the law
24 of ASOP principles?
25          ARBITRATOR IRVINGS:  Fair

1      ARBITRATION - VOLUME IV
2  enough.
3  BY MR. MILLER:
4      Q    Dr. Kra, what is your understanding
5  in this context of a sound approach to
6  valuing unfunded vested benefits for
7  withdrawal liability purposes?
8          MR. RICHMAN:  Objection.  The
9  same objection.
10          ARBITRATOR IRVINGS:  No.  He's
11 asking him to define it.
12     A    "Sound" has many different
13 definitions, and so I would need
14 clarification as to the context you're
15 looking for.  Is it sound for ongoing
16 funding?  Is it sound for withdrawal
17 liability?  Is it sound for financial
18 reporting?
19          There is no -- I need a better
20 context.
21     Q    Fair enough.  And let me build some
22 foundational questions.
23          When I refer to the Segal blend
24 approach, I'm referring to it in the context
25 of using it for valuing withdrawal liability

ARBITRATION - VOLUME IV

1  ARBITRATION - VOLUME IV
2  as opposed to ongoing funding.  Okay.
3      In that regard, are you aware of
4  any pension fund that uses the Segal blend
5  approach for ongoing or minimum funding
6  purposes?
7      A    No.
8      Q    So in connection with use of the
9  Segal blend approach respecting valuing
10 unfunded vested benefits for withdrawal
11 liability purposes, do you believe that the
12 Segal blend approach is a sound approach
13 from the standpoint of applicable actuarial
14 principles?
15     A    Under actuarial standards of
16 practice, I believe the Segal blended
17 approach would comport and comply with
18 actuarial standards of practice and with the
19 statute.
20     Is it the approach I would select?
21 No.  Does it comport with the rules?  I
22 believe it does.
23     Q    Do you believe it comports with the
24 rules in all events or situationally
25 depending on the particular pension fund

1  ARBITRATION - VOLUME IV
2  involved?
3      A    I don't give blanket statements
4  covering everything possible in the world.
5  I mean, there are always outlier, crazy
6  situations.
7      As an actuary before opining on
8  anything, I look at the situation, evaluate
9  the facts and determine whether something is
10 appropriate.
11     There are differences as to whether
12 all benefits are due to be paid within
13 six months so no benefits would be paid for
14 the next 30 years and it's a delivered
15 liability many years out.  There are so many
16 different scenarios that are possible, I
17 just can't give a for-all answer.
18     Q    Let's talk about PBGC interest
19 rates.  Would you characterize the interest
20 rates that are published by the PBGC as a
21 type of risk-free or near risk-free rate?
22     A    The PBGC rates are designed to be
23 relatively market-based risk-free rates.
24 I'm not going to say they're one hundred
25 percent risk free because there are

1  ARBITRATION - VOLUME IV
2  differences between Treasuries, corporate
3  bonds, triple As, double As, default risk,
4  but the PBGC rates I believe are designed to
5  be a proxy for a relatively risk-free
6  discounting system or structure.
7      Q    So for the purposes of this
8  examination and to move it along, would it
9  be fair to say that the PBGC rates are a
10 near risk-free rate?
11     A    A near risk-free rate.  I'm not
12 going to say they're the only possible
13 choice, but they are one of a number of
14 possible near risk-free rates that an
15 actuary can select.
16     Q    What is your understanding of how
17 PBGC rates are derived?
18     A    My understanding is -- and I would
19 have to look at their materials because
20 their methodologies may have changed over
21 the years.  But at certain points in time
22 they have surveyed insurance companies and
23 obtained annuity quotes, or they have used
24 their contacts in the pension industry to
25 determine what annuity quotes are or annuity

1  ARBITRATION - VOLUME IV
2  rates are and, based on those quotes or
3  rates and certain mortality tables, develop
4  what the interest rate would be or,
5  alternatively, maybe even given the interest
6  rate directly.
7      I would have to look at their
8  published materials because their
9  methodology may have evolved over time.  So
10 if you have something specific I could look
11 at, I'd be glad to comment on it.
12     Q    Am I correct that insurance
13 companies develop their annuity quotes in
14 part based on expected returns of portfolios
15 of high-grade corporate bonds?
16     A    They generally will look at the
17 corporate bond yield curve, the bonds in the
18 marketplace, the cash flows that are
19 expected under the annuity stream of pension
20 stream and try to determine a matching
21 portfolio to immunize themselves against the
22 changes in interest rates over time.
23     They may have to adjust for things
24 like calls and put options in bonds or
25 defaults, things like that.

ARBITRATION - VOLUME IV

1
2   Q    Would it, therefore, be fair to say
3   that PBGC rates approximate the expected
4   return on a portfolio of high-grade
5   corporate bonds?
6       A    They are close to.  I'm not going
7   to say they match, but they are
8   approximately in the range of what a
9   high-grade bond portfolio of a matching cash
10  flow would yield.
11      Q    And do you know what percentage of
12  the portfolio of assets owned by the Pension
13  Fund in this case is invested in high-grade
14  corporate bonds?
15      A    As of the withdrawal date of
16  May 2009, I believe that 47 percent of the
17  portfolio was invested in fixed income
18  securities.
19      Q    And fixed income securities, of
20  course, could include high-grade corporate
21  bonds but they could also include other
22  bonds that are not of a high-grade ranking,
23  correct?
24      A    Generally, they would include
25  high-grade bonds.  They might include other

ARBITRATION - VOLUME IV

1
2   bonds but they may also include money market
3   instruments that would have lower expected
4   returns.
5       Q    And I take it that you don't know
6   what the suballocations were of the Pension
7   Fund in this case as it relates to their
8   fixed income bond portfolio?
9       A    I don't have specifics on the
10  grades of bonds of event.
11      If we look at the 5500 filing, it
12  probably would have noted in it the duration
13  of the bond portfolio.  And, generally, most
14  of these funds would have a duration that is
15  shorter than the duration of the liabilities
16  and thus would have a lower return than what
17  would be needed to immunize the cash flows
18  of the pension obligations.
19      Q    But that's generally speculative on
20  your part?  You haven't done the analysis.
21      A    We have the 5500s here; we could
22  easily look at it.
23      Q    But you haven't done that analysis?
24      A    I haven't done that analysis.
25      Q    Does the Pension Fund in this case

ARBITRATION - VOLUME IV

1
2   primarily own high-grade corporate bonds?
3       A    I have not analyzed the specific
4   bond holdings of this Fund.
5       Q    Do you know whether the Pension
6   Fund in this case primarily owns risk-free
7   or near risk-free assets?
8       A    I have not analyzed the specific
9   holdings other than to note that this Fund
10  was 47 percent of fixed income securities as
11  of the withdrawal date.
12      Q    Do you know if the Pension Fund in
13  this case plans to shift or alter its
14  investment allocation and increase its
15  percentage of risk-free or near risk-free
16  assets in the future?
17      A    I have not spoken with any of the
18  trustees or anyone from the investment
19  advisers of the Fund and I have no knowledge
20  of their long-term plans.
21      Q    Are you familiar with the term
22  "actuarial bias"?
23      A    I've heard that term.
24      Q    What is your understanding of the
25  term "actuarial bias"?

ARBITRATION - VOLUME IV

1
2       A    That, let's say, you had a bond
3   portfolio that was going to earn 5 percent
4   over a period of the payout stream of these
5   benefits but you were worried about
6   adverse -- let's say you were, if you used,
7   let's say, 4 percent because you were afraid
8   that people might outlive the mortality
9   tables and you wanted conservatism, or you
10  use 6 percent because you said, well, we're
11  rolling the dice and we might do better.
12      So that would be a bias, in my
13  view, as to which way you are valuing the
14  liabilities, higher or lower.
15      Q    So to continue with your example,
16  if a bond portfolio was otherwise
17  objectively projected to earn 5 percent,
18  and the actuary estimated the return to be
19  either less than 5 or more than 5 because of
20  other circumstances, in that case the
21  actuary would be engaging in actuarial bias,
22  correct?
23      A    Not necessarily because there may
24  be justifications for the difference, such
25  as if the actuary were using the Neanderthal

ARBITRATION - VOLUME IV

1
2  Mortality Table where everybody is dying
3  quickly, then you'll justify using a
4  2 percent interest rate to offset the bias
5  in the mortality table; or if, on the other
6  hand, they were using the Superman Mortality
7  Table, then it would justify using a
8  7 percent interest rate.
9      Q    But if one assumes all things are
10  otherwise equal in terms of other
11  assumptions, if a bond portfolio is
12  otherwise projected to earn 5 percent and an
13  actuary values it at less than or more, the
14  actuary would be engaging in a form of bias.
15      A    No.  I disagree with the statement
16  as phrased because you are saying the
17  portfolio.
18          I would say the bias initiates from
19  looking at the liability stream and looking
20  at the bonds that would match that liability
21  stream, not the actual bonds in the
22  portfolio.
23          So I don't look at the bonds that
24  are actually held by the fund.  I look at
25  the bonds that would match the liability

ARBITRATION - VOLUME IV

1
2  stream.
3      Q    In the example you gave, that's a
4  durational look, correct?
5      A    It's looking at -- well, duration
6  is an approximation because yield curves
7  could be concave or convex and you could
8  have the same duration -- two portfolios
9  could have the same duration yet a different
10  return.
11          Because, let's say, you had a bond
12  portfolio that had ten-year bonds and
13  one-year bonds, and you had another bond
14  portfolio with all five-and-a-half-year
15  bonds, they might both have -- or duration,
16  ten duration ones, the others are all
17  duration five and a half.  They might have
18  the same average duration, yet they would
19  have different returns because of the
20  convexity and concavity of the yield curve.
21          MR. MILLER:  I'm going to avoid
22      following up on that, and instead I'm
23      going to ask a more simple question.
24      Q    If an actuary were to engage in
25  bias, that would necessarily need to -- that

ARBITRATION - VOLUME IV

1
2  bias would necessarily need to be in
3  connection with the actuary's making a
4  future prediction of an event, correct?
5      A    Well, the bias would represent
6  either a conservatism or a lack of
7  conservatism in the projection.
8          Very often you'll see an insurance
9  company for life insurance will have a bias
10  assuming people die sooner just to make sure
11  that the life insurance policies have enough
12  in case a plane came along.
13      Q    But my question was really more
14  simple than that:  That bias, when
15  undertaken by an actuary, necessarily needs
16  to be in connection with the actuary's
17  prediction or projection of a future event?
18      A    Or it could be a bias in the
19  measurement of the current situation.
20          You have assets that may not have
21  readily tradeable market values, illiquid
22  assets, partnerships.  Then there could be a
23  bias in the valuation of those assets, which
24  is not a future event, it's a current event.
25      Q    I see.

ARBITRATION - VOLUME IV

1
2  I would like you now to assume that
3  a multiemployer pension plan is invested
4  primarily in risk-based assets.
5          And based on that assumption, do
6  you believe that a risk-free rate or near
7  risk-free rate would be an unbiased
8  prediction of the anticipated rate of return
9  for such a pension plan?
10      A    The risk-free or near risk-free
11  rate would represent a risk adjusted
12  projection of the return on that portfolio.
13      Q    But that's not quite the question I
14  asked.
15          I asked you the question of, as it
16  relates to actuarial bias.  If you assume
17  that a pension plan primarily owns
18  risk-based assets, do you believe that use
19  of the risk-free rate is and would be an
20  unbiased prediction of the anticipated rate
21  of return for that pool of pension plans?
22      A    I believe that it would be an
23  unbiased valuation of the liabilities, which
24  is what you use that return for.
25      Q    I want you to focus a little bit

ARBITRATION - VOLUME IV

1    more on the particulars of the question.
2            Assume you've got a pension plan
3    that primarily owns risk-based assets and an
4    actuary is predicting the anticipated rate
5    of return for that pension plan pool of
6    assets.
7            If that pension plan pool of assets
8    is primarily invested in risk-based
9    investments, is the use of a risk-free rate
10   or near risk-free rate an unbiased
11   prediction of the anticipated rate of
12   return?
13       A    Anticipated rate of return will be
14   a relatively bell-shaped curve.
15           And if you are evaluating the
16   50th percentile, the 50th percentile
17   will be higher than the risk-free rate.
18           However, if you are looking at it
19   in terms of value to the holder, valuing it
20   at the risk-free rate would reduce it to the
21   market price.
22       Q    Now I want to switch for a moment
23   from the concept of the actuary bias to the
24   concept of best estimates, because in your

ARBITRATION - VOLUME IV

1    direct testimony you were questioned by
2    Mr. Richman about the concept of best
3    estimate and best estimate range.
4            Do you remember that testimony?
5        A    I believe -- I don't remember the
6    details of my testimony, but I would
7    recognize that those concepts could have
8    been asked.  I have not seen the transcript
9    from a few weeks ago.
10       Q    Okay.
11           Assume, again, that a multiemployer
12   pension plan is invested primarily in
13   risk-based assets.
14           Do you believe that use of a
15   risk-free rate or near risk-free rate would
16   represent the actuary's best estimate of the
17   anticipated rate of return for this pension
18   plan's asset pool?
19       A    The question is if you are looking
20   at the returns on the asset pool or the
21   ability of the asset pool to cover the
22   liabilities of a liability stream --
23       Q    And let me stop you --
24       A    -- and the ASOPs make it very clear

ARBITRATION - VOLUME IV

1    that in picking the best estimate or the
2    best estimate range for a particular
3    situation, you have to look at the purpose
4    of the measure that is explicit in the ASOP.
5            So absent the purpose of the
6    measure for which the answer may be
7    different depending on purpose of measure, I
8    can't answer the question.
9        Q    Okay.  So I'm going to unpack that
10   answer a little bit and ask you a particular
11   question as it relates to a particular
12   portion of it.
13           If the actuary's task is in fact to
14   look at and to predict the anticipated
15   returns on that asset pool and that is the
16   task, do you believe that the risk-free rate
17   or near risk-free rate would represent the
18   best estimate of the anticipated rate of
19   return for that asset pool, if the asset
20   pool was invested primarily in risk-based --
21       A    The actuary would end up with a
22   spectrum of returns with probabilities under
23   ASOP 27.  The best estimate is a range
24   between generally the 25th and 75th

ARBITRATION - VOLUME IV

1    percentiles as the ASOP was constituted at
2    the time of this particular measure.
3            And so if you were looking
4    at solely expected return on assets for
5    purposes of projecting the assets, you would
6    have a range of the 25th to 75th
7    percentiles on the return of those assets.
8    And that is what the ASOP says.
9        Q    I know but that's not the question
10   I wanted you to answer.
11           I wanted you to answer a simple
12   question.
13           If you have a -- if a pension plan
14   has a pool of assets and they are primarily
15   invested in equities, would the risk-free or
16   near risk-free rate represent the best
17   estimate of the anticipated future return
18   for that pool of assets?
19       A    A future return on a future pool of
20   assets would be a range of returns depending
21   on -- it is a probability of different
22   returns.  You could calculate the 50th
23   percentile, the mean or the median that will
24   differ from the risk-free rate.

ARBITRATION - VOLUME IV

1
2          However, the best estimate is a
3    range which covers a range of returns, and
4    the risk-free rate may very well be within
5    that range.
6        Q    Or the mean or median rate of
7    return would be distinct from the risk-free
8    rate or near risk-free rate?
9        A    That mean or median return would
10   equal the risk-free rate plus a risk premium
11   depending on the riskiness of the portfolio.
12         The risk premium that is earned
13   over time by those who bear the risk.
14       Q    So that's another way of saying yes
15   to my question?
16       A    I'm not saying it's yes.  You are
17   characterizing it as yes.  I'm being very
18   explicit --
19         MR. MILLER:  I withdraw it.
20       Q    Do you believe that the risk-free
21   rate should be used to valuate a pension
22   plan's unfunded vested benefits for
23   withdrawal liability purposes --
24       A    Yes.
25       Q    Let me finish the question.

ARBITRATION - VOLUME IV

1
2        A    I heard a pause, so I answered the
3    question when I heard the pause.  I thought
4    there was a question mark.
5        Q    I'll try to phrase the question and
6    state the question without taking a pause or
7    a breath.
8          Do you believe that the risk-free
9    rate should be used to value a pension
10   plan's unfunded vested benefits for
11   withdrawal liability purposes regardless of
12   the actual assets that the pension fund owns
13   in its portfolio?
14       A    Yes.
15       Q    Would the use of the risk-free or
16   near risk-free discount rate in such a case
17   reflect the anticipated investment returns
18   on the plan's actual portfolio of assets?
19       A    It would represent a risk adjusted
20   expected return on the plan's assets.
21       Q    But it would not represent the
22   expected mean or median return on that
23   plan's portfolio of actual assets, correct?
24       A    It would not represent the mean or
25   median.

ARBITRATION - VOLUME IV

1
2        Q    Right.
3          Would the use of the risk-free or
4    near risk-free discount rate in such a case
5    reflect the anticipated experience of that
6    plan?
7        A    It would represent the risk
8    adjusted anticipated experience of the plan.
9        Q    And what do you mean by "risk
10   adjusted anticipated experience"?
11       A    Let's say I own a portfolio, a
12   hundred percent of the S&P 500.  And
13   hypothetically let's assume -- and I'm not
14   giving investment advice -- that the S&P 500
15   is expected to return 9 percent compounded
16   annually over the next 20 years.
17         And let's furthermore assume that a
18   risk-free portfolio for that same 20 years
19   horizon would earn 5 percent.
20         If I wanted to guarantee that, even
21   though I'm expecting to earn 9, that I would
22   never get less than 5 over that 20-year
23   period, essentially I would have to give up
24   the 4 percent and all of the upside.
25         In other words, I would have to pay

ARBITRATION - VOLUME IV

1
2    the counterparty that's guaranteeing me the
3    5 percent floor everything that I earn up
4    above 5, the 5 to 9 and everything above
5    that.
6        Q    And that related to the Bader swap
7    that you previously testified to?
8        A    The Bader swap is basic finance.
9        Q    So let me ask you this question:
10   Would you say that the risk-free or near
11   risk-free rate when used to calculate
12   withdrawal liability reflects a best
13   estimate of anticipated experience under
14   every multiemployer plan?
15       A    As I said, I can't say every
16   because there's always some outlier
17   situation, so I don't want to give an
18   unequivocal for all because then maybe we
19   can come up with some weird situation.
20         But in general, my view is that the
21   risk-free rate based on the liability stream
22   of the payments under the fund represents
23   the best risk adjusted estimate of returns
24   under the plan and experience under the
25   plan.

ARBITRATION - VOLUME IV

1
2   Q    Putting outliers aside, of any
3   multiemployer plan, correct?
4   A    Of any multiemployer plan.
5   Q    And I take it that's because you
6   believe it's appropriate to avoid a transfer
7   of risk from the withdrawing employer to
8   other contributing employers to, in these
9   circumstances, hypothesize for withdrawal
10  liability calculation purposes a different
11  pool of assets that is comprised of
12  risk-free or near risk-free assets, correct?
13  A    I don't follow the question.  There
14  are too many moving parts in that question,
15  so let's break it up.
16  Q    Okay.
17       So am I right that under your
18  theory, it's appropriate to use a risk-free
19  rate or near risk-free rate to calculate
20  withdrawal liability because there is a
21  prospect -- depending on the rate that's
22  used -- of transferring risk from
23  withdrawing employers to other contributing
24  employers, correct?
25  A    If you use a rate any higher than

ARBITRATION - VOLUME IV

1
2   the risk-free rate, the withdrawing employer
3   is transferring risk which has value,
4   negative value, so to speak, to the ongoing
5   employers, and essentially the ongoing
6   employers are subsidizing the withdrawing
7   employer to the extent of the risk transfer.
8   Q    That's my understanding of your
9   opinion.
10       And so in order to avoid this
11  transfer of risk from the withdrawing
12  employer to the other contributing
13  employers, under your approach, you
14  essentially hypothesize for withdrawal
15  liability calculation purposes a different
16  pool of assets comprised of risk-free or
17  near risk-free assets to determine the
18  discount rate as opposed to the actual plan
19  portfolio, whatever that might be.
20  A    What I would do is I would not look
21  at the actual portfolio.  I would look at
22  the liability stream.  And "a liability is a
23  liability is a liability, is a liability, is
24  a liability to quote that poet about roses
25  (ph.), and say that the liability is

ARBITRATION - VOLUME IV

1
2   independent of the opposing assets.
3       A liability is what it is and the
4   assets are what they are.  And one is used
5   to help pay the other, but would almost be
6   to say that if the bank I take my mortgage
7   from, if I borrow money as a home equity
8   loan and I go and invest it in high-risk
9   equities, the bank should mark down the loan
10  as being a lower liability because there's a
11  higher expected return on the cash flow
12  payments.
13  Q    So your approach in effect is based
14  on the anticipated experience of the plan in
15  connection with not the plan's actual
16  invested assets, but a different pool of
17  assets, risk-free assets.  Isn't that right?
18  A    It's valuing the liabilities based
19  on a portfolio of bonds that would match the
20  liability stream of the benefit payments.
21  Q    Regardless of the actual assets
22  that the particular pension plan may be
23  invested in, correct?
24  A    Correct.
25  Q    Let's turn back to the topic of

ARBITRATION - VOLUME IV

1
2   best estimate and best estimate ranges.
3       Dr. Kra, I think you testified in
4   your direct examination about a best
5   estimate discount rate for valuing
6   liabilities needing to fall within a best
7   estimate range in order to be consistent
8   with actuarial practice.
9       Do you remember that?
10  A    Yes.
11  Q    And is it your view that under
12  standard actuarial practice an actuarial
13  best estimate, for example, future
14  investment returns of a portfolio,
15  necessarily refers to an estimated range?
16  A    The actuarial standard of practice
17  that was in effect in May of 2009 described
18  it as a range in which it was more like --
19  the narrowest range that it was more likely
20  than not.  And the actuarial practice at
21  that time was a 50 percent spread in the
22  probability distribution generally viewed as
23  the 25th to 75th percentiles.
24  Q    But, of course, in picking a
25  discount rate for valuing liabilities, one

ARBITRATION - VOLUME IV

1
2  has to and as part of that calculation come
3  up with a single number or a single rate for
4  that purpose, right?
5      A    Yes.
6      Q    And is it your testimony that as
7  long as the rate that is chosen falls within
8  the best estimate range, as you believe that
9  shall be defined, such a number would
10 represent the best estimate?
11     A    As the actuarial standard of
12 practice.  It's not what I believe, it's
13 what the ASOP said.  The ASOP said that it
14 was the narrowest range more likely than
15 not, which the practice at that time was
16 25th to 75th percentile.  It's not my
17 view, it's the standard of practice as
18 applied by actuaries in the United States in
19 2009.
20     Q    But just to clarify that, this is
21 your view of what general actuarial practice
22 was at the time?
23     A    That's my understanding of it.
24     I was one of the co-authors of the
25 implementation guide published by the

ARBITRATION - VOLUME IV

1
2  American Academy of Actuaries on the very
3  issue.
4      Q    Let me ask you this:  How does an
5  actuary go about choosing, in your judgment,
6  particularly during the relevant time here
7  in which this withdrawal liability
8  calculation had to be made, a single number
9  within the best estimate range in order to
10 actually make the liability present value
11 calculation?
12     A    There are a number of factors.
13     Number one, you have to look at the
14 purpose as ASOP 27 states, you must look at
15 the purpose of the measure.  ASOP 27 says
16 there are a number of different approaches
17 that can be taken.  ASOP 27 gives a cash
18 flow matching approach which comes up with a
19 near risk-free rate.  The bond approach as
20 one approach.  It also gives a
21 building-block approach as another
22 alternative approach.
23     There are a number of approaches
24 that acknowledges that there are multiple
25 approaches that actuaries can take based on

ARBITRATION - VOLUME IV

1
2  their best judgment, and it lists a few of
3  them and specifies that the actuary must
4  look at the purpose of the measure in
5  deciding how to do it.
6      Q    It was my understanding based on
7  your earlier testimony that those approaches
8  that you've identified, the building-block
9  approach and the cash flow approach, those
10 were approaches to come up with the range.
11     I asked you a different question
12 which is how does one go about picking the
13 number within the best estimate range?
14     A    Can we look at the ASOP because I
15 don't believe that's what I -- I didn't say
16 that's how you pick the range.  I believe
17 that's also how -- it was helping in getting
18 the number.  That's another way of getting
19 the number that many actuaries use the cash
20 flow matching to come up with their number.
21     Q    Got it.
22     And so it's your judgment, just to
23 clarify the record, that use of the
24 building-block approach or use of the cash
25 flow method approach would be approaches

ARBITRATION - VOLUME IV

1
2  that are designed not merely to get you to a
3  range, but to get you to a particular rate
4  within a best estimate range?
5      A    I believe that those approaches
6  were used by many actuaries to get a
7  particular rate.
8      The range would be using some type
9  of stochastic model which would give a
10 probability distribution which would help
11 set the outer bounds for the range; whereas,
12 the cash flow would give you a particular
13 number within a range.
14     Q    In your expert report and I believe
15 in your direct testimony consistent with
16 your expert report, you characterized
17 3.5 percent to 7 percent as a reasonable
18 range of discount rates for the valuation of
19 unfunded vested benefits in connection with
20 this case for withdrawal liability purposes;
21 is that correct?
22     A    I think we should look at the
23 report.  I believe I identified that as the
24 range of interest rates or bond rates that
25 could have been selected at that time

ARBITRATION - VOLUME IV

1  because of other benchmarks that could
2  have been observed.
3
4          And I'd have to look at the wording
5  again in my report.
6      Q    No. I think you properly
7  characterized your report. And let me
8  expand on that a little bit.
9          Am I right that your opinion both
10  in your report and in your testimony was
11  that at the time the withdrawal liability
12  calculation in this case had to be made, the
13  range for risk-free to near risk-free rates
14  went from as low as 3.5 to 7 percent?
15      A    I believe that's what I said.
16      Q    And therefore, I assume, you would
17  agree and it is your opinion that any number
18  within that range of 3.5 percent to
19  7 percent would have been a reasonable
20  discount rate that the actuary could have
21  used to compute the withdrawal liability in
22  this case, right?
23      A    How I would rephrase it is that I
24  would not challenge anything in that range
25  as being unreasonable because I think there

ARBITRATION - VOLUME IV

1  would be good defense.
2      Q    So any number within that range
3  would not be unreasonable?
4      A    I would have difficulty challenging
5  anything in that range as being
6  unreasonable.
7      Q    Seven percent would be a discount
8  rate that is beyond reasonable challenge, in
9  your judgment?
10      A    What I was saying is that if the
11  actuary picked anything in that range, I
12  would have difficulty challenging. It may
13  not be the one I would have picked within
14  that range, but I would have difficulty
15  challenging it as being unreasonable.
16      Q    Using actuarial rules of thumb or
17  other accepted mathematical methods to
18  estimate, can you estimate what the monetary
19  difference is for The Times' withdrawal
20  liability between using a 7 percent discount
21  rate versus a 3.5 percent discount rate to
22  value the liability?
23      A    Without doing the calculation, I
24  would have to get pencil and paper, look at

ARBITRATION - VOLUME IV

1  the documents, and could I come up with an
2  estimate? Yes. Have I done so? No. Could
3  I give an estimate off the cuff, no.
4      Q    Let me see just for a moment if I
5  could probe that a little bit more.
6          You are familiar with Darren
7  French's expert report in this case,
8  correct?
9      A    I've read it but I have not looked
10  at it in over a month.
11      Q    Let me see if I can refresh your
12  recollection.
13          Do you recall that Mr. French
14  essentially came up with an effective
15  discount rate for the Segal blend as applied
16  in this case and that effective rate was
17  roughly 6.5 percent?
18      A    If I recall his testimony at
19  deposition, he had a range and I don't
20  recall if it was 6 to 6 and a quarter, 6 and
21  a quarter to 6 and a half, or 6, 6 and a
22  half, I don't recall, but it was within that
23  ballpark.
24      Q    Here's what I'm getting at. In his

ARBITRATION - VOLUME IV

1  expert report, he did make a calculation of
2  the difference in The Times' withdrawal
3  liability between using a 7.5 percent rate
4  and roughly this 6.5, maybe a little bit
5  lower rate.
6          Do you remember that?
7      A    I believe I saw that, yes.
8      Q    And do you remember that his
9  calculation of the difference between an
10  application of the 7.5 discount rate and
11  this roughly 6.5 discount rate was
12  approximately and at least I think
13  6.5 million.
14          Do you remember that?
15      A    I'd have to see the report but that
16  doesn't surprise me but I don't remember the
17  number.
18      Q    But it doesn't sound unreasonable
19  to you?
20      A    No.
21      Q    In that regard, if $6.5 million is
22  at least a reasonable approximation of the
23  monetary difference in liability between
24  using 7.5 and approximately 6.5, isn't it

ARBITRATION - VOLUME IV

1  the case from the standpoint of rule of
2  thumb that the monetary difference for
3  The Times between 7 percent and
4  3.5 percent is likely be at least
5  $12 million?
6      A    Yes.  Remember that when you are
7  looking at a difference of withdrawal
8  liability, you are looking at leveraged
9  numbers.
10      So, for example, if the assets of a
11  fund were a hundred million and the change
12  in the discount rate moved the liability
13  from being 101 million to being 105 million,
14  a 4 percent difference, it would be a
15  quintupling of a withdrawal liability.
16      So when you have leveraging because
17  of the assets, you get a very
18  disproportionate effect on withdrawal
19  liability in the calculation.
20      So a liability of 105 million
21  versus a liability of 101 million is a
22  4 percent differential.  Yet the difference
23  in withdrawal liability would be 5 million
24  versus 1 million, a 5-to-1 ratio.

ARBITRATION - VOLUME IV

1      So looking at the difference in the
2  withdrawal liability or ratio is not really
3  a valid measure because of this leveraging
4  effect.
5      Q    Let's move to a different subject,
6  the implications of the actuary in this Fund
7  using a 7.5 percent investment return
8  assumption.
9      Doctor, I want you to assume for
10  purposes of these questions that an
11  actuary's best estimate is that a Pension
12  Fund's actual assets will return on average
13  7.5 percent annually.
14      If the actuary nonetheless
15  discounts the unfunded vested benefits for
16  withdrawal liability purposes using the
17  lower rate and the 7.5 percent best estimate
18  return is in fact realized, isn't it true
19  that the withdrawing employer will have
20  overfunded its allocable share of the
21  benefits?
22      A    If the Fund was invested within an
23  expected return of 7 and a half percent and
24  there were no risks involved and the Fund

ARBITRATION - VOLUME IV

1  earned 7 and a half percent, and you valued
2  the liabilities at 6, the withdrawing
3  employer would have paid extra.
4      On the other hand, if that return
5  came because the risk was borne and it was
6  just serendipitously -- or however the word
7  is -- was achieved, then the ongoing
8  employers bore risk, they took risk, they
9  won the bet.
10      Q    I didn't ask about who was bearing
11  this.
12      I asked essentially a fairly simple
13  math question.
14      If the best estimate of future
15  expected returns is 7.5 percent annually and
16  that 7.5 percent best estimate is realized,
17  and the actuary nonetheless discounts
18  unfunded vested benefits for withdrawal
19  purposes using the lower rate, it will be
20  true that the withdrawing employer would
21  have overfunded its allocable share of its
22  benefits; yes or no?
23      A    No.  It will have funded its
24  allocable.  The ongoing employers then went

ARBITRATION - VOLUME IV

1  to Atlantic City and gambled with the money
2  and won the bet.
3      So it's that they took risk with
4  the money they received, they won the bet.
5      Had they lost the bet, they would
6  have made it up.
7      So they did not overfund.  They
8  paid the right number, the withdrawing
9  employer.  It's just that the ongoing
10  employers took risk with that money and won
11  the bet.
12      Q    However, if you simply focused on
13  actual results over time and then looked
14  back, isn't it true that in retrospect if
15  the Fund returned 7.5 and you determined the
16  liabilities and thus the withdrawal
17  liability payments at less than 7.5, the
18  employer in retrospect, the withdrawing
19  employer in retrospect will be paying more
20  than its allocable share of the benefits?
21      A    The withdrawing employer will have
22  paid more than would have been necessary to
23  cover those benefits given the actual return
24  which could have come from even buying the

Page 824

ARBITRATION - VOLUME IV

1
2    lottery ticket.  So if they bought a lottery
3    ticket and that's how they made their 7 and
4    a half percent, should that have been
5    anticipated when the withdrawal liability
6    payment was determined.
7            ARBITRATOR IRVINGS:  You've
8        stated your respective positions on
9        this question.  Let's move on.
10           MR. MILLER:  Okay.
11   BY MR. MILLER:
12       Q    We've been talking about investment
13   risk in connection with multiemployer
14   pension plans.
15           If a pension plan's trustees
16   want less investment risk for their
17   portfolio, they're free to change their
18   investment allocation and derisk, correct?
19       A    Trustees have the ability to change
20   investment strategy, to derisk, to de-fees
21   (ph.).  There are lots of different things
22   that trustees do.
23       Q    Including, if they wanted, changing
24   their investment allocation to reduce their
25   risk in the portfolio?

Page 825

ARBITRATION - VOLUME IV

1
2       A    They have that ability.
3       Q    And if pension trustees wanting
4    less investment risk in fact do derisk and
5    change their investment allocations, that
6    would certainly affect their discount rate
7    for funding purposes, correct?
8       A    Multiemployer plans generally look
9    at the investment -- actuaries from
10   multiemployer pension plans often will look
11   at the investment mix to determine the
12   discount rate that they use for funding
13   purposes.
14           And if they -- to the extent that a
15   portfolio has a greater portion of fixed
16   income securities, many actuaries will lower
17   the discount rate and increase the funding
18   requirements.  I'm not going to say all
19   actuaries do that but many actuaries do
20   that.
21       Q    And, in fact, the typical practice
22   is for funding purposes to use as the
23   discount rate for valuing liabilities the
24   investment return assumption.  And if the
25   investment return assumption is lowered

Page 826

ARBITRATION - VOLUME IV

1
2    because the investment allocations have been
3    changed to derisk, then in general,
4    multiemployer pension fund actuaries will
5    change the discount rate?
6       A    Many of them will change the
7    discount rate.
8       Q    But, to your knowledge, the Pension
9    Fund here has not changed their investment
10   allocations either at the time or since the
11   withdrawal liability assessment?
12       A    I have not seen anything on what
13   they've done to their investment portfolio
14   in recent years.
15       Q    If a pension plan's trustees wanted
16   to avoid bearing any risk that the
17   withdrawing employer would underfund its
18   share of unfunded vested benefits, the
19   trustees could segregate the withdrawal
20   liability payments and invest them in
21   risk-free assets, correct?
22       A    They could look at the liabilities
23   for the employees of the withdrawing
24   employer, take the assets, a lockable share
25   of the assets that they currently have that

Page 827

ARBITRATION - VOLUME IV

1
2    are lockable to those employees, and put
3    them in -- give them to a particular
4    investment manager.  And they could take all
5    the withdrawal liability payments and give
6    it to a particular investment manager and
7    have that investment manager invest matching
8    the liability stream of those employees.
9    That is something they had the ability to
10   do.
11       Q    And, again, you don't know one way
12   or the other whether the Pension Fund here
13   has done it?
14       A    I have not seen anything but I
15   could not say they have or have not.  I have
16   not seen anything that says they have or
17   haven't.
18       Q    I think that in your direct
19   testimony you explained that if a
20   multiemployer pension plan's assets turn out
21   to expect a 7.5 percent investment return
22   but do not achieve that 7.5 percent
23   investment return, in the context of a
24   withdrawal liability, the plan cannot then
25   ex post facto go back to a withdrawing

1    ARBITRATION - VOLUME IV
2    employer and seek more money, correct?
3        A    I believe so, yes.
4        Q    But isn't it also true that if the
5    pension plan's assets turn out to return
6    more than 7.5 percent, the withdrawing
7    employer does not get a partial refund of
8    its withdrawal liability, correct?
9        A    Correct.
10        Q    I think we mentioned earlier in
11    this examination and during the course of
12    your direct testimony you discussed
13    something called a Bader swap.
14        Do you remember that?
15        A    I don't remember how I discussed it
16    at deposition or at arbitration, but I
17    discussed Bader swaps.
18        Q    And am I right to very briefly
19    summarize it that it's essentially a theory
20    of demonstrating the relationship between
21    risk premium and the risk of return below
22    the risk-free rate, right?
23        A    Basically, the Bader swap
24    demonstrates that if you had a risk-free
25    rate and you took any other portfolio and

1    ARBITRATION - VOLUME IV
2    you wanted to ensure that you would not earn
3    less than the risk-free rate on that
4    portfolio, that you would have to give up
5    one hundred percent of the upside above the
6    risk-free rate.
7        Q    And that principle is called the
8    Bader swap because it was developed by a
9    then-actuary named Lawrence Bader?
10        A    It was developed by Larry Bader
11    based on his experience working for nine
12    years at Salomon Brothers and observing Wall
13    Street and derivatives and all the
14    functions, and he actually showed how we
15    could literally demonstrate it in the
16    marketplace.
17        Q    And I gather that it is your view
18    that applying that principle here, the idea
19    is that from an ex-ante perspective using
20    the risk-free rate to value liabilities
21    reflects their market value, because if you
22    wanted to avoid any risk of underfunding
23    liabilities, the risk-free rate is the most
24    you'd be able to count on, correct?
25        A    That's correct.

1    ARBITRATION - VOLUME IV
2        Q    So, thus, rather than making a
3    prediction for future plan experience,
4    application of the risk-free rate to value
5    unfunded vested benefits for withdrawal
6    liability purposes is effectively valuing
7    them based on their ex-ante market value,
8    right?
9        MR. RICHMAN:  Objection.  Can
10    you go back and tell us experience --
11    future plan experience about what?
12        MR. MILLER:  Let me phrase the
13    question again and see if the expert
14    can answer.  If the expert feels he
15    can answer it, I think that's fine.
16        MR. RICHMAN:  Well, I don't.
17        ARBITRATOR IRVINGS:  Let's see
18    if we understand the question.
19        Go ahead.
20    BY MR. MILLER:
21        Q    Applying the principles developed
22    by Larry Bader in the context of withdrawal
23    liability, am I right that rather than
24    making a prediction about the future pension
25    plan experience of its assets, application

1    ARBITRATION - VOLUME IV
2    of the risk-free rate to value the unfunded
3    vested benefits for withdrawal liability
4    effectively values them based on their
5    ex-ante market value?
6        A    It values them using ex-ante market
7    value, and that determines the expected
8    return on the fund if it were to be so
9    invested and represents what the liabilities
10    could be settled for.  And it is a market
11    valuation of a future stream of benefits and
12    what matching investments were produced.
13        Q    And, in fact, under your approach,
14    you don't have to make any predictions about
15    future investment returns about the pension
16    plan's actual assets, correct?
17        A    We look at the what the future
18    pension plan's assets would produce if they
19    were in a matching bond portfolio.
20        Q    And not looking at the future
21    investment returns for the plan's assets as
22    actually invested, correct?
23        A    Does not look at that.
24        Q    Thank you.
25        And, in fact, under your approach,

ARBITRATION - VOLUME IV

1  you don't make any predictions about the
2  anticipated experience under the plan of its
3  actual assets, correct?
4      A    Except to the extent that at the
5  time of this withdrawal, subject to ASOP 27
6  one must be in the best estimate range, we
7  generally would look also at the
8  distribution of returns on the actual
9  portfolio to determine the 25th and 75th
10  percentiles. And that might put bookmarks
11  on the discount rate.
12        MR. MILLER:  I need the list of
13    the Objected Exhibits because I'm
14    going to introduce a heretofore
15    Objected Exhibit.
16  BY MR. MILLER:
17      Q    Doctor, I'm going to hand you a
18  list of Objected Exhibits, an Exhibit 3 from
19  that list. It's a report of an actuarial
20  task force.
21      A    I'm not going to look at it until
22  the lawyer says I can look at it.
23        MR. RICHMAN:  Who objected to
24    this?

ARBITRATION - VOLUME IV

1        MR. MILLER:  You objected to
2  it, just to clarify the record.
3        MR. RICHMAN:  I don't know if
4    you have a copy of it.
5        MR. MILLER:  I'm sorry. It's 3
6    in the list of Objected Exhibits.
7    It's a report of an actuarial task
8    force. That's part of the
9    legislative history of the
10    multiemployer pension plan.
11        MR. RICHMAN:  And I think it's
12    out of bounds here. It's 1979,
13    November 1979. And it is before the
14    law was actually passed. It's
15    legislative history which is not open
16    for forming an opinion of this
17    actuary.
18    I don't understand the use of this.
19    Maybe you should tell us what the use of
20    this is.
21        MR. MILLER:  Fair. This is
22    legislative history. It was
23    submitted -- this report was
24    submitted to Congress in its

ARBITRATION - VOLUME IV

1  deliberation of the Multiemployer
2  Pension Plan Amendments Act of 1980.
3      And it is legislative history in
4  which this actuarial group provided its
5  opinion on the section of ERISA that
6  relates to the actuarial assumptions that
7  should be used to calculate withdrawal
8  liability.
9      And, indeed, our argument as it
10  relates to the Segal blend is that the
11  Segal blend is essentially inappropriate
12  as a matter of law because interpreting
13  that provision, Section 4213, of ERISA
14  that talks about the actuarial
15  assumptions that have to be
16  applied {inaudible-overlapping voices}
17  calculation issue, you shouldn't use the
18  Segal blend.
19      So this is -- we want this in the
20  record for two purposes: First, it's
21  legislative history, so it's not even
22  part of the factual record. The
23  Arbitrator can always take into account
24  legislative history in connection with

ARBITRATION - VOLUME IV

1  construing a particular statutory
2  provision that is, indeed, at issue in
3  the case.
4      And, second, in connection with its
5  use for this expert witness, I'd like to
6  confirm whether this expert agrees with
7  the opinions that were advocated by this
8  group and whether those opinions, if he
9  knows, made their way into the law.
10        MR. RICHMAN:  Well, we heard
11    two key words there, "law" and "law."
12    And what this is is an argument
13    that they can make in their brief at the
14    end of the hearings.
15    It is they are attempting to use it
16    to interpret the law. And also there's
17    argument pro and con with respect to the
18    use of the legislative history and what
19    these folks think.
20    Just as a note wasn't produced, I
21    don't know whether the witness ever saw
22    that.
23    And I know that The Times has been
24    very excited about things that haven't

ARBITRATION - VOLUME IV

1  been produced, but this belongs in a
2  brief.  It doesn't belong with respect to
3  questioning the opinion of this actuary.
4      Now, what The Times' counsel can do
5  is create a question based on materials,
6  and based on this material, he can ask
7  the question about do you believe X.  And
8  then he can argue the legislative history
9  in his brief.
10      ARBITRATOR IRVINGS:  Well,
11  given the fact he could argue
12  legislative history and based on the
13  question and what's here, let's save
14  the time and you can make reference
15  to it and we can get this person's
16  opinion on it.  And it is a small
17  piece of the case.
18      Let's move on.
19      MR. MILLER:  Okay.
20  So I can ask the question?
21      ARBITRATOR IRVINGS:  You can
22  ask the question.  I haven't admitted
23  it yet.
24      MR. MILLER:  I understand.

ARBITRATION - VOLUME IV

1      ARBITRATOR IRVINGS:  Okay.
2      MR. RICHMAN:  Can I take a
3  moment to read the report?
4      MR. MILLER:  Sure.
5      ARBITRATOR IRVINGS:  Do you
6  want to direct him?
7      MR. MILLER:  Sure.  Page 1499
8  of the report indicates that the
9  Academy Task Force was either led by,
10  or certainly a member was Lawrence
11  Bader who developed the principle
12  that the expert witness is adopting
13  for purposes of this case.
14      And on Page 1502, the Academy Task
15  Force advocates to Congress certain
16  language and rules be included in
17  connection with how to calculate
18  withdrawal liability.
19      And I want to ask the witness what
20  he understands the task force to be
21  saying here and whether the
22  recommendation to Congress is consistent
23  with his views and whether he knows, one
24  way or the other, whether Congress in

ARBITRATION - VOLUME IV

1  adopting 4213 expressly adopted the task
2  force's suggestions.
3      That's it.
4      ARBITRATOR IRVINGS:  Go ahead.
5  Ron, have you had a chance to read
6  it?
7      THE WITNESS:  Could I read it?
8  I've never seen this.
9      ARBITRATOR IRVINGS:  Absolutely
10  not.  No, you can read it.
11      THE WITNESS:  I'll be honest
12  with you, I have never seen this
13  document before to my recollection,
14  so I would like to read a few pages.
15      ARBITRATOR IRVINGS:  Go ahead.
16      THE WITNESS:  Okay.
17      MR. MILLER:  Okay.
18  BY MR. MILLER:
19      Q    I'm going to ask you a couple quick
20  questions about this task force report.
21      On Page 1499, you see that Lawrence
22  Bader's name is mentioned.
23      Is this the same Lawrence Bader
24  that you were previously testifying about in

ARBITRATION - VOLUME IV

1  connection with the development of the Bader
2  swap?
3      A    Yes.
4      Q    And if you turn to the fourth or
5  fifth page of the report under the heading
6  Withdrawal Liability, which is Section
7  Number 6, Section Number 6 of the report
8  indicates that this task force is requesting
9  that the withdrawal liability amendments
10  that Congress was then considering be
11  clarified to provide that the total unfunded
12  vested liability of the plan be based on
13  PBGC assumptions for valuing all vested
14  benefits.
15      Do you see that?
16      A    Yes.
17      Q    And that AAA Task Force
18  recommendation is consistent with your views
19  based on the Bader swap, correct?
20      A    Yes.
21      Q    And just below that, the task force
22  goes on to say that Schedule B numbers are,
23  quote, inappropriate for determining
24  withdrawal liability."

ARBITRATION - VOLUME IV

2      Do you see that?
3    A   Yes.
4    Q   Right.  And what are the Schedule B
5  numbers that they're referring to?
6    A   This was issued, if we look at the
7  date on this document, November 7, 1979, at
8  a time when valuation interest rates were
9  well below PBGC interest rates and so, like
10  a withdrawal liability using valuation
11  assumptions, produced much higher withdrawal
12  liabilities than would have been developed
13  using PBGC assumptions.
14      And Congress decided to -- did not
15  specifically explicitly adopt this
16  recommendation.
17      Had they adopted this
18  recommendation at that time, most withdrawal
19  liabilities would have been much lower than
20  they were under practice as adopted
21  subsequent to the enactment of MEPPA.
22      So Congress did not adopt because
23  they felt that the Schedule B numbers had an
24  actuarial basis, if you would have it, to
25  increasing the withdrawal liability, and

ARBITRATION - VOLUME IV

2  Congress decided to increase the withdrawal
3  liability.
4    Q   So just to confirm, Congress did
5  not adopt the task force's suggestion in
6  that regard, did it?
7    A   Congress --
8    Q   That's a yes or no question.
9    A   Congress did not explicitly adopt
10  it, but they permitted it within the range
11  of what the actuary would do.
12    Q   But they did not express --
13      MR. RICHMAN:  Let him finish
14  his answer.
15    A   I'm under affirmation to tell the
16  whole truth, not partial truths.
17    Q   No.  You are under affirmation to
18  answer my questions.  You will have an
19  opportunity to --
20      MR. RICHMAN:  Let him finish.
21  Let him finish.
22      ARBITRATOR IRVINGS:  Finish
23  your answer.
24    A   What Congress did is it let the
25  actuary select an assumption which could be

ARBITRATION - VOLUME IV

2  the Schedule B or could be the PBGC.  It did
3  not explicitly direct the actuary which to
4  do.
5    Q   That's your legal interpretation?
6    A   That's my actuarial interpretation
7  as an actuary having to implement Title IV
8  and having been examined by the Joint Board
9  for the Enrollment of Actuaries on Title IV
10  ERISA.
11    Q   In connection with single-employer
12  plans, am I right that Congress did
13  expressly instruct that PBGC assumptions be
14  used to value vested benefits when a
15  single-employer plan settles its liability,
16  correct?
17    A   Not when it settles it, but when a
18  plan is valued for purposes of turning it
19  over to the PBGC in a distressed
20  termination.
21      When a plan is settled outside the
22  context of a distressed termination,
23  Internal Revenue Code, Section 417(e),
24  interest rates must be used for lump sums
25  and insurance company quotes would be used

ARBITRATION - VOLUME IV

2  for buying annuities.
3    Q   And the 417(e) rates are typically
4  tied to corporate bond rates, correct?
5    A   Today they're tied to corporate
6  bond rates.  At some times they have in the
7  past been tied to Treasuries.
8    Q   And both corporate bond rates and
9  Treasuries are forms of risk-free rates,
10  correct?
11    A   Yes.
12      MR. MILLER:  We're done with
13  this line of questioning on this
14  document.  So will it be admitted?
15      ARBITRATOR IRVINGS:  It's not
16  an actual exhibit.
17      MR. MILLER:  That's correct.
18  It's not -- it doesn't necessarily
19  need to be in the factual record of
20  this case.  It's legislative history
21  and you can determine the value of
22  it.
23      ARBITRATOR IRVINGS:  Right.  I
24  won't admit it as an exhibit.  We can
25  make reference to it.

ARBITRATION - VOLUME IV

1  
2     THE WITNESS:  Should I close
3  this book up?
4     MR. MILLER:  Yes.
5  BY MR. MILLER:
6     Q    And, in fact, let me ask you this.
7  I do have about 20 minutes left.
8     Doctor, your testimony discussed
9  the so-called cash flow matching method to
10  develop an investment return assumption or
11  discount rate both in the course of this
12  examination and the examination with
13  Mr. Richman.
14     Do you remember discussing the
15  so-called cash flow matching method?
16     A    I remember the cash flow method.  I
17  don't remember all the things that we
18  discussed.
19     Q    Okay.  Do you believe that the
20  Pension Fund here or, more particularly, its
21  actuaries used the cash flow matching method
22  to develop the 7.5 percent rate that they
23  used for funding valuation purposes?
24     A    There's nothing in the reports that
25  I was provided that indicated how they came

ARBITRATION - VOLUME IV

1  
2  up with the 7.5 percent.
3     Q    Let's assume for purposes of the
4  next question that the 7.5 percent rate was
5  in fact developed by the actuary here using
6  the building-block method.
7     Assuming that to be the case, would
8  it be proper to use the distinct cash flow
9  matching method to develop a different
10  discount rate solely for withdrawal
11  liability purposes?
12     MR. RICHMAN:  Objection as to
13  the use of the term "proper."
14     MR. MILLER:  Actuarially
15  proper.
16     ARBITRATOR IRVINGS:  Okay.
17  Thank you.
18     A    Number one, I cannot accept as a
19  given that they used the building-block
20  approach because when I observed the
21  information from the different 5500s, the
22  asset mix in different year ends was
23  different.  And if they truly used the
24  building-block approach, they would have had
25  different expected return assumptions for

ARBITRATION - VOLUME IV

1  
2  each valuation.
3     So I cannot accept that 7.5 was the
4  building-block approach in each and every
5  one of those years because with different
6  asset mixes, it would be highly implausible
7  that they come up with the same answer.
8     Q    So it's your actuarial judgment,
9  even though -- strike that.
10     It's your actuarial judgment based
11  on what you have looked at that you do not
12  believe that the actuary for this plan in
13  fact used the building-block approach?
14     A    I cannot believe they used the
15  building-block approach and applied it for
16  each and every one of those years, because
17  if they had done so, they probably would
18  have come up with a different expected
19  return on plan assets for each and every one
20  of those valuations.
21     Q    I just want to drill down quickly
22  on this.
23     Are you sceptical about whether the
24  plan's actuary in this case used the
25  building-block approach for developing the

ARBITRATION - VOLUME IV

1  
2  discount rate for the time period around
3  which the withdrawal liability calculation
4  was made?
5     A    I don't know whether they did it
6  then or at a different time or whether they
7  just did it at some other date and left the
8  number unchanged.  I have no idea when and
9  if they did it.
10     Q    All right.
11     Now I want to ask a different
12  question.  I want you to assume that they
13  did it, okay.
14     Assume that they developed
15  7.5 percent using the building-block
16  approach.  Given that assumption, would it
17  be proper to use the distinct cash flow
18  matching method to develop a different rate
19  solely for withdrawal liability purposes?
20     A    Well, let's rephrase it that my
21  view is maybe they should have used the cash
22  flow discount method for both.
23     Q    But that's not the question that I
24  asked.  Just answer the question.
25     A    So, if appropriate, I think that

ARBITRATION - VOLUME IV

the cash flow method is the appropriate
method and that perhaps both of them should
have been done using the cash flow method.

Q    In your experience with
multiemployer plans, am I correct that
withdrawal liability payments are typically
made into the same pool of assets and
invested alongside employer contributions
and any other sources of income for the
pension plan, correct?

A    Most multiemployer funds will have
one pool of assets where they invest all the
money.

Q    And that would include the
withdrawal liability payments that they
receive from the withdrawing employers,
correct?

A    Correct.

Q    And the withdrawal liability
payments are used by multiemployer plans to
pay all liabilities and benefits just like
regular employer contributions, correct?

A    All the money is in one trust fund.
And under Internal Revenue Section -- I

ARBITRATION - VOLUME IV

believe it's 414(l) -- I believe that as a
single plan, all assets are available for
all benefits.

Q    Okay.

Doctor, do you recall that in
connection with your direct examination, you
discussed a Section 4213 of ERISA which
contains the statutory requirement that
actuarial assumptions and methods that are
used to calculate withdrawal liability need
in the aggregate to be reasonable?

A    I believe so.  If I could have a
copy of my report, it would help.

May I look at it?

Q    Yes, absolutely.

A    So could you repeat the question?

Q    Sure.  I asked you, frankly, to
recall your direct examination testimony and
whether in connection with the direct
examination you had agreed with the legal
proposition that for purposes of withdrawal
liability calculations, actuarial
assumptions and methods need, in the
aggregate, to be reasonable?

ARBITRATION - VOLUME IV

A    That's what the statute says.  It
says "must select assumptions and methods
which, in the aggregate, are reasonable."

Q    And this requirement to select
actuarial assumptions and methods that in
the aggregate are reasonable, this
requirement is not unique to the withdrawal
liability context.  It also applies to
actuaries in other contexts?

A    There are other contexts.  Some
require that each assumption be reasonable,
and others require that the assumptions in
the aggregate be reasonable.  We would have
to look at the specific cite to determine
whether it is in the aggregate or assumption
by assumption.

Q    And this requirement that actuarial
assumptions and methods be used which in the
aggregate are reasonable, does that also
apply to a plan and satisfy minimum funding
requirements?

A    Yes, subject to.  In some instances
it's a stronger test on funding that they
may require each assumption to be reasonable

ARBITRATION - VOLUME IV

or it could be in the aggregate -- and I'd
have to look at the specifics.  I know
single-employer plans, it's each assumption.
Multiemployer plans, historically was in the
aggregate.  But I believe they may have made
some changes and I'd have to check the exact
wording.

Q    Do you agree that the use of the
same language in these different contexts
tends to act as a check on the actuary's
discretion?

A    The actuary could not -- assuming
all the other assumptions are reasonable,
the actuary could not select a zero percent
discount rate or select a 25 percent
discount rate because those would not in the
aggregate be reasonable.

So there is some -- I won't call
"handcuffing" -- but some limitations put on
the actuary.

Q    But I asked a slightly different
question.  My question was:  The ERISA
statute employ's identical language to
describe actuarial assumptions and methods

ARBITRATION - VOLUME IV

1
2  to be used in determining whether a plan is
3  satisfying minimum funding requirements and
4  properly calculating withdrawal liability,
5  correct?
6      A    It uses similar language.  However,
7  I believe what that does is it puts similar
8  boundaries on both.  It does not require the
9  same answer for both.
10      Q    And would it be fair to
11  characterize those boundaries as a check on
12  the actuary's discretion?
13      A    They are limitations on the
14  actuary's discretion.  I don't know if you
15  call it a "check."  It's a limitation.
16      Q    Do you agree that use of
17  assumptions such as low interest rates, that
18  would tend to increase the fund's unfunded
19  vested liability for withdrawal liability
20  purposes, would also make it more difficult
21  for the plan to satisfy minimum funding
22  requirements if those same assumptions were
23  used?
24      A    Those same assumptions -- if you
25  lower the discount rate for minimum funding,

ARBITRATION - VOLUME IV

1
2  the minimum funding requirements would go up
3  and make it more difficult for the fund to
4  satisfy minimum funding requirements.
5      Q    Do you agree with the notion that
6  the discount rate assumption that is used to
7  compute unfunded vested benefits for
8  withdrawal liability purposes is a critical
9  assumption to the analysis?
10      A    The discount rate is a critical
11  assumption in determining withdrawal
12  liability and unfunded vested benefits.
13      Q    Do you agree that --
14      A    But as is mortality and other
15  assumptions.
16      Q    Do you agree that the discount rate
17  used to compute unfunded vested benefits for
18  withdrawal liability purposes must be used
19  for other purposes as well?
20      A    What other purposes?
21      Q    Minimum funding, for example?
22      A    I believe the assumptions are
23  permitted to be the same and are permitted
24  to be different.
25      Q    So am I correct that you disagree

ARBITRATION - VOLUME IV

1
2  that the discount rate used to compute
3  unfunded vested benefits for withdrawal
4  liability purposes must be used for minimum
5  funding purposes?
6      A    I got the plus and minus mixed up
7  on it.
8           I disagree that you must use the
9  same interest rate for minimum funding and
10  withdrawal.
11           Otherwise, we could say whatever
12  rates you used for withdrawal must be used
13  for minimum funding.  Could be argued either
14  way.
15           MR. RICHMAN:  Just answer the
16  question.
17      Q    Are there any other contexts aside
18  from minimum funding in which you believe
19  the same discount rate used to compute
20  unfunded vested benefits for withdrawal
21  liability purposes must be used?
22           MR. RICHMAN:  I'm sorry.  Hang
23  one second.
24           MR. MILLER:  And, Ron, I can
25  rephrase.  Let me rephrase.  That's

ARBITRATION - VOLUME IV

1
2  fine.  Make it more clear.
3  BY MR. MILLER:
4      Q    Do you believe that there are any
5  instances in which an actuary needs to use
6  the same discount rate that it is using to
7  compute unfunded vested benefits for
8  withdrawal liability purposes?
9      A    The actuary has to use discount
10  rates for a myriad of purposes.  I have not
11  cataloged them all.  Some would use the same
12  as withdrawal liabilities, some would use
13  other discount rates.  I can't categorically
14  say which ones without looking at a list of
15  what I'd have to do.
16      Q    Is it your opinion that if a court
17  were to rule that the discount rate used to
18  compute unfunded vested benefits for
19  withdrawal liability purposes must be used
20  for other actuarial purposes, such court
21  would be in error?
22           MR. RICHMAN:  Objection.
23      A    I don't know what other purpose --
24           MR. RICHMAN:  Excuse me.
25           Objection.  Are you asking a legal

ARBITRATION - VOLUME IV

1  question here?
2       MR. MILLER:  I'm asking based
3  as an actuarial judgment matter.
4       ARBITRATOR IRVINGS:  You can
5  ask him based on actuarial judgment
6  whether he must use the same.  But to
7  ask him to decide whether a court is
8  right or wrong --
9       MR. MILLER:  I'll withdraw the
10  question.
11       THE WITNESS:  I do not have a
12  J.D.
13  BY MR. MILLER:
14      Q    Dr. Kra, you agree, do you not,
15  that even a single unreasonable actuarial
16  assumption is capable of rendering actuarial
17  assumptions that are used to compute
18  withdrawal liability unreasonable in the
19  aggregate?
20      A    I'm sorry?
21      Q    Let me restate the question.
22       Do you agree that, if a single
23  actuarial assumption that's part of the
24  withdrawal liability calculation is

ARBITRATION - VOLUME IV

1  unreasonable, that that single unreasonable
2  actuarial assumption is capable, depending
3  on its magnitude, of rendering the actuarial
4  assumptions in the aggregate to be
5  unreasonable?
6      A    A single unreasonable assumption
7  could end up resulting in the withdrawal
8  liability -- or the assumptions in the
9  aggregate being reasonable or unreasonable
10  depending on the other factors, such as are
11  there offsetting assumptions in the other
12  direction or not.
13       So, for example, if you had all the
14  assumptions which are barely reasonable on
15  one end and then you had another assumption
16  way off the chart just further down, then it
17  would be unreasonable.
18       On the other hand, if all the other
19  assumptions were just at the upper end on
20  one extreme and this assumption were down on
21  the other side unreasonable, on the
22  aggregate you could have very reasonable
23  results.
24       So the selection of one

ARBITRATION - VOLUME IV

1  unreasonable assumption does not necessarily
2  determine whether the total result is
3  reasonable or unreasonable.
4      Q    Right.  But conceptually, a single
5  unreasonable actuarial assumption, if not
6  offset by other assumptions, could render
7  the actuarial assumptions in the aggregate
8  to be unreasonable, correct?
9      A    A single unreasonable assumption
10  might be unreasonable, let's say, just a
11  smidgen below the regional line --
12       ARBITRATOR IRVINGS:  Okay.
13  Let's move on.
14      Q    Are there other actuarial
15  assumptions that were made in connection
16  with the withdrawal liability assessment
17  against The Times in this case that are, in
18  your view, unreasonable -- strike that.
19       Is it your judgment that use of the
20  Segal blend assumption is reasonable
21  standing alone?
22      A    I believe that the use of Segal
23  blend assumption as used in this withdrawal
24  liability calculation would give a more

ARBITRATION - VOLUME IV

1  reasonable assumption than the funding
2  valuation assumption.
3      Q    So I take it that's another way of
4  saying, yes, that the Segal blend assumption
5  is reasonable standing alone?
6      A    Standing alone, the Segal blend
7  assumption I believe is a more reasonable
8  assumption than the valuation interest rate.
9      Q    In your view, were there any other
10  actuarial assumptions that were made in
11  connection with the withdrawal liability
12  assessment against The Times that, in your
13  view, were unreasonable?
14      A    As I went through my report, I went
15  through the other assumptions, and I
16  indicated that while I believe that some of
17  them were off by a little in different
18  directions -- and we can go through them --
19  that they were not so different as to reach
20  the level of unreasonable.
21       MR. MILLER:  I have no further
22  questions.
23       MR. RICHMAN:  Let me have a few
24  minutes and let's finish him before

ARBITRATION - VOLUME IV

1 ARBITRATION - VOLUME IV
2 lunch.
3 ARBITRATOR IRVINGS:  Yes.
4 MR. RICHMAN:  I have no
5 questions.
6 MR. MILLER:  I would like to
7 pursue further Bader swap -- no, just
8 kidding.
9 ARBITRATOR IRVINGS:  Okay.
10 Fine.  Thank you very much.
11 MR. MILLER:  We're off the
12 record.
13 (A luncheon recess was taken at
14 12:16 p.m. through 1:39 p.m.)
15
16 MITCHELL LEWIS,
17 having been first duly sworn by
18 Arbitrator Irving, was examined
19 and testified as follows:
20 DIRECT EXAMINATION BY MR. RICHMAN:
21 Q    Good afternoon, Mr. Lewis.
22 A    Good afternoon.
23 Q    How are you today?
24 A    I'm good.  Thank you.
25 Q    Are you currently employed?

1 ARBITRATION - VOLUME IV
2 A    I'm.
3 Q    And by whom are you employed?
4 A    I'm a partner at WeiserMazars LLP.
5 Q    How long have you been there?
6 A    Twenty years.
7 Q    And what is your current position
8 there?
9 A    Partner.
10 Q    How long have you been a partner?
11 A    Twenty years.
12 Q    What are your duties at Weiser?
13 A    I'm an audit partner and client
14 relationship partner and oversee the audit
15 practice of our Employee Benefit group and
16 our Nonprofit Organizations group.
17 Q    Are you familiar with the NMDU
18 Pension Fund?
19 A    I am.
20 Q    And when did you first become
21 familiar with it?
22 A    Weiser became the auditors there
23 when I joined them in 1997.
24 Q    And did you have a role with
25 respect to Weiser providing services to the

1 ARBITRATION - VOLUME IV
2 Pension Fund in 1997?
3 A    Yes, I did.
4 Q    And what was your role?
5 A    I was a partner in charge of the
6 aggregate amount.  I had overall
7 responsibility.
8 Q    As partner in charge of the
9 engagement, what services did you provide to
10 the Pension Fund?
11 A    We did the annual audit of the
12 pension, preparation of the Form 5500 and
13 other tasks that might have been needed just
14 in providing service.  Also included at
15 times doing some employer audits.
16 Q    Employer audits.
17 What is an employer audit?
18 A    Visiting participating employers
19 who contribute to the Fund, I review their
20 records for contributions.
21 Q    And you're reviewing their records
22 for contributions for what purpose?
23 A    For accuracy, for completeness,
24 primarily.
25 Q    Is Weiser still the auditor for the

1 ARBITRATION - VOLUME IV
2 Pension Fund?
3 A    No, we're not.
4 Q    When did it cease being the auditor
5 for the Pension Fund?
6 A    The year-end May 31, '13 was our
7 final year.
8 Q    When you say year-end May 31, is
9 that the fiscal year?
10 A    That's the Fund's fiscal year.
11 ARBITRATOR IRVINGS:  Did you
12 say '13?
13 THE WITNESS:  Yes.
14 MR. RICHMAN:  Thirty-one, '13.
15 ARBITRATOR IRVINGS:  Yes.
16 BY MR. RICHMAN:
17 Q    During the time that you were the
18 auditor for the Pension Fund, did you
19 develop an understanding about the basis
20 upon which employers contributed to the
21 Pension Fund?
22 A    Yes, I did.
23 Q    And what was that understanding?
24 A    Based on our understanding of the
25 Funds, employers paid a percentage of

ARBITRATION - VOLUME IV

compensation based on shifts.

Q    And how did you develop that understanding?

A    Reading the documents, the Collective Bargaining Agreements, discussions with the Fund management.

Q    Okay.

With whom in Fund management did you have discussions with about this?

A    Our primary contact was the Fund director Murray Schwartz; however, we also interacted with the various individuals that worked at the Fund office.

Q    Do you know who those individuals are or were?

A    Barbara Albergo was the accountant, bookkeeper.

There were a number of women who worked in the office with various tasks, and I don't remember their last names now. But they each had areas of expertise that they worked on and we interacted with all of them.

Q    When you say "we" interacted with

ARBITRATION - VOLUME IV

all of them, that means more than just you?

A    Yes.  Me and the audit team.

Q    And I know from 1997 to 2013 is a long period of time.

Can you take us through, going backwards from 2013, who participated on this audit team from Weiser?

A    There have been a number of changes during that time period both as a result of people coming and going and promotions, so it would be impossible for me to exactly lay out when and where all of the individuals were.  But each year there was an audit team that had a manager and a staff of one or two or three people.

Q    Okay.  And to whom did the manager report to?

A    To me.

Q    And during the time you were auditor for the Pension Fund, did you develop an understanding specifically about how The New York Times contributed to the Pension Fund?

A    Our understanding was that New York

ARBITRATION - VOLUME IV

Times' contributions were no different, their basic contribution, as any of the other contributing employers.

Q    And how did you develop that understanding?

A    From our years of being there, our reading the Collective Bargaining Agreements, our review of the records reflecting contributions coming in.

Q    Now, when you went to a contributing employer to do a payroll audit, what would you do?

A    We would randomly select a period of time.

During the period we were reviewing, usually a year period, maybe two years, we would select a weekly period based on payroll, and we would request from the contributing employer their payroll records that related to the participating employees of NMDU.

And we would then use that data to compare it to the contribution reports and the dollars that were contributed to the

ARBITRATION - VOLUME IV

Fund.

Q    And when you did this audit, did you or your team go to the contributing employer, or was this done your office?

A    In most cases, we would go to the offices.  There were certain electronic records that were transferred back and forth, but generally we would go to the contributing employer's office.

Q    Have you been to The New York Times' offices?

A    I have not, no.

Q    But members of your team have been there?

A    Yes, I believe.  My recollection is yes.

Q    Okay.

And who decided whether to conduct of a payroll audit of a contributing employer?

A    Fund director would talk to us and then he would talk to the trustees, and it would come as a starting point from there.

Q    Who was the person, if there was

Page 868

ARBITRATION - VOLUME IV

1  one person, or group of people, if there was
2  a group of people, who actually told you to
3  go do an audit of X-employer?
4      A    Fund director.
5      Q    That's Mr. Schwartz?
6      A    Yes.
7      Q    You testified already that you
8  oversaw the performance of an annual audit?
9      A    Yes.
10     Q    And can you take us through the
11 process of doing that?
12     A    ERISA requires Form 5500 to have an
13 audit attached to it.
14         The audit is conducted by an
15 independent auditing firm, independent
16 qualified public accounting firm, which we
17 were, to give an opinion on the financial
18 statements and the attached footnotes.
19 Notes of the financial statement.
20         And that was our primary
21 responsibility of the audit team.
22     Q    And how would you go about
23 fulfilling that responsibility?
24     A    Well, they thought it was a

Page 869

ARBITRATION - VOLUME IV

1  risk-based approach, so we would review what
2  we believed to be the risk areas and focus
3  our procedures in those areas:  Investment
4  portfolio, evaluation of investments,
5  confirmations would be sent, review of
6  pricing, review of contributions by
7  contributing employers, operating expenses
8  of the Fund; all those factored into the
9  various procedures that we performed the
10 duty on.
11     Q    What was the end result of your
12 audit?
13     A    Well, the end result was an issued
14 opinion that was signed and attached to the
15 Fund's financial statements.
16     Q    And who signed the opinion provided
17 by Weiser to the Pension Fund?
18     A    I signed the opinion.
19     Q    Let me show you Exhibit 65.
20         If you can take a look at that,
21 thumb through that.  I'm not going to ask
22 you to read the whole thing, but just take a
23 look and see what is encompassed within the
24 exhibit.

Page 870

ARBITRATION - VOLUME IV

1      A    Okay.
2      Q    Can you identify for us what this
3  is?
4      A    This appears to be the filing of
5  the Form 5500 which includes the audited
6  financial statement for May 31, 2003.
7      Q    Okay.  And what I would like you to
8  turn to, where I have my green tab.  Just
9  kidding.
10         If you look at the numbers at the
11 top, you'll see at the very top is the last
12 four numbers, 0294.
13         Sorry.  Page Numbers 0028, which is
14 in the second line.
15         Do you see that?
16     A    Yes.
17     Q    And if you turn to 0035.
18     A    Yes.
19     Q    And on the top of that page, the
20 page itself is numbered 2.
21         Do you see that?
22     A    Yes.
23     Q    And there is a heading called
24 Contributions and there is a sentence that

Page 871

ARBITRATION - VOLUME IV

1  says, "Participating employers contribute to
2  the plan based on the number of shifts
3  worked by employees as defined by the
4  Collective Bargaining Agreements.  The plan
5  is noncontributory for employees."
6         Do you see that?
7      A    Yes, I do.
8      Q    And did you write that sentence?
9      A    I reviewed this sentence.  I'm not
10 sure I technically wrote it.
11     Q    Okay.  And is there somebody else
12 who wrote the sentence?
13     A    Well, the footnotes are the
14 representation of the Fund.  So as auditors,
15 we are -- we give an opinion on the
16 accuracy, the fairness of the financials
17 including the notes.  So, technically, they
18 are not our notes, they're the Fund's notes,
19 but we review them with Fund management for
20 accuracy.
21     Q    Okay.  And did you review this note
22 about contributions with Fund management?
23     A    Yes.
24     Q    And who at Fund management did you

Page 872

ARBITRATION - VOLUME IV

1  ARBITRATION - VOLUME IV
2  review it with?
3     A    Fund director.
4     Q    Mr. Schwartz?
5     A    Murray Schwartz, yes.
6     Q    Did you review all the notes with
7  Mr. Schwartz?
8     A    Yes.
9     Q    Can you tell me about that process?
10    A    We liked to read the notes to the
11  financial statements before the financials
12  were issued, and so he would go through them
13  with us at sort of an exit meeting prior to
14  the finalizing of the audit process.
15    Q    So were you present when he was
16  reviewing these notes?
17    A    I was.
18    Q    Did he ask questions?
19    A    Sometimes he does -- he did, yes.
20    Q    Do you recall him having any
21  questions about the Contributions section?
22    A    No, no.
23        MR. RICHMAN:  I'll ask Miguel,
24  I've got two more like this exactly.
25    I can go through them if you would

Page 873

1  ARBITRATION - VOLUME IV
2  like.
3        MR. EATON:  Just tell me which
4  ones they are.
5        MR. RICHMAN:  Page number is
6  37.  And then the next one is 33.
7        I'm sorry, let me retract that and
8  let me just go through it.  It may just
9  be easier.
10  BY MR. RICHMAN:
11    Q    So if you turn Exhibit 66.
12        Do you see that?
13    A    Yes.
14    Q    Can you identify what this is,
15  Exhibit 66?
16    A    This is the notes to the financial
17  statement for the year ending May 31, 2004.
18    Q    And if you take a look at Page 37,
19  which is also has "Page 2" on the top of the
20  actual page, what process did you follow in
21  dealing with this statement about
22  contributions?
23    A    We would have reviewed the
24  financial statement with Mr. Schwartz, and
25  either he accepted it as it was or he'd

Page 874

1  ARBITRATION - VOLUME IV
2  modify if he thought that was appropriate.
3  And we would go and conclude the process and
4  then move forward with our process of
5  issuing and completing the audit.
6     Q    Did he have any issue with this
7  description of contributions?
8     A    No, he didn't.
9     Q    Let me have you turn to 67.
10        Do you see that?
11    A    I do.
12    Q    And can you tell us what that is?
13    A    These are notes to the financial
14  statements for the financial statement
15  period ending May 31, 2005.
16    Q    And let's see if I can shorten
17  this.
18        Did you follow the same process in
19  issuing the report, the auditor's opinion,
20  as you did for the two previous ones that we
21  just took a look at?
22    A    We did.  We took the same approach,
23  same process.
24    Q    Let's turn to Page 33 of
25  Exhibit 67.

Page 875

1  ARBITRATION - VOLUME IV
2     A    I'm here.
3     Q    And you see it says
4  "Contributions"?
5     A    Yes.
6     Q    And this time there's a 7 on the
7  bottom of the page, right?
8     A    There is.
9     Q    And this description is different
10  than the description in the two previous
11  exhibits, 65 and 66, correct?
12    A    It is.
13    Q    Can you tell us the process as to
14  how the language was changed for this audit
15  report?
16    A    Well, this is eight, nine, ten
17  years ago, so it's hard to remember exactly
18  what happened with the discussions at the
19  time.
20        However, there were occasions when
21  Mr. Schwartz would read something and think
22  that it should be better described or
23  expanded a bit.  And so that's what was done
24  here.
25        I do recall there was a particular

ARBITRATION - VOLUME IV

1
2  discussion about some of the contributions
3  not relating to Collective Bargaining
4  Agreement.  For example, the Union made
5  contributions not under Collective
6  Bargaining Agreement but under something
7  similar.
8       So my recollection is at the time
9  they were reviewing that and if -- where he
10 felt this footnote should be expanded.
11 Q    Okay.
12      And if you take a look at the
13 second-to-last sentence of that description,
14 it says, "In addition, under certain
15 circumstances specified in their Collective
16 Bargaining Agreements, participating
17 employers made contributions to the plan for
18 shifts that were paid but not work by their
19 employees."
20      Do you see that?
21 A    Yes.
22 Q    And that is in addition to what was
23 in 65, Exhibit 65 and 66, correct?
24 A    Yes.
25 Q    And how did that get in there?

ARBITRATION - VOLUME IV

1
2  A    Again, I'm just trying to recall.
3       The opening sentence talked about
4  shifts worked, and there must have been some
5  conversation at the time:  Well, there are
6  contributions made for nonworking shifts,
7  vacation, sick, Workers' Comp, things like
8  that.  So he must have felt we should expand
9  the description a bit to include those
10 factors.
11 Q    And did you agree with that?
12 A    We did.
13      If I could just say one thing.  The
14 opening paragraph in Note 1 says it's just a
15 brief description.
16      So the details, the real details to
17 the Collective Bargaining Agreement are in
18 the Collective Bargaining Agreements
19 themselves.  This is just a summary based on
20 the account standards.
21 Q    Thank you.
22      During the time that you were the
23 auditor for the Pension Fund, was
24 Mr. Schwartz always the Fund manager?
25 A    I recall the very first year -- as

ARBITRATION - VOLUME IV

1
2  a partner at M.R. Weiser, Mr. Schwartz was
3  the Fund manager the whole time.
4  Q    And during the time that you were
5  the audit partner for the Pension Fund, did
6  the process of meeting with Mr. Schwartz,
7  did the reviewing the footnotes change?
8  A    They did not change.  Except the
9  very final year, May 31, '13, was different
10 because the Fund office had just closed and
11 that report was issued in March of '14.  So
12 during that time, we did not have that
13 conversation with Mr. Schwartz.
14      MR. RICHMAN:  Now, Miguel, I
15 can go through 68 through 75.
16      Do you want to take a look at them
17 and see if --
18      MR. EATON:  Yeah, let me take a
19 look at them.
20      MR. RICHMAN:  Sixty-eight is
21 Page 61 and it's -- the Bates Number
22 is 1487.
23      MR. EATON:  Okay.
24      MR. RICHMAN:  Sixty-nine is
25 Page 59.  And it's Bates 1793.

ARBITRATION - VOLUME IV

1
2       Exhibit 70, it is -- the Bates
3  numbers is easiest to go by -- 2042.
4       MR. EATON:  Okay.
5       MR. RICHMAN:  And Exhibit 71 is
6  Bates 1572.
7       MR. EATON:  Okay.
8       MR. RICHMAN:  And 72 is Bates
9  1719.
10      MR. EATON:  Okay.
11      MR. RICHMAN:  And 74 is Bates
12 1953.
13      ARBITRATOR IRVINGS:  74?  What
14 happened to 73?
15      MR. RICHMAN:  Oh, okay.
16 Seventy-three was the --
17      Seventy-four is the amended --
18 We can do 73.
19      ARBITRATOR IRVINGS:  I'm sorry.
20 On 73, it's on Page 2118.
21      MR. EATON:  Seventy-three is
22 fine with us.
23      MR. RICHMAN:  And 74 is on
24 1953.
25      MR. EATON:  Okay for 74.

Page 880

ARBITRATION - VOLUME IV

1      MR. RICHMAN: And 75 is on
2  1637.
3      MR. EATON: Okay.
4      MR. RICHMAN: And 76 is 1869.
5      MR. EATON: Okay.
6  BY MR. RICHMAN:
7      Q    Mr. Lewis, maybe we'll just take a
8  look at Exhibit 76 so you can take a look at
9  the language.
10      And we're going to Bates Number
11  1869 which is on the bottom.
12      Okay.
13      And in the second-to-last sentence
14  of the paragraph under Contributions, it
15  says, "Under certain circumstances ..."
16      Do you see that language?
17      A    Yes.
18      Q    "... specified in the Collective
19  Bargaining Agreements."
20      Can you give us an example of those
21  circumstances?
22      A    Vacation pay, not worked, but was
23  paid. Workers' Comp.
24      Q    Were there others as well?

Page 881

ARBITRATION - VOLUME IV

1      A    Sick. I don't recall exactly.
2  Those are certainly a number of days that
3  fell into this category.
4      Q    Now, when you did a payroll audit,
5  did you note the position of the person for
6  whom the employer was contributing?
7      A    No, we would not know the position.
8      Q    And what would you see or look at?
9      A    We would see payroll journals that
10  would list the individual employees of the
11  contributing employer and their pay for that
12  period, gross pay, the net pay,
13  withholdings.
14      I don't recall exactly, but
15  generally that's what the pay would have.
16  It might have -- that's primarily --
17      Q    What you would look at?
18      A    What we would look at.
19      Q    Were there ever situations where
20  you had questions for the employer,
21  contributing employer?
22      A    There were occasions, yes.
23      Q    And how did you deal with those
24  questions?

Page 882

ARBITRATION - VOLUME IV

1      A    We had a -- whoever the contact was
2  at the contributing employer we were
3  interacting with would be the person we
4  would ask questions of.
5      Q    Did you discuss your annual audit
6  reports at a trustees meeting?
7      A    We did discuss our annual reports,
8  yes.
9      Q    And what was the nature of the
10  discussion?
11      A    The reports had already been issued
12  and returns had been filed by that time.
13      Generally, just an overview of the
14  audit, and the report itself was included in
15  the package of all the trustees.
16      Q    I just want to make sure I
17  understand.
18      Did the trustees have a copy of the
19  annual audit?
20      A    Yes.
21      Q    Did you ever get a question from
22  Mr. Hayes with respect to the contribution
23  footnotes that we were looking at?
24      MR. EATON: I'm going to

Page 883

ARBITRATION - VOLUME IV

1  object. It's vague. There's a long
2  time period going on here.
3      ARBITRATOR IRVINGS: Ever? Go
4  ahead. I'm saying at any point did
5  Mr. Hayes object to -- that's fine.
6      MR. RICHMAN: Okay.
7  BY MR. RICHMAN:
8      Q    Did at any point Mr. Hayes, during
9  the time he was a trustee, object to the
10  language of the contribution provisions that
11  we've been looking at in your audit reports?
12      A    No.
13      Q    Did any of the trustees other than
14  Mr. Hayes at any time object to the language
15  that was in the Contribution section of the
16  audit report?
17      A    No.
18      Q    Did Neal Schelberg?
19      Do you know who Neal Schelberg is?
20      A    I do.
21      Q    And who is he?
22      A    One of the counsels to the Fund.
23      Q    Did Mr. Schelberg at any time
24  object to the language of the Contributions

ARBITRATION - VOLUME IV

1
2  section in your audit opinion?
3      A    No, no.
4      Q    Let me just ask a collective:  Did
5  anybody object to the language concerning
6  the contribution provisions that was
7  reviewed in your audit report?
8      A    No, no one ever did.
9      Q    Did you ever review -- I'm sorry.
10  Withdraw that.
11      Did the Fund have a standardized
12  remittance report for employers to use in
13  contributing to the Fund?
14      A    No.  The Fund did not have a
15  standard format.
16      They accepted the reporting formats
17  of the individual contributing employers.
18      Q    And were all the formats the same
19  as the contributing employers?
20      A    They were all different.
21      Q    I saw you smile.
22      A    Each contributing employer had
23  their own system, software, formats, and the
24  Fund office accepted them as they were.
25      Q    I want to turn to Exhibit 72 again,

ARBITRATION - VOLUME IV

1
2  if I may.
3      So you could turn to the Bates
4  Number 1684, please.  It's Schedule R.
5      A    Okay.
6      Q    Now, what is Schedule R a schedule
7  to?
8      A    Schedule R is an attachment to
9  Form 5500.
10      Q    And for the Pension Fund, did you
11  complete Schedule R?
12      A    Yes, we did.
13      Q    And can you tell us what shows up
14  on Schedule R?
15      A    This was a schedule of contributing
16  employers that had contributed more than
17  5 percent of total contributions for the
18  plan year.
19      Q    And you see Exhibit 72, can you
20  identify the contributing employers who
21  contributed more than 5 percent of plan year
22  to the Pension Fund?
23      A    Daily News, New York Times, New
24  York Post, Hudson News, Newark Morning
25  Ledger.

ARBITRATION - VOLUME IV

1
2      Q    If you would look at on the
3  left-hand side, do you see the Number 13?
4      A    Yes.
5      Q    And go down to E.
6      Do you see that?
7      A    I do.
8      Q    And it says, "Contribution rate
9  information (if more than one rate applies,
10  check this box and see instructions
11  regarding required attachment), otherwise
12  complete Items 13E1 and 13E2."
13      Now, in Exhibit 72, the box is
14  checked.
15      Did you check that box?
16      A    We did.
17      Q    Okay.  And did you attach something
18  to the schedule?
19      MR. RICHMAN:  Do you mind if I
20  help him find the page?
21      MR. MILLER:  That's fine.
22  BY MR. RICHMAN:
23      Q    If you take a look at 1709.  And if
24  you can tell us what that is.
25      A    This was just a supplemental

ARBITRATION - VOLUME IV

1
2  schedule showing different rates based on
3  these particular shifts that were worked.
4      Q    Okay.  And you say "shifts that
5  were worked."  Where are shifts on this
6  page?
7      A    The day rate, the short night, the
8  long night.  Saturday night is a particular
9  day of the work week and it was known as a
10  shift.
11      Q    And you see on the right-hand side
12  of the page, it says daily high rate, daily
13  low rate with numbers?
14      A    Yes.
15      Q    What are those numbers?
16      A    Those are the dollars required to
17  be contributed for that particular shift
18  that was worked in particular for those
19  employees.
20      Q    Let's go back to 1684, please.
21      You got that?
22      A    I do.
23      Q    So if you look E2, it says "base
24  unit measure" and it has a box for hourly, a
25  box for weekly, a box for unit production.

ARBITRATION - VOLUME IV

And then it has a box that says "other
specify."

    I'm just reading the form parts
right now.

    A   Yes.

    Q   And you filled that in by checking
the box and writing "8 percent of daily wage
rates."

    A   We did.

    Q   Why did you do that?

    A   Because that's what the Collective
Bargaining Agreement called for.

    Q   Do you know what a base unit
measure is?

    A   It's not a term I used.  So
generally, no.

    Q   Now let's go to 74.

    There were two --

    Exhibit 73 is a Form 5500 -- and
you can look at it in your book -- for the
year 2010.

    And Exhibit 74, if you flip,
there's also a Form 5500 for the year 2010.

    Do you see that?

ARBITRATION - VOLUME IV

    A   Yes.

    Q   How come there were two that year?

    A   There were two because the second
form was an amended return because of
inaccuracy in the census information.

    Q   In the census information.

    Did it have anything to do with the
contribution rate?

    A   No.

    Q   Okay.  So take a look at
Exhibit 74, please.  And take a look at
1914.

    A   Okay.

    Q   Now, on the left-hand side of the
page under 13, you see the names of the
contributing employers?

    A   Yes.

    Q   And is there any difference in the
way you filled out this for 2010,
Exhibit 74, and what you did for the prior
year?

    A   No difference, other than the
dollar amounts, that I recall.

    Q   Okay.  Let's turn to 1940, please,

ARBITRATION - VOLUME IV

of that same exhibit.

    A   Okay.

    Q   And is that information any
different than the information that you
provided in Exhibit 72?

    A   It's the same format.

    Q   And if you flip back and forth, you
see the rates are different.

    A   If the rates are different, it's
because there was a new updated Collective
Bargaining Agreement or something that would
have changed the rates.

    Q   But the format is the same?

    A   Yes.

    Q   Now, let's take a look at 75,
Exhibit 75, please.

    So if you take a look at Bates
Number 1611, please.

    A   Okay.

    Q   Is this the same format as the
other two that we looked at?

    A   Yes, it is.

    Q   And you see 13E has a check in the
box.

ARBITRATION - VOLUME IV

    Do you see that?

    A   Yes.

    Q   But it's hard to prove a negative,
but I can tell you having looked through
this, there is no attachment.

    A   Right.

    Q   And if you take a look at 76, 1834.
And 13E, you checked the box.

    Do you see that?

    A   Yes.

    Q   And I can tell you -- we can all
take a look and if someone finds it they get
extra points, because we haven't been able
to find an attachment for either Exhibit 75
or 76.

    And can you tell us why there is no
attachment?

    A   I cannot.

    Should have been attached.

    Q   Did you ever do an audit of C & S?

    A   We did do an audit of C & S.

    Q   Do you know who asked you to do
that audit?

    A   Fund director, Mr. Schwartz.

ARBITRATION - VOLUME IV

1 
2 Q   Do you know why he asked you to do
3 that audit?
4 A   Because C & S was closing and the
5 Fund felt that before the records scattered,
6 that it makes sense to go in there and
7 review and do procedures to see about the
8 compliance with the contributions.
9 Q   And were you involved in that
10 audit?
11 A   I was.
12 Q   And what was your role in the
13 audit?
14 A   I oversaw the process and
15 procedures.
16 Q   Let me show you Exhibit 51.
17    Do you see that?
18 A   I do.
19 Q   And these are minutes of a trustees
20 meeting; is that correct?
21 A   Yes.
22 Q   Let's turn to page 1244.
23    You see Roman numeral VII and you
24 see C?
25 A   Yes.

ARBITRATION - VOLUME IV

1 
2 Q   And there is a discussion about the
3 City & Suburban audit?
4 A   Yes.  I see that.
5 Q   And it says that "attached hereto
6 as Exhibit G."  It's a letter from you dated
7 April 20, 2010.
8    Do you see that?
9 A   I do.
10 Q   And before we turn to that exhibit,
11 if you turn the page to 1245, you see the
12 last sentence says, "A meeting has been
13 scheduled to discuss and reconcile the
14 findings with the employer after which you
15 advised the Pension Fund accordingly."
16    Do you see that?
17 A   I do.
18 Q   And did you ever schedule a meeting
19 with C & S?
20 A   We did.  Technically, we had our
21 meeting with The New York Times.
22 Q   And why did you have the meeting
23 with The New York Times?
24 A   Because they were our contact.  The
25 records were maintained by The Times and

ARBITRATION - VOLUME IV

1 
2 those were the individuals we were directed
3 to contact to do the audit.
4 Q   And let's go to what is marked
5 Bates Number 1246, please.
6 A   Okay.
7 Q   And can you tell us what that is?
8 A   Well, this is just the first page
9 of the memo communicating our findings of
10 procedures that we did related to C & S.
11 Q   Okay.  And I can't read her name
12 because her initials are hiding somewhere in
13 the letters.  Ivy --
14 A   Narissi.
15 Q   Ivy Narissi.
16    And who is she?
17 A   She works at WeiserMazars as a
18 manager.
19 Q   And what was her role in connection
20 with this audit?
21 A   She's more directly involved with
22 the team that actually did the testing and
23 supervised and managed them, and she
24 reported to me.
25 Q   Okay.  The work that was done on

ARBITRATION - VOLUME IV

1 
2 this audit, was any of it done at the
3 offices or facilities at The New York Times?
4 A   I can't say specifically.  I
5 believe they were.
6 Q   And if you look at the second
7 paragraph on the front page of the memo, it
8 talks about, at the bottom of that paragraph
9 talks about, "The procedures and findings
10 are as follows."
11    And can you describe to us what
12 were your procedures and findings?
13 A   Well, as we wrote here, we
14 requested the payroll reports for these
15 periods that we selected.  We recalculated
16 the shifts that were worked for the
17 employees that we had selected, and we
18 compared them to the transmittal reports
19 which was the reports of contributions to
20 the Fund, to compare to see if there were
21 any differences between shifts that were
22 worked and shifts that were contributed for.
23 Q   Okay.
24    And when you said from the weekly
25 payroll reports we recalculated the number

1      ARBITRATION - VOLUME IV
2   of shifts, why did you have to recalculate
3   the number of shifts?
4      A    I'd be guessing.  Either the
5   numbers weren't there, the shifts were not
6   easily reconcilable from the reports we had,
7   but it was something that we had to do.
8      Q    Okay.
9            Well, the Pension Fund
10  contributions came in on what basis?  I'm
11  talking about a time period.
12     A    Monthly, I believe.
13     Q    And when did Welfare contributions
14  come in?
15     A    I believe weekly.
16     Q    And did The Times report shifts on
17  a monthly basis?
18     A    They reported shifts -- I believe
19  they reported shifts on a monthly basis.
20     Q    On a monthly basis?
21     A    You know, I don't want to guess.  I
22  don't recall exactly.
23     Q    The second point that you have is,
24  "The test of qualifying shifts included
25  verification of inclusion of paid absences

1      ARBITRATION - VOLUME IV
2   such as vacation days, paid sick days,
3   et cetera in the computation of
4   contributions."
5            What is the "test of qualifying
6   shifts"?
7      A    That was our review of these
8   payroll records to see that all the shifts
9   were included -- "qualifying shifts" meaning
10  somebody might have worked or just been paid
11  for nonworking shifts to see that they were
12  included in the contributions.
13     Q    If you turn the page to 1247, Bates
14  number.
15           Do you see that?
16     A    Yes.
17     Q    At the top, it's A, Finding.
18           Can you tell us what your finding
19  was?
20     A    Our finding was that the rate that
21  was used to calculate the shift contribution
22  was different than what we believed it
23  should have been.
24     Q    And what did you believe it should
25  have been?

1      ARBITRATION - VOLUME IV
2      A    Based on the shift contribution
3   rate.
4      Q    And what was it based on?
5      A    It was a fixed amount.  It's the
6   same dollar amount for all employees rather
7   than distinguishing the type of day or work
8   period they worked.
9      Q    Okay.
10           When you say day or work period --
11     A    Meaning a long day, a long night, a
12  Saturday night.  All of those have different
13  rates.  But these contributions were all
14  paid based on the same rate.
15     Q    Okay.
16           And then you reached a conclusion.
17  And you say, "This is inconsistent about how
18  Welfare contributions are calculated."
19           Why are you mentioning Welfare
20  contributions?
21     A    The testing that we do are both
22  Welfare and Pension since the participants
23  or the employees were the same, and the
24  shifts process was the same as well.
25           So for Welfare, they were paying

1      ARBITRATION - VOLUME IV
2   based on the shifts and the percentage, but
3   for pension, they weren't.  And that's why
4   we made that notation.
5      Q    Let me take you to Exhibit 45.
6      A    Okay.
7      Q    So this was a trustees meeting?
8      A    Yes.
9      Q    Okay.  And you see on Page Bates
10  Number 1250, there is a -- says that you
11  "reviewed the final results of the payroll
12  audit of the City & Suburban Delivery
13  Systems, Inc."
14           Do you see that?
15     A    Yes, I do.
16     Q    And did you actually do that with
17  the trustees?
18     A    I don't know if we did it with the
19  trustees or we did it with Fund counsel and
20  Fund director.
21     Q    Well, Exhibit 45 is a minutes of a
22  meeting of the trustees, if you turn to the
23  front page.
24     A    Right.
25     Q    Okay.

ARBITRATION - VOLUME IV

1
2    And these are minutes of that
3    meeting.  The B on Page 1250 is minutes of
4    that meeting?
5         A    Yes.
6         Q    Do you have any reason to believe
7    that you didn't review it --
8         A    No.
9         Q    -- with the trustees?
10        A    No.  I'm sorry.  You are right.
11        Q    Just so the record is clear --
12        A    I was looking at it because the
13   date of the letter was in June and the
14   trustees meeting was in December.  So it was
15   reviewed with the trustees three months
16   later.  That's all I was trying to say.
17        Q    Okay.  Got it.  Thank you.
18        And let's take a look at Page 1251
19   Bates number.
20        A    Okay.
21        Q    And can you tell us what this is?
22        A    This was a summary after more
23   detailed reviews.  And the review with
24   individuals I guess at The Times related to
25   C & S to conclude on what the dollars were

ARBITRATION - VOLUME IV

1
2    that resulted in the underreporting that we
3    identified in our procedures, previously
4    talked about.
5         Q    Okay.  And would you take a look at
6    the second paragraph.  "To address these
7    discrepancies, Weiser held meetings,
8    numerous phone calls and e-mail
9    communications with The New York Times over
10   the past few weeks to finalize a total
11   underreporting of contributions to the
12   Pension Fund."
13        Do you see that?
14        A    Yes.
15        Q    Do you have knowledge who at Weiser
16   participated in those meetings?
17        A    The manager in the engagement, Ivy
18   Narissi, and myself.
19        Q    And do you recall who you met with
20   at The Times?
21        A    Not specifically.
22        Q    Okay.  Do you recall where you met?
23        A    Probably the meetings might have
24   been at The New York Times with my staff.  I
25   remember having some phone conversations.

ARBITRATION - VOLUME IV

1
2    So between us, we did these different
3    things.
4         Q    Okay.  And let's take a look at
5    Bates Number 1252, please.
6         And if you would look at the top of
7    the page, it says "Result."
8         A    Okay.
9         Q    Do you see that?
10        A    Yes.
11        Q    "Times agreed that the hourly rate
12   calculation should only be used for
13   apprentices" and recalculated the period
14   January 1, 2007 through December 31, 2008.
15        And how was that recalculated?
16        A    The Times went back and refigured,
17   recalculated again based on the appropriate
18   shift rates for the individuals during that
19   period.  It was too cumbersome and
20   voluminous for us to have done that.
21        Q    Okay.
22        When you discussed this issue at
23   the meeting on September 24, 2010, did
24   anyone object to your findings?
25        A    No, no one objected.

ARBITRATION - VOLUME IV

1
2         Q    Did anyone raise questions about
3    the basis on which The Times should be
4    contributing to the Pension Fund?
5         A    No.
6         MR. RICHMAN:  I just want to
7    take about five minutes.
8         ARBITRATOR IRVINGS:  Sure.
9    Thank you.
10        (A brief recess was
11   taken.)
12        MR. RICHMAN:  Back on.
13        ARBITRATOR IRVINGS:  Go right
14   ahead.
15        MR. RICHMAN:  Okay.
16   BY MR. RICHMAN:
17        Q    Mr. Lewis, could you tell from
18   Exhibits 45 and 51 how much money was due
19   from The Times that The Times paid as a
20   result of its paying an hourly rate versus a
21   shift rate?
22        ARBITRATOR IRVINGS:  I'm sorry.
23   Again, the exhibit?
24        MR. RICHMAN:  Forty-five and
25   51.

1    ARBITRATION - VOLUME IV
2        A    I can tell the total amount.  Total
3    amount, yes.
4        Q    And what was that?
5        A    $343,289.
6        Q    But was that the difference of
7    paying between an hourly and a shift rate?
8        A    I'm sorry, I can't --
9        Q    Let me put you on Exhibit 51.
10       A    Okay.
11       Q    And specifically Page 1247, the
12   Bates number.
13       A    Yes.
14       Q    You see that?
15       A    Yes.
16       Q    You see at the top it says
17   "Findings"?
18       A    Yes.
19       Q    And you see your conclusion?
20       A    Yes, I do.  Approximately $25,000.
21       MR. EATON:  I'm sorry.  What
22   page?
23       MR. RICHMAN:  1247, in 51.
24       MR. EATON:  Yes.
25       MR. RICHMAN:  Okay.

1    ARBITRATION - VOLUME IV
2        MR. EATON:  And which
3    conclusion are you looking at.
4        MR. RICHMAN:  I was looking at
5    the conclusion under A.
6        Q    You see there is an A and a B?
7        A    I do.
8        The A Finding dollars was really
9    just an approximation.
10       Q    Okay.
11       A    It was really unclear at the time.
12       Q    Okay.
13       And is there any -- okay.
14       Now I want to look at Exhibit 45.
15   Can you tell us there how much the actual
16   number was?
17       A    Page 3 there is a Finding A, B and
18   C.
19       Q    Yes.
20       ARBITRATOR IRVINGS:  Of 45?
21       MR. EATON:  Of 45, yes.
22       A    Re:  Calculation, approximately
23   24,000.
24       Q    And that's on 1253, Bates Number
25   1253?

1    ARBITRATION - VOLUME IV
2        A    Yes.
3        Q    Under Finding A?
4        A    Under Finding A.
5        Q    Were The New York Times remittance
6    reports easy to use?
7        A    They were not.
8        MR. EATON:  Objection.
9        ARBITRATOR IRVINGS:  What's the
10   objection?
11       MR. EATON:  What sense -- it's
12   a vague question.
13       ARBITRATOR IRVINGS:  Well, do
14   you have a follow-up question?
15       Go ahead.
16   BY MR. RICHMAN:
17       Q    Why?
18       A    There were a number of different
19   reports that were submitted by The New York
20   Times for various components of
21   contributions as well as just the format of
22   the reports and the layout of the shift
23   information.
24       Q    What specifically about the layout
25   of the shift information?

1    ARBITRATION - VOLUME IV
2        A    Well, the shift information really
3    came through the Welfare reporting
4    documentation but it was also used for the
5    Pension as well.  So same report.
6        Q    And why did that or did it not make
7    that easy or difficult to use?
8        A    Welfare Fund contributions were
9    more frequent than the Pension contributions
10   during the reporting period, so it made it
11   difficult to track one to the other.
12       Q    But were you able to do that?
13       A    Generally.
14       MR. RICHMAN:  I have no further
15   questions.
16       MR. EATON:  Why don't we go off
17   the record while we rearrange the
18   room.
19       CROSS EXAMINATION BY MR. EATON:
20       Q    Good afternoon, Mr. Lewis.
21       A    Good afternoon.
22       Q    You testified on your direct
23   that -- I think, correct me if I'm wrong --
24   that you are familiar with how the Pension
25   Fund tracks employer contributions?

ARBITRATION - VOLUME IV

1
2      A    Yes.
3      Q    And you are familiar with the
4  remittance reports that employers send to
5  the Pension Fund?
6      A    Yes.
7      Q    And I think you testified that the
8  reports are not identical from employer to
9  employer; is that right?
10     A    That's right, yes.
11     Q    And even the schedule on which the
12 employers report are not the same; is that
13 correct?
14     A    Yes, that's correct.
15     Q    And one of your roles as the
16 auditor was to conduct an annual audit of
17 the Fund; is that right?
18     A    Yes, that's right.
19     Q    And is it fair to say that the goal
20 was to ensure that the Fund is receiving the
21 proper amount of contributions from each
22 contributing employer?
23     A    The goal of the annual audit is to
24 be able to determine whether the financial
25 statements present fairly the financial

ARBITRATION - VOLUME IV

1
2  position and changes in net assets.
3      Q    Okay.  And I guess is it fair to
4  say that a part of ensuring what you just
5  mentioned, a part of that would be to ensure
6  that the employer contributions are what
7  they're supposed to be; is that right?
8      A    Fairly presented.
9      Q    And when you conducted --
10         ARBITRATOR IRVINGS:  Just so
11 I'm clear, is that a different
12 answer?
13         THE WITNESS:  I'm just trying
14 to be clear that the auditor gives an
15 opinion on fairness, fairly
16 presented.
17         So however you ask the question,
18 the answer is still the audit opinion is
19 based on present fairly, not total
20 accuracy.
21         ARBITRATOR IRVINGS:  I want to
22 clarify.  If we're talking about the
23 distinction between what the purpose
24 of the annual Fund audit is versus
25 what the purpose of an audit in an

ARBITRATION - VOLUME IV

1
2  employer's contributions.
3         MR. EATON:  Understood.  We're
4  talking about the annual Fund audit.
5         ARBITRATOR IRVINGS:  Okay.
6  BY MR. EATON:
7      Q    Can you describe what you mean by
8  "fairly presented"?
9      A    That is an audit standard generally
10 accepted in the United States, presents
11 fairly.
12         No material differences.  A reader
13 would not come to a different conclusion if
14 the financial statements were presented
15 differently.
16     Q    Okay.  So is materiality, is that a
17 threshold?
18     A    Materiality is a component of the
19 audit, yes.
20     Q    And so for an audit for a fund of
21 this size -- when I say fund, I mean the
22 NMDU Pension Fund -- what is material for a
23 fund of this size in the annual audit
24 context?
25     A    Materiality was based on Fund

ARBITRATION - VOLUME IV

1
2  assets, total assets.  So materiality was
3  probably a million dollars.
4      Q    A million dollars meaning plus or
5  minus of the results of your audit?
6      A    Yes.
7      Q    And the process of conducting the
8  annual Fund audit, is it fair to say that
9  you would take a sampling of contributing
10 employers and review their remittance
11 reports as part of that audit?
12     A    Yes.
13     Q    Would a sampling be three or four
14 employers in a particular year or higher or
15 lower than that?
16     A    With this Fund it was usually,
17 since there was a smaller group of very
18 large contributors we usually looked at the
19 same employers each year.
20     Q    And was The New York Times one of
21 those employers you reviewed every year in
22 connection with the Fund audit?
23     A    Yes.
24     Q    And is it fair to say you are
25 familiar with The New York Times remittance

ARBITRATION - VOLUME IV

1
2  reports in particular because they were part
3  of that annual audit?
4      A    Yes.
5      Q    And for The Times Pension
6  remittance reports, did they report shift
7  information at all on those reports?
8      A    The Welfare Fund reports had the
9  shift information and that was also used for
10  Pension.
11      Q    My question is a little bit
12  different:  On the Pension Fund remittance
13  reports, was there any information about
14  shifts on The New York Times remittance
15  reports?
16      A    I don't recall seeing that.
17      Q    And for the Times Welfare reports,
18  that did include information about shifts;
19  is that right?
20      A    It did.
21      Q    And on those Welfare remittance
22  reports from The Times, did they
23  differentiate the type of shift that was
24  being reported?
25      A    I'm sorry.  I really just don't

ARBITRATION - VOLUME IV

1
2  remember the details to the remittance
3  reports themselves.
4      Q    And is it your understanding that
5  employees for The Times worked different
6  kinds of shifts?
7      A    Yes.
8      Q    And what were some of those types
9  of shifts?
10      A    They were day shifts and night
11  shifts and weekend shifts.
12      Q    Let me turn to Exhibit 48.
13          Have you ever seen this document?
14      A    I don't recall.  Something similar.
15  This one exactly, I don't remember.
16      Q    And is it fair to say that that's a
17  pension remittance report for The New York
18  Times?
19      A    My recollection would be yes.
20      Q    And now let's turn to Exhibit 86.
21          Let me know when you are there.
22      A    Okay.
23      Q    The Bates Number is FUND-98 and the
24  cover e-mail is an e-mail from Todd Jackson
25  to Barbara dated June 9, 2011.

ARBITRATION - VOLUME IV

1
2          If I could direct your attention to
3  beginning on the second page.
4          And the Subject from the first page
5  says "Weekly deliverers deduction PPE
6  6-4-2011."
7          Do you see that?
8      A    Yes.
9      Q    If I could direct your attention to
10  the second page.
11          Are you familiar with this type of
12  document?
13      A    Generally.  Not specifically this
14  document.
15      Q    Is it fair to say that this is a
16  Welfare remittance report for The New York
17  Times?
18      A    I don't know in particular that
19  that's the case.
20      Q    Let's look back at the first page.
21          And it's from Todd Jackson.
22          And do you see on the signature
23  line it says "NYT Shared Service Center"?
24          His e-mail signature line at the
25  bottom of the e-mail.

ARBITRATION - VOLUME IV

1
2      A    Oh, sorry.  Yes.
3      Q    Are you familiar with what the New
4  York Times or the NYT Shared Services Center
5  is?
6      A    I am.
7      Q    And what is it?
8      A    A common administrative area for
9  The New York Times and its subsidiaries or
10  affiliates where record-keeping takes place.
11      Q    And when you had interactions with
12  The Times with respect to the Pension Fund,
13  did you deal with people at the New York
14  Times Shared Service Center?
15      A    I really don't recall.  The
16  documents that I saw were directed to
17  particular New York Times employees.  I
18  don't know if they're from the Shared
19  Service Center or someplace else.
20      Q    Under "Attachment" it says "Weekly
21  deliveries deductions."
22          Do you see that?
23      A    Yes.
24      Q    And the body of the message says,
25  "Attached is the weekly deliverers report."

ARBITRATION - VOLUME IV

1
2     Do you see that?
3     A    Yes.
4     Q    Does this e-mail give you more
5  comfort that this is a New York Times
6  Welfare remittance report?
7     A    Well, that's what the cover to the
8  e-mail says.  I can't swear that this was
9  attached to it.
10     Q    Okay.  Fair enough.
11         The actual attachment was produced
12  in native format, but this comes from the
13  Fund.
14         Didn't you testify on direct that
15  you were familiar with the remittance
16  reports?
17         MR. RICHMAN:  Objection.
18     A    Generally, yes.
19     Q    So generally speaking, was this the
20  type of report you were used to seeing from
21  The New York Times?
22     A    There were a lot of reports that
23  The New York Times had and they used a lot
24  of acronyms and shorthand and so I don't
25  remember exactly what DELCOL is.

ARBITRATION - VOLUME IV

1
2         ARBITRATOR IRVINGS:  Ron, do
3  you have any dispute about what this
4  is?
5         MR. RICHMAN:  I don't have any
6  dispute about what it is, but it's
7  really the issue with would the
8  witness have been able to --
9         MR. EATON:  Ron, let's look at
10  his deposition on Page 56.
11         MR. RICHMAN:  Well, are you
12  asking me a question or --
13         MR. EATON:  I was just
14  directing you to where I was.
15         MR. RICHMAN:  Okay.
16         MR. EATON:  And for the record,
17  I'm looking at his deposition on
18  Page 56.  And I'll ask it this way.
19  BY MR. EATON:
20     Q    Mr. Lewis, do you recall at your
21  deposition being asked the following
22  question:  "And was shift information in
23  that" --
24     A    Excuse me.
25     Q    On Page 56, do you recall being

ARBITRATION - VOLUME IV

1
2  asked the following question:  "Okay.  So
3  would you have to look at the Welfare
4  reports in order to get the shift
5  information to review The New York Times'
6  pension contributions?"
7         Answer:  "Yes."
8     A    Yes, I recall that.
9     Q    So for you to get shift
10  information, you would not look at The Times
11  pension reports but you would look at the
12  Welfare remittance reports; is that fair to
13  say?
14     A    Yes.
15     Q    In their remittance reports for
16  Welfare, did The Times differentiate the
17  type of shift that was reported?  Excuse me,
18  the type of shift that was worked?
19     A    So I just don't recall.
20     Q    Let me direct your attention to
21  Page 50 of your deposition, beginning at
22  Line 8.
23         Question:  "The employer reports
24  that come in, do those differentiate shifts
25  in any particular way?  Let me give you an

ARBITRATION - VOLUME IV

1
2  example that may be clearer.
3         "Does it say weekday shift versus
4  Saturday shift versus night or does it just
5  say, quote, shift?"
6         Answer:  "My recollection is it
7  just says 'shifts.'"
8         Question:  "And when you look at
9  the computer screen on the Fund database,
10  does that differentiate between the types of
11  shifts?"
12         Answer:  "I don't recall it
13  differentiating."
14         Do you recall those questions and
15  did you give those answers?
16     A    Yes.
17     Q    So is it your understanding then
18  that The Times makes Pension contributions
19  based on the type of shift worked?
20     A    Yes.
21     Q    So let me unpack that just a little
22  bit.
23         So if Employee Smith works three
24  shifts in a week and one is for a day shift
25  and one is for a night and one is for a long

ARBITRATION - VOLUME IV

1  night, The Times according to your
2
3  understanding would make three different
4  levels of Pension contribution based on
5  those different types of shifts; is that
6  right?
7      A    Yes.
8          Technically, the contribution was a
9  percentage of compensation, so if
10  compensation changed slightly depending on
11  the day, then the contribution would change
12  in the same pro rata way.  Because
13  percentage was the same, 8 percent.
14      Q    Now, for the audit, if you did not
15  know the type of shifts that the employees
16  worked, how did you ensure that The Times
17  sent in the proper Pension contribution for
18  those employees?
19          MR. RICHMAN:  Can we just --
20  talking about the annual audit.
21          MR. EATON:  Talking about the
22  annual audit.
23          MR. RICHMAN:  Okay.  Just
24  making sure.
25      A    We used just an analysis of a range

ARBITRATION - VOLUME IV

1
2  of shift dollars that would be contributed
3  from the high to the low in terms of what
4  the dollar amount would have been.  And we
5  would compare the totals that were
6  contributed and see if it fell within the
7  range.
8          So if it was between the high and
9  the low range, then that was accepted during
10  the audit process.
11      Q    Okay.  So, but that information was
12  not based on any knowledge of the number of
13  day shifts worked by the work force, versus
14  the number of night shifts worked by
15  workforce; is that right?
16      A    Yes, that's right.
17      Q    And so explain to me how the
18  process that you followed would actually
19  ensure that The Times contributed the amount
20  that they were supposed to contribute for
21  the Pension Fund?
22          MR. RICHMAN:  Objection.
23  That's not the testimony here.  This
24  is an issue of materiality because
25  we're dealing with the annual audit.

ARBITRATION - VOLUME IV

1
2          MR. EATON:  It would be helpful
3  if the witness can provide the
4  answer.
5          ARBITRATOR IRVINGS:  Absolutely,
6  but I think this does go to the
7  question about whether we're talking
8  about what they determined for the
9  annual audit as opposed to what they
10  determined where they're auditing the
11  contributions of an employer.
12          MR. EATON:  And I'll get there.
13          ARBITRATOR IRVINGS:  That's
14  fine.
15          Then go ahead, please answer the
16  question.
17      A    Our procedures during the annual
18  audit was an approximation.  It was a range.
19      Q    And so did that procedure or that
20  standard that you wanted to meet change at
21  all when conducting a payroll audit for an
22  employer versus an annual audit for the
23  Fund?
24      A    Yes, because the records were
25  different, were more detailed.

ARBITRATION - VOLUME IV

1
2      Q    Did you ever conduct a payroll
3  audit of The New York Times?
4      A    We did.
5      Q    And when you conducted a payroll
6  audit of The New York Times, did you have
7  the information that broke out the types of
8  shifts worked?
9      A    Yes, because we saw what the
10  individual was earning, and the earnings
11  corresponded to the shifts.
12      Q    That wasn't my question.  I think I
13  asked a slightly different question.
14          Did you have data or information
15  from The Times about what type of shift the
16  employees worked when you conducted a
17  payroll audit of The Times?
18          MR. RICHMAN:  Objection.  Asked
19  and answered.
20          ARBITRATOR IRVINGS:  No, I
21  don't think so.
22          Go ahead.
23      A    I believe we had the information we
24  needed to do that, because we saw the pay
25  that was earned during the period and the

Page 924

ARBITRATION - VOLUME IV

1  earnings for the period corresponded to the
2  shifts.
3  
4      Q    Is it your understanding that the
5  shift information for Welfare reports on
6  The New York Times were concurrent with the
7  shifts worked for employees receiving
8  pension contributions?
9      A    Yes.
10     Q    And what is the basis of that
11  understanding?
12     A    It's part of the contribution
13  process.  I understood it from discussions
14  with the Fund office.
15     Q    Did you ever get that understanding
16  based on any conversations with people from
17  The New York Times?
18     A    I don't recall having that
19  conversation.
20     Q    Did you ever see any report from
21  The New York Times that had Pension
22  contributions reported in a way that was not
23  a percent times a wage?
24     A    No.
25     Q    Let's talk a little bit about the

Page 925

ARBITRATION - VOLUME IV

1  difference between the standard for the
2  Pension Fund audit versus a payroll audit.
3      Q    Can you quantify in any way what
4  the difference is in materiality in those
5  two different audits?
6      A    The annual audit of The New York
7  Times was just one of a number of
8  contributing employers.
9      A payroll audit is for that
10  employer in particular, so there was more
11  specificity when dealing with the payroll
12  audit than dealing with the annual audit of
13  the Fund.
14     Q    Let me clarify the question a
15  little bit.
16     I think you testified that for the
17  annual audit of this Pension Fund, given its
18  size, the materiality threshold was
19  approximately a million dollars; is that
20  right?
21     A    Yes.
22     Q    Can you tell me what the
23  materiality threshold for payroll audit of
24  The New York Times would be with respect to

Page 926

ARBITRATION - VOLUME IV

1  its contributions to the Pension Fund?
2      A    We didn't use a materiality formula
3  when we did the payroll audits.  We just
4  looked at the results of each period's test
5  to see the results.
6      Q    And the information you had from
7  The New York Times was the wages and
8  8 percent; is that right?
9      A    Yes.
10     Q    Can you describe the process that
11  you went through in conducting the payroll
12  audit of The New York Times?
13     A    I don't recall the specific
14  engagement; however, we would have randomly
15  selected a period of time, couple weeks
16  during the period, randomly selected
17  individuals during that period and reviewed
18  their payroll that was paid to them, and
19  recalculated the contribution to see if it
20  matched what was being paid to the Fund.
21     Q    And did the information from the
22  Fund database play any part in a payroll
23  audit of The Times or was your information
24  strictly from The Times?

Page 927

ARBITRATION - VOLUME IV

1      A    We were comparing from one to the
2  other.  So the Fund records ultimately were
3  what was being tested to.  So, yes.
4      Q    So for a payroll audit of a
5  contributing employer -- let's talk about
6  The New York Times in particular.
7      So for a payroll audit of The New
8  York Times, you would at some point compare
9  The Times' data and payroll information with
10  that information that the Fund had received;
11  is that right?
12     A    Yes.
13     MR. RICHMAN:  Evan, can I ask
14  you to stop moving your head?
15     MR. MILLER:  Sure.
16     MR. EATON:  I can't see him.
17     MR. RICHMAN:  But I can.  I'm
18  sitting right across from him.  I see
19  the head going up and down.
20  BY MR. EATON:
21     Q    I think you explained a little bit
22  about the process of the payroll audit.
23     Can you explain to me how exactly
24  you determined whether The Times was

46

Page 928

ARBITRATION - VOLUME IV

1
2  contributing the proper amount when you did
3  the payroll audit of The Times?
4      A    We would look at the total payroll
5  for the period.  We would look to the
6  factor, the 8 percent factor to see the
7  multiplication.  We would look to see that
8  the number of shifts were contributed for
9  that period.  There was a maximum number of
10 shifts per week.
11     We multiply and do the math and
12 come to a number and see if that was
13 contributed.
14     Q    And when you say you would multiply
15 and do the math, you would take the eligible
16 earnings and multiply it by the rate?
17     A    Yes.
18     Q    And just to confirm, that rate was
19 8 percent; is that correct?
20     A    Yes.
21     Q    Did The New York Times ever conduct
22 a self-audit, that you can recall?
23     A    Well, I can recall them notifying
24 the Fund office that they undercontributed
25 at some point.  If that's what you are

Page 929

ARBITRATION - VOLUME IV

1
2  referring to as a self-audit, then I guess
3  I'm thinking they did that.
4      Q    And you answered my next question.
5  And the conclusion was that they had
6  underpaid; is that right?
7      A    Yes.
8      Q    In your experience was it common
9  for contributing employers to self-report to
10 the Pension Fund that they had underpaid?
11     A    No, that's not common.
12     Q    Let's look at Exhibit 50.
13     Take a second to review that.
14     Mr. Lewis, have you seen this
15 document before?
16     A    I have, yes.
17     Q    And just for the record, the first
18 page has two e-mails on it and it's Bates
19 Number WEISER-177.
20     The first is an e-mail from you to
21 Ivy Narissi on August 8, 2012 at 3:03 p.m.
22     And the bottom e-mail is an e-mail
23 from Morris Claffee to you on August 8, 2012
24 at 5:17 p.m.
25     Do you see that?

Page 930

ARBITRATION - VOLUME IV

1
2      A    I do.
3      Q    And let's focus on the bottom
4  e-mail.  Mr. Claffee writes, "Hello, Mitch,
5  Per our conversation, please see above
6  attachment for summary and details of
7  employer Deliverers' Pension and Welfare
8  contributions that were not funded due to
9  setup issues.  This issue was detected
10 during self-audit of employer contributions.
11 These have been corrected in our payroll
12 system, and we have implemented additional
13 controls to make sure that they are not
14 missed going forward.  Please review
15 attachment and advise of any questions or
16 concerns."
17     Do you recall receiving this e-mail
18 from Mr. Claffee?
19     A    I recall once I saw it, that makes
20 sense that I would have received it.  I
21 don't remember exactly at that time, but,
22 yes.
23     Q    And if you flip to the next page,
24 there appears to be a spreadsheet that's
25 WEISER-178, Bates Number.

Page 931

ARBITRATION - VOLUME IV

1
2      I want to focus on Column B where
3  it looks like we have deduction code, DELPEN
4  and DELWEL.
5      And then in Column D, looks like we
6  have dollar figures; is that right?
7      A    Yes.
8      Q    And is this sort of a summary of
9  the results from the self-audit that
10 The Times did?
11     A    Yes.
12     Q    So they ended up concluding that
13 they for DELPEN owed approximately $62,000
14 and for DELWEL, approximately $62,000; is
15 that right?
16     A    Yes.
17     Q    Let's look at the next page,
18 WEISER-179.
19     And Column B seems to be employee
20 names.  And then I want to focus on Columns
21 G, H and I with G being the earnings subject
22 to deduction, H the deduction percent and I
23 the calculated deduction.
24     Do you see those?
25     A    Yes.

ARBITRATION - VOLUME IV

1
2   Q    Is it your understanding that for
3   this self-audit process, The Times went
4   through and for the employees listed in
5   Column B wrote their earnings subject to
6   deduction, multiplied it by 8 percent and
7   then remitted a check based on the result of
8   that math?
9   A    Yes.
10  Q    So the remedy for the shortfall by
11  The Times was to take earnings, multiply it
12  by 8 percent and that was the result they
13  needed to send you to top up for their
14  previous shortfall; is that right?
15  A    Yes, sent to the Fund.
16  Q    And then if you could flip to the
17  next payable which is WEISER-180, Column K.
18  It's just a continuation of the previous
19  column, but you see it says DELPEN for the
20  deduction code?
21  A    Yes.
22  Q    And your understanding is that's
23  the Pension deduction code; is that right?
24  A    Yes.
25  Q    Let's go later in the document and

ARBITRATION - VOLUME IV

1
2   go to WEISER-221.
3       Are you there?
4   A    Yes.
5   Q    And Column B again is employee
6   names, and then Columns G, H and I are the
7   same for, as we previously looked at
8   earnings, subject to deduction, deduction
9   percentages and calculated deduction.
10      And if you just flip the page
11  briefly, you'll see in Column K, this is for
12  DELWEL.
13      Do you see that?
14  A    Yes.
15  Q    Am I correct that The Times sort of
16  undertook this process to make up for the
17  shortfall by taking Column G, which is the
18  earnings subject to deduction, multiplying
19  it by 7.68 percent, and then the product of
20  that calculation is what they remitted to
21  make up for the shortfall?
22  A    Yes.
23  Q    Is there any mention in these
24  calculations or this process about shifts?
25  A    No, there's not.

ARBITRATION - VOLUME IV

1
2   Q    Any mention of shift wage?
3   A    No.
4   Q    Any mention of shift rate?
5   A    Not that I see.
6   Q    And when you received this e-mail
7   from Mr. Claffee, first, was it accompanied
8   with a check with this or soon thereafter?
9   A    I don't recall the timing. We did
10  not get the check.
11  Q    It went to the Fund?
12  A    Right.
13  Q    Okay.
14      What was your reaction when you got
15  this e-mail?
16  A    Surprised. It was unusual and we
17  went -- we were asked what we should do
18  about the -- the Fund asked what should we
19  do about this.
20  Q    Well, let's start with the first
21  part.
22      Why were you surprised?
23  A    It's out of the ordinary that a
24  contributing employer would send a report
25  like this on underreported contributions.

ARBITRATION - VOLUME IV

1
2   Q    Did you discuss -- first, did you
3   have any communication with Mr. Claffee as a
4   result of this e-mail, that you can recall?
5   A    I don't recall specifically but
6   clearly says in the e-mail that we did.
7   Q    Did you discuss this with anyone at
8   the Pension Fund?
9   A    Yes, we did.
10  Q    And with whom did you discuss it?
11  A    We would have discussed it with the
12  Fund director and I believe one of the Fund
13  attorneys.
14  Q    Did you discuss this with the
15  trustees at all?
16  A    I don't recall having specific
17  conversations with the trustees.
18  Q    Do you remember if this came up at
19  all in your trustee meetings?
20  A    I wasn't at every meeting, so I'm
21  not really sure. I don't recall.
22  Q    Did you believe that The Times
23  properly calculated the amount that they had
24  to make up for?
25  A    It appeared that the calculation,

ARBITRATION - VOLUME IV

1
2   based on what we saw, made sense to us in
3   that these individuals were not included in
4   the Fund reporting, the Fund's own internal
5   reporting of shifts and credit and any of
6   those things.  They just were not listed.
7       So in that regard, being that these
8   individuals were here paid for during this
9   period, then it made sense to us that
10  The Times was saying that they were in fact
11  employees of The Times and NMDU members
12  didn't make sense.
13      Q    Aside from sort of people not being
14  reported on the remittance reports, did the
15  actual calculations make sense to you?
16      A    They did.
17      Q    And did you discuss the actual
18  calculations with Mr. Schwartz?
19      A    I don't recall specifically.  I
20  would say we probably had a conversation
21  about it.
22      Q    Did he ask you any questions to the
23  effect of where is the information about
24  shifts?
25      A    I don't recall him saying that.

ARBITRATION - VOLUME IV

1
2       Q    Do you recall him objecting in
3   any way to The Times conducting their
4   self-audit in this particular way?
5       A    No.
6       Q    You testified on your direct
7   examination about an audit you conducted of
8   C & S.
9       Do you recall that?
10      A    Yes, I do.
11      Q    And can you describe how that audit
12  came about?
13      A    I think I mentioned it earlier that
14  C & S was closing and we were asked to
15  review their contribution rates and payments
16  for a period prior to their closing.
17      Q    Let's look at Exhibit 45.
18      A    Okay.
19      Q    On the page that's Bates labeled
20  FUND-1250, if you go there.
21      Under Paragraph B, it says,
22  "Mr. Lewis reviewed the final results of the
23  payroll audit of the City & Suburban
24  Delivery Systems, Inc. as detailed in the
25  June 14, 2010 memorandum attached hereto as

ARBITRATION - VOLUME IV

1
2   Exhibit H.  As noted, a settlement payment
3   of $343,289 was made on June 24, 2010.  A
4   copy of the check is also attached as part
5   of Exhibit H."
6       So you attended this trustee
7   meeting; is that right?
8       A    It says I did.  I must have, yes.
9       Q    Do you recall presenting the
10  results of your audit to the trustees?
11      A    Yes.
12      Q    Could you describe the trustees
13  meeting?  Set the scene for me.  Who was
14  there, where was it?
15      A    Well, it was five years ago, so
16  it's very difficult for me to really
17  remember those kind of details.
18      Q    Okay.  Do the best you can.
19      A    Trustee meetings took place at
20  Proskauer's office.  Huge conference table
21  and everybody was sitting around it, the
22  lawyer trustees on one side and the Union
23  trustees on the other, and professionals
24  intermixed, and the Fund director at the
25  head of the table with the actuaries.

ARBITRATION - VOLUME IV

1
2       Q    And when you presented information
3   at one of these trustee meetings, do you
4   walk up to the head of the table and stand
5   and present, or do you just remain seated
6   and talk to the trustees and those present?
7       A    I remained seated.
8       Q    Let's look at your letter, Bates
9   labeled 1251.
10      And it's dated June 14, 2010.  And
11  the Subject is "Conclusion of payroll audit
12  of City & Suburban Delivery Systems, Inc."
13      The first paragraph states, "As
14  previously communicated in a report dated
15  April 20, 2010, Weiser noted that there were
16  three discrepancies while performing
17  procedures to determine that City & Suburban
18  Delivery Systems, Inc., C & S, was in
19  compliance with the Newspaper and Mail
20  Deliverer-Publishers Pension Fund
21  contribution obligation pursuant to the
22  terms of the Newspaper & Mail Deliverers
23  Union of New York and the C & S Collective
24  Bargaining Agreement."
25      Do you see that?

ARBITRATION - VOLUME IV

1
2    A    I do.
3    Q    So your task was to ensure that the
4    contributions comported with the Collective
5    Bargaining Agreement; is that right?
6    A    Yes.
7    Q    Let's look at your first finding
8    that's at the bottom of 1251.
9        Tell me if I accurately summarized
10    this:  That The Times had agreed to
11    contribute based on hours for apprentices
12    only, but in fact they were contributing
13    based on hours for employees other than
14    apprentices; is that right?
15    A    Yes.
16    Q    And you note in the last sentence
17    of Page 1251, "The CBA stated that only
18    apprentices were to be paid using the hourly
19    rate."
20        Is that right?
21    A    Yes.
22    Q    If you turn to the next page,
23    FUND-1252.
24        For the results, let me direct your
25    attention to the sentence that begins "Due

ARBITRATION - VOLUME IV

1
2    to the CBA ..."
3        Do you see that?
4    A    Yes.
5    Q    It says, "Due to the CBA, effective
6    date of March 31, 2006, Weiser requested the
7    recalculation of contributions for the
8    period April 1, 2006 through December 31,
9    2006.  Thus each period was recalculated for
10    a total apprentice hours times hourly rate,
11    and all regulars were recalculated
12    multiplying total eligible earnings times
13    applicable pension percent."
14        Do you see that?
15    A    Yes.
16    Q    I want to focus on the last half of
17    that sentence that begins "All regulars were
18    recalculated ..."
19    A    Okay.
20    Q    What do you mean by that?
21    A    That only the apprentices, that
22    group was based on that particular rate;
23    that others should have been based on their
24    work day rates.
25    Q    Okay.  So I'm trying to figure out

ARBITRATION - VOLUME IV

1
2    how The Times remedied this sort of
3    inaccurate contribution they were making.
4        When it says, "Regulars were
5    recalculated by multiplying total eligible
6    earnings times applicable pension percent,"
7    does that mean that their earnings were
8    multiplied by 8 percent?
9    A    Their eligible earnings, yes, based
10    on maximum shifts.  Because they could have
11    worked six days or seven days, they don't
12    contribute on all of those days.
13        So it wouldn't necessarily have
14    been a hundred percent of the earnings.  The
15    earnings would have been limited to five
16    days.
17    Q    So are total eligible earnings
18    synonomous with wages?
19    A    Yes.
20    Q    So for The Times to remedy this
21    shortfall, they took total eligible earnings
22    and multiplied it by the applicable Pension
23    percent.
24        Was the applicable Pension percent
25    8 percent?

ARBITRATION - VOLUME IV

1
2    A    Yes.
3    Q    I believe you testified on your
4    direct that The Times went back and
5    recalculated based on the shifts -- the
6    wages earned per shift.
7        Do you recall that?
8    A    I do.
9    Q    Is it still your testimony that
10    they looked at the type of shift worked, or
11    did they look at total eligible earnings and
12    multiply it by 8 percent?
13    A    Well, the type of shifts correspond
14    to the earnings.  So they basically looked
15    at the earnings but the earnings are
16    comparative.  That is the shift.  Because
17    the earnings are specific to a particular
18    type of shift, so it is earnings, but it's
19    also the type of day that the person works
20    or night.
21    Q    So it's your understanding that
22    8 percent of eligible wages or eligible
23    earnings means the same thing as 8 percent
24    of the shift rate that was worked?
25    A    Yes.

ARBITRATION - VOLUME IV

1
2    Q    Is it your understanding that
3  contributions are made based on shifts that
4  are not worked?
5    A    Some.
6    Q    And what's your understanding of
7  the types of contributions that are made
8  based on shifts not worked?
9    A    Vacation, sick, Workers' Comp, I
10 believe.
11   Q    And would military pay be another
12 one?
13   A    That, I don't recall.  I'm sorry, I
14 don't recall.
15   Q    Do you know how foremen are paid?
16 Strike that.
17        Do you know the basis upon which
18 foremen get Pension contributions made on
19 their behalf?
20   A    I believe it was their pay times
21 8 percent.
22   Q    So is it still your
23 understanding -- strike that.
24        When The Times corrected their
25 discrepancy under Finding 1, is it your

ARBITRATION - VOLUME IV

1
2  understanding that they took 8 percent of
3  the wages paid and also 8 percent of the
4  nonworked shift pay, such as vacation pay
5  and military pay and foreman salary, those
6  things we just listed?
7    A    Yes, except those nonworked days
8  were I believe not restricted to just five
9  days.
10        If an individual was paid for
11 ten days of vacation, then the full
12 contribution was made.
13   Q    Is it your understanding that
14 foremen were paid per shift or based on a
15 salary?
16   A    I don't really have a detailed
17 knowledge of the foremen's compensation
18 process.
19   Q    Okay.  Let's go to Paragraph B on
20 FUND-1252.
21        It says, "The rate increases were
22 made on March 31, 2008.  The calculation of
23 the hourly rate was not updated."
24        Do you see that?
25   A    I do.

ARBITRATION - VOLUME IV

1
2    Q    And the results -- I want to focus
3  your attention on the sentence that starts
4  "For the regulars ..."
5        Do you see that?
6    A    I'm sorry?
7    Q    The sentence begins "The
8  recalculation by The Times ..."
9    A    Sorry.  I'm off.
10   Q    Understood.  Fair enough.  Let me
11 direct you.  We're under Paragraph B,
12 paragraph that begins "Result ..."
13   A    Yes, "The recalculation by the
14 Fund ...," yes.
15   Q    "The recalculation by The Times was
16 based on regulars on total earnings.
17 Therefore, the rate increase is
18 automatically included in updated
19 calculation."
20        So similar to our last sort of
21 section that we discussed, is it your
22 understanding that The Times to make up for
23 their shortfall took total earnings and
24 multiplied it by a percentage?
25   A    Yes.

ARBITRATION - VOLUME IV

1
2    Q    And for Finding C, Paragraph C, the
3  finding was that the diversion percentages
4  were not updated, meaning diversion from the
5  Pension Fund to the Welfare Fund; is that
6  right?
7    A    Yes, that's right.
8    Q    And the remedy here was -- and let
9  me direct you to the sentence that begins
10 "For the regulars ..."
11        "For the regulars, total earnings
12 were multiplied by 6 percent for the periods
13 2006, 2007 and January 2008, 6.5 percent for
14 February 2008 through June 2008, and
15 7 percent for July 2008 through
16 December 2008.  No exceptions were noted."
17        Do you see that?
18   A    Yes.
19   Q    So again, The Times' remedy was
20 wages times a percent?
21   A    Yes.
22   Q    In any of these findings or
23 results, are shifts mentioned with respect
24 to the regulars?
25   A    There's no comment here about

ARBITRATION - VOLUME IV

1  shifts.
2      Q    Is wage rate mentioned with respect
3  to regulars anywhere?
4      A    The term exactly "wage rate"?  It
5  says here "earnings, wages."
6          "Wage rate?"  No, I don't see that.
7      Q    Do you see "shift rate" anywhere?
8      A    No.
9      Q    And you presented these findings to
10 the trustees; is that correct?
11     A    Yes.
12     Q    Did any of the trustees ask a
13 question to the effect of:  "Why doesn't it
14 say shift rate"?
15     A    No.
16     Q    Did they ask any questions --
17 strike that.
18     A    No.
19     Q    Did they ask any questions about
20 your conclusions or the results that
21 describe the process by which The Times had
22 to make up for the shortfall?
23     A    No, I don't recall.
24         MR. EATON:  Can we take about a

ARBITRATION - VOLUME IV

1  five-minute break.
2          ARBITRATOR IRVINGS:  Sure.
3          (A brief recess was
4  taken.)
5  BY MR. EATON:
6      Q    Mr. Lewis, if I could direct your
7  attention to Exhibit 75, please.  It's in
8  the blue binder.  And specifically to Bates
9  Number FUND-1611.  It's the Schedule R for
10 that Form 5500.
11         And I believe you testified on
12 direct examination that you filled out the
13 Schedule R; is that right?
14     A    We did.
15     Q    "We" meaning?
16     A    The firm.
17     Q    And on what basis did you fill this
18 out?
19         Strike that.  Let me ask a better
20 question.
21         Did you review the Collective
22 Bargaining Agreement for The Times before
23 you filled out Section 13E?
24     A    No.

ARBITRATION - VOLUME IV

1      Q    Where did you get the information
2  from to fill out Section 13E?
3      A    It was our understanding of what
4  the rate is for contribution.
5      Q    All right.  And is it your
6  understanding that a base unit measure
7  equals a contribution base unit?
8      A    I have not used the term before.
9  I'm not really familiar with it.
10     Q    Used which term?
11     A    "Base unit contribution."
12     Q    Let's clarify.
13         The term used here is "base unit
14 measure."
15     A    Right.  Okay.
16     Q    Do you have an understanding of
17 what that term means?
18     A    I don't have a technical
19 definition, no.
20     Q    So then on what basis did you check
21 the box "Other" and write "8 percent of
22 daily wage rates"?
23     A    Because we know that the
24 contribution percentage is 8 percent and

ARBITRATION - VOLUME IV

1  it's based on wages related to shifts rather
2  than hourly, weekly or unit of production.
3      Q    So it's your understanding that the
4  base unit measure is not shifts; is that
5  right?
6      A    No, I said it is.  I said it's not
7  hourly, weekly or unit or production.  It's
8  based on daily wage rates which are based on
9  shifts.
10         So there's no term here that says
11 "shifts" so I couldn't check that box.
12     Q    Understood.
13         My question is:  Is it your
14 understanding that 8 percent of daily wage
15 rates means the same thing as shifts?
16     A    Yes.
17         MR. EATON:  No further
18 questions.
19 FURTHER DIRECT EXAMINATION BY MR. RICHMAN:
20     Q    Let me show you Exhibit 50 -- not
21 that I show -- can you turn to Exhibit 50?
22     A    Okay.
23     Q    All set?
24     A    Yes.

ARBITRATION - VOLUME IV

1
2    Q    So you see this is an e-mail that
3    you had -- the top one is an e-mail you had
4    with Ms. Narissi?
5    A    Yes.
6    Q    And we went through on
7    cross-examination a document that is part of
8    Exhibit 50.
9         And what I would like you to do is
10   turn to page WEISER-221.
11        You got that?
12   A    Yes.
13   Q    And so what I would like to focus
14   on, you see on the left-hand side there are
15   numbers starting with 966 and going to 1011?
16   A    Yes.
17   Q    I want to focus on the Column 1003.
18        Do you see that?
19   A    Yes.
20        MR. EATON:  You are talking
21   about Row 1003?
22        MR. RICHMAN:  You're right,
23   sorry.
24   A    I knew what you meant.
25   Q    And I'm looking at Gregory Gruol,

ARBITRATION - VOLUME IV

1
2    G-R-U-O-L.
3         Do you see him?
4    A    Yes.
5    Q    And you see that for the week
6    6-4-2011, I'm under D?
7    A    Yes.
8    Q    That would be column?
9    A    Correct.
10   Q    That it has 288.51.
11   A    Yes.
12   Q    Do you see that?
13   A    Yes.
14   Q    And do you know -- and that's a
15   dollar amount, correct?
16   A    Yes.
17   Q    And do you know what that dollar
18   number represents?
19   A    His earnings.
20   Q    Now, let me show you.  I just want
21   you to focus on the fact that your e-mail
22   with Ms. Narissi is dated 8-8-2012.
23   A    Yes.
24   Q    So let's take a look at Exhibit 86.
25   If you look at the first page of Exhibit 86,

ARBITRATION - VOLUME IV

1
2    and it's Bates Number 98.
3         Do you see that?
4    A    Yes, I do.
5    Q    And that's an e-mail from Todd
6    Jackson at The New York Times.
7         Do you see that?
8    A    I do.
9    Q    And that is sent more than two
10   months -- about two months earlier on
11   June 9th -- actually, a year and two
12   months earlier, on June 9, 2011 to Barbara
13   at Publishers NMDU Welfare Fund.
14        And who is the Barbara in that?
15   A    Barbara is a Fund employee who is
16   involved in the bookkeeping and the
17   accounting.
18   Q    And this actually says "Barbara A."
19   Do you know who Barbara A. is?
20   A    Her last name is Albergo.
21   Q    If you turn to -- there's not a
22   page number but it is the third page, and
23   you look at Mr. Gruol who is about
24   two-thirds down the page.  They're in
25   alphabetical order.

ARBITRATION - VOLUME IV

1
2         You see him?
3    A    Yes.
4    Q    And you see the Base, it says "1"
5    under the column Base.  Says "1"?
6    A    Yes.
7    Q    Do you know what that is?
8    A    Specifically, I don't.  I think
9    it's shifts.
10   Q    Let me show you Exhibit 42.  See if
11   we can have all these out together.
12   A    Yes.
13   Q    You see exhibits -- Bates Number
14   2373?
15   A    Yes, I do.
16   Q    And you see the factor 3-31-2011?
17   A    Yes.
18   Q    And if you look across the Day
19   Rate, that day rate is 288.52?
20   A    Yes.
21   Q    Now let's go back to Mr. Gruol in
22   Exhibit 50.
23   A    Okay.
24   Q    And you see the 288.51?
25   A    Yes.

Page 956

```
 1              ARBITRATION - VOLUME IV
 2       Q    Putting all these together, do you
 3    have any understanding as to what the 288.51
 4    is?
 5       A    This is his earnings for that
 6    one -- working that one period of time which
 7    is a shift for that day rate.
 8          MR. RICHMAN:  No further
 9    questions.
10          MR. EATON:  Just one follow-up.
11    FURTHER CROSS EXAMINATION BY MR. EATON:
12       Q    If Mr. Richman hadn't picked an
13    example that had one shift in it but
14    multiple, could you do the math the same way
15    if the employee worked a day shift and two
16    night shifts, for example?
17       A    Without having further information,
18    it would be difficult to do.
19          MR. EATON:  No further
20    questions.  Done for now.
21
22          (Continued on next page.)
23
24
25
```

Page 957

```
 1              ARBITRATION - VOLUME IV
 2
 3          ARBITRATOR IRVINGS:  Excellent.
 4    Thank you.
 5
 6          (Whereupon, the proceedings were
 7    adjourned at 4:28 p.m.)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 958

```
 1              ARBITRATION - VOLUME IV
 2              I N D E X
 3                        PAGE
 4    WITNESS:  ETHAN EMANUEL KRA
 5    Cross Examination by Mr. Miller        783
 6
 7    WITNESS:  MICHELL LEWIS
 8    Direct Examination by Mr. Richman      860
 9    Cross Examination by Mr. Eaton         907
10    Further Direct Examination by Mr. Richman   951
11    Further Cross Examination by Mr. Eaton   956
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 959

```
 1              ARBITRATION - VOLUME IV
 2              C E R T I F I C A T E
 3    STATE OF NEW YORK    )
                            : ss.
 4    COUNTY OF NEW YORK   )
 5          I, BARBARA R. ZELTMAN, Shorthand
 6    Reporter and Notary Public, within and
 7    for the State of New York, do hereby
      certify:
 8          That this transcript is a true
 9    record of the proceedings had.
10          I further certify that I am not
11    related to any of the parties to this
12    action by blood or marriage, and that I
13    am in no way interested in the outcome of
14    this matter.
15          IN WITNESS WHEREOF, I have hereunto
16    set my hand this 7th day of April, 2015.
17
18
19
20              _____
                BARBARA R. ZELTMAN
21              Court Reporter and Notary Public
22
23
24
25
```

1

2   THE ARBITRATION TRIBUNALS OF THE

3   AMERICAN ARBITRATION ASSOCIATION

4

5   -----------------------------------------x

6   In the Matter of the Arbitration between:

7

8   THE NEW YORK TIMES COMPANY,

9                           Petitioner,

10              vs.

11  NEWSPAPER AND MAIL DELIVERERS'-PUBLISHERS'

12  PENSION FUND

13                          Respondent.

14  -----------------------------------------x

15  No. 01-14-0000-1433

16

17

18      PROCEEDINGS AT ARBITRATION

19      BEFORE MARK IRVINGS, ESQ.,

20              ARBITRATOR

21              VOLUME V

22

23

24  Reported by:  David Henry

25  JOB NO. 97105

Page 961

September 17, 2015
9:30 a.m.

Continued Proceedings at
Arbitration (Volume V), before Mark
Irvings, Esq., Arbitrator, held at the
offices of the American Arbitration
Association, 120 Broadway, New York,
New York.

---

Page 962

A P P E A R A N C E S:

JONES DAY
Attorneys for the Petitioner
   51 Louisiana Avenue, N.W.
   Washington, DC 20001
BY:  EVAN MILLER, ESQ.
AND: YAAKOV ROTH, ESQ.
AND: MIGUEL EATON, ESQ.

SCHULTE ROTH & ZABEL
Attorneys for Respondent
   919 Third Avenue
   New York, New York 10022
BY:  RONALD RICHMAN, ESQ.
AND: MAX GARFIELD, ESQ.
AND: ADAM GARTNER, ESQ.

ALSO PRESENT:

ANDREW GUTTERMAN, ESQ.
   The New York Times
TOM BENTVENA
ANNE KOSKI, ESQ.
   The Segal Company (p.m. session)

---

Page 963

Hayes - Direct
        TERRY HAYES, recalled as a
witness, having previously been duly
sworn, was further examined and
testified as follows:
DIRECT EXAMINATION BY MR. MILLER:
        Q.  Mr. Hayes, welcome back.  You
testified in these proceedings back in
February, and we've called you back to
testify specifically about the subject of
what occurred at meetings of the board of
trustees and to ask you about minutes from
those meetings and various exhibits to
those minutes.  Those are the only matters
we'll be asking you about today.
        I'd like to start though by
asking you to refresh our respective
memories about certain aspects of your
February testimony to lay the foundation
for the new questioning.
        MR. RICHMAN:   Do we really need
to do this?
        MR. MILLER:  It's just a couple
of I think useful foundational
questions, and I do think it will make

---

Page 964

Hayes - Direct
the documents go more quickly.
        Q.  Have you recently reviewed your
February testimony?
        A.  Yes, I have.
        Q.  And what was your testimony about
your understanding between 2008 and the
time that the Fund assessed partial
withdrawal liability in September, 2013
about the relevant measure for the
70 percent decline test for partial
withdrawal liability?
        A.  Yes, during that period of time
the measurement was a percentage of wages.
        Q.  Okay, alright, with those
preliminaries, the documents we'll discuss
this morning are contained in the yellow
binder, so why don't you open that now.
Let me turn your attention initially to
Exhibit 125.  And Mr. Hayes, can you
briefly summarize and identify these
materials?
        A.  The first page is the agenda that
lists the items that are going to be
discussed at the meeting.  The page after

---

Hayes - Direct

1 Hayes - Direct
2 that are the actual minutes from that
3 meeting.
4     Q.   And that meeting took place on
5 July 25, 2007, is that right?
6     A.   That's correct.
7     Q.   Why don't you turn your attention
8 to the first page of the agenda and the
9 first item on the agenda that day, and why
10 don't you explain quickly what that first
11 item is.
12     A.   Yeah, the first item basically
13 announces me as a new publisher trustee
14 replacing Bob Nusspickel, who was the
15 previous trustee for the publishers.
16     Q.   So was this your first meeting of
17 the board of trustees for the NMDU Fund?
18     A.   Yes, it was.
19     Q.   Now let's turn to the exhibit to
20 these minutes which I believe begins at
21 page 3311, that's on the bottom right.
22 It's also called Exhibit I to the minutes.
23     A.   Yes.
24     Q.   Take a look at the exhibit to
25 these minutes for a moment.

1 Hayes - Direct
2     A.   Okay.
3     Q.   I'm not going to ask you any
4 specific questions about the letter.  Just
5 generally for foundational purposes, why
6 don't you tell us what this letter is
7 about.
8     A.   This letter was from Segal who
9 was the actuary for the Fund explaining to
10 us that due to the new rules associated
11 with the Pension Protection Act, that there
12 were going to be changes in funding.
13     Q.   And during your service on the
14 board of trustees, how much attention did
15 the board pay to the Pension Protection Act
16 and its rules?
17     A.   We paid a lot of attention to
18 that.  It was brand new and legislation was
19 occurring as time went on.
20     Q.   And roughly how many meetings did
21 the board have over the course of years in
22 which it discussed Pension Protection Act
23 issues?
24     A.   We discussed it at virtually
25 every meeting and there are special

1 Hayes - Direct
2 meetings in which we had discussions about
3 it.
4     Q.   During your time on the board of
5 trustees, how would you compare the time
6 that the trustee spent on Pension
7 Protection Act matters versus the time the
8 board spent on withdrawal liability
9 matters?
10     A.   We spent a lot of time on the
11 Pension Protection Act and virtually no
12 time on withdrawal liability.
13     Q.   And in connection with Pension
14 Protection Act matters, who guided the
15 trustees with respect to those matters?
16     A.   Segal was the actuary through
17 John Urbank and Rosana.
18     Q.   And Rosana?
19     A.   Egan, sorry.
20     Q.   And of the time that the trustees
21 spent at its meetings hearing from Segal,
22 roughly what percentage would you estimate
23 related to Segal advising about Pension
24 Protection Act issues?
25     A.   Most of Segal's updates to us

1 Hayes - Direct
2 really revolved around the Pension
3 Protection Act, you know, funding
4 improvement plans, the zoning and how the
5 zones were calculated and identified.  So
6 we spent a lot of time with them on that.
7     Q.   Okay, why don't you turn your
8 attention now to Exhibit 126, which are
9 meeting of materials and minutes for
10 September 20, 2007 board meeting.
11     A.   Yes, I see that.
12     Q.   And why don't you take a look at
13 the first page of those minutes, which is
14 3086, again September 20, 2007.
15     A.   I have it.
16     Q.   Mr. Hayes, do you remember
17 attending this meeting on September 20,
18 2007?
19     A.   While I don't specifically
20 remember attending, it says I was here.  I
21 have no reason to think that I wasn't.
22     Q.   Alright, let me draw your
23 attention to page five of the minutes.
24 It's on 3090.
25     A.   Yes, sir.

Hayes - Direct

1
2   Q.   And at the top of page 5 there is
3   a bullet point that talks about Pension
4   Fund diversion of two percent being reduced
5   to one percent.  Do you see that?
6   A.   Yes, I do.
7   Q.   And there is a similar reference
8   to diversion in a bullet that's right under
9   this little redacted box.  Do you see that
10  as well?
11  A.   Yes, I do.
12  Q.   And then on the next page, page
13  6, there is also mention of diversion in
14  paragraph four as part of a trustee motion.
15  Do you see that?
16  A.   Yes, I do.
17  Q.   What is your understanding of the
18  Pension Fund diversion?
19  A.   The Pension Fund diversion
20  occurred before I joined the trustee board,
21  but it was the diversion of up to two
22  percent of the wages associated with the
23  Pension Fund contribution that was
24  available for the union to divert to the
25  Welfare Fund.

Hayes - Direct

1
2   Q.   And so in connection with the
3   references to a 2 percent and a 1 percent
4   and a 1.5 percent on page 5, what are those
5   percentages of?
6   A.   Those are percentages of wages.
7   Q.   During your time on the board of
8   trustees, did the subject of pension
9   contribution diversions frequently come up?
10  A.   Yes.
11  Q.   And when the issue of diversions
12  were discussed, how were the diversion
13  amounts typically expressed?
14  A.   The diversion amounts were
15  typically expressed in dollars and wages.
16  Q.   Let me draw your attention back
17  to page 5 of the minutes, and there is a
18  bullet right about the middle of the page
19  that begins, if the sixers' contributions,
20  do you see that?
21  A.   Yes, I do.
22  Q.   And you see at the end of, or the
23  second half of that sentence in the bullet
24  point, it talks about guaranties to the
25  Welfare Fund through a possible increase in

Hayes - Direct

1
2   the employees' shift contribution, do you
3   see that?
4   A.   Yes, I do.
5   Q.   So that does mention shift
6   contributions.  What is that a reference
7   to?
8   A.   That is a reference to the
9   employees' per shift contribution to the
10  Welfare Fund.
11  Q.   Alright, let's turn our attention
12  now to Exhibit 127.  And those are agenda
13  meeting materials for a December 19, 2007
14  meeting.
15  A.   Yes, I see that.
16  Q.   Okay.  And let's begin drawing
17  your attention to page 1 and the discussion
18  of who was present.
19  A.   I see that.
20  Q.   And did you attend this meeting?
21  A.   Again, I don't have a specific
22  recollection, but the minutes state I was
23  there so there's no reason for me to think
24  I wasn't.
25  Q.   And now let's turn to page 2 of

Hayes - Direct

1
2   the minutes, that's Fund number 3094, and
3   toward the middle of the page there is a
4   discussion that begins under the heading
5   Consultants' Report, do you see that?
6   A.   Yes, I do.
7   Q.   And the consultants in this
8   regard would be whom?
9   A.   That would be Mr. Urbank and
10  Ms. Egan.
11  Q.   Let me draw your attention
12  specifically to a sentence just about in
13  the middle of that paragraph.  It begins
14  with the word contributions, contributions
15  for the year beginning.  Why don't you read
16  that sentence to yourself.
17  A.   Yes, sir.
18  Q.   And there is a reference in that
19  sentence to projected contributions, quote,
20  reflecting the contribution reallocation to
21  the Welfare Fund being reduced from 2
22  percent to 1.5 percent, do you see that?
23  A.   Yes, I do.
24  Q.   And is that a continuation of the
25  discussion on diversion and reallocation

Hayes - Direct

1
2   from the prior meeting that we just
3   discussed?
4       A.  Yes, it is.
5       Q.  And that contribution
6   reallocation that's discussed in this
7   paragraph, the references to percentages,
8   those are again a percentage of what?
9       A.  Percentage of wages.
10      Q.  All right, let's move to the next
11  page, page three.  And why don't you
12  quickly if you can review the first two
13  paragraphs.
14      A.  Yes, sir.
15      Q.  Okay, and you'll see in those
16  paragraphs that there is a mention of zone
17  certification, and I think you mentioned a
18  couple of moments ago in your testimony
19  about zone certifications.
20      Did you participate at board
21  meetings in which Segal would discuss the
22  need to have zone certifications?
23      A.  Yes.
24      Q.  And how often would those board
25  meetings occur?

Hayes - Direct

1
2       A.  We talked about the zones ad
3   nauseam during the period of time.
4       Q.  So often?
5       A.  Yes, very often.
6       Q.  And did Segal propose to help the
7   trustees project what zone the fund would
8   be in the future?
9       MR. RICHMAN:  Can we not lead?
10      THE ARBITRATOR:  I mean, I've
11  let you lead the whole time, but at
12  some point --
13      MR. MILLER:  I understand.
14      Q.  Did there come a time in which
15  Segal made proposals to the trustees in
16  connection with certain services relating
17  to the Pension Protection Act?
18      A.  Yes, they did.
19      Q.  And what do you remember the
20  nature of those proposals to be?
21      A.  Mr. Urbank had suggested to us
22  that we may hire them to do an asset
23  liability modelling study.
24      Q.  And did the trustees approve
25  Segal going ahead with such a study?

Hayes - Direct

1
2       A.  Yes, we did.
3       Q.  And in fact was that work
4   performed and presented to the trustee?
5       A.  Yes, it was.
6       Q.  Okay, let's turn to Exhibit 128,
7   which are meeting materials from April 17,
8   2008.
9       A.  Yes, I have it.
10      Q.  And again, please take a look at
11  the first page of the minutes and the
12  discussion of the trustees who were
13  present.
14      A.  Yes, I have it.
15      Q.  Did you attend this meeting?
16      A.  Again, I don't have any specific
17  recollection, but it says I was there, so I
18  was there.
19      Q.  Okay, now I want to draw your
20  attention to one of the exhibits to these
21  minutes.  It's Exhibit C, which begins on
22  page 3319, about seven pages in to
23  Exhibit 128.  It's an April 17, 2008 memo
24  from Urbank and Egan to the board.
25      A.  Yes, I have it.

Hayes - Direct

1
2       Q.  Do you see that?
3       A.  Yes, I do.
4       Q.  And the memo is entitled Pension
5   Protection Act of 2006, information
6   requirements for zone certification.  Take
7   a moment to review this memo.
8       A.  Yes.
9       Q.  Do you recall seeing this
10  particular memo at a board of trustees
11  meeting?
12      A.  Not this particular memo, but we
13  had memos like this throughout the period
14  because the zones were done annually, so.
15      Q.  Please take a look at page 2 of
16  the memo under the heading projected
17  industry activity.
18      A.  Yes, sir.
19      Q.  And please take a note of the
20  last sentence in that paragraph, and
21  particularly the last line of that
22  sentence.
23      A.  Yes, sir.
24      Q.  That last line indicates that
25  Segal needs an assumption about, quote,

Hayes - Direct

1 expected wage increases in future years,
2 since contributions are a percentage of
3 wages. Although I understand you don't
4 recall this particular document, let me ask
5 you this question. Do you recall seeing
6 documents in which Segal referred to Fund
7 contributions as a percentage of wages?
8     A. Yes.
9     Q. Do you recall Segal
10 representatives who attended trustee
11 meetings describing the Pension Fund's
12 contributions as a percentage of wages?
13     MR. RICHMAN: Objection. Come
14 on, all we're doing here is reading
15 documents. I mean, what are we doing?
16 And the questions are leading besides
17 that. We have said repeatedly, and
18 all you have to do is read the
19 documents to say they say percentage
20 of wages. The documents tell us that,
21 right? I don't understand what we're
22 doing here.
23     MR. MILLER: Well, first,
24 obviously terminology and the

Hayes - Direct

1 practices that were engaged in by the
2 advisors to the Fund and the
3 terminology that was used at trustee
4 meetings is very important to the
5 determination of what contribution
6 base units are. Moreover, while the
7 documents do speak for themselves, I'm
8 trying once I lay the foundation and
9 have the witness acknowledge what the
10 document is saying to go on to ask
11 questions about the terminology and
12 how it may have been discussed.
13 That's exactly the last question that
14 I asked.
15     THE ARBITRATOR: Well,
16 certainly the last question you asked
17 we can have. I don't think it's
18 necessary to go through and have him
19 point to each thing. I'm sure you'll
20 do that with precision in your brief.
21     Q. Alright, so may I turn back to
22 the last question. Do you recall Segal
23 representatives who attended trustee
24 meetings describing the Pension Fund's

Hayes - Direct

1 contribution?
2     MR. RICHMAN: Objection, that's
3 leading.
4     THE ARBITRATOR: I agree.
5     Q. Fair enough. Do you recall
6 attending trustee meetings in which there
7 were descriptions of --
8     MR. RICHMAN: Objection.
9     THE ARBITRATOR: He can finish
10 this. Were there descriptions and
11 what were they.
12     MR. MILLER: Yes, that's right.
13     Q. Were descriptions of the
14 contributions discussed at trustee
15 meetings?
16     A. Yes.
17     Q. And what were they?
18     A. It was discussed as contributions
19 being a percentage of wages.
20     Q. And that terminology that was
21 discussed at these meetings, contributions
22 being a percentage of wages, was that
23 consistent with your understanding of how
24 contributions to the Fund are made?

Hayes - Direct

1     A. It was consistent.
2     Q. Did use of this terminology
3 influence your understanding of the
4 contribution formula?
5     MR. RICHMAN: Objection.
6     THE ARBITRATOR: You're arguing
7 now.
8     Q. Alright, let's turn to
9 Exhibit 131. And again, I draw your
10 attention to the first page of the minutes
11 and its discussion of what trustees were
12 present, and why don't you advise as to
13 whether you attended this meeting.
14     A. Again, I have no specific
15 recollection. The minutes said I was here.
16 I don't doubt that I was there.
17     Q. Alright, let's turn your
18 attention to page 6 of the minutes, and the
19 discussion on that page under the heading
20 Segal Company Report.
21     A. Yes, I see that.
22     Q. And you'll notice that part way
23 down the page, the minutes indicate that
24 the trustees adopted a motion authorizing

Page 981

Hayes - Direct

1  Segal to use certain assumptions in
2  connection with their zone certification
3  work.  Do you see that?
4      A.  Yes, I do.
5      Q.  Do you recall the board of
6  trustees authorizing Segal to make certain
7  assumptions in connection with PPA zone
8  certifications?
9      A.  Yes.
10     Q.  In connection with that, did the
11 trustees ever authorize or adopt
12 assumptions about future shifts for Segal
13 to use in connection with zone
14 certifications?
15         MR. RICHMAN:   Objection, it's
16 leading.
17         THE ARBITRATOR:   Sustained.
18     Q.  Alright, let's move on to
19 Exhibit 136.  Same initial question, take a
20 look at page 1.  It should be the same
21 answer sir, no reason to believe you were
22 not at the reason?
23     A.  Exactly.
24         THE ARBITRATOR:   Maybe if we

Page 982

Hayes - Direct

1  get to the point where you do recall
2  meeting at a meeting, you can tell us.
3      Q.  Why don't you look at section 10
4  of the minutes that begin on page 4, in
5  paragraph B.
6      A.  Yes.
7      Q.  And in reviewing paragraph B,
8  you'll see that toward the end of that
9  page, there is a discussion in which there
10 are a number of bullet point items relating
11 to an apparent request that the trustees
12 made of the Segal representatives in
13 connection with their projections.  Why
14 don't you review those for a moment.
15     A.  Okay.
16     Q.  Let's focus on the second to last
17 bullet at the bottom of the page 5, where
18 there is a discussion again of reallocation
19 and Welfare Fund contributions.  Do you see
20 that language?
21     A.  Yes, I do.
22     Q.  And there is a mention in that
23 language of Welfare Fund offset
24 contributions based on shift rate

Page 983

Hayes - Direct

1  contributions, do you see that?
2      A.  Yes, I do.
3      Q.  I think you testified a couple of
4  minutes ago that you attended board
5  meetings in which the subject of pension
6  diversion was discussed?
7      A.  Yes.
8      Q.  And did you also attend board
9  meetings at which the subject of
10 reallocation of monies from the Welfare
11 Fund back to the Pension Fund, was that
12 discussed?
13     A.  Yes.
14     Q.  And what do you recall about
15 those discussions relating to reallocation
16 at these meetings?
17     A.  At this meeting we were
18 discussing because of the condition of the
19 zone reallocating the diversion money that
20 had been going from pension to welfare back
21 from welfare to pension to help with that
22 zone clarification, and then there was a
23 discussion about how do we get money back
24 into the Welfare Fund since we were moving

Page 984

Hayes - Direct

1  the money, and the discussion here talked
2  about having that loss, if you will,
3  covered by an increase in the shift rate
4  and what they're talking about here is, as
5  I said before, employees pay for welfare.
6  Employees pay a set amount of dollars per
7  shift into the Welfare Fund.  So this talks
8  about increasing that per shift
9  contribution.
10         THE ARBITRATOR:   Did you say
11     employees?
12     A.  Employees.  So this talks about
13 increasing that contribution for employees,
14 or doing a modification to their benefits,
15 or maybe a little of both.
16     Q.  Alright, now let's turn to
17 Exhibit 137.  And I'd like to draw your
18 attention to the first page under the
19 heading discussion of funding improvement
20 plan.
21     A.  Yes, sir.
22     Q.  Okay.  Do you recall attending
23 trustee meetings in which funding
24 improvement plans were discussed by the

Hayes - Direct

1  trustees?
2      A.  Yes, sir.
3      Q.  At the bottom of the next page,
4  page 2, in the last paragraph, there is a
5  discussion of Segal representatives
6  conducting an interactive presentation.  Do
7  you see that?
8      A.  Yes, I do.
9      Q.  Do you remember attending a board
10 of trustees meeting in which there were
11 interactive presentations from Segal?
12     A.  I remember attending a meeting
13 where there was an interactive
14 presentation.
15     Q.  And can you describe generally
16 what occurred during the course of that
17 presentation?
18     A.  Yes.  Ms. Egan and Mr. Urbank
19 brought with them one of the people from
20 their firm that came in with this
21 interactive program.  We were at Proskauer
22 at the time and they were able to project
23 this program on to a screen where you could
24 actually see them make manipulations to
25

Hayes - Direct

1  certain areas that would then calculate out
2  where our zone would be over 10 years,
3  20 years, that sort of thing.
4      Q.  Okay, and at these interactive
5  sessions or at this interactive session,
6  did Segal model future contribution
7  amounts?
8      A.  Yes, they did.
9      Q.  And what do you recall about the
10 method and terminology they used in
11 connection with modelling future
12 contribution methods?
13     A.  The modelling of the future
14 contributions were basically a change in
15 the rate, the rate being a percentage, so
16 they were looking at move the percentage of
17 the wages from 8 percent to 10 percent or
18 from 8 percent to 11 percent or some type
19 of combination until they were able to get
20 the funding up into the zone, the green
21 zone, and how long it would stay green
22 until we had to do something else.
23     Q.  Now let's take a look at the
24 exhibit to these minutes, it's only one I
25

Hayes - Direct

1  believe, and I believe it's not labelled as
2  such, but it begins at Fund 3366.
3      A.  Yes, I see that.
4      Q.  Take a moment to look at that
5  exhibit.
6      A.  Yes.
7      Q.  What is this document?  Do you
8  recall this document?
9      A.  This is the document that was
10 distributed by Segal talking about the
11 funding improvement plan.  This is again,
12 as I was talking about, those different
13 movements and adjustments you could make to
14 the plan, are contributions to the Fund
15 that would drive different scenarios of our
16 funding zones.
17     Q.  Did you discuss this document or
18 versions of this document at any board of
19 trustees meetings?
20     A.  Yes, we did.
21     Q.  And was that discussion in
22 addition to the interactive modelling you
23 just testified about?
24     A.  Yes.  In fact as I said, I
25

Hayes - Direct

1  remember one interactive meeting, but then
2  there were a host of meetings that went on
3  after that where we basically talked
4  through what we had seen on the board, and
5  we made suggestions sometimes of, if you
6  change this, what would occur.
7      Q.  And I want you to focus again on
8  this slide deck.  And do you recall a
9  meeting or multiple meetings in which you
10 discussed this slide deck or versions of
11 it?
12     A.  Yes.
13     Q.  Can you take a look at the slide
14 labelled -- it's really page 4 of the deck,
15 Fund 3370.
16     A.  Yes, I see that.
17     Q.  And why don't you focus on the
18 heading at the top, possible FIP.
19     A.  Yes.
20     Q.  And it uses the phrase 8 percent
21 CR.  What is your understanding of what CR
22 meant?
23     A.  Contribution rate.
24     Q.  During the course of the
25

Hayes - Direct

1  discussion of this document, was there any
2  discussion of what that 8 percent of CR
3  was, or was of?
4      A.  Yes.  As I stated before, it was
5  a percentage of wages.
6      Q.  And now let's focus, going ahead
7  to page or slide deck page 12, which is
8  Fund 3378.  And you'll see that there is a
9  mention of scenarios and scenarios 2 and 3.
10  It uses that same term methodology.  And
11  did you have the same, similar discussion
12  respecting what that terminology meant in
13  these meetings?
14      A.  Yes, it was very clear.
15      Q.  Alright, let's turn to
16  Exhibit 138.
17      A.  Yes, sir.
18      Q.  In fact let's move ahead to
19  Exhibit 140.  October 11, 2011.
20      A.  Yes, sir.
21      Q.  And again on the first page it
22  indicates that you were present.  I want
23  you to draw your attention to page 4 of the
24  minutes, and the discussion under the

Hayes - Direct

1  heading 8, which is entitled Segal Company
2  Report.  Why don't you take a moment and
3  review the discussion under VIII(A).
4      A.  Yes, sir, I see that.
5      Q.  Do you remember this discussion
6  about El Diario at any board of trustee
7  meeting?
8      A.  I do not recall that, no.
9      Q.  Do you have a view as to why you
10  don't remember a board meeting at which El
11  Diario was discussed?
12      THE ARBITRATOR:    He didn't say
13  that.
14      Q.  Do you have a view as to why you
15  do not remember attending a board of
16  trustee meeting in which -- board of
17  trustee meeting discussing Diario?
18      A.  Yes, I do have a thought about
19  that.
20      Q.  And why don't you explain.
21      A.  In preparation for my testimony,
22  because I had not really seen this and
23  focused on this, I went back to check my
24  calendar to see what was happening that

Hayes - Direct

1  day.  And as it turned out I was double
2  booked for meetings that day.  So I may
3  have missed this because I departed this
4  meeting early so I could get back to a
5  meeting at headquarters.
6      Q.  And when you reviewed your
7  calendar, what did it show about the timing
8  of that other meeting?
9      A.  It showed that I had to be back
10  at headquarters for a meeting that I was
11  leading that began at 1:00 o'clock.
12      Q.  And did you attend that 1:00
13  o'clock meeting that was shown on your
14  calendar?
15      A.  Yes, I absolutely attended that
16  meeting.
17      Q.  And why do you have that level of
18  confidence?
19      A.  I went so far as to contact the
20  attendees at that meeting to make sure that
21  their notes would reflect that I was at
22  that meeting.  They checked those notes and
23  I was absolutely there.
24      Q.  This meeting that you attended

Hayes - Direct

1  back at headquarters, was it a meeting of
2  consequence for you?
3      A.  It was a very important meeting.
4  The Times was looking at doing a reduction
5  in force, in its staffing, so it was a very
6  important meeting.
7      Q.  Why don't you turn to page 1 of
8  the minutes.
9      A.  Yes, sir.
10      Q.  And what does that say about when
11  the trustee meeting began?
12      A.  The meeting began at 10:30.
13      Q.  And page 6 of the minutes
14  indicates when the meeting was adjourned.
15  Can you take a look at that.
16      A.  Page 6 indicates that it was
17  adjourned at two, 2:00 p.m.
18      Q.  Based on all this, what is your
19  understanding of how long you attended the
20  meeting on October 11, 2011?
21      A.  I left that meeting an hour and a
22  half or more before it was over, based on
23  the times.
24      Q.  Now let's turn to Exhibit 141.

Hayes - Direct

1
2    A.   Yes, sir.
3    Q.   And focus on the first page which
4  is the agenda page, and focus on the first
5  item of the agenda for that day.  Do you
6  see what that is?
7    A.   Yes, I do.
8    Q.   So that relates to adoption of
9  minutes of, among other things, the
10  October 11th meeting?
11    A.   Yes.
12    Q.   As far as you know, did you
13  attend this meeting on December 9th?
14    A.   Same as before, I'm listed as
15  being there.  I have no reason to believe I
16  wasn't.
17    Q.   When minutes of this Fund's
18  trustees are formally adopted, are they
19  executed?
20    A.   They're executed at the meeting,
21  yes.
22        THE ARBITRATOR:   I'm not sure I
23  know what you mean by executed.
24    Q.   Are the minutes signed?
25    A.   They're signed at the meeting.

Hayes - Direct

1
2    Q.   And who signs -- what is the
3  protocol for signing the minutes of this
4  Fund's trustee meeting?
5    A.   The minutes will be signed by one
6  union trustee and one publisher trustee.
7    Q.   Let's go back to the minutes of
8  October 11, 2011.  And the signatures on
9  those minutes are on page 6.
10    A.   Yes, sir.
11    Q.   It's Fund 3178.  And you'll note
12  the employer trustee signature.  Is that
13  your signature?
14    A.   No, it's not.
15    Q.   Whose signature is that?
16    A.   That's Dan Murphy's signature.
17    Q.   Who is he?
18    A.   He was my partner trustee on the
19  publisher side.
20    Q.   Even on occasions where you did
21  not sign minutes, was it your practice to
22  review draft minutes before being adopted?
23    A.   Normally yes.
24    Q.   And when would you do that?
25    A.   They would send the minutes out

Hayes - Direct

1
2  to us and we would review those minutes and
3  make comments before we would meet at the
4  meeting where they would be adopted.
5    Q.   And did you follow that practice
6  here and review on or before December 9th
7  the minutes from October 11, 2011?
8    A.   I do not recall reviewing those
9  minutes.  As I stated earlier, we were
10  going through a reduction in force and this
11  December time frame, November, December
12  time frame was when we were actually
13  letting the people go.  We had run the
14  process and we were actually letting them
15  go during this period.  So I was diverted
16  and I didn't follow my usual protocol
17  apparently.
18    Q.   Alright, let's turn to
19  Exhibit 143, which are minutes of
20  February 27, 2013.
21    A.   Yes, sir.
22    Q.   And why don't you draw your
23  attention to just the first heading which
24  is Roman one, call to order, take a quick
25  look at that discussion.  And as far as you

Hayes - Direct

1
2  are aware, what was the purpose of this
3  meeting in the winter of 2013?
4    A.   This was a special meeting to
5  discuss the funding improvement plan.
6    Q.   Can you turn to page 3 of the
7  minutes under a heading entitled B, four
8  scenarios?
9    A.   Yes.
10    Q.   And why don't you take a moment
11  to review the discussion in B, and
12  particularly the itemized projections of
13  that are at the bottom of that page and the
14  top of the next page.
15    A.   Yes, sir.
16    Q.   Do you remember attending a
17  meeting in which Segal discussed
18  projections for a funding improvement plan
19  set of schedules?
20    A.   Yes.
21    Q.   And you'll see in the discussion
22  at the bottom of that page Segal indicating
23  projections and particularly two
24  alternatives which referred to percentages
25  of wages being changed in connection with

Hayes - Direct

1    the contribution rate to this Fund.  Do you
2    see that?
3        A.  I do.
4        Q.  Do you recall whether in the
5    presentation that Segal made relating to
6    proposed schedules for funding improvement
7    plans, Segal orally describing the Fund's
8    contribution rates in a manner similar to
9    what is described in this --
10       MR. RICHMAN:   Objection; come
11   on.
12       THE ARBITRATOR:  You're
13   slipping.
14       Q.  Do you recall Segal describing
15   the employer contribution rate for the
16   pension plan in connection with any of the
17   meetings which discussed funding
18   improvement plan schedules?
19       A.  Yes, sir.
20       Q.  And what do you recall about how
21   they characterized the contribution?
22       A.  They were always characterized as
23   a percentage of wages and the percentages
24   were adjusted that would drive a different

Hayes - Direct

1    net contribution.
2        Q.  Alright, I now want to turn your
3    attention to page 5 of the minutes.  That's
4    the last page.
5        A.  Yes, sir.
6        Q.  And the discussion under heading
7    C, selection of schedules for the FIP,
8    discusses the trustee determination.  But I
9    want you to focus on the second paragraph,
10   and why don't you read that to yourself for
11   a moment.  And that second paragraph talks
12   about the union adopting an alternative
13   schedule which was part of the funding
14   improvement plan.
15       Let me ask you, do you know how
16   union employees and officials are
17   compensated?
18       A.  They're salaried.
19       Q.  And do union officials get paid
20   based on shifts worked?
21       A.  No.
22       Q.  Does the union make contributions
23   to the NMDU Fund?
24       A.  As far as I know, yes.

Hayes - Direct

1        Q.  Now let's turn to Exhibit 150.
2        A.  Yes, sir.
3        Q.  These are minutes to a board
4    meeting on June 20, 2014.
5        A.  Yes, sir.
6        Q.  And let's not focus on the actual
7    minutes themselves, but rather one of the
8    attachments in Exhibit A, that's on 3437.
9        A.  Yes, sir.
10       Q.  It's an April 4, 2014 memo from
11   Egan and Urbank to the board.  Can you
12   please review this memo and -- you only
13   need to review the first paragraph.
14       A.  Okay.  Yes, sir.
15       Q.  And you'll note in the middle of
16   the paragraph, there is a sentence that
17   begins with the word assuming and it
18   describes the contribution rate as
19   potentially increasing from 8 percent to
20   11.8 percent of the shift rate, do you see
21   that?
22       A.  Yes, I do.
23       Q.  Did you see this memo at the time
24   of the meeting?

Hayes - Direct

1        A.  I'm sure I did.
2        Q.  In all of the meetings over the
3    years in which Segal had discussed the
4    Pension Protection Act and funding
5    improvement plans, do you recall the Segal
6    representatives ever using this terminology
7    to describe the contributions?
8        MR. RICHMAN:   Objection.
9        THE ARBITRATOR:   What's the
10   objection?
11       MR. RICHMAN:   Leading.
12       MR. MILLER:  I don't think it
13   is.
14       THE ARBITRATOR:   You can have
15   that.  Go ahead.
16       A.  No.
17       Q.  Does The New York Times make
18   contributions to the NMDU Fund on the basis
19   of a percentage of shift rates times number
20   of shifts or on the basis of a percentage
21   of wages?
22       A.  Our contribution is made on a
23   percentage of wages.
24       MR. MILLER:  No additional

Hayes - Cross

questions at this time.

(Recess taken: 10:24-10:59 a.m.)

CROSS-EXAMINATION BY MR. RICHMAN:

Q. Mr. Hayes, you testified previously that on July 25, 2007 you became a trustee. Do you remember that?

A. Yes.

Q. So that was your first meeting. And what I'd like you to take a look at is Exhibit 127.

A. Yes, sir.

Q. You did attend that meeting, correct?

A. Yes, I have no reason to think I didn't.

Q. Okay, but you have no real recollection of attending that meeting?

A. No specific recollection.

Q. Okay. And as I understand your testimony, and correct me if I'm wrong -- let me rephrase that. Do you have a specific recollection of attending any meeting of the Fund?

A. I remember the meeting where we

Hayes - Cross

had the interactive program. I remember that very clearly.

Q. And what date was that?

A. I don't remember the date, but I remember the meeting itself very clearly.

Q. And how long was that meeting?

A. That meeting lasted probably four hours.

Q. How long was the Segal report?

A. It was all Segal. There was nothing else happening.

Q. And do you remember the month that meeting occurred in?

A. No.

Q. Do you remember the year?

A. No.

Q. So if you take a look at Exhibit 127, let's look at the agenda which is 3450. Do you see that?

A. Yes.

Q. And if you look at 6 on the agenda, Weiser, LLP, do you know who those folks are?

A. Yes.

Hayes - Cross

Q. Who are they?

A. Those are the accountants.

Q. Are they still the accountants to the Fund?

A. No.

Q. When did they stop being the accountants to the Fund?

A. I don't recall specifically. I believe it was around the time when we transitioned from a Fund office to a TPA type setup, Costello Accounting.

Q. Okay, when was that?

A. Costello began to take control in February.

Q. Of what year?

A. Of 14 I believe.

Q. And you said I believe, is that because you're not sure?

A. No, that's not it. There was some transition problems from the Fund office to Mr. Costello, so he was actually doing work. So I don't know when we officially made him the accountant.

Q. So in Exhibit 127, let's take a

Hayes - Cross

look at page 5. And what I'm looking at is the Weiser, LLP report, if you could take a look at that, please.

A. Yes.

Q. Do you remember that occurring?

A. I remember Mr. Lewis being at meetings. I don't remember this discussion specifically.

Q. What do you recall Mr. Lewis doing at meetings?

A. Most of the time Mr. Lewis's presentations were very short and he only hit highlights. He basically passed out a book and he would hit the highlights of the book, if there were any, and then he was gone.

Q. Alright, a book, what do you mean by a book?

A. He gives a report.

Q. A report, and what was that report?

A. It was his financial report.

Q. Okay, and did you read that financial report?

Hayes - Cross

1
2   A.  Not at the meeting.  I may have
3   reviewed some of them after, but not at the
4   meeting, no.
5   Q.  You may review some of them
6   after?
7   A.  Yes.
8   Q.  Have you ever reviewed a
9   financial report of the Pension Fund?
10  A.  Yes.
11  Q.  Yes, okay.  And you do understand
12  that financial reports have footnotes, or
13  notes?
14  A.  Yes.
15  Q.  I'm sorry, I forget, what is your
16  position at the New York Times?
17  A.  I'm Senior Vice-President of
18  Operations and Labor.
19  Q.  And you read financial reports
20  before?
21  A.  Yes.
22  Q.  Okay.  Let's take a look at --
23  oh, I'm sorry, did any of the Fund
24  professionals, and by that I mean any of
25  the lawyers, of which there were many, ever

Hayes - Cross

1
2   report to you that the Fund's financial
3   reports were incorrect?
4   A.  Incorrect?
5   Q.  Incorrect.
6   A.  No.
7   Q.  And did any of them ever report
8   to you that they contained information that
9   was not correct?
10  A.  No.
11  Q.  And I know I mentioned Fund
12  counsel in that.  One of those Fund counsel
13  was Mr. Schelberg?
14  A.  Yes.
15  Q.  That's from Proskauer?
16  A.  Yes.
17  Q.  And that's the same firm that The
18  New York Times uses at times for labor
19  relations purposes, correct?
20  A.  Yes.
21  Q.  And did any of the Segal folks
22  ever report to you that the Fund's
23  financial reports prepared by the Weiser
24  firm were incorrect?
25  A.  No.

Hayes - Cross

1
2   Q.  Did Murray Schwartz report to you
3   that any of the financial reports the
4   Weiser firm prepared were incorrect?
5   A.  No.
6   Q.  Did any of the trustees that you
7   served with ever report to you that any of
8   the financial reports of the Fund were
9   incorrect?
10  A.  Not that I recall.
11  Q.  Well, you say not that you
12  recall.  If someone had reported that to
13  you, would you have done something?
14  A.  Oh, yes.  I think them as a
15  trustee, they would have done something.
16      MR. MILLER:  Mr. Arbitrator, I'm
17  going to object at this point.  When
18  Mr. Hayes previously testified, there
19  was an opportunity by Mr. Richman at
20  that juncture to question him about
21  financial reports.  This line of
22  questioning goes beyond the direct
23  testimony of Mr. Hayes earlier today,
24  because it is not limited to the
25  supplemental documents that we

Hayes - Cross

1
2   received during the course of this
3   hearing.
4       MR. RICHMAN:  I call him as a
5   witness.  Do you want me to call him
6   as a witness?  This was somebody I was
7   never permitted to depose, and when
8   that decision was made, the ruling was
9   there's going to be no deposition, he
10  was going to testify about a very
11  small area, which he went beyond the
12  first time this year, which was really
13  not about how the Fund operated, but
14  how The New York Times operated and
15  saw its contribution obligation to the
16  Fund.  And in that ruling you said I
17  would have, given that there was no
18  deposition permitted, a wide latitude.
19  And there are minutes here that have
20  been produced that have various
21  financial reports in them, and I do
22  want to go through those.
23      THE ARBITRATOR:  Pertaining to
24  what subject?
25      MR. RICHMAN:  Well, there are

Hayes - Cross

1  notes that say very specifically what
2  the contribution based unit is for the
3  Fund's employers.  And I understand
4  why The New York Times doesn't want to
5  get into this, but this happened
6  repeatedly at meetings on an annual
7  basis.
8      THE ARBITRATOR:    Discussions at
9  the meetings?
10     MR. RICHMAN:    Yes.
11     THE ARBITRATOR:  Do you want to
12 respond?
13     MR. MILLER:   Yes.  To the extent
14 that those financial reports were
15 available to Mr. Richman during the
16 first time that Mr. Hayes appeared, he
17 had every license at that juncture to
18 use those financial reports.  And
19 indeed yes he did, and that was the
20 opportunity to examine Mr. Hayes about
21 what those financial reports said and
22 whether Mr. Hayes had reviewed those
23 reports.
24     MR. RICHMAN:    We didn't have

Hayes - Cross

1  the minutes.
2      MR. MILLER:   And there is no
3  reason as a consequence that he should
4  be given a second bite at the apple.
5  He was not prohibited during that
6  first time around from using those
7  reports for the very purpose he's
8  currently attempting to use them.
9      THE ARBITRATOR:    You can
10 examine what was discussed at the
11 meetings to the extent that it goes to
12 his understanding of what the terms
13 were.
14     MR. RICHMAN:    I'm going to take
15 a little break, and maybe I can
16 shorten this.
17     (Recess taken:  11:12-11:16 a.m.)
18 CONTINUED CROSS-EXAMINATION BY MR. RICHMAN:
19  Q.  So let's take a look at
20 Exhibit 131.  And were you present at this
21 meeting?
22  A.  I have no reason to think I
23 wasn't.
24  Q.  Do you have a recollection of

Hayes - Cross

1  this meeting?
2      A.  Not specifically.
3      Q.  Do you remember if anything
4  occurred at this meeting?
5      A.  Not specifically.
6      Q.  And let's take a look at the
7  agenda, and on it you see, and that's the
8  first page of Exhibit 131, do you see that?
9      A.  Yes, I do.
10     Q.  And 5, Weiser LP re financial
11 statements, do you see that?
12     A.  Yes, I do.
13     Q.  And let's go to part of the
14 meeting where that's discussed, which is at
15 page 4 of the minutes.
16     A.  Yes, sir.
17     Q.  Okay, and it says Mitch Lewis
18 provided -- do you see where I'm reading
19 from?
20     A.  Yes.
21     Q.  Mr. Lewis provided and reviewed
22 with the trustees the final financial
23 statements for the fiscal years ended May
24 31, 2008 and May 31, 2007.  Do you see

Hayes - Cross

1  that?
2      A.  Yes.
3      Q.  And do you recall Mr. Lewis doing
4  that?
5      A.  As I said, Mr. Lewis's reports
6  were pretty succinct, so I'm sure he did.
7      Q.  Okay, but I asked you a question
8  not about the nature of his reports, but I
9  asked if you recall that he did that.
10     A.  I have no specific recollection.
11     Q.  But you have no doubt that he
12 did?
13     A.  I have no doubt that he did his
14 usual quick report.
15     Q.  Okay, and how long was his quick
16 report?
17     A.  Usually less than five minutes.
18     Q.  And did you ever ask him any
19 questions about any of the financial
20 reports?
21     A.  Not that I specifically remember.
22     Q.  Okay, do you remember other
23 people asking questions about the financial
24 reports?

Page 1013

Hayes - Cross

1
2    A.  Not that I specifically remember.
3    Q.  Okay, let's go to 134.  And were
4    you at this meeting?
5    A.  There is no reason for me to
6    think I wasn't.
7    Q.  And you see on the agenda the
8    Weiser report?
9    A.  Yes.
10   Q.  Okay, and let's turn to page 4 of
11   the minutes.
12   A.  Yes.
13   Q.  And do you remember Mr. Lewis
14   distributing and reviewing the financial
15   reports for 2009 and 2008?
16   A.  I have no specific memory of it,
17   but that's his usual practice.
18   Q.  Okay, and do you remember anybody
19   raising any questions about the reports?
20   A.  Not specifically.
21   Q.  Okay, when Mr. Lewis gives his
22   reports, who is in attendance?
23   A.  The trustees are there, the
24   lawyers of course, Mr. Schwartz, and
25   sometimes some of the other people that we

Page 1014

Hayes - Cross

1
2    use for finances and that sort of thing.
3    Q.  Okay, does anyone get excluded
4    from the room when Mr. Weiser -- when
5    Mr. Lewis gives his reports?
6    A.  Not usually.
7    Q.  So let's take a look at
8    Exhibit 140, please.
9    A.  Yes, sir.
10   Q.  And you were present at this
11   meeting?
12   A.  Yes, I was present for a portion
13   of the meeting.
14   Q.  For a portion of the meeting?
15   A.  Yes.
16   Q.  And this is the meeting that you
17   left early?
18   A.  Yes.
19   Q.  By the way, where is your office
20   in relation to Proskauer's office?
21   A.  It's across the street.
22   Q.  Across the street?
23   A.  Yes.
24   Q.  And what street is that crossing?
25   A.  It's across 41st Street.

Page 1015

Hayes - Cross

1
2    Q.  When you see the -- on page 3 of
3    the minutes, there is a WeiserMazars
4    report, do you see that?
5    A.  Yes.
6    Q.  And do you have any reason to
7    doubt that was given at that meeting?
8    A.  I have no doubt that it was.
9    Q.  Do you have any recollection of
10   that report being given at the meeting?
11   A.  No.
12   Q.  Let's go to Exhibit 142.  Were
13   you in attendance at this meeting?
14   A.  Yes, I have no reason to think I
15   wasn't on the list.
16   Q.  Okay, and so if you look on the
17   agenda, you see the WeiserMazars report?
18   A.  Yes.
19   Q.  And that's for fiscal years May
20   31, 2010 and May 31, 2011, do you see that?
21   A.  Yes.
22   Q.  Alright, let's turn to the --
23   page 4 of the report.
24   A.  Page 4 of the minutes.
25   Q.  Of the minutes, I'm sorry, thank

Page 1016

Hayes - Cross

1
2    you.  And so you see the WeiserMazars
3    report?
4    A.  Yes.
5    Q.  Now, this description is a little
6    bit different than the description that
7    we've seen in the previous minutes about
8    Mr. Lewis's report.  This one says
9    Mr. Lewis distributed and reviewed in
10   detail the final statements.  Do you see
11   that?
12   A.  I see that.
13   Q.  Do you have any reason to believe
14   that that's not accurate?
15   A.  It wasn't usually his practice to
16   do detailed anything.
17   Q.  That wasn't the question I asked
18   you?
19   A.  What was the question?
20   Q.  I said do you have any reason to
21   believe that the minutes are inaccurate?
22   A.  I don't recall him doing a
23   detailed meeting.
24   Q.  So do you think that the minutes
25   are inaccurate?

Hayes - Cross

1   A. Possibly.

2   Q. Possibly. But other than you
don't recall, you don't have any other
reason to believe that these minutes are
inaccurate?

3   A. Except it wasn't the practice of
Mr. Lewis to give us more than a
five-minute run-through.

4   Q. Okay, now, you indicated at the
end of your testimony today that the
contribution that The Times made to the
Pension Fund was a percentage of wages, is
that correct?

5   A. Yes.

6   Q. And that's what you believe the
contribution to be, a percentage of wages?

7   A. Yes.

8   Q. And that percentage changed over
time, didn't it?

9   A. It changed with the diversion,
yes.

10  Q. But in your mind the contribution
obligation was a percentage of wages?

11  A. Yes.

Hayes - Cross

Q. Okay. Was overtime included?

A. I don't do the calculation, so I
can't tell you the elements.

Q. Do you know how many shifts The
Times pays for when contributing to the
Pension Fund?

A. As I say, we contributed based on
a percentage of wages. Shifts are -- I
don't even know what that means when it
comes to contribution to the pension.

Q. Do you know what a shift is?

A. I know what a shift is.

Q. You do, okay. Do you know --

A. But it has no relationship to our
requirement to make a contribution to the
Pension Fund.

Q. It has no relationship to that?

A. No.

Q. Did you ever read the collective
bargaining agreement between The Times and
the NMDU?

MR. MILLER: Objection, asked
and answered.

THE ARBITRATOR: I know. The

Hayes - Cross

problem is your last question to him
opened this whole thing up. If you'll
agree to strike the last question and
answer, I'll cut this off and rely on
what we went through the first day.

MR. RICHMAN: I don't
understand how you can do that.

MR. MILLER: I'm prepared to do
that. We'll strike it.

MR. RICHMAN: He has made a
statement and he has not only -- if
you're going to strike his entire
testimony, I'll back off. But if the
-- and I'm happy to have the testimony
about El Diario stay. I want that to
stay. I definitely want that to stay.
But everything else with respect to
percentage of contribution rate is a
percentage of wages, that's on the
board?

THE ARBITRATOR: Fair enough.
The issue is though, is this going to
be different than what we went through
on his first day?

Hayes - Cross

MR. RICHMAN: I think so,
because he's now said some things
which are really interesting. And
also, you know, look, we have some
serious credibility issues here. So I
do have the right to go into the
credibility. I mean, the witness is
now saying this just doesn't --
basically a shift doesn't have
anything to do with it. And that's
pretty fascinating, given the
collective bargaining agreement.

THE ARBITRATOR: Well, when you
start getting into have you read the
collective bargaining agreement, we
went through all that.

MR. RICHMAN: Well, what you
did was cut it off and said I could
read the collective bargaining
agreement and I don't need his
interpretation of it. But I want his
mindset, because I am attacking his
credibility.

MR. MILLER: He had an

Hayes - Cross

1  opportunity to do that the last time
2  around.  And he also had an
3  opportunity to cross-examine
4  Mr. Claffee, who is the person at The
5  Times who is most knowledgeable about
6  how contributions are made.
7       THE ARBITRATOR:   In fairness,
8  Mr. Hayes was asked, and did talk
9  repeatedly about what is the basis of
10  contributions.  So while I made the
11  effort seeing if I could trade off the
12  last answer for cutting it off, that
13  deal is not acceptable.
14      MR. RICHMAN:   I'll trade off
15  the percentages.  If you want to trade
16  off all of that discussion, either
17  that or we're going to go through the
18  whole thing and it's not going to be
19  short.
20      MR. MILLER:   Well, I will take
21  you up on your offer.  It was a
22  summation question obviously, and I
23  appreciate that, but the remainder of
24  his testimony remains in.

Hayes - Cross

1       THE ARBITRATOR:   Okay, go ahead.
2       MR. MILLER:   Exactly.  The
3  questioning was about what happened at
4  the meeting.
5       THE ARBITRATOR:   But it was
6  also about his understanding of what
7  the basis of the contribution was.  It
8  wasn't about what was or wasn't said
9  at the meeting.  It was certainly
10  broader.  So go ahead, let's just get
11  this done with.  Go ahead.
12  FURTHER EXAMINATION BY MR. RICHMAN:
13      Q.  So let me show you the collective
14  bargaining agreement, Mr. Hayes, which I
15  understand from your testimony the prior
16  time that you testified, you had read.
17  This is Exhibit 8.  Let's look at page 55.
18  Do you see that Pension Fund language?
19      A.  Yes, I do see the language.
20      Q.  And do you see it says the
21  publisher agrees it shall contribute 8
22  percent of each employee's pay rate per
23  shift for each shift worked by each
24  employee in the bargaining unit -- I will

Hayes - Cross

1  skip the name of the fund -- but not in
2  excess of five shifts in any payroll week
3  in any one office for any one employee.  Do
4  you see that?
5       A.  Yes.
6       Q.  And so what I would like to know
7  after reading that, do you still believe
8  that shifts have nothing to do with the
9  contribution obligation of The New York
10  Times?
11      MR. MILLER:   Objection.  Is he
12  asking for a contract interpretation
13  or is he asking him for his
14  understanding of how The Times
15  contributes?
16      MR. RICHMAN:   I said do you
17  believe.  I want his view.  Does he
18  believe.
19      THE ARBITRATOR:   Well, to the
20  extent that all the prior testimony
21  was about his understanding of what
22  the basis of the contribution is, this
23  goes to his understanding.  Go ahead.
24      A.  What was your question again

Hayes - Cross

1  please?
2       Q.  My question is, and if you need
3  to take a look at this language, I'll give
4  you the time to take a look at it.  My
5  question is do you still believe that the
6  contribution obligation of The New York
7  Times to the Pension Fund has nothing to do
8  with shifts?
9       A.  No, I stand corrected after
10  looking at this.  It is capped by five
11  shifts, so our percentage of wages is
12  capped at the five shifts.
13      Q.  Okay, and did you ever form a
14  belief of the phrase in the Pension Fund
15  language about the publisher agrees it
16  shall contribute eight percent of
17  employees' pay rate per shift for each
18  shift worked?  Is that how --
19      MR. MILLER:   Objection, now he's
20  really asking about his contract
21  interpretation.
22      MR. RICHMAN:   No, I'm asking if
23  he ever developed a belief about what
24  that meant.

Hayes - Cross

1
2      MR. MILLER:  That's asking for
3   his contract interpretation, belief
4   based on the language of the contract.
5      THE ARBITRATOR:  Well, he's
6   testified as to his belief is based on
7   something, so you can inquire.  Go
8   ahead.
9      THE WITNESS:  My belief is not
10  based on this language.
11     Q.  It's not based on this language?
12     A.  No.
13     Q.  And is it your belief that this
14  language is irrelevant?
15     MR. MILLER:  Objection.  It's
16  argument.
17     THE ARBITRATOR:  Yes, it's
18  argument.
19     Q.  So in various actuarial reports
20  that we've gone through today in minutes as
21  well as reports that are attached to the
22  minutes, when there is a phrase, for
23  example, eight percent of wages as the
24  contribution rate, that is not the full
25  description of the contribution rate, is

Hayes - Cross

1
2   it?
3      MR. MILLER:  Objection.  We
4   haven't gone through actuarial
5   reports.
6      MR. RICHMAN:  The actuary's
7   reports at the meetings.  The
8   actuaries reported at the meeting.
9      THE ARBITRATOR:  Okay, so what'
10  the question?  I'm sorry.
11     Q.  So when the phrase is used, eight
12  percent of wages or some other percentage
13  of wages, that's not a full description of
14  what the contribution obligation is, is it?
15     A.  Yes.
16     Q.  It is?  So there is no six shift
17  limit in your mind?
18     A.  The limit as we just read here is
19  five shifts.
20     Q.  Okay, sorry.  You're right.  I
21  stand corrected.  But that limit doesn't
22  appear anywhere in the reports that the
23  actuary gave at various trustees' meetings,
24  correct?
25     MR. MILLER:  Objection.  Now

Hayes - Cross

1
2   he's asking about what was contained
3   in reports.
4      MR. RICHMAN:  No, reports
5   are describing --
6      MR. MILLER:  Oh, the meeting
7   description?
8      MR. RICHMAN:  Yes.
9      THE ARBITRATOR:  Thank you, go
10  ahead.
11     A.  There was no discussion about
12  shifts.
13     Q.  Okay, and so there is no
14  discussion about any limit on the
15  contributions in terms of wages, correct?
16     A.  There is no discussion about
17  shifts.
18     Q.  I asked you a question.  And my
19  question to you was, is there any
20  discussion in the reports, and I mean the
21  oral reports that the actuary gave at
22  various Fund meetings that we went through
23  at some length today about any limit on
24  wages being used for the calculation of
25  pension contributions?

Hayes - Cross

1
2      A.  It was always stated as a percent
3   of wages.
4      Q.  So there was no limit stated?
5      MR. MILLER:  In the discussions.
6      Q.  In the discussions.
7      A.  No.
8      Q.  And you were very familiar with
9   the PowerPoints, the PowerPoint
10  presentation that the Segal folks made for
11  apparently four hours or something like
12  that, from that length, is that right?
13     A.  I have no specific on how long it
14  lasted.  I just know the whole meeting was
15  about this PowerPoint.  And it wasn't a --
16  it was really an interactive program.
17     Q.  And in that report, the
18  interactive report provided by the
19  actuaries to the trustees, was there a
20  discussion about a limit on the amount of
21  wages that would be used for calculating
22  pension contributions?
23     A.  No.
24     Q.  Did you ever hear the actuary
25  talk about the limit of wages that could be

Hayes - Cross

used to calculate pension contributions?
A. Not that I recall.
Q. Now, I just want to make sure the record is clear on something. We talked about a -- we didn't talk, you testified about an employee's shift contribution.
A. Yes.
Q. And that was to the Welfare Fund?
A. Yes.
Q. And that was a contribution made by, actually by employees?
A. Yes.
Q. It was not a contribution made by The New York Times, correct?
A. Yes.
Q. Now, is it your view that the -- putting aside the employees's shift contribution, that contribution to the Welfare Fund, and I'm not talking about percentages because I know those changed. The contributions to the Welfare Fund were derived differently than contributions to the Pension Fund?
Now, in your view, putting aside



Hayes - Cross

the employees' shift contribution to the Welfare Fund, and I'm not talking about the different percentages that were used for the Pension and Welfare Fund, but was the basis for making a contribution to the Welfare Fund different than the basis for making a contribution to the Pension Fund?
MR. MILLER: You're talking about the employer contribution?
MR. RICHMAN: Employer contributions, yes.
A. Yes.
Q. It was different. And why was it different?
A. There are other elements that are part of that calculation. I'm not close enough to be able to identify them for you, but they're different.
Q. And are they both subject to a limitation on the number of shifts?
A. As I said, I'm not close enough to all the elements of the welfare contribution to say that's true. I do know now, there is this sixer, where if you work



Hayes - Cross

a six shift, there is a contribution. But that limit it maybe a couple of years old.
Q. After the assessment of withdrawal liability?
A. Somewhere around the same -- it was before because we were talking about the FIP at the time, so they were talking about putting money back into the Welfare.
Q. I want to go to Exhibit 128, please. And as I recall your testimony you were present at this meeting, is that accurate?
A. I have no reason to think I wasn't there.
Q. So I want to turn to page 3320, which is the second page of the April 17th Segal report. And it's April 17th of 2008.
MR. MILLER: This is Exhibit C?
MR. RICHMAN: Yes, it is Exhibit C.
Q. You'll know you're there when you see 3320. And did the Segal folks go over this report in the meeting?
A. There was discussion at the



Hayes - Cross

meeting, yes.
Q. Okay. And so if you'll look in projected industry activity, that's 4.
A. Yes.
Q. And if you go towards the bottom of the page, and I believe it is the last sentence, please note that on this point we need an assumption for both the average shifts per active participant, projected number of active participants and the expected wage increases in future years since contributions are a percentage of wages. Do you know why the Segal folks were asking for information on average shifts per active participant?
A. I can only make an assumption of what they were asking for.
Q. I don't want you to assume.
A. I don't know what's inside their heads.
Q. So you read this report?
A. Yes.
Q. And so when you read this report you saw this line, the last sentence of

Hayes - Cross

1  what's labelled paragraph four?
2      A.  Right.
3      Q.  Did you ask a question about why
4  are you asking about average shifts?
5      A.  No, there was no discussion at
6  that meeting about the shifts, so there was
7  no discussion between the trustees and
8  Segal about that language.
9      Q.  Okay, so nobody at the meeting
10  actually said well, why do you need shifts?
11     A.  No.
12     Q.  Okay, and when are you read it,
13  you didn't think it was odd that they were
14  asking for shift information?
15     A.  Like I said, no, I have my
16  thoughts on why they needed it.
17     Q.  Okay, but that wasn't my
18  question.
19     A.  No, I did not ask them.
20     Q.  Okay, you didn't ask, you didn't
21  think it was odd?
22     A.  No.
23     Q.  And as far as you know, nobody
24  else asked?

Hayes - Cross

1      A.  That's correct.
2      Q.  Let's go to Exhibit 140, please.
3  Now, I want to focus on the Segal report on
4  El Diario.  Now, as I understand it, you
5  don't know, and correct me if I'm wrong,
6  you don't know for sure whether you were
7  there during this report or not?
8      A.  I don't recall this report, so I
9  assume I wasn't there.
10     Q.  But there are lots of other
11  things you don't recall about the meetings
12  of the trustees over the years, but you
13  still may have been there, correct?
14     A.  I don't think I was there for
15  this, because of what was being talked
16  about.
17     Q.  And if you became aware of what
18  was being talked about, would that have
19  caused you to do something?
20     A.  It would have caused me to ask
21  maybe some questions.
22     Q.  Okay.  And so when you left the
23  meeting, did anyone else leave with you?
24     A.  No.

Hayes - Cross

1      Q.  Okay.  And so --
2      A.  Leave with me to go to my
3  meeting?
4      Q.  Or leave with you, whether --
5      A.  I don't know who may have left at
6  the same time I did or after me, I have no
7  idea.
8      Q.  You have no idea.  And you have
9  no reason to believe that any of the other
10  attendees of the meeting who are listed on
11  the first page of the minutes, let's take a
12  look at who was there, you have no reason
13  to believe that any of those people other
14  than those people who -- where it's denoted
15  also present for a portion of the meeting?
16     A.  Yes.
17     Q.  That's 3173.  So let's take
18  everybody above that group.  Do you have
19  any reason to believe that any of those
20  people left that meeting at the time that
21  you left the meeting?
22     A.  As I stated, no-one left with me.
23     Q.  So have you no reason to believe
24  that anyone else left the meeting, is that

Hayes - Cross

1  correct?
2      A.  I don't know, is my answer.
3      Q.  Okay, no, I'm asking you if you
4  have any reason to believe that any of
5  these people above the line where it says
6  also present for a portion of the meeting,
7  whether you have any reason to believe that
8  they left the meeting before the meeting
9  concluded.
10     A.  I have no reason to believe.
11     Q.  Now, did Mr. Schelberg report to
12  you that there was a discussion about El
13  Diario?
14     A.  No.
15     Q.  Did he report to you that there
16  was a discussion about El Diario and
17  partial withdrawal liability?
18     A.  No.
19         THE ARBITRATOR:  Well, he
20  already said there was, and I think
21  that El Diario, then conjunction has
22  got to be right, because it requires
23  both things.
24         MR. RICHMAN:  Unless it

Hayes - Cross

1  changes.
2  THE ARBITRATOR:  So if you want
3  to know about partial withdrawal
4  liability, you have to ask that
5  question.
6  Q.  Okay, and so did anybody at the
7  meeting, I can go one by one, but it will
8  be less painful -- did anyone at that
9  meeting -- you have no reason anybody
10  actually left that meeting before it
11  concluded, report to you, writing or orally
12  or in any way, that there was a discussion
13  about partial withdrawal and the need to
14  calculate shifts for El Diario?
15  A.  No.
16  Q.  Did anyone report to you that
17  they objected to Segal's approach with
18  respect to El Diario?
19  MR. MILLER:  Objection, in light
20  of his past testimony.
21  THE ARBITRATOR:  He has no
22  knowledge about El Diario being
23  discussed at all.
24  MR. RICHMAN:  I know.  Did

Hayes - Cross

1  anyone report to you -- all these
2  people were at the meeting.  I want to
3  know whether anybody at the meeting
4  reported to him about -- did they say
5  to you, there is an issue with partial
6  withdrawal liability.
7  THE ARBITRATOR:  Period. Ask
8  that.
9  Q.  Okay, anybody at that meeting
10  report to you on that?
11  A.  No.
12  Q.  Okay, did anybody at the meeting
13  report to you about that they disagreed
14  with Segal's approach?
15  MR. MILLER:  Objection.  Same
16  reasoning.
17  Q.  You can answer the question in
18  one word.
19  THE ARBITRATOR:  Go ahead, just
20  answer it, please.
21  A.  No.
22  Q.  Now, do you know the exact time
23  you left the meeting?
24  A.  No.

Hayes - Cross

1  Q.  And as you testified previously,
2  your office is across the street from
3  Proskauer's office where the meeting was
4  held, correct?
5  A.  Yes.
6  Q.  And how long would it take you to
7  get across the street?
8  A.  A couple of minutes.
9  Q.  And if you notice first of all in
10  the first page of the minutes, we were
11  talking about the people above the line
12  that said also present for a portion of the
13  meeting?
14  A.  Yes.
15  Q.  And you see Ms. Lotruglio and Tom
16  Mazars and Mitch Lewis are mentioned as
17  attending a portion of the meeting, do you
18  see that?
19  A.  Yes.
20  Q.  But you're not listed as
21  attending a portion of the meeting?
22  A.  That's true.
23  Q.  Do you have any understanding as
24  to why you weren't reported as being

Hayes - Cross

1  present for only a portion of the meeting?
2  A.  No, I don't.
3  Q.  So this meeting occurred on
4  October 11, 2011.  That's correct, right?
5  A.  Yes.
6  Q.  And when was the next meeting of
7  the Fund, do you recall?
8  A.  Not without checking my schedule.
9  Q.  Let's go to the next meeting of
10  the Fund, 141.  Now, on page 1 of 141,
11  there is a date for the meeting that says
12  December 9, 2011, do you see that?
13  A.  Yes.
14  Q.  Okay, that is a little less than
15  two months after the meeting that occurred
16  on October 11th, correct?
17  A.  Yes.
18  Q.  Okay.  And I understand that you
19  do not recall reviewing the minutes from
20  the meeting that's Exhibit 140.
21  A.  That's correct.
22  Q.  Okay.  Can you say for certain
23  here today that you did not review those
24  minutes?

Page 1041

Hayes - Cross

1
2    A.  I can say that I don't recall
3  reviewing those meeting minutes.
4    Q.  And now, as I understood, you
5  said during this period of time, this
6  two-month period of time, that you were
7  very busy at work?
8    A.  Yes.
9    Q.  Okay.  Is it incorrect to say
10  that you're usually pretty busy at work?
11    A.  This was extraordinary because we
12  were doing a reduction in force.
13    Q.  Okay.  And is it your testimony
14  that you think you may not have had enough
15  time to review the minutes of the meeting
16  that occurred on October 11, 2011?
17    A.  That wasn't my testimony.  My
18  testimony is that I was focused on other
19  issues.  So I have no recollection of
20  reading those minutes, or reviewing them.
21    Q.  Okay.  Do you know who took the
22  minutes of the meeting?
23    A.  Usually Segal takes the minutes.
24    Q.  And then what's the process that
25  follows that?

Page 1042

Hayes - Cross

1
2    A.  He'll send the minutes, he'll
3  send the minutes out for review.  The time
4  period is flexible when you get it.  And
5  then when we actually get to the meeting,
6  there is only a set of minutes that need to
7  be signed, we don't get a whole new set of
8  them.  So we don't review them again at the
9  meeting.
10    Q.  Right, okay.  And when you say
11  that Mr. Urbank sends them out or Segal
12  sends them out for review, to whom do they
13  send minutes out to review?
14    A.  I know I get a copy.  I believe
15  the attorneys get a copy.  I don't know if
16  it goes to anybody else other than the
17  trustees.
18    Q.  Okay.  If you look at the
19  December 9, 2011 minutes, and it says
20  approval of prior minutes on the first
21  page.
22    A.  Yes.
23    Q.  Do you see that?
24    A.  Yes.
25    Q.  And it says the minutes of the

Page 1043

Hayes - Cross

1
2  regular meeting held on October 11, 2011
3  previously distributed by mail were
4  reviewed.  Do you have any reason to
5  believe that that didn't happen?
6    A.  You mean an actual review?
7    Q.  Yes.
8    A.  Yes.
9    Q.  Okay, and so these minutes are
10  incorrect?
11    A.  Well, I think what these minutes
12  speak to, if I recall there were some
13  corrections to the minutes that were mailed
14  out.  So the only thing that may have been
15  reviewed are the corrections.
16    Q.  And so you remember that on
17  December 9, 2011, sitting here today, you
18  remember that the review was of some
19  corrections?
20    A.  I'm reading just the minutes
21  itself, the approval of the minutes.  It
22  mentions that.
23    Q.  But you don't have an independent
24  recollection of that?
25    A.  No, I don't.

Page 1044

Hayes - Cross

1
2    Q.  Did anyone, Mr. Schelberg --
3  let's take Mr. Schelberg, suggest to you
4  that he -- that you ought to review the
5  minutes of the October meeting?
6    A.  It's standard procedure that we
7  should always as trustees review the
8  minutes.
9    Q.  And I appreciate that, and I
10  agree with that wholeheartedly.  But that
11  wasn't my question.  My question was did
12  Mr. Schelberg tell you --
13    A.  No.
14    Q.  I'm sorry, let me finish so we
15  get the record straight.  Did Mr. Schelberg
16  tell you to review the minutes of the
17  October 11th meeting?
18    A.  No.
19    Q.  Did anybody else associated with
20  the Fund say to you something to the effect
21  that you ought to review the minutes of the
22  October 11th meeting?
23    A.  No.
24    Q.  So let's go back to 140 again.
25  So Segal gives its report that's labelled

Page 1045

Hayes - Cross

1  eight, Roman numeral eight in the minutes,
2  it's on page 4 of the minutes, do you see
3  that?
4      A.  Yes.
5      Q.  And by the way, were the minutes,
6  were they -- did they go chronologically,
7  that is the first thing that happened at
8  the meeting was the first thing that
9  occurred in the minutes and the same way
10  after that?
11      MR. MILLER:  Do you understand
12  the question?
13      THE WITNESS:  I don't think I
14  understand his question.
15      Q.  So the minutes say, there is a
16  call to order, right?  That happened first.
17  Do you see that on the first page?
18      A.  Yes.
19      Q.  And then it has a Roman numeral 2
20  and 3?
21      A.  Yes.
22      Q.  And what I'm asking you about is
23  do the minutes actually report the sequence
24  of the events that occur at the meeting?

Page 1046

Hayes - Cross

1      MR. MILLER:  These minutes or
2  generally?
3      Q.  Well, in general.
4      A.  In general, yes.
5      Q.  Okay.
6      A.  There are times when we jump
7  around on the agenda, because really, the
8  minutes are done after.  The agenda at the
9  meeting is what you're really looking at.
10  And so sometimes you move this agenda
11  around as the meeting is actually taking
12  place.  I can't speak to, because I've
13  never really noticed, if the minutes follow
14  what actually happened.  So I can't give
15  you an answer to that.
16      Q.  At this meeting there was a --
17  well, let's take, if you look at page five
18  of the minutes, and I'm looking at Roman
19  numeral 10.
20      A.  Yes.
21      Q.  Fund office.  And there was a
22  motion made and seconded approving
23  ratifying the August 1, 2011 poll vote
24  approving a three percent wage increase, do

Page 1047

Hayes - Cross

1  you see that?
2      A.  Yes.
3      Q.  Were you there for that vote?
4      A.  I don't recall if I was there for
5  the vote.  I do recall talking it over with
6  the other management trustee, and I think
7  we did it in a sidebar.  But I don't recall
8  being -- I don't recall if I was there for
9  the actual motion.
10      Q.  Because the motion was made,
11  seconded and unanimously adopted ratifying
12  the August 1, 2011 poll vote.  Do you know
13  what a poll vote is?
14      A.  What it says, you'll get a call,
15  they'll ask you.
16      Q.  And this seems to indicate, and
17  tell me if you believe otherwise, this
18  seems to indicate there was an August 1,
19  2011 poll vote, correct?
20      A.  Yes.
21      Q.  And these are the minutes of the
22  October meeting.  Am I correct in saying
23  that the motion was to ratify the August 1,
24  2011, poll vote?

Page 1048

Hayes - Cross

1      A.  That's what it says.
2      Q.  And you don't know whether you
3  were there for this motion?
4      A.  Yes, I don't know.
5      Q.  And let's turn the page to
6  page 6.  And you see it says appeals?
7      A.  Yes.
8      Q.  And there is a motion made,
9  seconded and unanimously adopted to deny
10  Mr. Iaconi's appeal.  Do you see that?
11      A.  Yes.
12      Q.  Were you there for that vote?
13      A.  I don't know.  As I said, what
14  usually happens is that we'll move things
15  around.  I don't have any specific memory
16  of this particular yes or no. I don't
17  recall.
18      Q.  Let's go down to B, again still
19  under appeals.  And this had to do with an
20  appeal of a participant Joseph Testagrossi?
21      A.  Yes.
22      Q.  And then if you look down a
23  couple of paragraphs, it says motion was
24  made, seconded and unanimously adopted to

Page 1049

Hayes - Cross

1  deny Mr. Testagrossi's appeal subject to
2  the union trustees' further review of the
3  appeal, do you see that?
4      A.  Yes.
5      Q.  Were you there for that vote?
6      A.  I don't know.  As I said, there
7  are times when we moved things around, and
8  so I don't know if Murray might have asked
9  us at the beginning knowing I had to leave,
10  so I don't recall.
11      Q.  Had you told others who were
12  attending the meeting that you had to leave
13  the meeting early?
14      A.  Most of the occasions when I know
15  that I have another meeting to go to, I
16  will let it be known early.
17      Q.  But that's not the question I
18  asked you.
19      A.  The answer is probably.
20      Q.  But you have no recollection of
21  telling people that you were leaving this
22  meeting earlier?
23      A.  It is my normal practice to tell
24  people that.

Page 1050

Hayes - Cross

1      Q.  I'm asking you whether you have a
2  recollection.
3      A.  No, I don't.  I have no specific
4  recollection.
5      Q.  Okay.  Do you know what a quorum
6  is?
7      A.  Yes.
8      Q.  What is it?
9      A.  It's the minimum number required
10  to hold the meeting.
11      Q.  And do you know what the quorum
12  requirement for the Pension Fund is?
13      A.  No.
14      Q.  Let me see if maybe I can jog
15  your memory here.  Let's take a look at
16  Exhibit 47.  It's in the red book, or
17  orange binder, 47.  So do you know what
18  this document is?
19      A.  It looks to be a copy of the plan
20  document.
21      Q.  The agreement and declaration of
22  trust?
23      A.  Yes.
24      Q.  Do you know the difference

Page 1051

Hayes - Cross

1  between an agreement and declaration of
2  trust and the plan document?
3      A.  Yes.
4      Q.  Can you tell us what that is?
5      A.  The plan document speaks to the
6  plan, what the requirements are,
7  participants and that sort of thing.  This
8  is the agreement to establish the plan.
9      Q.  And to govern the plan, is that
10  fair to say?
11      A.  Yes.
12      Q.  And to govern the plan, okay.  So
13  let's take a look at page 28.
14      A.  Got it.
15      Q.  And in section 6.2, and -- I'm
16  sorry, 6.3, the section entitled quorum.
17      A.  Yes.
18      Q.  And it says that the quorum for
19  transaction of business at any regular or
20  special meeting of the trustees shall
21  consist of two union trustees and two
22  employer trustees.  Do you see that?
23      A.  I do.
24      Q.  Okay, do you know whether there

Page 1052

Hayes - Cross

1  was a quorum present if you left the
2  meeting for the other trustees to conduct
3  business?
4      A.  According to this there shouldn't
5  have been.
6      (Recess taken:  12:14-12:39 p.m.)
7  FURTHER CROSS-EXAMINATION BY MR. RICHMAN:
8      Q.  Alright, let's go back to
9  Exhibit 129 for a different reason.  And
10  you were present at this meeting, correct?
11      A.  Yes, I'm listed as being there.
12      Q.  Do you have any recollection of
13  being there?
14      A.  No recollection.
15      Q.  Let's turn to page 7.  I
16  understood your testimony the first time
17  you testified that there was no discussion
18  at the meetings as to other employers'
19  contribution obligations.  Is that your
20  testimony today?
21      MR. MILLER:  Objection.
22      THE ARBITRATOR:  I'm sorry, I
23  was reading this.  What was the
24  question?

Hayes - Cross

1
2  MR. RICHMAN:   The questioning
3  was about his prior testimony about
4  the lack of discussion about other
5  employers' contribution obligations.
6  Q.   And I'm happy to go back to page
7  196 of his hearing transcript, and at line
8  17.
9  "Question:  Now, do you know, or
10 did you ever know how other employers
11 contributing to the Pension Fund
12 contributed?
13 "Answer:  No.
14 "Question:  Okay, so as a trustee
15 you never inquired into that?
16 "Answer:  As a trustee it never
17 came up at any trustee meeting as to
18 how they were doing it.  I only know
19 how we were doing it."
20 THE ARBITRATOR:   Okay, what's
21 your question?
22 Q.   Let's take a look at the F, above
23 Hudson News, minimum contributions.  And
24 you see it talks about Hudson News
25 distributors in connection with a minimum

Hayes - Cross

1
2  shift guarantee pertaining to the Pension
3  Fund?
4  A.  I see that.
5  Q.  Were you present during that
6  discussion?
7  A.  I have no reason to -- I don't
8  know.  I will say that I have no reason to
9  think that I wasn't there for that.
10 Q.   And did you raise a question
11 about shift guaranties?
12 A.  No.
13 Q.  Did anyone else at the meeting
14 raise a question about shift guaranties?
15 A.  Not that I recall.
16 Q.  Did anyone else at the meeting
17 including yourself raise a question about
18 how Hudson News distributors contributed to
19 the Pension Fund?
20 A.  Not to my knowledge, no.
21 Q.  Now let's take a look at
22 Exhibit 130, please.  I'm sorry, let's go
23 back to -- just for one more question back
24 to the November 21, 2008 Exhibit
25 129 minutes.

Hayes - Cross

1
2  A.  Okay.
3  Q.  Is that your signature on page 8
4  of the minutes?
5  A.  Yes.
6  Q.  So you read these minutes before
7  you signed them?
8  A.  Yes.
9  Q.  Okay.  So let's go to
10 Exhibit 130.  Were you at this meeting?
11 A.  I have no reason to think I
12 wasn't.  My name is listed.
13 Q.  Alright, and let's take a look at
14 page 5 of the minutes.  And if you could
15 read that please to yourself.
16 A.  Okay.
17 Q.  Were you present during this
18 discussion?
19 A.  I have no reason to believe I
20 wasn't.
21 Q.  Okay, did you ask any questions
22 about the Pension Fund, Mr. Schwartz's
23 report?  Sorry, let's withdraw that.
24 Did you ask any questions about
25 Mr. Schwartz's report contained in the

Hayes - Cross

1
2  paragraph titled E in these minutes?
3  A.  I don't recall asking any
4  questions about that.
5  Q.  Did anyone else ask any questions
6  about this?
7  A.  I don't recall.
8  Q.  And let's take a look at the last
9  page of the minutes before the exhibits,
10 and that's page 7.
11 A.  Yes.
12 Q.  Is that your signature?
13 A.  Yes, it is.
14 Q.  And did you read these minutes
15 before you signed them?
16 A.  I would think I reviewed these
17 minutes either when they mailed them out or
18 glanced through them when I signed it.
19 Q.  Okay, but you would have read
20 them before you signed them?
21 A.  Yes.
22 Q.  Let's go to Exhibit 138, please.
23 And were you present at this meeting?
24 A.  I'm listed as being here.  There
25 is no reason for me to think I wasn't.

Hayes - Cross

1
2    Q.  Okay, so let's take a look at
3  page 2.  Take a look at the bottom of
4  page 2.
5    A.  Yes.
6    Q.  Alright.  And it says Mr. Murphy
7  requested that Segal provide the trustees
8  with a report setting forth the projected,
9  and I'm flipping the page, contributions
10 based on contribution rates under the
11 default schedules and estimated shift
12 totals through 2020 for the three largest
13 contributing employers to pension plan.
14     Were you there when Mr. Murphy
15 asked this question, or made this request?
16    A.  I don't have any specific
17 recollection, but I was probably there.
18    Q.  Okay, is there any reason to
19 believe you left the meeting early?
20    A.  No.
21    Q.  And did you ask Mr. Murphy why he
22 wanted this information?
23    A.  No.
24    Q.  Did anybody else at the meeting
25 ask Mr. Murphy why he wanted this

Hayes - Cross

1
2  information?
3    A.  Not to my recollection.
4    Q.  Let's go to Exhibit 145.  Were
5  you present at this meeting?
6    A.  I am listed as being there, yes.
7    Q.  Okay, any reason to believe you
8  weren't there?
9    A.  There is no reason for me to
10 believe I was not there.
11    Q.  And let's flip to page four,
12 please.
13    A.  Yes.
14    Q.  And you see Roman numeral 4, El
15 Diario mistaken contributions, do you see
16 that?
17    A.  Yes, I do.
18    Q.  Could you read that to yourself,
19 please.
20    A.  Yes.
21    Q.  So Mr. Schwartz is giving this
22 report on El Diario and contributions,
23 correct?
24    A.  Yes.
25    Q.  Okay, and he reported that El

Hayes - Cross

1
2  Diario had overpaid its contributions, is
3  that correct?  I'm looking at the second
4  sentence, if that's helpful.
5    A.  Yeah, I see that, yes.
6    Q.  Okay, and that the collective
7  bargaining agreement does not require
8  contributions in excess of five shifts in
9  any payroll week, do you see that?
10    A.  Yes.
11    Q.  Did you ask any questions of
12 Mr. Schwartz about that part of his report?
13    MR. MILLER:  Well, he didn't
14 testify that he has any recollection.
15    MR. RICHMAN:  I know, but he's
16 now read something and I'm asking if
17 he asked any questions.
18    A.  I did not ask questions, because
19 this was about -- I didn't ask questions.
20    Q.  Okay.  So let's go down to, you
21 see the sentence beginning after
22 discussion?
23    A.  Yes.
24    Q.  And it talks about Welfare Fund
25 for shifts for which contributions weren't

Hayes - Cross

1
2  due, and then it says and further
3  authorized El Diario to take a credit for
4  the erroneously paid shifts to the funds on
5  its next contributions due to the Fund, do
6  you see that?
7    A.  Yes, I do.
8    Q.  And did you ask Mr. Schwartz
9  about this credit that was being discussed?
10    MR. MILLER:  Let me object.
11 Again, he still has not testified one
12 way or the other whether he even
13 remembers this discussion.
14    THE ARBITRATOR:  Well, he can
15 say I don't remember whether I asked
16 any questions.
17    A.  I don't recall asking any
18 questions.
19    Q.  And do you recall whether anyone
20 else at the meeting asked questions about
21 erroneously paid shifts by El Diario?
22    A.  I don't have any recollection.
23    Q.  Do you recall whether anybody at
24 the meeting asked any questions about why
25 are we discussing shifts?

Hayes - Cross

1
2      A.   No.
3      Q.   Okay.  Now, at the bottom of that
4   paragraph there was a motion that was made,
5   seconded and unanimously adopted to -- the
6   first part is to refund the employee, the
7   mistaken self-payments, also made to the
8   Welfare Fund, and it says to allow the
9   employer to take a credit for the
10  erroneously paid shifts to the Funds on its
11  next contribution payment due to the Funds.
12  Do you see that?
13     A.   Yes, I do.
14     Q.   And you voted for that?
15     A.   Yes.
16          MR. MILLER:  Well, do you
17     remember?
18          MR. RICHMAN:   No, no, excuse
19     me, I'm on a cross-examination here.
20          THE WITNESS:   I probably voted
21  for that, yes.
22     Q.   Do you have any reason to believe
23  that this, the description of the motion
24  made, seconded and unanimously adopted
25  includes you voting in favor of it?

Hayes - Cross

1
2      A.   I have no reason to think I
3   didn't.
4      Q.   And can you tell us why you voted
5   for it?
6      A.   They had paid in excess of five
7   shifts a week in their calculation of their
8   contribution, their percentage, so they
9   were over the limit of five shifts.  That's
10  all we pay on.  So it was, if you will,
11  whatever those wages associated with that
12  shift, that was it.  I understood that.
13  Both the employee and the employer had paid
14  on the sixth shift.
15     Q.   So let's go down to Roman numeral
16  five.  Do you see that?  Mr. Carl Giordano,
17  Hudson News settlement?
18     A.   Yes.
19     Q.   And I'm focused on E, but feel
20  free to read the whole thing if you like.
21     A.   Focused on?
22     Q.   E, little E.  You see that, where
23  it says, had Mr. Giordano not been
24  wrongfully discharged, he would have been
25  working, and on that basis Hudson is

Hayes - Cross

1
2   willing to pay pension and welfare shifts
3   as necessary to get him back to the point
4   at which he can retire with a disability
5   pension from the Fund.  Do you recall this
6   discussion?
7      A.   Not specifically, but I'm sure I
8   was there for it.  I'm pretty sure I was
9   there for it.
10     Q.   So did you raise a question about
11  why there was a discussion about Hudson is
12  willing to pay pension shifts as necessary?
13     A.   No, I understood what that was
14  for.
15     Q.   Okay, and did you ask a question
16  about that?
17     A.   I understood what it was for.
18     Q.   Okay, did anybody else at the
19  meeting ask a question about it?
20     A.   There was a lot of discussion
21  around it.  There was a lot of discussion
22  around it.
23     Q.   And did anyone in that discussion
24  ask her why are they paying shifts?
25     A.   No.  As I said, I understood and

Hayes - Cross

1
2   I thought everyone else understood.
3      Q.   And what was your understanding?
4      A.   The employees get credit for
5   eligibility based on the number of shifts
6   that they work or are paid for.  This was
7   to make them qualify for that benefit.
8      Q.   Okay, and to qualify for that
9   benefit, the employer was willing to pay
10  for pension shifts, correct?
11     A.   Yes.
12     Q.   That's the way they were going to
13  contribute?
14     A.   Well, I can't say that's how they
15  were going to contribute.  What I can say
16  to you is that that was the way that the
17  employee would get credit, and this was
18  Hudson News working to get this employee
19  credit so he would be eligible, and so
20  there is an eligibility issue as far as the
21  shift discussion was concerned.
22     Q.   Well, the minutes say that Hudson
23  is willing to pay pension shifts as
24  necessary.
25     A.   Yes, for eligibility.  I have no

Hayes - Cross

1  idea and there was no discussion about how,
2  what it was based on, it just said shifts.
3  But it was an eligibility issue.
4       Q.  Well, it's eligibility for the
5  employee.
6       A.  Employee, yes.
7       Q.  But a contribution for the
8  employer, correct?
9       A.  Yes.
10       Q.  Now, if you'll flip the page,
11  you'll see there was a motion made, this is
12  on page 5.
13       A.  Yes.
14       Q.  Seconded and unanimously adopted
15  to accept such contributions from Hudson
16  News and award Mr. Giordano disability
17  pension subject to Hudson News contributing
18  on the required number of shifts as
19  determined by the Fund Office, do you see
20  that?
21       A.  Yes.
22       Q.  And you voted for those?
23       A.  Yes.
24       Q.  And if you look down at the

Hayes - Cross

1  signature of the employer trustee in the
2  minutes, is that your signature?
3       A.  Yes, it is.
4       Q.  Did you read these minutes before
5  you signed them?
6       A.  I read these minutes when they
7  were distributed and just reviewed them
8  when I signed them.
9       Q.  So you had read them before you
10  signed them?
11       A.  Yes.
12       Q.  Okay, thank you.  Okay, let's go
13  to 146 please.  And this is our friend
14  Mr. Giordano again.
15       A.  Yes.
16       Q.  Were you present at this meeting?
17       A.  It says I was there; I have no
18  reason to believe I wasn't.
19       Q.  Do you remember attending the
20  meeting?
21       A.  As I said, I don't have any
22  specific recollection, but it says I was
23  there; I have no reason to believe I wasn't
24  there.

Hayes - Cross

1       Q.  You're welcome to read the whole
2  description.  I'm going to focus on the --
3  about two thirds of the way down where it
4  starts with Mr. Bluestein noted the
5  trustees agreed at the September 12th
6  meeting, do you see that?
7       A.  Yes.
8       Q.  That the Funds could accept such
9  contributions from Hudson News and that
10  Mr. Giordano would be awarded a disability
11  pension subject to Hudson News contributing
12  on the required number of shifts, and then
13  it talk about Mr. Giordano being determined
14  to be permanently disabled.  Do you see
15  that?
16       A.  Yes.
17       Q.  Did you ask any questions about
18  that?
19       A.  There was a lot of discussion
20  about it, so I have to believe there were
21  questions asked.
22       Q.  Okay, you don't know whether you
23  asked any questions?
24       A.  I don't have any recollection if

Hayes - Cross

1  I did or did not.
2       Q.  Do you recall being at this
3  discussion?
4       A.  Not specifically, but I have no
5  reason to think I wasn't.
6       Q.  Okay, do you have any reason that
7  you left this meeting early?
8       A.  No.
9       Q.  And then if you go down a little
10  bit, the last sentence on that page, it
11  says, Mr. Bluestein explained the Fund
12  Office thereafter had calculated Hudson
13  News would have to pay the funds on
14  650 shifts.  And it talks about a different
15  number of shifts for different years,
16  right?  And then -- do you see that?
17       A.  Yes, I do.
18       Q.  Okay, and so Hudson News,
19  according to Mr. Bluestein, would report on
20  what the Fund Office wanted, they wanted
21  Hudson News to pay on all these different
22  shifts, correct?
23       A.  Yes.
24       Q.  Okay.  And then if we flip the

Page 1069

Hayes - Cross

1  page to page 2, do you see page 2?
2
3      A.  Yes, I do.
4      Q.  And there's a motion made, and
5  the motion was made, seconded and
6  unanimously adopted to required Hudson News
7  to contribute to the Pension and Welfare
8  Funds for a hundred shifts in the accrual
9  year February 1, 2012, do you see that?
10     A.  Yes, I do.
11     Q.  And you voted for that?
12     A.  Yes.  I have no recollection, but
13  I'm sure I did.
14     Q.  Okay, and did you raise a
15  question about Hudson News contributing to
16  the Pension Fund for a hundred shifts?
17     A.  No, because I understood what it
18  was for.
19     Q.  And let's just flip to page 3,
20  please, of the same exhibit.  Is that your
21  signature?
22     A.  Yes, it is.
23     Q.  And did you read these minutes
24  before you signed them?
25     A.  Yes, I did.

Page 1070

Hayes - Redirect

1
2      MR. RICHMAN:   We're finished.
3      MR. MILLER:  Just a couple of
4  minutes; we will have a small amount
5  of redirect.
6      (Recess taken:  1:03-1:15 p.m.)
7  REDIRECT EXAMINATION BY MR. MILLER:
8      Q.  Mr. Hayes, in connection with
9  your cross-examination testimony with
10  Mr. Richman, there was a discussion of a
11  recent sixer contribution, do you remember
12  that?
13     A.  Yes.
14     Q.  And I just want to clarify for
15  the record, the sixer contribution is made
16  to which Fund?
17     A.  The Welfare Fund.
18     Q.  And there was mention of Neil
19  Schelberg in your cross-examination, and I
20  want to ask you, is Mr. Schelberg a lawyer
21  for The New York Times?
22     A.  No, he's not.
23     Q.  There was some testimony in
24  connection with your cross-examination
25  about minimum shift guarantees.  Does The

Page 1071

Hayes - Redirect

1
2  New York Times have a minimum shift
3  guarantee with the union relating to
4  contributions to the Pension Fund?
5      A.  No, we do not.
6      Q.  In your experience as a trustee
7  of this Pension Fund, do trustees ever
8  leave trustee meetings during the course of
9  the meeting?
10     A.  Yes.
11     Q.  How often does this occur?
12     A.  It happens quite often.  They may
13  not be gone for the entire meeting, but
14  they may have to step out to do conference
15  calls and that sort of thing.
16     Q.  And finally, are you generally
17  familiar with the rules to be eligible for
18  a pension under the NMDU Fund?
19     A.  Generally, yes.
20     Q.  And can you briefly describe the
21  rules governing eligibility for that?
22     A.  Yes.  An employee who works a
23  hundred shifts will receive a pension
24  accrual for that year.
25     Q.  So that would be a hundred shifts

Page 1072

Hayes - Recross

1
2  a year?
3      A.  Yes.
4      Q.  And do you need a certain number
5  of pension accruals to be eligible for a
6  pension?
7      A.  Yes.
8      MR. MILLER:  I have nothing
9  else.
10  RECROSS-EXAMINATION BY MR. RICHMAN:
11     Q.  Mr. Hayes, you mentioned that it
12  happens quite often that people may leave
13  for part of the meeting, correct?
14     A.  Yes.
15     Q.  And I just want to make sure I
16  understand your testimony.  You say they
17  may not be gone for the entire meeting, but
18  they may have to step out to do conference
19  calls and that sort of thing?
20     A.  Yes.
21     Q.  Is it unusual for somebody to
22  leave the meeting in the middle of the
23  meeting and not come back?
24     A.  It does occur.  Not very often.
25     Q.  And other than the time that you

Page 1073

Hayes - Recross

have testified you did that on October 11th
of 2011, was there another time that you
left the meeting early and didn't come
back?

A.   Not that I recall off the top of
my head.  I was focused on that because it
was pointed out to me.

MR. RICHMAN:   That's all.

MR. MILLER:   Mr. Hayes, thank
you.

(Luncheon adjournment:  1:20 p.m.)

Page 1074

Egan - Cross

A F T E R N O O N   S E S S I O N

(Time noted:  2:15 p.m.)

ROSANA EGAN, recalled as a

witness, having previously been duly sworn,

was further examined and testified as

follows:

CONTINUED CROSS-EXAMINATION BY MR. MILLER:

Q.  Good afternoon, Ms. Egan.  I'm
going to be asking you a variety of
questions that relate to the documents that
you'll find in that yellow binder.  I'm
going to be splitting the questions into
two categories.  One category is questions
that relate frankly to the second issue in
the case, the Segal blend, and the other
sets of questions will relate to the
contribution base unit issue.  And that
means that we will not be going in
chronological order in regard to the
documents.  But I think this will make the
process easier to understand and we'll get
through it more quickly.

Let me ask you a couple of
foundational questions before we get into

Page 1075

Egan - Cross

the documents.  During your time as actuary
for the NMDU Fund, you selected a
7.5 percent rate as the investment return
assumption for the Fund, correct?

A.   For a portion of the time.  I'm
not sure if it's the whole time as the
actuary.  I don't remember going back to
day one.

Q.   But certainly in the more recent
years you had selected a 7.5 rate as the
investment return assumption, correct?

A.   Yes.

Q.   And you also used the 7.5 percent
rate as the discount rate to value the
plan's liabilities for funding purposes,
correct?

A.   Yes.

Q.   And once you set a discount rate
and an investment return assumption, do you
review the continued use of that particular
selected rate annually or with some
frequency?

A.   Yes.

Q.   Do you in fact review it

Page 1076

Egan - Cross

annually?

A.   Yes.

Q.   And generally when you go about
setting an investment return assumption for
a multi-employer plan, do you review the
multi-employer plan's investment policy
statement and take account of how the
assets are targeted to be invested?

A.   We would use as part of the
process what their target asset allocation
would be.

Q.   So the answer to my question is
yes in part, and as part of the process you
would take account of how the assets are
targeted to be invested, correct?

A.   Yes.

Q.   Okay, and specifically in the
case of the NMDU Fund in setting the 7.5
percent assumption for future investment
returns, did you examine the NMDU Fund's
investment policy statement?

A.   I don't remember off the top of
my head if I looked at the policy
statement.

Page 1077

Egan - Cross

Q. Did you review the NMDU Fund's targeted asset allocations?

A. I would have gotten the target allocation.

Q. And reviewed them?

A. I might have just gotten, you know, 20 percent is in this kind of assets, 30 percent is in this kind. It might have been not the whole report necessarily.

Q. But the information would have been obtained and used in the development of the rate?

A. Yes.

Q. Okay, so with that as background, let's turn to what's numbered as Exhibit 120 in this yellow binder. I'm not going to ask you about the minutes and agenda for the minutes contained within this exhibit. Instead if you turn to a document on the bottom right, 3263, which is also labelled Exhibit C to these minutes, it's a statement of investment objectives and policy. That's the document that I'm going to call to your attention.

Page 1078

Egan - Cross

I know it's a fairly lengthy document; my questions are going to be rather limited; but take a moment or two to familiarize yourself with the document.

Let me ask you, have you ever seen this document before?

A. I don't remember if I've ever seen this before.

Q. Do you remember seeing the investment policy statement for the NMDU Fund?

A. I'm not sure when you say investment policy statement, is that this report?

Q. Well, you just testified that you don't recall reviewing this document.

A. I don't remember. I don't remember if I did or didn't.

Q. So I'm going to ask you more broadly, do you remember reviewing an investment policy statement for the NMDU?

A. Not specifically.

Q. Why don't I draw your attention back to page 3053. And Ms. Egan, there is

Page 1079

Egan - Cross

a reference to a person named Mark Lotruglio as being present for that meeting, and it's referenced that Mr. Lotruglio is with Quan-Vest Consultants, do you see that?

A. Yes.

Q. And am I correct that Quan-Vest Consultants is and was the investment advisor to this Fund?

A. Yes.

Q. And Mr. Lotruglio works at Quan-Vest Consultants?

A. My understanding.

Q. Yes. I recognize that you don't recall seeing this document in particular. Nonetheless, I do want you to look at page 3265, this document being the policy statement. Take a look at page 3265, which is the second page of this investment policy statement.

A. Okay.

Q. And can you read to yourself what is under paragraph D on that page, and particularly D1, actuarial investment

Page 1080

Egan - Cross

return assumption.

A. Okay.

Q. So this statement says that over a complete market cycle, which the author says is three to five years, the total Fund is expected to perform above the actuarial assumption of 7.5 percent for investment return net of investment expenses.

Based on your experience as the NMDU Fund's actuary, do you have any judgment on the accuracy of this statement in terms of how the Fund's assets were intended to perform?

A. Can you repeat the question again?

(The pending question was read.)

THE WITNESS: No.

Q. Do you have any reason to believe that this statement was inaccurate?

A. No.

Q. Let's now turn to Exhibit 127. These are minutes from a meeting of December 19, 2007 of the NMDU Fund trustees. And it indicates in listing the

Page 1081

Egan - Cross

1
2       present individuals, aside from the
3       trustees, it indicates that you attended
4       and Mr. Urbank attended, do you see that?
5           A.  Yes.  The entire minutes?
6           Q.  Yes, it's only six pages, and let
7       me tell you why.  I'd like you to take a
8       look at the minutes and see if they refresh
9       your recollection about whether you recall
10      attending this meeting.  Go ahead.  Did you
11      attend this meeting?
12          A.  It looks like I did.
13          Q.  Do you have any reason to believe
14      did you not attend this meeting?
15          A.  No, I have no reason to believe
16      that.
17          Q.  Alright, let's focus on page 2 of
18      the minutes, and the text under a heading
19      that's Roman numeral 5, Consultant's
20      Report.  And the second paragraph under
21      Consultant's Report talks but having noted
22      the funding standard account credit balance
23      and how it was performing.  Do you see
24      that?
25          A.  Yes.

Page 1082

Egan - Cross

1
2           Q.  Great.  And then you, or the
3       minutes go on to say that should all
4       assumptions be reached, including the
5       7.5 percent investment assumption, a
6       projection of the funding standard account
7       credit balance shows no deficiency for
8       30 years, do you see that?
9           A.  Yes.
10          Q.  And then in -- on the next page,
11      on the top paragraph, there is a notation
12      that the Segal representatives then
13      reviewed the valuation relating to the
14      Pension Protection Act, and they noted the
15      Pension Protection Act funded ratio, do you
16      see that?
17          A.  Yes.
18          Q.  Let me ask you this question.  In
19      connection with the NMDU Fund, did you have
20      to make annual projections of the funded
21      percentage for Pension Protection Act
22      purposes?
23          A.  Yes.
24          Q.  And that was in order for you to
25      certify what particular zone the Fund would

Page 1083

Egan - Cross

1
2       be in for Pension Protection Act
3       requirements, correct?
4           A.  Yes.
5           Q.  And in connection with that work,
6       that annual projection funded percentage,
7       you used 7.5 percent as the discount rate
8       to value the plan's liabilities, correct?
9           A.  Yes.
10          Q.  Does the Pension Protection Act
11      require an actuary to use a particular
12      discount rate to value vested benefits for
13      purposes of zone certification
14      determination?
15          A.  They require you to use
16      reasonable assumptions.
17          Q.  And you chose consistent with
18      that requirement a 7.5 rate, correct, the
19      funding assumption?  You chose a
20      7.5 percent rate?  Yes or no.
21          A.  Yes.
22          Q.  Now I'd like you to turn to
23      what's labelled Exhibit C to these minutes,
24      and it's at Fund 3315.  This is a chart
25      that compares the funded percentages for

Page 1084

Egan - Cross

1
2       the NMDU Fund based on a variety of
3       different objectives, right?
4           A.  Yes.
5           Q.  And did you prepare this chart?
6           A.  Most probably.
7           Q.  You don't have any reason to
8       believe you did not prepare this chart?
9           A.  No.
10          Q.  And you'll notice on the far
11      right columns there are enumerated funded
12      percentages and then on the far left column
13      there is an identification of the different
14      purposes for which the funded percentage is
15      derived, do you see that?
16          A.  Yes.
17          Q.  Okay.  And then the footnotes, am
18      I right, explain in more detail what each
19      of these purposes are, is that right?
20          A.  Yes.
21          Q.  So for example to take the first
22      horizontal line which begins zone
23      certification, the funded percentage for
24      zone certification purposes in 2007 is
25      80.8 percent, is that right?

Egan - Cross

1
2   A.  Yes.
3   Q.  And this would be the annual zone
4   certification that we just talked about a
5   moment ago required by the Pension
6   Protection Act, correct?
7   A.  Yes.
8   Q.  And am I correct that if you look
9   at the notes, they indicate that for zone
10  certification, annual funding and
11  accumulated liability purposes, you used a
12  7.5 percent discount rate to value
13  investment returns and liabilities?
14  A.  Yes.
15  Q.  And why was the 7.5 percent
16  figure used for all three of these
17  purposes?
18  A.  Because it's an ongoing plan and
19  it's the long-term assumption.
20  Q.  The long-term return assumption?
21  A.  Yes.
22  Q.  And am I correct that for ERISA
23  reporting and PFEA reporting purposes, you
24  did not use a 7.5 percent investment return
25  assumption, but a 5.81 percent return

Egan - Cross

1
2   assumption, correct?
3   A.  Yes.
4   Q.  And where did that 5.81 percent
5   number come from?
6   A.  It was in a range that was -- it
7   was within a range that is promulgated by
8   the government.
9   Q.  So it's dictated by statutory
10  requirements?
11  A.  That it be within a certain
12  range.
13  Q.  And was 7.5 percent in that
14  range?
15  A.  No.
16  Q.  And then finally there is the
17  withdrawal liability measure, and the
18  withdrawal liability measure was calculated
19  using the Segal blend to value liabilities,
20  is that correct?
21  A.  Yes.
22  Q.  And no other of the measures on
23  this page relies on the Segal blend,
24  correct?
25  A.  Correct.

Egan - Cross

1
2   Q.  So the Segal blend is uniquely
3   applied for the withdrawal liability
4   purpose, correct?
5   A.  Yes.
6   Q.  And the statutory scheme, the
7   relevant statutory scheme does not require
8   use of the Segal blend to value benefit
9   liabilities for withdrawal liability
10  purposes, correct?
11  A.  Say that again?  I'm sorry,
12  repeat that?
13  (The pending question was read.)
14  THE WITNESS:  Yes, does not
15  require, yes.
16  Q.  Alright, let's turn to
17  Exhibit 128.  Those are the board minutes
18  for April 17, 2008.  And I note again on
19  the first page of those minutes, which is
20  3099, it indicates that you were present at
21  this board of trustees meeting.  Do you
22  have any reason to believe you were not
23  present?
24  A.  No.
25  Q.  Let me draw your attention to

Egan - Cross

1
2   page 2 of the minutes under the heading of
3   Roman number four, Consultant's Report, do
4   you see that?
5   A.  Yes.
6   Q.  And why don't you read the fourth
7   paragraph under capital letter A on that
8   page.  It begins with regard to investment
9   return, Mr. Lotruglio commented.  Why don't
10  you read that.  And again Mr. Lotruglio is
11  one of the representatives from the
12  investment advisor, correct?
13  A.  My understanding, yes.
14  Q.  So the minutes indicate that,
15  quote, with regard to investment return,
16  Mr. Lotruglio commented that the investment
17  portfolio was structured to produce a
18  7.5 percent annual rate of return.
19  Do you agree with this statement
20  set forth in the minutes?  That is do you
21  understand that the investment portfolio
22  for this Fund had been structured to
23  produce a 7.5 percent annual rate of
24  return?
25  A.  That's what it says.

Egan - Cross

1  Q.  You have no reason to disagree
2  with that statement?
3  A.  No.
4  Q.  Let me ask you this.  Do you know
5  whether in the case of this Fund, the
6  investment advisor chose the asset
7  allocations to produce a 7.5 percent annual
8  rate of return, or they chose the asset
9  allocations based on other factors and then
10 you used those allocations to develop your
11 7.5 percent assumed rate?
12 A.  I don't know why they do what
13 they do.
14 THE ARBITRATOR:  Who does?  You
15 said they.
16 A.  I don't know why the investment
17 advisor does what they do.
18 Q.  So just to clarify the record,
19 let me ask this clarifying question.
20 You are not aware of how the
21 investment advisor for this Fund went about
22 and what objectives it had in determining
23 the asset allocation classes for this Fund?
24 MR. RICHMAN:  Objection.  It

Egan - Cross

1  assumes that they determined it.
2  THE ARBITRATOR:  He's right.
3  Q.  In your experience with the NMDU
4  Fund, asset allocation classes are
5  selected, correct?
6  A.  You would think so.
7  Q.  Do you have any reason to think
8  -- you were the actuary, you attended --
9  A.  Repeat the question, please.
10 Q.  Do you have any reason to believe
11 that asset allocations were not selected
12 for this particular Fund?
13 A.  I have no reason to believe that
14 they were not selected, but I don't know by
15 whom.
16 Q.  You don't know whether the
17 investment advisor selected it or the
18 trustees selected them based on the
19 advisor's recommendation, correct?
20 A.  Correct.
21 Q.  In your experience however,
22 investment advisors at the least make
23 recommendations about asset classes for
24 multi-employer pension funds, correct?

Egan - Cross

1  MR. RICHMAN:  Objection, asks
2  for an expert witness opinion.  In her
3  experience?
4  THE ARBITRATOR:  I don't think
5  that's asking for an expert opinion,
6  it's asking for what her personal
7  experience is.
8  MR. RICHMAN:  She's not an
9  expert, and opinion is not relevant.
10 THE ARBITRATOR:  Well, this is
11 going to a factual question.  Go
12 ahead.
13 THE WITNESS:  I've seen it many
14 different ways, where the trustees select
15 whether they ask recommendations from the
16 advisors.  I've seen it all different ways.
17 Q.  Now let's turn to Exhibit D, and
18 it begins on page 3316.  A memo from you
19 and Mr. Urbank to the trustees of the NMDU.
20 Ms. Egan, are you there?
21 A.  Yes.
22 Q.  So the minutes indicate that you
23 prepared, and you and Mr. Urbank presented
24 this memo to the Fund trustees at this

Egan - Cross

1  April 17, 2008, meeting.  And I want to
2  draw your attention to page 2 of this memo.
3  And can you please review the very last
4  paragraph on page 2.
5  A.  Okay, yes.
6  Q.  This last paragraph indicates
7  that you and Mr. Urbank had recommended
8  that the trustees establish three potential
9  investment scenarios in connection with
10 certain Pension Protection Act projections
11 that you were going to make.  One was
12 called a pessimistic and then another an
13 optimistic and then the third was a
14 baseline scenario, do you see that?
15 A.  Yes.
16 Q.  And the baseline scenario it
17 states was a 7.5 percent investment return
18 baseline, do you see that?
19 A.  Yes.
20 Q.  And that in addition, this
21 investment assumption was going to be an
22 assumption to apply over either both of the
23 next five or ten years, do you see that?
24 A.  Yes.

Egan - Cross

1
2      Q.   And these various investment
3  scenarios were going to allow the trustees
4  after you had done some modelling to review
5  potential future funding levels for the
6  plan, right?
7      A.   Yes.
8      Q.   So you suggested according to
9  these minutes that the baseline return for
10  this exercise be a 7.5 percent return,
11  correct?
12      A.   Yes.
13      Q.   And in addition you suggested a
14  five-year or a ten-year investment return
15  modelling period, correct?
16      A.   Yes.
17      Q.   Why did you recommend 7.5 percent
18  as the suggested baseline return for a
19  possible five-year and possible ten-year
20  modelling period?
21      A.   It's a funding assumption.  It's
22  just to start off somewhere, to show what
23  the valuation is showing.  Illustration.
24      Q.   And you said a moment ago that
25  your funding assumption is a long-term

Egan - Cross

1
2  assumption.
3      A.   Yes, it is a long-term
4  assumption.
5      Q.   But for these modelling purposes
6  you believed it was appropriate to have as
7  a baseline for a five-year modelling period
8  7.5 percent, correct?
9      A.   It it's just basically to start
10  somewhere.  You're taking the valuation and
11  putting it out there, and this is where you
12  are based on the valuation.  Then we're
13  suggesting to go above and below it to see
14  sensitivity against the valuations -- to
15  see the sensitivity above and below the
16  valuation assumptions.
17      Q.   But nonetheless you thought 7.5
18  percent was an appropriate baseline for
19  this model.
20      A.   It's just the valuation
21  assumption.  We're just starting with the
22  valuation assumption.  It's a place to
23  start.  Numbers they already had.
24      Q.   Was there in your judgment any
25  other place to start?

Egan - Cross

1
2      A.   The next step is to look at
3  better and worse.
4      Q.   No, I'm sorry, in connection with
5  the baseline, in your judgment was there
6  any other appropriate place to start a
7  five-year investment return modelling
8  project than 7.5 percent?
9      A.   We were suggesting to do the
10  valuation assumption plus two more.  The
11  valuation assumption was already there.
12  Start there and then do two more, better
13  and worse.
14      Q.   Let me see if I can wrap this up
15  with one final question.  For purposes of a
16  baseline for a five year modelling
17  analysis, you recommended the 7.5 percent
18  funding assumption, correct?  Yes or no?
19      A.   To start somewhere.
20  Illustratively to start somewhere.  That is
21  what the baseline is, is a place to start.
22  And you already had those results.  No need
23  to do extra work, a place to start.
24      Q.   And the baseline would be
25  relative to a more optimistic assumption

Egan - Cross

1
2  and a more pessimistic assumption, correct?
3      A.   I'm not sure what the question
4  is.  I'm not sure I understand what you're
5  asking.
6      Q.   Let's turn to Exhibit 133.  And
7  these are minutes of a board of trustees
8  meeting of December 16, 2009, and it
9  indicates on the first page of the minutes,
10  Ms. Egan, that you attended?  I assume you
11  have no reason to believe you didn't.
12      A.   No.
13      Q.   Let's turn to page 2, and let's
14  draw your attention to the discussion under
15  section 5, which is entitled the Segal
16  Company, the Segal Company Discussion.
17          Alright, four paragraphs into the
18  discussion under B, which is therefore on
19  page 3, there is a paragraph that began,
20  Ms. Egan next commented, do you see that?
21      A.   Yes.
22      Q.   Why don't you read that
23  paragraph.
24      A.   To myself?
25      Q.   Yes.

Egan - Cross
1
2    A.  Okay.
3    Q.  So this paragraph indicates that
4  you had done a projection on the funding
5  standard account, correct?
6    A.  Yes.
7    Q.  Alright, let me ask a couple of
8  foundational questions here.  All
9  multi-employer plans need to maintain the
10  funding standard account, correct?
11    A.  Yes.
12    Q.  Right, and it's not an actual
13  subaccount of the trust, it's just a
14  bookkeeping account, correct?
15    A.  Yes.
16    Q.  And the calculations concerning a
17  funding standard account determine whether
18  there needs to be a minimum amount of
19  contributions to that pension plan under
20  the Internal Revenue Code, agreed?
21    A.  Yes.
22    Q.  So continuing to read the minutes
23  in this paragraph, it states that you
24  advised that, quote, the credit balance
25  will be depleted in the plan year ending

Egan - Cross
1
2  May 31, 2017, assuming future market value
3  rates of return of 7.5 percent.  Do you see
4  that?
5    A.  Yes.
6    Q.  And thus this discussion
7  indicates that you had modelled future Fund
8  performance in order to determine whether
9  and when the funding standard account would
10  run a deficit and thus require
11  contributions, correct?
12    A.  Under that one scenario, yes.
13    Q.  And in undertaking this
14  modelling, you assumed that for each year,
15  including and after 2009, the Fund would
16  earn a 7.5 percent return, correct?
17    A.  Yes.
18    Q.  And your results showed that
19  after eight straight years of a 7.5 percent
20  compounded return, there would be as of the
21  plan year ending May 31, 2017 a deficit in
22  the funding standard account, correct?
23    A.  Yes.
24    Q.  Okay, let's turn to Exhibit E to
25  these, and that begins at Fund page 3345.

Egan - Cross
1
2    Alright, this is a memo from you
3  and Mr. Urbank to the board of trustees,
4  and it discusses zone certifications and
5  certain modelling scenarios that you had
6  undertaken in order to project zone status.
7  Do you agree with that?
8    A.  Yes.
9    Q.  Okay, and did you prepare this
10  memo?
11    A.  Yes.
12    Q.  And let's take a look at the
13  second paragraph of the memo.  It begins
14  with the words although the trustees
15  elected to free.
16    A.  Yes.
17    Q.  So this paragraph indicates that
18  assuming all assumptions are met, including
19  a market rate of return of 7.5 percent,
20  there was a projection that by May 31, 2010
21  the Fund was expected to be seriously in
22  danger.  Do you see that?
23    A.  Yes.
24    Q.  So this memo was prepared in
25  November of 2009?

Egan - Cross
1
2    A.  Yes.
3    Q.  And am I therefore correct that
4  in November of 2009, Segal made a
5  projection about what the Fund's zone
6  status would be as of the end of that
7  current plan year?
8    A.  Yes.
9    Q.  Okay, and for purposes of making
10  the projection for that current plan year,
11  Segal assumed a 7.5 investment return.  Yes
12  or no?
13    A.  It was an illustration, yes.
14    Q.  So the answer to my question is
15  yes?
16    A.  Yes.
17    Q.  Now let's turn to page two.
18    A.  Same memo?
19    Q.  Yes, same memo, thank you.  And
20  why don't you read the paragraph
21  immediately after the chart on page two.
22    I'm sorry, I'm going to ask you
23  to focus on the first sentence to move this
24  along.  The first sentence indicates that
25  the projections in the chart above about

Egan - Cross

1
2  zone status in the future were made
3  assuming that the plan, quote, will
4  experience a market rate of return of
5  7.5 percent each year into the future.  Do
6  you see that quote?
7      A.  Yes.
8      Q.  So am I correct that Segal
9  thought it appropriate in projecting future
10 zone status that this plan would return 7.5
11 percent on its assets for each year in the
12 future?
13     A.  It was an illustration that if
14 you got seven and a half percent, this is
15 the result you would get.
16     Q.  But Segal determined to use the
17 7.5 percent investment return assumption
18 for purposes of this illustration model,
19 correct?
20     A.  This one illustration.
21     Q.  That's a yes?
22     A.  Yes, for this one illustration.
23     Q.  Now let's take a look at
24 Exhibit 137.  They are the minutes -- and
25 again, it indicates in the first page that

Egan - Cross

1
2  you attended that meeting.  I assume there
3  is no reason for you to believe that's
4  inaccurate?
5      A.  Right.
6      Q.  Okay.  So let me draw your
7  attention to the narrative under Roman
8  numeral 2, discussion of funding
9  improvement plan, and then very first
10 paragraph indicates that Mr. Urbank made a
11 presentation about the pension plan's zone
12 status and he reminded the trustees that
13 based on the actuarial valuation as of June
14 1, 2010 the Fund was in seriously
15 endangered status.  And then he indicated
16 that for this funded status purpose among
17 the assumptions was that you took a
18 7.5 percent investment rate of return
19 assumption into account, correct?
20     A.  For that document, yes.
21     Q.  That document being the
22 determination of zone status for June 1,
23 2010?
24     A.  I guess whatever is Exhibit A.
25     Q.  Unfortunately, there is no

Egan - Cross

1
2  Exhibit A.
3      A.  It's referring to Exhibit A, so I
4  don't remember exactly what was Exhibit A.
5  So it's hard to answer.
6      Q.  Sorry.  The reference to Exhibit
7  A is to a Segal report on funding
8  improvement plan projections.  The
9  reference to the determination of serious
10 endangered status as of June 1, 2010 in
11 this narrative is independent of the
12 reference to Exhibit a A.
13     A.  Okay, let me just read it again.
14     Q.  Take your time.  I think the clue
15 there is the language he reminded the
16 trustees.
17     A.  So seven and a half percent was
18 used for that purpose of the zone
19 certification.
20     Q.  So let me ask you to confirm
21 that.
22     A.  Okay.
23     Q.  For purposes of determining the
24 zone status of this fund, as of June 1,
25 2010, you had used an investment rate of

Egan - Cross

1
2  return assumption of 7.5 percent, correct?
3      A.  Yes.
4      Q.  Okay, thank you.  Now I'm going
5  to turn to a series of questions about the
6  first issue in this case, contribution base
7  units.  Alright, let's turn our attention
8  back to an earlier set of minutes.  Let's
9  turn to Exhibit 128.
10     A.  Okay.
11     Q.  Do you have any reason to believe
12 you did not attend this meeting of the
13 trustees which is on April 17, 2008?
14     A.  No.
15     Q.  Okay, let me draw your attention
16 to page 3 of the minutes.  There is a
17 discussion near the top of a motion by the
18 trustees in connection with certain
19 assumptions to be used for Pension
20 Protection Act status and education
21 purposes, and then there is a discussion
22 about contribution of rate change
23 information, that's the paragraph near the
24 top that begins with regard to, okay, do
25 you see that?

Egan - Cross

1    A. Yes.
2    Q. Okay. So this page of the
3  minutes and this note indicates the union
4  trustees in their capacity as union
5  officials agreed to provide Segal with a
6  schedule of future contribution rate
7  changes by employer, do you see that?
8    A. Yes.
9    Q. To your knowledge was that
10  information ever provided?
11    A. I'm not sure how detailed it was
12  provided. It might not have been by
13  employer, it might have been just big
14  picture.
15    Q. Do you recall receiving some form
16  of future contribution rate information
17  from the union officials?
18    A. I don't remember exactly what was
19  received for this purpose.
20    Q. You don't remember one way or the
21  other?
22    A. No. I can't picture it.
23    Q. I'm now going to draw your
24  attention to Exhibit C of these minutes.

Egan - Cross

1  It begins at page Fund 3319. And this is a
2  memo from Mr. Urbank and you to the board
3  of trustees dated April 17, 2008. Take a
4  moment to look at this memo and then let me
5  know whether you drafted this memo or
6  approved this memo.
7    A. Yes.
8    Q. Yes, you --
9    A. I finished looking at it, and
10  yes, I was probably involved in this memo.
11    Q. You were involved in the
12  preparation of this memo?
13    A. Yes.
14    Q. Okay. Can you turn to paragraph
15  4, and in the last sentence in paragraph 4,
16  you see it refers to, quote, contributions
17  are a percentage of wages, do you see that?
18    A. Yes.
19    Q. So am I correct that in this memo
20  you chose to characterize the contributions
21  to this Fund as a, quote, percentage of
22  wages, correct? Yes or no.
23    A. It was written that way, yes.
24    Q. And you either wrote it or

Egan - Cross

1  approved it, yes?
2    A. Yes.
3    Q. Let's turn to Exhibit 130, those
4  are minutes from December 9, 2008. Do you
5  see those minutes?
6    A. Yes.
7    Q. Okay. And again it indicates in
8  the minutes that you attended and I assume
9  you did, or there's no reason to believe
10  you didn't?
11    A. Correct.
12    Q. Alright. And let's turn to the
13  discussion on page 3, under heading 7, the
14  Segal Company.
15    A. Okay.
16    Q. And in particular paragraph A.
17  And let me just get right to the question
18  at hand. In the last sentence of that
19  paragraph, it indicates that Segal needed
20  in order to proceed with certain studies
21  for Pension Protection Act purposes input
22  from the trustees for among other things
23  contribution rates. Do you see that?
24    A. Where are you?

Egan - Cross

1    Q. I'm sorry, I was focusing on the
2  last sentence in paragraph 7A at the top of
3  page 3. I'm sorry, I was moving too
4  quickly.
5    A. I'm sorry, I'm slow. Okay.
6    Q. So you agree that the minutes
7  indicate that Segal required input from the
8  trustees on, among other things,
9  contribution rates?
10    A. Yes.
11    Q. Did the trustees or anyone else
12  on behalf of the Fund provide Segal with
13  the contribution rates that were requested?
14    A. I don't remember what was
15  provided here for this purpose.
16    Q. You don't know one way or the
17  other?
18    A. This is for live modelling and
19  it's provided at the point of the
20  modelling, so people say if the
21  contribution rate goes up 10 percent, let
22  me see what it looks like, and we plug in
23  what if it goes up 10 percent. If the
24  investment return goes down to negative two

Egan - Cross

1    percent, what does it look like, and we
2    plug in that.  That's the input we need to
3    do.
4         Q.   And do you recall in connection
5    with this live modelling getting that input
6    on contribution rates?
7         A.   At the point of the modelling
8    they asked us to try different things.  And
9    I don't remember exactly what different
10   scenarios they asked us to do, but they
11   gave us direction as to what to plug in.
12        Q.   Let's turn to Exhibit 131.  Okay,
13   I want you to turn to Exhibit H in this set
14   of minutes from August 5, 2009, 131, and
15   Exhibit H is found at page 03330.
16        A.   What section am I in?
17        Q.   Exhibit 131, at the top it says
18   Exhibit H, at the top on the right, do you
19   see that?
20        A.   Yes.
21        Q.   Okay, good.  This is a memo from
22   you and Mr. Urbank to the board of trustees
23   dated August 5, 2009, correct?
24        A.   Yes.

Egan - Cross

1         Q.   And did you prepare this memo?
2         A.   Most probably.
3         Q.   And do you have any reason to
4    believe you did not present on this memo at
5    the trustee meeting of August 5, 2009?
6         A.   I'm not sure.  It's not in the
7    minutes.
8         Q.   Maybe this will refresh your
9    recollection.  Turn to page six, and under
10   the heading Roman 9, Segal Company Report,
11   look at the second paragraph.  It says that
12   you and Mr. Urbank distributed and
13   reviewed.
14        A.   Yes, so then we probably did.
15        Q.   Okay.  So the first paragraph
16   indicates that Segal had been making zone
17   status certification projections, and those
18   projections were based on certain
19   assumptions and it identifies key
20   assumptions such as active participants and
21   annual wage increases, do you see that?
22        A.   Yes.
23        Q.   There was no assumption made
24   about shifts to be worked in the future,

Egan - Cross

1    correct?
2         A.   No.
3         Q.   And that's because Segal did not
4    calculate future contributions by
5    projecting a number of expected shifts and
6    multiplying that expected shift number by a
7    per shift wage rate, correct?
8         A.   Correct.
9         Q.   All right, let's turn now to
10   Exhibit 134.  And why don't you turn your
11   attention to the document that's got at the
12   top of it, Exhibit F.  And it begins at
13   page 3356.  It's a May 19, 2010 memo from
14   Mr. Urbank and you.
15        A.   Yes.
16        Q.   Alright, did you prepare this
17   memo?
18        A.   Probably, yes.
19        Q.   And why don't you turn your
20   attention to page 2 of the memo and the
21   paragraph that's numbered paragraph 4,
22   projected industry activity.
23        A.   Okay.
24        Q.   And take a look at the last

Egan - Cross

1    sentence.
2         A.   Okay.
3         Q.   So again, you chose to use as the
4    terminology to describe contributions to
5    this Pension Fund contributions being a
6    percentage of wages, correct?
7         A.   Yes.
8         Q.   In that last sentence respecting
9    projected industry activity, you also asked
10   the Fund to provide you in connection with
11   modelling you were doing with, quote,
12   expected wage increases in future years.
13   Do you see that?
14        A.   Yes.
15        Q.   And then you go on to say since
16   contributions are a percentage of wages, do
17   you see that?
18        A.   Yes.
19        Q.   In connection with this Fund, to
20   use your words in this memo, since
21   contributions are a percentage of wages,
22   you would need to know how future wages
23   might increase in order to project future
24   contributions, correct?

Egan - Cross

1
2     A.  Yes.
3     Q.  Alright, now let's turn to
4  Exhibit 137.  And these are meeting minutes
5  of February 15, 2011.  Do you see that?
6     A.  Yes.
7     Q.  And on page 1 it indicates that
8  you attended and Mr. Urbank attended and it
9  also indicates that two others of your
10  colleagues from the Segal Company attended
11  in meeting, Mr. Lehman and Mr. Santasiero?
12     A.  Yes.
13     Q.  Do you remember this meeting?
14     A.  There were a couple where they
15  attended, so I don't know if I remember
16  this specific one.
17     Q.  But again there is a foundational
18  question.  You have no reason to believe --
19     A.  -- that I wasn't there, no.
20     Q.  Alright.  I want you to turn your
21  attention to the first exhibit behind the
22  minutes and that's an exhibit that begins
23  at page 3366.
24     A.  Yes.
25     Q.  Okay, and take a minute to look

Egan - Cross

1
2  at this exhibit.
3     A.  Okay.
4     Q.  This exhibit looks to be like a
5  slide deck or a PowerPoint presentation, is
6  that correct?
7     A.  That's what it looks like.
8     Q.  And did you prepare this
9  document?
10     A.  I most probably was involved.
11     Q.  You were involved in the
12  preparation of this document, correct?
13     A.  Yes.
14     Q.  And turn to page 4 of this
15  document, slide 4, it's Fund document
16  number 3370.  And at the top of that page
17  there is a heading, it refers to eight
18  percent CR allocation increasing to
19  11.5 percent, do you see that?
20     A.  Yes.
21     Q.  And what does CR stand for?
22     A.  Contribution rate.
23     Q.  So this slide discusses
24  essentially a funding improvement plan
25  option or schedule in which the Fund's

Egan - Cross

1
2  contribution rate would move from eight
3  percent to 11.5 percent, correct?
4     A.  The portion of the contribution
5  rate that was 8 percent becomes 11.5
6  percent.
7     Q.  But it says eight percent
8  contribution rate, correct?
9     A.  Allocation.
10     Q.  And then it says in the first
11  bullet point, reflects current contribution
12  rate of eight percent of wages?
13     A.  Allocation.
14     Q.  And what is your understanding of
15  the word allocation?
16     A.  That the contribution rate is
17  eight percent of the wage rate, and the
18  portion that's a percentage is the eight,
19  the allocation to the wage rate is the
20  eight.
21     Q.  But you didn't use the term wage
22  rate, did you?
23     A.  No, but that's what it's meant to
24  mean.
25     Q.  You meant it to mean wage rate?

Egan - Cross

1
2     A.  Yes.
3     Q.  In connection with the
4  February 15, 2011, meeting, did you present
5  to the trustees and go over with the
6  trustees this document?
7     A.  Most probably.
8     Q.  You don't have any reason to
9  believe you didn't?
10     A.  Right, correct.
11     Q.  Did you explain to them what you
12  had meant by allocation?
13     A.  I don't remember specifically
14  what I explained.
15     Q.  Alright, let's turn to slide 12,
16  which is on page 3378.  And I want to draw
17  your attention to the bullet points under
18  scenario two and scenario three.  Do you
19  see those?
20     A.  Yes.
21     Q.  So scenario two, the third bullet
22  point talks about eight percent, I guess
23  that's contribution rate with reallocation
24  increases contribution rate to 10 percent,
25  do you see that?

1     Egan - Cross
2     A.   Yes.
3     Q.   And then under scenario 3,
4  eight percent contribution rate
5  with reallocation increases the
6  contribution rate to nine percent.
7     A.   Okay.
8     Q.   What did you mean by
9  reallocation?
10     A.   I don't know that it meant
11  anything different than what the other
12  meant.
13     Q.   But nonetheless you used the word
14  reallocation as opposed to allocation?
15     A.   Yes, it says that there, yes.
16     Q.   I want to draw your attention
17  back one slide to slide 11, which is 3377.
18  Excuse me, and I want to talk to you about
19  the bullet that begins projected
20  contributions based on average
21  contributions.  Do you see that bullet?
22     A.   Yes.
23     Q.   And I notice that you used the
24  phrase in this bullet, average
25  wage/contribution, do you see that?

1     Egan - Cross
2  Wage/contribution?
3     A.   Yes.
4     Q.   So I want to ask a couple of
5  questions about the relationship between
6  wages and contributions.  Under this
7  Pension Fund if an employer increases the
8  total wages it pays to its employees, it
9  also would increase the contributions it
10  pays to the Pension Fund, correct?
11     A.   Yes.
12     Q.   So in this Fund there is a direct
13  correlation between increases in wages and
14  increases in contributions, yes?
15     A.   Yes.
16     Q.   And given this direct correlation
17  between wages and contributions, you used
18  this formulation of one word wage/
19  contribution in the memo or in this
20  PowerPoint because the concepts of wages
21  and contributions moved together, correct?
22     A.   I don't know if that's why we
23  used it, but the wages and contributions do
24  move together.
25     Q.   Does anything on this slide

1     Egan - Cross
2  mention shift numbers and expected shifts?
3     A.   No.
4     Q.   And there is nothing in this
5  PowerPoint document at all that mentions
6  shift numbers or projects expected shifts,
7  correct?
8     A.   It doesn't project expected
9  shifts and it doesn't use wages to project
10  either.
11     Q.   But I asked you about shifts so
12  why don't you answer my question.
13     A.   Okay.
14     Q.   Mr. Richman can ask you
15  questions.
16     A.   Sure, yes.
17     Q.   So let me clarify the record.
18  There is nothing in this PowerPoint
19  presentation that mentions shift numbers or
20  projects expected shifts, correct?
21     A.   Correct.
22     Q.   Okay, so sticking with
23  Exhibit 137 and turning to the minutes, I
24  want to draw your attention to, on page 2
25  of the minutes, and it's the very last

1     Egan - Cross
2  paragraph.  So the very last paragraph
3  begins the Segal representatives then
4  conducted an interactive presentation
5  modelling a series of scenarios based on
6  various assumptions as well as various
7  contribution rates, do you see that?
8     A.   Yes.
9     Q.   And this is the, again, just to
10  confirm for the record, the minutes of the
11  February 15, 2011 trustee meeting.  So this
12  notation in the minutes, this notation will
13  lead to that interactive live modelling
14  presentation that you previously referred
15  to in your testimony, correct?
16     A.   Yes.
17     Q.   Okay, so this was the
18  presentation in which I guess trustees
19  suggested different contribution rates that
20  were modelled, correct?
21     A.   Yes.
22     Q.   And in connection with their
23  offering up different contribution rates,
24  the trustees asked you to model different
25  projections of future shifts?

Egan - Cross

1    A.  No.
2    Q.  Alright, now let's turn to
3  Exhibit 138.  This is a meeting on April 6,
4  2011.  And the first page of the minutes,
5  Ms. Egan, indicates that it was largely --
6  it was a special meeting and it was largely
7  to discuss a funding improvement plan.
8    A.  Yes.
9    Q.  Okay.  I want to draw your
10 attention to the slide deck of the
11 PowerPoint presentation that follows these
12 minutes that begins on page 3386.  And in
13 order to move this exam along, you'll see
14 that as part of Exhibit 139 and as part of
15 Exhibit 143, there are also PowerPoint
16 presentations.
17      THE ARBITRATOR:  Where are we
18 now?
19    Q.  We were on 138 and I also asked
20 her to take a look at the PowerPoint
21 presentations behind 139, Mr. Arbitrator,
22 and 143.  And my question was did these
23 slide decks use the same terminology
24 respecting contributions and contribution

Egan - Cross

1  rates that we discussed in connection with
2  the PowerPoint for the February 15th on
3  2011?
4    A.  Most probably.
5    Q.  Anything else to add to that
6  answer?
7    A.  No.
8    Q.  Let me ask you this.  Isn't it
9  true that in discussing contributions and
10 the contribution rate for this Fund with
11 the trustees, your practice was to
12 characterize the contribution rate as
13 either a percentage or a percentage of
14 wages?
15    A.  Yes.
16    Q.  And isn't it also true that you
17 employed this practice of characterizing
18 the contribution rate as a percentage or a
19 percentage of wages over a multi-year
20 period?
21    A.  Most probably.
22    Q.  That's a yes?
23    A.  Yes.
24    Q.  And this was a practice that not

Egan - Cross

1  only did you employ, but Mr. Urbank also
2  employed it in connection with this Fund,
3  correct?
4    A.  I cannot speak for him.
5    Q.  Do you have any reason to believe
6  he did not?
7    A.  Not really.
8    Q.  And isn't it also true that
9  Mr. Urbank would take the lead for the
10 Pension Fund in drafting trustee minutes,
11 correct?
12    A.  Yes.
13    Q.  And in connection with the effort
14 to prepare minutes, he too employed this
15 practice of referring to the contribution
16 rate as either a percentage or a percentage
17 of wages, correct?
18    A.  It appears that way.
19    Q.  Do you have any reason to believe
20 that was not the case?
21    A.  No.
22    Q.  And he too employed this practice
23 over a number of years, correct?
24    A.  I would assume so.

Egan - Cross

1    Q.  And the trustees of the Fund
2  routinely would listen to the Segal team
3  characterize the contribution rate as
4  either a percentage or a percentage of
5  wages, correct?
6      MR. RICHMAN:  Objection as to
7  what the trustees would do.  Argue
8  that.
9      THE ARBITRATOR:  Sustained.
10 They were in the room, and they spoke
11 it, and you can argue whether they
12 heard it.
13    Q.  Let me ask you this.  Isn't it
14 true that you also employed a practice of
15 referring to the plan's contributions as a
16 percentage of wages?
17    A.  I'm not sure.
18    Q.  You're not sure?
19    A.  No.
20    Q.  Why don't we turn to Exhibit 150.
21 And why don't you turn to Exhibit A, it
22 begins at page 3437.  This was an exhibit
23 to the trustees meeting of June 20, 2014.
24 This is a memo from you and Mr. Urbank to

Egan - Cross

1  the board.  It's dated April 4, 2014.  Do
2  you see that?
3      A.  Yes.
4      Q.  And let me draw your attention to
5  the first paragraph, and in the middle of
6  the first paragraph there is a sentence
7  that begins with the word assuming, do you
8  see that?  Assuming that all employers?
9      A.  Yes.
10      Q.  Okay, and in this paragraph it
11  refers to contribution rate increases from
12  eight percent to 11.8 percent of the shift
13  rate, do you see that?
14      A.  Yes.
15      Q.  Did any of the prior memoranda
16  that you had prepared to the board of
17  trustees use that formulation, percent of
18  shift rate?
19      A.  Not that I recall.
20      Q.  And this memorandum was prepared
21  after the assessment of the withdrawal
22  liability against The New York Times,
23  correct?
24      A.  I think so.

Egan - Cross

1      Q.  And it was prepared after The New
2  York Times had challenged the assessment on
3  the ground that it misstated contribution
4  base units, correct?
5      A.  Say that again.
6      Q.  And this memorandum was created
7  after The Times had challenged the
8  assessment on the ground that the
9  assessment and determination of partial
10  withdrawal liability had misstated
11  contribution base units, correct?
12      A.  Yes.
13      Q.  Did that withdrawal liability
14  dispute play any role in your and
15  Mr. Urbank's decision to change the wording
16  about contribution rate?
17      A.  It may have.
18      Q.  You don't remember one way or the
19  other?
20      A.  It made me revisit how we phrase
21  it.
22      Q.  So it did play a role?
23      A.  Yes.
24      Q.  And in deciding to make this

Egan - Cross

1  change, did you consult with any of the
2  trustees beforehand?
3      A.  No.
4      Q.  Did you consult with anybody at
5  the Fund beforehand?
6      A.  No.
7      Q.  Did you and Mr. Urbank consult
8  with anybody at Segal before you made this
9  change?
10      A.  I don't remember.
11      Q.  Now I want to talk briefly about
12  withdrawal liability matters and their
13  coming to the attention of the trustees.
14  You served as a Pension Fund actuary
15  through 2014, is that correct?
16      A.  I don't remember exactly when we
17  were terminated.
18      Q.  But approximately the end of
19  2014?
20      A.  I don't remember, somewhere into
21  that.
22      Q.  In the 10-year period from 2005
23  through 2014, how many employers actually
24  withdrew from this Fund and you prepared

Egan - Cross

1  withdrawal liability assessments?
2      MR. RICHMAN:   Objection, we
3  went through this the first time
4  around in great detail, which if I
5  remember correctly you pleaded with me
6  not to go through every one of them.
7      MR. MILLER:  I will withdraw the
8  question.  That's quite alright, the
9  documents will speak for themselves.
10      THE ARBITRATOR:  Fine.  Thank
11  you.
12      Q.  Let me ask this question, which
13  I'm pretty confident was not raised
14  earlier.  How many times in the 10-year
15  period from 2005 to 2014 did you discuss
16  withdrawal liability issues at trustee
17  meetings?
18      A.  I don't remember how many times.
19      Q.  It was infrequently, correct?
20      A.  I don't remember how often.
21      Q.  Do you remember back in February
22  in this matter testifying about a Fund
23  contributor named El Diario?
24      A.  Yes.  This year?

Egan - Cross

Q. Yes, when you testified earlier this year in this proceeding.

A. Yes.

Q. Prior to your giving that testimony, did you meet with attorneys from Schulte Roth to prepare for that testimony?

A. Probably.

Q. Do you have any reason to believe you didn't?

A. No.

Q. Did you review any documents in connection with preparing for that testimony back in February?

A. I don't remember.

Q. Did you review any documents in preparing for that testimony that discussed or made mention of El Diario?

A. I have no idea. I don't remember.

Q. Did you review any trustee minutes that referenced El Diario?

A. I have no idea.

Q. Did you discuss with the Schulte Roth attorney El Diario and El Diario's

Egan - Cross

participation in the Fund?

MR. RICHMAN: Objection. That's privileged.

MR. MILLER: Schulte Roth is not counsel for the witness. There is no indication of a mutual defense agreement. And beyond that, even to the extent that there may be some privilege here, and we don't think there is, obviously I'm asking these questions as it relates to prior conduct and the issue of sanctions, and in connection with that issue, I don't think that the privilege here to the extent it exists is sufficiently strong to prohibit my asking questions about the extent to which this was discussed.

MR. RICHMAN: There is a privilege. They were the actuary to the Fund, and that privilege carries over to the Fund and our representation of the Fund. With respect to this ridiculous notion of

Egan - Cross

sanctions, I will remind everybody that it was your opinion that said that they hadn't asked for documents relating to contribution base units, and this would be a document that would fall within that range. They can argue whatever they want, we're not waiving privilege.

MR. MILLER: It mischaracterizes your order, because the fact is that we asked about contribution base units. Your order related to the question of the contribution rate.

MR. RICHMAN: It never asked about contribution rates.

MR. MILLER: And obviously these minutes address contribution base units. I think your opinion was clear that notwithstanding the other sets of minutes, these minutes were clearly relevant and should have been provided. I take the position that as it relates to the existence of the privilege, while there may be a

Egan - Cross

privilege that extends to the actuary in connection with decisions about legal advice to give to the trustees, the preparation of this witness for testimony falls outside of that scope. And again beyond that point, I don't think it holds up in connection with the issue that we're trying to make factual here.

MR. RICHMAN: I've been through lots of it these arbitrations, and I'm happy to brief this issue. I have never heard of anyone asserting that there is no privilege between a witness service provider and the counsel representing the Fund, not only in giving advice to Fund trustees, but in preparation for an arbitration.

MR. MILLER: The only other thing I'd add is at the time she gave her testimony and she was prepared for the testimony, she technically was no longer a service provider.

Page 1133

Egan - Cross

1    Egan - Cross
2        MR. RICHMAN:   But she was
3    testifying about services she provided
4    to the Fund.
5        THE ARBITRATOR:   Okay, I have
6    to acknowledge that I have never dealt
7    with an issue of privilege as it
8    relates to requests for sanctions.
9    This is a new wrinkle.
10       Let me ask you this.  Let's posit
11   for a moment that you had full
12   discussions with people in that time
13   frame about El Diario.  How would they
14   be able to establish that fact?
15       MR. RICHMAN:   First of all I
16   don't think it's relevant.  But the
17   answer is what time period are you
18   talking about?
19       THE ARBITRATOR:   Prior to
20   February of 2015.  Her prior
21   testimony.
22       MR. RICHMAN:   And you want to
23   know how would they establish the fact
24   of whether --
25       THE ARBITRATOR:   Let's posit

Page 1134

Egan - Cross

1    that the Fund was fully aware before
2    there was a production request that
3    they had this El Diario information
4    and they said we're not going to turn
5    it over.  We're going to use it just
6    at the hearing to surprise them.
7        MR. RICHMAN:   Well, there are
8    two things to that.  And one, I just
9    want to make sure I'm right on my
10   facts.  What was not produced were the
11   minutes.  And the -- even if we had
12   the discussion with her, it would have
13   been a rebuttal to Mr. Hayes'
14   testimony.
15       THE ARBITRATOR:   I'm not
16   suggesting necessarily that you had
17   the discussions and hence the
18   sanctions are appropriate.  I'm just
19   asking about how you establish a
20   factual predicate for an argument if
21   you can't ask the question about
22   whether it was discussed.
23       MR. RICHMAN:   Well, whether it
24   was discussed is -- there was an

Page 1135

Egan - Cross

1    Egan - Cross
2    estimate that had been turned over to
3    them.
4        THE ARBITRATOR:   And that goes
5    to the merits of whether or not I
6    think there was anything done in bad
7    faith and the sanctions.
8        MR. RICHMAN:   But I would be
9    surprised, I quite frankly don't
10   remember that there was any discussion
11   about the estimate that was turned
12   over, because we turned over all the
13   withdrawal liabilities.
14       MR. MILLER:   We can show you the
15   estimate.  It made no reference to
16   shifts, which is why the minutes were
17   important.  And second, you hit the
18   nail on the head.  Without answering
19   the question that I probed, there
20   would be no ability on the part of The
21   New York Times to make a relevant fact
22   inquiry as to whether the information
23   contained in those minutes was used to
24   prepare this witness for purposes of
25   surprise testimony.

Page 1136

Egan - Cross

1    Egan - Cross
2        THE ARBITRATOR:   Well, I don't
3    want to call this witness back.  I
4    will allow you to answer the question
5    and we can brief it if need be.
6        MR. RICHMAN:   What's the
7    question?
8        THE REPORTER:   "Did you discuss
9    with the Schulte Roth attorney El
10   Diario and El Diario's participation
11   in the Fund?"
12       MR. RICHMAN:   That's an
13   inappropriate question.  You -- as I
14   understand what you are saying, is
15   whether there was a discussion with
16   the witness with respect to the
17   minutes about El Diario.  That was
18   what was not turned over in the
19   initial discussion.
20       MR. MILLER:   No, because there
21   remains the possibility that the
22   minutes themselves were not discussed.
23   The minutes were not shown to the
24   witness, but the text, the language of
25   the minutes was in fact orally

Egan - Cross

discussed with the witness to refresh
her recollection and prepare her for
what you have dubbed surprise
testimony.

    THE ARBITRATOR:  Go ahead.  You
can have your question.  Go ahead.

    THE REPORTER:  "Did you discuss
with the Schulte Roth attorney El
Diario and El Diario's participation
in the Fund?"

    THE WITNESS:  When?

FURTHER EXAMINATION BY MR. MILLER:

    Q.  In preparation for your testimony
in February.

    A.  I don't remember exactly.

    MR. MILLER:  Mr. Arbitrator,
let's do the following.  Can we take a
short break?  I think I'm basically
done.  We'll discuss this issue and
see if there is any necessary
followup.  If there will be followup,
I will anticipate it will be just a
couple of minutes.

    (Recess taken:  4:01-4:13 p.m.)

Egan - Cross

FURTHER CROSS-EXAMINATION BY MR. MILLER:

    Q.  Ms. Egan, I'm going to read you
an excerpt from your prior testimony on
February 24, 2015, and I'm going to ask you
if that refreshes your recollection about
whether El Diario was discussed in
preparing for that testimony.  So what I'd
like you to do is turn to tab two of the
hearing transcript that I handed to you,
and then turn to page 636 of the hearing.
Are you there?

    A.  Yes.

    Q.  I'm going to begin at line 5 and
read a series of questions and answers into
the record.

    "Question:  Now, was the El
Diario estimate ever discussed at a Pension
Fund meeting?

    "Answer:  I believe this one was
discussed at a Pension Fund meeting.

    "Question:  Do you know what the
nature of the discussion was?

    "Answer:  We reported the
calculation was done.

Egan - Cross

    "Question:  Okay, and was there
any discussion at the meeting other than
your report?

    "Answer:  My recollection is
that after our report, there was further
discussion of the possibility of El Diario
incurring a partial withdrawal liability,
possibility of it.

    "Question:  And what was the
nature of that discussion?

    "Answer:  I think there was a
discussion about what partials are, and how
partials could be -- and mentioned -- part
of the discussion was that you need to
track shifts to see if there is a
70 percent decline in the base units to see
if a partial possibly occurred.

    "Question:  Were you given the
assignment to track, to determine whether
partial withdrawal occurred?

    "Answer:  No.

    "Question:  Who was given that
assignment?

    "Answer:  I don't know if

Egan - Cross

anybody, anyone was given the assignment to
determine whether it occurred.  I think it
was just noted that the shifts need to be
kept track of to see if there is a
possibility."

    Ms. Egan, does this testimony
refresh your recollection of whether in
preparing for the testimony you discussed
El Diario with the Schulte Roth lawyers?

    A.  I don't remember if I discussed
it with the Schulte Roth lawyers.

    Q.  Let me ask you an additional
question.  Turn to the yellow binder.  And
Exhibit 140, which are the minutes from
Tuesday, October 11, 2011, and page 4 of
the minutes, which discuss under heading 8
the El Diario withdrawal.  Are you there?

    A.  Yes.

    Q.  Okay, and take a look at the
second paragraph under A.  We're looking at
Exhibit 140 of the binder, and it's page 4
of the minutes, El Diario.   And we're
looking at the second paragraph under A,
the one that begins following the

Egan - Cross

1  discussion, do you see that?
2
3      A.  Yes.
4      Q.  And then it says it was noted, it
5  uses that phrase, it was noted that due to
6  the reduction in shifts rather than a
7  complete withdrawal there may be partial
8  withdrawal.  As a result the Fund Office,
9  and then it uses the language will track
10  shifts, okay?  Now let's look at your
11  testimony.  And the answer that you gave on
12  the bottom of 636 beginning at line 22, you
13  also used the phrase, part of the
14  discussion was that, quote, you need to
15  track the shifts, and then again in the
16  answer you gave on page 637 beginning at
17  line 12, you said, I think it was just
18  noted that the shifts need to be kept track
19  of.  So in those two answers, you used
20  language that was almost precisely the same
21  as the language in that paragraph in the
22  minutes.
23      A.  But that's what you do for
24  partial withdrawals, is you track the
25  shifts.

Egan - Cross

1
2      Q.  Well, let me ask you --
3      MR. RICHMAN:  Let her finish her
4  answer.
5      Q.  Are you done?
6      A.  I guess so.
7      Q.  So looking at the language in
8  the minutes, again, it does not refresh
9  your recollection one way or the other
10  whether you had a discussion about El
11  Diario in preparation for your testimony?
12      A.  I don't remember exactly when my
13  discussions were, with whom, when, about
14  what.
15      Q.  And do you think it's just
16  essentially coincidence that you used
17  language --
18      MR. RICHMAN:  Objection.
19      THE ARBITRATOR:  Let him finish
20  the question.  Go ahead.
21      Q.  You think that it is essentially
22  coincidence that in connection with two of
23  the answers you gave, you used language
24  that is the same as the language in
25  the minutes?

Egan - Cross

1
2      MR. RICHMAN:  Objection, it's
3  argumentative, and she's already
4  explained that's how you do it.
5      THE ARBITRATOR:  Okay, it's
6  cross-examination.  She can answer
7  that.  Go ahead.
8      THE WITNESS:  I should answer
9  him?
10      THE ARBITRATOR:  Yes.
11      A.  That is the typical way to
12  describe that kind of situation.  An
13  actuary would describe it that way.  If we
14  wrote the minutes, we would describe it
15  that way.  I write the way I speak.  I
16  would describe it that way.
17      Q.  Using the words track shifts?
18      A.  Yes.
19      Q.  And what about the verb it was
20  noted?
21      A.  I use that all the time.
22  Everything is noted in what we do.
23      Q.  And did you draft the minutes for
24  the October 11th meeting?
25      A.  No.

Egan - Redirect

1
2      MR. MILLER:  Thank you.  No
3  additional questions.
4      MR. RICHMAN:  I do have
5  questions.
6  REDIRECT EXAMINATION BY MR. RICHMAN:
7      Q.  So Ms. Egan, let's turn to
8  Exhibit 133.  And specifically I would like
9  you to look at, from 3346, please, and that
10  will be towards the back.
11      You say on 3346, or you and
12  Mr. Urbank says in this memo, and it's
13  under the box, the projections are based on
14  the assumption that the Plan will
15  experience a market rate return of
16  7.5 percent each year into the future.  Do
17  you see that?
18      A.  Yes.
19      Q.  Did you believe that it was
20  reasonable to assume that the market return
21  on the portfolio, the Fund would be
22  7.5 percent each year into the future?
23      A.  We assumed a long-term assumption
24  of seven and a half percent, not that you
25  necessarily get 7.5 each year, but a

47

Page 1145

Egan - Redirect

1 long-term assumption of seven and a half
2 percent.
3     Q.  Now, in a lot of the projections
4 you did you made assumptions.  You need to
5 make assumptions to do projections, is that
6 correct?
7     A.  Correct.
8     Q.  Okay.  And one of the assumptions
9 that you need to do to come up with to make
10 a projection about the funding of a plan --
11 let me withdraw that, leading.
12     Can you describe just generally,
13 not full-blown actuarial speak, but just
14 generally the assumptions that you need to
15 assume for this Pension Fund to make
16 projections about its financial condition
17 into the future?
18     A.  There's a lot of assumptions.
19     Q.  Let's talk about the major
20 assumptions.
21     A.  Major assumptions would be -- in
22 the projections would be your investment
23 return into the future, maybe how your
24 contributions will change into the future,

Page 1146

Egan - Redirect

1 whether your population goes up or down
2 into the future, maybe mortality, how
3 people live or die.
4     Q.  And how does population going up
5 and down figure into the projections?
6     A.  Well, what happens is there are
7 liabilities tied to people and there's
8 money tied to people.  Liabilities that are
9 owed and there's money coming in.  Both of
10 them are tied to the numbers of people.
11     Q.  And let's talk about the money
12 coming in.
13     A.  Okay.
14     Q.  When you talk about the money
15 coming in, the slideshows that Mr. Miller
16 showed you, you used the phrase
17 contribution rate or percentage of wages.
18 And why did you use that?
19     A.  What did we mean by that?
20     Q.  Yeah, why did you use that to
21 describe the contributions coming into the
22 Fund?
23     A.  The way -- our understanding of
24 how the Fund makes contributions, it's a

Page 1147

Egan - Redirect

1 percentage of the wage rate times the
2 shift.  Since employers have several
3 different types of wage rates and they're
4 at all different shifts, it was always hard
5 to get that kind of information by each
6 employer, so we would focus on the
7 contribution rate, eight percent, which was
8 the easiest way to talk about
9 contributions, so we would talk about that
10 eight percent which sometimes changed to
11 six percent, would go back up to eight
12 percent.  So we would focus on the eight
13 percent.  It was the easiest way to talk
14 about the contributions.
15     Q.  Let's turn to Exhibit 128,
16 please.  And let me ask you, Mr. Miller
17 pointed out that after withdrawal liability
18 was assessed by the Fund against The New
19 York Times, you used a different phrasing,
20 right, for contributions?
21     A.  Yes.
22     Q.  And was it you or Mr. Urbank who
23 decided to use that phrasing?
24     A.  I don't remember exactly how it

Page 1148

Egan - Redirect

1 came about, but we thought it would be
2 clearer to express it more specifically,
3 since there have been issues.
4     Q.  When you say since there have
5 been issues, what was the issue that had
6 come up?
7     A.  The issue?
8     Q.  I'm going to take the pain and
9 leading and he'll -- so the The New York
10 Times withdrawal liability?
11     A.  Yes.
12     Q.  So as I understand your
13 testimony, correct me if I'm wrong, that
14 you thought it would be clearer since that
15 issue came up?
16     A.  Clearer, yes.
17     Q.  Looking at 138, this is your memo
18 and Mr. Urbank's, I'm on 3320.  So this is
19 for zone certification, right?
20     A.  Yes.
21     Q.  And 3320, if you look at
22 paragraph 4, the last sentence says please
23 note that on this point we need an
24 assumption for both the average shifts per

Egan - Redirect

1  active participant, projected number of
2  active participants and the expected wage
3  increases in future years since
4  contributions are a percentage of wages.
5  Do you see that.
6      A.  Yes.
7      Q.  Why did you include average
8  shifts per active participant in this?
9      A.  Because it was my understanding
10 that the contributions were made by a
11 certain percentage of the wage rate times
12 the shifts per active employee.
13     Q.  Okay.  And it was your
14 understanding at the time you wrote this
15 memo?
16     A.  Yes.  And this was the first year
17 we were requesting this data.
18     Q.  And did your understanding of the
19 way the contribution obligation of the
20 employers contributing to the Fund, did
21 that understanding change?
22     A.  No.
23     Q.  I'm going to rephrase the
24 question.  Did that change at any time that

Egan - Redirect

1  you were the actuary to the Fund?
2      A.  No.
3      Q.  Can you take a look at
4  Exhibit 138, please.
5          Now, if you flip past the agenda
6  you'll see the minutes of an April 6th,
7  2011 meeting.
8      A.  Okay.
9      Q.  And I think you've testified
10 already that there is no reason to doubt
11 that you were there?
12     A.  Right.
13     Q.  And if you'd look at the bottom
14 of page 2, and it's right under the
15 redacted.  Do you see where it says
16 redacted, the bottom of page 2, big bold
17 letters?
18     A.  Oh, yes I see.
19     Q.  It says Mr. Murphy.  Who is
20 Mr. Murphy, by the way?
21     A.  He was a -- I'm assuming he was a
22 trustee.  I'm not sure if he still is
23 because I'm not involved with the Pension
24 Fund.

Egan - Redirect

1      Q.  So it says Mr. Murphy requested
2  that Segal provide the trustees with a
3  report setting forth the projected
4  contributions based on contribution rates
5  under the default schedule and estimated
6  shift totals through 2020 for the three
7  largest contributing employers to the
8  pension plan.  Do you see that?
9      A.  Yes.
10     Q.  And did you have a conversation
11 with Mr. Murphy, let's start with at this
12 meeting about his request?
13     A.  Repeat the question.
14     Q.  Did you have a conversation with
15 Mr. Murphy about his request at this
16 meeting?
17     A.  After the meeting?
18     Q.  No, at the meeting.
19     A.  I don't remember exactly, but I'm
20 assuming he --
21     Q.  No, I don't want your assumption.
22     A.  I'm not sure what the question
23 is.
24     Q.  Mr. Murphy requested, right?  You

Egan - Redirect

1  see that, you see the request he made?
2      A.  Yes.
3      Q.  And I'm asking you, did you have
4  a conversation or discussion with him,
5  and/or the trustees at the meeting about
6  this, his request?
7      A.  I don't remember exactly what the
8  conversation was.
9      Q.  And did you ever get, by the way,
10 the estimated shift totals?
11     A.  I don't remember.
12         MR. MILLER:  Excuse me, in
13 connection with her prior answer, she
14 said I don't remember exactly what the
15 conversation was, if there was.
16         THE WITNESS:  Other than what's
17 written.  That's what I --
18         MR. MILLER:  The record is
19 confused.
20     Q.  Alright, so let me see if we can
21 clarify the record.
22         Mr. Murphy made a request, okay.
23 And in his request he wanted estimated
24 shift totals through 2020 for the three

Egan - Redirect

1  largest contributing employers for the
2  pension plan, do you see that?
3
4       A.  Yes, I do see that.
5       Q.  Do you remember that request?
6       A.  I don't remember the details of
7  that, no.
8       Q.  Forget the details.  Do you
9  remember that he made this request?
10      A.  I don't remember exactly.
11      Q.  Okay.  Do you have any reason to
12 believe that these minutes are not
13 accurate?
14      A.  No.
15      Q.  And was there a discussion
16 between Mr. Murphy and you or anybody else
17 at the meeting about his request for
18 estimated shift totals?
19      A.  I don't know because I don't
20 remember.
21      Q.  I think that clarifies the -- I
22 think we got it nailed down, okay.
23           And then did you ever get
24 estimated shift totals through 2020?
25      A.  Not that I remember.

Egan - Recross

1
2       Q.  Do you know why?
3       A.  No.
4       MR. RICHMAN:   We have no
5  further questions.
6           (Recess taken:  4:37-4:53 p.m.)
7  RECROSS-EXAMINATION BY MR. MILLER:
8       Q.  Ms. Egan, can you turn your
9  attention to Exhibit 134, and then why
10 don't you turn your attention to Exhibit F
11 to those minutes.  134 is the minutes of
12 May 19, 2010, and there's a letter from --
13 a memo from you and Mr. Urbank to the
14 trustees.  It's at Fund 3356.  And this is
15 another data request for a zone
16 certification analysis, correct?
17      A.  Yes.
18      Q.  And if you turn to page 2 of the
19 letter, under paragraph 4 of projected
20 industry activity, you are again asking for
21 information to use in that years's zone
22 status projection, correct?
23      A.  Yes.
24      Q.  And you'll note that in this
25 letter, the 2010 letter, in the last

Egan - Recross

1
2  sentence, you do not ask for average shift
3  per active participant, correct?
4       A.  Yes.
5       Q.  Now let's turn to Exhibit 144.
6  Those are the minutes of the July 30, 2013
7  meeting.  Okay, and let's turn to an
8  exhibit to those minutes.  It's the same
9  data request letter that begins at Fund
10 3434.  Are you there?
11      A.  Yes.
12      Q.  Okay, and if you turn to page 2,
13 on paragraph 4, projected industry
14 activity, the last sentence, once again,
15 you do not ask for average shift per active
16 participant information, correct?
17      A.  Correct.
18      Q.  Alright, and then finally let's
19 turn to Exhibit 150.  And take a look at --
20 it begins at page 3440.  And let's look at
21 that year's iteration of the data request.
22 Again look at page 2 under the Projected
23 Industry Activity heading, and once again,
24 you are no longer seeking average shift per
25 active participant data, correct?

Egan - Recross

1
2       A.  Yes.
3       Q.  And the reason I take it that you
4  no longer sought that information following
5  the letter in 2008 was that you never
6  received estimated shift total information,
7  correct?
8       A.  We realized we don't need it.
9       Q.  You realized that you did not
10 need estimated shift -- projected shift
11 information in order to project future
12 contributions, correct?
13      A.  Yes.
14      Q.  In the testimony you gave with
15 Mr. Richman, he asked you about certain
16 basic assumptions that you as an actuary
17 make in projecting the future performance
18 of the Fund.  And you indicated in response
19 to that question that you seek typically
20 information on the number of participants
21 because that can affect assets and it can
22 also affect liabilities.  And in fact I
23 think the phrase you used was liabilities
24 are tied to people.  Do you remember that
25 testimony?

Egan - Recross

1
2   A.  Yes, I think I just said it.
3   Q.  Correct, testimony before
4   Mr. Richman.
5   A.  I think I remember.
6   Q.  Isn't it true that in connection
7   with this Pension Fund, participants earn
8   annual -- isn't it true that in connection
9   with the NMDU Fund, participants accrue and
10  earn pension credits annually by reference
11  to the shifts that they work?
12  A.  I believe pension credits are
13  based on shifts.
14  Q.  And isn't it true that in order
15  to earn a year of pension credit under this
16  plan, you need a hundred shifts?
17  A.  I don't remember exactly how many
18  shifts you need to earn a pension.
19  Q.  But again to confirm, but you
20  need shifts to earn pension credit,
21  correct?
22  A.  Yes.
23  Q.  And therefore shift information
24  would be helpful in projecting the future
25  liabilities of this Pension Fund, correct?

Egan - Recross

1
2   A.  No.
3   Q.  And why is that?
4   A.  Because we assume that everyone
5   earns one pension credit into the future.
6   That's one of our assumptions.
7   Q.  So that's because you essentially
8   created a mechanic, an assumption that
9   avoids the need to get shift information in
10  projecting future liabilities, correct?
11  A.  Yes.
12  Q.  But I asked you a different
13  question.  The question I asked you was
14  putting aside the mechanic that Segal
15  employed in connection with this NMDU Fund,
16  as a general matter, given how pension
17  accruals are earned, it would be helpful in
18  projecting future liabilities to obtain
19  shift information?
20  A.  Helpful to me or to someone else?
21  Q.  Helpful to the actuary in
22  projecting future liabilities.
23  A.  I did not need shift information
24  to project future liabilities.
25  Q.  And that's because you couldn't

Egan - Recross

1
2   get shift information, correct?
3   A.  No, because we assumed everyone
4   earned one pension credit into the future.
5   So we never asked for it to do liabilities.
6   Q.  If somebody worked -- let's
7   assume that you needed a hundred shifts to
8   get a year of pension service, okay?
9   A.  Okay.
10  Q.  And if an employee worked
11  90 shifts, that employee would not get a
12  year of pension credit, correct?
13  A.  Under that scenario, yes.
14  Q.  Right.  And under the mechanic
15  that you employed, your mechanic did not
16  distinguish between employees who did not
17  earn sufficient shifts to obtain a year of
18  pension accrual, correct?
19  A.  Repeat the question.
20      (The pending question was read.)
21  THE WITNESS:  It's very
22  confusing, what you're asking, because I'm
23  not sure what you're asking.
24      MR. RICHMAN:  Let's rephrase
25  the question then.

Egan - Recross

1
2   THE WITNESS:  When I calculate a
3   liability, I ask the Fund for information
4   to calculate liability.  Shift is not
5   information I need.  I ask them for the
6   pension credits that a participant has.  I
7   don't need to use shifts because they give
8   me the pension credits that a participant
9   has.  I don't need to calculate that the
10  person had 900 shifts so they didn't earn
11  the pension credit.  They give me the
12  pension credit.  I don't need the shift
13  information.  They're doing that
14  calculation.
15  Q.  But on occasion you project
16  future liabilities and future accruals,
17  correct?
18  A.  Yes.
19  Q.  And in connection with the
20  projection of future accruals, you don't
21  rely on past accruals, do you?
22  A.  We assume that each participant
23  earns a full pension credit each year into
24  the future.  That is one of the
25  assumptions.  So there is no need for us to

Egan - Recross

get that information --

Q.  Okay.  Now let's go back to my question.

A.  -- in calculating liabilities for the Pension Fund.

Q.  Now let's go back to my question. You assume each participant will earn a year of pension service in the future, correct?

A.  Yes.

Q.  You make that assumption notwithstanding whether that participant will earn sufficient shifts in a year in the future to actually get that pension service credit, correct?  Yes or no.

A.  Whether they do or not, it comes out in the next year's calculation.  You have a gain or a loss.  I'm not sure where there's a question.  Maybe I'm not --

Q.  Let me try it one more time and then I'll give up.

You make a projection about the number of participants that will earn service credits each year into the future,

Egan - Redirect

correct?

A.  I assume that each participant will earn a pension credit.  I don't say that now three of the four that are there are going to not get the pension credit.  I say they all are getting a pension credit.

Q.  Correct.  And you make the assumption that they will all get the pension credit because you don't make an assumption about the number of shifts they will have in the future, right?

A.  Yes, I guess.  I'm not sure.

Q.  Yes?

A.  We don't make an assumption about the number of shifts into the future.

MR. MILLER:  I have no further questions.

REDIRECT EXAMINATION BY MR. RICHMAN:

Q.  This will be quick, I promise.

So Mr. Miller showed you Exhibits 134, 144 and 150, and he showed you that you weren't in those exhibits asking for information about shifts, and he asked you why not and you said you realized you did

Egan - Redirect

not need that information.  Why?

A.  Because the way we project contributions is not the way contributions are made.  It is not taking by the number of people times the percentage times the wage rate times the shifts.  It is just taking last year's contribution dollars and projecting those dollar amounts into the future by either increasing or decreasing them because of events that are expected to happen in the future.  For instance if you expect the number of people to go down 10 percent, we take last year's contribution dollars and reduce it by the 10 percent going into the future.  We expect if the trustees expect wage increases of two percent a year, we increase the contribution dollars by two percent a year. So there is no need to get wage rate information or shift rate information or contribution rate information to project contributions.  We just need to know what changes are happening to those dollar contributions to do these projections.

Egan - Redirect

MR. RICHMAN:  That's all I have.

MR. MILLER:  That's all I have.

THE ARBITRATOR:  Thank you very much, all.

(Proceedings adjourned:  5:08 p.m.)

Page 1165

1
2                C E R T I F I C A T E
3
4    STATE OF NEW YORK      )
5                          ) ss.:
6    COUNTY OF NEW YORK     )
7
8        I, DAVID HENRY, a Certified Court
9    Reporter and Notary Public within and for
10   the State of New York, do hereby certify:
11       That the foregoing is a true and
12   accurate transcript of the proceedings
13   herein.
14       I further certify that I am not
15   related to any of the parties to this
16   action by blood or marriage; and that I am
17   in no way interested in the outcome of this
18   matter.
19       IN WITNESS WHEREOF, I have hereunto
20   set my hand this 29th day of September,
21   2015.
22
23
24       -------------------------
25       DAVID HENRY

Page 1166

1
2                  I N D E X
3
4    TERRY HAYES
5    DIRECT EXAMINATION BY MR. MILLER   963
6    CROSS-EXAMINATION BY MR. RICHMAN   1001
7    REDIRECT EXAMINATION BY MR.        1070
8    MILLER
9    RECROSS-EXAMINATION BY MR.         1072
10   RICHMAN
11
12   ROSANA EGAN
13   CONTINUED CROSS-EXAMINATION BY     1074
14   MR. MILLER
15   REDIRECT EXAMINATION BY MR.        1144
16   RICHMAN
17   RECROSS-EXAMINATION BY MR.         1154
18   MILLER
19   REDIRECT EXAMINATION BY MR.        1162
20   RICHMAN
21
22
23
24
25

1

2           AMERICAN ARBITRATION ASSOCIATION

----------------------------------------X

3    THE NEW YORK TIMES COMPANY,

4

5         A       Petitioner,

6

v.

7

NEWSPAPER and MAIL DELIVERERS'-PUBLISHERS'

8    PENSION FUND,

9                Claimant.

----------------------------------------X

10

11

12

13                  DAY 6 - VOLUME VI

14                   ARBITRATION

15                New York, New York

16            Wednesday, October 7, 2015

17

18

19

20

21   REPORTED BY:  BARBARA R. ZELTMAN

22               Professional Stenographic Reporter

23

24   Job Number:  97106

25

Page 1168

October 7, 2015
9:35 a.m.

Arbitration proceedings held at American
Arbitration Association, 120 Broadway, New York, New
York, before BARBARA R. ZELTMAN, a Professional
Stenographic Reporter and Notary Public within and
for the State of New York.

---

Page 1169

APPEARANCES:

ARBITRATOR:  MARK IRVINGS, ESQ.
             24 Elba Street
             Brookline, Massachusetts  02446

JONES DAY
Attorneys for Petitioner
    51 Louisiana Avenue, N.W.
    Washington, D.C.  20001
    BY:  EVAN MILLER, ESQ.
         MIGUEL EATON, ESQ.
         YAAKOV ROTH, ESQ.

SCHULTE ROTH & ZABEL
Attorneys for the Claimant
    919 Third Avenue
    New York, New York  10022
    BY:  RONALD RICHMAN, ESQ.,
         MAX GARFIELD, ESQ., and
         ADAM GARTNER, ESQ.

ALSO PRESENT:  Jeffrey Zomper
               Thomas Bentvena

---

Page 1170

ARBITRATION - VOLUME VI

(Whereupon, the following
proceedings were had:)
MR. RICHMAN:  Are you ready?
NEAL SCHELBERG,
having been first duly sworn by
Arbitrator Irving, Notary Public, was
examined and testified as follows:
DIRECT EXAMINATION BY MR. RICHMAN:
Q    You're a partner at Proskauer Rose,
correct?
A    Yes.
Q    How long have you been a partner
there?
A    I've been a partner --
MR. RICHMAN:  I'll leave out
through the preliminaries.
MR. MILLER:  I will object when
I need to.
MR. RICHMAN:  Okay.
A    I've been a partner for 28 years.
Q    28 years.  Okay.
And what's your field of practice?
A    Employees benefits.

---

Page 1171

ARBITRATION - VOLUME VI
Q    And your specialization within that
field?
A    I represent Taft-Hartley funds.
Q    And one of the funds is the NMDU
Pension Fund?
A    Correct.
Q    How long have you been counsel to
the NMDU Pension Fund?
A    Since 1991.
Q    Do you have a designation in terms
as fund counsel, employer counsel, union
counsel with respect to the fund?
A    I've been designated employer
trustee counsel.
Q    Okay.  And what does that mean as
employer trustee counsel?
A    Well, I'm co-counsel to the trust
fund, but I was designated by the
publishers, who were the employers who
contribute to the funds.
Q    But you are actually counsel to the
Fund itself?
A    Correct, I'm co-counsel for the
Fund.

ARBITRATION - VOLUME VI

1
2      Q    And I'm sorry, how long have you
3  been counsel to the NMDU Pension Fund?
4      A    Since, I believe, 1991.
5      Q    And was someone at Proskauer
6  counsel before that?
7      A    No, no.  They were a new client in
8  1991 and maybe 1990, 1991, 1992, some time
9  around then, after the Newspaper and Mail
10  Deliverers' Union and Maxwell Newspapers who
11  purchased the Daily News, after that sale, I
12  became counsel to the Funds.
13     Q    Now, Proskauer is also counsel for
14  The New York Times, correct?
15     A    Correct.
16     Q    Okay.
17         What services does Proskauer
18  provide to The New York Times?
19     A    I think we provide a range of
20  services, including providing labor
21  employment advice.
22     Q    Does Proskauer Rose provide
23  employer benefit proxies to its clients?
24     A    I think we do on occasion.
25     Q    And would you characterize The New

ARBITRATION - VOLUME VI

1
2  York Times as an important client of
3  Proskauer Rose's?
4         MR. MILLER:  Objection.
5         Mr. Arbitrator, as you know,
6  Mr. Schelberg is here today to testify on
7  a very narrow issue.  And that issue
8  relates to Mr. Hayes' attendance at an
9  October 11, 2011 trustee meeting.
10        The line of questioning that
11  Mr. Richman is now engaging in is not
12  foundational as it relates to the issue
13  upon which Mr. Schelberg is here to
14  testify.  It is unrelated and, therefore,
15  I object to this line of questioning.
16        ARBITRATOR IRVINGS:  What's the
17  relevance?
18        MR. RICHMAN:  The relevance
19  is -- arose yesterday and it's going
20  to go to the sanctions motion that we
21  are going to file.
22        As you know, there will be
23  sanctions motions filed in every
24  direction with respect to The New York
25  Times having conversations with

ARBITRATION - VOLUME VI

1
2  Mr. Schelberg.
3         There was, in the flurry of e-mail
4  yesterday, the defense raised by Evan
5  with respect to the ability of The New
6  York Times to speak with Mr. Schelberg
7  about fund business.  And as I said in a
8  conversation that we had subsequent to
9  that e-mail that we disagreed with that
10  view, but you made clear on the telephone
11  call that you weren't interested in
12  hearing it at that point in time.
13        But it is something that the
14  parties, I believe, are going to address
15  in all the various sanctions motions that
16  go back and forth.
17        MR. MILLER:  But first,
18  Mr. Richman should not be allowed to
19  use this witness as a means of
20  building an evidentiary case.  I
21  think, as a matter of law, he doesn't
22  have one.
23        But he should not use this
24  proceeding and this witness' testimony on
25  that extrinsic issue to the merits of

ARBITRATION - VOLUME VI

1
2  this case.
3         Mr. Richman propounded and
4  proffered an affidavit from Mr. Schelberg
5  and that affidavit related exclusively to
6  the issue that he's here to testify about
7  today.
8         There was no indication in that
9  affidavit and there was no indication in
10  any of the communications that I had with
11  Mr. Richman and in the conference call we
12  had with you yesterday afternoon that
13  this witness testimony today was going to
14  be about building a case for sanctions
15  against Mr. Schelberg or his law firm or
16  me.
17        Let me strongly suggest -- I need
18  to speak for Mr. Schelberg.  If the
19  Proskauer Rose law firm knew or thought
20  that Mr. Schelberg was going to be
21  testifying today as it related to a
22  sanctions motion, rest assured that
23  Mr. Schelberg would not be here and
24  certainly would not be here without
25  counsel.

ARBITRATION - VOLUME VI

1  ARBITRATION - VOLUME VI
2  MR. RICHMAN:  Let me eliminate
3  so we can avoid this issue.
4  MR. MILLER:  But this goes way
5  beyond the scope of the testimony
6  that Mr. Schelberg indicated he would
7  be focusing on and I believe you
8  understood was the purpose of the
9  testimony today.
10  MR. RICHMAN:  Let me just
11  respond to that because with a parade
12  of horrors that is coming down the
13  track is not really the case.
14  We are not filing a motion against
15  Neal Schelberg or the Proskauer Rose
16  firm.  We have absolutely zero intention
17  to do that.  Zero intention to do that.
18  Our beef is with The New York
19  Times.
20  And the fact of the matter is at
21  the last hearing, there was some of the
22  discovery taken very specifically that
23  was permitted to be taken with respect to
24  a sanctions motion that The New York
25  Times claims it's going to file against

1  ARBITRATION - VOLUME VI
2  the Fund with respect to discovery.
3  This is the same issue.  It doesn't
4  involve the Proskauer firm, it doesn't
5  involve Mr. Schelberg.  And, quite
6  frankly, I'm not asking -- we won't even
7  be asking that Mr. Miller be sanctioned
8  individually.
9  But we have a situation where there
10  is a -- obviously, been some very
11  difficult issues that have come up in the
12  course of discovery and this is one of
13  them.
14  We wouldn't be here today had -- we
15  just permitted Mr. Schelberg's affidavit
16  to come in.
17  ARBITRATOR IRVINGS:  Let me cut
18  this short.  I understand that
19  there's going to be potentially you
20  raised an issue of sanctions
21  regarding documents with Mr. Hayes.
22  That's within the context of this
23  case --
24  MR. RICHMAN:  Right.
25  ARBITRATOR IRVINGS:  -- and

1  ARBITRATION - VOLUME VI
2  evidence in this case.  And you can
3  make your arguments at the
4  appropriate time.
5  The allegation that there was no
6  violation of rules of ethics, quite
7  frankly, if you want to raise that, take
8  it to the board of Bar overseers.  But
9  that's not whether they should or
10  shouldn't have spoken to them yesterday.
11  Let's focus on why he was here, why he
12  was called and get to that.
13  You are free to raise the other
14  discovery sanctions in your closing
15  brief, but the Rule 4.2 issues, that's a
16  matter for the Bar overseers.
17  MR. RICHMAN:  But here's the
18  difference here, it relates very
19  specifically in attempt to change the
20  testimony with respect to
21  Mr. Schelberg and it relates very
22  specifically to discovery and the
23  conduct of this case.
24  And I respectfully disagree that it
25  doesn't.

1  ARBITRATION - VOLUME VI
2  It should not be addressed in this
3  case.
4  ARBITRATOR IRVINGS:  You are
5  free to ask about communication, but
6  I'm not going to go into a
7  broad-ranging detour.
8  MR. RICHMAN:  Okay.  I'll make
9  it very short.
10  ARBITRATOR IRVINGS:  Okay.
11  BY MR. RICHMAN:
12  Q    So yesterday, Mr. Schelberg, you
13  had some conversations with the Jones Day
14  firm?
15  MR. MILLER:  Objection.
16  Mr. Arbitrator, even as a relates
17  to conversations that I may have had with
18  Mr. Schelberg yesterday, I would submit
19  that that's not the purpose for which
20  he's testifying about today.
21  What Mr. Richman should ask him
22  about is facts that relate to the
23  October 11, 2011 trustee meeting and
24  Mr. Hayes.  That's what his affidavit was
25  all about.  The affidavit that the Fund

ARBITRATION - VOLUME VI

1  indicated if it went into evidence,
2  Mr. Schelberg wouldn't even be here.
3      So that's the issue that needs to
4  be -- for which live testimony needs to
5  be taken and that issue only.
6      ARBITRATOR IRVINGS:  To the
7  extent that reflecting on our
8  discussions yesterday there are
9  questions about when that testimony
10  changed from the affidavit, this is a
11  fair grounds for inquiry.
12      Go ahead.
13  BY MR. RICHMAN:
14      Q    Mr. Schelberg, so you had
15  discussions with Jones Day yesterday?
16      A    Yes.
17      Q    With whom did you have discussions?
18      A    With Evan.
19      Q    And how long were those
20  discussions?
21      A    Brief.
22      Q    And what was the nature of those
23  discussions?
24      A    We talked about today's hearing.

ARBITRATION - VOLUME VI

1  Really, it was about logistics, what time I
2  should be here.  Those kinds of things.
3      Q    Did you have any discussion with
4  Mr. Miller or anyone else from Jones Day
5  with respect to what you might provide in an
6  affidavit in connection with this hearing?
7      A    A proposed affidavit was sent to
8  me.
9      Q    By Mr. Miller?
10      A    Correct.
11      Q    And what was the nature of the
12  proposed affidavit?
13      A    I didn't really go through it
14  because I knew my testimony would be here.
15  I scanned it, but I didn't get to it in
16  detail.
17      Relate my quick -- my quick review
18  of it related to the trustee's meeting that
19  is apparently in question, the
20  October 11th meeting, and how that meeting
21  was conducted, you know, kind of just
22  confined to that.
23      But again, I must tell you I looked
24  at it very quickly because I knew I had to

ARBITRATION - VOLUME VI

1  be here, so I wasn't really focused on the
2  affidavit.
3      Q    Okay.
4      But before Mr. Miller sent you the
5  affidavit, you had a discussion with him
6  about the contents of what was going to be
7  in the affidavit, correct?
8      A    We talked about issues relating to
9  the way the meeting was conducted, you know,
10  whether those discussions led to the
11  affidavit and whether all the material terms
12  of that discussion were in the affidavit,
13  that, I can't tell you about.
14      But yes, we did have a general
15  discussion about how meetings were conducted
16  on the Drivers' funds.
17      MR. RICHMAN:  I'm going to move
18  on from here.  I think I have enough.
19      ARBITRATOR IRVINGS:  Okay.
20  BY MR. RICHMAN:
21      Q    So let's focus on the
22  October 11th meeting.
23      Now, we do have -- I'm sorry,
24  before we actually focus on the meeting, I

ARBITRATION - VOLUME VI

1  just want to talk about how minutes were
2  taken, the process that went through to go
3  from the board meeting to final approval
4  minutes.
5      So you attended board meetings?
6      A    Yes, I did.
7      Q    And when you attended board
8  meetings, what was the purpose for you being
9  there?
10      A    I was serving as counsel to the
11  trust, so I was there to serve in that
12  capacity, give advice on issues that arose
13  during the course of the meeting.
14      Q    Okay.
15      And was there somebody who attended
16  the meetings -- and I'm focused on the
17  Pension Fund meetings -- was there someone
18  who attended the meetings who took notes to
19  prepare the minutes?
20      A    Well, we had someone who prepared
21  the minutes.
22      Q    Who was that?
23      A    John Urbank, U-R-B-A-N-K, at the
24  Segal Company.

ARBITRATION - VOLUME VI

Q    And so did Mr. Urbank take notes at the meeting?

A    Correct.

Q    Okay.

And what was your involvement in the process of creating minutes from the meeting?

A    The process that we followed was that John Urbank would actually prepare a draft set of minutes.

The minutes would be sent to myself and to the then director of the Fund, Murray Schwartz.

Murray and I would then schedule a time after he and I individually reviewed the proposed draft and we would go through the minutes.

Q    So when you say "schedule a time," was that actually a meeting or a telephone conference?

A    No.  Murray and I would pick some, you know, evening, always happened around 6:00, I always wanted to get home and Murray would keep me on the phone for a long time,

ARBITRATION - VOLUME VI

but that's okay.

And we would spend an hour or so going through the minutes, Murray had his comments, I had my comments.  I would incorporate our comments and send that draft to my co-counsel for their review.

Co-counsel would then review the minutes.  They might have some changes, they might accept it as is and we would work towards finalizing the minutes, send it back to John.  John would then present it at the next meeting that followed.

Q    Okay.

Let me see if we can expedite this.

MR. RICHMAN:  Could you show him the October 11th.  It's in the yellow book.

BY MR. RICHMAN:

Q    Got it?

A    Yes.

Q    Okay.

So am I correct that you stated that you would spend an hour or two with Murray on the phone to discuss the minutes?

ARBITRATION - VOLUME VI

A    Yeah, depending upon the length of the minutes, the details that we needed to go through, some issues more complicated, maybe they weren't stated properly.  That kind of thing.  So there was no hard and fast rule, but with Murray, they were always long conversations.

Q    Okay.  All right.

And I'm sorry, you said that you sent it to co-counsel?

A    Correct.

Q    Who was the co-counsel at the time of the October 11, 2011 meeting?

A    It's indicated in the minutes under Present.

It was Warren Mangan, as well as Elizabeth O'Leary.

Q    Okay.  And what was Mr. Mangan's role?

A    I often ask myself that question, but he was designated as the Union trustee co-counsel.  And Elizabeth functioned, I suppose, as Plan counsel.

Q    Okay.

ARBITRATION - VOLUME VI

So at this time with respect to this meeting, would you have gone through the process that you described?

A    I would think so, yes.

Q    Do you have any reason to believe that you wouldn't have gone through that process?

A    I mean, that was the typical process that we followed.  And I would have no reason to believe that we didn't follow it.  I couldn't tell you for a fact we did, but I would think we would follow that process.

Q    And would you receive comments from co-counsel on a regular basis?

A    Yeah, yeah.

Q    And so who incorporated those comments?

A    Typically, it would be me because, you know, I was the one who had the conversation with the director and Murray was very meticulous about minutes and always had lots of comments, so I kind of had the master draft.

ARBITRATION - VOLUME VI

1
2      But, you know, it would depend,
3  depend upon the nature of the issues.  Maybe
4  Elizabeth was more hands-on in a particular
5  issues so maybe she would have done it.
6      But they followed my lead, for the
7  most part.
8      Q    Okay.
9      So if you incorporated the
10  comments, what would you then do?
11      (Mr. Zomper enters the room.)
12      A    I would incorporate the comments
13  from co-counsel, produce a final draft, give
14  everyone the opportunity to have one final
15  review of it.
16      If I received no further comments,
17  I would then send them to John Urbank, who
18  would actually present it at the next
19  meeting as the minutes of the preceding
20  meeting.
21      Q    And when you say "present it to
22  everyone," who is included in the
23  "everyone"?
24      A    "Everyone" would have been all of
25  the trustees and to the director, Murray.

ARBITRATION - VOLUME VI

1
2      Q    And did you also send it to
3  co-counsel?
4      A    Yeah, it would have been sent to
5  all co-counsel and to the trustees and to
6  the director.
7      Q    And did you generally receive
8  comments back from the trustees with respect
9  to the minutes?
10      A    If we did, it was at the meeting
11  itself, so we typically did not get comments
12  before the meeting.  It could happen.
13      More often than not, the trustees,
14  you know, spent a fair amount of time going
15  through the minutes before the meeting and
16  they came to the meeting and they could
17  raise issues at the meeting.
18      Q    If there were an issue raised at
19  the meeting, the next meeting about the
20  preceding meeting's minutes, would that be
21  reflected in the minutes of the next
22  meeting?
23      A    We could do it either one of two
24  ways and it depended upon the nature of the
25  comment.  If there was a typo or something

ARBITRATION - VOLUME VI

1
2  like that, we would just correct it and then
3  republish the minutes of the preceding
4  meeting.
5      Q    Right.
6      A    If it was a comment that was more
7  substantive in nature, what we would do is
8  we would -- in the minutes of the meeting
9  that we were at, we would reflect that the
10  minutes of the preceding meeting, there was
11  further discussion and either it was not
12  stated properly or there was some other
13  iteration or some other comment, so it would
14  be reflected in the next meeting.
15      Q    Do you recall any conversations
16  with respect to this October 11, 2011
17  minutes during the minute creation process?
18      A    I would say this to you.
19      Since October 11, 2011, I probably
20  have attended 500 meetings.
21      Q    So you don't remember this one?
22      A    This doesn't jump off page.
23      Q    Okay.
24      A    So, you know, we typically got
25  comments because, again, that was Murray.

ARBITRATION - VOLUME VI

1
2  And it could be as simple as we started -- I
3  see the meeting was called at 10:30, maybe
4  Murray would call me and say, no, the
5  meeting started at 10:27, so we would change
6  it, pretty meticulous, but I have no
7  recollection.
8      Q    Okay.
9      Are you familiar with the voting
10  requirements of the Trust Agreement of this
11  Pension Fund?
12      A    I represent a lot of funds.  I
13  can't tell you that I have it memorized, but
14  I have a general sense of it.
15      Q    And do you know whether there is a
16  quorum requirement?
17      A    I believe there is.
18      Q    Do you know what it is?
19      A    Off the top of my head, I can't
20  tell you, it would either have been one and
21  one or two and two.
22      One employer trustee/one Union
23  trustee, or two employer trustees and two
24  Union trustees.
25      Q    In terms of when you attended,

ARBITRATION - VOLUME VI

1
2  let's say, the Pension Fund meetings,
3  whatever issues that arose with respect to
4  the quorum requirement?
5      A    Could you restate?  You are asking
6  whether there were --
7      Q    Issues that arose with respect to
8  the quorum requirement?
9      A    An issue would only arise if there
10 was some question whether there was a quorum
11 or not.  And I can't tell you.  I'm not
12 following.  Are you asking specifically at
13 this meeting?
14     Q    No, no.  Just generally.
15     A    You know, I'd go around the room
16 before the meeting starts and I kind of make
17 a mental check to make sure we have enough
18 trustees to convene a meeting.
19         If we don't, we will state it
20 because then the actions we take at that
21 meeting, since the meeting was not duly
22 constituted, raises some questions as to
23 whether we've convened a meeting.
24         So I kind of have a mental check
25 when I go around to see who is in the room.

ARBITRATION - VOLUME VI

1
2      Q    Okay.
3         Do you know whether you did it for
4  this meeting?
5      A    I think it -- I'm not sure --
6      Q    Do you want to take a minute and
7  look at the minutes?
8      A    I'm just not remembering whether we
9  noted that there was a quorum or I can just
10 see by the people who were here, this
11 constituted -- the four individuals here
12 constituted the full board of trustees, so
13 I'm going to assume we had a quorum based
14 upon just --
15         MR. MILLER:  Mr. Arbitrator,
16 objection.  He's just speculating at
17 this point.  He has no recollection.
18         ARBITRATOR IRVINGS:  Okay.
19 What's the question, please, exactly?
20         MR. RICHMAN:  I asked if he had
21 any recollection of any quorum issue
22 arising out of this meeting.
23         MR. MILLER:  Yes or no?
24         MR. RICHMAN:  He can't say yes
25 or no.

ARBITRATION - VOLUME VI

1
2      A    Again, you are asking me to go back
3  to a particular meeting that I attended
4  almost exactly four years ago.  And asked me
5  whether there was a quorum at this meeting,
6  whether there was any discussion whether
7  there was a quorum.  I have no recollection
8  whether that is so or not.
9      Q    Okay.
10         Do you know whether, under the
11 Trust Agreement, a trustee can give his
12 proxy --
13     A    I believe there is a proxy.
14     Q    Sorry, you have to let me finish.
15     A    I'm sorry.
16     Q    -- his proxy to another trustee to
17 vote?
18     A    I believe there's a proxy provision
19 and I believe it allows proxies to be given
20 to another trustee.
21     Q    Okay.
22         Do you know whether in this
23 October 11, 2011 meeting any of the trustees
24 gave a proxy to any of the other trustees?
25     A    I have no recollection.

ARBITRATION - VOLUME VI

1
2      Q    And if that did occur, would that
3  be in the minutes?
4      A    I would hope it would be in the
5  minutes.
6      Q    And just incidentally, I said proxy
7  to any of the other trustees.
8         Is there a mechanism for a trustee
9  to give a proxy to somebody who is not a
10 trustee?
11     A    I don't have the Trust memorized.
12         If you want to give me a copy of
13 the Trust, I might be able to answer your
14 questions.
15         MR. MILLER:  The Trust speaks
16 for itself.  Either allow it or not.
17 We're all lawyers, we can interpret
18 the Trust.
19         ARBITRATOR IRVINGS:  Thank you.
20 What's your response?
21         MR. RICHMAN:  The response is
22 we are all lawyers, we can read the
23 Trust and -- but if it will refresh
24 the witness' recollection, I think he
25 should look at it.

1         ARBITRATION - VOLUME VI
2         ARBITRATOR IRVINGS:  And you
3    are saying it would refresh his
4    recollection as to whether there was
5    a proxy given or you can --
6         MR. RICHMAN:  Well, I wanted
7    to -- look, yes, we're all lawyers
8    and we can argue what the Trust
9    means.  But we have with us Fund
10   counsel, or one of the Fund counsel.
11        ARBITRATOR IRVINGS:  Show him
12   if his refreshes his recollection.
13        MR. RICHMAN:  It's going to
14   take two seconds, shorter than this
15   discussion.
16   BY MR. RICHMAN:
17        Q    Forty-seven in the red book.
18   Yeah, take a look at Voter Trustee
19   6.4, on Page 28, which is FUND-2304.
20        A    If I may, may I just read it?
21        ARBITRATOR IRVINGS:  Yes.
22        Q    Yeah, read it.  You don't have to
23   read it out loud.
24        MR. MILLER:  Read to yourself.
25        A    Okay.

1         ARBITRATION - VOLUME VI
2    Q    Okay.
3         So is it correct to say that the
4    proxy can only be given by a trustee to
5    another trustee?
6    A    I'm looking --
7    Q    Look at C.
8    A    Okay.
9         MR. MILLER:  It says what it
10   says.
11        But I think the question here was
12   Mr. Schelberg was going to look at the
13   document and see if it refreshed his
14   recollection, so let's ask that.
15   A    Okay.  I can answer the question,
16   if you want.
17   Q    Please.
18   A    The Trust Agreement provides that a
19   proxy can be issued to -- if it's an
20   employer trustee, to another employer
21   trustee; if it's a Union trustee, to another
22   Union trustee, as the case may be.
23   Q    And it needs to be in writing,
24   correct?
25   A    It needs to be in writing.

1         ARBITRATION - VOLUME VI
2    Q    Let me show you this affidavit.
3         MR. MILLER:  Objection.
4         The whole reason that Mr. Schelberg
5    is here today is to obviate the
6    discussion of and submission into
7    evidence of this affidavit.
8         If he wants to ask him questions,
9    let him ask questions.
10        MR. RICHMAN:  I'll ask him
11   questions.
12   BY MR. RICHMAN:
13        Q    So, Mr. Schelberg, the October 11,
14   2011 final minutes incorporated your
15   comments, correct?
16        A    I believe so, yes.
17        Q    Okay.
18        Do you have any recollection of
19   Mr. Hayes -- and you know who Mr. Hayes is?
20        A    Yes.
21        Q    -- giving his vote of proxy to
22   another trustee in connection with the
23   October 11, 2011 meeting?
24        A    I have no recollection.
25        Q    Sorry.  Just bear with me one

1         ARBITRATION - VOLUME VI
2    second.
3         So why don't we take a look at the
4    October 11th minutes.  And there are
5    several places in the minutes.  The first
6    place, I think, if you take a look at the
7    third page of the minutes.  That's the one
8    on the top that says "Page 3" and starts
9    with an "H."
10        And you see a motion made with
11   respect to Quan-Vest?
12   A    Correct.
13   Q    Second, they unanimously adopted.
14        And then there's a second motion
15   with respect to Quan-Vest, right?
16   A    Right.
17   Q    And in order for those motions to
18   be seconded and unanimously adopted, there
19   would need to be a quorum; is that correct?
20   A    Under the terms of the Trust, yes.
21   Q    Now, let's go to Page 5 of the
22   minutes, please.
23        And looking at -- if you look in
24   Roman Numeral IX C in the middle of the
25   page.

ARBITRATION - VOLUME VI

1  
2     Do you see that?
3        MR. MILLER:  We have a redacted
4  version.  And you've asked him about
5  a portion of the minutes that have
6  been redacted in connection with this
7  case.
8        MR. RICHMAN:  Well, I would
9  like to show the witness an
10  unredacted version.
11        ARBITRATOR IRVINGS:  No.
12        MR. MILLER:  No.
13  BY MR. RICHMAN:
14     Q    If there were motions made during
15  this meeting that indicate that they were
16  seconded and unanimously adopted, those
17  motions would be to meet the quorum
18  requirement, correct?
19     A    Yes.
20     Q    Okay.  Let's skip the redaction.
21        MR. RICHMAN:  Well I just
22  need to take a minute or two.
23        ARBITRATOR IRVINGS:  Okay.
24  Great.
25        (A brief recess was

ARBITRATION - VOLUME VI

1  
2  taken.)
3  BY MR. RICHMAN:
4     Q    In connection with the October 11,
5  2011 Pension Fund meeting, do you have or
6  did you ever see a written proxy from any of
7  the trustees giving their vote to another
8  trustee?
9     A    No, I did not.
10     Q    Is that something you would have
11  seen?
12     A    I would think that if there was a
13  proxy, I would have seen it, yes.
14     Q    With respect to -- turn to Page 4
15  of the minutes, please.
16        And you see Roman Numeral VIII is
17  the Segal report.
18        Do you see that?
19     A    Yes.
20     Q    And in A, there is a reference to
21  withdrawal liability determination for
22  El Diario.
23        Do you see that?
24     A    Yes, I see that.
25     Q    Do you recall any of that

ARBITRATION - VOLUME VI

1  
2  discussion?
3     A    Not specifically.
4        I knew El Diario was a contributing
5  employer, but I don't have any specific
6  recollection of this.
7     Q    Okay.
8        Did you provide any input into the
9  discussion with respect to what a partial
10  withdrawal was?
11        MR. MILLER:  Objection.
12        He just testified he doesn't
13  remember any.
14        MR. RICHMAN:  I'm working on
15  his memory here.
16        MR. MILLER:  Go ahead.
17     A    You know, if there was a discussion
18  at the meeting, I probably participated in
19  that discussion.
20     Q    Well, is there any doubt that there
21  was a discussion at the meeting?
22     A    No, no, it says there was.
23        MR. RICHMAN:  I have no further
24  questions.
25        MR. MILLER:  Give us a couple

ARBITRATION - VOLUME VI

1  
2  of minutes.
3        ARBITRATOR IRVINGS:  Certainly.
4        (A brief recess was
5  taken.)
6        CROSS EXAMINATION BY MR. MILLER:
7     Q    Mr. Schelberg, I think in
8  connection with your direct testimony, you
9  testified that you had no recollection of
10  Terry Hayes giving his vote to another
11  trustee by proxy during the October 11th
12  meeting.
13        Do you remember that testimony?
14     A    Yes.
15     Q    But am I correct that you have no
16  recollection, one way or the other, as to
17  whether Mr. Hayes gave a proxy?
18     A    Correct.
19     Q    Can you recall any occasion in
20  which a trustee gave his proxy to another
21  trustee in connection with a trustee vote on
22  an agenda item?
23     A    May I ask a question?
24        Do you mean with respect to the
25  driver's fund or just generally or --

ARBITRATION - VOLUME VI

1
2  Q   My question related to the NMDU
3  Fund.
4     A   Okay.
5     I honestly cannot recall a time
6  where there was a proxy given.  I just don't
7  remember it.  It doesn't happen that often
8  and I just don't remember whether it ever
9  happened on the Fund.  I just don't recall.
10    Q   Do you recall whether there have
11 been occasions in which trustees of the NMDU
12 Fund arrive to meetings late or leave
13 meetings early?
14    A   Yes, they do.
15    Q   In a circumstance in which a
16 trustee needs to leave a meeting early, have
17 there been occasions in which the trustee
18 advises the Fund director of that fact, and
19 as a consequence, the sequence of
20 consideration of agenda items is changed in
21 order to ensure that they vote on an item
22 occurs while a quorum of trustees remain?
23    A   Yes.
24    Q   Let me draw your attention back to
25 Exhibit 140.

ARBITRATION - VOLUME VI

1
2     A   Yes.
3     Q   Those are the minutes of the
4  October 11th.
5     A   Okay.
6     Q   And why don't you turn your
7  attention to Page 5.
8     A   Okay.
9     Q   And Item Roman X, which is entitled
10 Fund Office.
11    And you'll see under Item X, it
12 indicates that, "A motion was made and
13 unanimously approved at this October 11th
14 meeting to approve a 3 percent wage increase
15 to Fund office personnel."
16    Do you see that?
17    A   Yes, I do.
18    Q   Is this an example of the kind of
19 agenda item that would be of sufficient
20 importance to the Fund director so that if a
21 trustee needed to leave a meeting early, the
22 Fund director would change the order of the
23 agenda items to ensure that this issue was
24 taken up before the trustee had to leave?
25    MR. RICHMAN:  Objection.

ARBITRATION - VOLUME VI

1
2     ARBITRATOR IRVINGS:  You're
3  asking him to speculate on what was
4  in Mr. Schwartz's mind?
5     MR. MILLER:  I'll withdraw the
6  question.
7     ARBITRATOR IRVINGS:  Thank you.
8  BY MR. MILLER:
9     Q   In instances in which trustees left
10 early, and as a consequence, the agenda
11 items had their sequence changed in order to
12 cast a vote while a quorum of trustees
13 remained present, would the minutes
14 necessarily have reflected that change in
15 the sequence of agenda items?
16    A   Probably not.
17    Q   I think you were asked a couple of
18 questions on direct about trustee review of
19 minutes of meetings.
20    You don't know whether in the
21 extent particular trustees actually reviewed
22 any particular set of minutes, do you?
23    A   No.
24    Q   There were several questions that
25 Mr. Richman asked you about the quorum rules

ARBITRATION - VOLUME VI

1
2  for the NMDU Fund.
3     Can you say for certain that in
4  connection with all votes at all trustee
5  meetings of the NMDU funds, the quorum rules
6  were satisfied?
7     A   I can't say that with certainty.  I
8  would hope they were, but I can't say that
9  for certainty.
10    Q   Okay.
11    MR. MILLER:  Give us a couple
12 of minutes.  It really will be just a
13 couple of minutes to see if I have
14 any further questions.
15    MR. RICHMAN:  All right.
16    MR. MILLER:  I have no
17 additional questions.
18    MR. RICHMAN:  I do.  Just a
19 couple of questions.
20    REDIRECT EXAMINATION BY MR. RICHMAN:
21    Q   So, Mr. Schelberg, when you get the
22 minutes from Mr. Urbank, right, do they go
23 in the order of the agenda or do they go in
24 the order of the meeting?
25    A   Murray was very meticulous and he

ARBITRATION - VOLUME VI

1 would match up the minutes with the agenda.
2 So, you know, Item Number 1 on the agenda
3 would be Item Number 1.  Item Number 2 would
4 be Number 2 and we followed all the way
5 through.
6     Q    When you do -- if you look at X,
7 where it says, "Poll vote, 3177," number on
8 the bottom.
9         What's a "poll vote"?
10     A    What would happen is between
11 regularly-scheduled meetings, if there was
12 some item that needed to be considered by
13 the board, what Murray would do is, he would
14 call the trustees and poll them, speak to
15 them and orally get their vote.
16         And then at the next
17 regularly-scheduled trustees' meeting, he
18 would state it as another agenda item and
19 note that the poll vote that occurred
20 between the regularly-scheduled meetings
21 would then be presented and it would then be
22 ratified by the trustees at that meeting.
23     Q    And that's to make sure the Trust
24 Agreement procedures were followed?
25

ARBITRATION - VOLUME VI

1     A    Well, two things:  Number 1, yes.
2         And then Number 2, to ensure that
3 it's then recorded in the minutes,
4 otherwise, it would not have gotten into the
5 minutes.
6         MR. RICHMAN:  I have no further
7 questions.
8         MR. MILLER:  No further
9 questions.
10         MR. RICHMAN:  All right.  You
11 are free to go.
12         MR. MILLER:  Thank you.
13         (A brief recess was
14 taken.)
15     FURTHER CROSS EXAMINATION:
16     Q    Good morning, Mr. Urbank.
17     A    Good morning.
18     Q    So I'm going to divide the
19 questioning this morning into two parts.
20         The first, we'll just, essentially,
21 take up where we left off in the prior
22 cross-examination and we'll be focusing on
23 documents primarily, not exclusively, in
24 this white binder.
25

ARBITRATION - VOLUME VI

1         And then for the second part, I'll
2 be discussing with you various documents in
3 the yellow binder and, more particularly,
4 minutes of trustee meetings and exhibits
5 thereto.
6         So with that as a background, let's
7 dive in and let's begin by reviewing your
8 prior direct testimony.
9         And I believe that you have a
10 transcript of your prior direct testimony in
11 front of you.
12         MR. RICHMAN:  Why are we doing
13 this?
14         MR. MILLER:  It's
15 cross-examination.
16         ARBITRATOR IRVINGS:  Go ahead.
17 BY MR. MILLER:
18     Q    So I would like to draw your
19 attention to Page 451 of the transcript.
20         Are you there?
21     A    Yes.
22     Q    Good.
23         And what I would like you to do is
24 to read the questions and answers that you
25

ARBITRATION - VOLUME VI

1 gave in connection with your direct
2 testimony that begin on Page 451 at Line 17
3 and go down to Page 452 at Line 11.
4         Okay.  So why don't you do that.
5     A    Out loud?
6     Q    Please.
7         ARBITRATOR IRVINGS:  Why are we
8 doing that?
9         MR. MILLER:  It's foundational.
10 I'm then going to ask him about that
11 testimony.  It's cross-examination.
12         ARBITRATOR IRVINGS:  Well, I
13 don't mind you asking him about his
14 testimony.  I have a philosophical
15 issue about people reading aloud.
16         MR. MILLER:  Okay.  That's,
17 essentially, for your convenience
18 because you don't have the document.
19         I'll give it to you.
20     Q    Okay.  Go ahead, why don't you just
21 read.
22     A    From 17 to where?
23     Q    From 17 to Line 11 on 452.
24     A    Okay.

ARBITRATION - VOLUME VI

1
2  Q    Okay.
3        So is it still your testimony that
4  the basis for your view that CBU's shifts is
5  that you were advised by the Fund office
6  that that's how the Fund was receiving its
7  contributions from contributing employers?
8  A    Yes.
9  Q    So just to clarify, the basis for
10 your view that CBU's shifts is that the Fund
11 received its contributions from the
12 employers on the basis of shifts, correct?
13 A    Yes.
14 Q    What if a contributor to the Fund
15 compensates its employees based not on
16 shifts, but on a different method?
17       For example, what if an employer
18 that contributes to the Fund compensates its
19 employees based on salary?  In such a case,
20 how would you compute whether that
21 contributor has 70 percent decline for
22 partial withdrawal purposes?
23       MR. RICHMAN:  Objection.
24 He's a fact witness.  He's not
25 providing opinion about how to do

ARBITRATION - VOLUME VI

1
2  something.
3        I don't understand the
4  hypothetical.  Why he's being asked
5  hypothetical questions.
6        MR. MILLER:  Well, first,
7  there's been testimony in the record
8  that some of or at least one of the
9  contributing employers here, in fact,
10 compensates its employees not based
11 on shifts, but based on salary.
12       And so relying upon that, I want to
13 ask questions that go to the
14 reasonableness and the legitimacy of the
15 position that shifts are CBUs, which is
16 at the heart of the matter here.
17       MR. RICHMAN:  And we're also
18 missing a foundation question about
19 whether he does this.
20       MR. MILLER:  I'm sorry, I used
21 the wrong verb.
22       As you know, there's been some
23 testimony that employers compensate their
24 employees based on salary.  They receive
25 a salary.  And that they then contribute

ARBITRATION - VOLUME VI

1
2  to the Fund based on salary.
3        ARBITRATOR IRVINGS:  Okay.
4        But there was a foundation
5  objection raised, which is legitimate.
6        So do you want to deal with the
7  foundation as to whether he does the
8  calculations?
9        MR. MILLER:  Okay.
10 BY MR. MILLER:
11 Q    Do you perform withdrawal liability
12 calculations in connection with your work or
13 did you perform withdrawal liability
14 calculations in connection with your work
15 for the Pension Fund?
16 A    No.
17 Q    Those calculations were performed
18 by your colleague, Ms. Egan, correct?
19 A    If requested.
20 Q    If requested.
21       And -- but it was your pattern and
22 practice to review those calculations and
23 present those calculations to the client,
24 the Fund, correct?
25 A    I reviewed the correspondence, too.

ARBITRATION - VOLUME VI

1
2  I didn't review the actual calculation, the
3  mathematical determinations.
4  Q    Would you present the calculation
5  findings to the Fund?
6  A    Yes.
7  Q    So, therefore, you have familiarity
8  with the general rules in which withdrawal
9  liability calculations are made, correct?
10       MR. RICHMAN:  Objection.
11 And the issue of "you present."
12       MR. MILLER:  Well, he answered
13 the question.
14       MR. RICHMAN:  Well, the problem
15 is the "you."
16       Who is the "you" in this?
17       And he also didn't testify with
18 regard -- to make the jump of the
19 familiarity.
20       If you want to ask him base
21 questions about how familiar he is with,
22 you can ask that, although I'm going to
23 object on the ground that if he didn't
24 perform the calculations, why are we
25 asking with respect to this fund, he

Page 1216

ARBITRATION - VOLUME VI

1   ARBITRATION - VOLUME VI
2   shouldn't be asked questions about.
3        ARBITRATOR IRVINGS:  Taking it
4   one at a time.
5        I interpreted "you" as him
6   personally, not the royal "you."
7        MR. MILLER:  And that's the
8   intent of the question.
9        ARBITRATOR IRVINGS:  Okay.  So
10  let's start with that.
11       Just to clarify, did you personally
12  present calculations to the Fund to the
13  trustees?
14       THE WITNESS:  No.
15       ARBITRATOR IRVINGS:  You did
16  not?
17       THE WITNESS:  Presented the
18  correspondence to them.  I don't
19  recall actually presenting a partial
20  withdrawal liability calculation to
21  the trustees personally.
22  BY MR. MILLER:
23       Q    Nonetheless, are you generally
24  familiar with the rules that govern
25  calculation of complete withdrawal and

Page 1217

ARBITRATION - VOLUME VI

1   ARBITRATION - VOLUME VI
2   partial withdrawal?
3        A    I understand, yes.
4        Q    And you have been present at NMDU
5   Fund meetings in which your colleagues
6   discussed withdrawal liability calculations
7   that they made at the request of the Fund,
8   correct?
9        A    Yes.
10       MR. MILLER:  So,
11  Mr. Arbitrator, I think that he has a
12  sufficient background to be asked his
13  view on how the fact that one of the
14  employers both compensated and made
15  contributions to the Fund based on
16  salary comports with his position
17  about what constitutes contribution
18  base units.
19       MR. RICHMAN:  Which employer
20  are you speaking about?
21       MR. MILLER:  The Union.  There
22  was testimony about that.  Union
23  employees.
24       MR. RICHMAN:  Is the Union
25  subject to the Collective Bargaining

Page 1218

ARBITRATION - VOLUME VI

1   ARBITRATION - VOLUME VI
2   Agreement?
3        MR. MILLER:  The point is that
4   there's been testimony that the Union
5   compensates its own employees on a
6   salaried basis and makes
7   contributions on a salaried basis.
8        I would like to ask this witness
9   how that fact squares with his
10  assumption.
11       ARBITRATOR IRVINGS:  You can
12  ask him about factual questions.
13  He's not here as an expert.
14       MR. MILLER:  Okay.
15  BY MR. MILLER:
16       Q    So it is the case that during the
17  course of the engagement that Segal had with
18  this fund, that Segal did calculate
19  withdrawal liability both for withdrawing
20  employers and in connection with requests
21  for estimates, right?
22       A    Yes.
23       Q    And in connection with those
24  efforts, you would routinely ask
25  Mr. Schwartz and the Fund office for certain

Page 1219

ARBITRATION - VOLUME VI

1   ARBITRATION - VOLUME VI
2   data that allowed the Segal team to prepare
3   the calculation, correct?
4        A    Yes.
5        Q    And typically, you would ask for
6   that information in the form of a written
7   letter, correct?
8        A    Yes.
9        Q    Draw your attention to the white
10  book.
11       Why don't you take a look at
12  Exhibit 15.
13       MR. RICHMAN:  Exhibit?
14       MR. MILLER:  15.
15  BY MR. MILLER:
16       Q    So you'll see that Exhibit 15 is a
17  letter dated March 11, 2009 from you to
18  Mr. Schwartz in connection with a request
19  for a calculation of withdrawal liability.
20       Do you see that?
21       A    Yes.
22       Q    Did you write this letter?
23       A    Yes.
24       Q    And did you, in fact, request this
25  data?

ARBITRATION - VOLUME VI
1
2   A   Yes.
3   Q   And you'll note in the second
4   paragraph under 2, there's a reference to
5   hours.  It says, "Shifts/hours"?
6   A   Uh-huh.
7   Q   Was information about hours
8   relevant to calculation of NMDU Fund
9   withdrawal liability?
10      MR. RICHMAN:  Mr. Arbitrator, I
11  object to this line of questioning.
12      This is documents that not only did
13  The New York Times have, but they all
14  asked these questions before on
15  cross-examination.
16      MR. MILLER:  The prior
17  cross-examination was aborted on
18  finishing, as I indicated, right at
19  the outset.  I'm finishing that
20  cross-examination and then I'm going
21  to move on to the supplemental
22  documents.
23      And, frankly, I don't have much
24  more on cross.
25      ARBITRATOR IRVINGS:  Go ahead.

ARBITRATION - VOLUME VI
1
2       MR. RICHMAN:  Okay.  I just
3   want to note for the record that
4   specific question was asked before.
5       ARBITRATOR IRVINGS:  Do you
6   want to reask it?
7       THE WITNESS:  Thank you.
8   BY MR. MILLER:
9   Q   Was information about hours
10  relevant to calculation of NMDU Fund
11  withdrawal liability?
12  A   There is, in the Plan document,
13  reference to hours for purposes of pension
14  credit for non-work events, such as
15  vacation.
16      So my belief is that the reason
17  it's stated shifts and hours is because of
18  that.
19  Q   So in connection with this
20  March 11, 2009 request for data from the
21  Fund, did the Fund ever respond to you?
22  A   I don't know a hundred percent
23  certainty, but I would assume that they
24  would have --
25      MR. RICHMAN:  Objection.

ARBITRATION - VOLUME VI
1
2       You either know or you don't.
3   A   I don't know for certain that they
4   did.
5   Q   Do you recall if Segal ever
6   performed the withdrawal liability estimate
7   calculation that's referred to in this
8   letter?
9   A   No.
10  Q   No, you don't recall?
11  A   I don't recall if we specifically
12  did it for this request.
13  Q   Okay.
14      If the calculation had, in fact,
15  been prepared, would the calculation itself
16  and the worksheets relating to that
17  calculation be in Segal's files?
18  A   Yes.
19  Q   And you are aware that there was a
20  request for documents made to Segal
21  encompassing estimates prepared for The New
22  York Times, correct?
23  A   Yes.
24  Q   And do you have any reason to
25  believe that if the work had been performed

ARBITRATION - VOLUME VI
1
2   that's referred to in connection with this
3   letter -- strike that.  Let me ask it a
4   better way.
5       Do you have any reason to believe
6   that if the work relating to this letter
7   were in Segal's files, it would not have
8   been produced to The New York Times in this
9   case?
10  A   No.
11  Q   Now I want to draw your attention
12  to the yellow binder in Exhibit 135.
13      Exhibit 135 are minutes of a
14  September 24, 2010 trustees meeting.
15      And if you draw your attention to,
16  I think, it's Page 5 of the minutes, it's at
17  FUND-03147.  Roman numeral heading XI.
18      Do you see that there, New York
19  Times?
20  A   Yes.
21  Q   And it makes reference to an
22  Exhibit L, which is a Proskauer Rose
23  letter regarding New York Times request for
24  a withdrawal liability estimate.
25      Do you see that?

ARBITRATION - VOLUME VI

1
2    A    Yes.
3    Q    And why don't you turn a couple of
4    pages thereafter to FUND-03363.
5         And you'll see that there is an
6    August -- and that is an August 4, 2010
7    letter from Stephen Mogila of Proskauer Rose
8    to Murray Schwartz.
9         Do you see that letter?
10   A    Yes.
11   Q    Why don't you take a moment to read
12   the body of that letter to yourself.
13   A    I've read it.
14   Q    Okay.
15        So I take it that in connection
16   with preparation of withdrawal liability
17   estimates that Segal would make relating to
18   this Pension Fund, Segal would charge for
19   that service, correct?
20   A    The Fund would.
21   Q    Segal would charge the Fund?
22   A    The Fund would charge.
23   Q    The Fund would charge --
24   A    Charge the employer for the
25   calculation.

ARBITRATION - VOLUME VI

1
2    Q    Okay.
3         So if an employer made a request
4    for an estimate of withdrawal liability, the
5    Fund would charge the employer for a cost
6    relating to the preparation of such
7    estimate, correct?
8    A    Correct.
9    Q    And as set forth in this letter in
10   connection with a withdrawal liability
11   estimate that The New York Times requested,
12   the Fund, in turn, sought a $1,000 fee from
13   The Times to cover its costs for preparing
14   that estimate, correct?
15        MR. RICHMAN:  Objection.
16        You gotta start with has he seen
17   the letter before.
18        MR. MILLER:  I was asking
19   generally questions.  If you would
20   like --
21        MR. RICHMAN:  No, no.  You were
22   referencing the letter.
23        If you are going to reference the
24   letter and ask questions about the
25   letter, you gotta ask if he's ever seen

ARBITRATION - VOLUME VI

1
2    the letter.
3         MR. MILLER:  I have no problem
4    with that.
5    Q    Have you ever seen this letter
6    before?
7    A    It's part of the minutes.  I would
8    have saw it.
9    Q    And you testified that you
10   understood that the Fund did charge
11   employers a fee when those employers
12   requested a withdrawal liability
13   calculation, correct?
14   A    Yes.
15   Q    And do you recall generally the fee
16   amount that the Fund would request for
17   performing and calculating the estimate?
18   A    Thousand dollars.
19   Q    Do you have any reason to believe
20   that it was not a thousand dollars?
21   A    No.
22   Q    And this letter indicates and
23   attaches, in fact, a check from The New York
24   Times or from -- I'm sorry, it attaches a
25   check from the Mercer company, and as

ARBITRATION - VOLUME VI

1
2    indicated on the letter, that check is being
3    provided to the Fund on behalf of The Times.
4         Do you see that?
5    A    Yes.
6    Q    All right.
7         The letter goes on to say that
8    Mr. Mogila had reached out to you,
9    Mr. Urbank, and had instructed you to
10   prepare a withdrawal liability estimate for
11   The New York Times.
12        Do you see that sentence in the
13   letter?
14   A    Yes.
15   Q    Do you recall a conversation with
16   Mr. Mogila relating to a New York Times
17   estimate for withdrawal liability?
18   A    I don't.
19   Q    You'll note that the date of this
20   letter is August 4, 2010.
21        Do you recall whether Segal ever
22   prepared a withdrawal liability estimate on
23   behalf of The New York Times on or around
24   August of 2010?
25   A    I don't.

ARBITRATION - VOLUME VI

1
2      Q    If Segal had prepared an estimate
3  in 2010, would that be in Segal's files?
4      A    Yes.
5      Q    Do you have any reason to believe
6  that if the work had been performed and was
7  contained in Segal's files, it would not
8  have been produced in The New York Times in
9  this case?
10     A    It would have been produced to the
11 Fund.
12     Q    Do you know if The New York Times
13 ever received an estimate of withdrawal
14 liability based on the request and payment
15 that is referred to in this August 4, 2010
16 letter?
17     A    No.
18     Q    Now I need you to go back to the
19 white book.  And why don't you open up
20 Exhibit 17.
21         And why don't you take a moment and
22 familiarize yourself with this document.
23         Ready?
24     A    Yes.
25     Q    So this document is a memorandum

ARBITRATION - VOLUME VI

1
2  from you and your colleague, Ms. Egan, to
3  Murray Schwartz and it provides Mr. Schwartz
4  with a partial withdrawal liability
5  calculation for The New York Times, correct?
6      A    Yes.
7      Q    Did you prepare this memo or have a
8  hand in its preparation?
9      A    I prepared it with Ms. Egan.
10     Q    Did you discuss the withdrawal
11 liability results that are contained on
12 Page 2 of this memorandum with Mr. Schwartz?
13     A    I don't recall.
14     Q    And you'll note that on Page 2 of
15 this memorandum, it provides a calculation
16 both for a partial withdrawal and a complete
17 withdrawal amount.
18         Do you see that in the second
19 paragraph on Page 2?
20     A    Yes.
21     Q    And let me draw your attention back
22 to the first paragraph of this memorandum.
23         And why don't you read the second
24 sentence, the sentence that begins, "This
25 partial withdrawal calculation reflects ..."

ARBITRATION - VOLUME VI

1
2      A    "This partial withdrawal
3  calculation reflects that there was a
4  partial cessation of the employers'
5  obligation to contribute to the plan as of
6  January 2009 at City and Suburban."
7         MR. RICHMAN:  You can always
8  read to yourself.
9         MR. MILLER:  You can.
10        THE WITNESS:  I was doing it
11 for the stenographer.
12        MR. RICHMAN:  No, you don't
13 have to.
14     Q    The calculation that's contained --
15 or calculations that are contained in this
16 memorandum, these calculations were not
17 performed in response to a withdrawal
18 liability estimate from The New York Times,
19 correct?
20     A    I don't recall.
21     Q    So you don't know one way or the
22 other whether the Fund directed you to make
23 these calculations or they were in
24 connection with a request from The New York
25 Times?

ARBITRATION - VOLUME VI

1
2      A    The Fund would have requested it.
3      Q    But you don't know whether the
4  Fund's request was as a consequence of a
5  request by The New York Times for an
6  estimate?
7      A    No.
8      Q    You don't know one way or the
9  other?
10     A    No.
11     Q    And drawing attention, again, to
12 the second sentence in the first paragraph
13 which refers to City and Suburban.
14        Are you aware whether the partial
15 withdrawal liability calculation that was
16 requested by the Fund was in connection with
17 a potential 70 percent partial withdrawal or
18 another form of partial withdrawal?
19     A    I don't recall.
20     Q    All right.  Let's move from that
21 document to Exhibit 4 in the same binder.
22        And Exhibit 4 should be an
23 August 15, 2011 letter from Mitch Hofing to
24 Stephen Mogila.
25        I apologize, Mr. Urbank, before I

1          ARBITRATION - VOLUME VI
2    get into questions on Exhibit 4, which is
3    an August 15, 2011 letter, I want to,
4    again, point out to you the date of the
5    letter that we just went over, the letter
6    which is in Exhibit 17.
7          So take a look first at Exhibit 17
8    again and please make note of the date of
9    that memo, July 19, 2011.
10         Do you see that?
11    A    Yes.
12    Q    Okay.
13         And now let's turn to Exhibit 4,
14    which is, as you'll see, an August 15, 2011
15    letter.
16         So this letter in Exhibit 4 is
17    dated less than 30 days after the Segal
18    Company had provided its calculation of The
19    New York Times partial and complete
20    withdrawal liability, correct?
21    A    Yes.
22    Q    Why don't you take a moment to
23    familiarize yourself with the letter.
24         So you'll note that in Paragraph 1
25    of this letter, it indicates that The New

1          ARBITRATION - VOLUME VI
2    York Times is requesting an estimate of
3    withdrawal liability as if a complete
4    withdrawal had occurred during the most
5    recent Plan year.
6          And in Paragraph 2, it essentially
7    asked for backup worksheets in connection
8    with that complete withdrawal liability
9    calculation request.
10         Do you see that?
11    A    Yes.
12    Q    Have you ever seen this letter
13    before?
14    A    I don't recall.
15    Q    Did you ever receive a call from
16    Fund counsel or anyone else from the Fund in
17    the summer of 2011 about preparing a
18    response to a request from The New York
19    Times for withdrawal liability?
20    A    I don't recall.
21    Q    Now given that this letter came in
22    less than 30 days after Segal had prepared
23    and provided to the Fund a withdrawal
24    liability calculation relating to The New
25    York Times, isn't it the case that at the

1          ARBITRATION - VOLUME VI
2    time the Fund received this request, it
3    already had in its possession the
4    calculation that Segal had done the prior
5    month, correct?
6    A    I think so.
7    Q    Did you ever advise the Fund in the
8    summer of 2011 that it already had in its
9    possession the calculation that had been
10    undertaken and we discussed in Exhibit 17?
11    A    No.
12    Q    Do you know if Ms. Egan did?
13    A    I don't know.  I don't know.
14         ARBITRATOR IRVINGS:  Can you
15    keep your voice up a little bit,
16    please.
17         THE WITNESS:  Sure.
18         I don't know.
19    BY MR. MILLER:
20    Q    And again, you'll see in the second
21    numerated paragraph in this letter that they
22    ask for backup worksheets relating to a
23    calculation of The New York Times withdrawal
24    liability.
25         In connection with the calculation

1          ARBITRATION - VOLUME VI
2    that Segal performed and which is discussed
3    in the July 19, 2011 letter that we just
4    went over, I assume that there would have
5    been backup worksheets in connection with
6    that undertaking?
7          MR. RICHMAN:  I want to make a
8    general objection here and I raised
9    it before and we've now come back to
10    it.
11         These documents were all available
12    for cross of this witness.  There is no
13    new document that's being brought into
14    play here.  So is this a double --
15         MR. MILLER:  We didn't finish
16    the cross.  It's not more complicated
17    than that.
18         ARBITRATOR IRVINGS:  It was
19    terminated because it was an issue of
20    what additional documents were out
21    there.
22         MR. MILLER:  Exactly.
23         ARBITRATOR IRVINGS:  Go ahead.
24    BY MR. MILLER:
25    Q    So again, in connection with the

ARBITRATION - VOLUME VI

1
2   July calculation that we previously
3   discussed, Segal would, in its normal
4   course, maintain the backup worksheets for
5   such a calculation, correct?
6       A    Yes.
7       Q    Okay.
8           And those backup worksheets for the
9   July 2011 calculation would have been in
10  Segal's possession as of August 15, 2011,
11  correct?
12      A    Yes.
13      Q    And do you know of any reason why
14  those backup worksheets could not have been
15  promptly provided to the Fund in connection
16  with this August 15, 2011 request?
17      A    No.
18      Q    Do you know whether the backup
19  worksheets for the July calculation were
20  ever provided to the Fund?
21      A    No, we don't provide backup
22  worksheets.
23      Q    Do you know if the Fund ever
24  responded to the letter from James Dexter of
25  Dexter Hofing to Stephen Mogila dated

ARBITRATION - VOLUME VI

1
2   August 15, 2011?
3       A    No.
4       Q    Now I want to focus my questions on
5   the documents that's contained in the yellow
6   set.
7           But before I do, I want to get into
8   some foundational questions that will help,
9   hopefully, move the examination along.
10          Let me know when you are ready.
11      A    Ready.
12      Q    So you were the client relationship
13  manager for Segal in connection with the
14  NMDU Fund engagement, correct?
15      A    Yes.
16      Q    And you attended all the trustee
17  meetings during the term of Segal's
18  engagement by the Fund, correct?
19      A    I believe so.
20      Q    And among your responsibilities as
21  client relationship manager was to take
22  notes at meetings of the trustees and
23  prepare the initial draft of the trustee
24  minutes, correct?
25      A    Yes.

ARBITRATION - VOLUME VI

1
2       Q    And am I correct that once you
3   prepared the initial draft, you would then
4   send that draft to the Fund administrator
5   and to Mr. Schelberg as counsel to the Fund?
6       A    Yes.
7       Q    And you do so in order to obtain
8   their comments and edits, correct?
9       A    Yes.
10      Q    And am I correct that occasionally,
11  Proskauer Rose or, more particularly,
12  Mr. Schelberg, would edit your draft of the
13  minutes and save those edits in a new
14  document that would have a Proskauer Rose
15  document number on the bottom; is that
16  correct?
17      A    I don't know.
18      Q    But is it fair to say that
19  before -- strike that.
20          Once counsel and the Fund
21  administrator had made their suggested
22  changes and approved the draft of the
23  minutes with those changes, the practice was
24  then to send the minutes back to you,
25  correct?

ARBITRATION - VOLUME VI

1
2       A    Yes.
3       Q    And you, in turn, would then
4   disseminate the minutes to trustees as
5   approved by the Fund administrator and
6   Mr. Schelberg prior to the subsequent
7   trustees meeting, correct?
8       A    Yes.
9       Q    And am I correct, therefore, that
10  the language and terminology that's
11  contained in the trustee minutes would be
12  either your language and terminology or the
13  language and terminology of the Fund's
14  counsel or administrator, correct?
15      A    Yes.
16      Q    And the language and the
17  terminology that is contained in those
18  minutes would, in turn, reflect the
19  statements and terminology that was actually
20  used at the trustee meetings, correct?
21      A    Yes.
22      Q    And in all instances, you, Fund
23  counsel, Schelberg and the Fund
24  administrator would sign off on the language
25  and terminology used in those minutes before

ARBITRATION - VOLUME VI

1
2 those minutes were more widely disseminated
3 to trustees and Fund staff, correct?
4     A    Yes.
5     Q    All right.  Let's take a look at
6 some particular documents.
7          Why don't you draw your attention
8 to Exhibit 126.  It's a document that
9 contains the minutes of a trustee meeting of
10 September 20, 2007.
11          Ready?
12     A    Oh, yes.
13     Q    So drawing your attention to the
14 first page of the minutes where it indicates
15 who was present, it indicates that you were
16 present at this meeting.
17          Do you see that?
18     A    Yes.
19     Q    Okay.
20          Do you have any reason to believe
21 you did not attend the September 20, 2007
22 meeting of the NMDU Fund trustee?
23     A    No.
24     Q    And do you have any reason to
25 believe that you did not prepare the initial

ARBITRATION - VOLUME VI

1
2 draft of the minutes of that meeting?
3     A    No.
4     Q    All right.  Let's take a look at
5 Page 4 -- I'm sorry, Page 5 of the minutes.
6          And on Page 5, you see a couple of
7 bullet points and they're kind of wedged
8 between some redacted material.
9          Do you see that?
10     A    Yes.
11     Q    Okay.
12          So on Page 5, it indicates near the
13 top that there was some discussion relating
14 to diversion and the Union trustees excuse
15 themselves to caucus and upon their return,
16 they made a proposal which is set forth in
17 the two bullet points in the middle of the
18 page.
19          Do you see that?
20     A    Yes.
21     Q    I want to draw your attention to
22 that third bullet, the one that begins, "If
23 the sixers contribution is not
24 implemented ..."
25          Do you see that?

ARBITRATION - VOLUME VI

1
2     A    Yes.
3     Q    You'll note that in this bullet, it
4 specifically states that in connection with
5 the Welfare Fund, employees make shift
6 contributions.
7          Do you see that?
8     A    Yes.
9     Q    And it refers to a possible
10 increase in shift contributions?
11     A    Yes.
12     Q    Do you know why that specific
13 language referring to shift-based
14 contributions was used in denoting how
15 contributions to the Welfare Fund are made?
16     A    It's because how they were done.
17     Q    Why don't you turn your attention
18 to Exhibit 134.
19          And 134 contains the minutes of a
20 May 19, 2010 board meeting of the NMDU Fund.
21          And I think I'm going to skip for
22 the moment questioning you about the minutes
23 themselves and, instead, ask you to turn
24 your attention to an exhibit to those
25 meeting minutes.

ARBITRATION - VOLUME VI

1
2          It's Exhibit F, which begins at
3 03356.
4     A    Yes.
5     Q    Before I dive in, let me just ask a
6 quick foundational question or two.
7          The minutes from this May 19th
8 meeting indicates that you were present, if
9 you take a quick look at the first page.
10          Do you have any reason to believe
11 you were not present at this meeting?
12     A    No.
13     Q    Okay.  Back to Exhibit F.
14          Exhibit F is a memo from you and
15 Ms. Egan to the board of trustees and it
16 addresses the issue of information requests
17 for 2010 zone certification.
18          Do you see that?
19     A    Yes.
20     Q    And am I correct that one of the
21 elements of the Pension Protection Act of
22 2006 in connection with multi-employer
23 pension plans was to require that the
24 actuaries for these plans provide an annual
25 certification as to what zone of funding the

ARBITRATION - VOLUME VI

1
2  plan would be in, correct?
3      A    Yes.
4      Q    Okay.
5          So this letter is essentially an
6  information request to the board of trustees
7  so that Segal can -- consistent with the
8  statutory requirements, could prepare the
9  2010 zone certification for this fund,
10  correct?
11     A    Yes.
12     Q    And I noticed that your name is
13  first in the memo, it's not alphabetical.
14         Does that mean that you wrote this
15  memo?
16     A    No.  It had no bearing.
17     Q    Okay.  But did you write this memo?
18     A    I prepared this memo with Ms. Egan.
19     Q    So it's fair to say that you and
20  Ms. Egan jointly drafted this?
21     A    Yes.
22     Q    Let me draw your attention to
23  Page 2 of the memo under that heading
24  Number 4, which is Projected Industry
25  Activity.

ARBITRATION - VOLUME VI

1
2      Q    Do you see that?
3      A    Yes.
4      Q    At the bottom of that paragraph in
5  the last sentence, you and Ms. Egan indicate
6  to the trustees that you are going to need
7  an assumption, it says "for three items."
8          Do you see that?
9      A    Yes.
10     Q    And the third and last of those
11  items is information on expected wage
12  increases in future years.
13         Do you see that?
14     A    Yes.
15     Q    And the remainder of that sentence,
16  it explains why you need information from
17  the trustees about expected wage increases,
18  correct?
19     A    Yes.
20     Q    And, indeed, it says and explains
21  that the reason you need information on
22  expected wage increases is because
23  contributions are a percentage of wages,
24  correct?
25     A    Yes.

ARBITRATION - VOLUME VI

1
2      Q    Did you discuss this memo with the
3  trustees at the May 19, 2010 board meeting?
4      A    Yes.
5      Q    And do you have any reason to
6  believe that in the meeting, you used
7  language in describing the contribution
8  formula for the NMDU Fund that is different
9  from the language that's contained in this
10  last sentence in Paragraph Number 4?
11     A    I don't recall if we went into that
12  great of detail.
13     Q    Now, this letter requesting
14  annual -- strike that.
15         This letter requesting information
16  for an annual certification, this was, in
17  fact, a form letter that you and Ms. Egan,
18  indeed, sent to the trustees annually,
19  correct?
20     A    Yes, it's a letter that was sent
21  annually.
22     Q    Okay.
23         And am I correct that in each year
24  in which you sent the trustees this memo,
25  you continued to use this same language

ARBITRATION - VOLUME VI

1
2  describing contributions as a percentage of
3  wages, correct?
4      A    I don't recall without seeing each
5  letter.
6      Q    Okay.  Well, let me see if I can
7  help you.
8          Why don't you turn to Exhibit 144
9  and this form letter is contained at
10  FUND-03434.
11         And you'll see on Page 2 there's
12  that same Paragraph 4 about Projected
13  Industry Activity.
14         Do you see that?
15     A    Yes.
16     Q    And this 2013 version of the letter
17  uses these same terminology in connection
18  with describing the contribution formula to
19  the Pension Fund, correct?
20     A    Yes.
21     Q    And if you quickly turn your
22  attention to Exhibit 150, you'll see that at
23  the back of that exhibit is the form of this
24  letter for 2014 and just take a quick look
25  at Paragraph 4 and confirm to me that the

ARBITRATION - VOLUME VI

1  ARBITRATION - VOLUME VI
2  2014 version also contains this same
3  terminology in characterizing the
4  contribution formula?
5      A    Yes.
6      Q    It does, correct?
7      A    Yes.
8      Q    So in light of these documents, let
9  me return to the more general question that
10 I asked a moment ago.
11      Am I correct that in each year in
12 which you sent this memo, you continued to
13 use this same language describing
14 contributions as a percentage of wages,
15 correct?
16     A    Yes, based on what I reviewed.
17     Q    Let's move on and -- let's move on
18 to Exhibit 136.
19      And 136 contains the meeting
20 minutes for a meeting dated December 20,
21 2010.
22      Do you see that?
23     A    Yes.
24     Q    And it also indicates on the first
25 page of the minutes that you attended.

1  ARBITRATION - VOLUME VI
2      Any reason to believe you did not
3  attend?
4      A    No.
5      Q    Any reason to believe that you did
6  not prepare the initial draft of these
7  minutes?
8      A    No.
9      Q    Let me draw your attention to
10 Page 5 of the minutes.
11      And there's a discussion that
12 begins under the heading with a capital B,
13 says, "Discussion ensued regarding the
14 Fund's seriously endangered status."
15      Do you see that?
16     A    Yes.
17     Q    Okay.
18      It appears that -- and I want to
19 try to move this along quickly.
20      It appears from the minutes that in
21 connection with this discussion about the
22 Fund's seriously endangered status, at the
23 end of that discussion, which is
24 characterized as lengthy, the trustees
25 requested the Segal representatives to

1  ARBITRATION - VOLUME VI
2  provide projections of the Fund's funded
3  status taking into consideration certain
4  assumptions.
5      Do you see that?
6      A    Yes.
7      Q    Okay.
8      Take a moment and why don't you
9  read those bullet points that set forth the
10 assumptions and then I'm going to ask you a
11 couple questions about it.
12      Ready?
13     A    Yes.
14     Q    So let's take a look at the first
15 bullet.
16      And in the first bullet, the
17 trustees are requesting Segal to do some
18 modeling about Fund's funded status taking
19 into consideration required increases in
20 employer contribution rates.
21      This bullet makes no reference to
22 shifts or a shift rate in describing the
23 employer contribution rates; does it not?
24     A    No.
25     Q    Now, let me draw your attention to

1  ARBITRATION - VOLUME VI
2  the fifth bullet, the one just up from the
3  bottom.  The one that begins, "An increase
4  in employer contributions."
5      Do you see that one?
6      A    Yes.
7      Q    So the first sentence talks about
8  modeling based on an assumption that there
9  would be an increase in employer
10 contributions of half a million to a million
11 dollars.  And then it says, "Based on a
12 reallocation of employer contributions from
13 the Welfare Fund."
14      Do you see that?
15     A    Yes.
16     Q    So am I correct that in connection
17 with the NMDU Fund, at least during 2010,
18 there was, at that time, a diversion
19 protocol in which a portion of a Pension
20 Fund contributions were diverted to the
21 Welfare Fund?
22     A    Yes.
23     Q    And in connection with this first
24 sentence in the bullet point, it makes note
25 of a potential reallocation of the diverted

Page 1252

ARBITRATION - VOLUME VI
1
2  contributions from the Welfare Fund back to
3  the Pension Fund, correct?
4      A    Yes.
5      Q    Okay.
6          So am I correct that when these
7  notes use the word "reallocation" in this
8  bullet point, what they were referring to
9  was taking some of the monies that had been
10 diverted or allocated to the Welfare Fund
11 and reallocating them back to the Pension
12 Fund, correct?
13     A    Yes.
14     Q    Now I want to have you focus your
15 attention on the second sentence of that
16 bullet point, the one that begins, "The
17 Welfare Fund contribution allocation."
18         Do you see that?
19     A    Yes.
20     Q    So I gather that what this minute
21 is referring to is the -- it memorializes a
22 trustee observation made at the meeting that
23 if there is a reallocation from the Welfare
24 Fund back to the Pension Fund, that
25 reallocation will result in the Welfare Fund

Page 1253

ARBITRATION - VOLUME VI
1
2  having less contributions and the diminution
3  in Welfare Fund contributions can be offset
4  by an increase in the shift rate
5  contribution.
6          Does that appear to be what that
7  minute is addressing?
8      A    Yes.
9      Q    And the reference in that sentence
10 to, quote, "shift rate contribution," that
11 would be a reference to the Welfare Fund,
12 correct?
13     A    Yes.
14     Q    And that's because employees make
15 contributions to the Welfare Fund here based
16 on a shift rate, correct?
17     A    Yes.
18     Q    And that's also because some
19 employers contribute to the Welfare Fund
20 here, in part, based on a shift rate,
21 correct?
22     A    Yes.
23     Q    Do you know why the minutes in this
24 fifth bullet point specifically referred to
25 Welfare Fund contributions as shift rate

Page 1254

ARBITRATION - VOLUME VI
1
2  contributions, but make no reference to
3  shift rates in that first bullet when
4  describing employer contribution rates to
5  the Pension Fund?
6      A    The method for the Welfare Fund
7  contribution by the employees, not the
8  employer, were based on the shifts worked
9  for all the employees who were eligible for
10 benefits under the Welfare Fund.
11     Q    And this last sentence which refers
12 to "shift rate contributions," is that
13 referring to a shift rate contributions for
14 employees and employers?
15     A    No.  It says "employee."
16     Q    No, it doesn't.  It does not in
17 that sentence, that's why I'm asking you the
18 question.
19     A    Okay.  Sorry.
20     Q    Do you know the answer to that
21 question?
22     A    I'm sorry, can you repeat the
23 question?
24         MR. MILLER:  Can you repeat the
25 question back?

Page 1255

ARBITRATION - VOLUME VI
1
2  (Requested portion of record read.)
3      A    Here, it's referring to employee.
4      Q    But it doesn't say that?
5      A    No.
6      Q    So let's head to 137.
7          So Exhibit 137 contains meeting
8  minutes of a meeting on February 15, 2011.
9          And those meeting minutes, again,
10 indicate, Mr. Urbank, that you attended and
11 let me ask, once again.
12         Do you have any reason to believe
13 you did not attend?
14     A    No.
15     Q    Okay.
16         And you'll see that following the
17 four pages of minutes, there's a copy of a
18 PowerPoint presentation, what appears to be
19 a PowerPoint presentation.
20         Do you see that?
21     A    Yes.
22     Q    And am I correct that this
23 PowerPoint presentation was handed out and
24 discussed at this February 15, 2011 meeting?
25     A    Yes.

23

Page 1256

ARBITRATION - VOLUME VI

1           ARBITRATION - VOLUME VI
2     Q   And why don't you turn to, I guess
3 it would be PowerPoint Slide 4, which is at
4 FUND-03370.
5       Do you see that?
6     A   Yes.
7     Q   And there's reference to the
8 initials CR.
9       That would be contribution rate,
10 right?  That would be an abbreviation for
11 the words "contribution rate"?
12     A   Yes.
13     Q   So am I correct that this slide
14 discusses a possible funding improvement
15 plan option in which the contribution rate
16 for the NMDU Pension Fund would move from
17 8 percent, it says, of wages increasing to
18 11.5 percent.
19       Am I correct?
20     A   Yes.
21     Q   Does anything on this slide mention
22 shift numbers or a shift rate?  Yes or no?
23     A   No.
24     MR. RICHMAN:  The yes or no
25 stuff really should stop.

Page 1257

ARBITRATION - VOLUME VI

1           ARBITRATION - VOLUME VI
2     MR. MILLER:  Why?  I'm allowed
3 to ask him --
4     MR. RICHMAN:  No, you ask one
5 question at a time, then you stop and
6 then the person answers it before he
7 says yes or no.
8     ARBITRATOR IRVINGS:  It's fine.
9 It called for a yes or no answer.
10     Let's move on.
11 BY MR. MILLER:
12     Q   Why don't we turn --
13     MR. RICHMAN:  The reason -- I'm
14 sorry.  The reason I raise that is
15 that the witness has a right to
16 answer other than yes or no.
17     MR. MILLER:  No, he doesn't.
18 If he's asked a yes or no question,
19 he needs to answer that yes or no
20 and --
21     ARBITRATOR IRVINGS:  Let's move
22 on.
23 BY MR. MILLER:
24     Q   Turn your attention to FUND-03378.
25     And here, in connection with

Page 1258

ARBITRATION - VOLUME VI

1           ARBITRATION - VOLUME VI
2 scenarios 2 and 3 for, again, a possible
3 funding improvement plan, there is, once
4 again, a reference to an 8 percent
5 contribution rate increasing to, in one
6 case, 10 percent and in another case to
7 9 percent, correct?
8     A   Yes.
9     Q   And this reference to reallocation,
10 that would be reallocation from the Welfare
11 Fund to the Pension Fund?
12     A   No.
13     Q   What is that relating to?
14     A   You mean going from 8 percent to
15 9 percent?
16     Q   Oh, it just means the increase?
17     A   Yes.  Reallocating the contribution
18 from 8 percent to 9 percent.
19     Q   Okay.
20     Let's turn to Exhibit 138, April 6,
21 2011 meeting minutes.
22     And the first two pages -- strike
23 that.
24     Mr. Urbank, once again, it
25 indicates in the front page of the meeting

Page 1259

ARBITRATION - VOLUME VI

1           ARBITRATION - VOLUME VI
2 minutes that you attended, and I assume you
3 have no reason to believe you were not in
4 attendance?
5     A   Correct.
6     Q   And you'll see that Pages 1, 2 and
7 3 are primarily devoted to a discussion of a
8 funding improvement plan that, apparently,
9 occurred at this April 6th meeting,
10 correct?
11     A   Yes.
12     Q   And there's a lot of mention on
13 Page 2 of these minutes of advice and points
14 that you made in connection with the
15 discussion on April 6th.
16     Do you see that?
17     A   Yes.
18     Q   Okay.
19     I want to draw your attention to
20 the last paragraph on Page 2 right above the
21 box that's labeled "Redacted."
22     And why don't you just read to
23 yourself the last two sentences in that
24 paragraph.
25     Ready?

ARBITRATION - VOLUME VI

1
2    A    Yes.
3    Q    And am I correct that these notes
4    refer to a discussion and advice that you
5    provided to the trustees at this meeting
6    about the mandatory or required schedules
7    under the law relating to a funding
8    improvement plan?
9    A    Yes.
10    Q    Okay.
11        And furthermore, at the very bottom
12    of that paragraph, there is mention of two
13    funding improvement plan proposals in which
14    it says, "The employer contribution rate
15    would be increased from 8 percent to
16    12.4 percent in one proposal and from 8 to
17    13.6 percent in the other proposal."
18        Do you see that?
19    A    Yes.
20    Q    So am I correct that these minutes
21    indicate that the meeting with the
22    trustees, you referred to the employer
23    contribution rate as a percentage, correct?
24    A    Yes.
25    Q    Do you have any reason to believe

ARBITRATION - VOLUME VI

1
2    that at that meeting, you did not refer to
3    the contribution rate as a percentage?
4    A    No.
5        MR. RICHMAN:  He just said yes.
6        ARBITRATOR IRVINGS:  Thank you.
7    BY MR. MILLER:
8    Q    All right.  Let's move to
9    Exhibit A.
10        So I take it, this is a revised
11    version of the PowerPoint presentation we
12    previously looked at.
13        And this revised version was
14    discussed at the April 6, 2011 meeting,
15    correct?
16    A    Yes.
17    Q    Okay.
18        And if you take a look at, again,
19    Slide 4 and probably Slide 12 -- not
20    Slide 12 -- just Slide 4 in this case, it,
21    again, uses the phrase "8 percent CR" where
22    "CR" means contribution rate, correct?
23    A    Yes.
24    Q    Okay.
25        This PowerPoint presentation which

ARBITRATION - VOLUME VI

1
2    we looked at now two iterations of, this
3    PowerPoint presentation was continuously
4    edited and we presented to the trustees
5    during the course of 2011, correct?
6        And if you need to -- why don't you
7    turn to Exhibit 143 and you'll see another
8    iteration.
9    A    I'm sorry?  Which page?
10    Q    Exhibit 143 where you'll see
11    another iteration.
12        And, indeed, as my colleague
13    pointed out, the version in Exhibit 143 is,
14    in fact, dated February of 2013, right?
15    A    Yes.
16    Q    So am I correct that during the
17    period from 2011 to 2013, Segal routinely
18    presented various iterations of this
19    PowerPoint presentation respecting the
20    creation of a funding improvement plan?
21        MR. RICHMAN:  Objection as to
22    the word "routinely."
23        MR. MILLER:  Why don't you
24    repeat the question.  This is not
25    working.  And we'll ask it without

ARBITRATION - VOLUME VI

1
2    the word "routine."
3        THE REPORTER:  Hit the "Follow"
4    icon on the right side, will take you to
5    the end.
6        MR. MILLER:  Oh, I see.  Okay.
7    BY MR. MILLER:
8    Q    Am I correct that during the period
9    from 2011 to 2013, Segal presented various
10    iterations of this PowerPoint presentation
11    in connection with the creation of a funding
12    improvement plan?
13    A    Yes.
14    Q    And in communicating -- strike
15    that.
16        And in each of the iterations of
17    this PowerPoint presentation, you referred
18    to the contribution rate as a percentage or
19    percentage of wages, correct?
20    A    Yes.
21    Q    And there is no mention of the
22    words "shift rate" or "shift wage" in any of
23    the PowerPoint presentations that Segal made
24    during the period from 2011 to 2013,
25    correct?

```
 1          ARBITRATION - VOLUME VI
 2     A    No.
 3     Q    And in communicating the material
 4  on these PowerPoint presentations to the
 5  trustees, you used the same language and
 6  terminology that you employed in the
 7  PowerPoint presentation itself, correct?
 8     A    In what context?
 9     Q    Well, let me ask that question more
10  clearly.
11          You discussed these PowerPoint
12  presentations with the trustees, correct?
13     A    Yes, at meetings.
14     Q    And in doing so, you used the same
15  terminology that's contained in the
16  PowerPoint presentations, correct?
17     A    Yes.
18     Q    The Pension Protection Act was, I
19  think, enacted in 2006.
20          Is it fair to say that the Pension
21  Protection Act was discussed at many
22  meetings of the NMDU Fund between 2006 and
23  when Segal's engagement with this fund
24  concluded?
25     A    It was discussed.  I don't know how
```

```
 1          ARBITRATION - VOLUME VI
 2  many.
 3     Q    Okay.
 4          Was it the subject of much
 5  discussion at many meetings?
 6     A    It was discussed at the meetings.
 7     Q    At numerous meetings?
 8     A    Over the course of six years, it
 9  was discussed at many meetings during that
10  period.
11     Q    Okay.
12          MR. MILLER:  I have no further
13  questions.
14          MR. RICHMAN:  I think it makes
15  sense not to break for lunch.
16          MR. MILLER:  No, I agree.
17          ARBITRATOR IRVINGS:  I agree.
18  FURTHER DIRECT EXAMINATION BY MR. RICHMAN:
19     Q    So you testified previously that
20  contribution base units were shifts both in
21  a prior proceeding and today.
22          And is that still your
23  understanding how the Pension Fund works?
24     A    Yes.
25     Q    Now I want to show you Exhibit 42.
```

```
 1          ARBITRATION - VOLUME VI
 2  White book.
 3          You got 42 in front of you?
 4     A    42.
 5     Q    All right.
 6          So the first page, which is 2370?
 7     A    Yes.
 8     Q    So there's a cover page.
 9          Do you see that?
10     A    Yes.
11     Q    Okay.
12          And then behind it, if you just
13  take a quick look.  I'm not asking you to
14  read it.  Just take a quick look.
15          You received this document?
16     A    Yes.
17     Q    And I want to focus you on the --
18  let's look at Page 2371.
19          You got that page?
20     A    Yes.
21     Q    And you see under the heading
22  Effective 3-31-2013.
23          Do you see that?
24          And if you see on the left-hand
25  side, it says, "Day rate, short night, long
```

```
 1          ARBITRATION - VOLUME VI
 2  night, Saturday night."
 3          Do you know what those are?
 4     A    They're different shift periods.
 5     Q    Okay.
 6          And do all the shifts have the same
 7  number of hours?
 8     A    I don't know.
 9     Q    I want to show you Exhibit 150.  So
10  let's look at 150, Exhibit 150, and that is
11  in the yellow book, I believe.
12          Do you see that?
13     A    Okay.
14     Q    Now --
15     A    I have a different 150.
16     Q    I'm sorry.  Yes.  Okay.
17          So look in 150, these are minutes
18  of the January 31, 2014 --
19          ARBITRATOR IRVINGS:  January 20
20  --
21          MR. MILLER:  January 31 -- no,
22  we have a different one.
23          ARBITRATOR IRVINGS:  We have a
24  different one.
25  BY MR. RICHMAN:
```

Page 1268

ARBITRATION - VOLUME VI

1
2  Q    Sorry.  June 20, 2014, trustees
3  meeting.
4      Do you see that first page?
5  A    Yes.
6  Q    And then what I'm focused on is go
7  to Page 3437 on the bottom right-hand
8  corner.  That's Exhibit A.
9  A    Oh, yes.
10  Q    Okay.
11      Now, you see in a sentence that in
12  the left-hand margin begins, "May 31, 2025,"
13  or a line that begins "May 31, 2025 ... "?
14      Do you see that?
15  A    Yes.
16  Q    Okay.
17      And then the next sentence says,
18  "Assuming that all employers will adopt the
19  alternative schedule; i.e, the distribution
20  rate increases from 8 percent to
21  11.8 percent of the shift rate when the new
22  collective bargaining agreements
23  negotiated ... "  And then it goes on.
24      And Mr. Miller took you through
25  various documents, funding improvement plan

Page 1269

ARBITRATION - VOLUME VI

1
2  documents as they were changed from time to
3  time.  And the phrase "shift rate" wasn't in
4  those documents, correct?
5  A    Correct.
6  Q    But it's in this document, and why
7  is that?
8  A    Here, we were just clarifying what
9  the contribution basis was.
10  Q    And why were you clarifying this?
11  A    Just for clarification purposes so
12  everybody was fully aware.
13  Q    Okay.
14      Well, the date of the document is
15  April 14, 2014.
16  A    Uh-huh.
17  Q    3437, right?
18      Is that before or after The New
19  York Times withdrew from the Fund?
20  A    The withdrawal liability was prior
21  to that.
22  Q    And so why were you using the term
23  "shift rate" in this document and you hadn't
24  used it in the Funding improvement plan
25  document?

Page 1270

ARBITRATION - VOLUME VI

1
2  A    Just to clarify what the
3  contribution basis was.
4  Q    And why did you feel the need to
5  clarify it?
6  A    Because there was some
7  misunderstanding going on related to
8  contributions.
9  Q    Okay.
10      And what were those
11  misunderstandings?
12  A    That we were just referencing more
13  globally contribution rate as a percentage
14  of wages versus that it was actually based
15  on the daily wage rate or shift rate.
16      MR. MILLER:  Objection.  He's
17  speculating.
18  BY MR. RICHMAN:
19  Q    Why did you think it was the
20  confusion?
21  A    Because the questions raised.
22      ARBITRATOR IRVINGS:  You are
23  asking him why he thought someone
24  else was confused?  You can ask him
25  why he did this, but if you are

Page 1271

ARBITRATION - VOLUME VI

1
2  asking him about the state of someone
3  else's mind ...
4      MR. RICHMAN:  That's fine.
5  BY MR. RICHMAN:
6  Q    In the various documents that
7  Mr. Miller took you through and it said
8  "contribution rate percentage of wages."
9      Do you remember those?
10  A    Yes.
11  Q    Okay.
12      And why wasn't the term "shift"
13  used in those documents?
14  A    We didn't think it was necessary at
15  the time to be so explicit in terms of the
16  contributions, it was -- effectively,
17  mathematically it works out that he take the
18  percentage of the wages daily or entirely
19  and you come up with the same amount for the
20  contributions.
21  Q    And did the contribution base unit
22  during the time that you were consultant to
23  the Fund change from shifts?
24  A    Not that I'm aware aware.
25  Q    I want to take you on a different

27

ARBITRATION - VOLUME VI

1  subject here and that has to do with the
2  minutes.
3          You went to the trustees meeting,
4  as I understand your testimony, you took
5  notes at the meetings?
6      A    Yes.
7      Q    Okay.
8          And when you took notes at the
9  meetings, did you take -- did your notes
10  correspond with what was happening at the
11  meeting at the time?
12     A    Yes.
13     Q    And were there times where agenda
14  items were changed in terms of Agenda
15  Item 6 being taken up before Agenda Item 3?
16     A    During the course of the meeting,
17  that could have happened.
18     Q    Okay.
19          And when that happened or if that
20  happened, the notes that you took would
21  reflect that 3 become before 6 or 6 before
22  3?
23     A    The order I take my notes is in the
24  order of the events that happened at the

ARBITRATION - VOLUME VI

1  meeting, regardless of what it said on the
2  agenda, order of the agenda.
3      Q    Okay.
4          And then as I understand it, you
5  send your notes to the Fund director,
6  correct, Mr. Schwartz?
7      A    Yes.  And counsel.
8      Q    And counsel.  Okay.
9          And that counsel was Mr. Schelberg?
10     A    Yes.
11     Q    And then they make comments on the
12  draft that you did, correct?
13     A    They return them to me with their
14  edits.
15     Q    And when you did the draft minutes,
16  did the draft minutes follow the order of
17  the meeting?
18     A    Yes.
19     Q    Okay.
20          And do you recall any situation in
21  which you got back minutes as edited by
22  Mr. Schelberg or the Fund administrator
23  where they changed the order of your draft

ARBITRATION - VOLUME VI

1  minutes?
2      A    I don't recall.
3      Q    So you don't recall that it
4  happened or you don't recall it ever
5  happened?
6      A    I don't recall that they changed
7  the order that I had initially written the
8  minutes in.
9      Q    Now, in the minutes -- and let's go
10  to the October 11th minutes.  That is 140
11  in the yellow book.
12          Now --
13     MR. RICHMAN:  I'm going to take
14  a break for a second.  Sorry.  We'll
15  be right back.
16          (Pause.)
17  BY MR. RICHMAN:
18     Q    Okay.  Mr. Urbank, do you ever
19  remember at a trustees meeting a trustee
20  giving his voting proxy to another trustee?
21     A    No, I don't.
22     MR. RICHMAN:  I have no further
23  questions.
24     MR. MILLER:  Just give us a

ARBITRATION - VOLUME VI

1  minute.
2          (Pause.)
3     MR. MILLER:  We have no further
4  questions.
5     ARBITRATOR IRVINGS:  Excellent.
6
7          (Whereupon, the proceedings had
8  concluded at 1:15 p.m.)

Page 1276

```
 1              ARBITRATION - VOLUME VI
 2               C E R T I F I C A T E
 3   STATE OF NEW YORK   )
                         : ss.
 4   COUNTY OF NEW YORK   )
 5           I, BARBARA R. ZELTMAN, Shorthand
 6   Reporter and Notary Public, within and
 7   for the State of New York, do hereby
 8   certify:
 9           That this transcript is a true
10   record of the proceedings had.
11           I further certify that I am not
12   related to any of the parties to this
13   action by blood or marriage, and that I
14   am in no way interested in the outcome of
15   this matter.
16           IN WITNESS WHEREOF, I have hereunto
17   set my hand this 19th day of October,
18   2015.
19
20
         _____
21          BARBARA R. ZELTMAN
            Court Reporter and Notary Public
22
23
24
25
```

Page 1277

```
 1              ARBITRATION - VOLUME VI
 2                  I N D E X
 3
 4     WITNESS:                      PAGE
 5   NEAL SCHELBERG
 6
 7   Direct Examination by Mr. Richman        1170
 8   Cross Examination by Mr. Miller          1203
 9   Further Direct Examination by Mr. Richman   1207
10   Further Cross Examination by Mr. Miller     1209
11   Further Direct Examination by Mr. Richman   1265
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```