UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
THE NEW YORK TIMES COMPANY,

             Plaintiff,

    -against-

NEWSPAPER AND MAIL DELIVERERS'-PUBLISHERS'
PENSION FUND,

             Defendant.
------------------------------------------X
NEWSPAPER AND MAIL DELIVERERS'-PUBLISHERS'
PENSION FUND AND THE BOARD OF TRUSTEES OF
THE NEWSPAPER AND MAIL DELIVERERS'-
PUBLISHERS' PENSION FUND,

             Plaintiffs,

    -against-

THE NEW YORK TIMES COMPANY,

             Defendant.
------------------------------------------X

17 Civ. 6178



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3 26 18

17 Civ. 6290

OPINION and
ORDER

A P P E A R A N C E S:

       <u>Attorneys for The New York Times Company</u>

       JONES DAY
       51 Louisiana Avenue, N.W
       Washington, D.C. 20001
       By: Evan Miller, Esq.
           Yaakov M. Roth, Esq.
           Mark C. Savignac, Esq.

Attorneys for Newspaper and Mail Deliverers'-
Publishers' Pension Fund and its Board of Trustees

SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022
By:  Ronald E. Richman, Esq.
     Max Garfield, Esq.
     Adam B. Gartner, Esq.

**Sweet, D.J.**

In these consolidated actions, The New York Times Company (the "Times") and the Newspaper and Mail Deliverers'-Publishers' Pension Fund and Board of Trustees of the Newspaper and Mail Deliverers'-Publishers' Pension Fund (together, the "Fund") have cross-moved for summary judgment under Federal Rule of Civil Procedure 56 on their respective requests to modify or vacate the arbitration award (the "Award") issued by assigned arbitrator Mark L. Irvings (the "Arbitrator") in American Arbitration Association ("AAA") Case No. 01-14-1433 on July 19, 2017, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., as amended by the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), 29 U.S.C. § 1381, et seq.

The dispute arises out of a carefully-negotiated multiemployer collective bargaining agreement ("CBA") that governs certain aspects of the Newspaper and Mail Deliverers'-Publishers' Pension Fund applicable to many newspapers in New York City. The instant motions present a veritable Augean Stables of issues to be resolved, a cavalcade of sharp disputes that have been distilled down by the parties and their skilled

3

counsel to four principal issues. Put simply, these issues are:
(1) whether the Times incurred liability by partially
withdrawing from the Fund for plan years ending May 31, 2012,
and May 31, 2013; (2) whether the discount rate used by the Fund
when assessing the Times' withdrawal liability was appropriate;
(3) whether the Fund applied the proper statutory procedure to
calculate liability for the second partial withdrawal; and (4)
whether and to what extent the Times is entitled to interest on
the repayment of overpaid withdrawal liability.

Based on the conclusions set forth below, the motions are
determined as follows. First, the Times incurred withdrawal
liability, and the Arbitrator's finding that the CBA's
contribution base unit under 29 U.S.C. § 1301(a)(11) ("CBU") was
shifts has not been rebutted. Second, the Fund's use of the
Segal Blend rate when assessing the Times' withdrawal liability
was, in this instance, improper, and the Arbitrator's finding to
the contrary is reversed. Third, the Fund's calculation of the
Times' second partial liability was improper. Lastly, the
Arbitrator correctly determined that the Times was entitled to
interest on overpaid withdrawal liability, and his conclusion as
to the applicable interest rate has not been rebutted.

4

# I. **Statutory Background and Facts**

## a. Statutory Background

Before delving into the facts, a brief overview of ERISA's statutory framework is appropriate.

"ERISA is a comprehensive statutory scheme regulating employee retirement plans." Trs. of Local 138 Pension Tr. Fund v. F.W. Honerkamp Co. Inc., 692 F.3d 127, 128 (2d Cir. 2012) (citing 29 U.S.C. § 1001, et seq.). Part of ERISA's purpose is "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 214 (1986) (internal quotation marks omitted). CBAs create employer retirement plans and employer obligations to contribute to such plans. See 29 U.S.C. §§ 1002(37)(A), 1392(a). In addition, Congress created the Pension Benefit Guaranty Corporation ("PBGC"), "a wholly owned Government corporation, to administer an insurance program for participants in both single-employer and multiemployer pension plans." Id. (citation omitted); see 29 U.S.C. § 1306.

Multiemployer pension plans, like the one at issue here, are where "multiple employers pool contributions into a single fund that pays benefits to covered retirees who spent a certain amount of time working for one or more of the contributing employers." Trs. of Local 138 Pension Tr. Fund, 692 F.3d at 129. Such plans are useful in "certain unionized industries" where companies often go "into and out of business, and . . . employees transfer[ ] among employers." Id. Looking to such plans, Congress passed the MPPAA to amend ERISA and "adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 722 (1984).

The MPPAA implemented "new rules under which a withdrawing employer would be required to pay whatever share of the plan's unfunded vested liabilities was attributable to that employer's participation." Pension Benefit Guar. Corp., 467 U.S. at 723 (citation omitted). "This withdrawal liability is the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." Id. at 725

6

(quoting 29 U.S.C. §§ 1381, 1391). "[C]omplete withdrawal from a plan occurs when an employer (1) permanently ceases to have an obligation to contribute to a plan arising (a) under one or more collective bargaining or related agreements or (b) as a result of a duty under applicable labor-management relations law; or (2) permanently ceases all covered operations under a plan. Withdrawal liability may also be imposed for partial withdrawals." ILGWU Nat'l Ret. Fund v. Levy Bros. Frocks, 846 F.2d 879, 881 (2d Cir. 1988) (citing 29 U.S.C. §§ 1381, 1383, 1385, 1392). The MPPAA defines a "partial withdrawal" if, in any plan year, there is a "70 percent contribution decline." 29 U.S.C. § 1385(a)(1).[1] Employers pay withdrawal liability in

---

[1]    ERISA Section 4205 defines a partial withdrawal, more fully, as follows:

(a)    Except as otherwise provided in this section, there is a partial withdrawal by an employer from a plan on the last day of a plan year if for such plan year –

(1)    there is a 70-percent contribution decline, or . . .

(b)    For purposes of subsection (a) of this section –

(1)(A) There is a 70-percent contribution decline for any plan year if during each plan year in the 3-year testing period the employer's contribution base units do not exceed 30 percent of the employer's contribution base units for the high base year.

29 U.S.C. § 1385. A "3-year testing period" is "the period consisting of the plan year and the immediately preceding 2 plan years." Id. § 1385(b)(1)(B)(i). An employer's "contribution base units for the high base year is the average number of such units for the 2 plan years for which the employer's contribution base

annual installments, calculated based on an employer's historical contribution amount. See 29 U.S.C. §§ 1391(c), 1399(c).

Congress later authorized the PBGC to promulgate regulations to "provide for proper adjustments . . . so that the liability for any complete or partial withdrawal in any subsequent year . . . properly reflects the employer's share of liability with respect to the plan." 29 U.S.C. § 1386(b)(2). The PBGC obliged, creating a credit applicable to subsequent withdrawal liability based on payments already made, such that the "credit phases out over time, thereby roughly capturing the change in the composition of the liability pool and allocating withdrawal liability accordingly." Cent. States, Se. & Sw. Areas Pension Fund v. Safeway, Inc., 229 F.3d 605, 612 (7th Cir. 2000) (citing 29 C.F.R. § 4206.1, et seq.); see also 26 C.F.R. § 4206.1(a) ("The purpose of the [statutory] credit is to protect a withdrawing employer from being charged twice for the same unfunded vested benefits.").

---

units were the highest within the 5 plan years immediately preceding the beginning of the 3-year testing period." Id. § 1385(b)(1)(B)(ii). A "contribution base unit" as "a unit with respect to which an employer has an obligation to contribute under a multiemployer plan." Id. § 1301(a)(11).

After an employer withdraws from a plan, the plan sponsor
is vested with the authority to determine the amount of
withdrawal liability. See 29 U.S.C. §§ 1382, 1391. The plan
sponsor then informs the withdrawing employer of the liability,
sets a payment schedule, and demands payment. Id. §§ 1382(2),
1399(b)(1). Within 90 days of receiving the notice, the employer
may request a review of the sponsor's determination of liability
or the payment schedule. Id. § 1399(b)(2)(A). Either side may
thereafter initiate arbitration proceedings within 60 days of
the earlier of: (1) the date on which the employer was notified
of the sponsor's withdrawal liability determination and demand
for payment, or (2) 120 days after the date of the employer's
request for review. Id. § 1401(a)(1). If the employer fails to
request arbitration within the statutory time periods, the
amount of withdrawal liability assessed by the plan sponsor in
the notice becomes "due and owing." Id. § 1401(b). Regardless of
whether an employer requests review or initiates an arbitration,
the employer needs to pay the assessed withdrawal liability
payments in accordance with the payment schedule set forth in
the notice. Id. § 1399(c)(2).

Arbitral decisions over ERISA disputes are subject to
judicial review by federal courts. 29 U.S.C. § 1401(b)(2).

b. The CBA and its Provisions

The following facts are drawn from the parties'
declarations, attached exhibits, and Rule 56.1 Statements
submitted in connection with the instant cross-motions for
summary judgment. See Fund's 56.1 Statement ("Fund's 56.1"), No.
17 Civ. 6178, Dkt. No. 26; the Times' 56.1 Statement ("Times'
56.1"), Dkt. No. 20; the Fund's Rule 56.1 Response ("Fund's 56.1
Response"), Dkt. No. 27; the Times' Rule 56.1 Response ("Times'
56.1 Response"), Dkt. No. 29; the Times' Rule 56.1 Reply
("Times' 56.1 Reply"), Dkt. No. 29; Declaration of Jacob M. Roth
dated September 15, 2017 ("Roth Decl."), Dkt. No. 19;
Declaration of Max Garfield dated October 20, 2017 ("Garfield
Decl."), Dkt. No. 28. Unless otherwise noted, the facts are
undisputed.

In 1981, the Newspaper and Mail Deliverers' Union of New
York and Vicinity (the "NMDU") and the Times entered into a CBA.
See Garfield Decl. Ex. 4 (the CBA). Of relevance here, the CBA
contained provisions that required the Times to make
contributions to the Fund, a multiemployer pension plan. While
amended over the years, the CBA's provisions concerning pension

10

contributions have remained the same and operative from then to
the instant dispute.[2]

Section 13-I of the CBA, which describes the Times'
contribution requirements to Fund, provides, in relevant part:

> The [Times] agrees it shall contribute 8% of each
> employee's pay rate per shift for each shift worked by
> each employee in the bargaining unit to the [Fund],
> but not in excess of five (5) shifts in any payroll
> week in any one office for any one employee. In
> addition contributions shall be made when an employee
> becomes eligible for worker's compensation benefits.
> Such payments shall be retroactive to the first day of
> absence.

CBA § 13-I.1. In addition to shifts worked, Section 13-K.3
required that the Times make contributions for "days of paid
leave":

> Days of paid leave taken or not taken but paid for
> during the year or leave accumulated when taken or
> paid for under this Section shall be included in the
> schedule of days worked for which vacations and days
> of paid leave are allowed and for which welfare and
> pension contributions are made.

CBA § 13-K.3. Section 13-K.5 further provided that: "Time spent
on duty with the National Guard or on Reserve Duty, shall be
included in the days worked for which paid leave is allowed, to
a maximum of two (2) weeks." CBA § 13-K.5.

---

[2]    For example, over the years, the NMDU and the Times have
agreed to adjust the amounts that employees are paid. Fund's
56.1 ¶ 12. These changes are not relevant to the issues
presented here.

11

Section 5 of the CBA details "Shifts and Regular Working Time." Under the CBA, a "day shift" is "[a] regular day's work" that consists of "7 hours and 54 minutes or less consecutively between the period of 7:00 a.m. to 8:00 p.m." and a "night shift" as either "a result night's work" consistent of "seven (7) or fewer consecutive hours of work on short nights and eight (8) or fewer consecutive hours of work on one long night between the period of 6:00 p.m. and 10:00 a.m." or "seven and one-half (7 1/2) or fewer consecutive hours of work when the period shall begin at 4:00 p.m." on Saturday. CBA §§ 5-A, 5-B. Each type of shift had a different applicable wage rate, depending on whether the shift was "hourly," "daily," weekly," or "overtime." CBA § 13-A.

Under the CBA, employees working in particular positions are entitled to extra pay. For example, participating employees who drive a tractor-trailer receive an extra $2.25 for every shift, CBA § 2-E.2(j), and who operate a forklift receive an extra $0.25 per shift, CBA § 3-Q.

The CBA also included provisions that required the Times to contribute to the Publishers'-Newspaper and Mail Deliverers' Welfare Fund (the "Welfare Fund").[3] Section 13-H.1 required that:

> The [Times] agrees that it shall contribute 6 1/2% of each employee's rate per shift for each shift worked by each employee in the bargaining unit to the [Welfare Fund], but not in excess of five (5) shifts in any payroll week in any one office for any one employee. In addition to the above percentage contribution, for each shift worked by each employee who is not a regular situation holder . . . there shall be an additional contribution to the [Welfare Fund] of $6.00 per shift, but not in excess of five (5) shifts in any one payroll week in any one office for any one employee, in the first year of this Agreement. In the second year such additional contribution shall be increased to $7.00; in the third year, to $8.00. In addition contributions shall be made when an employee becomes eligible for worker's compensation benefits. Such payments shall be retroactive to the first day of absence. . . .

CBA § 13-H.1. In subsequent years, the Welfare Fund was amended. For example, in 1987, the parties agreed that "an additional $3.76 per shift from wages and after taxes (maximum of five shifts) shall be contributed to the Welfare Fund." Garfield Decl. Ex. 6 § 2(a). In 1992, the parties agreed to a provision that allowed reapportionment between the two funds:

> With respect to wage increases effect March 31, 1993 and thereafter, the Union may elect to reapportion the contributions due on those increases between its pension plan and its health and welfare plan the total

---

[3]    ERISA defines an "obligation to contribute" as on arising "(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a).

13

(8%) and health and welfare (7.68%) plan contributions made by the Times, provided that: (i) the total contribution made by The Times to all plans does not exceed 15.68%; (ii) the Union notifies The Times at least ninety (90) days in advance of its intent to reapportion the contributions; and (iii) the reapportionment shall not, in any event, result in a contribution to the pension fund of less then [*sic*] the amount necessary to meet any minimum contribution requirements established by law.

Garfield Decl. Ex. 7 § 8(D).

### c. The Assessed Partial Withdrawals

In 2008, the Times closed its wholly-owned distribution business, City and Suburban Delivery Systems ("C&S"). Times' 56.1 ¶ 8; Fund's 56.1 ¶ 93. Under a separate CBA with nearly identical language to the Fund's CBA, the Times also contributed to the Fund for C&S employees. Fund's 56.1 ¶¶ 94-96. While initially planning to lay off C&S employees and pay the anticipated withdrawal liability, after negotiating with the NMDU, the Times decided to retain approximately 65 C&S employees. Times' 56.1 ¶ 10; Fund ¶ 98. The hired C&S employees were paid at the Times' wage rate, which was higher than the previously paid C&S rate of pay. Fund's 56.1 ¶ 104.

On September 13, 2013, however, the Fund informed the Times that the Fund had assessed the Times as having partially

14

withdrawn from the Fund during the plan years ending May 31,
2012, and May 31, 2013, incurring $25.7 million in withdrawal
liability. Times' 56.1 ¶ 11. The Fund made its assessment by
calculating a 70% decline in CBUs, with shifts worked by
employees as the applicable CBU. Fund's 56.1 ¶ 35. The Times had
viewed the applicable CBU under the CBA as wages. Fund's 56.1
¶ 36. During the Fund plan years at issue, neither the dollar
amounts of non-overtime pay the Times paid to covered employees
nor total contributions to the Fund declined to the level that
would constitute a partial withdrawal under ERISA. Times' 56.1
¶ 12. It is undisputed that, if the opposing side's claims as to
the applicable CBU is correct, that side's mathematical
assessment with regard to whether the Times incurred partial
liability withdrawal is also correct.

The Fund's actuary, Rosana Egan ("Egan") of The Segal
Company ("Segal") assessed the Times' withdrawal liability for
both plan years ending May 31, 2012, and May 31, 2013, and used
shifts as the applicable CBU. Fund's 56.1 ¶¶ 37, 43-44. In
calculating the Times' withdrawal liability, Egan used the
"Segal Blend," which combined lower market interest rates
published by the PBGC and the plan's generally used minimum
funding investment return interest rate, 7.5%, to calculate the

15

Fund's unfunded vested benefits. For all other purposes other than withdrawal liability, Egan used a minimum funding investment return assumption of 7.5%. Fund's 56.1 ¶ 39. Fund's 56.1 ¶ 38; Times' 56.1 ¶ 18. Using the Segal Blend, Egan calculated the Times' partial withdrawal liability for the plan year ending May 31, 2012, to be $25,706,371 (the "First Assessment"), and for the plan year ending May 31, 2013, to be $7,849,772 (the "Second Assessment").[4] Fund's 56.1 ¶¶ 37, 43; Times' 56.1 ¶ 11.

The Second Assessment, which covered the Times' partial withdrawal liability for the plan ending May 31, 2013, was calculated using the following procedure: first, Egan subtracted the statutory credit provided by 29 U.S.C. § 1386(b) from the Times' allocable share of the Fund's unfunded vested benefits ("UVBs") calculated under 29 U.S.C. § 1386(a)(1) and, second, multiplied that difference by the partial withdrawal fraction described by 29 U.S.C. § 1386(a)(2). Times' 56.1 ¶ 26; see Garfield Decl. Ex. 19, at 27.

---

[4]     The Fund initially calculated the 2013 partial withdrawal liability as $0, but revised its calculations in December 2014 following receipt of final figures. See Interim Op. 27.

16

### d. The Arbitrator's Interim Opinion

In April 2014, the Times initiated arbitration proceedings pursuant to 29 U.S.C. § 1401(a)(1). Before the Arbitrator, the Times disputed the Fund's determination that a partial withdrawal had occurred, the Fund's computation of the liability, and the Fund's calculation of the Second Assessment. See Roth Decl. Ex. A ("Interim Op."), at 1-2.

The Arbitrator conducted six days of hearing between February 10, 2015 and October 7, 2015, which included admitted exhibits and testimony. The Arbitrator heard testimony from: Egan, who served as the Fund's enrolled actuary from the mid-1990s until 2015; John Urbank ("Urbank"), the Fund's benefits consultant and client relationship manager from around 1995 through 2015; Mitchell Lewis ("Lewis"), the Fund's auditor at WeiserMazars LLP from 1997 through 2013; Morris Claffee ("Claffee"), the Times' senior payroll manager responsible for submitting contributions for Times employees covered by the NMDU's CBA to the Fund; Terry Hayes ("Hayes"), the Times' Director of Labor Relations and a Fund Trustee; Neal Schelberg ("Schelberg"), a Proskauer Rose partner in employee benefits who served as co-counsel for the Fund; Darren French ("French"), the

17

Times' actuarial expert; and Ethan Emanuel Kra ("Kra"), the Fund's actuarial expert. See generally Garfield Decl. Ex. 3 ("Arbitration Transcript"). The parties submitted post-hearing briefing by February 20, 2016. Interim Op. 1.

On June 14, 2016, the Arbitrator issued an Interim Opinion that summarized the evidence received and made certain factual findings. Interim Op. 1. First, the Arbitrator found that "shifts" were the applicable CBU for the Times' contribution to the Fund "when viewed as a contextual whole," which included reviewing different provisions' language in the CBA and the longtime understanding and actions of the parties involved with the Fund. See id. at 63. As such, the Arbitrator concluded that the Times had incurred the assessed partial withdrawal liability. See id. The Arbitrator also upheld the Fund's use of the Segal Blend, noting that it was "settled law" that "the Segal Blend is consistent with the requirements of § 4312(a)." See id. at 54-59. With regard to the Second Assessment, however, the Arbitrator found that the Fund had improperly calculated the amount of credit to which the Times was owed, terming the Fund's assessment of partial withdrawal liability for the May 2013 plan "convoluted" and, accordingly, reduced the partial withdrawal liability for the plan year ending May 31, 2013, from $7,849,772

18

to $375,100. See id. at 59–63. Lastly, the Arbitrator ordered
that the Fund repay the Times the amount the Times overpaid the
Fund, including "appropriate interest." Id. at 63.

### e. The Arbitrator's Opinions on Interest

Following the Interim Opinion, the Times and the Fund
disagreed as to the appropriate interest rate to be applied to
the Fund's overpayment repayments. Back before the Arbitrator,
the Times argued that an 18% interest rate was applicable
because that was the rate the Times had been asked by the Fund
to apply when the Times once made a late contribution payment.
See Roth Decl. Ex. H ("Interim Interest Op."), at 5-8. The Fund
argued that the 18% rate had not been formally adopted for
withdrawal liability and, therefore, the interest rate set by
the PBGC was applicable. See id. at 8-9.

On December 24, 2016, the Arbitrator issued an interim
ruling and found that, while the Fund had not formally
established an applicable rate, discovery was necessary to
determine if the Fund had a "policy and practice regarding the
imposition of interest for delinquent withdrawal liability

payments, and the inclusion of interest on refunds of overpayments of withdrawal liability." Id. at 12-13.

On July 12, 2017, following discovery and the submission of briefing, the Arbitrator issued a Final Ruling on Interest. See Roth Decl. Ex. J ("Final Interest Op."). There, the Arbitrator rejected the Times' request for 18% interest, noting that there was only a single instance when the Fund imposed an 18% rate on a late withdrawal liability payment, which did not "establish that the Board [of the Fund] even adopted a uniform policy" of charging such an interest or that it was "charged on a consistent basis over a reasonable period of time." Id. at 18-21. Accordingly, the Arbitrator affirmed the Fund's use of the then-applicable PBGC interest rate, which was 3.25%. Id. at 21.

### f. The Arbitrator's Final Award

On July 19, 2017, the Arbitrator issued the Award and stated that all issues involved in the arbitration were fully resolved. See Roth Decl. Ex. J. Following the Arbitrator's rulings, the Fund refunded the Times the overpayment of principal along with interest calculated pursuant to 29 C.F.R. § 4219.32(c). Fund's 56.1 ¶ 114.

20

## II. **Prior Proceedings**

On August 15, 2017, the Times filed an action to vacate the Award in part. No. 17 Civ. 6178 (RWS), Dkt. No. 1. On August 18, 2017, the Fund also filed an action to vacate the Award in part. No. 17 Civ. 6290 (RWS), Dkt. No. 1. On September 11, 2017, the two actions were consolidated. No. 17 Civ. 6178 (RWS), Dkt. No. 17; No. 17 Civ. 6290 (RWS), Dkt. No. 17.

On September 15, 2017, the Times moved for summary judgment, and the Fund cross-moved for the same on October 20, 2017. No. 17 Civ. 6178 (RWS), Dkt. Nos. 18, 24; No. 17 Civ. 6290 (RWS), Dkt. No. 23. The motions were heard and marked fully submitted on December 6, 2017.

## III. **Applicable Standards**

### a. Summary Judgment

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. Westinghouse Elec. Corp. v. N.Y.C. Transit Auth., 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson, 477 U.S. at 249). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

## b. Standards of Review of ERISA Arbitration Decisions

Under ERISA, courts reviewing decisions of an arbitrator apply different standards to questions of law and to questions of fact. When reviewing an arbitrator's legal conclusions apply courts apply a *de novo* standard of review. 666 Drug, Inc. v. Tr.

of 1199 SEIU Health Care Emps. Pension Fund, 571 F. App'x 51, 52 (2d Cir. 2014); HOP Energy, L.L.C. v. Local 553 Pension Fund, 678 F.3d 158, 160 (2d Cir. 2012). When reviewing an arbitrator's factual findings, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." Nat'l Ret. Fund v. Metz Culinary Mgmt., Inc., No. 16 Civ. 2408 (VEC), 2017 WL 1157156, at *5 (S.D.N.Y. Mar. 27, 2017) (quoting 29 U.S.C. § 1401(c)). For mixed questions of law and fact, in the absence of controlling Second Circuit precedent, courts generally adopt a clear error standard of review. See 666 Drug, Inc. v. Tr. of 1199 SEIU Health Care Emps. Pension Fund, No. 12 Civ. 1251 (PAE), 2013 WL 4042614, at *5 (S.D.N.Y. Aug. 8, 2013) (collecting cases), aff'd, 571 F. App'x 51 (2d Cir. 2014).

## IV. **The Parties' Motions for Summary Judgment are Granted in Part and Denied in Part**

### a. The Arbitrator's Decision that the Times Partially Withdrew from the Fund is Affirmed

The first issue presented is what constitutes the CBUs under the CBA. That answer—whether it is "shifts," the Fund's answer, or "wages," the Times' answer—is the fulcrum around which whether the Times partially withdrew from the Fund turns.

23

As described above, the Arbitrator concluded that the answer was "shifts." Interim Op. 33.

The Times argues that the Arbitrator's conclusion was "legally flawed." Times' Mem. in Supp. of Mot. for Summ. J. ("Times' Mem.") 18, No. 17 Civ. 6178, Dkt. No. 20. To the Times, the question presented is one purely of law: how to apply ERISA's definition of a "contribution base unit," the "unit with respect to which an employer has an obligation to contribute," to the obligations created by the CBA. 29 U.S.C. § 1301(a)(11); see Times' Mem. 18. Principally, the Times points to parts of the CBA that require the Times to contribute for instances when employees do not actually work, such as various leaves of absence, and evidence presented to the Arbitrator that certain categories of employees, like foremen, received compensation not based on shifts to demonstrate that the "substance and reality" of the Times' pension obligations to the Fund. Times Mem. 18-19. Finally, the Times avers that, as a purely legal question, it is improper to consider the subjective understanding of and actions based on the CBU by those at the Fund and at the Times. Times Mem. 20.

In response, the Fund presents two arguments. First, the Fund contends that the CBA's language alone is what determines the Times' contribution obligations, and the CBA's terms unambiguously required that contributions be made "per shift for each shift worked" by covered employees. Fund's Mem. of Law in Supp. of Cross-Mot. for Summ. J. ("Fund's Mem.") 18 (quoting CBA § 13-I.1), No. 17 Civ. 6178, Dkt. No. 25. The Fund supports this reading by pointing to other CBA provisions that define "day" and "night" shifts, as well as others which cap the Times' contributions to the Fund at five shifts in any given payroll week. See Fund's Mem. 19. As a secondary argument, the Fund contends that, given the Administrator considered extrinsic evidence in making his determination, his interpretation of the CBA is a factual finding entitled to a higher degree of deference. See Fund's Mem. 22-24.

Initially, it needs to be determined which standard of review is appropriate when reviewing the Arbitrator's finding of shifts as the CBU. The Interim Opinion does not afford a cut-and-dry answer.

The Arbitrator examined the language of the CBA and found that adopting the Times' reading would render the provision

25

"'for each shift worked' wholly superfluous," Interim Op. 33,

which is the kind of language courts generally employ when

construing a contract's "plain meaning." LaSalle Bank Nat'l

Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir.

2005) (citations omitted) ("[A]n interpretation of a contract

that has 'the effect of rendering at least one clause

superfluous or meaningless . . . is not preferred and will be

avoided if possible."). Were this the exclusive, or even primary

basis upon which the Arbitrator's decision rested, *de novo*

review of this legal determination would be appropriate.

However, the Arbitrator's opening observation was that the

CBA was "not without some ambiguity," Interim Op. 33, a comment

repeated several other times, see id. at 33-34. Following a

brief discussion of surplusage—itself a canon of construction

used to resolve ambiguity—the Arbitrator dedicated the majority

of his analysis to resolving "[w]hatever ambiguity in the

provision exists [that] derives from the phrase 'shift worked.'"

Interim Op. 33. In doing so, the Arbitrator considered other

provisions of the CBA, see id. 33-36, and witness testimony,

relying especially on evidence from the Fund's enrolled actuary

and auditor, which the Arbitrator found truthful, see id. 36-38.

Taken in its entirety, the CBU decision in the Interim Opinion

is properly read as finding the CBA ambiguous and then resolving

that unspecified amount of ambiguity in the CBA through

consideration of intrinsic and extrinsic evidence.

"When courts interpret CBAs, traditional rules of contract

interpretation apply as long as they are consistent with federal

labor policies." Aeronautical Indus. Dist. Lodge 91 of Int'l

Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United

Techs. Corp., Pratt & Whitney, 230 F.3d 569, 576 (2d Cir. 2000).

Whether or not a contract is ambiguous is a threshold question

of law to be reviewed de novo. See, e.g., Broder v. Cablevision

Sys. Corp., 418 F.3d 187, 197 (2d Cir. 2005); Walk-In Med. Ctrs.,

Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987)

("The determination of whether a contract term is ambiguous is a

threshold question of law for the court."). A contract is

unambiguous when it has "'a definite and precise meaning,

unattended by danger of misconception in the purport of the

contract itself, and concerning which there is no reasonable

basis for a difference of opinion.'" Olin Corp. v. Am. Home

Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012) (citation omitted);

see Walk-In Med. Ctrs., 818 F.2d at 263 (stating that language

is ambiguous if it is "capable of more than one meaning when

viewed objectively by a reasonably intelligent person who has

examined the context of the entire integrated agreement and who
is cognizant of the customs, practices, usages and terminology
as generally understood in the particular trade or business").

    The Arbitrator's conclusion that the CBA was "not without
some ambiguity" was proper. Reasonable bases exist to believe,
from the language of the CBA's provision alone, that the CBU
could be either shifts or wages. The Fund's argument that
"shifts" avoids surplusage because Section 13-I.1 has language
requiring payment "per shift for each shift" has merit. Also, in
the same section, the CBA caps the number of payroll week shifts
at five shifts. See CBA § 13-I.1. It is valid to wonder why that
language be there if the CBA meant anything other than "shifts."
However, the Times' arguments are not without their own weight.
Paying "8% of each employee's pay rate per shift for each shift
worked" could be reasonably read to mean monetary contribution
rate of 8% of earnings or, in other words, the total payments
over the total shifts. Moreover, as the Times identifies, the
CBA requires 8% contributions to the Fund for paid leave, which
amounts to employees' unworked time that is quantified in days—
to implement a "shifts worked" approach requires a leap of

interpretative logic that even the Arbitrator recognized.[5] See CBA § 13-K.3; Interim Op. 34 (emphasis added) ("Once one incorporates the notion that all time compensated . . . is treated as a 'shift worked,' any ambiguity in §13-I.1 is resolved."). Accordingly, the Arbitrator's consideration of

---

[5]   In its submissions, the Times repeatedly cites to extrinsic evidence, such as testimony given during the Arbitration regarding contribution practices, even while arguing that *de novo* review is appropriate. The Times contends that such evidence is appropriate even while simultaneously stating that this is a question of law because "applicable labor-management relations law" obligations can arise from under ERISA law from "past practices." See Times Mem. 14 (quoting, in part, 29 U.S.C. § 1392(a)(2)). This argument fails. To be sure, in addition to CBAs, employer obligations to contribute to plans can arise from "a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a). However, the Supreme Court has clarified that that avenue of obligation refers to "any obligation imposed by the [National Labor Relations Act of 1935]." Laborers Health & Welfare Tr. Fund For N. California v. Advanced Lightweight Concrete Co., 484 U.S. 539, 546 & n.11 (1988) (citing 29 U.S.C. § 1392(a)). No such obligation has been put forth as relevant to the instant dispute. The Times' citation to Bozetarnik v. Mahland, 195 F.3d 77, 82 (2d Cir. 1999), does not persuade that past practices amount to an ERISA-imposed duty. In Bozetarnik, the court rejected that certain alleged past practices could amount to implied terms of a CBA, particularly because that CBA contained an integration clause; nowhere did the court discuss past practices as creating duties arising under labor law. See id. at 82-83. Accordingly, any determination of the CBA's ambiguity requires looking only to the language of the CBA. See Aeronautical Indus., 230 F.3d at 576 (citing United Mine Workers v. LTV Steel Co. (In re Chateaugay Corp.), 891 F.2d 1034, 1038 (2d Cir. 1989)) ("Only when provisions are ambiguous may courts look to extrinsic factors—such as bargaining history, past practices, and other provisions in the CBA—to interpret the language in question.")

29

extrinsic evidence to resolve what is an ambiguous contract was proper. See Aeronautical Indus., 230 F.3d at 576-77 ("[W]e believe that extrinsic factors are relevant to determining the precise nature of the Company's duties . . . because the contested contractual language is not unambiguous on its face.").

The Arbitrator's factual finding that that CBA's CBU are shifts is presumptively correct except by a rebuttal showing of the clear preponderance of the evidence. See 29 U.S.C. § 1401(c). Under such a standard, the Arbitrator's finding must remain undisturbed.

As the Interim Opinion demonstrates, the Arbitrator considered a wide range of presented extrinsic evidence. He considered the Fund's Pension Plan, which detailed the Fund's operations and described employee compensation from contributing employers in terms of "credited service shifts." Interim Op. 34. After hearing days of witnesses, detailed above, the Arbitrator highlighted the testimony of Egan and Lewis, both of whom testified that "they always understood the CBU to be shifts," as credible. Interim Op. 36; see id. 37 ("[T]heir actions over the years demonstrated the truthfulness of their assertions."). The

30

Arbitrator noted that the Welfare Fund's contribution language, which had "virtually identical language" to the Fund's CBA and treated the contribution rate as shifts, supported the conclusion that shifts was the CBU. Interim Op. 36.

In reaching his conclusion, the Arbitrator considered the evidence put forward by the Times, and which are similar to the arguments raised by it on the instant motion. See Times' Mem. 18-20. Such facts included: that the Times' payroll software was set up to combine different shift-based pays into a single amount, entitled "Base MTD [Month to Date]," which was then multiplied by 8% to get the pension contributions; the fact that the Times made pension contributions for the differentials paid for shifts of employees entitled to higher pay, like forklift operators; and that the Times consistently reported to the Segal actuaries that the Times was using wages as its contribution rate. See Interim Op. 34-35, 37.

The Times' position is not meritless, and evidence adduced supports the contention that many employees at the Times who interacted with the Fund believed that the CBUs were wages. Assuredly, there was confusion between the parties. However, a contract can only mean one thing, and the "determination as to

31

which of competing inferences to draw" between compelling
evidence "lies within the province of the trier of fact." In
Time Prods., Ltd. v. Toy Biz, Inc., 38 F.3d 660, 665 (2d Cir.
1994) (citations omitted). By statute, that trier was the
Arbitrator. Particularly in the face of the weight given by the
Arbitrator to the testimonies of Egan and Lewis, the Times'
evidentiary showing today has not established by a clear
preponderance of the evidence that the Arbitrator was incorrect
in concluding that the terms of the CBA set the applicable CBUs
as wages. See, e.g., Faiveley Transp. Malmo AB v. Wabtec Corp.,
559 F.3d 110, 118 (2d Cir. 2009) ("Assessments of the
credibility of witnesses are peculiarly within the province of
the trier of fact and are entitled to considerable deference.").

Accordingly, the Arbitrator's factual finding is afforded
deference, and his conclusion that the CBA's CBU is shifts is
upheld. See Sigmund Cohn Corp. v. Dist. No. 15 Machinists
Pension Fund by its Bd. of Trs., 804 F. Supp. 490, 493 (E.D.N.Y.
1992) (citing Chi. Truck Drivers Pension Fund v. Louis Zahn Drug
Co., 890 F.2d 1405, 1406 (7th Cir. 1989)) ("Courts reviewing
arbitration awards have consistently upheld the arbitrator's

factual findings under [ERISA] section 4221(c)'s [29 U.S.C.
§ 1401(c)] 'presumption of correctness.'").[6]

### b. The Arbitrator's Approval of the Segal Blend is Reversed

The second issue presented is whether the Fund's actuary,
Egan, after concluding that the Times had partially withdrawn
from the Fund, used the appropriate discount rate in calculating
the Times' withdrawal liability. Specifically, Egan used a
discount rate of 6.5%, known in the industry as the Segal Blend,
which was calculated by blending the Fund's investment-return
rate of 7.5% with lower, risk-free rates published by the PBGC.
Interim Op. 25. This rate was different than what the Fund used
when calculating the Times' minimum funding requirements. As
such, the parties dispute whether the asymmetrical application
of the Segal Blend was legally permissible.

The Times contends that the Fund's actuary's use of the
Segal Blend violated both ERISA and Supreme Court precedent.
First, the Times argues that the rate the Fund used for

---

[6] As the Arbitrator's decision that the CBUs were shifts is
upheld, the Fund's argument that, even were the CBUs to be found
as wages, that the Times still incurred liability because it
attempted to "evade or avoid" withdrawal liability pursuant to
29 U.S.C. § 1392(c), need not be reached. See Fund's Mem. 24-27.

33

calculating minimum funding requirements, 7.5%, needed to be the same that was used for any withdrawal liability calculations. In support, the Times identifies identical language in ERISA between the minimum funding rules and withdrawal liability calculations, both of which require an actuary to use rates that are "reasonable (taking into account the experience of the plan and reasonable expectations)" and which, "in combination, offer the actuary's best estimate of anticipated experience under the plan." 29 U.S.C. § 1084(c)(3)(A)-(B) (detailing permissible actuarial assumptions for minimum funding for multiemployer plans); 29 U.S.C. § 1393(a)(1) (detailing permissible actuarial assumptions for withdrawal liability); see Times Mem. 24-25.[7]

---

[7]    Section 1084(c)(3), which addresses actuarial assumption requirements for minimum funding as to ERISA plans, requires:

> For purposes of this section, all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods—(A) each of which is reasonable (taking into account the experience of the plan and reasonable expectations), and (B) which, in combination, offer the actuary's best estimate of anticipated experience under the plan.

29 U.S.C. § 1084(c)(3).

Section 1393(a), which addresses actuarial assumption requirements for withdrawal liability as to ERISA plans, requires:

> The corporation may prescribe by regulation actuarial assumptions which may be used by a plan actuary in determining the unfunded vested benefits of a plan for purposes of determining an employer's withdrawal liability under this part. Withdrawal liability under

34

Congress' use of identical language, the Times contends, meant that the same assumptions—and, therefore, the same rates—were to be used in both cases. In addition, the Times points to the Supreme Court's decision in <u>Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.</u>, 508 U.S. 602 (1993), which discussed "the necessity" of a Fund actuary to apply "the same assumptions and methods in more than one context," particularly highlighting a fund's interest rate assumption. <u>Id.</u> at 632; <u>see id.</u> at 633 ("[T]he calculation of withdrawal liability is . . . arguably the most important assumption" and "is the critical interest rate assumption that must be used for other purposes as well."); Times Mem. 25-27. Based on those statements, the Times avers that Egan's use of the Segal Blend solely for the purpose of calculating withdrawal liability was wrong. Lastly, the Times argues that the Segal Blend's estimation were not the best estimate of the anticipated experience of the Fund, because a blend of risk-free rates does

---

this part shall be determined by each plan on the basis of—(1) actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan, or (2) actuarial assumptions and methods set forth in the corporation's regulations for purposes of determining an employer's withdrawal liability.

29 U.S.C. § 1393(a).

not represent the Fund's actual investment portfolio. See Times
Mem. 28-30.

The Fund counters that Egan's use of the Segal Blend was
proper. In response to the Times' statutory arguments, the Fund
notes that while ERISA language identified by the Times is the
same between the two provisions, the minimum funding provision
requires actuarial assumptions only to be "reasonable," 19
U.S.C. § 1084(c)(3), while withdrawal liability provisions
require the assumptions be reasonable "in the aggregate," 29
U.S.C. § 1393(a)(1); see Fund's Mem. 28. Moreover, the minimum
funding and withdrawal liability sections each require an
actuary to take into account "reasonable expectations" and
"anticipated expectations." Compare 29 U.S.C. § 1393(a)(1), with
id. § 1084(c)(3). If Congress had intended the same assumptions
to be used for contributions as with withdrawals, posits the
Fund, Congress could and would have included a cross-reference,
like in other sections. See Fund's Mem. 29. To the Fund, ERISA's
expectation language demonstrates that, as withdrawal liability
calculations are made after an employer has withdrawn from a
fund and face no further risk connected to that fund's
performance, it is reasonable and proper for an actuary to set a

lower return rate based on a finding of lower risk.[8] <u>See</u> Fund's
Mem. 27-30. Second, the Fund avers that <u>Concrete Pipe</u> does not
foreclose this reading, noting that the Court only went so far
as to state that "[u]sing different assumptions [for different
purposes] could very well be attacked as presumptively
unreasonable both in arbitration and on judicial review," which
is not the same as explicitly forbidding different rates.
<u>Concrete Pipe</u>, 508 U.S. at 633 (second alteration in original)
(citation omitted).

In his Interim Opinion, as noted above, the Arbitrator
sided with the Fund in concluding that Egan's use of the Segal
Blend was legally acceptable. <u>See</u> Interim Op. 54-59. The
Arbitrator acknowledged that the Times' reading of <u>Concrete Pipe</u>
was not "implausible," but that the Supreme Court's language was
also "not a definitive rejection . . . of using different
assumptions for different purposes." Interim Op. 55. Rather, the
<u>Concrete Pipe</u> Court "was leaving open the possibility an actuary

---

[8]     Should a fund fail to meet it investment return assumption—
for example, in the case of the Fund, a return of 7.5%—
contributing employers are required to make up the shortfall.
<u>See</u> Reply Mem. of Law in Further Supp. of the Fund's Mot. for
Summ. J. ("Fund's Reply") 13, No. 17 Civ. 6178, Dkt. No. 29;
Combined Reply Mem. in Supp. of the Times' Mot. for Summ. J. and
Opp. to Cross-Mot. for Summ. J. ("Times' Opp.") 11, No. 17 Civ.
6178, Dkt. No. 30.

could convincingly explain why it was appropriate and reasonable to use different interest rate assumptions for different purposes." Id. As to the Times' ERISA statutory language arguments, the Arbitrator found that they were "not new" and had not been accepted by other arbitrators or federal courts; rather, the Arbitrator observed that "arbitration awards have expressly held that the Segal Blend . . . if found by the actuary to be the appropriate actuarial assumption, is appropriate under § 4312(a)." Id. at 56-57. As such, the Arbitrator upheld the use of the Segal Blend by the Fund, concluding that "[i]f the dominant case law is going to be reversed based on the Times' arguments, that action will not come in an arbitration decision, but rather through court review." Id. at 58.

Before reviewing the Arbitrator's opinion, a more fulsome review of Concrete Pipe is merited—or, as the opinion covers a wider range of topics, at least as to the part of the opinion implicated by the parties' dispute. Broadly-speaking, in Concrete Pipe, an arbitrator determined that Concrete Pipe and Products of California had incurred withdrawal liability because it did not pay enough into a CBA-created employee pension plan covered by ERISA. See Concrete Pipe, 508 U.S. at 614-15. On

38

appeal, the Court affirmed the plan's assessment, concluding that the statutory regime created by the MPPAA under which employers made payments into pension funds did not create procedural due process or takings violations under the Fifth Amendment. See id. at 647.

Part of the Court's opinion addressing procedural due process is relevant to the present issue. One of Concrete Pipe's arguments was that the MPPAA created opportunities for trustee bias to influence the amount employers had to pay in withdrawal liability: because the MPPAA allowed determinations of a plan's trustees to be made without a hearing, and because those conclusions were then insulated by the MPPAA's presumptions of correctness on appeal before an arbitrator, the statute deprived employers the opportunity for a fair adjudication. See id. at 620. After concluding that the MPPAA needed to be read to permit employers to challenge factual determinations before an arbitrator by a preponderance of the evidence, the Court applied its determined presumption to factual issues raised by Concrete Pipe in its challenge. See id. at 630-32. One such issue was the amount of withdrawal liability assessed by the plan.

The Court concluded that a fund's calculation of withdrawal liability differed from other facts found by a fund. In part, the Court found this because withdrawal liability is calculated by an actuary, who is "not . . . vulnerable to suggestions of bias or its appearance" because "actuaries are trained professionals subject to regulatory standards." Id. at 632. In addition to external professional standards, the Court highlighted common language in ERISA regarding actuarial assumptions between two different contexts: withdrawal liability and minimum funding. Similar language itself created checks on the ability of a plan to be biased because:

> The use of the same language to describe the actuarial assumptions and methods to be used in these different contexts . . . check[s] the actuary's discretion in each of them. Using different assumptions [for different purposes] could very well be attacked as presumptively unreasonable both in arbitration and on judicial review. . . . For example, the use of assumptions (such as low interest rates) that would tend to increase the fund's unfunded vested liability for withdrawal liability purposes would also make it more difficult for the plan to meet the minimum funding requirements.

Id. at 632-33 (alteration in original) (internal quotation marks and citation omitted). Moreover, the Court did not find "any method or assumption unique to the calculation of withdrawal liability . . . so manipulable as to create a significant opportunity for bias to operate, and arguably the most important assumption . . . is the critical interest rate assumption that

must be used for other purposes as well." Id. at 633. Before an arbitrator, an employer would need to rebut an actuary's conclusions by a preponderance that "the combination of methods and assumptions employed in the calculation would not have been acceptable to a reasonable actuary." Id. at 635. That presumption, however, did not support a procedural due process objection. Id.

Insofar as the Times wishes to argue that use of different interest rates in different contexts is always impermissible as a matter of law, that argument fails. Both the ERISA provisions and the language of Concrete Pipe discussed above indicate otherwise.

The ERISA provisions addressing actuarial assumptions as to minimum funding versus withdrawal liability, while similar, are meaningfully different. Specifically, the inclusion of the clause "in the aggregate" is an addition that cannot be ignored. 29 U.S.C. § 1393(a)(1). That clause's distinct inclusion in the withdrawal liability section, suggests that Congress envisioned the possibility that calculating withdrawal liability could combine many different assumptions and methods to result in something different than that found for the contribution

requirements. See Bates v. United States, 522 U.S. 23, 29-30 (1997) (citation omitted, alteration in original) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). That said, the overall similarity of language should not be ignored, and suggests that Congress expected that the rates used in the different situations would be, at minimum, similar, if not the same. See Smith v. City of Jackson, Miss., 544 U.S. 228, 233 (2005) (plurality opinion) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

The conclusion reached from Concrete Pipe is the following. Actuarial bias against withdrawing employers was guarded against because there is no "significant opportunity for bias to operate" when "the most important assumption . . . is the critical interest rate assumption that must be used for other purposes as well." Concrete Pipe, 508 U.S. at 632-33. In the same breath, however, the Court stated that the "assumptions

42

used by [a] Plan in its other calculations may be supplemented by several actuarial assumptions unique to withdrawal liability." Id. at 633 (emphasis added, internal quotation marks omitted). The expectation is that a standard, uniform interest rate is applied in all contexts, and any deviation "could very well be attacked as presumptively unreasonable both in arbitration and on judicial review." Id. at 633 (citation omitted). That does not mean, however, that deviation is, at all times, impermissible by law—were that the case, the Court would not have included the open-ended "could very well be" language rather than something more definitive. While few courts have delved into the murky mists of these particular ERISA provisions, this Court is not the first to read Concrete Pipe in this way. See Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc., 698 F.3d 346, 355 (7th Cir. 2012) (Posner, J.) (discussing Concrete Pipe and observing that "the Court [in Concrete Pipe] had indicated that 'supplemental' assumptions that might cause the rates to diverge were permissible").

However, simply because the use of the Segal Blend uniquely in the context of calculating an employer's withdrawal liability is not prohibited as a matter of law does not mean that its

43

application in the present context was proper. Rather, to the
extent that the Times contends that the use of the Segal Blend
in this instance violated ERISA law, that claim is merited.

The Arbitrator's decision that the Segal Blend's use was
reasonable in the aggregate is a mixed question of fact and law
and is reviewed for clear error. See 666 Drug, Inc., 2013 WL
4042614, at *5 (collecting cases); accord Plan Bd. of Sunkist
Ret. Plan v. Harding & Leggett, Inc., 463 F. App'x 702, 703 (9th
Cir. 2011) (reviewing district court's review of withdrawal
liability interest rate assumption for clear error).

As detailed above, ERISA requires that when determining an
employer's withdrawal liability, "actuarial assumptions and
methods" must, "in the aggregate, [be] reasonable (taking into
account the experience of the plan and reasonable expectations)
and which, in combination, offer the actuary's best estimate of
anticipated experience under the plan." 29 U.S.C. § 1393(a)(1)
(emphasis added). Egan's testimony before the Arbitrator was
that a 7.5% percent assumption was her "best estimate of how the
Pension Fund's assets . . . will on average perform over the
long term." Arb. Tr. 568:3-8; see Arb. Tr. 600:3-15 (observing
that the Segal Blend was "lower" than Egan's best estimate of

44

anticipated plan experience in the long term). If 7.5% was the
Fund actuary's "best estimate," it strains reason to see how the
Segal Blend, a 6.5% rate derived by blending that 7.5% "best
estimate" assumption with lower, no-risk PBGC bond rates, can be
accepted as the anticipated plan experience. This is especially
when the blend includes interest rates for assets not included
in the Fund's portfolio. The Segal Blend's applicability is
further undermined by Egan's acknowledgment that she had used
the Segal Blend as her "best estimate" when calculating withdraw
liability "regardless of the particular pension plan's actual
portfolio of assets." Arb. Tr. 585:10-586:5.

In defense of the Segal Blend, the Fund argues that there
is less risk facing employers like the Times who withdraw
because the liability of those employers becomes fixed; if the
Fund underperforms, the withdrawer is not required to pay more,
unlike an employer still part of the Fund's plan. See Fund Mem.
28-29. Because of this background, the Fund notes, not only did
Egan, but also the Fund's actuarial expert, Kra, testified that
the Segal Blend was, in the aggregate, reasonable. See Fund Mem.
33-34 (citing Arb. Tr. 695:12-16). On the other hand, the
Times's rejoinder that a withdrawing employer also does not
share in any over-performance by the Fund, which would reduce

45

future contribution obligations, effectively nullifies the
Fund's argument. See Times' Opp. 11. Accordingly, the inquiry
returns to what the statute states it requires for an applicable
return rate: what is the best estimate of the "anticipated
experience" under the plan." 29 U.S.C. § 1393(a)(1).

The Arbitrator's Interim Opinion did not actively engage
with the issue of whether the Segal Blend's rate was a
reasonable best estimate. Rather, after concluding that the
Segal Blend was not foreclosed as a matter of law, he found that
there was "no evidence to suggest that the decision to use the
Segal Blend was part of a scheme to take advantage of the Times"
and accepted that, because Egan had been using the "Segal Blend
when calculating withdrawal liability the entire time," the
Times could not claim the Segal Blend's caused it to be
"unfairly penalized." Interim Op. 58-59.[9] That reasoning does not
support a finding that the Segal Blend's rate was the "best
estimate" of the plan's "anticipated experience." A lack of
duplicity does not, by itself, equate with a correct answer.

---

[9]     Earlier in the Interim Opinion, the Arbitrator did outline
Egan, Kra, and French's testimony as to the Segal Blend, though
without opining on the merits of the rate. See Interim Op. 31-
33.

46

In sum, the actuary's testimony, combined with the untethered composition of the Segal Blend and paucity of analysis by the Arbitrator, create "a definite and firm conviction that a mistake has been made" in accepting the Segal Blend; as such, this Court will "set the findings aside even though there is evidence supporting them that, by itself, would be considered substantial." Wu Lin v. Lynch, 813 F.3d 122, 128 (2d Cir. 2016) (quoting 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2585 (3d ed. 2007)). Accordingly, the Arbitrator's decision that the Segal Blend was the appropriate rate to calculate the Times' partial withdrawal is reversed. In the absence of additional evidence sufficient to support a different rate, the Times' liability should be recalculated using the 7.5% assumption testified to as the "best estimate."

### c. The Arbitrator's Reversal of the Fund's Calculations of the 2013 Partial Withdrawal is Affirmed

The third issue presented is which method for calculating successive partial liability withdrawal is appropriate. As found above, the Times incurred withdrawal liability for both plan years ending May 31, 2012 and May 31, 2013. Under ERISA, to "protect a withdrawing employer from being charged twice for the

47

same unfunded vested benefits" when charged over multiple years,
29 C.F.R. § 4206.1(a), a credit mechanism computation was
statutorily created to reduce a withdrawing employer's
withdrawal liability by any liability incurred the previous
year. See 29 U.S.C. § 1386; see generally 29 C.F.R. § 4206.1, *et
seq.* The parties do not dispute that Section 1386 is the
relevant statute, but rather how to read and apply its
computational directives to calculate the Times' 2013 partial
withdrawal liability—or, in other words, an order of operations
problem in the form of statutory interpretation.

29 U.S.C. § 1386, or ERISA Section 4206, is the portion
relevant here, and describes with ERISA's typical simplicity how
to calculate partial withdrawal liability. Because of its
significance to the instant issue, the relevant portion of
Section 1386 is presented here:

(a) The amount of an employer's liability for a
partial withdrawal, before the application of sections
1399(c)(1) and 1405 of this title, is equal to the
product of—

(1) the amount determined under section 1391 of
this title, and adjusted under section 1389 of
this title if appropriate, determined as if the
employer had withdrawn from the plan in a
complete withdrawal—

(A) on the date of the partial withdrawal,
or

48

(B) in the case of a partial withdrawal described in section 1385(a)(1) of this title (relating to 70-percent contribution decline), on the last day of the first plan year in the 3-year testing period, multiplied by

(2) a fraction which is 1 minus a fraction—

(A) the numerator of which is the employer's contribution base units for the plan year following the plan year in which the partial withdrawal occurs, and

(B) the denominator of which is the average of the employer's contribution base units for—

(i) except as provided in clause (ii), the 5 plan years immediately preceding the plan year in which the partial withdrawal occurs, or

(ii) in the case of a partial withdrawal described in section 1385(a)(1) of this title (relating to 70-percent contribution decline), the 5 plan years immediately preceding the beginning of the 3-year testing period.

(b)

(1) In the case of an employer that has withdrawal liability for a partial withdrawal from a plan, any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction of such liability) of the employer with respect to the plan for a previous plan year.

29 U.S.C. § 1386(a)-(b)(1).

49

The Fund contends that the proper computational procedure was the way it initially calculated the Times' 2013 liability, which is as follows. First, the Fund calculated the Times' allocable share of the UVBs under 29 U.S.C. § 1386(a)(1), then subtracted from that number the statutory credit of the amount of the Times' partial withdrawal liability the previous year under 29 U.S.C. § 1386(b), and then multiplied that difference by a fraction which represents the decline of the partial withdrawal, described in 29 U.S.C. § 1386(a)(2). See Fund's Mem. 35-36; Second Assessment at 27. The Fund argues that the statute's language is unambiguous. Under Section 1386, the first element of the equation is "the amount determined under section 1391 of this title [ERISA Section 4211], and adjusted under section 1389 of this title [ERISA Section 4209] if appropriate, determined as if the employer had withdrawn from the plan in a complete withdrawal." 29 U.S.C. § 1386(a)(1). As Sections 1391 and 1389 apply whether there is a full or partial withdrawal, the Fund argues, the only way not to render the "determined as if the employer had withdrawn from the plan in a complete withdrawal" directive superfluous requires applying Section 1386(b)(1) as part of Section 1386(a)(1), which requires that any employer "for a partial or complete withdrawal from that plan in a subsequent plan year . . . be reduced by the amount of

any partial withdrawal liability." Id. § 1386(b)(1); see Fund's
Mem. 36. Because the ERISA provision is unambiguous, the Fund
states, any extrinsic evidence, such as PBGC documents put
forward by the Times and described below, are irrelevant. See
Fund's Mem. 36-38.

By contrast, the Times argues that the partial withdrawal
calculation should go as follows. First, the employer's
allocable share of the plan's UVBs is calculated as if it had
been a complete withdrawal, pursuant to 29 U.S.C. § 1386(a)(1).
That figure is then multiplied by the aforementioned partial
withdrawal fraction laid out in 29 U.S.C. § 1386(a)(2). Then,
that product is reduced by any partial liability from the
previous plan year, pursuant to 29 U.S.C. § 1386(b)(1). See
Times' Mem. 31. The Times supports this computational
interpretation in three ways. Similarly pointing to the statute,
the Times observes that Section 1386(a) first states how to
calculate "an employer's liability for a partial withdrawal,"
and then, logically, Section 1386(b) states that an employer's
"withdrawal liability for a partial withdrawal" is reduced by
credit for the prior partial withdrawal. See Times' Mem. 32.
Second, the Times identifies an Opinion Letter by the PBGC which
states that the "plain language [of] Section 4206(a) precludes

the prior use of Section 4206(b)(1) in this adjustment process"
in the manner set-out by the Fund and that calculations as
argued by the Fund are "clearly erroneous." PBGC Op. Letter 85-4
(Jan. 30, 1985); see Times' Mem. 33. Lastly, the Times contends
that the Fund's mathematical proscription causes the Times to
incur additional liability on subsequent partial withdrawals,
even if nothing changes between the initial and successive
partial withdrawals, which defeats the purpose of Congress
granting the credit at all. See Times' Mem. 33.

The Arbitrator concluded, as a matter of law, that the
Times' partial withdrawal liability adjustment calculations were
correct. See Interim Op. 59-60. Without opining on what legal
weight to apply to the PBGC Opinion Letter, the Arbitrator found
the Opinion Letter to present a "more faithful reading and
application of § 4206." Id. Calling the Fund's statutory reading
"convoluted," the Arbitrator concluded there was:

> [N]o cogent reason to believe Congress intended that a
> fund is supposed to start the calculation following
> § 4206(a)(1), then skip the step set forth in
> § 4206(a)(2) and go to the subtraction of prior
> partial withdrawal liability called for in
> § 4206(b)(1), and only then revert back to the
> multiplier of the partial withdrawal fraction
> described in § 4206(a)(2).

Id.

Reviewing the Arbitrator's statutory interpretations *de novo*, his conclusion is affirmed. This "review necessarily begins with the statutory text to determine whether the language, viewed in context, unambiguously reveals Congress's intent." United States v. Colasuonno, 697 F.3d 164, 173 (2d Cir. 2012) (citing Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)).

Looking to the text of the statute itself, Section 1386 is laid out in a two-part fashion. In subsection (a), the "amount" of an employer's partial withdrawal liability is determined in Section 1386(a), which requires multiplying the UVBs in Section 1386(a)(1) by the contribution-base decline fraction of Section 1386(a)(2). Next, in subsection (b), the liability determined in Section 1386(a) is reduced by the amount of any partial withdrawal liability from the previous plan year. Viewed this way—in other words, in the order the statute was written—the statutory calculations proceed in a logical, linear, and unambiguous fashion. "To be sure, Congress might have expressed itself more clearly, but . . . this is the most natural reading of the statute." Shepherd v. Goord, 662 F.3d 603, 607 (2d Cir. 2011).

The Fund's contention that any other reading but theirs makes the "as if the employer had withdrawn from the plan in a complete withdrawal" language superfluous is unavailing.[10] Rather, this clause clarifies that, even though the overall section deals with partial withdrawal, the starting calculation at Section 1386(a)(1) is arrived at no differently than in a complete withdrawal. While perhaps overly cautious of ERISA's drafters, this reading does not necessarily render the clause superfluous. At minimum, the clause's inclusion does not warrant the statutory hop-scotch the Fund would otherwise have actuaries perform. See Krause v. Titleserv, Inc., 402 F.3d 119, 127-28 (2d Cir. 2005) (quoting Hohn v. United States, 524 U.S. 236, 249 (1998) and Lamie v. United States Tr., 540 U.S. 526, 536 (2004)) (second alteration in original) ("[W]e are reluctant to endorse an awkward reading of its words for no better reason than to satisfy the canon of construction . . . '[g]eneral principles of

---

[10]  Curiously, the Fund argues in its briefing that the statute is "unambiguous, as it is here because it has only one reading that gives effect to all of the words." Fund's Mem. 37. However, the preference of avoiding surplusage is itself a canon of construction. See, e.g., Marx v. Gen. Revenue Corp., 568 U.S. 371, 386 (2013) (discussing the "canon against surplusage"). Courts are instructed to use canons of statutory construction to help resolve any statutory ambiguity. Colasuonno, 697 F.3d at 173. By invoking an argument against surplusage, the Fund itself acknowledges the possibility of ambiguity. In any event, as described above, both the statutory text and extrinsic guidance point in the same direction: the Times' position.

statutory construction are notoriously unreliable' and 'should
not take precedence over more convincing reasons'" because the
"'preference for avoiding surplusage constructions is not
absolute.'").

Lastly, to whatever extent there were ambiguity as to
Section 1386, it is squarely resolved by the 1985 PBGC Opinion
Letter. The PBGC wrote the 1985 Opinion Letter after being
presented with the same question here. There, the PBGC concluded
the Times' reading "correct" and the Fund's reading "clearly
erroneous." PBGC Op. Letter 85-4 (Jan. 30, 1985). The PBGC's
opinion is instructive and a useful cross-check. See Beck v.
PACE Int'l Union, 551 U.S. 96, 104 (2007) (alteration in
original) (quoting Mead Corp. v. Tilley, 490 U.S. 714, 722, 725-
26 (1989)) ("We have traditionally deferred to the PBGC when
interpreting ERISA, for 'to attempt to answer these questions
without the views of the agencies responsible for enforcing
ERISA, would be to embar[k] upon a voyage without a compass.'");
Trs. of Local 138 Pension Tr. Fund, 692 F.3d at 134-35 ("The
PBGC, the agency charged with administering the withdrawal-
liability provisions under ERISA, is traditionally afforded
substantial deference in its reasonable interpretations of the
statute."); Marcella v. Capital Dist. Physicians' Health Plan,
Inc., 293 F.3d 42, 48 (2d Cir. 2002) (citing Opinion Letters

from the Department of Labor and observing that "[w]hatever ambiguity there might be in ERISA on this point . . . we are supported in our conclusion by the . . . agency charged with interpretation and enforcement of the statute").

Accordingly, the Arbitrator's conclusion that the Second Assessment was incorrectly calculated and order that the Fund's calculations be redone was correct and is affirmed.

### d. The Arbitrator's Approval of the Interest Rate the Fund Applied to the Times' Overpayment is Affirmed

The fourth and last issue presented pertains to the amount that the Fund needs to refund the Times for overpayments of partial withdrawal liability payments. As found above, the Times incurred partial withdrawal liability for plans ending May 31, 2012, and May 31, 2013, but the Fund incorrectly computed that liability as to the Second Assessment, resulting in the Times overpaying. As such, the Fund needed to repay the Times. Vanquishing the question of repayments, however, created, like the Lernaean Hydra, two new questions to resolve.

The first question is whether interest needs to be included when repaying overpaid withdrawal liability. Imperfect overlap

between the directives of ERISA's statutory language and PBGC regulations creates this problem. 29 U.S.C. § 1103(c)(1), ERISA Section 403(c)(1), requires that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses in administering the plan." 29 U.S.C. § 1103(c)(1). ERISA's anti-inurement provision has certain exceptions, however, including: "In the case of a withdrawal liability payment which has been determined to be an overpayment, [the anti-inurement rule] shall not prohibit the return of such payment to the employer within 6 months after the date of such determination." Id. § 1103(c)(3). "The purpose of the anti-inurement provision, in common with ERISA's other fiduciary responsibility provisions, is to apply the law of trusts to discourage abuses such as self-dealing, imprudent investment, and misappropriation of plan assets, by employers and others." Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 23 (2004). At the same time, PBGC regulation provides that: "If the plan sponsor or an arbitrator determines that payments made in accordance with the schedule of payments established by the plan sponsor have resulted in an overpayment of withdrawal liability, the plan sponsor shall refund the

overpayment, with interest, in a lump sum." 29 C.F.R
§ 4219.31(d). The simultaneous existence of these provisions—one
expressly referencing the payment of interest and the other
conspicuously not—muddies the water.

If interest is owed, the second question is what should be
the applicable rate. PBGC regulation proscribes that a fund must
"credit interest on the overpayment . . . at the same rate as
the rate for overdue withdrawal liability payments, as
established under [29 C.F.R.] § 4219.32 or by the plan pursuant
to [29 C.F.R.] § 4219.33." 29 C.F.R. § 4219.31(d). The question
here, therefore, is whether the Fund authorized an interest rate
at a particular level or if the PBGC default interest rate under
Section 4219.32 is to apply.

The Times avers that payment of interest is necessary
because of the PBGC's promulgations, which have been regularly
followed by federal courts and prevent a potentially
unconstitutional "interest-free loan" from an employer to a fund
by an biased fund trustees prior to any arbitral review. Times'
Mem. 35 (alteration in original) (quoting Huber v. Casablanca
Indus., Inc., 916 F.2d 85, 103 (3d Cir. 1990), abrogated on
other grounds by Milwaukee Brewery Workers' Pension Plan v.

Joseph Schlitz Brewing Co., 513 U.S. 414, 431 (1995) (holding that the "MPPAA calculates its installment schedule on the assumption that interest begins accruing on the first day of the year following withdrawal")). In addition, the Times contends that the PBGC regulation is not contrary to ERISA because the overpaid sums are not plan assets and therefore not covered by the anti-inurement provision. See id.

As to the applicable rate, the Times argues for 18%, pointing to the Section 9.5(b) of the Fund's Trust Agreement, which includes a provision entitled "Default in Payment" and provides: "A delinquent Employer shall be liable for any expenses incurred in effectuating such payment (including . . . interest at a rate of 18 percent per annum or such other interest rate that the Trustees deem appropriate given the circumstances)." Times' Mem. 36 (quoting Times' 56.1 ¶ 28); see also Garfield Decl. Ex. 64 ("Trust Agreement") art. IX. Outside of the Trust Agreement, the Times points to evidence it argues demonstrates a practice by the Fund of using 18%, including several instances when the Fund either informed the Times that payment delinquency incurred 18% per annum interest or sought that rate in litigation with other employers. See Times' Mem. 36; Times' Opp. 19-20.

In response, the Fund argues that it should not have to pay any interest. Pointing to ERISA's language and relying on Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), the Fund contends that ERISA's language unambiguously and "directly" speaks on the issue of interest on overpayment returns, foreclosing the application of interest on such returns and making the PBGC's regulation an impermissible construction of ERISA entitled to no deference. Id. at 842; see Fund's Mem. 38-39. The Fud also rejects the argument that the overpayments are not an asset of the plan, stating that clear ERISA provisions expressly carving out an exception for such repayments foreclose that reading. See Fund's Reply 15-16.

If it owes interest, the Fund argues the Arbitrator's factual findings and determination of 3.5% as the rate should be affirmed. The Fund notes that nothing in the Fund's Trust Agreement that expressly deals with withdrawal liability proscribes an interest rate, observing that Trust Agreement Section 9.10, which deals with withdrawal liability, does not mention interest rates, but that Section 9.4(a), which deals with "the failure of any Employer to make Employer contributions to the Trust Fund," expressly mentions Section 9.5(b), the

provision relied upon by the Times. Trust Agreement art. XI; see Fund's Reply 18. Furthermore, the Fund avers, the evidence adduced in the arbitration demonstrated that, rather than a regular practice of requiring 18%, the Fund has used a variety of rates over the years; to the extent an 18% rate was used, it was either in error, such as with the Times, or as a matter of ERISA statutory requirement necessitating 18% for delinquent contributions. See Fund's Mem. 40; Fund's Reply 19-20.

The Arbitrator first determined that the PGBC regulation did not violate ERISA's anti-inurement rule and, therefore, the Fund needed to pay interest on any repayment to the Times for overpaid withdrawal liability at the same rate a charged for late payment of withdrawal liability. Interim Interest Op. 10; Final Interest Op. 17. The Arbitrator's decision was "assumed" and principally based on the Third Circuit's decision in Huber, which upheld the PGBC rule regarding interest and whose conclusions regarding the interplay between Section 4129.31(d) and the anti-inurement rule has never been overturned or questioned by any other court. Final Interest Op. 17; see Interim Interest Op. 10. Before deciding the applicable rate, however, the Arbitrator permitted additional discovery on Fund to see if the Fund had established a withdrawal liability

61

interest rate either by policy or practice. See Interim Interest
Op. 12-13.

Following discovery, the Arbitrator ultimately concluded
that, in the absence of an established rate by the Fund, the set
PBGC rate of 3.25% applied. Final Interest Op. 20-21. The
Arbitrator did not find that the Fund trustees had unanimously
adopted an express interest rate for late withdrawal fees, as
the Arbitrator found required under the Fund's Trust Agreement
Section 6.4(a), based in part on an affidavit submitted by a co-
counsel to the Fund, even while noting that Fund Board meeting
minutes had indicated past discussion about, but no actual vote
on, such a policy.[11] See Interim Interest Op. 10; Final Interest
Op. 10, 18. The Arbitrator also rejected the Times' argument
that Section 9.5 was relevant to withdrawal liability payments,
finding that that provision was part of the Trust Agreement to
address employer contributions and, significantly, neither made
a specific reference to withdrawal liability nor included a
general statement as to "any payment" of an employer when
discussing interest rates. Interim Interest Op. 10-11. As to any

[11] Fund Trust Agreement Section 6.4(a) provides: "All action
of the Board shall be taken by unanimous vote of the Trustees,
as hereinafter provided. When voting, the Employer Trustees, as
a unit, shall each have one vote. All action by the Board shall
be by unanimous vote of the two units." Trust Agreemen art. XI.

established practice or policy, the Arbitrator reviewed
different instances of the Fund seeking interest on late
withdrawal liability and found that the Fund had, on differing
occasions, used a 0% rate, 3.25% rate, 5% rate, and 18% rate.
Final Interest Op. 6-9, 19-20. After reviewing the marshalled
evidence, the Arbitrator found that "the Fund has had a practice
of assessing interest on late payments of withdrawal liability
and contributions at a rate substantially below 18% and very
close to the prevailing PBGC rate if payments were made for the
Fund to initiate litigation." Final Interest Op. 20.

    The first issue—whether interest is to be applied at all—
requires resolution of a purely legal question. Namely, what is
to be made of the PBGC's promulgated regulation interpreting
ERISA in the context of ERISA's anti-inurement provision? While
not binding, the Third Circuit's opinion in Huber is
informative, as the court there faced the same issue as
presented here. In Huber, the court determined that Congress had
intended to consider overpayment funds part of a plan's assets,
and that the absence of discussing interest in Section
1103(c)(1), when Congress had included interest in other ERISA
provisions, indicated the statute itself barred interest. See
Huber, 916 F.2d at 101-02. However, as ERISA also required

employers to pay assessed withdrawal liability upfront and only later dispute the payments before a neutral arbitrator to potentially recoup its monies—a "draconian interim payment procedure"—not applying the PBGC regulation would permit, "in effect[,] an interest free loan" to a fund. Id. at 102. Striking down the application of the anti-inurement clause with regard to interest on overpayments of withdrawal liability was, to that court, "the least intrusive means of adjusting the statute to preserve its constitutionality." Id.

The analysis in Huber and its outcome is adopted. While philosophically brow-raising to construe an employer's overpayments as part of the plan's assets, the language of Section 1103(c) indicates that Congress intended overpayments to be treated as such.[12] Had Congress not envisioned overpayments on withdrawal liability to be part of the plan's assets, there would have been no reason to have expressly included a carve-out

_____

[12]     Put another way, if monies were assessed and charged to an employer by a fund, but later found to be collected improperly, it is curious to view those contested sum, under the law, as already subsumed by monies in the fund whose "exclusive purpose[ ]" is to benefit participants in the plan, as opposed to still the property of the employer, or perhaps, even, nobodies. 29 U.S.C. § 1103(c)(1). Of course, possession is nine-tenths of the law. Regardless, the statute is clear on this point and, naturally, controls, philosophical disagreements be they as they may.

for such sums. See 29 U.S.C. § 1103(c)(3). The anti-inurement provision is therefore appropriately applied here.

Unlike the Huber court's reading, however, it is not clear that the absence of an explicit provision to provide interest in the withdrawal liability section is so "telling" as to itself bar such interest payments. Huber, 916 F.2d at 101 (citation omitted). As the Times notes, the Supreme Court has "since 1933 . . . consistently acknowledged that a monetary award does not fully compensate for an injury unless it includes an interest component." Kansas v. Colorado, 533 U.S. 1, 10 (2001) (collecting cases). This principle is as judicially established as it intuitively proper. Given this backdrop, ERISA's statutory language is best read as "silent" on the specific issue of interest, at which point the "question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. The PBGC regulation, which unobtrusively fills this statutory silence, is certainly such a reasonable construction.

Whether ERISA is ambiguous, and the PBGC regulation is applied, or is clear, and normally would not, in the present instance, however, is a distinction without a difference. The

PBGC regulation must be applied because, were ERISA's statute to be all there is, "the employer may deprived of (and the trustees allowed) the use of a considerable sum for a substantial period of time." Huber, 916 F.3d at 102. Such an arrangement only avoids constitutional due process concerns "so long as an employer has not been forced to overpay." Id.

The Fund is wrong to claim that the concerns raised by the Huber court—concerns regarding ensuring procedural safeguards against self-interested fund trustees—were resolved by the Supreme Court's decision in Concrete Pipe. As discussed above, the Concrete Pipe Court discussed at length the ways in which review by a neutral arbitrator would alleviate due process concerns created by various statutory presumptions favoring a fund's trustees. See supra at 39-41. However, sidestepping constitutional concerns with regard to presumptions of correctness does not address, and does not resolve, the risk of statutorily permitting interest-free loans to funds at the expense of employers. Review by a neutral arbitrator is not a panacea: while certainly a check on the risk of potentially abusive trustees, it nevertheless remains true that the "harm caused by the biased decisionmaker is alleviated" only when an improperly assessed payment is returned in a form that does not

amount to an "interest-free loan." Huber, 916 F.2d at 103. This
is acutely true in a regime known amongst the courts as a "pay
now-fight later" system. See, e.g., Amalgamated Lithographers of
Am. v. Unz & Co. Inc., 670 F. Supp. 2d 214, 222 (S.D.N.Y. 2009).
Procedural due process and fair adjudication require a balance
to exist where there is no incentive to manipulate ERISA's rules
and the system does not deprive a party of property without the
opportunity for complete compensation down the line. See id. at
102 (citing First English Evangelical Lutheran Church v. Cnty.
of L.A., 482 U.S. 304, 318-19 (1987)) ("[T]he difference between
permanent and temporary loss of the use of property is a matter
of degree, not of kind.").

    This Court is not the first to reach this conclusion, even
in the wake of Concrete Pipe—including, notably, the Third
Circuit. See Bd. of Trs. of Trucking Emps. of N. Jersey Welfare
Fund, Inc.-Pension Fund v. Kero Leasing Corp., 377 F.3d 288, 304
& n.18 (3d Cir. 2004) ("We are not persuaded that our conclusion
in Huber regarding payment of interest was dealt a fatal blow by
the Supreme Court's decision in Concrete Pipe."); accord Mary
Helen Coal Corp. v. Hudson, 235 F.3d 207, 214 (4th Cir. 2000)
(addressing Coal Act payment obligation claims, which the court
held were treated like "an obligation to pay withdrawal

liability under [Title IV of ERISA]," citing Huber approvingly, and holding that "[g]iven the pay first, dispute later framework, adopting the Trustees' interpretation of the anti-inurement clause would expose 'serious constitutional defects' in the application of the provision"). Thirty years after Huber, applying 29 C.F.R § 4219.31(d) as a patch that remains the "least intrusive" way to resolve this ERISA issue. Huber, 916 F.2d at 102. Accordingly, the Fund owes the Times interest on repayments of overpaid withdrawal liability.

Given that the Times is owed interest on such overpayments, the rate of interest needs to be determined. The Arbitrator answered by concluding the applicable PBGC rate applied because the Fund had not adopted a set policy, either by statute or practice. See Final Interest Op. 18, 20; see also 29 C.F.R. § 4219.31(d). That conclusion is upheld.

First, the Arbitrator was correct when he construed that the 18% per annum interest rate established by Section 9.5 of the Trust Agreement, the section entitled "Default in Payment," applies only to late contributions by employers. See Interim Interest Op. 8. The Arbitrator's conclusions with regard to the Trust Agreement's provisions looked solely at the contract and,

therefore, should be reviewed as a question of law. See Interim
Interest Op. 10-11.

Trust Agreement Article Nine may be entitled "Payments to
the Fund," but that does not mean that every subsection
provision must necessarily bleed into the others. Trust
Agreement art. IX. Looking at the agreement, Subsection 9.5(b)
is nestled between provisions that discuss what happens when an
employer fails to make a contribution to the Fund, see id.
§ 9.4, and permitted enforcement actions by the Fund when an
employer fails to make required contributions, see id. § 9.6;
directly above Section 9.5(b) is Section 9.5(a), which discusses
the Fund's Board's authority to take action to pursue collection
of employer contributions, see id. § 9.5(a). Discussion of
withdrawal liability is at the very end of the section and
focuses on the process for arbitrating disputes over withdrawal
liability. See id. § 9.10. Section 9.10 does not discuss
interest rates or details about payments of any sort. See id.
Grafting the interest rate written in the context of and meant
to be applied to delinquent payments by employers onto a section
that discusses which offices of the AAA should hear cases and
under which state's laws those cases should be heard is not the

most "natural reading" of the Trust Agreement. Shepherd, 662
F.3d at 607; see generally Trust Agreement art. IX.

The Arbitrator's factual finding that the Fund had no
policy or practice applying 18% to overdue withdrawal liability
payments is similarly upheld. Final Interest Op. 20-21. The
Times points to instances, both as to itself and in prior
litigations involving the Fund, where the Fund used 18% as the
applicable interest rate for withdrawal liability.[13] As described
above, the arbitration's discovery also revealed, and the Fund
presented to the Arbitrator, other instances when the Fund
applied interest rates to delinquent withdrawal liability
payment sat rates not 18%, and which ranged from 0% to 5%.
Evidence from the Fund's Board meetings pulled in both
directions: the Fund trustees indicated at one meeting that
withdrawal liability interest rates should be the same as for

---

[13]    The Times also contends that because the Fund argued in
briefings for prior legal proceedings for an 18% rate, the Fund
is bound by that position under the doctrine of judicial
estoppel. See Times' Mem. 38 (citing Bates v. Long Island R.
Co., 997 F.2d 1028, 1037 (2d Cir. 1993)). The Fund's
explanation—that those prior lawsuits required an 18% interest
rate pursuant to ERISA Section 4301(b), which provides that
withdrawal liability be treated like delinquent contributions—
sufficiently supports the position that the Fund's posture in
those instances was different than here, where an interest rate
needed to have been established by the Fund to be applicable but
was not. See Fund's Reply 20.

delinquent contributions, but also that the trustees chose not
to adopt a rule that explicitly relates to withdrawal liability.
Final Interest Op. 10-11.

It is sufficient to observe that it has not been
established by a preponderance of the evidence that the
Arbitrator's finding was wrong.[14] For a plan to establish an
applicable withdrawal liability rate, it needed to be pursuant
to 29 C.F.R. § 4219.33. See 29 C.F.R. § 4219.31(d). To accord
with that provision, any rule adopted by the Fund needed
generally to "operate and be applied uniformly with respect to
each employer." Id. § 4219.33. The Arbitrator did not find a
"consistently applied" rate, and the facts adduced at the
arbitration could reasonably support that finding. Final
Interest Op. 20. While some evidence pulled in the opposite
direction, the possibility of a difference of opinion is not
enough to rebut the Arbitrator's conclusion. See Sigmund Cohn
Corp., 804 F. Supp. at 493; Mangan v. Owens Truckmen, Inc., 715

---

[14]    In other words, the Court need not determine whether it was
appropriate for the Arbitrator, after determining that there was
no formal adoption by the Fund of an interest rate for
withdrawal liability, to then proceed to look for a "de facto
policy" by the Fund. Final Interest Op. 19; see Interim Interest
Op. 11 (appearing to require the Fund to use the same rate
established at its practice for assessing interest on delinquent
withdrawal liability payments as for refunding overpayments as a
matter of equity).

F. Supp. 436, 439 (E.D.N.Y. 1989) (citation omitted) ("Title 29 U.S.C. § 1401(c) 'represents a considered decision by Congress that district courts not be authorized to second-guess arbitrators' decisions.'"). Accordingly, the Arbitrator's decision to apply the applicable PBGC rate of 3.25% interest on the refunded overpayments is affirmed.

**Conclusion**

For the foregoing reasons, the Times and Fund's cross-motions for summary judgment are granted in part and denied in part.

Submit judgment on notice.

It is so ordered.

**New York, NY**
**March 26, 2018**

ROBERT W. SWEET
**U.S.D.J.**